**No. 22-5807**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

————————————

STATE OF TENNESSEE, et al.,

Plaintiffs-Appellees,

v.

DEPARTMENT OF EDUCATION, et al.,

Defendants-Appellants.

————————————

On Appeal from the United States District Court
for the Eastern District of Tennessee, No. 3:21-cv-00308 (Atchley, J.)

————————————

### BRIEF FOR APPELLANTS

————————————

BRIAN M. BOYNTON
  *Principal Deputy Assistant*
  *Attorney General*

CHARLES SCARBOROUGH
JACK STARCHER
DAVID PETERS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7515*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue, NW*
  *Washington, DC 20530*
  *(202) 514-8877*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF JURISDICTION .............................................................. 1

STATEMENT OF THE ISSUES .............................................................. 1

STATEMENT OF THE CASE ................................................................. 2

    A.    Statutory Background ................................................................. 2

    B.    Agency Responses to *Bostock* ..................................................... 6

    C.    District Court Proceedings ......................................................... 9

SUMMARY OF ARGUMENT ................................................................. 15

STANDARD OF REVIEW .................................................................. 20

ARGUMENT .......................................................................... 20

I.    The States Lack Standing .............................................................. 20

II.    The States' Claims Are Not Reviewable. ........................................ 36

    A.    The Challenged Documents Are Not Final Agency Action. ................................................................. 36

    B.    The States Have an Adequate Alternative Remedy that Forecloses Pre-Enforcement Review Now ........................... 42

    C.    The States' Challenge to Education's Documents is Independently Barred Under *Thunder Basin*. ..................... 44

III.    The District Court Erred by Granting a Preliminary Injunction ........................................................................ 46

B.     The States Failed To Show that the Remaining Factors Favor Preliminary Relief. ...................................................... 55

C.     The Preliminary Injunction Is Overbroad. ........................... 59

CONCLUSION ........................................................................................ 63

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                **Page(s)**

*Air Brake Sys. Inc. v. Mineta,*
  357 F.3d 632 (6th Cir. 2004) ................................................................. 42

*Alfred L. Snapp & Son v. Puerto Rico,*
  458 U.S. 592 (1982) ................................................................................ 10

*A.M. ex rel. E.M. v. Indianapolis Pub. Sch.,*
  2022 WL 2951430 (S.D. Ind. July 26, 2022),
  *appeal docketed*, No. 22-2332 (7th Cir. July 27, 2022) ........... 30, 36, 39

*Arizona v. Biden,*
  40 F.4th 375 (6th Cir. 2022) ................................... 22, 26, 27, 37, 38, 40

*B.P.J. v. West Virginia State Bd. of Educ.,*
  550 F. Supp. 3d 347 (S.D. W. Va. 2021) ................................... 30, 36, 39

*Baker v. Adams Cty./Ohio Valley Sch. Bd.,*
  310 F.3d 927 (6th Cir. 2002) ................................................................. 57

*Barnes v. City of Cincinnati,*
  401 F.3d 729 (6th Cir. 2005) ................................................................. 55

*Bays v. City of Fairborn,*
  668 F.3d 814 (6th Cir. 2012) ................................................................. 47

*Beamon v. Brown,*
  125 F.3d 965 (6th Cir. 1997) ................................................................. 42

*Bennett v. Spear,*
  520 U.S. 154 (1997) ................................................................................ 36

*Bostock v. Clayton County,*
  140 S. Ct. 1731 (2020) ........................................... 1, 6, 12, 53, 54, 57, 58

*Bowen v. Massachusetts,*
    487 U.S. 879 (1988) ............................................................... 45

*Califano v. Yamasaki,*
    442 U.S. 682 (1979) ............................................................... 60

*Cameron v. EMW Women's Surgical Ctr., P.S.C.,*
    142 S. Ct. 1002 (2022) ........................................................... 28

*Cement Kiln Recycling Coal. v. EPA,*
    493 F.3d 207 (D.C. Cir. 2007)................................................. 38

*Chisholm v. St. Marys City Sch. Dist. Bd. of Educ.,*
    947 F.3d 342 (6th Cir. 2020) ................................................. 53

*Chrysler Corp. v. Brown,*
    441 U.S. 281 (1979) ............................................................... 49

*City of Pontiac Retired Emps. Ass'n v. Schimmel,*
    751 F.3d 427 (6th Cir. 2014) ................................................. 20

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ................................................... 32, 34, 35

*Colorado v. Toll,*
    268 U.S. 228 (1925) ............................................................... 28

*Dodds v. U.S. Dep't of Educ.,*
    845 F.3d 217 (6th Cir. 2016) .......................... 25, 55, 58, 59, 61

*EEOC v. R.G. & G.R. Harris Funeral Homes,*
    884 F.3d 560 (6th Cir. 2018) ............................... 6, 25, 55, 61

*Feller v. Brock,*
    802 F.2d 722 (4th Cir. 1986) ................................................. 62

*First Nat'l Bank of Lexington v. Sanders,*
    946 F.2d 1185 (6th Cir. 1991) ............................................... 48

*Flue-Cured Tobacco Coop. Stabilization Corp v. U.S. EPA,*
    313 F.3d 852 (4th Cir. 2002) .....................................................40, 41, 42

*Garcia v. Vilsak,*
    563 F.3d 519 (D.C. Cir. 2009).........................................................42, 43

*Gebser v. Lago Vista Indep. Sch. Dist.,*
    524 U.S. 274 (1998) ............................................................................. 5

*Grimm v. Gloucester Cty. Sch. Bd.,*
    972 F.3d 586 (4th Cir. 2020) as amended (Aug. 28, 2020),
    *reh'g en banc denied,* 976 F.3d 399 (4th Cir.),
    *cert. denied,* 141 S. Ct. 2878 (2021) ........................................25, 55, 61

*Hoctor v. U.S. Dep't of Agric.,*
    82 F.3d 165 (7th Cir. 1996) ............................................................... 48

*Ivan v. Kent State Univ.,*
    92 F.3d 1185 (6th Cir. 1996) ............................................................. 34

*Jama v. Department of Homeland Sec.,*
    760 F.3d 490 (6th Cir. 2014) ............................................................. 40

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) .....................................................................21, 35

*Massachusetts v. Mellon,*
    262 U.S. 447 (1923) ........................................................................... 27

*Midwest Media Prop., LLC v. Symmes Twp.,*
    503 F.3d 456 (6th Cir. 2007) ............................................................. 31

*Munaf v. Geren,*
    553 U.S. 674 (2008) ........................................................................... 47

*New Motor Vehicle Bd. v. Orrin W. Fox Co.,*
    434 U.S. 1345 (1977) ......................................................................... 59

v

*Occidental Life Ins. Co. of Cal. v. EEOC*,
   432 U.S. 355 (1977) ................................................................. 4

*Ohio ex rel. Celebreeze v. U.S. Dep't of Transp.*,
   766 F.2d 228 (6th Cir. 1985) ................................................. 28

*Overstreet v. Lexington-Fayette Urban Cty. Gov't*,
   305 F.3d 566 (6th Cir. 2002) ................................................ 55

*Parsons v. U.S. Dep't of Justice*,
   878 F.3d 162 (6th Cir. 2017) ............................... 39, 40, 41, 42

*Pelcha v. MW Bancorp, Inc.*,
   988 F.3d 318 (6th Cir. 2021) ................................................ 12

*Perez v. Mortg. Bankers Ass'n*,
   575 U.S. 92 (2015) ................................................... 48, 50, 52

*Platt v. Board of Comm'rs on Grievances & Discipline of
   Ohio Supreme Court*,
   769 F.3d 447 (6th Cir. 2014) ................................................ 32

*Rhea Lana, Inc. v. Department of Labor*,
   824 F.3d 1023 (D.C. Cir. 2016) ............................................ 38

*R.K. ex rel. J.K. v. Lee*,
   __ F.4th __, 2022 WL 17076105 (6th Cir. Nov. 18, 2022) .............. 31, 35

*Roberts v. Colorado State Bd. of Agric.*,
   998 F.2d 824 (10th Cir. 1993) .............................................. 58

*Rochester Tel. Corp. v. United States*,
   307 U.S. 125 (1939) ............................................................. 40

*Rogers v. Bennett*,
   873 F.2d 1387 (11th Cir. 1989) ............................................ 46

*Sackett v. EPA,*
    566 U.S. 120 (2012) ............................................................... 43

*School of the Ozarks v. Biden,*
    41 F.4th 992 (8th Cir. 2022) .................................................. 51

*Shalala v. Guernsey Mem'l Hosp.,*
    514 U.S. 87 (1995) ................................................................. 49

*Silver Sage Partners, Ltd. v. City of Desert Hot Springs,*
    251 F.3d 814 (9th Cir. 2001) .................................................. 58

*Smith v. City of Salem,*
    378 F.3d 566 (6th Cir. 2004) ........................................... 55, 61

*Steele v. Bulova Watch Co.,*
    344 U.S. 280 (1952) .............................................................. 61

*Stenberg v. Cheker Oil Co.,*
    573 F.2d 921 (6th Cir.1978) .................................................. 60

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) .............................................................. 32

*Taylor v. Cohen,*
    405 F.2d 277 (4th Cir. 1968) ................................................. 46

*Texas v. EEOC,*
    933 F.3d 433 (5th Cir. 2019) ................................................. 51

*Texas v. EEOC,*
    No. 2:21-CV-194-Z, 2022 WL 4835346 (N.D. Tex. Oct. 1, 2022) .......... 8

*Texas v. United States,*
    787 F.3d 733 (5th Cir. 2015) ................................................. 28

*Thunder Basin Coal Co. v. Reich,*
    510 U.S. 200 (1994) ..................................... 11, 17, 44, 45, 46

*TransUnion LLC v. Ramirez,*
  141 S. Ct. 2190 (2021) ................................................................. 20, 21

*United Food & Commercial Workers Union, Local 1099 v.*
  *Southwest Ohio Reg'l Transit Auth.,*
  163 F.3d 341 (6th Cir. 1998) ............................................................. 59

*United States v. AMC Entm't, Inc.,*
  549 F.3d 760 (9th Cir. 2008) ............................................................. 61

*Universal Life Church Monastery Storehouse v. Nabors,*
  35 F.4th 1021 (6th Cir. 2022) ............................................................ 20

*Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1*
  *Bd. of Educ.,*
  858 F.3d 1034 (7th Cir. 2017) ................................................. 25, 55, 61

*White v. Baxter Healthcare Corp.,*
  533 F.3d 381 (6th Cir. 2008) ............................................................. 33

*Whitmore v. Arkansas,*
  495 U.S. 149 (1990) ......................................................................... 32

*Whole Woman's Health v. Jackson,*
  142 S. Ct. 522 (2021) ................................................................. 21, 29

*Winter v. National Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ............................................................................ 47

