No. 22-5807

_____

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

_____

STATE OF TENNESSEE, et al.,

*Plaintiffs-Appellees*

v.

UNITED STATES DEPARTMENT OF EDUCATION, et al.,

*Defendants-Appellants*

_____

On Appeal from the United States District Court
For the Eastern District of Tennessee, No. 3:21-cv-00308 (Atchley, J.)

_____

## BRIEF OF THE NATIONAL EDUCATION ASSOCIATION, ET AL.,
## AS AMICI CURIAE IN SUPPORT OF DEFENDANTS-APPELLANTS

_____

ALICE O'BRIEN
KEIRA McNETT
TAYLOR POE
NATIONAL EDUCATION ASSOCIATION
1201 16th Street, N.W.
Washington, DC  20036-3290
(202) 236-4115

DAVID J. STROM
AMERICAN FEDERATION OF TEACHERS,
AFL-CIO
555 New Jersey Avenue, N.W.
Washington, DC 20001
(202) 393-7472

TEAGUE PATERSON
AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES,
AFL-CIO
1625 L Street, N.W.
Washington, DC  20036
(202) 775-5900

NICOLE G. BERNER
SERVICE EMPLOYEES INTERNATIONAL
UNION
1800 Massachusetts Avenue, N.W.
Washington, DC  20036
(202) 730-7383

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 29(a)(4)(A) and Fed. R. App. P. 26.1, the undersigned counsel for Amici herby discloses that Amici are not publicly held corporations, that Amici have no parent corporations, that no corporation directly or indirectly holds ten (10) percent or more of the ownership interest in the Amici, and that no other publicly held corporation has a direct financial interest in the outcome of the litigation. The case does not arise out of a bankruptcy proceeding.

Dated: December 20, 2022

Washington, D.C.                          */s/ Keira McNett*
                                         Keira McNett

                                         *Attorney for Amici Curiae*

i

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT……………………...………….… i

TABLE OF CONTENTS……………………………………………………….. ii

TABLE OF AUTHORITIES……………………………..………………………...iii

STATEMENT OF IDENTITY, INTEREST, AND AUTHORITY TO FILE……...1

SUMMARY OF ARGUMENT……………………………………………………  3

ARGUMENT……………………………………………………………………….6

    I.    Schools Have Long Operated From the Understanding That Title IX Prohibits Discrimination on the Basis of Sexual Orientation and Gender Identity…………………………………………………….…………..6

    II.    Efforts to Undermine Protections for LGBTQ+ Students are Based Not on Sound Legal Principles But on Political Motivations……………..14

    III.    Anti-LGBTQ+ Laws and School Policies Harm a Particularly Vulnerable Student Population and Degrade School Climates for All Students, While Inclusive Policies Benefit All Students……………17

    IV.    Anti-LGBTQ+ Laws and School Policies Harm the Educators Who Must Enforce Them and Who May be Discriminated Against……...23

CONCLUSION………………………………………………...…………………… 29

CERTIFICATE OF COMPLIANCE……………...…………………………... 30

CERTIFICATE OF SERVICE…………………………………………………… 31

# TABLE OF AUTHORITIES

## CASES

*Adams by & through Kasper v. Sch. Bd. of St. Johns County*,
    318 F. Supp. 3d 1293 (M.D. Fla. 2018)………......................……........11-12

*B.P.J. v. W. Virginia State Bd. of Educ.*,
    550 F. Supp. 3d 347 (S.D.W. Va. 2021)……..........……...................…...…..16

*Bd. of Ed. of Highland Local Sch. Dist. v. U.S. Dep't of Educ.*,
    208 F. Supp. 3d 850 (S.D. Ohio 2016) ……...…………..........….................19

*Bethel Sch. Dist. No. 403 v. Fraser*,
    478 U.S. 675 (1986)…………………………………….......................... 22

*Bostock v. Clayton Cnty., Georgia*,
    140 S. Ct. 1731 (2020)……....…………................…......…...........…10, 27

*Centola v. Potter*,
    183 F. Supp. 2d 403 (D. Mass. 2002)………......…........……………......…..7

*Corral v. UNO Charter Sch. Network, Inc.*,
    No. 10-cv-3379, 2013 WL 1855824 (N.D. Ill. May 1, 2013) …....................6

*D.V. v. Pennsauken Sch. Dist.*,
    No. 12-cv-7646, 2013 WL 4039022 (D.N.J. Aug. 7, 2013)…......................6

*Dodds v. United States Dep't of Educ.*,
    845 F.3d 217 (6th Cir. 2016)…....................................................................8

*Doe v. Se. Greene Sch. Dist.*,
    No. 03-cv-717, 2006 U.S. Dist. LEXIS 12790 (W.D. Pa. Mar. 4, 2006)…...6

*Eilenfeldt ex rel. J.M. v. United C.U.S.D. No. 304 Bd. of Educ.*,
    84 F. Supp. 3d 834 (C.D. Ill. 2015)…............................................................6

*Grimm v. Gloucester Cnty. Sch. Bd.*,
　　972 F.3d 586 (4th Cir. 2020)…..................................................................9, 10

*Hecox v. Little*,
　　479 F. Supp. 3d 930 (D. Idaho 2020)…........................................................9

*Hoffman v. Saginaw Pub. Schs.*,
　　No. 12-cv-10354, 2012 WL 2450805 (E.D. Mich. June 27,  2012)…...........6

*J.A.W. v. Evansville Vanderburgh Sch. Corp.*,
　　323 F. Supp. 3d 1030 (S.D. Ind. 2018)…......................................................11

*Montgomery v. Indep. Sch. Dist. No. 709*,
　　109 F. Supp. 2d 1081 (D. Minn. 2000)…...................................................6, 7

*N.K. v. St. Mary's Springs Acad. of Fond du Lac Wis., Inc.*,
　　965 F. Supp. 2d 1025 (E.D. Wis. 2013)….....................................................7

*Nelson v. Christian Bros. Univ.*,
　　226 F. App'x 448 (6th Cir. 2007)…................................................................9

*Parents for Privacy v. Dallas Sch. Dist. No. 2.*,
　　326 F. Supp. 3d 1075 (D. Ore. 2018)…....................................................9, 12

*Price Waterhouse v. Hopkins*,
　　490 U.S. 228 (1989)…...................................................................................7

*Ray v. Antioch Unified Sch. Dist.*,
　　107 F. Supp. 2d 1165 (N.D. Cal. 2000)…......................................................7

*Riccio v. New Haven Bd. of Educ.*,
　　467 F. Supp. 2d 219 (D. Conn. 2006)….........................................................6

*Seiwert v. Spencer-Owen Cmty. Sch. Corp.*,
　　497 F. Supp. 2d 942 (S.D. Ind. 2007)…........................................................6

*Shields v. Fed. Exp. Customer Info. Servs. Inc.*,
  499 F. App'x 473 (6th Cir. 2012)…...............................................................23

*Smith v. City of Salem*,
  378 F.3d 566 (6th Cir. 2014)…...................................................……....9

*Snelling v. Fall Mountain Reg'l Sch. Dist.*,
  No. 99-cv-448, 2001 WL 276975 (D.N.H. Mar. 21, 2001)…........................6

*Theno v. Tonganoxie Unified Sch. Dist. No. 464*,
  394 F. Supp. 2d 1299 (D. Kan. 2005)…........................................................7

*Turpin v. Good*,
  No. 1:07-cv-1205, 2010 WL 2560421 (S.D. Ind. June 24, 2010)..................7

*Videckis v. Pepperdine Univ.*,
  150 F. Supp. 3d 1151 (C.D. Cal. 2015)…......................................................7

*Walsh v. Tehachapi Unified Sch. Dist.*,
  827 F. Supp. 2d 1107 (E.D. Cal. 2011)…......................................................6

*Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
  858 F.3d 1034 (7th Cir. 2017)…..............................................................9, 11

*Wolfe v. Fayetteville, Ark. Sch. Dist.*,
  648 F.3d 860 (8th Cir. 2011)…......................................................................6

## STATUTES, RULES AND REGULATIONS

Fed. R. App. P. 29(a)(4)(E)……………………………….……………………...1

Fed. R. App. P. 29(a)(2)...............................................................................3

Ala. Code § 16-40A-5 (2022)....................................................................15

Ark. Code Ann. § 6-16-1006 (West 2021).................................................15

Ga. Code Ann. § 20-2-786 (West 2022)....................................................15

H.B. 2035, 55th Leg., 1st Sess. (Az. 2021)...............................................15

La. Stat. Ann. § 17:281 (1993) ...................................................................15

Mont. Code Ann. § 20-7-120 (West 2021).................................................15

S.C. Code § 59-32-30(A)(5).......................................................................15

Tenn. Code Ann. § 49-6-1308 (2021)........................................................15

## OTHER AUTHORITIES

ACLU, *Legislation affecting LGBTQ rights across the country 2021*,
    https://www.aclu.org/legislation-affecting-lgbtq-rights-across-
    country-2021…………………………...............……………………………..15

Kiara Alfonseca, *With anti-LGBTQ laws proliferating, older activists
    say history is repeating itself*, ABC News (Oct. 1, 2022),
    https://abcnews.go.com/US/anti-lgbtq-laws-proliferating-older
    -activists-history-repeating/story?id=90278754.........................……14

Anchorage School District, Administrative Guidelines: Working with
    Transgender and Gender Nonconforming Students and Employees
    (2020), https://www.asdk12.org/cms/lib/AK02207157/Centricity/
    Domain/1208/Guidelines%20for%20Working%20with%20
    Transgender%20Students%20and%20Employees%20EEO%20054
    %20%20update%208202020.pdf …………………………….………….......12

Arcadia Resolution Letter and Agreement (CA), OCR Case No. 09–12–1020,
    Arcadia Unified School District (July 24, 2013), www.justice.gov/sites/
    default/files/crt/legacy/2013/07/26/arcadialetter.pdf …...........……….………9

Henry Berg-Brousseau, *ICYMI: As Lawmakers Escalate Attacks on
    Transgender Youth Across the Country, Some GOP Leaders Stand
    up for Transgender Youth*, Human Rights Campaign (Mar. 24, 2022),
    https://www.hrc.org/press-releases/icymi-as-lawmakers-escalate-
    attacks-on-transgender-youth-across-the-country-some-gop-leaders-
    stand-up-for-transgender-youth...................................................................15

Melissa Block, *Accusations of 'grooming' are the latest political attack –
    with homophobic origins*, NPR (May 11, 2022), https://www.npr.org/

2022/05/11/1096623939/accusations-grooming-political-attack-homophobic-origins......................................................................27

Board on Children, Youth, and Families, National Academies of Sciences, Engineering and Medicine, "Report in Brief: *Preventing Bullying Through Science, Policy and Practice*" (2016), https://nap.nationalacademies.org/resource/23482/preventing_bullying _RiB.pdf................................................................................................20

Centers for Disease Control and Prevention, Youth Risk Behavior Survey Data Summary & Trends Report: 2009-2019, https://www.cdc.gov/ healthyyouth/data/yrbs/pdf/YRBSDataSummaryTrendsReport2019- 508.pdf…………………………………………………………………..19

Centers for Disease Control and Prevention, *LGBTQ-Supportive School Policies and Practices Help All Students Thr*ive, (June 2022), https://www.cdc.gov/healthyyouth/safesupportiveenvironments/pdf/ LGBTQ-School-PoliciesPractices.pdf...........................................................22

Caitlin M. Clark, et al., (2022). *The 2021 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools*, GLSEN, https://www.glsen.org/ sites/default/files/2022-10/NSCS-2021-Full-Report.pdf ......................18, 21

Columbus City School Board Policy No. 5517, Anti-Harassment (2016) (OH) …………………………………………………………..14

Complaint, *Tennessee v. Dep't of Educ.*, No. 3:21-cv-308 (E.D. Tenn. Aug. 30, 2021), ECF No. 1, ¶¶ 98-99................................………15

Adina C. Cooper, et al., *Examining the Relationship Between LGBTQ- Supportive School Health Policies and Practices and Psychosocial Health Outcomes of Lesbian, Gay, Bisexual, and Heterosexual Students*, LGBT Health, 9(1)……………………………….........………23

Marjorie Cortez, *After a girl beat their daughters in sports, Utah parents triggered investigation into whether she was transgender*, Desert News (Aug. 17, 2022), https://www.deseret.com/utah/2022/8/17/ 23310668/school-investigates-female-athlete-transgender-complaint..........21

Gov. Spencer Cox letter to J. Stuart Adams and Brad R. Wilson
   (Mar. 22, 2022), *Salt Lake City Tribune*, https://www.sltrib.com/news/
   politics/2022/03/22/gov-spencer-coxs/………...........................................17

Dallas Independent School District Board Policy FFH (TX), Freedom
   from Discrimination, Harassment, and Retaliation (2020)……...…………...14

Rev. Susan Fredrick-Gray, *Transphobic and Anti-Abortion Policies are
   a Direct Threat to My Religious Freedom*, Religion Dispatches
   (June 6, 2022), https://religiondispatches.org/transphobic-and-anti-
   abortion-policies-are-a-direct-threat-to-my-religious-freedom/ …................25

Freedom for All Americans, *Legislative Tracker: All Anti-LGBTQ Bills*,
    https://freedomforallamericans.org/legislative-tracker/anti-lgbtq-bills/......15

Kansas City, Kansas Public School Board Policy JGEC (KS),
   Sexual Harassment (2021)……......................……………………….…..14

Kansas City 33 School District (MO), Prohibition Against Discrimination,
   Harassment and Retaliation (Transgender and Gender Nonconforming
   Employee and Students) (2021), https://resources.finalsite.net/images/
   V1661288506/kcpublicschoolsorg/gi4j9nwo7nvryftniueu/CodeOf
   Conduct2022FINAL.pdf. ……...........................................................……....13

Edward Lempinen, *Attack on LGBTQ+ rights: The politics and psychology
   of a backlash*," Berkley News (May 2, 2022), https://news.berkeley
   .edu/2022/05/02/attack-on-lgbtq-rights-the-politics-and-psychology
   -of-a-backlash/ …...................................................................……14

Mesa Public Schools Board Policy JFD (AZ), Student Harassment and
   Bullying (2019)…..........................................................................14

Metro Nashville Board of Education (TN), A Resolution, Regarding
   Physical, Mental and Emotional Support for All Metropolitan
   Nashville Public School Students, Staff, Parents, and other
   Stakeholders Regardless of Gender Identity, Gender Expression,
   or Sexual Orientation, (Apr. 27, 2021), https://mnps.org/students-
   families/student-resources/LGBTQIA .........................................................13

Metro-Nashville Public School Board Policy No. 6.304 (TN),
Student Discrimination, Harassment, Bullying, Cyber-bullying,
and Intimidation (2020)………...................……....................................13

Model Code of Ethics for Educators § III.B.2, National Association of
State Directors of Teacher Education and Certification (2021),
https://www.nasdtec.net/page/MCEE_DOC#Principle%20III ………..........26

Aamna Modhin, *For black women, femininity and feminism are not mutually
exclusive*, Quartz (Jan. 6, 2018), https://qz.com/quartzy/1158081/
for-black-women-femininity-and-feminism-are-not-mutually-
exclusive ………………………………….…………….............................21

