No. 22-5807

IN THE UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

**STATE OF TENNESSEE, et al.,**

                              Plaintiff-Appellees,

>    **v.**

**DEPARTMENT OF EDUCATION, et al.,**

                         Defendant-Appellants.

On Appeal from the United States District Court
for the Eastern District of Tennessee

No. 3:21-cv-00308
Charles E. Atchley, Jr., Judge

**BRIEF OF AMICI CURIAE CALIFORNIA, COLORADO,
CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA,
HAWAI'I, ILLINOIS, MAINE, MARYLAND, MASSACHUSETTS,
MICHIGAN, MINNESOTA, NEVADA, NEW JERSEY, NEW
MEXICO, NEW YORK, OREGON, RHODE ISLAND, AND
WASHINGTON IN SUPPORT OF NEITHER PARTY**

ROB BONTA
Attorney General of California
MICHAEL L. NEWMAN
Senior Assistant Attorney General
LAURA FAER
Supervising Deputy Attorney General
JAMES E. RICHARDSON
JENNIFER A. GIBSON
BRIAN BILFORD (State Bar No. 262812)
Deputy Attorneys General
  300 South Spring Street, Ste. 1702
  Los Angeles, CA 90013-1230
  Telephone: (213) 269-6341
  Email:  Brian.Bilford@doj.ca.gov
*Attorneys for Amicus Curiae the
Attorney General of California*

(Additional counsel on signature pages.)

# TABLE OF CONTENTS

**Page**

INTERESTS OF AMICI CURIAE ............................................................1

ARGUMENT....................................................................................3

I.    If the Court Reaches Plaintiff States' Substantive Challenge to the Guidance, It Should Uphold That Guidance.................................................................................3

    A.    The Education Department's Guidance Reflects Clear Precedent Interpreting Title VII and Title IX........4

    B.    The EEOC's Guidance Reflects Established Precedent Interpreting Title VII .....................................8

II.    The Challenged Guidance Serves Important Interests in Protecting LGBT Individuals .................................................11

    A.    Title VII and Title IX Recognize the Discriminatory Harms Identified in the Challenged Guidance....................................................................11

    B.    LGBT Students and Employees Face Myriad Concrete Harms the Challenged Guidance is Meant to Prevent and Redress .....................................14

        1.    Harms Faced by LGBT Students.......................14

        2.    Harms Faced by LGBT Employees....................18

III.    Amici States Have Enacted Laws Similar to the Challenged Guidance, Providing Benefits without Compromising Privacy or Safety ..........................................20

    A.    Amici States' Efforts to Protect LGBT Persons in Education from the Concrete Harms of Discrimination Reap Substantial Benefits. ..................22

    B.    Amici States' Efforts to Protect LGBT Persons in Employment from the Concrete Harms of Discrimination Reap Substantial Benefits. ..................25

CONCLUSION .......................................................................27

# TABLE OF CONTENTS
## (continued)

**Page**

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) .........................29

CERTIFICATE OF SERVICE...................................................................30

# TABLE OF AUTHORITIES

**Page**

CASES

*Bill Johnson's Rests., Inc. v. NLRB*
 461 U.S. 731 (1983).................................................................3

*Bostock v. Clayton County, Georgia*
 140 S. Ct. 1731 (2020)....................................................*passim*

*Burlington Industries, Inc. v. Ellerth*
 524 U.S. 742 (1998).................................................................9

*Cannon v. Univ. of Chicago*
 441 U.S. 677 (1979)...............................................................13

*Chisholm v. St. Mary's City Sch. Dist. Bd. of Educ.*
 947 F.3d 342 (6th Cir. 2020)....................................................6

*Faragher v. City of Boca Raton*
 524 U.S. 775 (1998).................................................................9

*Gloucester Cnty. Sch. Bd. v. G.G.*
 137 S. Ct. 1239, No. 16-273, 2017 WL 930055 (Mar. 6,
 2017) ...................................................................................24

*Harris v. Forklift Sys., Inc.*
 510 U.S. 17 (1993)........................................................*passim*

*Jackson v. Birmingham Bd. of Educ.*
 544 U.S. 167 (2005).................................................................4

*Lujan v. Defs. of Wildlife*
 504 U.S. 555 (1992)...............................................................10

*Olmstead v. L.C. ex rel. Zimring*
 527 U.S. 581 (1999)..............................................................5, 7

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Oncale v. Sundowner Offshore Servs., Inc.*
  523 U.S. 75 (1998)...................................................................8

*Pelcha v. MW Bancorp, Inc.*
  988 F.3d 318 (6th Cir. 2021)...................................................7

*Roberts v. Jaycees*
  468 U.S. 609 (1984)................................................................26

*Soule v. Connecticut Ass'n of Sch., Inc.*
  No. 21-1365-CV, 2022 WL 17724715, at *8 (2d Cir. Dec.
  16, 2022)................................................................................7

*Tennessee v. United States Dep't of Educ.*
  No. 3:21-CV-308, 2022 WL 2791450, at *5-*20 (E.D. Tenn.
  July 15, 2022 ....................................................................3, 10

## STATUTES AND REGULATIONS

34 C.F.R. § 106.30(a) (2) .........................................................13

20 U.S.C. § 1681(a) ...................................................................4

42 U.S.C. § 2000e-2...............................................................8, 12

775 Ill. Comp. Stat. 5/1-102(A) ...............................................20

Cal. Educ. Code
  § 220...................................................................................20
  § 221.5(f)............................................................................20

Cal. Gov't Code
  § 12926(o) ..........................................................................20
  § 12926(r)(2) ......................................................................20
  § 12940(a)...........................................................................20
  § 12949 ...............................................................................20

## TABLE OF AUTHORITIES
### (continued)

Page

Title VII of Civil Rights Act of 1964 .................................................... *passim*

Colo. Rev. Stat. § 24-34-402 .......................................................................20

Conn. Gen. Stat.
   § 10-15c .....................................................................................................20
   § 46a-60 .....................................................................................................20

D.C. Code
   § 2-1402.11 ................................................................................................21
   § 2-1402.41 ................................................................................................21

Del. Code Title 19, § 711 .............................................................................20

Department of Education, Enforcement of Title IX of the
   Education Amendments of 1972 with Respect to
   Discrimination Based on Sexual Orientation and Gender
   Identity in Light of *Bostock v. Clayton County*, 86 Fed. Reg.
   32,637 (June 22, 2021) ........................................................................ *passim*

Haw. Rev. Stat. § 489-3 ...............................................................................20

Iowa Code
   § 216.6 .......................................................................................................20
   § 216.9 .......................................................................................................20

Mass. Gen. Laws
   ch. 76 § 5 ...................................................................................................21
   ch. 151B, § 4 ..............................................................................................21
   ch. 272 § 92A .............................................................................................21

Md. Code, State Gov't § 20-606 .................................................................21

Me. Rev. Stat. tit. 5
   § 4571 ........................................................................................................21
   § 4601 ........................................................................................................21

## TABLE OF AUTHORITIES
### (continued)

Page

Minn. Stat.
  § 363A.08 ..........................................................................................21
  § 363A.13 ..........................................................................................21

N.H. Rev. Stat. Ann. § 354-A:6 ......................................................21

