No. 22-5807

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

STATE OF TENNESSEE, *et al.*, *Plaintiffs-Appellees*,

and

ASSOCIATION OF CHRISTIAN SCHOOLS INTERNATIONAL, *et al.,*
*Intervenors-Appellees*,

v.

UNITED STATES DEPARTMENT OF EDUCATION, *et al.*,
*Defendants-Appellants*.

On Appeal from the United States District Court
for the Eastern District of Tennessee, No. 3:21-cv-308

**BRIEF AMICI CURIAE OF THOMAS MORE SOCIETY, CHRISTIAN
LEGAL SOCIETY AND THE NATIONAL ASSOCIATION OF
EVANGELICALS ON BEHALF OF APPELLEES**

Timothy Belz
*Counsel of Record*
J. Matthew Belz
Ottsen Leggat & Belz, LC
112 S. Hanley Street, Suite 200
St. Louis, Missouri 63105
314-726-2800

*Special Counsel for*
*Thomas More Society*

Carl H. Esbeck
*R. B. Price Professor Emeritus*
*and Isabella Wade & Paul C.*
*Lyda Professor of Law Emeritus*
209 Hulston Hall, Ninth &
   Conley Streets
Columbia, Missouri 65211
573-882-6543

# TABLE OF CONTENTS

Table of Authorities ............................................................................. iii

Interests of Amici ................................................................................ 1

Statement of the Case ......................................................................... 2

   A. Department of Education ............................................................ 2

   B. Equal Employment Opportunity Commission .......................... 3

Argument ............................................................................................ 6

   POINT ONE: If the Department of Education were to issue its new
Title IX regulations while this appeal is still pending, that would not
moot the Plaintiffs' or Intervenors' claims under the Administrative
Procedure Act. ................................................................................... 6

   POINT TWO: By its express terms, *Bostock* is limited to Title VII's
prohibition on employment discrimination "because of … sex" that
entails a "but-for" rule of causation, and the *Bostock* Court pointedly
stated that it was not deciding applications such as single-sex sports
and privacy concerns in the common use of bathrooms and locker
rooms. ................................................................................................ 8

   POINT THREE: Application of *Bostock* with its but-for rule of
causation to Title IX makes no sense if the plain text and title's
context are to carry any weight; employment discrimination presents
a distinctly different situation from, for example, school-based
athletics and performing arts where acknowledged differences
between males and females have been accounted for by Congress
in Title IX to achieve not blind equality, but equal opportunities
given the physiological differences between males and females, as
well as a laudable concern for privacy when being unclothed before
the opposite sex. ................................................................................ 12

   POINT FOUR: The Department of Education's releasing of its
Interpretation, Dear Educators Letter, and Fact Sheet Violated the
Major Question Doctrine. .................................................................. 20

Conclusion ............................................................................................ 23

Certificate of Compliance ...................................................................... 26

Certificate of Service ............................................................................. 26

# TABLE OF AUTHORITIES

Page(s)

Cases

*Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty., Fla.*,
___ F.4th ___, 2022 WL 18003879 (11th Cir. Dec. 30, 2022) ........................... 11

*Bostock v. Clayton County*,
140 S. Ct. 1731 (2020) ................................................................................. *passim*

*Cannon v. University of Chicago*,
441 U.S. 677 (1979) ................................................................................................ 19

*Grimm v. Gloucester Cnty. Sch. Bd.*,
972 F.3d 586 (4th Cir. 2020) ............................................................................... 11

*Meriwether v. Hartop*,
992 F.3d 492 (6th Cir. 2021) ............................................................................... 12

*Neese v. Becerra*,
2022 WL 16902425 (N.D. Tex. Nov. 11, 2022) ................................................. 14

*Pelcha v. MW Bancorp, Inc.*,
988 F.3d 318 (6th Cir. 2021) ............................................................................... 12

*Pennhurst State Sch. & Hospital v. Halderman*,
451 U.S. 1 (1981) .................................................................................................... 16

*Steward Mach. Co. v. Davis*,
301 U.S. 548 (1937) ............................................................................................... 16

*Texas v. EEOC*,
2022 WL 4835346 (N.D. Tex. Oct. 1, 2022) ............................................... 4, 5, 23

*United States v. Virginia*,
518 U.S. 515 (1996) ............................................................................................... 19

*West Virginia v. Environmental Protection Agency*,
142 S. Ct. 2587 (2022) ..................................................................................... 20, 21

## Statutes

20 U.S.C. 1681(a) ................................................................. 16, 17, 18

20 U.S.C. 1686 .............................................................................. 17

20 U.S.C. 1691(a)(9) .................................................................... 18

42 U.S.C. 2000e ............................................................. 3, 8, 14, 15, 16

## Rules

Fed. R. App. P. 32(a) .................................................................. 26

Fed. R. Civ. P. 65 .......................................................................... 3