**Statutes:**
5 U.S.C. § 551(4) ............................................................................... 49

5 U.S.C. § 553 ............................................................................. 48, 49

5 U.S.C. § 704 ............................................................................. 11, 36

20 U.S.C. § 1234g(a) ............................................................................ 6

20 U.S.C. § 1681(a) ............................................................... 4

20 U.S.C. § 1682 ............................................. 4, 5, 11, 17, 45, 51

20 U.S.C. § 1683 .................................................. 6, 11, 17, 45

28 U.S.C. § 1292(a)(1) ........................................................... 1

28 U.S.C. § 1331 .................................................................... 1

30 U.S.C. § 801 *et seq.* ........................................................ 46

42 U.S.C. § 2000e-2(a)(1) ...................................................... 2

42 U.S.C. § 2000e-2(a)(2) ...................................................... 3

42 U.S.C. § 2000e-5(b) ...................................................... 3, 33

42 U.S.C. § 2000e-5(f)(1) ...................................... 3, 4, 33, 50-51

**Regulations:**

34 C.F.R. § 100.7(a) .............................................................. 5

34 C.F.R. § 100.7(b) .......................................................... 5, 34

34 C.F.R. § 100.7(c) .......................................................... 5, 34

34 C.F.R. § 100.7(d) .......................................................... 5, 34

34 C.F.R. § 100.8(a) .......................................................... 5, 34

34 C.F.R. § 106.81 ................................................................ 5

**Agency Decisions**

*Baldwin v. Dep't of Transp.*,
   EEOC Appeal No. 0120133080 (July 15, 2015) ....................................7

*Lusardi v. Dep't, of the Army*,
   EEOC Appeal No. 0120133395 (Apr. 1, 2015) ....................................7

*Macy v. Dep't of Justice*
   EEOC Appeal No. 0120120821 (Apr. 20, 2012) ....................................7

**Other Authority:**

EEOC, *EEOC Litigation Statistics, FY1997 through FY2021*,
   https://perma.cc/R4RQ-PP5M ..................................................................4

## STATEMENT REGARDING ORAL ARGUMENT

The district court's decision entering a preliminary injunction against the Equal Employment Opportunity Commission, the Department of Education, and the Department of Justice raises important questions about state standing, reviewability under the Administrative Procedure Act, and the procedural requirements of the Administrative Procedure Act. Because it would assist the Court in resolving each of those questions, the United States requests that the Court hold oral argument.

## STATEMENT OF JURISDICTION

The plaintiff States invoked the district court's jurisdiction under 28 U.S.C. § 1331, but the district court's jurisdiction is contested. *See infra* Part I (arguing that plaintiffs lacked standing). The court entered its order granting in part and denying in part the plaintiff States' motion for preliminary injunction on July 15, 2022. Op. 46, R. 86, Page ID # 1987. The United States filed a timely notice of appeal on September 13, 2022. Notice of Appeal, R. 100, Page ID # 2407. This Court has statutory jurisdiction over the appeal under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

This case concerns a pre-enforcement challenge brought by 20 plaintiff States seeking to enjoin implementation of interpretive documents issued by the Equal Employment Opportunity Commission (EEOC) and the Department of Education (Education) in the wake of the Supreme Court's decision in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020). Those documents explain that the agencies interpret prohibited sex discrimination (under Title VII and Title IX respectively) to include discrimination based on sexual orientation or gender identity. The questions presented are:

1.    Whether the States have standing to support a pre-enforcement challenge to the agencies' documents.

2.    Whether the challenged documents constitute reviewable "final agency action" for purposes of review under the Administrative Procedure Act (APA).

3.    Whether the district court abused its discretion in granting a preliminary injunction where the States failed to show a likelihood of success on the merits of their APA notice-and-comment claim and failed to show that the balance of equities weighs in favor of preliminary relief.

4.    Whether the preliminary injunction granted is overbroad.

## STATEMENT OF THE CASE

### A.    Statutory Background

1.    Title VII of the Civil Rights Act of 1964 prohibits employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e-2(a)(1). Title VII also forbids an employer from "limit[ing], segregat[ing], or classify[ing] ... employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise

2

adversely affect his status as an employee, because of such individual's

... sex." *Id.* § 2000e-2(a)(2).  EEOC is tasked with implementing those

statutory prohibitions.

Although EEOC may bring enforcement actions against private

employers, Title VII does not authorize EEOC to bring enforcement

actions against states.  *See* 42 U.S.C. § 2000e-5(f)(1).  If EEOC receives a

charge claiming that an individual is aggrieved by an unlawful

employment practice by a state employer, EEOC will investigate that

charge.  *Id.* § 2000e-5(b).  After completing the investigation, EEOC will

decide whether there is reasonable cause to believe that the charge is

true.

If EEOC does not find reasonable cause, it will dismiss the charge

and issue a right-to-sue notice to the complaining employee or applicant.

42 U.S.C. § 2000e-5(f)(1).  If EEOC finds that there *is* reasonable cause

to believe that the charge is true, then the agency must "endeavor to

eliminate any such alleged unlawful employment practice by informal

methods of conference, conciliation, and persuasion."  *Id.*  If conciliation

fails with respect to a charge involving a State employer, EEOC must

refer the matter to the Department of Justice (DOJ) to decide whether to

bring an enforcement action or instead issue a right-to-sue notice. *Id.* § 2000e-5(f)(1).

Even as to private employers, EEOC has no authority to impose penalties but can instead only bring enforcement actions seeking damages in federal court. *See Occidental Life Ins. Co. of Cal. v. EEOC*, 432 U.S. 355, 363 (1977). And EEOC has limited resources, so in practice brings enforcement actions in only a small number of cases. *See* EEOC, *EEOC Litigation Statistics, FY1997 through FY2021*, https://perma.cc/R4RQ-PP5M. Thus, most Title VII suits are private actions.

2. Title IX prohibits discrimination on the basis of sex in federally funded education programs and activities. 20 U.S.C. § 1681(a). The statute authorizes and directs Education "to effectuate the provisions of section 1681 … by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute." *Id.* § 1682. Title IX is enforced in two ways: (1) through civil actions by private parties directly against recipients of federal financial assistance; and (2) through administrative actions that can, if voluntary compliance is not reached, result in a termination of

funding to educational programs or a request to DOJ to initiate other legal action. *See id.*; *see also Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 288 (1998).

In enforcing Title IX, Education's investigations typically begin with a complaint from a private party (though Education also has authority to initiate investigations on its own). 34 C.F.R. § 100.7(a), (b) (incorporated by 34 C.F.R. § 106.81). Education generally must investigate any complaint that indicates a "possible failure to comply" with Title IX. *Id.* § 100.7(c). If the investigation finds a "failure to comply," Education must attempt to secure voluntary compliance through informal means. *Id.* § 100.7(d)(1). If such efforts fail, Education will make a written finding that the recipient is in violation of Title IX and then, if further attempts at voluntary resolution are not successful, must either refer the matter to DOJ with a recommendation that appropriate proceedings be brought to enforce Title IX or begin administrative proceedings to suspend or terminate federal financial assistance. *Id.* §§ 100.7(d), 100.8(a). A final decision resulting from the agency's administrative proceedings to suspend or terminate financial

assistance is subject to judicial review in the court of appeals for the circuit in which the recipient is located.  20 U.S.C. §§ 1683, 1234g(a).

3.     In *Bostock v. Clayton County*, 140 S. Ct. 1731, 1744 (2020), the Supreme Court held that discrimination on the basis of sexual orientation or transgender status is necessarily discrimination "because of sex" under Title VII.  That decision affirmed, sub nom, this Court's decision in *EEOC v. R.G. & G.R. Harris Funeral Homes*, 884 F.3d 560 (6th Cir. 2018), which also held that Title VII prohibits discrimination based on transgender status.  The Supreme Court reasoned that "[a]n employer who fires an individual for being homosexual or transgender fires that person for traits or actions it would not have questioned in members of a different sex."  *Bostock*, 140 S. Ct. at 1737.  Because "[s]ex plays a necessary and undisguisable role in the decision," the Court held that such discrimination is prohibited by the plain text of Title VII.  *Id.*

**B.     Agency Responses to *Bostock***

In June 2021, EEOC issued a Technical Assistance Document titled "Protections Against Employment Discrimination Based on Sexual Orientation or Gender Identity."  Compl. Ex. D, R. 1-5, Page ID # 76-86.  That document made clear that it "does not have the force and effect of

law and is not meant to bind the public in any way," and that it instead was "intended only to provide clarity to the public regarding existing requirements under the law." *Id.* It describes the facts and holding of the Supreme Court's decision in *Bostock* and "explains the [EEOC's] established legal positions on LGBTQ+ related matters, as voted by the Commission." *Id.*, R. 1-5, Page ID # 77-78.[1] Those longstanding EEOC positions include, as relevant here, that (1) prohibiting an employee from dressing consistent with their gender identity would constitute sex discrimination, (2) while employers may generally have separate sex-segregated bathrooms, EEOC has "taken the position that employers may not deny an employee equal access to a bathroom … that corresponds to the employee's gender identity" and (3) intentional and repeated use of pronouns or names inconsistent with an employee's

---

[1] In particular, the document cites the Commission's positions as established in *Macy v. Dep't of Justice*, EEOC Appeal No. 0120120821 (Apr. 20, 2012), *Lusardi v. Dep't, of the Army*, EEOC Appeal No. 0120133395 (Apr. 1, 2015), and *Baldwin v. Dep't of Transp.*, EEOC Appeal No. 0120133080 (July 15, 2015).

gender identity could contribute to a hostile work environment."[2]  *Id.*, R. 1-5, Page ID # 81-82.

Also in June 2021, Education published in the Federal Register a Notice of Interpretation (NOI) "to clarify [its] enforcement authority over discrimination based on sexual orientation and discrimination based on gender identity under Title IX … in light of the Supreme Court's decision in *Bostock*."  Compl., Ex. A, R. 1-2, Page ID # 42.  The NOI explained that the interpretation would guide Education in processing complaints and conducting investigations, but that "it does not itself determine the outcome in any particular case or set of facts."  *Id.*  The next day Education issued a "Dear Educator" letter highlighting its interpretation of Title IX as explained in the NOI.  Compl., Ex. C, R. 1-4, Page ID # 71-72.  The letter noted that, consistent with the NOI, Education "will fully enforce Title IX to prohibit discrimination based on sexual orientation

---

[2] In October 2022, a federal district court issued a final judgment declaring this document unlawful, vacating it, and setting it aside in *Texas v. EEOC,* No. 2:21-CV-194-Z, 2022 WL 4835346 (N.D. Tex. Oct. 1, 2022).  In light of that now-final ruling, there is no longer a live controversy regarding whether this document is valid, and the district court no longer has jurisdiction over the States' claims against EEOC. This Court should therefore vacate the preliminary injunction as to EEOC and remand with instructions to dismiss the States' claims against EEOC as moot.

and gender identity in education programs and activities that receive Federal financial assistance from [Education]." *Id.* The letter was accompanied by a fact sheet jointly issued by Education and DOJ that provided examples of the types of incidents those agencies can investigate under Title IX, as well as information on how to file complaints. *Id.*, R. 1-4, Page ID # 73-74.