Movement Advancement Project, Safe Schools Laws,
www.lgbtmap.org/equality-maps/safe_school_laws/discrimination.............12

NEA Code of Ethics (Adopted by Representative Assembly, 1975),
https://www.nea.org/resource-library/code-ethics-educators ......................25

Office for Civil Rights, U.S. Dep't of Educ., Sexual Harassment Guidance:
Harassment of Students by School Employees, Other Students, or Third
Parties, 62 Fed. Reg. 50, 12034 (March 13, 1997)……...............................11

Office for Civil Rights, U.S. Dep't of Educ., Dear Colleague Letter,
Harassment and Bullying (Oct. 26, 2010), https://www2.ed.gov/
about/offices/list/ocr/letters/colleague201010.pdf........................................11

Office for Civil Rights, U.S. Dep't of Educ., Questions and Answers on
Title IX and Sexual Violence, (Apr. 29, 2014),
https://www2.ed.gov/about/offices/list/ocr/docs/qa201404titleix.pdf..........11

Office for Civil Rights, U.S. Dep't of Educ., Civil Rights Division, U.S. Dep't
of Justice, Dear Colleague Letter, Transgender Students (May 13, 2016),
https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201605-title
-ixtransgender.pdf……………………………...…………..........………11

Olathe Public School (KS), Student Code of Conduct (August 2022)…................13

Casey Parks, *Club Q shooting follows year of bomb threats, drag protests, anti-trans bills*, Washington Post (Nov. 20, 2022), https://www.washingtonpost.com/dc-md-va/2022/11/20/club-q-shooting-lgbtq-harassment/. …………….....................................................27

Doris A. Santoro, *Teacher Demoralization Isn't the Same as Teacher Burnout*, Education Week (Nov. 11, 2020), https://www.edweek.org/ teaching-learning/opinion-teacher-demoralization-isnt-the-same-as-teacher-burnout/2020/11..…………...............................................26

Elliot A. Tebbe, et al., "A Dangerous Visibility: Moderating Effects of Antitrans Legislative Efforts on Trans and Gender-Diverse Mental Health, *Psychology of Sexual Orientation and Gender Diversity*, American Psychological Assoc. (2022 Vol. 9, Issue 3), https://psycnet.apa.org/fulltext/2021-49910001.html ..................................18

The Trevor Project (2021), *2021 National Survey on LGBTQ Youth Mental Health*, https://www.thetrevorproject.org/wp-content/uploads/ 2021/05/The-Trevor-Project-National-Survey-Results-2021.pdf.…..............17

The Trevor Project (2022), *2022 National Survey on LGBTQ Youth Mental Health*, https://www.thetrevorproject.org/survey-2022/assets/Static/ trevor01_2022survey_final.pdf……........................................................18-19

Kathryn Varn, "'No One Felt Safe': Florida Schools, Students Feel Effects of So-Called 'Don't Say Gay' Law," *Tallahassee Democrat* (June 30, 2022),https://www.tallahassee.com/story/news/2022/06/30/ florida-schools-feel-impact-dont-say-gay-law/7751681001/……………....18

Warrensville Heights City School Board Policy No. 5517 (OH), Anti-Harassment (2019).……………… …...............................................….14

Madeline Will, *'I'm afraid to return to the classroom:' A Gay Teacher of the Year Speaks Out*, Education Week (May 12, 2022), https://www.edweek.org/teaching-learning/im-afraid-to-return-to-the -classroom-a-gay-teacher-of-the-year-speaks-out/2022/05. …..........………28

**STATEMENT OF IDENTITY, INTEREST AND AUTHORITY TO FILE**

This amici curiae brief is submitted on behalf of the National Education Association ("NEA"); the American Federation of Teachers, AFL-CIO ("AFT"); the American Federation of State, County, and Municipal Employees, AFL-CIO ("AFSCME"); and the Service Employees International Union ("SEIU").[1]

NEA is the nation's largest professional association representing approximately three million members, the vast majority of whom serve as educators, counselors, and education support professionals in our nation's public schools. NEA is committed to fulfilling the promise of public education to prepare every student to succeed in a diverse and interdependent world.

AFT represents approximately 1.7 million members in education, healthcare, and local, state, and federal government. On behalf of the AFT members who work in K-12 education, the civil rights issues raised by this case under Title IX are particularly important in the context of ensuring that all students, no matter what their sexual orientation or gender identity, can attend public schools that provide a safe, welcoming and secure learning environment.

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), Amici state that no party's counsel authored the brief in whole or in part; no party's counsel contributed money that was intended to fund preparing or submitting the brief, and no person – other than Amici, its members, or its counsel – contributed money that was intended to fund preparing or submitting the brief.

AFSCME is the nation's largest public sector labor union representing well over a million members throughout the United States. Many AFSCME members work in our nation's public schools in roles from nurses to support staff, and AFSCME is committed to ensuring that these schools are inclusive and welcoming environments.

SEIU represents approximately 2 million working men and women, including public school bus drivers, janitors, paraprofessionals, and other school support personnel; early learning and childcare professionals; higher education faculty members; and health care and property services workers. SEIU's membership is among the most diverse in the labor movement. SEIU members believe strongly that every member of the LGBTQ+ community should be able to live and work in an environment free from discrimination of any kind.

Amici represent education employees across the country who serve students in multiple ways throughout the school day. Amici have interviewed public school educators from different states, particularly those in the appellee states, for this brief and other amici briefs about these issues. Amici's memberships have valuable perspectives to offer this court on the needs of LGBTQ+ students, the importance of clear protections and policies that create safe and inclusive learning environments, and the harms inflicted when the rights and dignity of LGBTQ+ students and educators are undermined. This brief reflects both the specific

experiences of these educators as well as the views of Amici's memberships as a whole.

Amici curiae submit this brief with the consent of all the parties. *See* Fed. R. App. P. 29(a)(2).

## SUMMARY OF ARGUMENT

Amici urge this Court to reverse the district court's decision and affirm the appellant federal agencies' authority to issue guidance regarding the rights of LGBTQ+ people to be free from discrimination and harassment in federally-funded education programs and in their workplaces.

Specifically, Amici write to make the following four points:

1. The understanding that Title IX protects students and staff in education programs from discrimination because of their sexual orientation or gender identity and expression is well-established, and until recently, has not been particularly controversial as a legal or practical matter. Schools have been operating from this understanding based on the great weight of caselaw and decades of guidance from the U.S. Department of Education. Across the country, school districts have policies that address the harms posed to LGBTQ+ students and ensure them equal educational opportunities consistent with these Title IX obligations.

2. This understanding of Title IX's requirements and the established practices of a broad range of school districts is being called into question not by any change in the law – which in fact has only been further solidified by the Supreme Court's reasoning in *Bostock v. Clayton County* and subsequent lower court decisions – but because of political tactics targeting LGBTQ+ people, particularly public school students and educators. Specifically, some politicians have preyed on the lack of familiarity with transgender people to incite fear. Students and educators have borne the brunt of craven political tactics, as discriminatory laws, policies, and rhetoric have exploded in various states across the country, undermining the protections of federal civil rights laws, and harming a student population that already suffers disproportionately high levels of harassment and related damaging effects on mental health.

3. Failure to protect LGBTQ+ students from harassment and discrimination has profound negative consequences for these students and is detrimental to all students.  By contrast, affirmatively inclusive policies and practices create better school climates for all students and educators. The floor provided by Title IX's prohibition on sex-based discrimination is essential to prevent the most egregious harassment and to prohibit school policies that explicitly sanction discrimination against LGBTQ+ students. Clear guidance is necessary to ensure that schools understand these obligations. This is particularly crucial because of

4

the stress and trauma faced by many LGBTQ+ youth, which surveys have

shown are deeply distressed by these attacks, with as many as half seriously

considering suicide in the past year. Moreover, bullying, harassment and

discrimination against a particular group of students damages the school climate

for all students. In contrast, protections from discrimination and supportive

school policies lead to much better outcomes for LGBTQ+ students, and

inclusive school policies benefit all students and educators.