N.J. Stat. Ann.
  § 10:5-5 ..............................................................................................21
  § 10:5-12 ............................................................................................21
  § 18A:36-41 ........................................................................................21

N.M. Stat. Ann.
  §§ 22-35-2-1 *et seq.* (2019)..................................................21, 23
  § 28-1-2(Q)........................................................................................21
  § 28-1-7 ..............................................................................................21

N.Y. Comp. Codes R. & Regs. Title 9, § 466.13 .........................21

N.Y. Exec. Law § 291 .......................................................................21

Nev. Rev. Stat.
  § 613.310(4) ......................................................................................21
  § 613.330............................................................................................21
  § 651.050(2) ......................................................................................21
  § 651.070............................................................................................21

*Nondiscrimination on the Basis of Sex in Education Programs
  or Activities Receiving Federal Financial Assistance*, 85
  Fed. Reg. 30,026, 30,170 (May 19, 2020) ................................13

Or. Rev. Stat.
  § 659.850............................................................................................21
  § 659A.006 ........................................................................................21

*Racial Incidents and Harassment Against Students at
  Educational Institutions*, 59 Fed. Reg. 11,448-51 (Mar. 10,
  1994) ................................................................................................13

# TABLE OF AUTHORITIES
## (continued)

**Page**

R.I. Gen. Laws
  § 28-5-6(11) ........................................................... 21
  § 28-5-7 ................................................................. 21

Title IX of the Education Amendments of 1972 .................................. *passim*

Utah Code Ann. § 34a-5-106 ...................................................... 21

Vt. Stat. Ann. Title 21, § 495 ...................................................... 21

Wash. Rev. Code
  § 28A.642.010 ........................................................ 21
  § 49.60.180 ............................................................ 21

## COURT RULES

Fed. R. App. P. 29(a)(2) ............................................................ 1

## OTHER AUTHORITIES

Alberto Arenas et al., *7 Reasons for Accommodating
  Transgender Students at School*, Phi Delta Kappan (Sept. 1,
  2016), https://kappanonline.org/arenas-gunckel-smith-7-
  reasons-for-accommodating-transgender-students-school/ .................... 23

Amira Hasenbush et al., *Gender Identity Nondiscrimination
  Laws in Public Accommodations: A Review of Evidence
  Regarding Safety and Privacy in Public Restrooms, Locker
  Rooms, and Changing Rooms*, 16 Sexuality Rsch. & Soc.
  Pol'y 70-83 (2019),
  https://williamsinstitute.law.ucla.edu/publications/ma-
  public-accommodations/ ........................................................ 24

Brad Sears et al., Williams Institute, *LGBT People's
  Experiences of Workplace Discrimination and Harassment* 1
  (Sept. 2021), https://williamsinstitute.law.ucla.edu/wp-
  content/uploads/Workplace-Discrimination-Sep-2021.pdf .................... 18

# TABLE OF AUTHORITIES
## (continued)

Page

Brooke Migdon, *US LGBTQ+ Population Hits 20 Million*,
TheHill (Dec. 14, 2021), https://thehill.com/changing-
america/respect/diversity-inclusion/585711-us-lgbtq-
population-hits-20-million/ ....................................................................1

Cal. Senate Comm. on Educ., Bill Analysis: Assemb. Bill No.
1266 (2013-2014 Reg. Sess. Hearing Date June 12, 2013)....................22

Caroline Medina et al., Center for American Progress, *Fact
Sheet: LGBT Workers in the Labor Market* (June 1, 2022),
https://www.americanprogress.org/article/fact-sheet-lgbt-
workers-in-the-labor-market/ ...............................................................18

CDC, *Inclusive Practices Help All Students Thrive* (June 27,
2022), https://www.cdc.gov/healthyyouth/safe-supportive-
environments/LGBTQ-policies-practices.htm.......................................23

Christian N. Thoroughgood et al., *Creating a Trans-Inclusive
Workplace*, Harv. Bus. Rev. Mag. (Mar.-Apr. 2020),
https://hbr.org/2020/03/creating-a-trans-inclusive-workplace ...............19

Christy Mallory et al., Williams Inst., *Impact of Stigma and
Discrimination (Michigan)* 56 (2019),
http://williamsinstitute.law.ucla.edu/wp-
content/uploads/Impact-LGBT-Discrimination-MI-Apr-
2019.pdf..................................................................................................2

Crosby Burns et al., Ctr. for Am. Progress & AFSCME, *Gay
and Transgender Discrimination in the Public Sector: Why
It's a Problem for State and Local Governments, Employees,
and Taxpayers* 18 (2012),
https://www.americanprogress.org/wp-
content/uploads/2012/08/LGBTPublicSectorReport1.pdf ........................2

## TABLE OF AUTHORITIES
### (continued)

Page

David Baboolall et al., *Being Transgender at Work*, McKinsey
Q. (Nov. 10, 2021), https://www.mckinsey.com/featured-
insights/diversity-and-inclusion/being-transgender-at-work............. 19, 20

David Crary, *Debate Over Transgender Bathroom Access
Spreads Nationwide*, Salt Lake Trib. (May 10, 2016),
https://archive.sltrib.com/article.php?id=3875520&itype=C
MSID ................................................................................................. 24

EEOC, "Enforcement Guidance on *Harris v. Forklift Sys. Inc.*"
(Mar. 8, 1994) ...................................................................................... 9

EEOC, "Enforcement Guidance: Vicarious Liability for
Unlawful Harassment by Supervisors" (Jun. 18, 1999) ......................... 9

EEOC, "Questions & Answers for Small Employers on
Employer Liability for Harassment by Supervisors" (June
21, 1999) ............................................................................................. 9

Emily A. Greytak et al., GLSEN, *Harsh Realities: The
Experiences of Transgender Youth in Our Nation's Schools*
14 (2009), https://files.eric.ed.gov/fulltext/ED505687.pdf ............... 16, 17

Gabriel R. Murchison et al., *School Restroom and Locker Room
Restrictions and Sexual Assault Risk Among Transgender
Youth*, Pediatrics, June 2019,
https://publications.aap.org/pediatrics/article/143/6/e201829
02/76816/ ............................................................................................ 17

Human Rights Campaign, *Cities and Counties with Non-
Discrimination Ordinances that Include Gender Identity*
(Jan. 28, 2021), https://www.hrc.org/resources/cities-and-
counties-with-non-discrimination-ordinances-that-include-
gender .................................................................................................. 21

## TABLE OF AUTHORITIES
### (continued)

Page

Human Rights Watch, *Shut Out: Restrictions on Bathroom and
    Locker Room Access for Transgender Youth in US Schools*
    10 (2016),
    https://www.hrw.org/sites/default/files/report_pdf/uslgbttran
    s0916_web.pdf..................................................................................17, 22

Jaime M. Grant et al., Nat'l Ctr. for Transgender Equality and
    Nat'l Gay & Lesbian Task Force, *Injustice at Every Turn: A
    Report of the National Transgender Discrimination Survey*
    51 (2011),
    https://www.hivlawandpolicy.org/sites/default/files/Injustice
    %20at%20Every%20Turn.pdf .........................................................19, 26

Jody L. Herman et al., Williams Institute, *How Many Adults
    and Youth Identify as Transgender in the United States?* 1
    (2022), https://williamsinstitute.law.ucla.edu/wp-
    content/uploads/Trans-Pop-Update-Jun-2022.pdf .................................14