Fed. R. Civ. P.  54 ..................................................................... 6, 24

## Regulations

34 C.F.R. 106.34(a) ...................................................................... 15

34 C.F.R. 106.41 ........................................................................... 17

86 Fed. Reg. 32637 ..................................................................... 2, 3

87 Fed. Reg. 41537-38 ................................................................... 7

87 Fed. Reg. 41309-41579 .............................................................. 6

## Other Authorities

U.S. Const., Article I .............................................................. 23, 24

**INTERESTS OF AMICI**

The Thomas More Society ("TMS") is a national public interest law firm dedicated to restoring respect in the law for freedom of speech and religious liberty. A 501(c)(3) nonprofit incorporated in Illinois with offices in Chicago and Omaha, TMS pursues its purposes through civic education, litigation, and related activities. In this effort, TMS has represented many individuals and organizations in federal and state courts and filed numerous *amicus curiae* briefs with the aim of protecting the rights of individuals and organizations to communicate their political and social views, as well as to faithfully practice their religion, as guaranteed by the Constitution.

The National Association of Evangelicals ("NAE") is a nonprofit association of evangelical Christian denominations, churches, ministries, institutions, and individuals that includes more than 50,000 local churches from 74 different denominations and serves a constituency of over 20 million people.  Religious freedom is a gift of God and vital to the limited government which is our American constitutional federalist republic.

Christian Legal Society ("CLS") is a nondenominational association of Christian attorneys, law professors, and law students, with members in every state and chapters on law school campuses across the nation. CLS has long believed that our civil society prospers only when the First Amendment rights of all Americans

are protected, no matter how unpopular their speech and religious beliefs. To that end, CLS's legal advocacy division, the Center for Law & Religious Freedom, from its inception, has fought to preserve the autonomy of religious organizations from the government and to protect the religious exercise and free speech rights of all.

## STATEMENT OF THE CASE[1]

A.    *Department of Education*

On June 22, 2021, the United States Department of Education ("ED") published "Enforcement of Title IX of the Educational Amendments of 1972 With Respect to Discrimination on Sexual Orientation and Gender Identity in Light of Bostock v. Clayton County" ("Interpretation"). 86 Fed. Reg. 32637. The next day, June 23, 2021, ED issued a "Letter to Educators on Title IX's 49th Anniversary" ("Dear Educators Letter"). https://www2.ed.gov/about/offices/list/ocr/ correspondence/stateholders/educator-202106-tix.pdf. The letter was accompanied by "U.S. Dep't of Justice & U.S. Dep't of Educ., Confronting Anti-LGBTQI+ Harassment in Schools" ("Fact Sheet"). https://www2.ed.gov/about/offices/ list/ocr/-factsheet-tix-202106.pdf. The Interpretation, Dear Educators Letter, and

---

[1] In emails, legal counsel for Appellants, Appellees, and Intervenors consented to the filing of this brief. No counsel for any party authored this brief in whole or in part. No person or entity other than *Amici* and its counsel made a monetary contribution intended to fund the preparation or submission of this brief.

Fact Sheet state that considering the recent decision in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), ED will immediately begin to enforce Title IX of the Educational Amendments of 1972, 20 U.S.C. 1681-1686, as prohibiting discrimination on the bases of sexual orientation and gender identity.

Plaintiffs and Intervenors are subject to Title IX. They challenged the Interpretation, Dear Educators Letter, and Fact Sheet as having been issued contrary to various requirements of the Administrative Procedure Act ("APA") and the U.S. Constitution. Plaintiffs filed a motion for preliminary injunction pursuant to Fed. R. Civ. P. 65. The motion was granted on July 22, 2022. The court held, *inter alia*, that the three documents were reviewable under the APA and that ED had not complied therewith. Among the findings, the district court concluded that the three documents expanded *Bostock* beyond its boundaries. The district court also concluded that, unlike in *Bostock* wherein the Court was applying Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq*., the protected class of "sex" in Title IX should not be conflated with sexual orientation and gender identity.

B.   *Equal Employment Opportunity Commission*

On June 15, 2021, a document entitled "Protections Against Employment Discrimination Based on Sexual Orientation or Gender Identity" ("Technical Assistance Document") was published under the auspices of the Equal Employment Opportunity Commission. https://www.eeoc.gov/laws/guidance/

protections-against-employment-discrimination-based-sexual-orientation-or-
gender. The Technical Assistance Document followed the *Bostock* rule in various
circumstances (*e.g.*, dress codes, bathrooms, locker rooms, showers, use of
preferred pronouns or names) as applied to employment discrimination based on
sexual orientation and gender identity.