## C.    District Court Proceedings

In August 2021, 20 States filed suit challenging Education's and EEOC's respective informational documents and subsequently filed a motion for preliminary injunction asking the court to enjoin the agencies from enforcing those documents. *See* Compl., R. 1, Page ID # 33-34. On July 15, 2022, the district court denied the agencies' motion to dismiss and issued a preliminary injunction, prohibiting Education, EEOC, and DOJ from "implementing" the challenged documents against the States. Op. 46, R. 86, Page ID # 1987.[3]

1.    The district court first considered and rejected a number of threshold challenges to the States' suit. The court held that the States

---

[3] The States also named DOJ as a defendant because one of the documents challenged was a joint fact sheet issued by Education and DOJ.

9

had established Article III standing because they had alleged a cognizable injury to their "sovereign interest in the 'power to create and enforce a legal code.'" Op. 11, R. 86, Page ID # 1952 (quoting *Alfred L. Snapp & Son v. Puerto Rico*, 458 U.S. 592, 601-602 (1982)). In particular, the court held that the "interpretations of Titles VII and IX" expressed in the challenged documents "directly interfere with and threaten [the States'] ability to enforce their state laws as written," noting that 10 of the States identified laws that "arguably conflict with Defendants' guidance as to the legality of certain conduct related to sexual orientation and gender identity." Op. 12, R. 86, Page ID # 1953.

The district court next held that the challenged documents constitute final agency action reviewable under the APA. Although the documents state that they do not control the outcome on any particular set of facts, the court concluded that the documents were final agency action. As to Education, the court held that the documents were final because they will "dictate[] how [Education] will enforce Title IX going forward and require[] [Education] to investigate and pursue enforcement action against regulated entities, including [the States], when discrimination based on sexual orientation and gender identity is

10

alleged." Op. 28, R. 86, Page ID # 1969. And the court held that EEOC's document is final because it "takes firm positions regarding what Title VII demands of employers" and "invites" individuals to file charges if they believe their rights were violated. Op. 30, R. 86, Page ID # 1971. The court also held that the documents expanded the scope of Title VII and Title IX's anti-discrimination protections in a way that carries legal consequences for employers and educators. *Id.*

In addition, the district court rejected the government's arguments (1) that the States have an adequate remedy in a future enforcement proceeding, which would preclude APA review under 5 U.S.C. § 704, and (2) that the administrative enforcement scheme in Title IX, 20 U.S.C. §§ 1682-1683, precludes pre-enforcement challenges under *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994). Op. 32-34, R. 86, Page ID # 1976-1978.

2.    The district court then turned to the elements necessary to obtain a preliminary injunction. The court first held that the States were likely to succeed on the merits of their claim that the challenged documents are invalid because they are legislative rules that were promulgated without notice and comment. In so holding, the court

11

concluded that the various informational documents are legislative rules because they went beyond the holding of *Bostock* and expressed the agencies' views on various questions that the Supreme Court expressly left open. Op. 42, R. 86, Page ID # 1983. As to Title IX, the court held that Education "improperly expand[ed] the reach of *Bostock*" because "'the Court in *Bostock* was clear'" that it did not prejudge whether its holding would also apply to other anti-discrimination provisions. Op. 40-41, R. 86, Page ID # 1981-1982 (quoting *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021)). As to Title VII, the court held that EEOC also went "beyond the holding of *Bostock*" because the Court in *Bostock* declined to "prejudge" how its holding would apply to "'sex-segregated bathrooms, locker rooms, and dress codes.'" Op. 42, R. 86, Page ID # 1983 (quoting *Bostock*, 140 S. Ct. at 1753). Having found the States were likely to succeed on their notice-and-comment claim, the district court declined to consider the States' other claims.

The district court next found that the remaining equitable factors favored a preliminary injunction. The court concluded that the States faced irreparable harm to their sovereign interests absent an injunction because several of the States have laws that arguably conflict with the

challenged documents, which imposed pressure on the States to alter their laws.  Op. 43-44, R. 86, Page ID # 1984-1985.  On the other side of the ledger, the court found that any harm to the federal government associated with the injunction was outweighed by the harms to the States and found that the public interest lies in the correct "application of the law" and strict adherence to the APA's requirements.  Op. 45-46, R. 86, Page ID # 1985-1987.

Having found that the requirements for a preliminary injunction were satisfied, the district court enjoined the agencies "from implementing the [challenged documents] against [the States]."  Op. 46, R. 86, Page ID # 1987.  However, the court expressly declined to issue a nationwide injunction and clarified that its injunction "should only apply to [the plaintiff States]."  Op. 46 n.18, R. 86, Page ID # 1987.

3.    After the district court issued its decision, the United States filed a "notice of compliance" outlining the conduct the agencies believed was prohibited and the conduct that the agencies believed was still permissible.  The notice explained that "Defendants understand that they have been enjoined from implementing the specific challenged documents against the 20 Plaintiff States."  Notice 2, R. 97, Page ID

13

# 2058.   The agencies therefore explained that they "will not cite, reference, treat as binding, or otherwise rely upon the challenged documents in any investigations of claims or enforcement or administrative actions, if there are any, against [the States]." *Id.* The notice explained, however, that the government does not understand the injunction to prevent the agencies from enforcing Title VII and Title IX against the States generally and that the agencies will continue to investigate any claims brought against the States and "will support their investigations, enforcement, or administrative actions against [the States] (assuming there are any) with statutory text, implementing regulations, case law, and the specific facts and circumstances of each case." *Id.* The notice concluded that "Defendants believe that their understanding of the scope of the Court's injunction as presented in this [n]otice, absent further direction, is consistent with the Court's injunction and its decision to enjoin the guidance documents." Notice 3, R. 97, Page ID # 2059.   The States filed a response to the notice advocating for a broader view of the injunction.   Response to Notice, R. 98, Page ID # 2398-2406.   To date, the district court has not issued further direction in response to the United States' notice.

14

## SUMMARY OF ARGUMENT

1.    The district court erred in holding that the States have established a cognizable Article III injury to their sovereign interest in enacting and enforcing state law.  States can establish standing based on injuries to sovereign interests only when those injuries—like all Article III injuries—are sufficiently direct and concrete.  Here, the challenged documents do not prevent the States from enacting or enforcing any laws. Thus, the States allege only that there is an arguable inconsistency between certain *applications* of a few state laws and the understanding of Titles VII and IX expressed in the agency documents.  That kind of indirect tension is insufficient to create standing.  And even if the States' theory of sovereign injury were viable, the States still lack standing because they cannot show that any tension between state laws and Titles VII and IX is caused by the challenged documents (as opposed to the underlying anti-discrimination prohibitions in the statutes themselves) or redressable by an injunction against those documents.

Nor can the States establish standing based on the fact that they are covered by Title VII (in their roles as employers) and Title IX (in their roles as educators).  Pre-enforcement standing is the exception, not the

norm.  Here, the States cannot show that any enforcement action against them is sufficiently imminent to create a concrete injury.  And again, even if the States could establish injury, they cannot show that any threat of future enforcement is caused by the challenged documents themselves or that enjoining the "implementation" of the documents would redress the States' hypothetical future injuries by preventing the agencies from enforcing the statutes themselves.

2.    Aside from standing, there are at least three additional threshold barriers to judicial review of the States' challenge to the agencies' informational documents.  First, those documents are not "final agency action" within the meaning of the APA.  To constitute final agency action, this Court has made clear that the action must have immediate and direct legal effect, such as imposing liability on a regulated party, creating legal rights, or mandating a certain result in a future proceeding.  The challenged documents do nothing of the sort.  These educational documents only inform the public of the agencies' interpretations of Titles VII and IX following the Supreme Court's decision in *Bostock*.  The documents do not create any rights, they are not enforceable in any way, and they preserve the discretion of both agencies

16

to decide whether particular conduct constitutes unlawful discrimination on a case-by-case basis.

Second, the States have an adequate alternative remedy that forecloses APA review of their pre-enforcement challenge to these agency documents. If either the agencies or an individual attempt to enforce Title VII or Title IX against the States based on the interpretations summarized in the documents, the States would be able, at that time, to present any available defenses, including by challenging the agencies interpretations.

Finally, the States' challenge to Education's documents is independently barred under *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), because Congress provided an elaborate procedural scheme for administrative enforcement proceedings that culminate in the opportunity for judicial review. *See* 20 U.S.C. § 1682 (administrative process); *id.* § 1683 (judicial review). That comprehensive scheme demonstrates that Congress did not intend for pre-enforcement judicial review of Title IX claims.

3.     Even if the States' claims are reviewable, the district court abused its discretion by granting a preliminary injunction because the

States failed to make the necessary showing that they have both a substantial likelihood of success on the merits of their APA notice-and-comment claim and that the remaining injunctive factors weigh in favor of preliminary relief.

a.     On the merits, it is uncontested that notice and comment are only required for legislative rulemakings that, once completed, will have the force and effect of law.   But the challenged documents are not legislative rules.   They have no independent legal effect; they merely explain the agencies' interpretations of the statutory schemes they are entrusted to enforce.   The district court erred in concluding that any agency statement that expresses a view of the law more nuanced or detailed than what is strictly compelled by the text of the statute, as interpreted by binding precedent, is a legislative rule.   Interpretive rules are most useful where, as here, there is uncertainty about the precise meaning of a statutory prohibition.   Announcing to the public how the agency plans to navigate that uncertainty does not constitute legislative rulemaking.   In any event, the district court's reasoning was wrong even on its own terms, as binding precedent from this Circuit compels or at

least strongly supports all of the views expressed in the challenged documents.

b.    The States also failed to show irreparable harm or that the balance of equities weighs in favor of a preliminary injunction here.  For many of the same reasons the States have not established injury in fact, these informational documents cause the States no irreparable harm. And on the other side of the ledger, both the public and the United States have significant interests in allowing the agencies to educate the public about the meaning of Title VII and Title IX.  An injunction that prevents the agencies from educating the public about the government's understanding of those statutes is not in the public interest as it will only sow confusion and uncertainty.

c.    Finally, even if a preliminary injunction were appropriate, the injunction that the district court granted is overbroad.  The plaintiff States include numerous states that did not identify any state laws that even arguably conflict with the challenged documents.  Those States experience no irreparable harm pending final resolution of this lawsuit, and the district court abused its discretion in nevertheless awarding those States preliminary injunctive relief.

19

In addition, the district court abused its discretion in issuing injunctive relief covering States where the positions expressed in the agency documents are supported by binding precedent in the court of appeals in which the state is located. For those States, the district court's injunction reaches outside of its jurisdiction and causes substantial interference with the authority of other federal courts.

## STANDARD OF REVIEW

This Court reviews questions of standing de novo. *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1031 (6th Cir. 2022). In reviewing a district court's decision to grant a preliminary injunction, this Court reviews the question whether the movant is likely to succeed on the merits de novo. *See City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc) (per curiam). The district court's ultimate determination as to whether the preliminary injunction factors weigh in favor of granting a preliminary injunction is reviewed for abuse of discretion. *Id.*

## ARGUMENT

### I. The States Lack Standing.

"The law of Art[icle] III standing is built on a single basic idea—the idea of separation of powers." *TransUnion LLC v. Ramirez*, 141 S. Ct.