4. Clear guidance is also important to prevent harm to educators. First,

emboldened by divisive political rhetoric and the errant district court decision

on appeal here, more politicians are likely to push for and enforce anti-

LGBTQ+ laws and policies that sanction and even promote discrimination. This

is harmful and degrading to educators who are forced to implement policies that

contradict their deeply held beliefs, values, and professional ethics. Second, for

educators who may be discriminated against based on their sexual orientation or

gender identity, undermining or creating confusion about the protections

afforded by Title IX and Title VII increases their risk of harassment and

discriminatory treatment. Uncertainty about whether they will be protected is

forcing many out of the profession.

# ARGUMENT

## I.    Schools Have Long Operated From the Understanding That Title IX Prohibits Discrimination on the Basis of Sexual Orientation and Gender Identity.

The Department of Education's guidance at issue in this case is based on decades of caselaw and guidance, and it has been well understood by schools across the country that Title IX prohibits discrimination based on sexual orientation, sex stereotypes, and gender identity.  Two decades ago, beginning in 2000, federal courts heard a series of cases involving peer harassment of K-12 students based on their actual or perceived sexual orientation.[2]  In these cases, the

---

[2] *See Wolfe v. Fayetteville, Ark. Sch. Dist.*, 648 F.3d 860, 864-65 (8th Cir. 2011); *Eilenfeldt ex rel. J.M. v. United C.U.S.D. No. 304 Bd. of Educ.*, 84 F. Supp. 3d 834, 841 (C.D. Ill. 2015); *N.K. v. St. Mary's Springs Acad. of Fond du Lac Wis., Inc.*, 965 F. Supp. 2d 1025, 1034 (E.D. Wis. 2013); *D.V. v. Pennsauken Sch. Dist.*, No. 12-cv-7646, 2013 WL 4039022, at *10 (D.N.J. Aug. 7, 2013); *Corral v. UNO Charter Sch. Network, Inc.*, No. 10-cv-3379, 2013 WL 1855824, at *5-6 (N.D. Ill. May 1, 2013); *Hoffman v. Saginaw Pub. Schs.*, No. 12-cv-10354, 2012 WL 2450805, at *12-13 (E.D. Mich. June 27, 2012); *Walsh v. Tehachapi Unified Sch. Dist.*, 827 F. Supp. 2d 1107, 1115 (E.D. Cal. 2011); *Pratt v. Indian River Cent. Sch. Dist.*, 803 F. Supp. 2d 135, 151 (N.D.N.Y. 2011); *Turpin ex rel. J.F.T. v. Good*, No. 1:07-cv-1205, 2010 WL 2560421, at *3 (S.D. Ind. June 24, 2010); *Seiwert v. Spencer-Owen Cmty. Sch. Corp.*, 497 F. Supp. 2d 942, 953 (S.D. Ind. 2007); *Riccio v. New Haven Bd. of Educ.*, 467 F. Supp. 2d 219, 226 (D. Conn. 2006); *Doe v. Se. Greene Sch. Dist.*, No. 03-cv-717, 2006 U.S. Dist. LEXIS 12790, at *11-12 (W.D. Pa. Mar. 4, 2006); *Theno v. Tonganoxie Unified Sch. Dist. No. 464*, 394 F. Supp. 2d 1299, 1304 (D. Kan. 2005*); Snelling v. Fall Mountain Reg'l Sch. Dist.*, No. 99-cv-448, 2001 WL 276975, at *4 (D.N.H. Mar. 21, 2001); *Montgomery v. Indep. Sch. Dist. No. 709*, 109 F. Supp. 2d 1081, 1092 (D. Minn.

students' Title IX claims were analyzed to determine whether they constituted

either illegal sex stereotyping or sex discrimination per se.  Some courts drew on

the reasoning of the Supreme Court's decision in *Price Waterhouse v. Hopkins*,

490 U.S. 228 (1989), and found discrimination on the basis of sexual orientation to

be impermissible sex stereotyping under Title VII and Title IX. *See e.g.*, *Centola v.

Potter*, 183 F. Supp. 2d 403, 410 (D. Mass. 2002) ("The gender stereotype at work

… is that 'real' men should date women, and not other men."); *Montgomery v.

Indep. Sch. Dist. No. 709*, 109 F. Supp. 2d 1081, 1090 (D. Minn. 2000)

("[S]tudents began tormenting him based on feminine personality traits that he

exhibited and the perception that he did not engage in behaviors befitting a boy.").

Other courts analyzed Title IX claims based on sexual orientation as discrimination

per se, that is, differential treatment compared to a similarly situated person of the

opposite sex.  *See, e.g., Videckis v. Pepperdine Univ.*, 150 F. Supp. 3d 1151 (C.D.

Cal. 2015) (finding that "if Plaintiffs had been males dating females, instead of

females dating females, they would not have been subjected to the alleged different

treatment"); *Ray v. Antioch Unified Sch. Dist.,* 107 F. Supp. 2d 1165 (N.D. Cal.

2000) (explaining that the same-sex nature of the harassment was not a basis for

---

2000); *Ray v. Antioch Unified Sch. Dist.*, 107 F. Supp. 2d 1165, 1169–70 (N.D.
Cal. 2000).

dismissing the claim and analyzing the alleged behavior comparing it to opposite sex harassment).

When the needs of transgender youth and their vulnerability to harassment and discrimination began to be more visible, the Department of Education and federal courts, including in this circuit, identified how Title IX applied to this particular form of sex-based discrimination. In 2013, the Office of Civil Rights (hereinafter "OCR") resolved for the first time a Title IX complaint regarding a transgender student's access to sex-specific facilities at school and sex-specific accommodations during an overnight field trip, with the school district agreeing to provide the student access to the boys' facilities and to treat the student the same as other male students in all respects.[3] In the years following, federal courts analyzed discrimination against transgender students for their failure to conform to gender norms as impermissible sex stereotyping under Title IX.

This Court applied the same analysis in *Dodds v. U.S. Department of Education*, which held that it is "settled law in this circuit" that "stereotyping based on a person's gender-nonconforming behavior is impermissible discrimination," to deny an Ohio school district's motion to stay an injunction "ordering the school district to treat an eleven-year-old transgender girl as female and permit her to use

---

[3] Arcadia Resolution Letter and Agreement, OCR Case No. 09–12–1020, Arcadia Unified Sch. Dist. (July 24, 2013), www.justice.gov/ sites/default/files/crt/legacy/2013/07/26/arcadialetter.pdf.

the girl's restroom." 845 F.3d 217, 220-21 (6th Cir. 2016) (quoting *Smith v. City of Salem*, 378 F.3d 566 (6th Cir. 2014), regarding the settled nature of the law (discrimination based on gender identity is actionable under Title VII)); *see also Nelson v. Christian Bros. Univ.*, 226 F. App'x 448, 454 (6th Cir. 2007) ("Generally, courts have looked to Title VII, 42 U.S.C. §§ 2000e, as an analog for the legal standards in both Title IX discrimination and retaliation claims.").