Jody L. Herman, *Gendered Restrooms and Minority Stress: The
    Public Regulation of Gender and Its Impact on Transgender
    People's Lives*, J. of Pub. Mgmt. & Soc. Policy 65 (2013),
    https://williamsinstitute.law.ucla.edu/wp-
    content/uploads/Restrooms-Minority-Stress-Jun-2013.pdf..............17, 20

Joseph G. Kosciw et al., GLSEN, *The 2015 National School
    Climate Survey: The Experiences of Lesbian, Gay, Bisexual,
    Transgender, and Queer Youth in Our Nation's Schools*
    xviii. (2016), https://www.glsen.org/sites/default/files/2020-
    01/GLSEN%202015%20National%20School%20Climate%
    20Survey%20%28NSCS%29%20-%20Full%20Report.pdf.............15, 17

Joseph G. Kosciw et al., GLSEN, *The 2019 National School
    Climate Survey: The Experiences of Lesbian, Gay, Bisexual,
    Transgender, and Queer Youth in our Nation's Schools* 28
    (2020), https://www.glsen.org/sites/default/files/2021-
    04/NSCS19-FullReport-032421-Web_0.pdf .........................................15

# TABLE OF AUTHORITIES
## (continued)

Page

Kansas Hum. Rts. Comm'n, *Kansas Human Rights
    Commission Concurs with the U.S. Supreme Court's
    Bostock Decision* (Aug. 21, 2020),
    http://www.khrc.net/pdf/Kansas%20Human%20Rights%20
    Commission%20Concurs%20with%20the%20US%20Supre
    me%20Court%20Decision%20in%20Bostock%20v%20Cla
    yton%20County.pdf ............................................................... 20

Kerith J. Conran, Williams Inst., *LGBT Youth Population in the
    United States* 1 (Sept. 2020),
    https://williamsinstitute.law.ucla.edu/wp-
    content/uploads/LGBT-Youth-US-Pop-Sep-2020.pdf ............................ 14

Kristie L. Seelman, *Transgender Adults' Access to College
    Bathrooms and Housing and the Relationship to Suicidality*,
    63 J. of Homosexuality 1378 (2016),
    https://scholarworks.gsu.edu/cgi/viewcontent.cgi?article=10
    65&context=ssw_facpub ....................................................... 20

Kristina R. Olson et al., *Mental Health of Transgender
    Children Who Are Supported in Their Identities*, Pediatrics,
    Mar. 2016,
    https://sdlab.fas.harvard.edu/files/sdlab/files/olson_2016_pe
    diatrics_mental_health_of_transgender_children.pdf ........................ 24

Legislative Education Study Committee Bill Analysis, N.M. SB
    288 (Feb. 26, 2019) ............................................................... 23

Lindsay Mahowald, *LGBTQI+ Nondiscrimination Laws
    Improve Economic, Physical, and Mental Well-Being*,
    Center for American Progress (March 24, 2022),
    https://www.americanprogress.org/article/lgbtqi-
    nondiscrimination-laws-improve-economic-physical-and-
    mental-well-being/ ................................................................ 26

# TABLE OF AUTHORITIES
## (continued)

**Page**

Michelle M. Johns et al., *Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students - 19 States and Large Urban School Districts, 2017*, 68 Morbidity & Mortality Wkly. Rep. 67 (2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6348759/pdf/mm6803a3.pdf......................................................................................16

Movement Advancement Project & GLSEN, *Separation and Stigma: Transgender Youth and School Facilities* 4 (2017), https://www.lgbtmap.org/file/transgender-youth-school.pdf..................16

S. Rep. No. 100-64 (1987), *as reprinted in* 1988 U.S.C.C.A.N. 3, 6, 1987 WL 61447 ................................................................................4

Sandy E. James et al., Nat'l Ctr. For Transgender Equal., *The Report of the 2015 U.S. Transgender Survey* 132-34 (Dec. 2016), https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf...................................................................*passim*

U.S. Dep't of Educ., Office for Civil Rights, *Sexual Harassment: It's Not Academic* (Sept. 1988)........................................13

U.S. Equal Employment Opportunity Commission Guidance on Protections Against Employment Discrimination Based on Sexual Orientation or Gender Identity (June 15, 2021) ..................*passim*

## INTERESTS OF AMICI CURIAE

Amici Curiae States of California, Colorado, Connecticut, Delaware, Hawai'i, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, Rhode Island, Washington, and the District of Columbia ("Amici States") submit this brief pursuant to Fed. R. App. P. 29(a)(2) in support of the rights of the more than 20 million lesbian, gay, bisexual, and transgender ("LGBT") Americans to live, work, and pursue education without being subjected to discrimination on the basis of their identity.[1]  Amici States recognize that discrimination against LGBT individuals on the basis of sexual orientation and gender identity necessarily involves discrimination on the basis of sex—and that such discrimination causes significant, tangible, and legally-cognizable harms.  These conclusions are borne out by the experience of Amici States and their residents.

Discrimination on the basis of sex against LGBT individuals is especially damaging in employment and education, the contexts addressed by the two guidance documents at issue in this appeal.[2]  When employees do not have legal

---

[1] *See* Brooke Migdon, *US LGBTQ+ Population Hits 20 Million*, TheHill (Dec. 14, 2021).  This resource is available on the internet.  For authorities available online, citations indicate as much and full URLs appear in the table of authorities.  All URLs were last visited on December 21, 2022.

[2] U.S. Equal Employment Opportunity Commission ("EEOC") Guidance on Protections Against Employment Discrimination Based on Sexual Orientation or

protection from anti-LGBT discrimination—including protected access to bathrooms, the ability to dress consistent with their gender identities, and protection against pronoun misuse contributing to a hostile work environment— these employees and the States in which they live and work incur significant harms. Such harms can be economic, physical, and psychological in nature, and are cognizable under well-established anti-discrimination case law.

Discrimination against LGBT individuals directly threatens the interests of States. Workers who lose their employment due to discrimination are often forced to seek public assistance, as are individuals unjustly deprived of educational opportunities. As a result, States expend greater sums to ensure that victims of discrimination are fed and housed, and lose tax revenues due to business inefficiencies. *See, e.g.*, Christy Mallory et al., Williams Inst., *Impact of Stigma and Discrimination (Michigan)* 56 (2019) (internet); Crosby Burns et al., Ctr. for Am. Progress & AFSCME, *Gay and Transgender Discrimination in the Public Sector: Why It's a Problem for State and Local Governments, Employees, and Taxpayers* 18 (2012) (internet).

---

Gender Identity (June 15, 2021) (internet) ("EEOC Guidance"); Department of Education, Enforcement of Title IX of the Education Amendments of 1972 with Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of *Bostock v. Clayton County*, 86 Fed. Reg. 32,637 (June 22, 2021) (internet) ("Education Guidance") (collectively, "Guidance Documents").

Amici States also have a strong interest in ensuring that federal laws intended to protect LGBT individuals from discrimination are recognized and enforced. Amici States rely on Title VII of the Civil Rights Act of 1964 ("Title VII"), and Title IX of the Education Amendments of 1972 ("Title IX"), to protect their residents, workers, and students from discrimination. *See, e.g.*, *Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 742 (1983) (recognizing "the substantial State interest in protecting the health and well-being of its citizens") (quotation marks omitted). The Guidance Documents correctly effectuate these statutes' mandates, in turn making them more effective and of greater benefit to Amici States and vulnerable populations within them. The common experience of Amici States shows that protecting LGBT residents, workers, and students from discrimination on the basis of sex dramatically improves economic, psychological, health, employment, and educational outcomes for these individuals, yielding broad benefits, without compromising privacy or safety, or imposing significant costs.