The Technical Assistance Document was unilaterally issued by Charlotte
Burrows, Chair of the EEOC. Chair Burrows did not present the document to the
full commission for its consideration and disposition. This failure by the Chair led
to a finding that Burrows lacked authority to issue the document and it was
vacated. *See Texas v. EEOC*, 2022 WL 4835346 (N.D. Tex. Oct. 1, 2022). That
judgment was not appealed, and the parties now agree it is final.[2] The parties
disagree, however, concerning the effect of that final judgment.

---

[2] *See* Defendants-Appellants' opening brief, page 8 footnote 2:

> In October 2022, a federal district court issued a final judgment
> declaring this document unlawful, vacating it, and setting it aside in
> *Texas v. EEOC*, No. 2:21-CV-194-Z, 2022 WL 4835346 (N.D. Tex.
> Oct. 1, 2022). In light of that now-final ruling, there is no longer a live
> controversy regarding whether this document is valid, and the district
> court no longer has jurisdiction over the States' claims against EEOC.
> This Court should therefore vacate the preliminary injunction as to
> EEOC and remand with instructions to dismiss the States' claims
> against EEOC as moot.

Contrary to the suggestion of Defendants-Appellants, Appellees' claims against
EEOC are not moot. Rather, it is EEOC's defenses that are foreclosed by the final
judgment in *Texas v. EEOC* and application of the legal doctrine of issue
preclusion.

Plaintiffs and Intervenors are subject to Title VII. They challenged the Technical Assistance Document as having been issued by Chair Burrows without authority, as well as being contrary to various requirements of the APA and the U.S. Constitution. Plaintiffs filed a motion for a nationwide preliminary injunction. On July 22, 2022, the motion was granted. The district court held that the Technical Assistance Document was reviewable under the APA and that the EEOC had not complied therewith. Among the findings was that the document improperly expanded on the holding of *Bostock*.

In this appeal, Defendants-Appellants concede that the Technical Assistance Document has been found unlawful and was thereby vacated in *Texas v. EEOC*, and that the time for an appeal of that judgment has expired and it is final. Because the Technical Assistance Document is invalid nationwide, the EEOC should not have filed its notice of appeal in this case. The appeal by EEOC should be remanded to the district court.[3] Pursuant to the principles of issue preclusion, the district court should be directed to consider entry of an individually final vacatur

---

[3] See the immediately prior footnote 2 quoting from Defendants-Appellants' opening brief. Given EEOC's concession in the quoted passage, this Court should remand EEOC's appeal back to the district court. By pursuing an appeal on a matter that is the subject of an adverse final judgment in a parallel case, the EEOC cannot shift away from the district court the jurisdiction to render disposition of the claim against the commission in the instant case. Such disposition is only as to the EEOC as one of two Appellants. ED's appeal will have to proceed to address justiciability and the merits.

and injunction against the EEOC under Fed. R. Civ. P. 54(b), as well as to

entertain motions for possible costs and attorney's fees per Fed. R. Civ. P. 54(d).

## ARGUMENT

**POINT ONE: If the Department of Education were to issue its new Title IX regulations while this appeal is still pending, that would not moot the Plaintiffs' or Intervenors' claims under the Administrative Procedure Act.**

On June 23, 2022, ED posted a Notice of Proposed Rulemaking ("NPRM")

entitled ***Nondiscrimination on the Basis of Sex in Education Programs or***

***Activities Receiving Federal Financial Assistance***, and it was published in the

Federal Register on July 12, 2022. 87 Fed. Reg. 41309 – 41579. The NPRM

proposed new regulations as well as amendments to existing regulations pertaining

to sex discrimination as prohibited by Title IX, 20 U.S.C. 1681, 1682, 1683, 1685,

1686, 1687, and 1688. The deadline for receipt of comments by the public on the

proposed changes and additions was September 13, 2022.

Once having completed consideration of the public comments, ED may

promulgate the rules proposed in the NPRM. The rules could be unchanged or

issued in a form altered from those first published June 23, 2022. If the proposed

rules are issued while this appeal is still pending, that may cause the Appellant ED

to move to dismiss the instant APA claims as moot.

Such a motion to dismiss as moot would assume that there is complete

overlap between ED's Interpretation, Dear Educators Letter, and Fact Sheet, on the

one hand, and the final regulations that emerge from the NPRM of June 23, 2022. There is no such overlap. For example, the NPRM states that ED is postponing any rulemaking under Title IX with respect to transgenderism and participation in single-sex female athletic teams and their state-sanctioned athletic competitions. 87 Fed. Reg. at 41537-38. Regarding girls' and women's sports, ED states that sometime in the unspecified future it will issue a new and separate NPRM "to address whether and how" it should amend current regulations on single-sex athletics and "the question of what criteria, if any, recipients [of federal financial assistance] should be permitted to use to establish students' eligibility to participate on a particular male or female athletics team." *Id.* at 41537.