2190, 2203 (2021) (quotation omitted). "Under Article III, federal courts do not adjudicate hypothetical or abstract disputes" and "do not exercise general legal oversight of the Legislative and Executive Branches." *Id.* Instead, to establish standing, a plaintiff must prove that (1) it has "suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized[,] and (b) actual or imminent, not conjectural or hypothetical," (2) the injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court," and (3) it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992) (cleaned up).

Standing is particularly difficult to establish in a pre-enforcement challenge like this one. There is no "unqualified right to pre-enforcement review," even for claims raising fundamental constitutional rights. *Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 537-538 (2021). Instead, many statutory and constitutional rights "are as a practical matter asserted typically as defenses," not in "pre-enforcement cases." *Id.* at 538. That is because even in cases raising important rights, courts

may not "disregard the traditional limits on the jurisdiction of federal courts just to see a favored result win the day." *Id.*

1.    The district court held that the States established standing here based on a supposed injury to their sovereign interest in creating and enforcing a legal code.  Op. 10-12, R. 86., Page ID # 1951-1953.  That was error.

To start, the district court wrongly applied cases recognizing that states are sometimes entitled to "special solicitude" in the standing analysis.  Op. 10, R. 86, Page ID # 1951.  Contrary to the district court's suggestion, *see id.*, the mere fact that the plaintiffs here are states does not entitle them to any special treatment in the standing analysis.  To the contrary, Article III's "foundational standing requirements" apply to "private and public litigants alike."  *Arizona v. Biden*, 40 F.4th 375, 385 (6th Cir. 2022).  While the basic constitutional standing requirements remain the same for all parties, "States sometimes are entitled to 'special solicitude' in this area only because they may incur 'quasi-sovereign' injuries that private parties cannot."  *Id.*  Thus, while "States may have more theories of injury available to them, that does not allow them to bypass proof of injury in particular or Article III in general."  *Id.* at 386.

The question, then, is whether the States here adequately alleged an injury to some "quasi-sovereign" interest.  They have not.  This Court and the Supreme Court have repeatedly differentiated between two kinds of sovereign injuries—concrete, actual invasions of sovereign interests (sufficient to confer standing) and abstract questions of political or policy disagreement (insufficient to confer standing).  This case clearly falls into the latter camp.

The States here alleged that the challenged documents impinge on their sovereign interest to create and enforce a legal code.  *See* Compl. ¶¶ 98-99, R. 1, Page ID # 18-20.  In support of that claim, the States pointed to a handful of laws enacted by a few of the States that appear to contemplate or authorize differential treatment based on sex assigned at birth in public education, and therefore "at least arguably conflict with" Education's informational documents.  *Id.*  And the States cite laws from two states that allow employers to provide sex-segregated bathrooms and dressing rooms.  Compl. ¶ 99, R. 1, Page ID # 20 (listing laws from

Oklahoma and West Virginia).[4]  The district court concluded that the

challenged documents "arguably conflict" with those state laws.  Op. 11-

12, R. 86, Page ID # 1952-1953.  And on that basis, the court held that

the States had established that the documents interfered with the States'

sovereignty in a way sufficient to establish an Article III injury.  Op. 12,

R. 86, Page ID # 1953.

The district court erred in concluding that such indirect and

"arguable" conflicts between the challenged documents and a handful of

state laws are sufficient to confer standing to maintain a pre-enforcement

challenge.  The agencies' views do not prevent the States from enacting

or enforcing their laws, and the documents do not (and cannot) preempt

---

[4] The majority of the provisions the States cite in their complaint appear to have nothing to do with the challenged documents.  For example, Tennessee cites one law that protects students' rights to "[e]xpress religious viewpoints in a public school" and another stating that Tennessee is "committed to giving students the broadest possible latitude to speak, write, listen, challenge, learn, and discuss any issue" and that "no faculty will face adverse employment action for classroom speech."  Compl. ¶ 98, R. 1, Page ID # 18-19.  The States also cite several laws that generally allow for sex-separated locker rooms and bathrooms with no indication how these laws should apply to people who are transgender.  *See* Compl. ¶¶ 98-99, R. 1, Page ID # 18-20.  And the States cite a number of laws that generally protect religious liberty in the workplace or at institutions of higher education.  *Id.*  Neither the States nor the district court ever explained how the challenged documents call into question or conflict with any of those provisions.

24

any state law. Nor do the documents themselves prohibit any conduct. The documents make clear that they are merely expressing the agencies' understanding of the prohibitions against sex discrimination in Title VII and Title IX—prohibitions that this Court and others have held encompass discrimination against transgender people. *See EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.,* 884 F.3d 560, 577 (6th Cir. 2018) (holding that Title VII both "protects transgender persons because of their transgender or transitioning status" and prohibits discrimination against transgender people based on application of sex-specific policies based on sex assigned at birth); *Dodds v. U.S. Dep't of Educ.,* 845 F.3d 217, 221-222 (6th Cir. 2016) (per curiam) (holding that school district that sought to exclude transgender girl from girls' restroom was not likely to succeed on the claim because Title IX prohibits discrimination based on sex stereotyping and gender nonconformity); *see also Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020), as amended (Aug. 28, 2020), *reh'g en banc denied*, 976 F.3d 399 (4th Cir.), *cert. denied*, 141 S. Ct. 2878 (2021); *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.,* 858 F.3d 1034 (7th Cir. 2017).

Moreover, the documents do not purport to prejudge any particular case. *See infra* p. 37.  Nor do they indicate that sex-separated bathrooms, dress codes, or sports teams are per se unlawful under Title VII or Title IX.  Instead, the documents explain the agencies' views that particular *applications* of those kinds of policies can, in some circumstances, provide the basis for a viable sex discrimination claim.  Thus, the States' claim of injury boils down to a contention that the documents indicate that the agencies may view certain conduct that is arguably allowed under certain state laws to constitute unlawful discrimination under federal law.

Contrary to the district court's holding, that kind of potential "conflict between … state laws" and non-binding agency documents, Op. 12, R. 86, Page ID # 1953, is not the kind of concrete, actual invasion of a sovereign interest sufficient to confer standing.  This Court's recent decision in *Arizona v. Biden*, 40 F.4th 375 (6th Cir. 2022), is instructive.  There, the Court explained that the "special solicitude" that states enjoy in establishing standing is limited to cases where the state asserts certain direct injuries to concrete sovereign interests.  As in this case, the states in *Arizona* did "not protest regulation of them as States or preemption of local lawmaking authority."  40 F.4th at 386.  And they did

"not involve the 'classic' sovereign case, 'public nuisances,' in which a State invokes a desire 'to safeguard its domain and its health, comfort and welfare.'" *Id.* Instead, in *Arizona* (as here) the States merely complained of "indirect" burdens that allegedly "flow[] from the [challenged] [g]uidance." *Id.* As this Court explained, those kinds of injuries are not the kind of sovereign injuries that can confer standing.

The Supreme Court has similarly held that states cannot establish injury by raising "abstract questions ... of sovereignty" and explained that a state's "naked contention that Congress has usurped the reserved powers of the several States by the mere enactment of the statute" is insufficient to establish an Article III case or controversy. *Massachusetts v. Mellon*, 262 U.S. 447, 483, 485 (1923). Instead, states must allege that a sovereign interest was "actually invaded or threatened" by the challenged federal action. *Id.* at 485. Otherwise, states would be able to bring claims that present only "abstract questions of political power, of sovereignty, of government," which federal courts cannot adjudicate. *Id.*

In holding that the States here nevertheless alleged a sufficiently concrete harm to a sovereign interest, the district court relied on inapposite case law. Op. 11 & n.7, R. 86, Page ID # 1952. For example,

the court cited *Cameron v. EMW Women's Surgical Center, P.S.C.*, 142 S. Ct. 1002 (2022), for the proposition that "a [s]tate 'clearly has a legitimate interest in the continued enforceability of its own statutes,'" and "a [s]tate's opportunity to defend its laws in federal court should not be lightly cut off." *Id.* at 1011. But that case involved a lawsuit challenging the legality of a state law that a federal court had already held was unconstitutional. *See id.* at 1107. Other cases cited by the court are likewise distinguishable. Some involve challenges brought by states to the facial legality of a federal law or regulation, *e.g.*, *Colorado v. Toll*, 268 U.S. 228 (1925), or a challenge to a federal statute that expressly preempted certain state laws, *e.g.*, *Ohio ex rel. Celebreeze v. U.S. Dep't of Transp.*, 766 F.2d 228 (6th Cir. 1985), or a challenge to a federal statute that would cause some direct financial harm to the state *unless* the state changed its laws, *e.g.*, *Texas v. United States*, 787 F.3d 733 (5th Cir. 2015).

The more direct and concrete harms at issue in those cases only serve to underscore the novelty of the States' standing theory here. An "arguable conflict" with scattered state laws provides no basis for a pre-enforcement challenge to non-binding informational documents issued by

28

federal agencies charged with enforcing federal anti-discrimination statutes. Rather, the proper course is to wait to see whether any actual conflict ever arises between federal and state law and to litigate about any such conflict when it presents itself in the context of a specific enforcement proceeding. Here, no one questions the facial legitimacy of the underlying federal statutes at issue and no federal law or regulation has been claimed to preempt or render unlawful these state statutes. If the federal government were to take the position that any of these state laws are preempted or otherwise seek to render them invalid in some future litigation for any reason, the States would of course be free to raise any defense they wish at that time.

Under Article III, courts may not entertain preemptive declaratory litigation based upon hypothetical future conflicts between federal and state laws; they must instead wait until particular applications of specific state laws are alleged to violate Title VII or Title IX. At that stage, the States can assert all of the arguments they raise here in a defensive posture. *See Whole Woman's Health*, 142 S. Ct. at 538 (even very important rights are, "as a practical matter," usually "asserted … as defenses," not in "pre-enforcement cases"). Indeed, this is already

happening: Since this litigation began, plaintiffs West Virginia and Indiana have both faced private, as-applied challenges to their treatment of transgender students under Title IX and/or the Equal Protection Clause and (unsuccessfully) raised arguments about whether Title IX prohibits discrimination against transgender people in that litigation. *See A.M. ex rel. E.M. v. Indianapolis Pub. Sch.*, 2022 WL 2951430 (S.D. Ind. July 26, 2022) *appeal docketed*, No. 22-2332 (7th Cir. July 27, 2022) (Indiana school district preliminary enjoined from excluding transgender girl from participating in girls' softball team); *B.P.J. v. West Virginia State Bd. of Educ.*, 550 F. Supp. 3d 347 (S.D. W. Va. 2021) (similar). The States' attempt to short-circuit that kind of individual, case-by-case litigation by asserting nebulous injuries to vague sovereign interests should be rejected.