Other federal courts have reached the same conclusion. *See e.g.*, *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1049 (7th Cir. 2017) ("A policy that requires an individual to use a bathroom that does not conform with his or her gender identity punishes that individual for his or her gender non-conformance, which in turn violates Title IX."); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020), *as amended* (Aug. 28, 2020) (school board's policy requiring students to use bathrooms based on their biological sex violated Title IX); *Hecox v. Little*, 479 F. Supp. 3d 930 (D. Idaho 2020) (enjoining Idaho law that categorically bars transgender women from participating in women's sports teams and singles out members of women's teams for sex verification); *Parents for Privacy v. Dallas Sch. Dist. No. 2.*, 326 F. Supp. 3d 1075, 1106 (D. Ore. 2018) ("Forcing transgender students to use facilities inconsistent with their gender identity would undoubtedly harm those students and

prevent them from equally accessing educational opportunities and resources."),
*aff'd* 949 F.3d 210 (9th Cir. 2020).

The correctness of the reasoning and holdings of this line of cases in the
Title IX context were further confirmed by the Supreme Court's decision in
*Bostock v. Clayton County*, holding that "it is impossible to discriminate against a
person for being homosexual or transgender without discriminating against that
individual based on sex" in the context of employment discrimination under Title
VII. 140 S. Ct. 1731, 1747 (2020). Applying *Bostock*'s reasoning, the Fourth
Circuit held in *Grimm* that a school board violated Title IX with its policy denying
a transgender student access to bathrooms consistent with his gender identity and
refusing to amend his records to reflect his gender. 972 F.3d at 620.

At the agency level, OCR guidance has historically recognized that students
are protected under Title IX from being targeted because of their LGBTQ+ status.
Even prior to the development of caselaw and guidance affirmatively recognizing
that sex-based discrimination includes discrimination on the basis of sexual
orientation and gender identity, OCR's sexual harassment guidance going back to
1997 addressed protections for lesbian, gay and bisexual students.[4]  From 2010

---

[4] Dep't of Educ., Office for Civil Rights, Sexual Harassment Guidance:
Harassment of Students by School Employees, Other Students, or Third Parties, 62
Fed. Reg. 50,12034 (March 13, 1997).

through 2016, the Department of Education and the Department of Justice issued a series of guidance documents that explicitly addressed Title IX's application to LGBTQ+ students and affirmed that sexual orientation and gender identity are inherently sex-based characteristics protected under Title IX, including a 2016 Dear Colleague Letter specifying that denial of access to facilities consistent with a student's gender identity violates Title IX.[5] Although the incoming Trump Administration abruptly rescinded this Dear Colleague Letter in 2017, federal courts continued to interpret "on the basis of sex" to include discrimination on the basis of gender identity. *See, e.g., Whitaker*, 858 F.3d at 1034 (denying a transgender student access to facilities that match their gender identity "punishes that individual for his or her gender non-conformance, which in turn violates Title IX"); *J.A.W. v. Evansville Vanderburgh Sch. Corp.*, 323 F. Supp. 3d 1030, 1037 (S.D. Ind. 2018) (analyzing transgender student's claim under a sex-stereotyping framework); *Adams by & through Kasper v. School Bd. of St. Johns Cty.*, 318 F.

---

[5] Office for Civil Rights, U.S. Dep't of Educ., Dear Colleague Letter, Harassment and Bullying (Oct. 26, 2010), https://www2.ed.gov/about/offices/list/ocr/letters /colleague201010.pdf; Office for Civil Rights, U.S. Dep't of Educ., Questions and Answers on Title IX and Sexual Violence (Apr. 29, 2014), https://www2.ed.gov/ about/offices/list/ocr/docs/qa201404titleix.pdf; Office for Civil Rights, U.S. Dep't of Educ., and Civil Rights Division, U.S. Dep't of Justice, Dear Colleague Letter, Transgender Students (May 13, 2016), https://www2.ed.gov/about/offices/list/ ocr/letters/colleague-201605-title-ixtransgender.pdf.

Supp. 3d 1293 (M.D. Fla. 2018) (affirming that the term "sex" under Title IX

includes gender identity); *Parents for Privacy*, 326 F. Supp. 3d at 1106.

In light of this precedent and guidance, school districts across the country

have developed LGBTQ+ inclusive policies and explicitly prohibit discrimination

and harassment on the basis of sexual orientation and gender identity.[6] This

includes school districts within the appellee states, for example:

- Anchorage School District mandates that administrators and staff
  respect the right of an individual to be addressed by a name and pronoun
  that corresponds to their gender identity.[7]

- Kansas City Public Schools permit transgender and gender
  nonconforming learners to participate in physical education classes and

---

[6] In addition, at least 19 states, Puerto Rico and the District of Columbia have state
statues that explicitly prohibit discrimination on the basis of sexual orientation and
gender identity in education, in addition to the federal protections under Title IX.
*See* Movement Advancement Project, Safe Schools Laws, at
https://www.lgbtmap.org/equality-maps/safe_school_laws/discrimination.

[7] Anchorage Sch. Dis't, Administrative Guidelines: Working with Transgender and
Gender Nonconforming Students and Employees (2020),
https://www.asdk12.org/cms/lib/AK02207157/Centricity/Domain/1208/Guidelines
%20for%20Working%20with%20Transgender%20Students%20and%20Employee
s%20EEO%20054%20%20update%208202020.pdf.

intramural sports in a manner consistent with the learner's gender identity.[8]

- Metro Nashville School District provides equal access to all resources, programs, and facilities regardless of gender identity or sexual orientation, and explicitly recognizes that "affirming gender identity and gender expression for youth of all ages is proven to be one of the most effective mental health interventions" to support transgender and gender nonconforming youth.[9]

- Multiple school districts list gender identity and sexual orientation as protected categories in their harassment and bullying policies.[10]

---

[8] Kansas City 33 Sch. Dis't (MO), Prohibition Against Discrimination, Harassment and Retaliation (Transgender and Gender Nonconforming Employee and Students) (2021), https://resources.finalsite.net/images/v1661288506/kcpublicschoolsorg/gi4j9nwo7 nvryftniueu/CodeOfConduct2022FINAL.pdf.

[9] Metro Nashville Bd. of Educ., A Resolution, Regarding Physical, Mental and Emotional Support for All Metropolitan Nashville Public School Students, Staff, Parents, and other Stakeholders Regardless of Gender Identity, Gender Expression, or Sexual Orientation, (Apr. 27, 2021), https://mnps.org/students-families/student-resources/LGBTQIA.

[10] Olathe Public Sch., Student Code of Conduct (KS) (August 2022) (including gender identity and sexual orientation as protected classes under bullying policy); Metro-Nashville Public Schools Board Policy No. 6.304, Student Discrimination, Harassment, Bullying, Cyber-bullying, and Intimidation (2020) (TN) (recognizing sexual orientation and gender identity/expression as protected classes); Kansas City, Kansas Public Schools Board Policy JGEC, Sexual Harassment (2021) (KS)

## II.    Efforts to Undermine Protections for LGBTQ+ Students are Based Not on Sound Legal Principles But on Political Motivations.

This lawsuit is bound up in an ongoing political strategy of targeting LGBTQ+ people, which is employed by some politicians to divide and distract portions of the electorate. Politically motivated attacks on LGBTQ+ people go back decades, but the current campaign is distinguished by the sheer volume of proposed laws.[11] In 2021, more than 140 anti-LGBTQ+ bills were introduced in over 30 states, and in 2022, that number more than doubled to well over 300 anti-LGBTQ+ bills introduced in state legislatures.[12] These sadly familiar political

---

("Harassment based on gender identity or gender expression is expressly prohibited as outlined in this policy."); Warrensville Heights City Schools Board Policy No. 5517, Anti-Harassment (2019) (OH) (defining sex as including sexual orientation and gender identity); Columbus City Sch. Bd. Policy No. 5517, Anti-Harassment (2016) (OH) (recognizing sexual orientation and gender identity or expression as protected classes); Dallas Independent School District Board Policy FFH, Freedom from Discrimination, Harassment, and Retaliation (2020) (TX) (prohibiting harassment based on sexual orientation, gender identity, and gender expression.); Mesa Public Schools Board Policy JFD, Student Harassment and Bullying (2019) (AZ) (defining sex as including gender identity and sexual orientation).