## ARGUMENT

## I. IF THE COURT REACHES PLAINTIFF STATES' SUBSTANTIVE CHALLENGE TO THE GUIDANCE, IT SHOULD UPHOLD THAT GUIDANCE

Amici States take no position on the jurisdictional or procedural issues addressed by the district court. *See, e.g*., *Tennessee v. United States Dep't of Educ.*, No. 3:21-CV-308, 2022 WL 2791450, at *5-*20 (E.D. Tenn. July 15, 2022) (addressing, *inter alia*, Plaintiff States' standing, ripeness, and "notice and

comment claim").  But if Plaintiff States renew their substantive challenge to the

Guidance Documents on appeal, this Court should reject it.  Not only are both

Guidance Documents consistent with current case law interpreting Title VII and

Title IX, they are also necessary to conform the respective agencies' administrative

guidance to binding precedent.

### A.   The Education Department's Guidance Reflects Clear Precedent Interpreting Title VII and Title IX.

Just as Title VII reflects "a congressional intent to strike at the entire

spectrum of disparate treatment of men and women in employment," *Harris v.

Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotations and citations

omitted), Title IX's prohibition on sex-based discrimination is broad and subject to

few exceptions: "No person in the United States shall, on the basis of sex, be

excluded from participation in, be denied the benefits of, or be subjected to

discrimination under any education program or activity receiving Federal financial

assistance[.]"  20 U.S.C. § 1681(a); *see also* S. Rep. No. 100-64 (1987), *as

reprinted in* 1988 U.S.C.C.A.N. 3, 6, 1987 WL 61447 ("In enacting [Title IX],

Congress intended that [it] be broadly interpreted to provide effective remedies

against discrimination."); *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175

(2005) ("Congress gave the statute a broad reach.").  The plain meaning of the

phrase "on the basis of sex," along with the Supreme Court's long-standing and

consistent instructions to give full effect to Title IX's plain language, dictate that

Title IX reaches discrimination against LGBT students.

In *Bostock v. Clayton County, Georgia*, the Court held that the question of

whether LGBT individuals were protected from discrimination on the basis of sex

under Title VII "involve[d] no more than the straightforward application of legal

terms with plain and settled meanings," since an employer who discriminates

against employees for being lesbian, gay, bisexual, or transgender necessarily

"intentionally discriminate[s] against individual men and women in part because of

sex." 140 S. Ct. 1731, 1743 (2020). That conclusion, the Court stated, "should be

the end of the analysis," because "it is impossible to discriminate against a person

for being homosexual or transgender without discriminating against that individual

based on sex." *Id.* at 1741, 43; *see also id.* at 1745 ("an employer who

discriminates against homosexual or transgender employees necessarily and

intentionally applies sex-based rules."). While "homosexuality and transgender

status are distinct concepts from sex," distinguishing on the basis of sexual

orientation or gender identity is necessarily on the basis of sex. *Id.* at 1746-47.[3]

The Court's plain-language interpretation of Title VII applies equally to Title

IX, which has long been understood to focus on the individual ("no person") and

---

[3] As the Court observed, both sexual harassment and motherhood are also
conceptually distinct from sex, but discrimination on either basis has long been
recognized as sex discrimination. *Id.* at 1747.

5

incorporate similar standards. The Supreme Court has explicitly "looked to its Title VII interpretations of discrimination in illuminating Title IX." *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 617 (1999) (citing *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 75 (1992)). This Court has reached the same conclusion. *See*, *e.g.*, *Chisholm v. St. Mary's City Sch. Dist. Bd. Of Educ.*, 947 F.3d 342, 349–50 (6th Cir. 2020) ("In crafting our framework for analyzing Title IX claims, . . . we have drawn parallels between sex discrimination in the educational setting under Title IX and sex discrimination in the workplace under Title VII."). Indeed, while *Bostock* addresses Title VII, the Court uses both Title VII's phrase "because of sex" and Title IX's "on the basis of sex" interchangeably throughout. *See, e.g.*, 140 S. Ct. at 1737 ("[I]n Title VII, Congress outlawed discrimination in the workplace *on the basis of* race, color, religion, sex, or national origin."); *id*. at 1753 ("[E]mployers are prohibited from firing employees *on the basis of* homosexuality or transgender status. . . .") (emphasis added).

Plaintiff States argued below that the Education Department's guidance inappropriately expanded Title IX's substantive protections by relying on *Bostock*, which only addressed claims brought under Title VII. *See, e.g.*, Plaintiff's Mem. in Supp. of Plaintiff's Mot. for Prelim. Inj. (ECF No. 11) at 13-18 (hereinafter ECF No. 11). That argument is unfounded, because this Court and others "have drawn parallels between sex discrimination in the educational setting under Title IX and

6

sex discrimination in the workplace under Title VII." *Chisholm*, 947 F.3d at 349–50. In light of Title IX's plain text—and the Supreme Court's instruction to "look[] to its Title VII interpretations of discrimination in illuminating Title IX," *Olmstead*, 527 U.S. at 617 —the Education Department's interpretation of Title IX, updated to ensure that it conforms to *Bostock*, does not "'create new law, rights or duties.'" ECF No. at 11 (quoting *Tenn. Hosp. Ass'n v. Azar*, 908 F.3d 1029, 1042 (6th Cir. 2018)). It recognizes existing ones. *See, e.g.*, *Soule v. Connecticut Ass'n of Sch., Inc.*, No. 21-1365-CV, 2022 WL 17724715, at *8 (2d Cir. Dec. 16, 2022) (reviewing multiple circuit court decisions and regulatory authority to determine "that discrimination based on transgender status is generally prohibited under federal law" in the Title IX context).

Because the language prohibiting sex-discrimination in Title VII and Title IX is synonymous, and the Court has looked to its interpretations of Title VII in illuminating Title IX, Plaintiff States' repeated reliance on *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318 (6th Cir. 2021), is also misplaced. *See*, *e.g.*, Reply in Supp. of Plaintiff's Mot. for Prelim. Inj. (ECF No. 57) at 13. This Court held in *Pelcha* that *Bostock*'s interpretation of Title VII did not apply to a claim of discrimination under the Age Discrimination in Employment Act because that statute requires age be the "determinative reason" for the plaintiff's firing for a claim to be cognizable. *Pelcha*, 988 F.3d at 324. Title IX, like Title VII, has no such requirement.

**B.    The EEOC's Guidance Reflects Established Precedent Interpreting Title VII**

Title VII makes it unlawful "for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to *discriminate against* any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C. § 2000e-2 (emphasis added). "As used in Title VII, the term 'discriminate against' refers to 'distinctions or differences in treatment that injure protected individuals.'"  *Bostock*, 140 S. Ct. at 1753 (quoting *Burlington N. & S.F.R.*, 548 U.S. 53, 59 (2006)).  As the Supreme Court has repeatedly emphasized, "this language 'is not limited to "economic" or "tangible" discrimination.'"  *Harris*, 510 U.S. at 21 (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)).  Rather, "[t]he phrase terms, conditions, or privileges of employment evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment."  *Id.* at 21 (internal quotation marks and citation omitted); *see also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) ("The prohibition of harassment on the basis of sex . . . forbids [] behavior so objectively offensive as to alter the 'conditions' of the victim's employment.").