The primary injury reported by the Plaintiff-States is their loss of sovereign authority because of an inability to enforce various state laws. One type of state law widely reported by Plaintiff-States as being hindered is legislation governing sports competitions between students attending secondary schools, especially sports involving female-only athletic teams. Accordingly, there is no danger that the instant appeal will become moot while awaiting the Sixth Circuit panel's decision because of the near-future promulgation by ED of new Title IX regulations.

**POINT TWO: By its express terms, *Bostock* is limited to Title VII's prohibition on employment discrimination "because of ... sex" that entails a "but-for" rule of causation, and the *Bostock* Court pointedly stated that it was not deciding applications such as single-sex sports and privacy concerns in the common use of bathrooms and locker rooms.**

The *Bostock* Court "proceed[ed] on the assumption that [in Title VII] 'sex' . . . refer[s] only to biological distinctions between male and female." 140 S. Ct. at 1739. The Court went on to observe that "the question isn't just what 'sex' meant, but what Title VII says about it." *Id.* The Title VII statutory language prohibits employment discrimination "because of . . . sex." 42 U.S.C. 2000e-2(a)(1). The "because of" text led to the employment of "the simple and traditional standard of 'but-for' causation." 140 S. Ct. at 1739 (internal quotations cleaned up). This reflects a policy choice by Congress made with respect to the singular purpose of Title VII being the total eradication of discrimination in the workplace. As will be discussed in Point Three, *infra*, Title IX does not follow a rule of but-for causation.

"But-for" causation is integral to the operation of Title VII and the eradication of bias in employment. There can be multiple causes for a plaintiff suffering an adverse employment decision. Yet there is liability when only one such cause was sex discrimination. Congress could have provided that the discriminatory cause must be the sole cause or the primary cause, but instead it only required that the discrimination be one motivating factor. 140 S. Ct. at 1739.

This too is a policy choice by Congress singular to Title VII and the context of employment discrimination.

Further to the text of Title VII, the sex discrimination must be shown to be intentional. *Id.* at 1740, 1742. And the sex discrimination must be shown to be individual to the plaintiff-employee rather than categorical to the class of women. *Id.* at 1740-41, 1742. These too are policy choices by Congress. The choices are tailored to Title VII and the employment setting, and not transferrable to other statutory schemes just because the other statutory frameworks are also broadly characterized as civil rights acts. As will be discussed *infra* in Point Three, Title IX is different. In Title IX, it is acknowledged that individuals will have physical attributes above or below their sex's average, yet single-sex sports exist to accommodate the average physiological difference between the two sexes.

The determination in *Bostock* was that the definition of "sex" in Title VII is binary, referring to the distinction between male and female. *Id.* at 1739. Assuming a scheme of "but-for" causation, this binary definition of sex can work for discrimination based on sexual orientation. However, a binary definition of sex (male-female) does not always work for discrimination on the basis of gender identity. Hence, the *Bostock* Court's substitution of the words "transgender status" or "transgender person" for the broader term of "gender identity." *Id.* at 1737, 1741-42. A problem will almost certainly arise, however, in that ED's

9

understanding of "gender identity" includes binary and nonbinary identities. That is, there is a distinction between transgenderism that is binary (biological male presenting as female or biological female presenting as male), on the one hand, and the full array of claimed gender identities that include nonbinary genders such as gender nonconforming, genderqueer, genderfluid, and so on. A fulsome list can be long and complex. *See* https://en.wikipedia.org/wiki/List_of_gender_identities#:~:text=The%20term%20may%20be%20used,%2C%20bigender%2C%20trigender%2C%20polygender%2C. Further, an aspect of the unavoidable complexity is that gender identity can be understood to include how persons describe themselves, how they present, and how they feel.

A *Bostock* hypothetical illustrates when the problem arises. 140 S. Ct. at 1741. The Court considers where a plaintiff-employee, a transgender person who was identified as male at birth but now identifies as female, can successfully state a Title VII claim because the binary (male-female) comparison comports with Title VII's definition of "sex." *Id.* at 1739. However, if the plaintiff-employee were to identify as nonbinary, then there is no male-female dichotomy necessary to satisfy *Bostock*'s binary understanding of sex. That, of course, is a limit on the scope of Title VII as interpreted in *Bostock*. But it is also one more caution to those, such as ED, who indiscriminately would apply *Bostock*, with its definitions and policy

10

choices unique to Title VII, to other very different civil rights frameworks that
Title IX employs.