The possibility of future enforcement actions under Title VII or Title IX based on the same interpretations expressed in the challenged documents highlights another problem with the States' sovereign standing theory: Even assuming the States have alleged a viable injury to their sovereign interest, that injury is neither caused by the documents nor redressable by an injunction prohibiting the agencies from

30

implementing them.  *See R.K. by and through J.K. v. Lee*, __ F.4th __, 2022 WL 17076105, *2-4 (6th Cir. Nov. 18, 2022); *Midwest Media Prop., LLC v. Symmes Township*, 503 F.3d 456, 461 (6th Cir. 2007).  Any inconsistency between the States' laws and federal anti-discrimination laws derives from those anti-discrimination laws themselves (as interpreted by the federal courts).  As discussed in more detail below, *see infra* pp. 36-39, the documents—which merely summarize the agencies' understanding of those laws after *Bostock*—do not expand those anti-discrimination laws or create new rights or obligations.  Thus, the States will continue to experience exactly the same alleged "arguabl[e] conflict," Op. 12, R. 86, Page ID # 1953, between their laws and federal law even if the challenged documents are enjoined.

2.    While not addressed by the district court, the States also cannot establish standing based on the possibility that, at some point in the future, they might face an enforcement action under Title VII or Title IX in their capacity as employers or educators.[5]  Where a plaintiff seeks

---

[5] The States raised this theory of standing in district court, but (correctly) acknowledged at oral argument that it was a weaker, less-direct theory of injury.  *See* Op. 11, R. 86, Page ID # 1952 (noting the States "represented" at oral argument that "the alleged injury to their sovereign interests" was their stronger standing argument).

prospective relief based on the possibility of future injury, the "threatened injury must be certainly impending to constitute injury in fact." *Clapper v. Amnesty International USA*, 568 U.S. 398, 409 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). Mere "[a]llegations of possible future injury are not sufficient." *Id.* (alteration in original) (emphasis omitted) (quoting *Whitmore*, 495 U.S. at 158). Put another way, the prospect of enforcing a statute against the plaintiff must be "sufficiently imminent" to create a concrete injury. *Platt v. Board of Comm'rs on Grievances & Discipline of Ohio Supreme Court*, 769 F.3d 447, 451 (6th Cir. 2014) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)). A "theory of standing[] [that] relies on a highly attenuated chain of possibilities[] does not satisfy" this requirement. *Clapper*, 568 U.S. at 410.

Here, the States have not established any threat of government enforcement against them that is "actual or imminent." The States' theory of injury involves many steps between the issuance of EEOC's technical assistance document (which only summarizes established agency positions) and the initiation of any enforcement proceeding under Title VII by DOJ. The employer must first engage in conduct that is

32

impermissible under EEOC's interpretation of Title VII. A victim of discrimination must then file a charge with EEOC. *See* 42 U.S.C. § 2000e-5(f)(1). EEOC must then investigate the charge. *See id.* If EEOC finds reasonable cause to believe that discrimination has occurred, it must "endeavor to eliminate any such alleged … employment practice by informal methods of conference, conciliation, and persuasion." *Id.* § 2000e-5(b). And even if that fails, EEOC cannot itself bring an enforcement action against the state; rather, it can at most refer the matter to DOJ. *Id.* § 2000e-5(f)(1). DOJ must then decide whether to bring an action itself or instead issue a right-to-sue notice to the private individual. *Id.* Layered on top of all those steps, the question whether any particular employment action will ultimately be deemed to be unlawful discrimination is a deeply fact-intensive inquiry that is difficult to assess *ex ante. See White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008) (discussing fact-intensive *McDonnell Douglas* burden-shifting framework for evaluating Title VII discrimination claims).

Any theory of pre-enforcement injury based on the issuance of Education's documents is similarly protracted and speculative. The recipient of federal funds must first engage in conduct that would be

33

forbidden by Title IX, as interpreted by Education.  Education must then decide to initiate an investigation, which it usually does in response to a complaint from a private party.  *See* 34 C.F.R. § 100.7(b)-(c).  If the investigation indicates noncompliance, Education will then attempt to secure voluntary compliance through informal means.  *See id.* § 100.7(d)(1).  If that fails, Education issues a written finding that the funding recipient is in violation of Title IX.  *Id.*  If the funding recipient still does not comply voluntarily, Education will either refer the matter to DOJ or else commence administrative proceedings to terminate federal funding.  *See* 34 C.F.R. § 100.8(a).  And again, all of those steps are rendered even more indefinite by the inherently fact-intensive nature of Title IX's anti-discrimination prohibition.  *See Ivan v. Kent State Univ.*, 92 F.3d 1185 (6th Cir. 1996) (per curiam) (table) (adopting fact-intensive framework for cases involving allegations of gender discrimination by an educational institution in violation of Title IX).

In short, the threat of a future enforcement action is far too speculative and attenuated to confer standing at this juncture.  Any injury to the States is not actual or imminent because the occurrence of the injury depends "on a speculative chain of possibilities."  *Clapper*, 568

U.S. at 410. Furthermore, that theory of injury requires "guesswork as to how independent decisionmakers [*e.g.*, private parties aggrieved by discrimination] will exercise their judgment." *Id.* at 413.

The States' threat-of-enforcement standing theory also suffers from the same traceability and redressability problems as their sovereign-injury theory: Any injury associated with the possibility of future enforcement is not traceable to these informational documents and would not be redressed by judicial relief directed at those documents. *See R.K.*, 2022 WL 17076105, at *3 ("To satisfy the redressability element of standing, the plaintiff must show that it is 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" (quoting *Lujan*, 504 U.S. at 561)). The documents are not substantive regulations; they do not have the force or effect of law and do not themselves impose any legal obligations on the plaintiff States or on any other regulated party. *See infra* pp. 36-39, 49-51. The requirements to which the States object are traceable to Titles VII and IX, not to the challenged documents. And even if a court sets aside or enjoins the implementation of these documents, the federal government (and, for that matter, private parties) could still enforce Titles VII and IX against

the States. Indeed, at least two of the States have already preliminary injunctions issued against them in private, as-applied Title IX or constitutional challenges to their laws' treatment of transgender students. *See A.M. by E.M.*, 2022 WL 2951430; *B.P.J.*, 550 F. Supp. 3d 347. Tellingly, those courts did not rely on (or even reference) the Education documents in holding that the States' actions were unlawful.

## II.   The States' Claims Are Not Reviewable.

### A.   The Challenged Documents Are Not Final Agency Action.

Judicial review under the APA is generally limited to "final agency action." 5 U.S.C. § 704. Such action must (1) represent "the consummation of the agency's decisionmaking process," and (2) conclusively determine legal "rights or obligations." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotations omitted). Even assuming that these documents reflect the consummation of the agency's views about how best to read Title VII and Title IX, the challenged documents do not satisfy the second prong of the *Bennett* test.

As this Court has explained, in order to satisfy that second prong the agency action must "'impose liability' on a regulated party, create legal rights, or 'mandate, bind, or limit other government actors' in the

36

future." *Arizona*, 40 F.4th at 387. Here, numerous features of the challenged documents confirm that they do no such thing. As this Court has noted, it is helpful to "[s]tart with" what the documents actually say. *Id.* EEOC's document is called a "technical assistance document," and Education's documents are called an "interpretation" and a "fact sheet." *See* Compl., Ex. A, R. 1-2, Page ID # 42 ("interpretation"); Compl. Ex. C, R. 1-4, Page ID # 72-73 ("fact sheet" or "Resource for Students and Families"); Compl. Ex. D, R. 1-5, Page ID # 76 ("technical assistance document"). Those labels "do not evoke binding legal effect." *Arizona*, 40 F.4th at 387. "Consistent with [those] label[s]," the documents each expressly state that they do not have any independent legal effect. *Id.*; *see* Compl., Ex. A, R. 1-2, Page ID # 42 (Education's NOI "does not itself determine the outcome in any particular case or set of facts."); Compl. Ex. C, R. 1-4, Page ID # 73 (listing scenarios that Education "can investigate" without purporting to determine an outcome of any such investigation); Compl. Ex. D, R. 1-5, PageID # 77-78 (EEOC's document does "not have the force and effect of law and is not meant to bind the public in any way").

Instead, the documents each make clear that they are intended only to reflect the agencies' views about how best to read Title VII and Title IX's prohibitions against sex discrimination. *See* Compl., Ex. A, R. 1-2, Page ID # 42-44; Compl. Ex. C, R. 1-4, Page ID # 71; Compl. Ex. D, R. 1-5, Page ID # 77-79. In other words, the challenged documents "create[] no new legal obligations beyond those the [statute] already imposed." *Rhea Lana, Inc. v. Department of Labor*, 824 F.3d 1023, 1028 (D.C. Cir. 2016); *see also Arizona*, 40 F.4th at 478. They simply inform the public of the agencies' interpretation of Titles VII and IX, without purporting to alter those obligations in any way. And the documents do not bind the agency or anyone else to reach a particular conclusion on any facts. Indeed, the challenged documents expressly state that they are non-binding. *See Cement Kiln Recycling Coal. v. EPA*, 493 F.3d 207, 228 (D.C. Cir. 2007) (noting that non-binding disclaimers are "relevant to the conclusion that a guidance document is non-binding"). "Confirming that the [documents] lack[] legal effect is the reality that it is difficult to see how" anyone "could invoke [them] to establish legal protection." *Arizona*, 40 F.4th at 389. These are all "telltale signs" of nonreviewable agency

38

statements designed to educate and provide notice, "not of reviewable final agency action." *Id.* at 388.

Here, there is no need to guess about whether the "practical results of [the] agenc[ies'] action[s]" have had the requisite "immediate and significant" legal consequences necessary to constitute final agency action. *Parsons v. U.S. Dep't of Justice*, 878 F.3d 162, 168 (6th Cir. 2017). These documents were issued in June 2021 and were not preliminarily enjoined by the district court until July 2022. Yet the States suffered no "immediate and significant" legal consequences as a result of the challenged documents during that intervening year. *Id.* Indeed, while two of the States have had preliminary injunctions entered against them in lawsuits challenging their discriminatory treatment of transgender students since these documents issued, *see A.M. by E.M.*, 2022 WL 2951430 (Indiana); *B.P.J.*, 550 F. Supp. 3d at 347 (West Virginia), neither of those decisions relied upon or even mentioned the documents.

In nevertheless holding that these documents determine legal "rights or obligations," the district court focused primarily on the effects these documents might have on third parties in future, hypothetical agency actions—including private citizens considering whether to bring

discrimination complaints and the agency employees who would evaluate those individual allegations.  Op. 27-29, R. 86, Page ID # 1968-1971.  But this Court has repeatedly cautioned that "harms caused by agency decisions are not legal consequences if they stem from independent actions taken by third parties."  *Parsons*, 878 F.3d at 168 (6th Cir. 2017) (quotation omitted); *see also Arizona*, 40 F.4th at 388.