[11] *See* Kiara Alfonseca, *With anti-LGBTQ laws proliferating, older activists say history is repeating itself*, ABC News (Oct. 1, 2022), https://abcnews.go.com/US/anti-lgbtq-laws-proliferating-older-activists-history-repeating/story?id=90278754; Edward Lempinen, *Attack on LGBTQ+ rights: The politics and psychology of a backlash*," Berkley News (May 2, 2022), https://news.berkeley.edu/2022/05/02/attack-on-lgbtq-rights-the-politics-and-psychology-of-a-backlash/.

[12] ACLU, *Legislation affecting LGBTQ rights across the country 2021*, https://www.aclu.org/legislation-affecting-lgbtq-rights-across-country-2021;

tactics exploit fear and lack of familiarity with transgender and gender nonconforming people, particularly targeting transgender youth.[13]

Fifteen of the twenty appellee states have passed laws banning transgender girls from participating in school athletics, and several prohibit transgender students from using restrooms consistent with their gender identity. *See* Complaint, *Tennessee v. Dep't of Educ.*, No. 3:21-cv-308 (E.D. Tenn. Aug. 30, 2021), ECF No. 1, ¶¶ 98-99. Many of the states also have curriculum bans that attempt to erase all mention of LGBTQ+ people or limit student access to age-appropriate information about gender and sexuality. *See* Tenn. Code Ann. § 49-6-1308 (2021); Ala. Code § 16-40A-5 (2022); H.B. 2035, 55th Leg., 1st Sess. (Az. 2021); Ark. Code Ann. § 6-16-1006 (West 2021); Ga. Code Ann. § 20-2-786 (West 2022); La. Stat. Ann. § 17:281 (1993); Mont. Code Ann. § 20-7-120 (West 2021); S.C. Code § 59-32-30(A)(5).

While the states argue they have an interest here because the federal agencies' guidance contradicts their state laws, this is the tail wagging the dog. The

---

Freedom for All Americans, *Legislative Tracker: All Anti-LGBTQ Bills*, https://freedomforallamericans.org/legislative-tracker/anti-lgbtq-bills/.

[13] *See* Henry Berg-Brousseau, *ICYMI: As Lawmakers Escalate Attacks on Transgender Youth Across the Country, Some GOP Leaders Stand up for Transgender Youth*, Human Rights Campaign (Mar. 24, 2022), https://www.hrc.org/press-releases/icymi-as-lawmakers-escalate-attacks-on-transgender-youth-across-the-country-some-gop-leaders-stand-up-for-transgender-youth.

animus of powerful leaders toward a particular politically unpopular group of people is precisely why the U.S. Constitution and federal civil right laws prohibit such discrimination. As U.S. District Court Judge Joseph Goodwin wrote in his decision enjoining West Virginia's ban on transgender student athletes, policies that ostracize a particular group of citizens are not unfamiliar in our democracy:

> A fear of the unknown and discomfort with the unfamiliar have motivated many of the most malignant harms committed by our country's governments on their own citizens. Out of fear of those less like them, the powerful have made laws that restricted who could attend what schools, who could work certain jobs, who could marry whom, and even how people can practice their religions. Recognizing that classifying human beings in ways that officially sanction harm is antithetical to democracy, the states ratified the Fourteenth Amendment. It ensures that no state may "deny to any person within its jurisdiction the equal protection of the laws."

*B.P.J. v. W. Virginia State Bd. of Educ.*, 550 F. Supp. 3d 347, 350 (S.D.W. Va. 2021) (granting injunction against state law that barred a transgender student athlete from participating on a sports team consistent with her gender identity, holding that law violated the Equal Protection Clause and Title IX).

Furthermore, Judge Goodwin found in *B.P.J.* that the sports ban did not appear to be based on any legitimate government interest: "… I have been provided with scant evidence that this law addresses any problem at all, let alone an important problem. *Id.* Similarly, Utah's Governor Spencer Cox, who supports limitations on transgender participation in sports but nonetheless vetoed an outright

16

ban passed by the state legislature in March 2022, observed that "[r]arely has so much fear and anger been directed at so few."[14]

Just as there is no legitimate legal controversy over the protections that Title IX provides for lesbian, gay, bisexual, transgender, and intersex students, this recent barrage of anti-transgender laws serves no legitimate governmental interests but is being used for political purposes to the detriment of LGBTQ+ students and educators.

## III.    Anti-LGBTQ+ Laws and School Policies Harm a Particularly Vulnerable Student Population and Degrade School Climates for All Students, While Inclusive Policies Benefit All Students.

Whatever political advantages some state leaders may gain by promoting anti-LGBTQ+ positions, the costs of these tactics are borne by students, educators, and families of LGBTQ+ children. As documented in the Trevor Project's 2021 National Survey on LGBTQ Mental Health, 94% of LGBTQ youth reported that recent politics impacted their mental health.[15] Discrimination against LGBTQ+

---

[14] Gov. Spencer Cox letter to J. Stuart Adams and Brad R. Wilson (Mar. 22, 2022), as reported in the *Salt Lake City Tribune*, https://www.sltrib.com/news/politics/ 2022/03/22/gov-spencer-coxs/ (citing the miniscule number of transgender students participating in high school sports: four out of 75,000).

[15] The Trevor Project (2021), *2021 National Survey on LGBTQ Youth Mental Health*, at https://www.thetrevorproject.org/wp-content/uploads/2021/05/The-Trevor-Project-National-Survey-Results-2021.pdf. S*ee also*, Kathryn Varn, "'No One Felt Safe': Florida Schools, Students Feel Effects of So-Called 'Don't Say

students increased overall in 2021, with students from the South being the most likely to experience anti-LGBTQ+ discriminatory policies and practices, and victimization based on sexual orientation being highest among students in the South and Midwest."[16]

An overwhelming majority (83%) of LGBTQ+ youth report being harassed or assaulted during the 2021-2022 academic year, and four out of five (81.8%) LGBTQ+ students reported feeling unsafe in school because of their actual or perceived personal characteristics. GLSEN, *2021 National School Climate Survey*, at 10-11, 19.

The impact of harassment and discrimination is particularly devastating for this student population. LGBTQ+ youth report high levels of depression and suicidal ideation – multitudes of times higher than their cisgender, heterosexual peers. The Trevor Project found that 45% of LGBTQ youth (ages 13-24) seriously

---

Gay' Law," *Tallahassee Democrat* (June 30, 2022); Elliot A. Tebbe, et al., "A Dangerous Visibility: Moderating Effects of Antitrans Legislative Efforts on Trans and Gender-Diverse Mental Health, *Psychology of Sexual Orientation and Gender Diversity*, American Psychological Assoc. (2022 Vol. 9, Issue 3), https://psycnet.apa.org/fulltext/2021-49910-001.html ("Antitrans legislative efforts significantly shape the effects of antitrans stigma and marginalization on mental health from trans and gender-diverse (TGD) individuals…").

[16] Caitlin M. Clark, et al.,  (2022).*The 2021 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools*, GLSEN, 109, 121, https://www.glsen.org/sites/default/files/2022-10/NSCS-2021-Full-Report.pdf (hereinafter, "GLSEN, *2021 National School Climate Survey*).

considered attempting suicide in the past year, including half (50%) of LGBTQ children age 13-17 seriously considering and 18% attempting suicide.[17] Experiencing discrimination is a significant factor in this increased risk of harm: 19% of youth who had experienced discrimination based on sexual orientation or gender identity attempted suicide in the past year, whereas 7% of LGBTQ+ youth who did not report experiencing discrimination attempted suicide. *Id.*; s*ee also*, *Bd. of Educ. of Highland Local Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850, 871 (S.D. Ohio 2016) (finding that a transgender student experienced suicidal ideation because of her treatment at school; even a moderate risk of suicide is a significant risk of harm to a student).