The EEOC has long sought to implement the principle—consistently recognized by the Supreme Court—that "[w]hen the workplace is permeated with

'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." *Harris*, 510 U.S. at 21 (quoting *Meritor*, 477 U.S. at 65, 67). For example, in "Questions & Answers for Small Employers on Employer Liability for Harassment by Supervisors" (June 21, 1999) and "Enforcement Guidance: Vicarious Liability for Unlawful Harassment by Supervisors" (Jun. 18, 1999), the EEOC provided updated guidance in response to two Supreme Court cases that had been issued the prior year addressing the standards for employer liability for sexual harassment: *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); *see also, e.g.*, "Enforcement Guidance on *Harris v. Forklift Sys. Inc.*" (Mar. 8, 1994). By implementing guidance responsive to developments in Supreme Court interpretations of federal employment law, the EEOC helped ensure that the Court's holdings would be given full effect by those bound by the law and by those enforcing their rights under it.

The EEOC Guidance serves the same function. Using an accessible, question-and-answer format, the EEOC breaks down the *Bostock* holding, clarifies its applicability to both employees and employers, and explains how specific employment-related actions may be affected by *Bostock*, relying on existing case

law and guidance, the EEOC's reasoned decisions, and long-established principles of employment discrimination law.  *See* EEOC Guidance.

That *Bostock* addresses only the question before the Court—namely, whether discriminatory termination is unlawful under Title VII—does not mean that it has no application to other forms of discrimination.  *Cf. Tennessee*, 2022 WL 2791450, at *16 (noting the opinion's "limited reach").  The Court is obligated to rule only on the particular cases or controversies before it.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559-60 (1992).  But its reasoning readily extends further: the Court reaffirmed the scope of Title VII's anti-discrimination mandate to cover "'distinctions or differences in treatment that injure protected individuals.'" *Bostock*, 140 S. Ct. at 1753.  That encompasses dress or bathroom-access rules that discriminate on the basis of sex by denying equal rights to LGBT individuals.

Title VII forbids the "entire spectrum of disparate treatment," *Harris*, 510 U.S. at 21, and the EEOC guidance clarifies that, after *Bostock*, sex-based discriminatory actions—like imposing dress or bathroom use requirements inconsistent with an employee's gender identity—are unlawful under established Supreme Court precedent governing hostile workplace discrimination.  For example, the Supreme Court has long recognized that "severe or pervasive" instances of "discriminatory intimidation, ridicule, and insult," when based on sex, are actionable under Title VII, if a reasonable person would find such actions

harmful.  *See id.*  Being repeatedly forced to use a *sex-specific* restroom or to wear *sex-specific* clothes that do not match one's gender identity satisfies this standard. As discussed further in Section II, *infra*, ample research confirms concrete and substantial harm.  The guidance appropriately recognizes, as Supreme Court precedent dictates, that when such behavior is "severe or pervasive when considered together with all other unwelcome conduct based on the individual's sex including gender identity," it can create a work environment that violates Title VII.  EEOC Guidance at ¶ 7; *see also id.* (stating that "although accidental misuse of a transgender employee's preferred name and pronouns does not violate Title VII, intentionally and repeatedly using the wrong name and pronouns to refer to a transgender employee could contribute to an unlawful hostile work environment.").

## II.    THE CHALLENGED GUIDANCE SERVES IMPORTANT INTERESTS IN PROTECTING LGBT INDIVIDUALS

The anti-LGBT discrimination covered by the Guidance Documents causes concrete harms that are legally cognizable under settled standards for interpreting Title VII and Title IX, and the resulting injuries are amply documented.

### A.    Title VII and Title IX Recognize the Discriminatory Harms Identified in the Challenged Guidance

Both the plain text of Title VII and Title IX, as well as case law interpreting them, define the harms prevented by those statutes so as to include the behaviors addressed by the Guidance Documents.

As it is used in Title VII, the phrase "discriminated against" refers to "distinctions or differences in treatment that injure protected individuals." *Bostock*, 140 S. Ct. at 1753; *see also* 42 U.S.C. § 2000e–2(a)(1) (declaring that it is unlawful to discriminate against individuals with respect to, *inter alia*, "terms" or "conditions" of employment). Such differences in treatment are actionable under Title VII regardless of whether they constitute "'economic' or 'tangible' discrimination." *Harris*, 510 U.S. at 21 (citing *Meritor*, 477 U.S. 57). Moreover, even as to non-economic forms of discrimination, Title VII does not require a showing of "concrete psychological harm" for discriminatory conduct to be actionable. *Id.* at 22. Conduct violates Title VII whenever it is "severe or pervasive enough to create an objectively hostile or abusive work environment— an environment that a reasonable person would find hostile or abusive." *Id.* at 21. The challenged EEOC Guidance applies these principles in a straightforward manner that is necessitated by Supreme Court authority. *See, e.g.*, EEOC Guidance at ¶ 11 (limiting application to "severe or pervasive" unwelcome conduct such as "intentionally and repeatedly using the wrong name and pronouns to refer to a transgender employee").

Similarly, the history of Title IX's application, both by courts and by the Education Department, encompasses the behaviors identified in the Education Guidance. In enacting Title IX, Congress "sought to accomplish two related, but

nevertheless somewhat different, objectives": "to avoid the use of federal resources to support discriminatory practices" and "to provide individual citizens effective protection against those practices." *Cannon v. Univ. of Chicago*, 441 U.S. 677, 704 (1979). Since at least the 1980s, the Education Department's Office for Civil Rights ("OCR") has interpreted Title IX to broadly protect against not only overt discrimination, but also differential treatment that adversely impacts education. *See, e.g.*, *Racial Incidents and Harassment Against Students at Educational Institutions*, 59 Fed. Reg. 11,448-51, n.4 (Mar. 10, 1994) ("*Racial Incidents*") (Title IX sets similar legal standards). Consistent with Supreme Court precedent, OCR has long recognized that harassment "on the basis of sex" is prohibited by Title IX when it "denies, limits, provides different, or conditions the provision of aids, benefits, services, or treatment." U.S. Dep't of Educ., Office for Civil Rights, *Sexual Harassment: It's Not Academic* (Sept. 1988) 2 (quoting Antonio J. Califa, Director for Litigation Enforcement and Policy Services, U.S. Dep't of Educ., Office for Civil Rights, *Policy Memorandum* (Aug. 31, 1981)).

Such prohibited harassment "need not result in tangible injury or detriment" to its targets to be prohibited. *Racial Incidents*, 59 Fed. Reg. at 11,450; *see also* 34 C.F.R. § 106.30(a) (2) ("unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity"); *Nondiscrimination*

*on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026, 30,170 (May 19, 2020) ("[N]either [Title VII nor Title IX] requires 'tangible adverse action or psychological harm' before the sexual harassment may be actionable").

For all of these reasons, the Guidance Documents protect against only long-recognized actionable harm—differences in treatment that can injure or create a hostile or abusive work or educational environment—on the basis of sex.