The above-identified limitations do not exhaust all the boundaries on the
scope of *Bostock*. The understandable fear that *Bostock* would be read by zealots to
sweep broadly and alter other federal civil rights legislation or preempt state laws
when it comes to "sex-segregated bathrooms, locker rooms, and dress codes" was
expressly raised and then blocked by Justice Gorsuch for the Court. *Id.* at 1753. As
to Title IX in particular, that the many policy choices embedded in Title VII must
not be carried forward and skew ED's understanding of Title IX is required by
these words: "We have not had the benefit of adversarial testing about the meaning
of their terms, and we do not prejudge any such question today. . . . Whether other
policies and practices might or might not qualify as unlawful discrimination or find
justification under other provisions of Title VII are questions for future cases, not
these." *Id.*

The Eleventh Circuit recently refused to follow the Fourth Circuit in
applying the interpretive rule of *Bostock* and Title VII to Title IX. Compare *Adams
by & through Kasper v. Sch. Bd. of St. Johns Cnty*., Fla., No. 18-13592, slip. op.
35-49, ___ F.4th ___, 2022 WL 18003879 (11th Cir. Dec. 30, 2022) (en banc) (7-
4 ruling) with *Grimm v. Gloucester Cnty. Sch. Bd*., 972 F.3d 586 (4th Cir. 2020),

as amended (Aug. 28, 2020) and *Grimm v. Gloucester Cnty. Sch. Bd.*, 976 F.3d

399 (4th Cir. 2020).

The Sixth Circuit has been particularly vigilant in resisting the laziness of

jumping to conclusions with respect to the scope of *Bostock* beyond Title VII. *See*

*Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021) (by its own terms

*Bostock* extends no further than Title VII); *Meriwether v. Hartop*, 992 F.3d 492,

510 n.4 (6th Cir. 2021) (It does not follow that the principles in *Bostock* extend to

Title IX, citing textual differences.).

**POINT THREE: Application of *Bostock* with its but-for rule of causation to Title IX makes no sense if the plain text and title's context are to carry any weight; employment discrimination presents a distinctly different situation from, for example, school-based athletics and performing arts where acknowledged differences between males and females have been accounted for by Congress in Title IX to achieve not blind equality, but equal opportunities given the physiological differences between males and females, as well as a laudable concern for privacy when being unclothed before the opposite sex.**

Justice Gorsuch, writing for the Court in *Bostock*, "proceed[ed] on the

assumption that [in Title VII] 'sex' . . . refer[s] only to biological distinctions

between male and female." 140 S. Ct. at 1739. So for Title VII there are just two

sexes, either male or female. That assumption concerning the definition of the

word "sex" in Title VII, along with a "but-for" rule of causation, led to the Court's

rationale that included in the prohibition on discrimination in employment

"because of . . . sex" a prohibition on discrimination because of sexual orientation

and gender identity.

It follows that *Bostock* was possible only because Congress had built into Title VII a "but-for" rule of causation. Consider this Title VII illustration: Dick and Bob are employees at Acme Industrial and nearing the completion of their 90-day probationary period. At a company picnic, the HR director learns that Dick is married to Sally and Bob is married to Pete. At the end of probation, Dick is retained by HR but Bob is dismissed because he is gay. If Bob had been married to a woman, he would have been retained. But for Bob being married to a man rather than a woman, one link in the chain of causation leading to Bob's dismissal was an act of "sex" discrimination by Acme Industrial. That a second way of viewing the chain of causation leading to Bob's discharge was his sexual orientation does not cancel the fact that a causal link was an act of favoritism by the employer of one sex (female) over the other sex (male).[4]

---

[4] The gender-identity version of *Bostock* illustrated goes like this: Harry, a biological male, has recently begun to present as a female. Harry is dismissed by the employer because of her transgender status. This is "sex" (again, meaning one of just two possibilities, male or female) discrimination because if Harry had continued to present as a male there would have been no discharge. That is discrimination "because of . . . sex," the relevant link in the but-for chain of causation that Congress built into Title VII. It makes no difference that one could also view Harry as having been dismissed because of transgender status.

It must be recognized, however, that this illustration can be characterized as "sex" discrimination only because the employee's presenting gender falls into the male-female binary. If Harry's gender identity had been nonbinary, then there is no male-female binary or preference of one sex over the other sex. And if there is no male-female binary, then there can be no favoritism by the employer of one of the two sexes and thus no discrimination "because of . . . sex." Once again, *Bostock*

The *Bostock* rationale does not work when it comes to Title IX. Unlike Title VII, Congress did not build into Title IX a but-for rule of causation. *Neese v. Becerra*, 2022 WL 16902425, at *12 (N.D. Tex. Nov. 11, 2022); *see also id.* at *8; *Bostock*, 140 S. Ct. at 1739. Title IX reads "on the basis of sex" whereas Title VII has the finder of fact searching for discrimination—a lot or even a little—"because of . . . sex." Title IX's text "on the basis of sex" does not connote a derivative, but-for causation analysis like *Bostock* reasoned was the situation with "because of . . . sex." *Neese*, at *12.

Equally profound in their differences, Title VII is about women being treated strictly equal with men in the workplace whereas Title IX is about accounting for the physiological differences in women and men so as to provide equality of opportunities. So, unlike Title VII's implementation of a rule of strict equality for each individual in the workplace,[5] Title IX acknowledges that single-sex sports, for example, exist to accommodate the average physiological differences between men and women with an eye to providing equal opportunities to females as a class. Unlike Title VII, Title IX was not written to enforce individual, case-by-case equality. Rather, in dealing with sports the statute applies

---

"proceed[ed] on the assumption that [in Title VII] 'sex' . . . refer[s] only to biological distinctions between male and female." 140 S. Ct. at 1739.