That is true even where the third parties are agency officials who exercise their discretion in reliance on agency guidance.  Even in those circumstances the agency officials' "actions are not direct consequences" of the guidance but are instead "the product of independent agency decisionmaking."  *Parsons*, 878 F.3d at 168, 170 (quoting *Flue-Cured Tobacco Coop. Stabilization Corp v. U.S. EPA*, 313 F.3d 852, 860 (4th Cir. 2002)).  Thus, this Court has held that agency action is not final if it "'does not of itself adversely affect [a] complainant but only affects his rights adversely on the contingency of future administrative action.'"  *Jama v. Dep't of Homeland Sec.*, 760 F.3d 490, 496 (6th Cir. 2014) (quoting *Rochester Tel. Corp. v. United States*, 307 U.S. 125, 130 (1939)); *see also Arizona*, 40 F.4th at 388.  That is exactly the case here.  The informational documents issued by the agencies make clear that agency

40

officials remain free to—and indeed must—exercise their individual judgment on a case-by-case basis. *See,* Compl., Ex. A, R. 1-2, Page ID # 42; Compl. Ex. C, R. 1-4, Page ID # 73; Compl. Ex. D, R. 1-5, Page ID # 77-78. And as noted above, multiple layers of third-party action and discretion stand between the States and any potential enforcement action under Title VII or Title IX. *See supra* pp. 32-34. In other words, the relevant "final agency actions" here are the culmination of potential agency enforcement actions that have yet to occur. The APA requires plaintiffs to wait until those "final agency actions" come to pass (assuming they ever do) before seeking judicial review.

For similar reasons, the district court was wrong to suggest that the challenged documents have any current legal effect because they somehow coerce the States to change their conduct now by suggesting that the agencies might consider certain conduct to violate federal anti-discrimination laws in the future. *See* Op. 28-30, R. 86, Page ID # 1969-1971. This Court has held that those kinds of "coercive pressures" are not "legal consequences" for purposes of assessing final agency action. *Parsons*, 878 F.3d at 168 (quoting *Flue-Cured Tobacco*, 313 F.3d at 859). And even if the informational documents' "persuasive value" might

41

encourage private parties to file claims alleging discrimination, "these decisions are" likewise "attributable to independent responses and choices of third parties" and cannot be said to "legally flow" from the documents themselves. *Id.* (quoting *Flue-Cured Tobacco*, 313 F.3d at 861). In other words, "[h]arms resulting from a third-party's independent decision to rely upon" agency guidance "are not legal consequences of" the guidance itself. *Id.* That the States may fear monetary consequences as the result of some future enforcement action brought by the federal government or some private party does not alter that conclusion. *See Air Brake Sys. Inc. v. Mineta*, 357 F.3d 632, 645 (6th Cir. 2004) (cautioning that "adverse economic effects accompany many forms of indisputably non-final government action").

## B.   The States Have an Adequate Alternative Remedy that Forecloses Pre-Enforcement Review Now.

As this Court has long recognized, "[t]he APA does not express the U.S. government's consent to suit if an alternate adequate remedy is available to review a final agency action." *Beamon v. Brown*, 125 F.3d 965, 967 (6th Cir. 1997). The relief offered by the "alternat[e] remedy" will "be deemed adequate 'where a statute affords an opportunity for *de novo* district-court review' of the agency action." *Garcia v. Vilsak*, 563

42

F.3d 519, 522-523 (D.C. Cir. 2009). That standard is met here: in any enforcement action brought against a State based on the legal interpretations expressed in the challenged documents, those interpretations will be subject to de novo review by a court.

Contrary to the district court's holding, Op. 32-34, R.86, PageID#1973-1975, this is not the rare case where the plaintiffs can escape the no-adequate-remedy requirement by showing that the alternative remedy would expose them to substantial penalties. In support of that holding, the district court relied on the Supreme Court's decision in *Sackett v. EPA*, 566 U.S. 120 (2012). Op. 32-33, R. 86, Page ID # 1973-1974. There, the agency had issued a compliance order directly to the plaintiffs informing them that their land was subject to certain restrictions, that the compliance order represented the agency's final word on that matter, that the plaintiffs were therefore forbidden from undertaking a proposed construction project, and that failure to comply would result in significant penalties that would be measured from the date of the compliance order. *See Sackett*, 566 at 124-125.

This case is nothing like *Sackett*. As explained above, the States face no immediate consequences from the challenged documents that

43

would justify raising their arguments in a pre-enforcement challenge. *Supra* Part II.A.  The States have not even identified any specific action, complaint, or ongoing investigation arising from the documents that is likely to result in a determination that any state has violated Title VII or Title IX.  Nor do the challenged documents impose any other concrete, immediate hardship on the States that would allow them to bypass the normal rules of APA review.  The documents do not themselves impose any obligations or consequences on the States and do not exert any pressure on the States beyond that which already flows directly from the prohibitions against sex discrimination in Title VII and Title IX, as interpreted by the Supreme Court, this Court, and other courts across the country.  *See supra* pp. 36-39; *infra* pp. 49-51.

## C. The States' Challenge to Education's Documents is Independently Barred Under *Thunder Basin*.

Where it is "fairly discernable" that an elaborate statutory review scheme for administrative enforcement proceedings was intended to create an exclusive remedy, parallel jurisdiction outside that scheme is precluded.  *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207, 216 (1994) (quotation omitted).  That rule is fatal to the States' challenge to Education's Title IX guidance.  Congress did not intend to permit pre-

enforcement review of Title IX claims because it provided an elaborate procedural scheme for administrative enforcement proceedings that culminates in the opportunity for judicial review.  *See* 20 U.S.C. § 1682 (administrative process); *id.* § 1683 (judicial review); *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988) ("Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action.").

The district court held otherwise because it perceived a difference between challenging the end result of an agency's enforcement efforts and the issuance of "rules and regulations" that govern those enforcement efforts.  Op. 36, R. 86, Page ID # 1977.  That was error. Under the district court's reasoning, a party could always opt out of a congressionally created administrative review scheme just by framing its challenge at a higher level of generality.  But that is exactly the kind of argument that the Supreme Court rejected in *Thunder Basin* itself.  In that case, a mine operator brought a pre-enforcement challenge to an agency's interpretation of a statute, which could have formed the basis for enforcement action against the operator.  *See* 510 U.S. at 216. Confronted with a review process remarkably similar to that found in

Title IX, the Court held that Congress's intent to preclude pre-enforcement judicial review was "fairly discernible in the statutory scheme" under the Mine Act. *Id.* at 207 (citation omitted); *see* 30 U.S.C. § 801 *et seq.* And the Court therefore rejected the mine operator's attempt to bring a pre-enforcement challenge to the agency's interpretation. *See Thunder Basin*, 510 U.S. at 207-208. The same result is warranted here. *Cf. Rogers v. Bennett*, 873 F.2d 1387 (11th Cir. 1989) (same result under the parallel disability rights statute); *Taylor v. Cohen*, 405 F.2d 277 (4th Cir. 1968) (same result under Title VI, parallel race discrimination statute).

## III.    The District Court Erred by Granting a Preliminary Injunction.

For all the reasons discussed above, the district court should not have reached the preliminary injunction analysis at all because the States lack standing and because their challenges to these documents are not reviewable. If this Court rules in the government's favor on those questions, it should vacate the injunction and remand to the district court with instructions to dismiss without reaching the merits of the preliminary injunction analysis. If, however, this Court reaches the

merits of the preliminary injunction, it should find that the district court erred in its analysis as to each element.

"A preliminary injunction is an extraordinary and drastic remedy," *Munaf v. Geren*, 553 U.S. 674, 689-690 (2008) (quotation omitted), one that should "only be awarded upon a clear showing that the plaintiff is entitled to such relief," *Winter v. National Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). In determining whether to grant a preliminary injunction, a district court must consider: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." *Bays v. City of Fairborn*, 668 F.3d 814, 818-819 (6th Cir. 2012).

### A.   The States Have Not Shown a Likelihood of Success on Their Notice-and-Comment Claim.

The district court erred in holding that the States demonstrated a "strong likelihood of success," *Bays*, 668 F.3d at 818, on their claim that the challenged documents were procedurally deficient because they were not issued through notice-and-comment rulemaking.

The APA provides that notice-and-comment rulemaking requirements do not apply to "[interpretive] rules, general statements of policy, or rules of agency organization, procedure, or practice."  5 U.S.C. § 553(b)(A).  Interpretive rules stand in contrast to legislative rules, which must be issued through notice-and-comment rulemaking and (as the name suggests) have the "force and effect of law" once enacted.  *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015).  "[T]he critical feature of interpretive rules," on the other hand, "is that they are 'issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers.'"  *Id.* at 97.  An interpretive rule "simply states what the administrative agency thinks the statute means."  *First Nat'l Bank of Lexington v. Sanders*, 946 F.2d 1185, 1188 (6th Cir. 1991) (per curiam) (quotation omitted).  An agency that enforces "less than crystalline" statutes must interpret them, "and it does the public a favor if it announces the interpretation in advance of enforcement, whether the announcement takes the form of a rule or of a policy statement, which the [APA] assimilates to an interpretive rule."  *Hoctor v. U.S. Dep't of Agric.*, 82 F.3d 165, 167 (7th Cir. 1996).  So long as the underlying statute

itself (or some other rule) continues to form the basis of the asserted rights and obligations discussed in the rule, it is not a legislative rule.

Assuming they are properly considered to be rules at all,[6] the challenged documents are paradigmatic examples of "interpretive rules" that need not be subject to notice and comment. The documents are expressly non-binding and do not purport to have the force or effect of law. *See supra* pp. 36-39; *see also Chrysler Corp. v. Brown*, 441 U.S. 281, 302 (1979) (legislative rules "affect[] individual rights and obligations" (quotation omitted)). Rather, they represent the agencies' understanding of the longstanding sex discrimination prohibitions contained in Titles VII and IX and are merely intended to "advise the public of the agency's construction of the statutes and rules which it administers." *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995) (citation omitted). Viewed a different way, if the United States were to bring an enforcement action

---

[6] The APA does not require notice and comment for agency documents that are not rules. 5 U.S.C. § 553. "Rule" is defined to mean "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. § 551(4). Documents like EEOC's technical assistance document and Education's Fact Sheet do not satisfy that definition and were not required to go through notice and comment for that reason as well.

consistent with the legal interpretations espoused in the challenged documents, it would rely on the underlying statutes themselves as the basis for the action, not these documents.  And the documents would not be "accorded [the] weight [of law] in the adjudicatory process." *Perez*, 575 U.S. at 97 (quotation omitted).  Instead, it would be up to the court to decide for itself whether the interpretation proposed by the agency is valid and, if so, whether the evidence presented in a particular case establishes that prohibited discrimination took place.