The Centers for Disease Control and Prevention (CDC) Youth Risk Behavior Survey found even higher rates of attempted suicide than reported in the Trevor Project annual survey, with 23.4% of lesbian, gay and bisexual high school students attempting suicide one or more times during 2019, compared with only 6.4% of their heterosexual peers.[18] Lesbian, gay and bisexual high school students

---

[17] The Trevor Project (2022), *2022 National Survey on LGBTQ Youth Mental Health*, https://www.thetrevorproject.org/survey-2022/assets/static/trevor 01_2022survey_final.pdf.

[18] CDC, Youth Risk Behavior Survey Data Summary & Trends Report: 2009-2019, 100, https://www.cdc.gov/healthyyouth/data/yrbs/pdf/YRBSDataSummary TrendsReport2019-508.pdf.

were more than three times as likely to have made a suicide plan as their

heterosexual peers (40% compared to 12%). *Id.* at 99.

School policies that deny LGBTQ+ students protection from discrimination

and harassment and perpetuate harms to one group of students also have negative

impacts on non-LGBTQ+ students. Research on bullying shows that LGBTQ+

youth and those with disabilities are particularly vulnerable to bullying, and that

this impacts not only the victims but also the perpetrators.[19] "Children and youths

who bully others are more likely to be depressed, engage in high-risk activities

such as theft and vandalism, and have adverse outcomes later in life compared to

those who do not bully." *Id.*

School policies that explicitly discriminate against LGBTQ+ students are

harmful to cisgender, heterosexual students as well. Specifically, policies that

single out transgender students for adverse treatment also threaten equal

opportunities for any cisgender girl who is not stereotypically feminine. For

example, the Utah ban on transgender student athletes resulted in Utah parents

calling into question a female high school competitor's gender after she

outperformed the field in a statewide competition, resulting in an investigation to

---

[19] *See* Board on Children, Youth, and Families, National Academies of Sciences, Engineering and Medicine, "Report in Brief: *Preventing Bullying Through Science, Policy and Practice*" (2016), https://nap.nationalacademies.org/resource/23482/preventing_bullying_RiB.pdf.

review the parents' complaint.[20]  The result is traumatic, invasive and unnecessary policing of girls' bodies, which disproportionately impact Black and brown girls who are perceived as gender nonconforming.[21]

In contrast, school districts with inclusive policies see great benefits to LGBTQ+ students and better school climates for all students and educators. It is well-established that LGBTQ+ youth fare significantly better in schools with inclusive policies and supportive teachers. GLSEN, *2021 National School Climate Survey*, 35-36, 63-65, 70-74. Specifically, the survey found that LGBTQ+ students who experienced discrimination were "nearly three times likelier to have missed school in the past month because they felt unsafe or uncomfortable than those who had not." *Id.* at 36. LGBTQ+ students in schools with anti-bullying policies and lower levels of LGBTQ+-related discrimination also reported feeling greater belonging, better psychological well-being, with lower levels of depression, and they performed better academically. *Id.* at 35, 43, 65.

---

[20] Marjorie Cortez, *After a girl beat their daughters in sports, Utah parents triggered investigation into whether she was transgender*, Desert News (Aug. 17, 2022), https://www.deseret.com/utah/2022/8/17/23310668/school-investigates-female-athlete-transgender-complaint.

[21] *See* Aamna Modhin, *For black women, femininity and feminism are not mutually exclusive*, Quartz (Jan. 6, 2018),  https://qz.com/quartzy/1158081/for-black-women-femininity-and-feminism-are-not-mutually-exclusive (referring to history and prevalence of Black women being denigrated "for not being feminine enough").

The positive effects of inclusive policies that recognize the equality and dignity of all students extend not only to LGBTQ+ students, but also to their cisgender, heterosexual peers. A recent study found that "LGBTQ-supportive policies and practices are significantly associated with improved psychosocial health outcomes among both LGB and heterosexual students . . ." Adina C. Cooper, et al., *Examining the Relationship Between LGBTQ-Supportive School Health Policies and Practices and Psychosocial Health Outcomes of Lesbian, Gay, Bisexual, and Heterosexual Students*, LGBT Health, 9(1), 43–53. School climates that are safe and inclusive for LGBTQ+ students are good for all students.[22]

An educator interviewed for this brief observed that LGBTQ+ inclusive speech in the classroom helps teach students "what is appropriate in public life," and that regardless of what students may say privately, it is "valuable to draw the line of what is acceptable to do or say in a public or professional setting like school." *See Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 683 (1986) ("teachers…demonstrate the appropriate form of civil discourse and political expression by their conduct and deportment in and out of class."). A Kansas City teacher observed that the district's LGBTQ+ inclusive anti-bullying policy

---

[22] CDC, *LGBTQ-Supportive School Policies and Practices Help All Students Thri*ve, (June 2022), https://www.cdc.gov/healthyyouth/safe-supportive-environments/pdf/LGBTQ-School-Policies-Practices.pdf ("All young people do better in LGBTQ-inclusive schools.").

"reduces the 'othering' of LGBTQ+ students, so they don't feel singled out," and the district's annual anti-bullying training "makes them feel seen and reduces the fear of being involved in GSA [gay-straight alliance]."

LGBTQ+ inclusive school policies that aim to prevent bullying function much like workplace sexual harassment policies that create safer workplaces for employees while helping employers avoid liability by addressing conduct before it reaches the level of actionable discrimination. *See e.g.*, *Shields v. Fed. Exp. Customer Info. Servs. Inc.*, 499 F. App'x 473, 478 (6th Cir. 2012) (affirmative defenses in Title VII sexual harassment cases provide employers with "a strong inducement to ferret out and put a stop to any discriminatory activity in their operations"), quoting *Crawford v. Metro. Gov't of Nashville and Davidson Cnty.* 555 U.S. 271, 278 (2009). Similarly, school districts that implement policies and prohibit bullying not only reduce their potential liability but also create better school climates overall.

## IV.    Anti-LGBTQ+ Laws and School Policies Harm the Educators Who Must Enforce Them and Who May be Discriminated Against.

Educators experience the impacts of harmful political tactics in real time. When school districts react to public rhetoric of intolerance and fear, which is emboldened by the district court decision purporting to withdraw Title IX protections for LGBTQ+ youth and educators, educators have to deal with the immediate impacts for their students and themselves.  A teacher in Kansas detailed

what she witnessed after her district withdrew LGBTQ+ supportive policies: "What I am seeing now in my school is scary." The teacher described transgender students left to fend for themselves, often missing school because of harassment and the humiliation of repeated misgendering and "deadnaming." Another teacher who has experienced the "night and day" difference of teaching in a district that ignored attacks on LGBTQ+ students and educators and then in a different state with inclusive policies said, "It is so essential that it is clearly spelled out what protections exist, because we are a vast nation with vastly different environments, and it is important that no matter where students and teachers are, they need to know that they are safe and protected." Put simply, "a kid in Kansas shouldn't have to worry about it just because of where they live."

Educators themselves are harmed by the proliferation of state laws and school policies sanctioning discrimination against LGBTQ+ students. Anti-LGBTQ+ state laws and school policies are not self-enforcing; they require teachers, school counselors and nurses, and other school staff to carry them out. Some policies compel school staff who care deeply about the well-being of their students to harm transgender and nonbinary students by misgendering them, "outing" them against their will, and forcing them to use school facilities matching their birth sex. This is antithetical to the most fundamental, deeply held values and

24

beliefs of many educators, including the religious beliefs of some.[23] As one educator interviewed for this brief explained, policies that require them to "out" a student against their will are "completely contrary to their beliefs as a human and professional obligation to keep a student safe."