### B.    LGBT Students and Employees Face Myriad Concrete Harms the Challenged Guidance is Meant to Prevent and Redress

The Guidance Documents address real, ongoing harms suffered due to anti-LGBT discrimination in schools and workplaces.  In the educational setting, these harms include overt harassment, lower academic participation and achievement, sexual assault, and mental and physical health issues.  In the employment setting, LGBT workers similarly face overt harassment, lower pay, and mental and physical health issues as a result of discriminatory policies or workplace behaviors.

### 1.    Harms Faced by LGBT Students

There are more than 2 million LGBT youth in America.  *See* Kerith J. Conran, Williams Inst., *LGBT Youth Population in the United States* 1 (Sept. 2020) (internet); Jody L. Herman et al., Williams Institute, *How Many Adults and Youth Identify as Transgender in the United States?* 1 (2022) (internet).  In a recent survey, an astonishing 81% of LGBT youth reported being verbally harassed

because of their sexual orientation, gender identity, or gender expression, and more than one in three (35.1%) report they were verbally harassed often or frequently. Joseph G. Kosciw et al., GLSEN, *The 2019 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools* 28 (2020) (internet).  LGBT students who had experienced discrimination in their schools based on their sexual orientation or gender identity were also almost three times as likely (44.1% versus 16.4%) to have missed school because they felt unsafe or uncomfortable.  *Id.* at 49.  And LGBT students who experienced discriminatory policies and practices also had lower grade point averages and educational achievement, and lower levels of educational aspiration than other students.  *Id.* at 45, 48.  They were also found to have lower self-esteem and higher levels of depression than students who had not encountered such discrimination.  Joseph G. Kosciw et al., GLSEN, *The 2015 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools* xviii, 53-54 (2016) ("*2015 NSC Survey*").

Transgender students in particular suffer concrete harms—including greater risk of mental health issues and worse educational outcomes—as a result of severe and pervasive discrimination in schools.  Of students known or perceived as transgender, 77% reported negative experiences at school, including harassment and assault.  Sandy E. James et al., Nat'l Ctr. For Transgender Equal., *The Report*

*of the 2015 U.S. Transgender Survey* 132-34 (Dec. 2016).  More than half (54%) reported verbal harassment, 24% reported suffering a physical attack, and 13% reported being sexually assaulted at school.  *Id.* at 133-34.  The Centers for Disease Control and Prevention ("CDC") has found that transgender students are, as a group, up to five times more likely to report feeling unsafe at or going to and from school, being bullied at school, being threatened or injured with a weapon at school, being forced to have sex, and experiencing physical and sexual dating violence.  Michelle M. Johns et al., *Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students — 19 States and Large Urban School Districts, 2017*, 68 Morbidity & Mortality Wkly. Rep. 67, 69 (2019) (internet).

Transgender students who experienced discrimination, violence, and harassment due to their gender identity were three times more likely to have missed school in a given month than other students.  Movement Advancement Project & GLSEN, *Separation and Stigma: Transgender Youth and School Facilities* 4 (2017) (internet).  Nearly half of all transgender students responding to a national survey reported missing at least one day of school in the preceding month because they felt unsafe or uncomfortable there.  Emily A. Greytak et al., GLSEN, *Harsh Realities: The Experiences of Transgender Youth in Our Nation's Schools* 14 (2009).  They also reported feeling less connected to their schools than

other students.  Kosciw et al., *2015 NSC Survey*, at xviii, 95.  Nearly 20% of

transgender students left a K-12 school because their mistreatment was so severe,

and 40% of students who experienced frequent verbal harassment because of their

gender expression did not plan to continue on to college.  Greytak et al., *supra*, at

27.  Discrimination at school also puts transgender students at risk of suicide and

mental health issues; transgender people attempt suicide at approximately nine

times the rate of the general population.  James et al., *supra* at 114.

Transgender youth who are subjected to discriminatory school restroom and

locker room policies also face concrete and cognizable harms, including increased

risk of sexual assault compared to those without such restrictions.  Gabriel R.

Murchison et al., *School Restroom and Locker Room Restrictions and Sexual*

*Assault Risk Among Transgender Youth*, Pediatrics, June 2019, at 1 (internet); *see*

*also* Kosciw et al., *2015 NSC Survey* at xviii, 86 (70% surveyed avoided school

restrooms because they felt unsafe or uncomfortable).  Transgender students also

experience negative health effects from avoiding using the restroom, such as

kidney-related medical issues and urinary tract infections, when they are forced by

discriminatory policies to use a bathroom that does not match their gender identity.

Human Rights Watch, *Shut Out: Restrictions on Bathroom and Locker Room*

*Access for Transgender Youth in US Schools* 10 (2016) (internet); *see also* Jody L.

Herman, *Gendered Restrooms and Minority Stress: The Public Regulation of*

*Gender and Its Impact on Transgender People's Lives*, J. of Pub. Mgmt. & Soc.

Policy 65, 75 (2013) (54% reported negative health effects).

Removal of Title IX's protection for LGBT individuals would also cause serious ongoing harm.  For example, transgender students who reported negative treatment based on sex in grades K-12 were more likely than other respondents to be under serious psychological distress, to have experienced homelessness, and to have attempted suicide.  James et al., *2015 U.S. Transgender Survey*, *supra*, at 132.

## 2.    Harms Faced by LGBT Employees

Denying LGBT employees the protections recognized by the EEOC Guidance–including access to bathrooms and protection from severe or pervasive harassment–would similarly cause serious harms to transgender individuals and the States in which they live.  Close to half of LGBT workers in a recent survey reported having suffered adverse treatment at work because of their sexual orientation or gender identity, and nearly a third reported such treatment within the last five years.  Brad Sears et al., Williams Institute, *LGBT People's Experiences of Workplace Discrimination and Harassment* 1 (Sept. 2021) (internet).  LGBT workers are more likely to live in poverty, work in lower-paying service jobs, and rely on unemployment insurance, at least partially due to workplace exclusion and discrimination.  *See*, *e.g.*, Caroline Medina et al., Center for American Progress, *Fact Sheet: LGBT Workers in the Labor Market* (June 1, 2022) (internet).

Transgender workers in particular report "[n]ear universal harassment on the job," including verbal harassment, intrusive questions about surgical status, denial of access to restrooms, and physical and sexual assault. Jaime M. Grant et al., Nat'l Ctr. for Transgender Equality and Nat'l Gay & Lesbian Task Force, *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey* 51, 56 (2011) (internet). Nearly half of transgender workers report "at least some" discriminatory behavior on a *daily* basis, such as "being the target of transphobic remarks, being ignored, or being pressured to act in 'traditionally gendered' ways." Christian N. Thoroughgood et al., *Creating a Trans-Inclusive Workplace*, Harv. Bus. Rev. Mag. (Mar.-Apr. 2020) (internet). Many report being compelled to act and dress in ways that do not match their gender identity. David Baboolall et al., *Being Transgender at Work*, McKinsey Q. (Nov. 10, 2021) (internet). Seventy-seven percent of employed transgender individuals took steps to avoid workplace mistreatment within the previous year, such as hiding their gender transition or quitting their job. And fifteen percent of transgender individuals report being verbally harassed, physically attacked, and/or sexually assaulted at work because of their gender identity or expression. James et al., *supra*, at 148.[4]

---

[4] The effects of this pervasive discrimination are reflected in the educational, economic, and health outcomes for transgender employees. Transgender employees are 2.4 times more likely to work in entry-level jobs lacking health benefits than cisgender employees. Baboolall et al., *supra*. Relatedly, the average

One study found that, even compared to the elevated risks of suicide already experienced by transgender individuals, transgender people who had been denied access to bathroom facilities were more likely to have attempted suicide than were other transgender people.  Kristie L. Seelman, *Transgender Adults' Access to College Bathrooms and Housing and the Relationship to Suicidality*, 63 J. of Homosexuality 1378, 1388 (2016).  Similarly, transgender employees who face discriminatory bathroom policies in the workplace experience concrete harms, including avoiding drinking or eating during the workday and urinary infections and kidney-related medical issues from avoiding restrooms inconsistent with their gender identities.  Herman, *supra*, at 74-76.