[5] Even Title VII, with all its rules of strict sexual equality, does account for women being different from men when it comes to pregnancy and childbirth. 42 U.S.C. 2000e(k).

to each sex as a whole. Just this month a federal district court in *B.P.J. v. West Virginia State Board of Education*, Civil Action No. 2:21-cv-00316 (S.D.W. Va., Jan. 5, 2023), upheld a State of West Virginia law enacted to ensure equal opportunities for women in sports. The court sensibly observed:

> Whether a person has male or female sex chromosomes determines many of the physical characteristics relevant to athletic performance. Those with male chromosomes, regardless of their gender identity, naturally undergo male puberty, resulting in an increase in testosterone in the body. [The claimant] herself recognizes that "[t]here is a medical consensus that the largest known biological cause of average differences in athletic performance between [males and females] is circulating testosterone beginning with puberty." . . . While some females may be able to outperform some males, it is generally accepted that, on average, males outperform females athletically because of inherent physical differences between the sexes. This is not an overbroad generalization, but rather a general principle that realistically reflects the average physical differences between the sexes.

*Id.* at slip op. 17.[6] It is the same with some of the performing arts like voice,[7] dance, or theater where different, male and female roles are openly celebrated and thus taken into account by Title IX in order to achieve an overall equality of opportunity for women.

Seeing the many differences in the approach of these two venerable civil rights acts begins with their text. Title VII prohibits discrimination "because of . . .

---

[6] The court in *B.P.J.* went on to conclude, *inter alia*, that the word "sex" in Title IX means biological sex (male-female) and thus does not reach the plaintiff's allegations of discrimination on the basis of transgender status. *Id.* at 21-22.

[7] *See* 34 C.F.R. 106.34(a)(4) (single-sex choir).

sex," (42 U.S.C. 2000e-2(a)), whereas Title IX prohibits discrimination "on the basis of sex" (20 U.S.C. 1681(a)). Also fundamental, Title VII prohibits discrimination in employment alone (42 U.S.C. 2000e-2(e)), whereas Title IX prohibits discrimination in any "program or activity" by a recipient of "Federal financial assistance" (20 U.S.C. 1681(a)). Employment is not at all comparable to competition within team sports or a college's Title IX Office investigating coed dating or sexist behavior at fraternity parties. Moreover, Title VII is an exercise by Congress of its power under the Commerce Clause whereas Title IX is an exercise by Congress of its Spending Power.[8] Absent from Title IX is the required clear notice to states of an obligation to not discriminate on the basis of gender identity; that alone is fatal to the issuance of ED's interpretations. Title VII applies to all employers with 15 or more employees (42 U.S.C. 2000e(b)), whereas Title IX applies more narrowly by targeting only educational institutions (20 U.S.C. 1681(a)). Additionally profound is that Title VII safeguards as protected classes "race, color, religion, sex, and national origin" (42 U.S.C. 2000e-2(a)), whereas

---

[8] A safeguard of our federal system is the demand that Congress provide the States with a clear statement when imposing a condition on federal funding because "legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Pennhurst State Sch. & Hospital v. Halderman*, 451 U.S. 1, 17 (1981). Thus, the "legitimacy of Congress' power to legislate under the [S]pending [Power] . . . rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *Id*. (quoting *Steward Mach. Co. v. Davis*, 301 U.S. 548, 585–98 (1937)).

Title IX is focused alone on protecting the class based on "sex" (20 U.S.C. 1681(a)), a class where physiological differences sometimes matter when it comes to, for example, sports[9] and the performing arts, as does the innate need for privacy when undressing in the view of others.

These marked distinctions in Title IX, in contrast with Title VII, are easily seen in the statutory text. Privacy, for example, is evident in Title IX's rule of construction allowing for universities to provide dormitories and Greek-letter chapter houses that are segregated by female and male. 20 U.S.C. 1686. Title IX exempts the historic practice of maintaining all-women and all-men colleges (20 U.S.C. 1681(a)(5)), exempts YMCAs and YWCAs, as well as youth character-building organizations such as Boy Scouts and Camp Fire Girls (20 U.S.C. 1681(a)(6)(B)), and exempts the longstanding American Legion programs of Boys State and Girls Nation (20 U.S.C. 1681(a)(7)). The American Legion selects promising youth leaders, locates them on a college campus during a week each summer, and puts them through a simulated program of electing and operating a state legislature and governor. The experience has been that many girls, as a class, would hold back from taking leadership roles when in the presence of boys; thus, running a separate program for girls yields greater success in bringing along these