Moreover, as explained in the notice of compliance the agencies filed in district court, the underlying statutory requirements remain in effect and the agencies continue to have "statutorily required responsibilities" to investigate and (if appropriate) enforce those requirements, including when faced with privately filed complaints presenting these issues.  *See* Notice 2-3, R. 97, Page ID # 2058-2059.  Regardless of whether the agencies are enjoined from "implementing" these informational documents, private individuals remain free to file complaints with the agencies based on the theory articulated in the documents (or any other theory).  And once filed, the agencies must decide whether those theories comport with Title VII or Title IX.  *See* 42

50

U.S.C. § 2000e-5(f)(1) (Title VII); 20 U.S.C. § 1682 (Title IX); 34 C.F.R. § 100.7(c)-(d) (Title IX).  Finally, even if the agencies do not decide to pursue administrative enforcement themselves, individuals remain free to file lawsuits.

As the Eighth Circuit recently observed in considering an injunction against a similar agency document, "[a]n injunction against implementing [a HUD guidance memo]" would not stop the agency "from investigating all complaints of sex discrimination against a college, including complaints of discrimination because of gender identity or sexual orientation." *School of the Ozarks v. Biden*, 41 F.4th 992, 1001 (8th Cir. 2022).  That is because "[e]ven if HUD were enjoined from enforcing its internal directive, the agency would still be required by statute to investigate sex discrimination complaints filed" and in doing so "must consider the meaning of [the underlying anti-discrimination statute] in light of *Bostock* and its interpretation of similar statutory language." *Id.*; *see also Texas v. EEOC*, 933 F.3d 433, 451 (5th Cir. 2019).

In other words, there is no question that the agencies here will have to determine what the respective statutes they are charged with enforcing prohibit when read in light of the Supreme Court's reasoning

51

in *Bostock* and other relevant case law. And there is also no question that federal courts will ultimately have the authority to decide (de novo) whether the agencies' interpretations of the statutes are correct and whether the conduct of a given defendant constitutes sex discrimination under those interpretations. The only question is whether the agencies will "advise the public of [their] construction of the statutes and rules which [they] administer[]" ahead of time, *Perez*, 575 U.S. at 97 (quotation omitted), or do so for the first time in individual enforcement actions. The States' apparent preference for the latter approach does not transform these run-of-the-mill agency informational documents into legislative rules.

The district court's holding to the contrary lacks merit for several reasons. First, the court incorrectly framed the inquiry as whether the views given in the informational documents were *compelled* by *Bostock*. Op. 40-42, R. 86, Page ID # 1981-1983. As already discussed, *supra* pp. 48-49, that was the wrong question. Agency guidance is most useful in situations where the meaning of a law is unclear or requires interpretation that courts have not yet had reason or opportunity to provide.

52

Second, the district court's insistence that only *Bostock*'s narrow holding—and not its reasoning—can properly inform the agencies' interpretations of Titles VII and IX does not withstand scrutiny. The court noted, for example, that *Bostock* did not prejudge how its reasoning would apply to Title IX and other statutes that prohibit sex discrimination. Op. 40, R. 86, Page ID # 1981. The Supreme Court's choice to decide no more than necessary to resolve the Title VII claims at issue in that case is unsurprising. But because Education has a statutory duty to enforce Title IX—including by investigating complaints made by private parties—the agency must interpret that statute, including by considering the implications of *Bostock* for the (nearly identical) prohibition against sex-discrimination contained in Title IX. *See Chisholm v. St. Marys City Sch. Dist. Bd. of Educ.*, 947 F.3d 342, 349-350 (6th Cir. 2020) ("In crafting our framework for analyzing Title IX claims, we have looked to the Title VII landscape for guidance, as both statutes prohibit discrimination on the basis of sex.").

The district court's reasoning is even weaker as to EEOC and Title VII, where the court's sole rationale was that *Bostock* did not purport to prejudge how Title VII's prohibition applies to sex-specific bathrooms and

dress codes.  Op. 42, R. 86, Page ID # 1983.  For starters, the views summarized in the challenged EEOC documents reflect EEOC's longstanding understanding of Title VII and did not purport to be an interpretation of *Bostock*.  But in any event, even if not part of the Court's holding, *Bostock*'s reasoning (about situations where sex is a but-for cause of adverse employment decisions) has clear implications for the questions that EEOC addressed.  For both Education and EEOC, the mere fact that *Bostock* declined to reach certain questions not necessary to resolve that case (which would have been non-binding dicta, in any event) does not mean that agency interpretations that reflect the logical implications of *Bostock*'s reasoning are automatically legislative rules.

Third, even accepting the district court's incorrect view that an agency issues a legislative rule any time it announces an understanding of the law that goes beyond what is mandated by the text of the statute and binding court precedent, the court's conclusion that the documents here are legislative rules is still wrong.  While *Bostock* itself may not have expressly addressed whether Title IX's prohibition against sex discrimination bars discrimination based on gender identity, numerous courts of appeals—including this Court—have answered that question in

the affirmative based on the statutory text both before and after *Bostock*. *See Dodds*, 845 F.3d at 221-222; *Grimm*, 972 F.3d at 616; *Whitaker*, 858 F.3d at 1049-1050.   And while the Supreme Court has not yet had occasion to address how Title VII would apply to sex-specific employment policies related to dress codes and bathrooms, this Court and others have recognized that such policies violate Title VII when an employer requires a person who is transgender to conform to standards and norms based on their sex assigned at birth.  *See Harris Funeral Homes*, 884 F.3d at 560; *Barnes v. City of Cincinnati*, 401 F.3d 729 (6th Cir. 2005); *Smith v. City of Salem*, 378 F.3d 566, 573-575 (6th Cir. 2004).

## B.   The States Failed To Show that the Remaining Factors Favor Preliminary Relief.

In order to obtain the "extraordinary remedy" of a preliminary injunction, the moving party must show *both* a substantial likelihood of success on the merits and that the balance of equities favors such relief. *See Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) (preliminary injunction should only be granted "if the movant carries his or her burden of proving that the circumstances clearly demand it").   Even assuming the States made an adequate showing of likely success on the merits of their notice-and-comment

55

claim, they failed to show that the equities weighed in favor of a preliminary injunction prohibiting the agencies from implementing the challenged documents.

1.   For largely the same reasons that the States failed to establish their standing to challenge the agency documents, *see supra* Part I, they likewise failed to show that those documents caused them irreparable injury.  The district court concluded that the States face irreparable harm to their sovereign interests in the form of pressure to alter laws that are inconsistent with the agencies' statements.  Op. 43-44, R. 86, Page ID # 1984-1985.  But as discussed above, to the extent the States are experiencing some uncertainty about whether various laws that differentiate based on sex assigned at birth are lawful, that uncertainty does not spring from these documents.  The States do not contest that both Title VII and Title IX make it unlawful to discriminate based on sex in employment and education.  And the States do not (and cannot) challenge the Supreme Court's decision in *Bostock*, which went to great lengths to explain why discrimination against transgender or gay people is—as a matter of basic logic—also discrimination because of sex.  Nor do the States challenge the myriad cases from this Court and

others that reflect the same interpretations of Title VII and Title IX set forth in the challenged documents.

Moreover, any harm the States might claim related to the possibility of future enforcement against them is speculative and does not rise to the level of irreparable harm. Any monetary harms the States could potentially face as the result of a future enforcement action cannot justify a preliminary injunction because "potential monetary damage does not constitute irreparable harm." *Baker v. Adams Cty./Ohio Valley Sch. Bd.*, 310 F.3d 927, 930 (6th Cir. 2002) (per curiam).

In the end, the many ways in which the States attempt to demonstrate potential injury and irreparable harm underscore that their real quarrel here is with the underlying statutes and *Bostock*'s interpretation of what it means to discriminate on the basis of sex. The States cannot, however, establish irreparable harm based on their general discomfort or dissatisfaction with recent developments regarding the meaning of federal prohibitions against sex discrimination. And of course, this kind of pre-enforcement challenge to agency informational materials does not provide a vehicle for the States to relitigate or collaterally challenge *Bostock* or binding circuit precedent from this

Court and others across the country. To the extent there remains some uncertainty as to precisely what Title VII and Title IX do and do not allow, that only underscores the need for case-by-case analysis rather than blunderbuss pre-enforcement challenges to general agency informational documents. *See Bostock*, 140 S. Ct. at 1753-1754 (contemplating that difficult questions about the implications of the Court's decision would be resolved in "future cases").

2.     On the other side of the ledger, there is a substantial public interest in achieving Titles VII and IX's goals of eliminating discrimination in the workplace and education. Indeed, violations of federal civil rights statutes constitute irreparable harm as a matter of law. *See Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir. 2001); *Roberts v. Colorado State Bd. of Agric.*, 998 F.2d 824, 833 (10th Cir. 1993). Enjoining implementation of the documents challenged here likely would inhibit the agencies from adequately explaining to the public and regulated entities their understanding of the requirements imposed by Titles VII and IX, potentially leaving regulated entities confused about how the agencies intend to apply the statutes. *See Dodds*, 845 F.3d at 222 (holding that

the public interest weighed heavily against a stay of an injunction where the injunction sought to protect a transgender student's constitutional and civil rights, "a purpose that is always in the public interest"); *see also New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers) (whenever the government "is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury").

### C.    The Preliminary Injunction Is Overbroad.

Even assuming the district court did not abuse its discretion in issuing some preliminary injunctive relief, it nevertheless abused its discretion in issuing relief that was overbroad in two respects.

First, the district court failed to justify extending its injunction to plaintiff States that failed to identify any state laws that even arguably conflict with the challenged documents. "The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth.*, 163 F.3d 341, 348 (6th Cir. 1998) (quoting *Stenberg v. Cheker Oil Co.,* 573 F.2d 921, 925 (6th Cir.1978)). And a preliminary

injunction must be "no more burdensome to the defendant than necessary" to prevent irreparable harm to the plaintiffs. *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Here, the district court held that a preliminary injunction was justified because a few states had established that they suffered irreparable harm in the form of pressure to change (or decline to enforce) a handful of state laws. *See* Op. 43-44, R. 86, Page ID # 1984-1985. But many of the plaintiff States identified no such laws, and therefore failed to demonstrate any irreparable harm related to the documents. *See supra* pp. 23-24 & n.4; Compl. ¶¶ 98-99, R. 1, Page ID # 18-19. The district court provided no explanation why it was necessary to provide injunctive relief to those States. Nor did the district court (or the States) identify any state laws that even arguably conflict with the challenged documents to the extent those documents speak to discrimination based on sexual orientation. *See* Op. 12 & n.8-9, R. 86, Page ID # 1953. In both of those ways, the district court therefore abused its discretion by failing to cabin its preliminary injunction to ensure that it is "no more burdensome to the defendant than necessary" to prevent the irreparable harm identified. *Califano*, 442 U.S. at 702.

60

Second, the court independently abused its discretion in extending its injunction to States governed by circuit precedent indicating that discrimination based on gender identity or sexual orientation is unlawful sex discrimination, including States located within this Circuit. *See Harris Funeral Homes,* 884 F.3d 560; *Dodds,* 845 F.3d at 221-222; *Smith,* 378 F.3d at 573-575; *Grimm,* 972 F.3d at 618-619 (holding that "application of its restroom policy against [a transgender student] violated Title IX"); *Whitaker,* 858 F.3d 1034 (similar). Thus, for many of the States, the district court's injunction impermissibly enjoins the agencies from implementing the challenged documents even though some of the legal positions in those documents are compelled by the law of the relevant circuit.