Many educators believe that it is a core principle of their professional obligations to treat all students with dignity and acceptance for who they are and to foster learning environments based on respect and inclusion. NEA's Code of Ethics, adopted by its highest governing body in 1975, provides that educators accept "the responsibility to adhere to the highest ethical standards," including "the guarantee of equal educational opportunity for all."[24] As part of their ethical commitments to students, NEA members pledge that they "[s]hall not on the basis of race, color, creed, sex, national origin, marital status, political or religious beliefs, family, social or cultural background, or sexual orientation, unfairly a.) Exclude any student from participation in any program; b.) Deny benefits to any

---

[23] *See* Rev. Susan Fredrick-Gray, *Transphobic and Anti-Abortion Policies are a Direct Threat to My Religious Freedom*, Religion Dispatches (June 6, 2022), https://religiondispatches.org/transphobic-and-anti-abortion-policies-are-a-direct-threat-to-my-religious-freedom/ (describing tenets of Unitarian Universalism that compel acceptance and affirmation of LGBTQ+ individuals and citing research indicating that 97% of Unitarian Universalists support nondiscrimination of LGBTQ+ people).

[24] NEA Code of Ethics (Adopted by Representative Assembly, 1975), https://www.nea.org/resource-library/code-ethics-educators.

student; c.) Grant any advantage to any student." *Id.* They further commit that they

"[s]hall make reasonable effort to protect the student from conditions harmful to

learning or to health and safety" and "[s]hall not intentionally expose the student to

embarrassment or disparagement." *Id.* The Model Code of Ethics for Educators

similarly requires "[r]especting the dignity, worth and uniqueness of each

individual student including, but not limited to, actual and perceived gender,

gender expression, gender identity, sexual orientation…." [25] Anti-LGBTQ+

policies that violate these tenets of professional ethics by treating a particular

group of students as less deserving of respect, autonomy, and privacy conflict with

educators' ethical obligations and can be severely demoralizing.[26]

---

[25] Model Code of Ethics for Educators § III.B.2, National Association of State Directors of Teacher Education and Certification (2021), https://www.nasdtec.net/page/MCEE_DOC#Principle%20III); *see also*, Troy Hutchings, *"All" Means All- It Really is that Simple*, Ethics and Educators Blog (Sept. 13, 2022), https://www.nasdtec.net/blogpost/1757877/Ethics-and-Educators ("The MCEE does not create ethical duties for educators – instead, it organizes and ratifies ethical standards that are innate to the teaching profession.").

[26] *See* Doris A. Santoro, *Teacher Demoralization Isn't the Same as Teacher Burnout*, Education Week (Nov. 11, 2020), https://www.edweek.org/teaching-learning/opinion-teacher-demoralization-isnt-the-same-as-teacher-burnout/2020/11 ("Demoralization occurs when teachers cannot reap the moral rewards that they previously were able to access in their work. It happens when teachers are consistently thwarted in their ability to enact the values that brought them to the profession.").

For educators who are themselves LGBTQ+, the district court's decision undercuts their protections against employment discrimination pursuant to Title IX as well as Title VII, as the lower court also struck down the EEOC's guidance interpreting how *Bostock* applies to discrimination against transgender employees. This harmful decision comes during a time when LGBTQ+ people, and particularly transgender people, face alarming rates of violence in this county.[27] "Last year was the deadliest on record for trans people, and already this year the Human Rights Campaign has recorded another 32 violent deaths of transgender and non-binary people." *Id.* Educators and others who advocate for policies that affirm and support LGBTQ+ students find themselves the targets of hateful, defamatory, and dangerous rhetoric.[28]

LGBTQ+ educators, in particular, are experiencing significant anxiety in the current political climate, as harassment, discrimination, and vicious attacks by anti-LGBTQ+ groups become unbearable for some educators. As an LGBTQ+ teacher from Colorado explained, the most common question he hears from LGBTQ+

---

[27] *See e.g.*, Casey Parks, *Club Q shooting follows year of bomb threats, drag protests, anti-trans bills*, Washington Post (Nov. 20, 2022), https://www.washingtonpost.com/dc-md-va/2022/11/20/club-q-shooting-lgbtq-harassment/.

[28] *See e.g.*, Melissa Block, *Accusations of 'grooming' are the latest political attack – with homophobic origins*, *NPR* (May 11, 2022), https://www.npr.org/2022/05/11/1096623939/accusations-grooming-political-attack-homophobic-origins.

educators and aspiring teachers is whether teaching is right for them because of their sexual orientation or gender identity, and that uncertainty about whether they will be protected is "a significant factor in the drying up of the teacher pipeline." Another educator from Kentucky concurred that having anti-LGBTQ+ policies "makes teachers feel unwelcome" and "furthers the teacher shortages." They remarked that it is "very frustrating to have protections dependent on who is in office; it is extremely whiplash-inducing," because they often have to reconsider "whether it is safe for them or their students to be out and open about themselves."

Many LGBTQ+ educators interviewed for this brief who taught in school districts that are hostile to their rights and their very identity discussed the toll it takes on their mental health and well-being. Willie Edward Taylor Carver Jr., Kentucky's Teacher of the Year, spoke publicly about his decision not to return to teaching after another LGBTQ+ colleague received death threats and was forced to resign. "I'm a proud gay man, I am the 2022 Kentucky Teacher of the Year, and I'm afraid to return to the classroom. I want kids to see me and feel hope, but I'm tired. I've been doing this for a long time, and things are getting worse. This is painful and I am sorry."[29] This harm to LGBTQ+ educators in turn harms students

---

[29] Madeline Will, *'I'm afraid to return to the classroom:' A Gay Teacher of the Year Speaks Out*, Education Week (May 12, 2022), https://www.edweek.org/teaching-learning/im-afraid-to-return-to-the-classroom-a-gay-teacher-of-the-year-speaks-out/2022/05.

who lose highly-qualified educators at a time when public schools face unprecedented teacher shortages.

## CONCLUSION

For the foregoing reasons, Amici urge the Court to reverse the district court's decision.

Dated: December 20, 2022

Washington, D.C.                    */s/ Keira McNett*
                                    Keira McNett

DAVID J. STROM                      ALICE O'BRIEN
AMERICAN FEDERATION OF TEACHERS,    KEIRA McNETT
AFL-CIO                             TAYLOR POE
555 New Jersey Avenue, N.W.         NATIONAL EDUCATION ASSOCIATION
Washington, DC 20001                1201 16th Street, N.W.
(202) 393-7472                      Washington, DC  20036-3290
                                    (202) 236-4115

TEAGUE PATERSON                     NICOLE G. BERNER
AMERICAN FEDERATION OF STATE,       SERVICE EMPLOYEES INTERNATIONAL
COUNTY AND MUNICIPAL EMPLOYEES,     UNION
AFL-CIO                             1800 Massachusetts Avenue, N.W.
1625 L Street, N.W.                 Washington, DC  20036
Washington, DC  20036               (202) 730-7383
(202) 775-5900

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 6,402 words from the Statement of Interest through the Conclusion, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally space typeface using Microsoft Word with Times New Roman 14-point font.

Dated: December 20, 2022

Washington, D.C.                                     */s/ Keira McNett*
                                                          Keira McNett

                                                     *Attorney for Amici Curiae*

30

## CERTIFICATE OF SERVICE

I hereby certify that on December 20, 2022, the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

Dated: December 20, 2022

Washington, D.C.                                   */s/ Keira McNett*
                                                   Keira McNett

                                                   *Attorney for Amici Curiae*

31