## III.  AMICI STATES HAVE ENACTED LAWS SIMILAR TO THE CHALLENGED GUIDANCE, PROVIDING BENEFITS WITHOUT COMPROMISING PRIVACY OR SAFETY

Amici States have ample experience with laws and policies similar to the Guidance Documents.  At least twenty states and the District of Columbia[5] have

---

annual household income of a transgender adult is $17,000 less than the annual income for a cisgender adult, even when controlled for education level.  *Id*.

[5] *See, e.g.*, California: Cal. Educ. Code §§ 220, 221.5(f) (education); Cal. Gov't Code §§ 12926(o), (r)(2), 12940(a), 12949 (employment). Colorado: Colo. Rev. Stat. § 24-34-402 (employment). Connecticut: Conn. Gen. Stat. § 10-15c (education); *id.* § 46a-60 (employment). Delaware: Del. Code tit. 19, § 711 (employment). Hawaii: Haw. Rev. Stat. § 489-3 (public accommodations). Illinois: 775 Ill. Comp. Stat. 5/1-102(A) (employment, public accommodations). Iowa: Iowa Code § 216.6 (employment); *id.* § 216.9 (education). Kansas: Kansas Hum. Rts. Comm'n, Kansas Human Rights Commission Concurs with the U.S. Supreme

laws parallel to the Guidance Documents regarding discrimination against LGBT

students and employees.  At least 225 local governments have also enacted similar

laws.[6]  That experience confirms that protecting LGBT people from discrimination

yields broad benefits, without compromising privacy or safety, or imposing

significant costs.  Amici States enacted these protections because they recognized

the need to protect against the serious and concrete harms caused by anti-LGBT

---

Court's *Bostock* Decision (Aug. 21, 2020) (internet) (advising that Kansas laws prohibiting discrimination based on "sex" in "employment, housing, and public accommodation" contexts "are inclusive of LGBTQ and all derivatives of 'sex'"). Maine: Me. Rev. Stat. tit. 5, § 4571 (employment); *id.* § 4601 (education). Maryland: Md. Code, State Gov't § 20-606 (employment). Massachusetts: Mass. Gen. Laws. ch. 76, § 5 (education); *id.* ch. 151B, § 4 (employment); *id.* ch. 272, § 92A (public accommodation). Minnesota: Minn. Stat. § 363A.08 (employment); *id.* § 363A.13 (education). Nevada: Nev. Rev. Stat. §§ 613.310(4), 613.330 (employment); *id.* § 651.050(2), 651.070 (public accommodation). New Hampshire: N.H. Rev. Stat. Ann. § 354-A:6. New Jersey: N.J. Stat. Ann. § 10:5-5 (definition); *id.* § 10:5-12 (employment and places of public accommodation including schools); *id.* § 18A:36-41 (directing state department of education to develop guidelines to ensure a supportive and nondiscriminatory environment for transgender students).  New Mexico: N.M. Stat. Ann. § 28-1-2(Q) (definition); *id.* § 28-1-7 (employment); *id.* §§ 22-35-2-1 *et seq* (anti-bullying). New York: N.Y. Exec. Law § 291 (education, employment, public accommodations); N.Y. Comp. Codes R. & Regs. tit. 9, § 466.13 (interpreting definition of "sex" to include gender identity). Oregon: Or. Rev. Stat. § 659.850 (education); *id.* § 659A.006 (employment, public accommodations). Rhode Island: R.I. Gen. Laws §§ 28-5-6(11), 28-5-7 (employment). Utah: Utah Code Ann. § 34a-5-106 (employment). Vermont: Vt. Stat. Ann. tit. 21, § 495 (employment). Washington: Wash. Rev. Code § 28A.642.010 (education); *id.* § 49.60.180 (employment). District of Columbia: D.C. Code § 2-1402.11 (employment); *id.* § 2-1402.41 (education).

[6] Human Rights Campaign, *Cities and Counties with Non-Discrimination Ordinances that Include Gender Identity* (Jan. 28, 2021) (cataloguing municipal and county protections across the country) (internet).

discrimination against their residents, students and employees. The experience of Amici States after enacting these protections has confirmed their benefit in prohibiting and redressing anti-LGBT discrimination in schools and workplaces.

### A. Amici States' Efforts to Protect LGBT Persons in Education from the Concrete Harms of Discrimination Reap Substantial Benefits.

The laws enacted by Amici States have prevented and redressed concrete harms resulting from anti-LGBT discrimination.  For example, California adopted protections against gender-identity discrimination in schools to address harms suffered by transgender students, including the practice discussed in Section 2.B., *supra*, of students avoiding drinking and eating during school and experiencing medical complications to avoid restroom use.  Cal. Assemb. Comm. on Educ., Bill Analysis: Assemb. Bill No. 1266, at 5 (2013-2014 Reg. Sess.) (internet).  The Legislature also recognized that many school districts were not in "compliance with their obligations to treat transgender students the same as all other students," and that some were excluding transgender students from sex-segregated programs, activities, and facilities. Cal. Senate Comm. on Educ., Bill Analysis: Assemb. Bill No. 1266, at 4 (2013-2014 Reg. Sess. Hearing Date June 12, 2013) (internet); *see also* Human Rights Watch, *supra*.

Similarly, in 2019 New Mexico adopted a comprehensive anti-bullying law for youth in schools in response to its determination that LGBT students

experienced bullying at nearly twice the rate of straight/cisgender youth.  N.M. Stat. Ann. §§ 22-35-2-1 *et seq.* (2019); Legislative Education Study Committee Bill Analysis, N.M. SB 288 (Feb. 26, 2019) (discussing studies finding that LGBT youth "experience greater incidence of bullying at about twice the rate of their straight peers" creating a "hostile environment" in schools) (internet).

Inclusive polices like these have worked to address the harms LGBT students and employees in schools face by creating safer, more inclusive environments for everyone, without imposing any significant burdens.  One federal study found that schools that adopted policies to make the school environment more inclusive for LGBT students created a safer and more inclusive environment for all students, not just those who identified as LGBT.  CDC, *Inclusive Practices Help All Students Thrive* (June 27, 2022) (internet).  Policies that protect transgender students' right to use bathrooms, other facilities, and activities consistent with their gender identity also help to create school climates that enhance all students' well-being and facilitate their ability to learn.  Alberto Arenas et al., *7 Reasons for Accommodating Transgender Students at School*, Phi Delta Kappan, at 20-24 (Sept. 1, 2016) (internet).  And when transgender students are permitted to live consistently with their gender identity, their mental health outcomes are comparable to their peers.  Kristina R. Olson et al., *Mental Health of Transgender Children Who Are Supported in Their Identities*, Pediatrics, Mar. 2016, at 5-7

(internet); Br. of Amici Curiae Sch. Adm'rs at 4, *Gloucester Cnty. Sch. Bd. v. G.G.*, 137 S. Ct. 1239, No. 16-273, 2017 WL 930055 (Mar. 6, 2017).