---

[9] *See* 34 C.F.R. 106.34(a)(1) and 106.41 (athletics at educational institutions; single-sex sports).

young women. Title IX exempts from the rule of sex equality father-son and mother-daughter dinners and other activities. These programs recognize a bond of shared interests between parent and a child of the same sex, and that those shared interests can be enjoyed without taking away from other positive experiences. These things are not a zero-sum game and positive events need not be destroyed by unyielding egalitarianism. Finally, Title IX's text exempts beauty pageants that are a source of contestation and earned college scholarships available alone to young women (20 U.S.C. 1691(a)(9)). None of the forgoing exemptions and rule of construction in Title IX—which celebrate and preserve distinctions between females and males—are compatible with the strict no-sex distinctions in the workplace that is baked into Title VII and its but-for rule of causation.

With respect to these exemptions and rule of construction, Congress's operative definition of "sex" in Title IX is binary. A person is either one of two sexes, male or female. Consider, for example, the text of Title IX allowing transition "from being an institution which admits only students of *one sex* to being an institution which admits students of *both sexes*." 20 U.S.C. 1681(a)(2) (emphasis added). As observed in note 4, *supra*, that binary definition of sex can work in some instances of gender identity but never when a claimant's gender identity is nonbinary. Yet, ED's Interpretation, Dear Educators Letter, and Fact Sheet do not account for this lapse in rationality.

There is no denying that the overall problem that Congress was addressing fifty years ago when enacting Title IX was that within educational institutions girls and women had fewer opportunities than boys and men. *See Cannon v. University of Chicago*, 441 U.S. 677, 681 n.2, 695 n.16, 704 n.36 (1979). It is equally true that there are physiological differences between males and females such as muscle mass and bone structure, and these differences are not learned socially or by nurture and thus are not going away. *See United States v. Virginia (VMI)*, 518 U.S. 515, 533, 540-41 (1996). So, in some instances—such as single-sex sports—to treat biological males that identify as female as equal to biological females is to disadvantage the latter class. To compel such a result under the rubric of "antidiscrimination" is ironic, for it undermines the original purpose of Title IX. The *Bostock* rationale when applied to Title IX would lead to all sorts of twisted outcomes. Consider, for example, the biological female that identifies as male who will be forced to compete for a spot on the men's team even while having a physiology which is that of a biological female.

All this defies common sense. It follows that Title IX's text prohibiting discrimination "on the basis of sex" does not extend to discrimination on the basis of sexual orientation or gender identity. If such a step is to be taken, it is a step for Congress rather than the unelected judiciary following the lead of an ideologically saturated ED. If ED is so convinced of the wisdom and compassion of its

Interpretation, Dear Educators Letter, and Fact Sheet, then it should put the question to the people's elected representatives rather than proceeding unilaterally under the pretense of an interpretive mandate.

**POINT FOUR: The Department of Education's releasing of its Interpretation, Dear Educators Letter, and Fact Sheet is Contrary to the Major Question Doctrine.**

ED's release of the Interpretation, Dear Educators Letter, and Fact Sheet complained of here was driven not by the rule of law but the will to power. Abuses by Executive Branch agencies that aggrandize power away from delegations to the Legislative Branch are on the rise and the Judicial Branch has fashioned a remedy when the questions in balance are major.

As a separate and independent ground for rejecting the Appellees' brief that the prohibition on sex discrimination in Title IX includes discrimination on the bases of sexual orientation and gender identity, Amici look to the recent decision in *West Virginia v. Environmental Protection Agency*, 142 S. Ct. 2587 (2022). The Supreme Court held that the EPA does not have congressional authority to limit emissions at existing power plants through what is called "generation shifting" to renewable energy sources such as solar and wind. Finding that the proposed action of the EPA's Clean Power Plan fell under the "major question doctrine," the Court held that the plan required specific congressional approval for such a momentous agency directive. Chief Justice Roberts, for the Court, wrote that in "certain

extraordinary cases, both separation of powers principles and a practical understanding of legislative intent makes us 'reluctant to read into ambiguous statutory text' the delegation claimed [by the EPA] to be lurking there. [citation omitted] To convince us otherwise, something more than a merely plausible textual basis for the agency action is necessary. The agency instead must point to 'clear congressional authorization' for the power it claims." *Id.* at 2609. Justice Gorsuch, joined by Justice Alito, filed a concurring opinion. Justice Gorsuch noted the importance of the major question doctrine, stating that it "seeks to protect against 'unintentional, oblique, or otherwise unlikely' intrusions" on the areas of "self-government, equality, fair notice, federalism, and the separation of powers." *Id.* at 2620.