That kind of conflict with the law of other federal courts counsels against an injunction that sweeps outside of this Circuit. As other courts have held, "when exercising its equitable powers to issue an injunction, a court must be mindful of any effect its decision might have outside its jurisdiction" and "ordinarily should not award injunctive relief that would cause substantial interference with another court's sovereignty." *United States v. AMC Entm't, Inc.*, 549 F.3d 760, 770 (9th Cir. 2008); *see*

*also Steele v. Bulova Watch Co.*, 344 U.S. 280, 289 (1952); *Feller v. Brock*, 802 F.2d 722, 728 (4th Cir. 1986) (district court abused discretion in issuing injunction that frustrated "underlying policy of judicial administration which counsels against the creation of conflicts" between courts). The district court's failure to consider those factors was an independent abuse of discretion.

## CONCLUSION

For the foregoing reasons, the district court's preliminary injunction should be vacated. This Court should remand with instructions to dismiss for lack of jurisdiction or, in the alternative, should reverse on the merits because the States failed to demonstrate either a substantial likelihood of success on the merits or that the balance of equities favors preliminary relief.

Respectfully submitted,

BRIAN M. BOYNTON
   *Principal Deputy Assistant*
   *Attorney General*

CHARLES SCARBOROUGH

 *s/ Jack Starcher*
JACK STARCHER
DAVID PETERS
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7515*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 514-8877*
   *john.e.starcher@usdoj.gov*

December 2022

63

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,523 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.


*s/ Jack Starcher*
Jack Starcher

## CERTIFICATE OF SERVICE

I hereby certify that on December 15, 2022, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system.


*s/ Jack Starcher*
Jack Starcher

# DESIGNATION OF RELEVANT
# DISTRICT COURT DOCUMENTS

Pursuant to Sixth Circuit Rule 28(b)(1)(A)(i), the government designates the following district court documents as relevant:

| Record Entry | Description | Page ID # Range |
|---|---|---|
| RE 1 | Complaint | 1-38 |
| RE 1-2 | Complaint, Exhibit A | 41-45 |
| RE 1-4 | Complaint, Exhibit C | 69-74 |
| RE 1-5 | Complaint, Exhibit D | 75-86 |
| RE 86 | Memorandum Opinion and Order | 1942-1988 |
| RE 97 | Notice of Compliance | 2057-2060 |
| RE 99 | Response to Notice of Compliance | 2398-2406 |
| RE 100 | Notice of Appeal | 2407-2408 |

**ADDENDUM**

# TABLE OF CONTENTS

**Statutes**

5 U.S.C. § 551 ............................................................................... A1

5 U.S.C. § 553 ............................................................................... A1

5 U.S.C. § 704 ............................................................................... A2

20 U.S.C. § 1681 ............................................................................ A2

20 U.S.C. § 1682 ...................................................................... A2-A3

20 U.S.C. § 1683 ............................................................................ A3

20 U.S.C. § 1292 ............................................................................ A4

42 U.S.C. § 2000e-2 ....................................................................... A4

42 U.S.C. § 2000e-5 ................................................................. A5-A6

**Regulations**

34 C.F.R. § 100.7 ........................................................................... A7

34 C.F.R. § 100.8 ........................................................................... A8

**Administrative Procedure Act, 5 U.S.C. § 500 *et seq.***

**5 U.S.C. § 551. Definitions**

For the purpose of this subchapter—

* * *

**(4)** "rule" means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing;

* * *

**5 U.S.C. § 553. Rule making**

**(b)** General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law.

* * *

Except when notice or hearing is required by statute, this subsection does not apply--

**(A)** to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice;

* * *

**(c)** After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose.

* * *

## 5 U.S.C. § 704. Actions Reviewable

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

## Title IX and Education

## 20 U.S.C. § 1681. Sex

### (a) Prohibition against discrimination; exceptions

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance, except that:

* * *

(3) Educational institutions of religious organizations with contrary religious tenets

this section shall not apply to an educational institution which is controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization;

* * *

## 20 U.S.C. § 1682. Federal administrative enforcement; report to Congressional committees

Each Federal department and agency which is empowered to extend Federal financial assistance to any education program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, is authorized and directed to effectuate the provisions of section 1681 of

this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken. No such rule, regulation, or order shall become effective unless and until approved by the President. Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement, but such termination or refusal shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made, and shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found, or (2) by any other means authorized by law: *Provided, however,* That no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means.

* * *

## 20 U.S.C. § 1683. Judicial review

Any department or agency action taken pursuant to section 1682 of this title shall be subject to such judicial review as may otherwise be provided by law for similar action taken by such department or agency on other grounds. In the case of action, not otherwise subject to judicial review, terminating or refusing to grant or to continue financial assistance upon a finding of failure to comply with any requirement imposed pursuant to section 1682 of this title, any person aggrieved (including any State or political subdivision thereof and any agency of either) may obtain judicial review of such action in accordance with chapter 7 of Title 5, and such action shall not be deemed committed to unreviewable agency discretion within the meaning of section 701 of that title.

**Jurisdiction and Venue for the Courts of Appeals**

**28 U.S.C. § 1292. Interlocutory decisions**

(a) Except as provided in subsections (c) and (d) of this section, the courts of appeals shall have jurisdiction of appeals from:

(1) Interlocutory orders of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, or of the judges thereof, granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court;

* * *

**Title VII and EEOC**

**42 U.S.C. § 2000e-2. Unlawful employment practices**

**(a) Employer practices**

It shall be an unlawful employment practice for an employer--

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

* * *

**42 U.S.C. § 2000e-5. Enforcement provisions**

(a) **Power of Commission to prevent unlawful employment practices**

The Commission is empowered, as hereinafter provided, to prevent any person from engaging in any unlawful employment practice as set forth in section 2000e-2 or 2000e-3 of this title.

**(b) Charges by persons aggrieved or member of Commission of unlawful employment practices by employers, etc.; filing; allegations; notice to respondent; contents of notice; investigation by Commission; contents of charges; prohibition on disclosure of charges; determination of reasonable cause; conference, conciliation, and persuasion for elimination of unlawful practices; prohibition on disclosure of informal endeavors to end unlawful practices; use of evidence in subsequent proceedings; penalties for disclosure of information; time for determination of reasonable cause**

Whenever a charge is filed by or on behalf of a person claiming to be aggrieved, or by a member of the Commission, alleging that an employer, employment agency, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, has engaged in an unlawful employment practice, the Commission shall serve a notice of the charge (including the date, place and circumstances of the alleged unlawful employment practice) on such employer, employment agency, labor organization, or joint labor-management committee (hereinafter referred to as the "respondent") within ten days, and shall make an investigation thereof. * * * If the Commission determines after such investigation that there is not reasonable cause to believe that the charge is true, it shall dismiss the charge and promptly notify the person claiming to be aggrieved and the respondent of its action. * * * If the Commission determines after such investigation that there is reasonable cause to believe that the charge is true, the Commission shall endeavor to eliminate any such alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion. * * *.

* * *

A5

**(f) Civil action by Commission, Attorney General, or person aggrieved; preconditions; procedure; appointment of attorney; payment of fees, costs, or security; intervention; stay of Federal proceedings; action for appropriate temporary or preliminary relief pending final disposition of charge; jurisdiction and venue of United States courts; designation of judge to hear and determine case; assignment of case for hearing; expedition of case; appointment of master**

**(1)** If within thirty days after a charge is filed with the Commission or within thirty days after expiration of any period of reference under subsection (c) or (d), the Commission has been unable to secure from the respondent a conciliation agreement acceptable to the Commission, the Commission may bring a civil action against any respondent not a government, governmental agency, or political subdivision named in the charge. In the case of a respondent which is a government, governmental agency, or political subdivision, if the Commission has been unable to secure from the respondent a conciliation agreement acceptable to the Commission, the Commission shall take no further action and shall refer the case to the Attorney General who may bring a civil action against such respondent in the appropriate United States district court. The person or persons aggrieved shall have the right to intervene in a civil action brought by the Commission or the Attorney General in a case involving a government, governmental agency, or political subdivision. If a charge filed with the Commission pursuant to subsection (b) is dismissed by the Commission, or if within one hundred and eighty days from the filing of such charge or the expiration of any period of reference under subsection (c) or (d), whichever is later, the Commission has not filed a civil action under this section or the Attorney General has not filed a civil action in a case involving a government, governmental agency, or political subdivision, * * * the Commission, or the Attorney General in a case involving a government, governmental agency, or political subdivision, shall so notify the person aggrieved and within ninety days after the giving of such notice a civil action may be brought against the respondent named in the charge (A) by the person claiming to be aggrieved or (B) if such charge was filed by a member of the Commission, by any person whom the charge alleges was aggrieved by the alleged unlawful employment practice. * * *

A6

**Education Regulations**

**34 C.F.R. § 100.7. Conduct of investigations**

(a) Periodic compliance reviews. The responsible Department official or his designee shall from time to time review the practices of recipients to determine whether they are complying with this part.

(b) Complaints. Any person who believes himself or any specific class of individuals to be subjected to discrimination prohibited by this part may by himself or by a representative file with the responsible Department official or his designee a written complaint. A complaint must be filed not later than 180 days from the date of the alleged discrimination, unless the time for filing is extended by the responsible Department official or his designee.

(c) Investigations. The responsible Department official or his designee will make a prompt investigation whenever a compliance review, report, complaint, or any other information indicates a possible failure to comply with this part. The investigation should include, where appropriate, a review of the pertinent practices and policies of the recipient, the circumstances under which the possible noncompliance with this part occurred, and other factors relevant to a determination as to whether the recipient has failed to comply with this part.

(d) Resolution of matters.

(1) If an investigation pursuant to paragraph (c) of this section indicates a failure to comply with this part, the responsible Department official or his designee will so inform the recipient and the matter will be resolved by informal means whenever possible. If it has been determined that the matter cannot be resolved by informal means, action will be taken as provided for in § 100.8.

(2) If an investigation does not warrant action pursuant to paragraph (1) of this paragraph (d) the responsible Department official or his designee will so inform the recipient and the complainant, if any, in writing.

## 34 C.F.R. § 100.8. Procedure for effecting compliance

(a) General. If there appears to be a failure or threatened failure to comply with this regulation, and if the noncompliance or threatened noncompliance cannot be corrected by informal means, compliance with this part may be effected by the suspension or termination of or refusal to grant or to continue Federal financial assistance or by any other means authorized by law. Such other means may include, but are not limited to, (1) a reference to the Department of Justice with a recommendation that appropriate proceedings be brought to enforce any rights of the United States under any law of the United States (including other titles of the Act), or any assurance or other contractual undertaking, and (2) any applicable proceeding under State or local law.