Moreover, although Plaintiff States argued below that "[c]ommon sense" dictates that inclusive bathroom policies will "harm" the "important interests" of "privacy [and] safety," ECF No. 57 at 23-24, none of the Amici States that have enacted inclusive policies have reported instances of misconduct, like harassment in restrooms or locker rooms, by transgender students. That experience is consistent with research demonstrating that no such increase results from adopting inclusive policies. *See, e.g.*, Amira Hasenbush et al., *Gender Identity Nondiscrimination Laws in Public Accommodations: A Review of Evidence Regarding Safety and Privacy in Public Restrooms, Locker Rooms, and Changing Rooms*, 16 Sexuality Rsch. & Soc. Pol'y 70–83, 77-78 (2019) (internet) (finding no increase in criminal behavior resulting from inclusive bathroom laws); David Crary, *Debate Over Transgender Bathroom Access Spreads Nationwide*, Salt Lake Trib. (May 10, 2016) (quoting former county sheriff stating that Washington State law protecting bathroom access led to "no increase in public safety incidents as a result," and "that indecent exposure, voyeurism, and sexual assault[] are already illegal, and police use those laws to keep people safe.").

Furthermore, contrary to the Plaintiff States' contentions, enacting these laws and policies does not require elimination of single-sex facilities, such as restrooms,

24

changing rooms, or living facilities at educational institutions. *See, e.g.*, Plaintiff's Mem. in Opp. to Defendant's Mot. to Dismiss at 31-32. That claim is unsupported. Neither guidance document challenged here requires elimination of single-sex facilities. Plaintiff States' suggestion to the contrary appears premised on the erroneous assumption that sex-segregated bathrooms are no longer sex-segregated if transgender persons can access the bathrooms that match their gender identity.

In sum, state policies similar to the Education Guidance protect LGBT students from discrimination and have been proven to create safer, more welcoming, and productive school environments, not just for LGBT students, but for all students. There is no demonstrable harm to Plaintiff States caused by them.

### B. Amici States' Efforts to Protect LGBT Persons in Employment from the Concrete Harms of Discrimination Reap Substantial Benefits.

For many years, Amici States have had laws in place prohibiting employment discrimination based on gender identity and sexual orientation similar to the EEOC Guidance challenged here.[7] These laws, like the EEOC Guidance, prevent the demonstrable harms that result from allowing exclusionary workplace practices.

Laws and policies like these, and the EEOC Guidance, are needed to protect against discrimination that is, sadly, still pervasive in the workplace. *See* Section II.B.2, *supra*. Research has demonstrated that these protections "increase the

---

[7] *See supra* p. 21, n. 5.

likelihood of LGBT-friendly HR practices" that bring positive benefits and lessen the effects of anti-LGBT discrimination in the workplace.  Lindsay Mahowald, *LGBTQI+ Nondiscrimination Laws Improve Economic, Physical, and Mental Well-Being*, Center for American Progress (March 24, 2022) (internet).  And when transgender workers can safely transition and have their gender identities respected, they experience increased job performance and satisfaction, thereby increasing productivity and employee retention.  Grant et al., *Injustice at Every Turn*, *supra*, at 3.  These benefits further redound to both the states in which LGBT people work and society as a whole.  Mahowald, *supra* (noting that anti-discrimination laws and regulations help LGBT workers "more fully bring their talents to existing businesses and solo ventures, leading to improved economic growth.").

Provisions like the EEOC Guidance, therefore, promote compelling interests in "removing the barriers to economic advancement and political and social integration that have historically plagued certain disadvantaged groups."  *Roberts v. Jaycees*, 468 U.S. 609, 626 (1984).  These protections are needed to ensure that LGBT employees and students are fully protected from this type of pervasive discrimination and harassment no matter where they live.

# CONCLUSION

Amici States submit that the challenged guidance at issue in this case is a straightforward—indeed, necessary—application of existing Title VII and Title IX principles and precedent.  If the Court reaches Plaintiff States' substantive challenge to the guidance documents at issue, it should reject it.

Dated:  December 22, 2022              Respectfully submitted,

ROB BONTA
Attorney General of California
MICHAEL L. NEWMAN
Senior Assistant Attorney General
LAURA FAER
Supervising Deputy Attorney General
JAMES E. RICHARDSON
JENNIFER A. GIBSON
Deputy Attorneys General

/s/ Brian Bilford

BRIAN BILFORD
Deputy Attorney General
*Attorneys for Amicus Curiae the*
*Attorney General of California*

PHILIP J. WEISER
*Attorney General of Colorado*
1300 Broadway, 10th Floor
Denver, CO 80203

WILLIAM TONG
*Attorney General of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

KATHLEEN JENNINGS
*Attorney General of Delaware*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801

KARL A. RACINE
*Attorney General for the District*
*of Columbia*
400 6th Street NW
Washington, D.C. 20001

27

HOLLY T. SHIKADA
*Attorney General of Hawai'i*
425 Queen Street
Honolulu, HI 96813

KWAME RAOUL
*Attorney General of Illinois*
100 West Randolph Street, 12th Floor
Chicago, IL 60601

AARON M. FREY
*Attorney General of Maine*
6 State House Station
Augusta, ME 04333

BRIAN E. FROSH
*Attorney General of Maryland*
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202

MAURA HEALEY
*Attorney General of the
Commonwealth of Massachusetts*
One Ashburton Place
Boston, MA  02108

DANA NESSEL
*Attorney General of Michigan*
P.O. Box 30212
Lansing, Michigan 48909

KEITH ELLISON
*Attorney General of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King Jr.
Boulevard
St. Paul, MN 55155

AARON D. FORD
*Attorney General of Nevada*
100 North Carson St.
Carson City, NV 89701

MATTHEW J. PLATKIN
*Attorney General of New Jersey*
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625

HECTOR BALDERAS
*Attorney General of New Mexico*
P.O. Drawer 1508
Santa Fe, NM 87504

LETITIA JAMES
*Attorney General of New York*
28 Liberty Street
New York, NY 10005

ELLEN F. ROSENBLUM
*Attorney General of Oregon*
1162 Court Street N.E.
Salem, OR 97301

PETER F. NERONHA
*Attorney General of
Rhode Island*
150 South Main St.
Providence, RI 02903

ROBERT W. FERGUSON
*Attorney General of Washington*
P.O. Box 40100
Olympia, WA 98504

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 5,571 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

/s/ Brian Bilford

## CERTIFICATE OF SERVICE

I hereby certify that on December 22, 2022, I electronically filed the foregoing document with the United States Court of Appeals for the Sixth Circuit by using the CM/ECF system. Counsel of record for all parties are registered as ECF Filers and will therefore be served by the CM/ECF system.

/s/ Sean Puttick