It is an understatement that the addition of sexual orientation and gender identity to Title IX's existing protected class of sex raises major questions of political, economic, religious, medical, and ethical significance. There is a complete absence of direction in Title IX from Congress on how to balance these new competing interests. For example, ED's unilateral actions implicate educational curriculum in medical colleges and elsewhere. They implicate hospitals and health-care clinics at universities. They implicate health insurance coverage of employees and students, same-sex competitive sports, preferred pronouns, and privacy in restrooms and locker rooms, as well as married student

housing. Past guidance on Title IX has some school districts hiding from parents the school's efforts to treat their children as presenting as a sex other than that determined at birth. ED's unilateral actions also implicate the religious freedom of religious students and faculty at K-12 secular schools and institutions of higher education who are cited for discrimination when they follow their faith-informed conscience. They implicate freedom of speech and freedom of association when students invoke their University Title IX Office to stop their fellow students from expressing their sincere beliefs because the complainant "feels" in need of a "safe space" when encountering ideas with which they disagree. True, *Bostock* already applies to employment discrimination under Title VII, but that still leaves Title IX's coverage of employment at preschools that have less than 15 employees. In multiple and various circumstances, impossible for clients to reasonably predict, state and local laws and longstanding policies will be preempted by ED's interpretations. This damages federalism, especially in a subject area (education) that has been traditionally left to the states, and in which the states in turn have left much of K-12 education to local control. Finally, the medical specialty of pediatrics remains embroiled in a heated and complex debate concerning how best for schools to care for the onslaught of young and adolescent students reporting gender dysphoria.

Before the Executive Branch unilaterally inflates Title IX beyond the protected class of (binary: male-female) sex, *West Virginia v. EPA* requires that Congress act clearly through the bicameral legislative process of Article I of the U.S. Constitution. For years, Congress has had before it legislation that would add sexual orientation and gender identity to Title IX (as well as other venerable nondiscrimination acts), but the bills repeatedly have died in the House or Senate. That continued failure to pass legislation, in an elected body regularly subject to the voters, is democracy in action—a saying "no" to this disturbing expansion. That "sex" in Title IX means sexual orientation and gender identity was certainly not the original public meaning when Congress drafted, debated, and finally enacted Title IX fifty years ago. *See* 1972 U.S. Code, Cong. & Admin. News vol. 2, pp. 2462, 2559, and 2608 (collecting three congressional reports on Title IX; none of the reports mentioning sexual orientation or transgender status).

## CONCLUSION

Considering the foregoing arguments and authorities, Amici respectfully suggest that this Court:

1.    Remand the appeal by EEOC to the district court for disposition, considering Defendants-Appellants' admission in its opening brief, page 8 footnote 2, that EEOC's Technical Assistance Document has been found unlawful and vacated in a parallel case now final and binding nationwide (*Texas v. EEOC*, 2022

23

WL 4835346 (N.D. Tex. Oct. 1, 2022)). And that pursuant to principles of issue

preclusion, the district court may consider entry of an individually final injunction

against the EEOC as permitted by Fed. R. Civ. P. 54(b), as well as to entertain

possible requests for costs and attorney fees per Fed. R. Civ. P.  54(d).

2.      Affirm the district court in concluding that the rationale of *Bostock*

with its but-for rule of causation does not apply to Title IX's prohibition of

discrimination "on the basis of sex," and therefore that ED's Interpretation, Dear

Educators Letter, and Fact Sheet are invalid under the APA and were properly

vacated below.

3.      Conclude that before ED can unilaterally expand Title IX to the

protected classes of sexual orientation or gender identity, the rationale of *West

Virginia v. EPA* requires that Congress first act clearly through the bicameral

legislative process in Article I of the U.S. Constitution.

Respectfully submitted,

/s/ Timothy Belz
Timothy Belz
*Counsel of Record*
J. Matthew Belz
Ottsen Leggat & Belz LLC
112 S. Hanley Street, Suite 200
St. Louis, Missouri 63105
314-726-2800

*Special Counsel for Thomas More Society*

Carl H. Esbeck
*R. B. Price Professor of Law Emeritus and*
*Isabella Wade & Paul C. Lyda Professor of Law*
*Emeritus*
209 Hulston Hall
Ninth & Conley Streets
Columbia, Missouri 65211
573-882-6543

*Counsel for Amici Thomas More Society,*
*Christian Legal Society and*
*National Association of Evangelicals*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and 29(a)(5) because this brief contains 5,911 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and 6 Cir. R. 32(b)(1).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14-point Times New Roman font.

January 17, 2023                    /s/ Timothy Belz_____
                                    Timothy Belz


## CERTIFICATE OF SERVICE

Pursuant to Fed. R. App. P. 32(a)(7)(B), I certify that on January 17, 2023, I filed this brief electronically with the Clerk of the United States Court of Appeals for the Sixth Circuit. The Court's ECF system will automatically generate and send by email a Notice of Docket Activity to all registered attorneys currently participating in this case, constituting service on those attorneys.


January 17, 2023                    /s/ Timothy Belz_____
                                    Timothy Belz