No. 22-5807

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

————————

STATE OF TENNESSEE, et al.,
*Plaintiffs-Appellees*,

and

ASSOCIATION OF CHRISTIAN SCHOOLS INTERNATIONAL, et al.,
*Intervenors-Appellees*,

v.

DEPARTMENT OF EDUCATION, et al.,
*Defendants-Appellants.*

————————

On Appeal from the United States District Court for the
Eastern District of Tennessee
(No. 3:21-cv-00308)

---

## BRIEF OF ALL PLAINTIFFS-APPELLEES
## OTHER THAN STATE OF ARIZONA

---

JONATHAN SKRMETTI
  Attorney General and Reporter
  of the State of Tennessee

ANDRÉE S. BLUMSTEIN
  Solicitor General

CLARK LASSITER HILDABRAND
  Assistant Solicitor General
  *Counsel of Record*

STEVEN J. GRIFFIN
  Assistant Attorney General

  P.O. Box 20207
  Nashville, TN 37202
  (615) 253-5642
  Clark.Hildabrand@ag.tn.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................... iii

STATEMENT REGARDING ORAL ARGUMENT ............................................... 1

STATEMENT OF JURISDICTION ........................................................................ 2

STATEMENT OF THE ISSUES ........................................................................ 3

INTRODUCTION ...................................................................................... 3

STATEMENT OF THE CASE ........................................................................ 7

    A. *Bostock*'s Narrow Title VII Decision and Initial Response ...................... 7

    B. President Biden's Executive Order and Challenged Documents .............. 8

        1. Department of Education Interpretation and Fact Sheet .................. 8

        2. EEOC Technical Assistance Document ........................................... 9

    C. District Court Decision ...................................................................... 10

SUMMARY OF ARGUMENT ...................................................................... 13

STANDARD OF REVIEW ........................................................................ 14

ARGUMENT .......................................................................................... 15

I. The District Court Correctly Ruled That Plaintiff States Have Standing to Challenge the Department's Interpretation and Fact Sheet ......................... 15

    A. The Interpretation and Fact Sheet injure Plaintiff States ........................ 15

        1. At least 16 States' laws arguably conflict with the guidance .............. 16

        2. The injuries to the States are real, not abstract .................................. 19

    B. Plaintiffs' injuries are traceable to the Interpretation and Fact Sheet and redressable by the relief sought in this case .............................................. 21

II. The District Court Did Not Abuse Its Discretion by Enjoining Defendants from Implementing the Interpretation and Fact Sheet Against Plaintiffs .... 25

A. Plaintiff States' claims are reviewable ....................................................25

   1. The Interpretation and Fact Sheet are final agency actions .............25

   2. Plaintiffs lack an adequate alternative remedy .................................30

   3. Title IX does not provide an exclusive enforcement structure that precludes jurisdiction.......................................................................31

B.    Plaintiffs   are   likely   to   prevail   on   their   procedural   APA claims…………………………………………………………………..34

   1. The Interpretation and Fact Sheet are legislative rules issued without notice and comment ........................................................................34

   2. The Interpretation and Fact Sheet are arbitrary and capricious..........38

C.    Plaintiffs are likely to succeed on their claims that the Interpretation and Fact Sheet are contrary to law ....................................................39

   1. The Interpretation and Fact Sheet are contrary to Title IX ..............39

   2. The Interpretation and Fact Sheet violate the U.S. Constitution.......44

D. Preliminary relief from the Interpretation and Fact Sheet prevents irreparable harm and furthers the public interest ...................................46

E. The district court did not abuse its discretion by preliminarily protecting all Plaintiff States ....................................................................................49

III. This Court Should Dismiss as Moot Defendants' Appeal of the Preliminary Injunction of the Technical Assistance Document ...........................................52

A. The proper judgment is dismissal of the voluntarily mooted appeal .........52

B. Plaintiffs had standing to challenge the EEOC's guidance .........................54

CONCLUSION ....................................................................................................57

ADDENDUM ................................................................................................. A-1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs. v. Gardner*,
   387 U.S. 136 (1967) ........................................................................ 25, 26

*Abbott v. Perez*,
   138 S. Ct. 2305 (2018) .......................................................................... 47

*Adams v. Sch. Bd. of St. Johns Cnty.*,
   No. 18-13592, 2022 WL 18003879 (11th Cir. Dec. 30, 2022) (en banc) ... passim

*Adams v. Sch. Bd. of St. Johns Cnty.*,
   3 F.4th 1299 (11th Cir. 2021) ............................................................... 17

*Adams v. Sch. Bd. of St. Johns Cnty.*,
   968 F.3d 1286 (11th Cir. 2020) ...................................................... 17, 46

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
   458 U.S. 592 (1982) ................................................................. 15, 19, 20

*Appalachian Power Co. v. EPA*,
   208 F.3d 1015 (D.C. Cir. 2000) ...................................................... 28, 36

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,
   576 U.S. 787 (2015) ............................................................................. 21

*Arizona v. Biden*,
   40 F.4th 375 (6th Cir. 2022) ......................................................... passim

*B.P.J. v. W. Va. State Bd. of Educ.*,
   No. 2:21-cv-00316, 2023 WL 111875 (S.D. W. Va. Jan. 5, 2023) .. 18, 23, 28, 51

*Babbitt v. Farm Workers*,
   442 U.S. 289 (1979) ............................................................................. 22

*Ballard v. United States*,
   329 U.S. 187 (1946) ............................................................................. 41

*Bangura v. Hansen*,
    434 F.3d 487 (6th Cir. 2006) ...............................................30

*Bennett v. Spear*,
    520 U.S. 154 (1997).............................................. 25, 26

*Blankenship v. Blackwell*,
    429 F.3d 254 (6th Cir. 2005) ...............................................53

*Bostock v. Clayton County*,
    140 S. Ct. 1731 (2020)............................................... passim

*Bowen v. Massachusetts*,
    487 U.S. 879 (1988)...............................................30

*Califano v. Yamasaki*,
    442 U.S. 682 (1979)............................................. 50, 51

*Cape v. TSSAA*,
    563 F.2d 793 (6th Cir. 1977) ...............................................17

*City of Pontiac Retired Emps. Ass'n v. Schimmel*,
    751 F.3d 427 (6th Cir. 2014) (en banc) (per curiam) .................................. 14, 15

*Colorado v. Toll*,
    268 U.S. 228 (1925)...............................................19

*Ctr. for Auto Safety v. NHTSA*,
    452 F.3d 798 (D.C. Cir. 2006) ...............................................29

*Czyzewski v. Jevic Holding Corp.*,
    580 U.S. 451 (2017)...............................................16

*Deja Vu of Nashville, Inc. v. Metro. Gov't*,
    274 F.3d 377 (6th Cir. 2001) ...............................................48

*Dep't of Com. v. New York*,
    139 S. Ct. 2551 (2019)...............................................16

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
    140 S. Ct. 1891 (2020) .......................................................................38

*Detroit Edison Co. v. EPA*,
    496 F.2d 244 (6th Cir. 1974) ................................................... 28, 36

*Dismas Charities, Inc. v. DOJ*,
    401 F.3d 666 (6th Cir. 2005) ...........................................................35

*Dodds v. U.S. Department of Education*,
    845 F.3d 217 (6th Cir. 2016) (per curiam) ................................. 43, 44

*Doe v. Univ. of Cincinnati*,
    872 F.3d 393 (6th Cir. 2017) ...........................................................48

*D.T. v. Sumner Cnty. Schs.*,
    942 F.3d 324 (6th Cir. 2019) ...........................................................48

*E. Bay Sanctuary Covenant v. Garland*,
    994 F.3d 962 (9th Cir. 2020) ...........................................................50

*EEOC v. G.R. Harris Funeral Homes, Inc.*,
    884 F.3d 560 (6th Cir. 2018) ...........................................................49

*Encino Motorcars, LLC v. Navarro*,
    136 S. Ct. 2117 (2016) .....................................................................38

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) .........................................................................39

*Feller v. Brock*,
    802 F.2d 722 (4th Cir. 1986) ...........................................................52

*Florida v. Weinberger*,
    492 F.2d 488 (5th Cir. 1974) ...........................................................25

*Ford v. Wilder*,
    469 F.3d 500 (6th Cir. 2006) ..................................................... 6, 53

*Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*,
    561 U.S. 477 (2010) ........................................................................ 33, 34

*Garcia v. Vilsak*,
    563 F.3d 519 (D.C. Cir. 2009) ...............................................................31

*Gen. Elec. Co. v. EPA*,
    290 F.3d 377 (D.C. Cir. 2002) ...............................................................37

*Golden & Zimmerman, LLC v. Domenech*,
    599 F.3d 426 (4th Cir. 2010) .................................................................27

*Grimm v. Gloucester Cnty. Sch. Bd.*,
    972 F.3d 586 (4th Cir. 2020) ........................................................... 41, 43

*Haines v. Fed. Motor Carrier Safety Admin.*,
    814 F.3d 417 (6th Cir. 2016) .................................................................25

*Hoctor v. USDA*,
    82 F.3d 165 (7th Cir. 1996) ...................................................................38

*Jama v. Dep't of Homeland Sec.*,
    760 F.3d 490 (6th Cir. 2014) .................................................................28

*Karcher v. May*,
    484 U.S. 72 (1987) ................................................................................54

*Kentucky v. Biden*,
    No. 21-6147, 2023 WL 164614 (6th Cir. Jan. 12, 2023) ....................... 16, 24, 47

*Kentucky v. Biden*,
    23 F.4th 585 (6th Cir. 2022) .................................................................21

*Kentucky v. Yellen*,
    54 F.4th 325 (6th Cir. 2022) .................................................................44

*Kentucky v. Yellen*,
    563 F. Supp. 3d 647 (E.D. Ky. 2021) ...................................................45

*King v. Burwell*,
   576 U.S. 473 (2015)........................................................................46

*Klein v. U.S. Dep't of Energy*,
   753 F.3d 576 (6th Cir. 2014) .........................................................21

*Long v. Insight Comms. of Cent. Ohio, LLC*,
   804 F.3d 791 (6th Cir. 2015) .........................................................38

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992)........................................................................21

*Lusardi v. McHugh*,
   2015 WL 1607756 (EEOC Apr. 1, 2015)........................................56

*Maine v. Taylor*,
   477 U.S. 131 (1986)........................................................................19

*Mann Constr., Inc. v. United States*,
   27 F.4th 1138 (6th Cir. 2022) ................................................. 36, 38

*Marlow v. U.S. Dep't of Educ.*,
   820 F.2d 581 (2d Cir. 1987)...........................................................33

*Massachusetts v. EPA*,
   549 U.S. 497 (2007)................................................... 19, 21, 22

*Massachusetts v. Mellon*,
   262 U.S. 447 (1923)................................................... 20, 21

*Memphis A. Philip Randolph Inst. v. Hargett*,
   978 F.3d 378 (6th Cir. 2020) .........................................................15

*Meriwether v. Hartop*,
   992 F.3d 492 (6th Cir. 2021) ............................................... passim

*Midwest Media Prop., L.L.C. v. Symmes Twp.*,
   503 F.3d 456 (6th Cir. 2007) .........................................................22

*Missouri v. Holland*,
    252 U.S. 416 (1920) .................................................................................19

*Nat'l Council for Adoption v. Blinken*,
    4 F.4th 106 (D.C. Cir. 2021) ................................................................37

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012) .............................................................................45

*Nat'l Mining Ass'n v. McCarthy*,
    758 F.3d 243 (D.C. Cir. 2014) ..............................................................29

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*,
    145 F.3d 1399 (D.C. Cir. 1998) ............................................................50

*Nken v. Holder*,
    556 U.S. 418 (2009) .............................................................................14

*NLRB v. Wyman-Gordon Co.*,
    394 U.S. 759 (1969) .............................................................................35

*Ohio ex rel. Celebrezze v. U.S. Dep't of Transp.*,
    766 F.2d 228 (6th Cir. 1985) ......................................................... 15, 19

*Ohio Forestry Ass'n v. Sierra Club*,
    523 U.S. 726 (1998) .............................................................................25

*Online Merchs. Guild v. Cameron*,
    995 F.3d 540 (6th Cir. 2021) ........................................................ 22, 23

*Parsons v. DOJ*,
    801 F.3d 701 (6th Cir. 2015) ...............................................................24

*Parsons v. DOJ*,
    878 F.3d 167 (6th Cir. 2017) ........................................................ 26, 29

*Pelcha v. MW Bancorp, Inc.*,
    988 F.3d 318 (6th Cir. 2021) ................................................... 37, 39, 51

*Pennhurst State Sch. & Hosp. v. Halderman*,
451 U.S. 1 (1981) ..................................................................................44

*Perez v. Mortg. Bankers Ass'n*,
575 U.S. 92 (2015) ...............................................................................29

*Pharm. Res. & Mfrs. of Am. v. U.S. Dep't of Health & Human Servs.*,
138 F. Supp. 3d 31 (D.D.C. 2015) .......................................................29

*POET Biorefining, LLC v. EPA*,
970 F.3d 392 (D.C. Cir. 2020) .............................................................37

*R.K. v. Lee*,
53 F.4th 995 (6th Cir. 2022) ................................................................22

*Reiter v. Sonotone Corp.*,
442 U.S. 330 (1979) ..............................................................................43

*Rice v. Santa Fe Elevator Corp.*,
331 U.S. 218 (1947) ..............................................................................46

*Rogers v. Bennett*,
873 F.2d 1387 (11th Cir. 1989) ...........................................................34

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
141 S. Ct. 63 (2020) (per curiam) ........................................................48

*Romeo Cmty. Schs. v. U.S. Dep't of Health, Educ. & Welfare*,
438 F. Supp. 1021 (E.D. Mich. 1977).......................................... 33, 34

*Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.*,
547 U.S. 47 (2006) ....................................................................... 11, 15

*Rumsfeld v. Padilla*,
542 U.S. 426 (2004) ..............................................................................43

*Russman v. Bd. of Educ.*,
260 F.3d 114 (2d Cir.2001).................................................................53

*Sackett v. EPA*,
    566 U.S. 120 (2012).................................................................... 30, 31

*Sch. Dist. of Pontiac v. Sec'y of U.S. Dep't of Educ.*,
    584 F.3d 253 (6th Cir. 2009) (en banc) ...................................... 16, 45

*School of the Ozarks v. Biden*,
    41 F.4th 992 (8th Cir. 2022) ................................................................37

*SEC v. KPMG LLP*,
    412 F. Supp. 2d 349 (S.D.N.Y. 2006) ...............................................43

*Shalala v. Guernsey Mem'l Hosp.*,
    514 U.S. 87 (1995)................................................................ 34, 35, 37

*South Dakota v. Dole*,
    483 U.S. 203 (1987)..............................................................................45

*Steele v. Bulova Watch Co.*,
    344 U.S. 280 (1952)..............................................................................52

*Sullivan v. Benningfield*,
    920 F.3d 401 (6th Cir. 2019) ..............................................................15

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014)............................................................... 19, 22, 48

*Taylor v. Cohen*,
    405 F.2d 277 (4th Cir. 1968) (en banc) .............................................34

*Tenn. Hosp. Ass'n v. Azar*,
    908 F.3d 1029 (6th Cir. 2018) ............................................. 34, 35, 37

*Texas v. EEOC*,
    933 F.3d 433 (5th Cir. 2019) ...................................................... 21, 26

*Texas v. EEOC*,
    No. 2:21-CV-194-Z, 2022 WL 4835346 (N.D. Tex. Oct. 1, 2022)............. passim

*Texas v. EEOC*,
   No. 2:21-CV-194-Z, (N.D. Tex. May 26, 2022), ECF No. 53 ...........................55

*Texas v. United States*,
   201 F. Supp. 3d 810 (N.D. Tex. 2016) .................................................... 3, 31, 33

*Thunder Basin Coal Co. v. Reich*,
   510 U.S. 200 (1994) ....................................................................... 31, 32, 33

*Tumblebus, Inc. v. Cranmer*,
   399 F.3d 754 (6th Cir. 1989) ...............................................................14

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
   136 S. Ct. 1807 (2016) ................................................................... 26, 27

*U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*,
   513 U.S. 18 (1994) ...............................................................................53

*United States v. AMC Ent., Inc.*,
   549 F.3d 760 (9th Cir. 2008) ...............................................................52

*United States v. Virginia*,
   518 U.S. 515 (1996) ...............................................................................41

*Vitolo v. Guzman*,
   999 F.3d 353 (6th Cir. 2021) ...............................................................14

*West Virginia v. EPA*,
   142 S. Ct. 2587 (2022) ..........................................................................46

*Whole Women's Health v. Jackson*
   142 S. Ct. 522 (2021) ............................................................................22

*Wyoming ex rel. Crank v. United States*,
   539 F.3d 1236 (10th Cir. 2008) ...........................................................19

## Statutes

5 U.S.C. § 553 ..........................................................................................34

5 U.S.C. § 704 ..........................................................................................30

5 U.S.C. § 706 ..........................................................................................50

20 U.S.C. § 1234g(a) ................................................................................32

20 U.S.C. § 1681 ..................................................................... 37, 40, 41, 42

20 U.S.C. § 1682 ......................................................................... 32, 33, 36

20 U.S.C. § 1683 ................................................................................. 32, 33

20 U.S.C. § 1686 ............................................................................... passim

28 U.S.C. § 1292 ........................................................................................2

28 U.S.C. § 1331 ........................................................................................2

28 U.S.C. § 1346 ........................................................................................2

28 U.S.C. § 1361 ........................................................................................2

42 U.S.C. § 2000e-2(a)(1) ..................................................................... 7, 42

Ariz. Rev. Stat. Ann. § 15-120.02 ...........................................................18

Ga. Code Ann. § 20-2-316 .......................................................................50

Ind. Code Ann. § 20-33-13-4 ...................................................................18

Ky. Rev. Stat. Ann. § 164.2813 ...............................................................18

La. Stat. Ann. § 4:444 ..............................................................................18

Miss. Code. Ann. § 37-97-1 .....................................................................18

70 Okla. Stat. § 1-125 ...................................................................17

70 Okla. Stat. § 27-106 .................................................................18

S.C. Code Ann. § 59-1-500 ...........................................................18

S.D. Codified Laws § 13-67-1 .......................................................18

Tenn. Code Ann. § 49-7-180 .........................................................18

U.S. Const. amend. X .....................................................................46

U.S. Const. art. I, § 1 .....................................................................46

W. Va. Code Ann. § 18-2-25d ................................................. 18, 47

## Rules & Regulations

34 C.F.R. §§ 100.7-.8.....................................................................32

34 C.F.R. § 106.33 .............................................. 35, 41, 44, 47

34 C.F.R. § 106.37(c)............................................... 35, 41, 47

34 C.F.R. § 106.41(b) ............................................ 35, 41, 45, 47

118 Cong. Rec. 5,807 (1972) ........................................................40

85 Fed. Reg. 30,026 .......................................................................41

85 Fed. Reg. 30,178 .......................................................................42

86 Fed. Reg. 7,023 (Jan. 20, 2021) ...............................................8

86 Fed. Reg. 32,637 (June 22, 2021) …………………………….. …….passim

Fed. R. App. P. 4(a)(1)(B) .............................................................2

**Other Authorities**

ACLU of Texas, *ACLU of Tex. Civil Rights Compl. on Granbury ISD Book Bans Leads to Federal Invistigation* (Dec. 20, 2022), https://www.aclutx.org/en/press-releases/aclu-texas-civil-rights-complaint-granbury-isd-book-bans-leads-federal-investigation ..............................................................................................23

ACLU of Texas, Complaint (July 8, 2022), https://www.aclutx.org/sites/default /files/aclutx_granbury_isd_title_ix_complaint.pdf..............................................24

Bryan A. Garner et al., *The Law of Judicial Precedent* (2016)....................................52

Juno/James Dawson, *This Book is Gay* (2021 ed.)...........................................24

The American Heritage Dictionary (5th ed. 2011) ................................................41

**STATEMENT REGARDING ORAL ARGUMENT**

Plaintiff States[1] agree that oral argument will aid this Court's review.  The district court preliminarily enjoined Defendants from implementing the U.S. Department of Education ("Department") Interpretation, Dear Educator Letter, and Fact Sheet and the U.S. Equal Employment Opportunity Commission ("EEOC") Technical Assistance Document against Plaintiffs-Appellees because the federal agencies likely violated the Administrative Procedure Act ("APA") in promulgating the guidance documents.  This interlocutory appeal presents important issues of constitutional law and statutory interpretation and implicates billions of dollars of federal funding for Plaintiff States.

---

[1] The State of Arizona has elected not to join this brief and is not represented by counsel for the remaining 19 Plaintiff States.  Nothing in this brief purports to represent the current views of the State of Arizona.

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. §§ 1331, 1346, 1361.  Complaint, R. 1, PageID#6-7.  The district court issued its order granting Plaintiff States' Motion for Preliminary Injunction on July 15, 2022.  PI Order, R. 86, PageID#1987.  The district court found that Plaintiffs satisfied Article III's standing requirement.  *Id.* at PageID#1958.  Defendants timely appealed on September 13, 2022.  Notice of Appeal, R. 100, PageID#2407-08.  This Court has statutory jurisdiction over the appeal under 28 U.S.C. § 1292(a)(1).

After Defendants appealed, the U.S. District Court for the Northern District of Texas declared unlawful, vacated, and set aside the same EEOC Technical Assistance Document challenged in this case.  *Texas v. EEOC*, No. 2:21-CV-194-Z, 2022 WL 4835346, at *17 (N.D. Tex. Oct. 1, 2022).  EEOC voluntarily chose not to appeal that decision to the U.S. Court of Appeals for the Fifth Circuit by November 30, 2022, so the judgment in *Texas* became final.  Fed. R. App. P. 4(a)(1)(B). EEOC's decision not to appeal in *Texas* means there is "no longer a live controversy regarding whether this document is valid."  Defendants' Brief at 8 n.2. Because Defendants' appeal of the preliminary injunction against implementation of the Technical Assistance Document is now moot, this Court lacks jurisdiction to review that portion of the preliminary injunction order.

2

## STATEMENT OF THE ISSUES

I.     Whether Plaintiff States have Article III standing to challenge the Department's Interpretation, Dear Educator Letter, and Fact Sheet.

II.     Whether the district court abused its discretion by preliminarily enjoining Defendants from implementing against Plaintiff States the Interpretation, Dear Educator Letter, and Fact Sheet, which rewrote Title IX to prohibit discrimination based on sexual orientation and gender identity.

III.     Whether this Court should dismiss Defendants' appeal of the preliminary injunction of the EEOC Technical Assistance Document because this appeal became moot when EEOC chose not to appeal the vacatur of that document.

## INTRODUCTION

For the second time in less than a decade, the Department of Education has attempted to effect radical change in our nation's schools by purporting to "interpret" Title IX to prohibit sexual orientation and gender identity discrimination.  As in 2016, when its unlawful actions were enjoined, *Texas v. United States*, 201 F. Supp. 3d 810 (N.D. Tex. 2016), the Department has once again ordered States and other regulated parties to ignore the biological reality of sex when it comes to athletics, locker rooms, pronouns, and who knows what else, or face enforcement actions.

The district court in this case rightly granted Plaintiff States' Motion for Preliminary Injunction to protect them from Defendants' unlawful commands.  PI

Order, R. 86, PageID#1987.  Without using the notice-and-comment process, the Department began by "interpret[ing] Title IX's prohibition on discrimination 'on the basis of sex' to encompass discrimination on the basis of sexual orientation and gender identity."  Enforcement of Title IX of the Education Amendments of 1972 With Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of *Bostock v. Clayton County*, 86 Fed. Reg. 32,637 (June 22, 2021), Compl. Ex. A, R. 1-2, PageID#42-45 ("Interpretation").  Defendants then circulated a "Dear Educator Letter" and a "Fact Sheet" on "Confronting Anti-LGBTQI+ Harassment in Schools."  Department, Letter to Educators on Title IX's 49th Anniversary (June 23, 2021), Compl. Ex. C, R. 1-4, PageID#70-72; U.S. Dep't of Justice ("DOJ") & Department, Confronting Anti-LGBTQI+ Harassment in Schools (June 23, 2021), Compl. Ex. C, R. 1-4, PageID#73-74 (collectively, "Fact Sheet").

Defendants are of two minds about the effect of these documents.  When their audience is the regulated community, Defendants pull no punches.  Linking to the Fact Sheet, they take the position that conduct that violates the guidance—such as preventing a transgender student "from playing on a sports field [or] accessing the bathroom" consistent with the student's gender identity—is "against the law" and that they are "ready to act to defend" the rights of transgender students.  DOJ et al., Back-to-School Address for Transgender Students at 1:07-1:27, 4:36-40 (Aug. 17, 2021), https://bit.ly/3B8NvZn.  That aggressive tack adheres to the Department's

4

threat to "fully enforce" its rewriting of Title IX, such as when a high school does not allow "a transgender high school girl" (i.e., a biological boy) to use the girls' restroom or stops that student from trying out for the girls' cheerleading team. Fact Sheet, R. 1-4, PageID#72-73.

Forced to defend their edicts in this litigation, Defendants take a softer tack. They profess that "the documents do not purport to prejudge any particular case" or "indicate that sex-separated bathrooms, dress codes, or sports teams are per se unlawful," Defendants' Brief at 26, and assert that "[a]ny theory of pre-enforcement injury is" merely "speculative," Defendants' Brief at 33.

Defendants cannot have it both ways. Because Defendants' message to regulated parties has been clear—comply with the Interpretation and Fact Sheet or else face enforcement—the States have standing to bring this pre-enforcement challenge to prevent irreparable harm to their sovereign interests.

Plaintiffs are likely to succeed on the merits of their claims because, labels notwithstanding, the challenged documents constitute final agency actions that are legislative rules. These rules violated the APA at every turn and are substantively unlawful because they conflict with Title IX and violate the Constitution. The district court did not abuse its discretion in issuing a preliminary injunction protecting Plaintiff States from the Interpretation and Fact Sheet.

Nor did the district court abuse its discretion in preliminarily enjoining Defendants from implementing the Technical Assistance Document—unilaterally issued by the EEOC Chair—against Plaintiff States. *See* EEOC, Protections Against Employment Discrimination Based on Sexual Orientation or Gender Identity (June 15, 2021), Compl. Ex. D, R. 1-5, PageID#76-86 ("Technical Assistance Document"). Oddly, Defendants gloss over the fact that, while this appeal was pending, EEOC allowed a judgment declaring unlawful, vacating, and setting aside the Technical Assistance Document *nationwide* to become final by choosing not to appeal that decision. *Texas v. EEOC*, 2022 WL 4835346, at *17. In a single footnote, Defendants acknowledge that "there is no longer a live controversy regarding whether this document is valid." Defendants' Brief at 8 n.2.

This Court, therefore, should dismiss Defendants' appeal of the preliminary injunction of the Technical Assistance Document as moot without vacating that portion of the decision below "because the defendants were responsible for the mooting of" their own appeal. *Ford v. Wilder*, 469 F.3d 500, 506 (6th Cir. 2006). Even if this Court were to unnecessarily address Plaintiffs' standing at the district court to challenge the now-vacated document, both this district court and the *Texas* court correctly ruled that the States established standing.

6

## STATEMENT OF THE CASE

### A.    *Bostock*'s Narrow Title VII Decision and Initial Response

In *Bostock v. Clayton County*, the U.S. Supreme Court held that Title VII's prohibition on employment discrimination "because of [an] individual's . . . sex," 42 U.S.C. § 2000e-2(a)(1), prohibits an employer from "fir[ing] someone simply for being homosexual or transgender," 140 S. Ct. 1731, 1737 (2020).

The Supreme Court carefully limited its opinion and unequivocally did "not purport to address bathrooms, locker rooms, or anything else of the kind" under Title VII.  *Id.* at 1753.  In response to worries that *Bostock* would "sweep beyond Title VII to other federal . . . laws that prohibit sex discrimination," such as Title IX, the Supreme Court expressly declined to "prejudge" all other laws.  *Id.*  Constitutional concerns were "questions for future cases too."  *Id.* at 1754.

In early 2021, the Department issued a Memorandum acknowledging its "longstanding construction of the term 'sex' in Title IX to mean biological sex, male or female," and explaining its "position that," even after *Bostock*, "Title IX's statutory and regulatory provisions permit, and in some cases require, biological sex, male or female, to be taken into account in an education program or activity." Department, Memorandum for Kimberly M. Richey Re: *Bostock v. Clayton County* at 1, 6 (Jan. 8, 2021), https://bit.ly/3mwKI7H.  Athletics and living facilities could continue to separate the two sexes under Title IX.  *Id.* at 7-13.  DOJ reached similar

conclusions.    DOJ, Memorandum for the Civil Rights Division Regarding Application of *Bostock v. Clayton County* at 17 (Jan. 17, 2022), Compl. Ex. B, R. 1-3, PageID#63.

### B.    President Biden's Executive Order and Challenged Documents

As one of his first official acts, President Biden declared that *Bostock*'s analysis changed the meaning of all federal sex discrimination laws: "[L]aws that prohibit sex discrimination—including Title IX . . . along with [its] respective implementing regulations—prohibit  discrimination on the basis of gender identity or sexual orientation, so long as the laws do not contain sufficient indications to the contrary."    Exec. Order No. 13,988, 86 Fed. Reg. 7,023, 7,023 (Jan. 20, 2021). President Biden ordered the head of each agency to "fully implement the policy" set forth in the Executive Order.    *Id.* at 7,024.

### 1.    Department of Education Interpretation and Fact Sheet

On June 22, 2021, the Department published its new Interpretation of Title IX.  The Department concluded that Title IX's unique statutory requirements are no different from Title VII's and interpreted "Title IX's prohibition on discrimination 'on the basis of sex' to encompass discrimination on the basis of sexual orientation and gender identity."    Interpretation, 86 Fed. Reg. 32,637, 32,637, Compl. Ex. A, R. 1-2, PageID#42.    The Department declared that it "will fully enforce Title IX to prohibit discrimination based on sexual orientation and gender identity" and that the

8

Interpretation will "guide the Department in processing complaints and conducting investigations."  86 Fed. Reg. at 32,639.

The following day, the Department issued the Dear Educator Letter, and the Department and DOJ jointly issued the Fact Sheet.  Fact Sheet, Compl. Ex. C, R. 1-4, PageID#70-74.  The Fact Sheet identifies discrete examples of purportedly discriminatory conduct that the Department and DOJ "can investigate."  *Id.* at PageID#73.  That conduct includes preventing "a transgender high school girl," who is biologically a boy, from using the girls' restroom and "try[ing] out for the girls' cheerleading team."  *Id.*  The Fact Sheet also asserts that Defendants can investigate when a teacher instructs elementary school students that "there are only boys and girls" or refuses to use preferred "they/them pronouns."  *Id.*  The Fact Sheet encourages students who "have been treated unfairly . . . because of sexual orientation or gender identity" to "[w]rite down the details" and "[c]onsider filing a complaint" with the agencies.  *Id.* at PageID#74.

## 2.    EEOC Technical Assistance Document

On June 15, 2021, EEOC Chair Charlotte Burrows published a "technical assistance document" on the EEOC website that purports to "explain[] what the *Bostock* decision means for LGBTQ+ workers (and for all covered workers) and for employers across the country."  Technical Assistance Document, Complaint Ex. D, R. 1-5, PageID#77.  The Chairman issued the document without the approval of

other EEOC Commissioners.  Answer ¶¶ 88-91, R. 93, PageID#2034-35.

The Technical Assistance Document provided examples of employer actions that would constitute sex discrimination.  Those examples include "[p]rohibiting a transgender person from dressing or presenting consistent with that person's gender identity"; prohibiting a transgender person from using the "bathrooms, locker rooms, or showers" that correspond to the person's gender identity; and using "pronouns or names that are inconsistent with an individual's gender identity."  Technical Assistance Document, R. 1-5, PageID#81-82.  Though the document disclaimed binding legal effect, it directed people to contact EEOC with any reports of discrimination, including by filing a formal charge.  *Id.* at PageID#82-83.

### C.    District Court Decision

A group of state Attorneys General led by Tennessee—and including all Plaintiff States—sent a letter to President Biden detailing the procedural and substantive shortcomings in these agency actions.  Letter from Herbert H. Slatery III et al. to President Biden (July 7, 2021), https://bit.ly/3sNdNNn.  When Defendants declined to reconsider, the twenty Plaintiff States sued.  Compl., R. 1, PageID#1.  The States sought declaratory and injunctive relief and the setting aside of the challenged documents.  *Id.* at PageID#33-35.

Plaintiffs moved for a preliminary injunction, which the district court granted.  PI Mot., R. 10, PageID#120; PI Order, R. 86, PageID#1987.

To start, the district court ruled that "Plaintiffs have satisfied Article III's standing requirement."  PI Order, R. 86, PageID#1958.  Many Plaintiff States had already "enacted, and [were] currently enforcing, statutes that arguably conflict with Defendants' guidance as to the legality of certain conduct related to sexual orientation and gender identity." *Id.* at PageID#1953.  Because the "presence of one party with standing is sufficient to satisfy Article III's case or controversy requirement," the district court did not address any other source of standing for the States.  *Id.* at PageID#1950 (quoting *Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006)); *see also id.* at n.11 PageID#1957.

Next, the district court rejected Defendants' ripeness argument, which they have now abandoned.  *Id.* at PageID#1959.

The district court also rejected Defendants' reviewability arguments.  The challenged documents are final agency actions.  PI Order, R. 86, PageID#1972-73. Defendants did not contest that the documents mark the consummation of the agencies' decision-making process.  *Id.* at PageID#1966.  And the challenged documents determined the rights and obligations "of those subject to Title VII and IX, including Plaintiffs." *Id.*  Further, the district court ruled that "Plaintiffs do not have an adequate alternative remedy within the meaning of the APA" because "helplessly awaiting the initiation of enforcement proceedings and risking potential liability in the interim is not an adequate remedy under the APA."  *Id.* at

11

PageID#1975.  And "the express language of Title IX does not foreclose all judicial review."  *Id.* at PageID#1977.

Turning to the preliminary injunction factors, the district court held that "Plaintiffs have demonstrated a likelihood of success on the merits of their notice and comment claim."  *Id.* at PageID#1981.  The challenged documents act as legislative rules.  The Department's Interpretation and Fact Sheet, for instance, "create[] rights for students and obligations for regulated entities not to discriminate based on sexual orientation or gender identity that appear nowhere in *Bostock*, Title IX, or its implementing regulations."  *Id.* at PageID#1982.  The States suffer "an immediate injury to their sovereign interests" without an injunction, while Defendants have no "legitimate interest in enforcing the guidance documents that Plaintiffs have shown are likely to be procedurally invalid."  *Id.* at PageID#1985-86.

The district court limited the preliminary injunction to the Plaintiff States.  *Id.* at PageID#1987.

Defendants timely appealed.  Notice of Appeal, R. 100, PageID#2407.  The district court, with the parties' agreement, stayed proceedings pending appeal.  Order, R. 111, PageID#2546.  While Defendants' appeal was pending, another federal district court declared unlawful, vacated, and set aside the Technical Assistance Document.  *Texas v. EEOC*, 2022 WL 4835346, at *17.  EEOC voluntarily chose not to appeal that decision, so it became final.

## SUMMARY OF ARGUMENT

This Court should (1) affirm the district court's preliminary injunction prohibiting Defendants from implementing the Interpretation and Fact Sheet against Plaintiff States; and (2) dismiss as moot Defendants' appeal of the preliminary injunction prohibiting Defendants from implementing the now-vacated Technical Assistance Document.

The district court correctly ruled that Plaintiffs have standing to challenge the Department's Interpretation and Fact Sheet. The existence of a single Plaintiff with standing suffices for Article III, but all States have standing to challenge the attempted expansion of Title IX. The Department's threatened enforcement puts billions of dollars in federal funding at risk.

The district court did not abuse its discretion in granting preliminary relief. Plaintiffs' claims are reviewable because the challenged Department documents are final agency action, and there is no adequate or exclusive remedy that would preclude this pre-enforcement challenge. Plaintiffs are likely to prevail on both their procedural and substantive APA arguments. Defendants failed to issue these legislative rules with the requisite notice and comment, and the Interpretation and Fact Sheet are arbitrary and capricious. The documents fly in the face of Title IX and its implementing regulations by attempting to end ubiquitous and common-sense practices such as sex-separated bathrooms and athletic teams. That administrative

assertion of authority violates the Spending Clause, compels States to violate First Amendment rights, and undermines the Constitution's structure.

Finally, Defendants voluntarily mooted their appeal of the Technical Assistance Document injunction because they chose to relinquish the right to appeal another district court's vacatur of that document. Plaintiffs had standing to challenge the document, and this Court should allow the district court to address any remaining claims against EEOC or about Title VII in the first instance.

## STANDARD OF REVIEW

This Court reviews for abuse of discretion the district court's "determination as to whether the four preliminary injunction factors weigh in favor of granting or denying preliminary injunctive relief." *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc) (per curiam) (quoting *Tumblebus, Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 1989)). Those four factors are: "(1) whether the moving party has shown a likelihood of success on the merits; (2) whether the moving party will be irreparably injured absent an injunction; (3) whether issuing an injunction will harm other parties to the litigation; and (4) whether an injunction is in the public interest." *Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021) (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009)). This Court's standard of review "is deferential, but the court may reverse the district court if it improperly applied the governing law, used an erroneous legal standard, or relied

upon clearly erroneous findings of fact." *Schimmel*, 751 F.3d at 430.

This Court reviews questions of standing and mootness de novo. *Sullivan v. Benningfield*, 920 F.3d 401, 407 (6th Cir. 2019).

## ARGUMENT

## I.    The District Court Correctly Ruled That Plaintiff States Have Standing to Challenge the Department's Interpretation and Fact Sheet.

All Plaintiff States have standing to challenge the Department's expansion of Title IX.  But even if only one State has standing, that "is sufficient to satisfy Article III's case or controversy requirement." *Rumsfeld*, 547 U.S. at 52 n.2.

### A.    The Interpretation and Fact Sheet injure Plaintiff States.

This case easily satisfies Article III's case-or-controversy requirement. *See Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 386 (6th Cir. 2020) (requiring only "a 'substantial likelihood' of standing" at the preliminary-injunction stage).    The Department's Interpretation and Fact Sheet injure Plaintiffs by interfering with their sovereign authority to make and enforce laws; threatening the loss of billions of dollars in federal funding; and imposing administrative costs and burdens by forcing them to evaluate compliance with the agencies' new interpretations. *See, e.g.*, *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982) (interference with a State's sovereign "power to create and enforce a legal code" is sufficient to establish standing); *Ohio ex rel. Celebrezze v. U.S. Dep't of Transp.*, 766 F.2d 228, 232-33 (6th Cir. 1985) (potential preemption

of state laws sufficient to establish standing); *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2565 (2019) (future loss of federal funds sufficient to establish standing); *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'"); *Kentucky v. Biden*, No. 21-6147, 2023 WL 164614, at *8 (6th Cir. Jan. 12, 2023) ("each plaintiff currently receives funding" from the federal government so each plaintiff had standing); *Sch. Dist. of Pontiac v. Sec'y of U.S. Dep't of Educ.*, 584 F.3d 253, 261-62 (6th Cir. 2009) (en banc) (plurality opinion) (compliance costs sufficient to establish standing).[2]   Those injuries are directly traceable to the challenged guidance and are redressable by the relief sought in this case.

### 1. At least 16 States' laws arguably conflict with the guidance.

There is an arguable conflict between the States' laws and practices and the challenged guidance with respect to the "nearly universal" "practice of separating school bathrooms based on biological sex," which is proscribed by the Interpretation and Fact Sheet. *Adams v. Sch. Bd. of St. Johns Cnty.*, No. 18-13592, 2022 WL 18003879, at *1 (11th Cir. Dec. 30, 2022) (en banc) (rejecting Title IX challenge); *see, e.g.*, PI Ex. D ¶ 4, R. 11-4, PageID#175 ("Tennessee's state special schools maintain sex-separated bathroom and locker facilities."). Plaintiffs Tennessee,

---

[2] "Plaintiffs represented" below "that the alleged injury to their sovereign interests is the most direct injury that confers standing." PI Order, R. 86, PageID#1952. That does not mean other injuries are insufficient. *See* Defendants' Brief at 31 n.5.

Alaska, Nebraska, Oklahoma, and West Virginia have even passed laws protecting the privacy of both sexes while using the bathroom. *See* PI Order, R. 86, PageID#1953; Compl. ¶¶ 98-99, R. 1, PageID#18-20 (copies in Addendum); *see also* 70 Okla. Stat. § 1-125.

But the Interpretation relies on the long-ago vacated panel opinion in *Adams* which ruled that sex-separated bathrooms violate Title IX. 86 Fed. Reg. 32,639 (citing *Adams*, 968 F.3d 1286, 1305 (11th Cir. 2020), *Title IX ruling vacated*, 3 F.4th 1299 (2021), *ruling no Title IX violation*, 2022 WL 18003879 (2022) (en banc)). And the Fact Sheet pronounced that a school cannot stop high school boys who identify as girls from using the girls' bathroom. Fact Sheet, R. 1-4, PageID#73.

The same conflict exists in the context of athletics. Many interscholastic sports have separate teams for boys and girls, with particular focus on protecting athletic opportunities for girls due to "distinct differences in physical characteristics and capabilities between the sexes." *Cape v. TSSAA*, 563 F.2d 793, 795 (6th Cir. 1977); *see, e.g.*, PI Ex. D ¶ 4, R. 11-4, PageID#176 (describing sex-separated basketball teams at a Tennessee-run school); *cf. Adams*, 2022 WL 18003879, at *19-22 (Lagoa, J., specially concurring).

Accordingly, Plaintiffs Tennessee, Alabama, Alaska, Arizona, Arkansas, Idaho, Indiana, Kentucky, Louisiana, Mississippi, Montana, Oklahoma, South Carolina, South Dakota, and West Virginia have all enacted laws protecting sex-

17

separation in athletics.  PI Order, R. 86, PageID#1953; Compl. ¶¶ 98-99, R. 1, PageID#18-20 (copies in Addendum); *see also* Tenn. Code Ann. § 49-7-180; Ariz. Rev. Stat. Ann. § 15-120.02; Ind. Code Ann. § 20-33-13-4; Ky. Rev. Stat. Ann. § 164.2813; La. Stat. Ann. § 4:444; Miss. Code. Ann. § 37-97-1; 70 Okla. Stat. § 27-106; S.C. Code Ann. § 59-1-500; S.D. Codified Laws § 13-67-1; W. Va. Code Ann. § 18-2-25d.   Yet the Fact Sheet asserts that the newfound prohibition of discrimination on the basis of gender identity allows the Department to take action against a school that only allows (biological) girls to try out for girls' teams.  Fact Sheet, R. 1-4, PageID#73.  That is an arguable conflict.  Defendants themselves argue that following West Virginia's athletics law equates to "discriminatory treatment of transgender students," Defendants' Brief at 39, even though a district court upheld the law under Title IX, *B.P.J. v. W. Va. State Bd. of Educ.*, No. 2:21-cv-00316, 2023 WL 111875, at *9 (S.D. W. Va. Jan. 5, 2023).

And the Interpretation and Fact Sheet's prohibition of discrimination on the basis of sexual orientation and gender identity stretches beyond bathrooms and sports fields.  The Fact Sheet, for example, defines such discrimination to include a teacher telling elementary school students that "there are only boys and girls" and refusing to use "they/them pronouns" for a singular student.  *Id.* at PageID#73. Those mandates threaten to violate some teachers' religious beliefs and free speech rights, despite state laws and constitutional provisions arguably to the contrary.

Compl. ¶¶ 98-99, R. 1, PageID#18-20 (identifying Oklahoma and West Virginia provisions and a law regulating Tennessee universities that arguably conflict).

Defendants claim that this "'arguable conflict' with scattered state laws provides no basis for a pre-enforcement challenge." Defendants' Brief at 28. But "[n]othing in the [Supreme] Court's decisions requires a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate th[e] law." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 163 (2014). An "arguable" conflict suffices.

### 2. The injuries to the States are real, not abstract.

Nor are Plaintiffs' sovereignty interests too "abstract" to satisfy Article III's injury-in-fact requirement. Defendants' Brief at 23. "[A] State clearly has a legitimate interest in the continued enforceability of its own statutes." *Maine v. Taylor*, 477 U.S. 131, 137 (1986); *see also Alfred L. Snapp & Son*, 458 U.S. at 601 (recognizing a State's "sovereign interest[]" in "creat[ing] and enforc[ing] a legal code"). And a long line of precedent confirms that States may seek injunctive relief in federal court to protect that interest. *See, e.g.*, *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007); *Colorado v. Toll*, 268 U.S. 228, 229-30 (1925); *Missouri v. Holland*, 252 U.S. 416, 431 (1920); *Ohio ex rel. Celebrezze*, 766 F.2d at 233; *Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1242 (10th Cir. 2008).

Besides the States' laws already on the books, the challenged documents also

19

seek to interfere with the States' power to *create* a legal code responsive to problems in their public schools. *Cf. Alfred L. Snapp & Son*, 458 U.S. at 592. For example, Tennessee teachers have expressed concern about being required to use biologically inaccurate pronouns to refer to students. *See* Not. of Supplemental Auth., R. 83, PageID#1229. But the General Assembly's Fiscal Review Committee, quoting extensively from the Department's guidance, concluded before the preliminary injunction that Title IX now prohibits discriminating based on sexual orientation and gender identity and thus placed a $5,385,248,493 fiscal note on a bill to protect teachers. Resp. to Not. of Supplemental Auth., R. 79, PageID#1163-64. A representative of the ACLU of Tennessee also cited the challenged guidance to advocate against the bill. Not. of Supplemental Auth., R. 83, PageID#1229.

The contrast between this case and *Arizona v. Biden*, 40 F.4th 375 (6th Cir. 2022), only serves to confirm that Plaintiff States have standing. In *Arizona*, this Court reversed a nationwide preliminary injunction of a memorandum that the Secretary of Homeland Security issued "to his deputies outlining th[at] Department's immigration enforcement priorities and policies." *Id.* at 379-80. In contrast, the Department issued the Interpretation and Fact Sheet to the Title IX-regulated public, including Plaintiffs. While the States in *Arizona* did "not protest regulation of them as States or preemption of local lawmaking authority," *id.* at 386, that is a central aspect of the harm here.

20

Defendants' reliance on *Massachusetts v. Mellon*, 262 U.S. 447 (1923), Defendants' Brief at 27, is misplaced. The law challenged in *Mellon* merely required Massachusetts to "share . . . the field of state power" with Congress by helping implement a federal program. 262 U.S. at 485. It did not interfere with the State's authority to enact and enforce its own laws. The Supreme Court has limited *Mellon* to its facts. *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 802 n.10 (2015) (collecting decisions). "There is thus no *Mellon* bar against the plaintiff states' suit in their sovereign and quasi-sovereign capacities." *Kentucky v. Biden*, 23 F.4th 585, 598 (6th Cir. 2022).

**B.    Plaintiffs' injuries are traceable to the Interpretation and Fact Sheet and redressable by the relief sought in this case.**

Plaintiffs' injuries are directly traceable to the challenged guidance and would be redressed by the declaratory and injunctive relief sought in the Complaint, which includes prohibiting Defendants from enforcing their unlawful guidance. *See Texas v. EEOC*, 933 F.3d 433, 449 (5th Cir. 2019). Plaintiffs' procedural claims also satisfy the more "relaxed" redressability standard that applies to those claims. *Klein v. U.S. Dep't of Energy*, 753 F.3d 576, 579 (6th Cir. 2014) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 572 n.7 (1992)). That standard requires merely that Plaintiffs show "some possibility that the requested relief will prompt" the agency to "reconsider" its decision. *Massachusetts*, 549 U.S. at 518.

Plaintiffs do not need to wait until there is a pending enforcement action

against them.  The Supreme Court has made clear that "[w]hen an individual is subject to" the threatened enforcement of a law, "an actual . . . enforcement action is *not a prerequisite to challenging the law*."  *Susan B. Anthony List*, 573 U.S. at 158 (emphasis added).  A plaintiff "satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution.'"  *Id.* at 159 (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)).  Plaintiffs easily satisfy those requirements, especially since "sovereign State[s]" are "entitled to special solicitude in [the Court's] standing analysis." *Massachusetts*, 549 U.S. at 518-20.

*Whole Women's Health v. Jackson* still allows pre-enforcement suits by entities against officials who can enforce a law against them. 142 S. Ct. 522, 535-36 (2021).  Plaintiffs are not unregulated entities, *see R.K. v. Lee*, 53 F.4th 995, 1000 (6th Cir. 2022), and the newly prohibited conduct does not clearly violate "*other* regulations," *Midwest Media Prop., L.L.C. v. Symmes Twp.*, 503 F.3d 456, 461 (6th Cir. 2007).[3]

A "credible threat" exists that the challenged guidance will be enforced. *Susan B. Anthony List*, 573 U.S. at 159.  Defendants "ha[ve] not disavowed

---

[3] Contrary to Defendants' assertion, Defendants' Brief at 29, Plaintiffs continue to question the constitutionality of Title IX if it really contains the prohibitions that the Department announced.  *See* PI Reply, R. 57, PageID#593.

enforcement." *Online Merchs. Guild v. Cameron*, 995 F.3d 540, 551 (6th Cir. 2021). The Department instead vowed to "fully enforce" its guidance and rely on it "in processing complaints and conducting investigations." Interpretation, 86 Fed. Reg. at 32,639. Defendants' "history of past enforcement" lends their threats additional credibility. *Online Merchs. Guild*, 995 F.3d at 550 (quotation marks omitted). The DOJ filed a statement of interest opposing a West Virginia law that "exclud[es] transgender girls from participating in single-sex sports restricted to girls." Statement of Interest of the United States at 1, *B.P.J. v. W.V. State Bd. of Educ.*, No. 2:21-cv-00316 (S.D. W. Va. June 17, 2021), ECF No. 42, *available at* https://www.justice.gov/crt/case-document/file/1405541/download. The district court in *B.P.J.* nevertheless upheld the law because "Title IX authorizes sex separate sports in the same manner as" the state statute. *B.P.J.*, 2023 WL 111875, at *9.

And the Department recently opened an investigation of the Granbury Independent School District in Texas after the ACLU of Texas filed a complaint relying on the Interpretation and Fact Sheet. ACLU of Texas, *ACLU of Tex. Civil Rights Compl. on Granbury ISD Book Bans Leads To Federal Investigation* (Dec. 20, 2022), https://www.aclutx.org/en/press-releases/aclu-texas-civil-rights-complaint-granbury-isd-book-bans-leads-federal-investigation. The complaint alleges: (1) that the district superintendent said "There are two genders. There's male and there's female"; and (2) that he "explicitly directed district librarians to

pull books" regarding transgender and LGBTQ issues from library shelves.  ACLU of Texas, Compl. 1 (July 8, 2022), https://www.aclutx.org/sites/default/files/aclutx_granbury_isd_title_ix_complaint.pdf.[4]    The ACLU cited both the Interpretation and Fact Sheet for the principle that "[f]ederal law bars discrimination on the basis of sexual orientation or gender identity, as Department of Education guidance recognizes." *Id.* at 5-6 & nn.13, 15.

Defendants' Interpretation and Fact Sheet thus put Plaintiffs "to a 'Catch-22,' stuck between heavy compliance costs or feared" loss of billions of dollars in federal funds. *Arizona*, 40 F.4th at 387.  Every Plaintiff oversees and operates educational institutions, programs, and activities that receive substantial federal funding.  Compl. ¶¶ 12-16, R. 1, PageID#4-5; PI Ex. A ¶¶ 3-4, R. 11-1, PageID#166-67; PI Ex. B ¶¶ 6-8, R. 11-2, PageID#170; PI Ex. C ¶¶ 6-7, PageID#173.  By modifying Title IX to prohibit discrimination based on sexual orientation and gender identity, Defendants force Plaintiffs either to accede to the abridgment of their sovereignty and the imposition of irreparable compliance costs or to risk the loss of billions of dollars in federal education funding. *See Kentucky*, 2023 WL 164614, at *8-9.  True, private litigants can also sue Plaintiffs.  But Plaintiffs "need not show that a favorable

---

[4] Most prominently, the ACLU faulted the removal of *This Book Is Gay* even though the book encourages minors to use sex apps, glorifies sixteen-year-olds having sexual relations with married adults, and contains other lewd material.  ACLU of Tex., Compl. at 2 n.1, 3, 5; *see* Juno/James Dawson, *This Book is Gay* 182-83, 187-88, 199-200, 208 (2021).

decision will relieve [their] *every* injury." *Parsons v. DOJ*, 801 F.3d 701, 716 (6th Cir. 2015).

The district court correctly stopped Defendants from using the "fear of future sanctions" to force compliance with their unlawful dictates. *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 734 (1998); *see Abbott Labs. v. Gardner*, 387 U.S. 136, 153 (1967). There is no reason to place "sovereign [States] at such risk when so little would be gained by doing so and so much might be lost." *Florida v. Weinberger*, 492 F.2d 488, 493 (5th Cir. 1974).

## II. The District Court Did Not Abuse Its Discretion by Enjoining Defendants from Implementing the Interpretation and Fact Sheet Against Plaintiffs.

### A. Plaintiff States' claims are reviewable.

Plaintiffs are likely to prevail in establishing the reviewability of their claims against Defendants' implementation of the Interpretation and Fact Sheet.[5]

#### 1. The Interpretation and Fact Sheet are final agency actions.

The Department's Interpretation and Fact Sheet are final agency actions subject to judicial review under the APA. To constitute a final agency action, "the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *Bennett v. Spear*, 520

---

[5] Defendants treat the reviewability elements as jurisdictional, but they are not. *See* PI Order, R. 86, n.6 PageID#1950; *Haines v. Fed. Motor Carrier Safety Admin.*, 814 F.3d 417, 424 (6th Cir. 2016).

U.S. 154, 177-78 (1997) (cleaned up).  And the action must be one by which "*rights or obligations* have been determined, or from which *legal consequences will flow*." *Id.* (emphases added; cleaned up).  Courts must take a "pragmatic" approach to finality.  *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1815 (2016) (quoting *Abbott Labs.*, 387 U.S. at 149).

Defendants do not dispute that the challenged documents satisfy the first requirement for final agency action as the consummation of the decision-making process.  *Bennett*, 520 U.S. 154, 178 (1997); *see* Defendants' Brief at 36; PI Opp. 23, R. 48, PageID#321.  The parties' disagreement, therefore, centers on the second requirement:  whether the actions are ones by which "'rights or obligations have been determined,' or from which 'legal consequences will flow.'"  *Bennett*, 520 U.S. at 178 (quotation omitted).  Under the "'pragmatic' approach" to finality the Supreme Court has "long taken," *Hawkes*, 136 S. Ct. at 1815 (quoting *Abbott Labs.*, 387 U.S. at 149), the challenged documents satisfy that requirement because they "have the effect of committing the agencies . . . to a view of the law that, in turn, forces the plaintiffs either to alter their conduct, or expose themselves to potential liability," *Texas*, 933 F.3d at 446 (5th Cir. 2019) (cleaned up); *see Parsons*, 878 F.3d 162, 167 (6th Cir. 2017) ("[A]gency actions that definitively determine legal rights or obligations result in legal consequences.").

26

The Interpretation and Fact Sheet are final agency action because they purport to represent the Department's definitive interpretation of Title IX—an interpretation that will guide the agency's enforcement of the law and thus impose obligations on regulated parties. *See* Interpretation, 86 Fed. Reg. at 32,639. Moreover, legal consequences flow from the Interpretation and Fact Sheet because Title IX recipients that do not comply with the guidance will risk the loss of substantial federal funds. *See Hawkes*, 136 S. Ct. at 1815 (agency action was final where it warned regulated parties that, if they engage in certain conduct, "they do so at the risk of significant criminal and civil penalties").

Defendants argue that these documents "do not have any *independent* legal effect" because consequences really come from violating Title IX or its implementing regulations. Defendants' Brief at 37 (emphasis added). That argument is a non-starter; the Department did not simply "restate or report what already exists in the relevant body of statutes, regulations and rulings." *Golden & Zimmerman, LLC v. Domenech* 599 F.3d 426, 432 (4th Cir. 2010). Rather, the Interpretation and Fact Sheet "read 'gender identity'" and sexual orientation "into the definition of 'sex'" and thus attempt to expand Title IX beyond what its text allows. *Adams*, 2022 WL 18003879, at *15.

Although Defendants may have strategically stayed their hand while the preliminary injunction was pending, the passage of time has confirmed that the

27

documents extend far beyond what Title IX requires. The en banc Eleventh Circuit has now held that "separating school bathrooms based on biological sex passes constitutional muster and comports with Title IX." *Adams*, 2022 WL 18003879, at \*1. *Contra* Interpretation, 86 Fed. Reg. at 32,639 (relying on now-vacated panel opinion); Fact Sheet, R. 1-4, PageID#73 (declaring that the Department and DOJ can investigate sex-segregated bathrooms as Title IX violations). Additionally, despite DOJ's intervention, West Virginia prevailed at the district court in *B.P.J.* because "Title IX authorizes sex separate sports in the same manner as" the state statute. 2023 WL 111875, at \*9. *Contra* Fact Sheet, R. 1-4, PageID#73.

Tellingly, Defendants never look beyond the documents' "self-serving labels" to their content. PI Order, R. 86, PageID#1968. "Labels . . . do not control the inquiry. Legal effects do." *Arizona*, 40 F.4th at 389; *see Detroit Edison Co. v. EPA*, 496 F.2d 244, 249 (6th Cir. 1974); *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1024 (D.C. Cir. 2000). The substance of Interpretation and Fact Sheet make clear that they are cudgels designed to be used against regulated entities.

The documents leave no "discretion" to agency officials to decide that discrimination on the basis of sex does not encompass discrimination on the basis of sexual orientation or gender identity. Defendants' Brief at 40.[6] The documents

---

[6] In relying on *Jama v. Department of Homeland Security*, Defendants forget that they have conceded that the documents constitute the consummation of the agencies' decision-making process. 760 F.3d 490, 496 (6th Cir. 2014) (ruling that alien failed

legally bind the Department to its expansion of Title IX, which has a "direct effect on" the "day-to-day business" of Plaintiffs because the Department enforces Title IX against regulated entities. *Parsons*, 878 F.3d at 167 (quotation omitted). Unlike the report to Congress in *Parsons* which "other agencies or law-enforcement officers" were not "required to consider," the Department *must* follow its Interpretation and Fact Sheet. *Id.* at 169. And Department officials have "authority to initiate investigations" without any private party filing a complaint. Defendants' Brief at 5.

Defendants further argue that their actions are not final because the documents "merely summarize the agencies' understanding of" Title IX or "simply inform the public of the agencies' interpretation of Titles VII and IX." Defendants' Brief at 31, 38. Even if the documents were as benign as Defendants claim, such "general statements of policy" are final agency action when, as here, an agency "threatens enforcement" of policies that are "binding on [their] face or in practice." *Ctr. for Auto Safety v. NHTSA*, 452 F.3d 798, 807 (D.C. Cir. 2006). "[R]egulated entities are not without recourse" to challenge a nominally interpretive rule. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 105-06 (2015); *see Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014) (Kavanaugh, J.); *Pharm. Res. & Mfrs. of Am. v.*

---

to satisfy this first *Bennett* prong and thus could not challenge "intermediate steps in the removal" process).

*U.S. Dep't of Health & Human Servs.*, 138 F. Supp. 3d 31, 41-45 (D.D.C. 2015). What matters is the actual *effect* of the challenged actions.

### 2.    Plaintiffs lack an adequate alternative remedy.

Raising arguments as defenses in future enforcement proceedings is not the sort of adequate remedy contemplated in 5 U.S.C. § 704.  Section 704 ensures "that the APA's general grant of jurisdiction to review agency decisions is not duplicative of more specific statutory procedures for judicial review." *Bangura v. Hansen*, 434 F.3d 487, 501 (6th Cir. 2006).  But that provision must be construed narrowly, so as not to "defeat the central purpose of providing a broad spectrum of judicial review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988).

When administrative action imposes immediate consequences on regulated parties, courts routinely allow pre-enforcement challenges even if the parties could raise the same arguments as defenses in an eventual enforcement action.  For example, *Sackett v. EPA*, 566 U.S. 120 (2012), allowed a pre-enforcement challenge to an EPA compliance order even though "judicial review ordinarily comes by way of a civil action brought by the EPA." *Id.* at 127.  Because the plaintiffs could not "initiate that process" and instead had to "wait for the Agency to drop the hammer" while accruing daily penalties, APA review was the only "adequate remedy." *Id.* at 127, 131.

The same reasoning applies here.  The challenged guidance forces Plaintiffs

to choose between complying with the guidance, which would cause irreparable injury, or violating the guidance at the risk of significant financial penalties. Like the proposed alternatives in *Sackett*, the latter option would require Plaintiffs to "wait for the [agencies] to drop the hammer," *Sackett*, 566 U.S. at 127. That is not an adequate remedy. *See Texas*, 201 F. Supp. 3d at 826-27 (rejecting the same "alternative remedy" argument when States challenged nearly identical guidance issued by a previous administration).

The only case Defendants cite to the contrary is inapposite. *See* Defendants' Brief at 42-43 (citing *Garcia v. Vilsak*, 563 F.3d 519 (D.C. Cir. 2009)). To remedy the USDA's yearslong failure to investigate civil rights complaints, Congress gave complainants "a choice between going to court immediately or first renewing their administrative complaints" with the USDA. *Garcia*, 563 F.3d at 521, 524. But the D.C. Circuit ruled that "Congress's special remedial statute" had not given complainants the right to "pursue their failure-to-investigate claims under the APA simultaneously in the same lawsuit." *Id.* at 521, 523. That unique situation hardly forbids pre-enforcement challenges of Title IX regulations.

### 3.    Title IX does not provide an exclusive enforcement structure that precludes jurisdiction.

District court jurisdiction over pre-enforcement challenges to agency action is precluded only if Congress's intent to preclude jurisdiction is "fairly discernible in the statutory scheme." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994)

31

(quotation marks omitted).  In *Thunder Basin*, the Court held that the Mine Safety and Health Act satisfied that standard because it established a "comprehensive enforcement structure" consistent with legislative history of a "clear concern with channeling and streamlining the enforcement process."  *Id.* at 216.

Defendants contend that the "review process . . . found in Title IX" is "remarkably similar" to the one in *Thunder Basin* because it provides for an administrative hearing followed by judicial review.  Defendants' Brief at 45-46.  But the only provision of Title IX that addresses judicial review is 20 U.S.C. § 1683, which provides that:

> Any department or agency action taken pursuant to section 1682 of this title *shall be subject to such judicial review as may otherwise be provided by law for similar action* taken by such department or agency on other grounds.  In the case of action, not otherwise subject to judicial review, terminating or refusing to grant or to continue financial assistance upon a finding of failure to comply with any requirement imposed pursuant to section 1682 of this title, any person aggrieved (including any State or political subdivision thereof and any agency of either) *may obtain judicial review of such action in accordance with chapter 7 of Title 5 . . . .*

(Emphases added.)   Thus, the "elaborate procedural scheme" that Defendants reference, Defendants' Brief at 45, is established not by Title IX's "statutory scheme" but instead by Department regulations and other statutes governing procedures for specified agency actions, including withholding federal funding, *see* Defendants' Brief at 5-6 (citing 34 C.F.R. §§ 100.7-.8; 20 U.S.C. §§ 1234g(a),

1683).

But the "agency action taken pursuant to section 1682," 20 U.S.C. § 1683, that is being challenged in this case is *not* the withholding of federal funds. It is the issuance of "rules, regulations, or orders of general applicability." *Id.* § 1682. And courts have held that the APA is the relevant law that provides for judicial review of an agency's rules. *Romeo Cmty. Schs. v. U.S. Dep't of Health, Educ. & Welfare*, 438 F. Supp. 1021, 1028 (E.D. Mich. 1977) (allowing pre-enforcement APA challenge to Title IX regulation), *aff'd*, 600 F.2d 581 (6th Cir. 1979); *cf. Marlow v. U.S. Dep't of Educ.*, 820 F.2d 581, 582 (2d Cir. 1987) (similar judicial-review provision in the Rehabilitation Act did not preclude APA review). Indeed, Title IX's statutory scheme "explicitly contemplates a cause of action under the A.P.A. for redress of unlawful agency action 'not otherwise subject to judicial review.'" *Romeo*, 438 F. Supp. at 1029 (quoting 20 U.S.C. § 1683). Because no "elaborate statutory framework exists covering Plaintiffs' claims," there is no reason to think that Congress intended to preclude district-court review under the APA. *Texas*, 201 F. Supp. 3d at 826 (rejecting identical argument in challenge to similar guidance).

This case is distinguishable from *Thunder Basin* in another important respect. The statutory claims there "ar[o]se under the Mine Act and f[e]ll squarely within the Commission's expertise." 510 U.S. at 214. The claims here, by contrast, include procedural challenges and claims that the guidance violates Title IX and the

Constitution. These claims are "wholly collateral" to Title IX's administrative-review scheme and do not involve the sort of fact-driven compliance questions that might benefit from administrative review. *Id.* at 212; *see also Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010); *Romeo*, 438 F. Supp. at 1028. Plaintiffs need not "bet the farm . . . by taking the violative action before testing the validity of the" Interpretation and Fact Sheet. *Free Enterprise Fund*, 561 U.S. at 490 (quotation marks omitted).

The only two cases Defendants cite for extending *Thunder Basin* to these Title IX claims predated *Thunder Basin* and involved attempts to enjoin *pending* administrative proceedings under *Title VI*. Defendants' Brief at 46 (citing *Rogers v. Bennett*, 873 F.2d 1387 (11th Cir. 1989); *Taylor v. Cohen*, 405 F.2d 277 (4th Cir. 1968) (en banc)).

**B.    Plaintiffs are likely to prevail on their procedural APA claims.**

**1.    The Interpretation and Fact Sheet are legislative rules issued without notice and comment.**

"The APA sets different procedural requirements for 'legislative rules' and 'interpretive rules': the former must be promulgated pursuant to notice-and-comment rulemaking; the latter need not." *Tenn. Hosp. Ass'n v. Azar*, 908 F.3d 1029, 1042 (6th Cir. 2018) (citing 5 U.S.C. § 553). A rule that "intends to create new law, rights or duties" is legislative. *Id.* (quotation marks omitted). And "a rule that 'adopts a new position inconsistent with any of . . . existing regulations' is

necessarily legislative." *Id.* (quoting *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 100 (1995) (alteration adopted)).

"The notice and comment rulemaking requirements were intended to 'assure fairness and mature consideration of rules of general application.'" *Dismas Charities, Inc. v. DOJ*, 401 F.3d 666, 678 (6th Cir. 2005) (quoting *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 764 (1969) (plurality opinion)). A "central purpose[] of the requirement . . . is to give those with interests affected by rules the chance to participate in [their] promulgation." *Id.*

The Department's Interpretation and Fact Sheet are legislative rules. They "create new law," *Azar*, 908 F.3d at 1042, by imposing on regulated entities a new obligation not to discriminate based on sexual orientation or gender identity—an obligation that appears nowhere in Title IX and that *Bostock* did not impose, either. Moreover, both the Interpretation and Fact Sheet contradict the Department's existing regulations and thus effect "a substantive change in the regulations." *Guernsey Mem'l Hosp.*, 514 U.S. at 100 (quotation marks omitted). The Interpretation and Fact Sheet cannot be reconciled with Title IX itself and Department regulations expressly authorizing Title IX recipients to draw distinctions based on biological sex—including by providing separate athletic teams and living facilities. *See* 20 U.S.C. § 1686; 34 C.F.R. §§ 106.33, 106.37(c), 106.41(b); *Adams*, 2022 WL 18003879, at *1.

35

Because the documents are legislative rules, the Department was required to give the States and other affected parties notice and an opportunity to participate. Indeed, it is hard to imagine an issue more in need of public input and deliberation.

Defendants raise two arguments in response. First, they argue that the challenged documents are not legislative rules because the documents say they do not "have the force or effect of law." Defendants' Brief at 49. Second, they argue that the documents merely "interpret" what Title IX means in light of *Bostock*. Defendants' Brief at 53. Both arguments fail.

Defendants' first argument improperly focuses on the "particular label[s]" the agencies placed on the documents rather than on "the substance of what" they in fact have done. *Detroit Edison Co.*, 496 F.2d 244 at 249 (quotation marks omitted). "It is well-established that an agency may not escape the notice and comment requirements . . . by labeling a major substantive legal addition to a rule a mere interpretation." *Appalachian Power Co.*, 208 F.3d at 1024. When Congress has given an agency some authority to issue rules and regulations, as it has for the Department, 20 U.S.C. § 1682, their nominally interpretive rules are more likely to, in effect, be legislative ones. *Mann Constr., Inc. v. United States*, 27 F.4th 1138, 1144 (6th Cir. 2022).

And when the substantive effect of the challenged documents is considered, the only permissible conclusion is that the Interpretation and Fact Sheet are

legislative.  The Interpretation and Fact Sheet "effec[t] a substantive change in the regulations" by "adopt[ing] a new position inconsistent with . . . [the Department's] existing regulations" and are thus "necessarily legislative." *Azar*, 908 F.3d at 1042 (first alteration in original) (quoting *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 100 (1995)).  Plus, they are being "applied by the agency in a way that indicates [they are] binding." *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002).[7]

Defendants may not simply point to *Bostock* to justify their change in position, since that decision was "narrow" and "limited only to Title VII itself." *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021).  The Interpretation and Fact Sheet did not merely "remind parties of existing statutory or regulatory duties" but rather imposed *new* duties and "chang[ed] the text" of the statute and regulations they "profess[ed] to interpret." *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 407 (D.C. Cir. 2020).  Because neither Title IX, its implementing regulations, nor *Bostock* "compels or logically justifies" the Department's Interpretation or Fact Sheet, those documents are legislative rules issued in violation of the APA's notice-and-comment requirements. *Nat'l Council for Adoption v. Blinken*, 4 F.4th 106, 113 (D.C. Cir. 2021).

---

[7] Unlike Plaintiff States, the religious college in *School of the Ozarks v. Biden*, was "specifically exempted from the prohibition on sex discrimination in education under Title IX."   41 F.4th 992, 998-99 (8th Cir. 2022) (citing 20 U.S.C. § 1681(a)(3)).  And the memorandum challenged there did "not specifically address the subject of housing for students at colleges and universities." *Id.* at 996.

Defendants are not doing Plaintiffs "a favor" by "announc[ing] the interpretation in advance of enforcement" of a "less than crystalline statute." Defendants' Brief at 48 (quoting *Hoctor v. USDA*, 82 F.3d 165, 167 (7th Cir. 1996)); *see Mann Constr.*, 27 F.4th at 1144 (ruling IRS notice was legislative rule despite claimed purpose "to inform taxpayers of" agency's plans). Instead, they are enacting the policy of President Biden's executive order by obliterating 20 U.S.C. § 1686— which expressly allows sex-segregated living facilities but is completely ignored in the challenged documents and Defendants' Brief—and numerous longstanding regulations.

## 2. The Interpretation and Fact Sheet are arbitrary and capricious.

Plaintiffs are also likely to succeed on their claim that the Interpretation and Fact Sheet are arbitrary and capricious because they conflict with prior agency guidance, including the Department's initial post-*Bostock* guidance and longstanding regulations that allow—and sometimes require—distinctions based on biological sex. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913-14 (2020). While the district court, having ruled that Plaintiffs were likely to succeed on their notice-and-comment claim, did not address this claim, the Court "may affirm the judgment on any ground supported by the record." *Long v. Insight Comms. of Cent. Ohio, LLC*, 804 F.3d 791, 794 (6th Cir. 2015).

38

The Department failed to adequately acknowledge its change in position, to provide "good reasons" for that change, and to consider the "serious reliance interests" at stake. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (quotation marks omitted); *see FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Institutions relied on this prior guidance, including in designing and constructing facilities. For instance, had they known the Department would eventually interpret Title IX to prohibit discrimination based on gender identity, they may have offered more single-occupant living facilities. But the Department did not consider these interests—it merely noted that it had issued contrary guidance in the past. Interpretation, 86 Fed. Reg. at 32,637.

**C.    Plaintiffs are likely to succeed on their claims that the Interpretation and Fact Sheet are contrary to law.**

**1.    The Interpretation and Fact Sheet are contrary to Title IX.**

The documents are substantively unlawful because their purported interpretation is contrary to Title IX.

As an initial matter, the Department cannot simply point to *Bostock* to justify its interpretation of Title IX. *Bostock* concerned only Title VII; expressly noted that "other federal or state laws that prohibit sex discrimination"—like Title IX—were not "before" the Court; and refused to "prejudge any such question" about what those statutes require. 140 S. Ct. at 1753. Nor is *Bostock*'s analysis necessarily applicable

to Title IX. *Pelcha*, 988 F.3d at 324 (declining to extend *Bostock* to another antidiscrimination statute because *Bostock* "was limited only to Title VII itself"). Title IX is more "about schools and children—and the school is not the workplace." *Adams*, 2022 WL 18003879, at *11. "Title VII differs from Title IX in important respects." *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021). It therefore "does not follow that principles announced in the Title VII context automatically apply in the Title IX context." *Id.*

The Department must instead justify its interpretation based on Title IX itself. But the Interpretation and Fact Sheet squarely conflict with Title IX. Title IX provides that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). As *Meriwether* emphasized, Title IX—unlike Title VII—*expressly authorizes* separation based on sex in certain circumstances. 992 F.3d at 510 n.4. For example, it allows certain single-sex educational institutions and organizations, 20 U.S.C. § 1681(a)(1)-(9), and "separate living facilities for the different sexes," *id.* § 1686; *see* 118 Cong. Rec. 5,807 (1972) (statement of Sen. Bayh, chief Senate sponsor) (explaining that this statutory provision ensures that covered institutions may "permit differential treatment by sex . . . in sports facilities or other instances where

personal privacy must be preserved"); 34 C.F.R. § 106.33 (allowing "separate toilet, locker room, and shower facilities on the basis of sex").

The Department also allows covered programs to "operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport," *id.* § 106.41(b), and even *requires* universities to consider sex in allocating athletic scholarships, *id.* at § 106.37(c); *Meriwether*, 992 F.3d at 510 n.4. These regulations underscore that "[p]hysical differences between men and women . . . are enduring" and that the "'two sexes are not fungible'" but rather have "'inherent differences.'" *United States v. Virginia*, 518 U.S. 515, 533 (1996) (Ginsburg, J.) (cleaned up) (quoting *Ballard v. United States*, 329 U.S. 187, 193 (1946)).

As the Department has always construed the term, "sex" in Title IX refers only to biological sex, not gender identity. *E.g.*, 85 Fed. Reg. 30,026, 30,178 ("Title IX and its implementing regulations include provisions that presuppose sex as a binary classification.").[8] That was the ordinary meaning of the term when Title IX was enacted. *See Adams*, 2022 WL 18003879, at *14 (collecting dictionary

---

[8] Title IX only uses "sex," but most Americans still consider both "gender" and "sex" as referring to "[e]ither of the two divisions, designated male and female, by which most organisms are classified on the basis of their reproductive organs and functions." *Gender*, The American Heritage Dictionary (5th ed. 2011); *Sex*, The American Heritage Dictionary (5th ed. 2011) (same).

definitions); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 632-33 (4th Cir. 2020) (Niemeyer, J., dissenting) (same).

Statutory context confirms this binary understanding of "sex." *See* 20 U.S.C. § 1681(a)(2) (an institution may change "from . . . . admit[ting] only students of one sex to . . . admit[ting] students of *both sexes*" (emphasis added)); *id.* § 1681(a)(6)(B) (referring to ''Men's'' and ''Women's'' associations and organizations for ''Boy[s]'' and ''Girl[s],'' "the membership of which has traditionally been limited to persons of *one sex*" (emphasis added)); *cf.* 85 Fed. Reg. at 30,178 ("In promulgating regulations to implement Title IX, the Department expressly acknowledged physiological differences between the male and female sexes.").

Because Title IX expressly authorizes separation based on biological sex in myriad contexts, including athletics and living facilities, it precludes the Department's view that a covered program may not prevent an individual of one sex from using facilities or competing on teams designated for the other sex, or otherwise differentiate between the sexes in circumstances where those differences matter.

The text of Title IX is materially different from Title VII in another respect: Title IX prohibits discrimination "on *the basis* of sex," 20 U.S.C. § 1681(a) (emphasis added), rather than "because of . . . sex," 42 U.S.C. § 2000e-2(a)(1). That distinction is significant. *Bostock* concluded that Title VII's prohibition on discrimination "because of" sex imposed a but-for causation requirement, which the

42

Court acknowledged "can be a sweeping standard." 140 S. Ct. at 1739; *see id.* at 1741-42 (acknowledging that "[w]hen an employer fires an employee because she is homosexual or transgender, two causal factors may be in play—*both* the individual's sex *and* something else (the sex to which the individual is attracted or with which the individual identifies)").

Title IX, by contrast, prohibits only discrimination "on *the basis* of sex." That language makes clear that biological sex must be the *sole* reason for the discrimination. "A statutory provision's use of the definite article 'the,' . . . indicates that Congress intended the term modified to have a singular referent." *SEC v. KPMG LLP*, 412 F. Supp. 2d 349, 387-88 (S.D.N.Y. 2006); *accord Rumsfeld v. Padilla*, 542 U.S. 426, 434 (2004).[9]

Nor do lower federal-court decisions support the Department's interpretation of Title IX. The en banc Eleventh Circuit has now ruled that "separating the use of male and female bathrooms in the public schools based on a student's biological sex . . . comports with Title IX." *Adams*, 2022 WL 18003879, at *1. And the Fourth Circuit's majority decision in *Grimm*, which completely ignored 20 U.S.C. § 1686, suffers from the same shortcomings as the Interpretation. *See Grimm*, 972 F.3d at

---

[9] Even if the *Bostock* opinion used "because of" and "on the basis of" interchangeably, "the language of an opinion is not always to be parsed as though" it were "the language of a statute." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979).

634 (Niemeyer, J., dissenting). *Dodds v. U.S. Department of Education*, 845 F.3d 217 (6th Cir. 2016) (per curiam), does not support Defendants' position either. There, this Court declined to stay a preliminary injunction and did not definitively address whether the school district had violated Title IX. *Id.* at 222. As Judge Sutton pointed out, the Supreme Court reached exactly the opposite conclusion when it granted a similar stay request. *Id.* at 222 (Sutton, J., dissenting). Notably, the Department failed even to mention *Meriwether* or any other decision that would undermine its Interpretation.

### 2. The Interpretation and Fact Sheet violate the U.S. Constitution.

**Spending Clause.** Congress enacted Title IX pursuant to its Spending Clause authority, and the documents violate the Spending Clause for three separate reasons.

*First*, Title IX does not unambiguously prohibit discrimination based on sexual orientation or gender identity. If "Congress intends to impose a condition on the grant of federal moneys," as it did under Title IX, "it must do so unambiguously." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981); *see Kentucky v. Yellen*, 54 F.4th 325, 354 (6th Cir. 2022), *rehearing en banc requested*. And Congress did not "unambiguously" say so. *Adams*, 2022 WL 18003879, at *17-18.

Nor does Title IX unambiguously prohibit separating athletic teams or living facilities based on biological sex. Both the statute and its implementing regulations expressly allow sex-separated facilities. *See* 20 U.S.C. § 1686; 34 C.F.R. § 106.33;

*see Adams*, 2022 WL 18003879, at \*17 ("The notion that the School Board could or should have been on notice that its policy of separating male and female bathrooms violates Title IX and its precepts is untenable.").  And longstanding regulations expressly authorize sex-separated sports teams.  *See id.* at \*18 (citing 34 C.F.R. § 106.41(b)).  Because Congress did not "*provide*[] *clear notice to the States* of their [purported] obligation" to treat individuals according to their gender identity, the Department may not impose that obligation under the guise of a regulatory "interpretation."  *Pontiac*, 584 F.3d at 271 (plurality opinion).

*Second*, the Department's guidance uses the threat of withholding substantial federal funding to coerce Plaintiff States into adopting the agency's preferred policies.  This "is much more than 'relatively mild encouragement'—it is a gun to the head."  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 581 (2012) (opinion of Roberts, C.J.) (quoting *South Dakota v. Dole*, 483 U.S. 203, 211 (1987)); *see Kentucky v. Yellen*, 563 F. Supp. 3d 647, 658 (E.D. Ky. 2021) (ruling American Rescue Plan Act unconstitutionally coercive regardless of whether the funding provisions were unambiguous), *merits ruling affirmed on other grounds*, 54 F.4th 325 (6th Cir. 2022).  And if the statutes really meant what Defendants now say they mean, then those statutes would no doubt be coercive.

*Third*, the Department's guidance attempts "to induce the States to engage in activities that would themselves be unconstitutional."  *Dole*, 483 U.S. at 210.  For

instance, the Department's position that the use of biologically accurate pronouns could constitute discrimination runs headlong into the First Amendment. In *Meriwether*, this Court ruled that a state university in Ohio, a Plaintiff State, "flouted" the First Amendment and "violated [a professor's] free-speech rights" by punishing the professor for declining to use a student's "preferred pronouns." 992 F.3d at 511-12.

**Structural provisions.** The Department's purported "interpretation" of Title IX constitutes an unlawful exercise of legislative authority that exceeds the agency's jurisdiction. *See* U.S. Const. art. I, § 1. Even if Title IX were ambiguous with respect to the issues the Interpretation and Fact Sheet address, those issues are ones of "deep . . . political significance" that must be decided by Congress. *King v. Burwell*, 576 U.S. 473, 486 (2015) (quotation marks omitted); *see West Virginia v. EPA*, 142 S. Ct. 2587, 2609-16 (2022). Nor may an administrative agency interpret a statute in a manner that intrudes so significantly on States' traditional authority without clear evidence that Congress intended that result. *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947); U.S. Const. amend. X.

### D. Preliminary relief from the Interpretation and Fact Sheet prevents irreparable harm and furthers the public interest.

The preliminary injunction of the Department's guidance serves the public interest. Rather than *resolving* uncertainty, the Interpretation and Fact Sheet *created* uncertainty. The documents conflict with Title IX's clear language, including 20

U.S.C. § 1686, and numerous regulations, including 34 C.F.R. §§ 106.33, 106.37(c), 106.41(b). And they rely on outdated opinions such as the vacated original panel decision in *Adams*. *Compare* Interpretation, 86 Fed. Reg. at 32,639 (citing *Adams*, 968 F.3d 1286), *with Adams*, 2022 WL 18003879, at *1, *11-14 (reaching the exact opposite conclusion from the documents challenged here). Leaving the Department's guidance in place does not "educate the public." Defendants' Brief at 19. It *mis*educates the public.

Without the preliminary injunction, Plaintiffs would once again experience the compliance costs and threats to sovereignty that the Department intended. These harms are irreparable. *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018) (A State's "inability to enforce its duly enacted" laws "inflicts irreparable harm on the State."); *Kentucky*, 2023 WL 164614, at *8 (ruling that "compliance costs in the absence of a preliminary injunction" are "irreparable" due to the "federal government's sovereign immunity").

As explained above, at least sixteen Plaintiff States have laws that arguably conflict with the Interpretation and Fact Sheet. It is hard to see, for example, how West Virginia's law limiting female sports teams to biological girls, W. Va. Code Ann. § 18-2-25d, does not conflict with the documents. Many schools, universities, and athletic organizations throughout Plaintiff States, including ones directly operated by the States, would also encounter similar difficulties. *See, e.g.*, PI Ex. D

¶¶ 4-5, R. 11-4, PageID#176-77.  These irreparable sovereign harms alone are sufficient to warrant relief.

Enforcement of the challenged guidance would also harm the important interests that these and other laws are intended to protect—including privacy, safety, and First Amendment freedoms.  "When constitutional rights are threatened or impaired, irreparable injury is presumed." *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 407 (6th Cir. 2017); *see Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (per curiam) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

A regulated party is not required to wait until there is a pending enforcement action to seek preliminary relief.  *See Susan B. Anthony List*, 573 U.S. at 158.  And this is not a case about "ifs."  *Contra D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019).  As pointed out above, the Department is *already* investigating a school district in Texas—not covered by the preliminary injunction—after the ACLU of Texas filed a complaint reliant on the Interpretation and Fact Sheet.

Defendants, meanwhile, suffer no harm if this Court affirms the injunction.  Because the challenged guidance is procedurally and substantively unlawful, Defendants have no valid interest in enforcing it.  *Deja Vu of Nashville, Inc. v. Metro. Gov't*, 274 F.3d 377, 400 (6th Cir. 2001).

**E.     The district court did not abuse its discretion by preliminarily protecting all Plaintiff States.**

Rather than granting a nationwide injunction, the district court heeded Chief Judge Sutton's encouragement to limit the preliminary injunction to the Plaintiff States who chose to join this litigation.  PI Order, R. 86, PageID#1987 (citing *Arizona v. Biden*, 40 F.4th 375, 396 (6th Cir. 2022) (Sutton, C.J., concurring)). Limiting the injunction in this way still protects *all* Plaintiff States, as they would be were they to succeed in having the challenged documents vacated.

Below, Defendants mostly agreed: "If this Court were to enjoin any aspect of the challenged documents . . . its injunction should apply only to the Plaintiff States, excluding those in the Fourth and Seventh Circuits."  PI Opp., R. 48, PageID#337. Such an injunction would have protected 17 of the 20 Plaintiff States, all except Indiana, South Carolina, and West Virginia.  *Id.* at PageID#338.[10]

Having received almost entirely what they requested for the Interpretation and Fact Sheet injunction, Defendants now want to slice and dice the preliminary injunction order even further.  Defendants' Brief at 59-61.  Other than the request to exclude three States, Defendants failed to raise their proposed limitations below. Anyhow, the proposed limitations are all meritless.

---

[10] For the Technical Assistance Document, Defendants also asked relief to be bound by the Sixth Circuit's Title VII decision in *EEOC v. G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560 (6th Cir. 2018), whose judgment was affirmed but reasoning disagreed with in *Bostock*, 140 S. Ct. at 1754.  PI Opp., R. 48, n.13 PageID#338.

*First*, Defendants request the Court limit the preliminary injunction to exclude any Plaintiff State without a law that arguably conflicts. Defendants' Brief at 59-60. But as explained above, sixteen Plaintiff States have such laws. The district court did not abuse its discretion in protecting the remaining four Plaintiff States (Georgia, Kansas, Missouri, and Ohio). In APA cases, one of the ultimate remedies is completely vacating the unlawful agency action nationwide. 5 U.S.C. § 706; *see Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998); *E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 987 (9th Cir. 2020); *Texas*, 2022 WL 4835346, at *17. While this case is pending, this Court should not punish Georgia, Kansas, Missouri, and Ohio by denying relief they would receive at the end of the case. Limiting preliminary injunctions to the parties involved protects "States that did not participate in the lawsuit." *Arizona*, 40 F.4th at 395 (Sutton, C.J., concurring). No similar concern applies here.

Excluding the four aforementioned Plaintiff States threatens their ability to create new laws to codify longstanding practice or remedy emerging threats to First Amendment rights; subjects them to compliance costs; and leaves them vulnerable to loss of federal funds. Georgia, for example, recently created an oversight committee with the express power to prohibit males from competing in girls' sports at high schools that receive state funding. Ga. Code Ann. § 20-2-316. And preferred

pronoun requirements threaten the First Amendment rights of professors in Ohio. *See Meriwether*, 992 F.3d at 511-12.

*Second*, Defendants ask the Court to rewrite the injunction somehow to allow them to enforce unspecified portions of the guidance relating to "discrimination based on sexual orientation." Defendants' Brief at 60. Defendants cite no authority other than *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). But, under *Califano*, "the scope of injunctive relief is dictated by the extent of the violation established." *Id.* If the Interpretation and Fact Sheet are legislative, then the Department had no authority at all to promulgate them without notice and comment.

*Third*, Defendants ask the Court to exclude "all States governed by circuit precedent indicating that discrimination based on gender identity or sexual orientation is unlawful sex discrimination, *including States located within this Circuit*." Defendants' Brief at 61 (emphasis added). This request is baffling.

For starters, Defendants did not take such a view of Sixth Circuit precedent below. PI Opp., R. 48, PageID#337-38. The pre-*Bostock* decisions Defendants now cite dealt with Title VII or, as with *Dodds*, did not determine the merits of the issue presented. Subsequent decisions have limited *Bostock* to Title VII, *Pelcha*, 988 F.3d at 324, and indicated that "Title VII differs from Title IX in important respects," *Meriwether*, 992 F.3d at 510 n.4. Plus, even with the Fourth Circuit's erroneous

51

decision in *Grimm*, West Virginia has *prevailed* at this point in its defense of its athletics law.  *B.P.J.*, 2023 WL 111875, at *9.

The fundamental problem with Defendants' request, however, is that "each of the 13 federal circuit courts follows only its own precedent."  Bryan A. Garner et al., *The Law of Judicial Precedent* 37 & n.11 (2016).  And *this* preliminary injunction turns on whether the challenged documents complied with the APA.  No other court in the country has reviewed the Department's guidance for such compliance.

Having every State sue within its federal circuit would be more likely to create conflicts than resolve them.  *See Feller v. Brock*, 802 F.2d 722 (4th Cir. 1986) (describing conflicting injunctions).  A district court, "in exercising its equity powers, may command persons properly before it to cease or perform acts outside its territorial jurisdiction."  *Steele v. Bulova Watch Co.*, 344 U.S. 280, 289 (1952).  The only case Defendants have left for their remarkable request is a divided Ninth Circuit opinion where *the federal government itself* sought a nationwide injunction.  *United States v. AMC Ent., Inc.*, 549 F.3d 760 (9th Cir. 2008).  The district court acted reasonably in limiting its preliminary injunction to Plaintiff States.

## III.  This Court Should Dismiss as Moot Defendants' Appeal of the Preliminary Injunction of the Technical Assistance Document.

### A.  The proper judgment is dismissal of the voluntarily mooted appeal.

Plaintiffs and Defendants agree that EEOC's failure to appeal the vacatur of the Technical Assistance Document in *Texas*, 2022 WL 4835346, at *17, means that

"there is no longer a live controversy regarding whether this document is valid," Defendants' Brief at 8 n.2. The document is no more. Thus, the proper remedy is for this Court to dismiss Defendants' appeal of the preliminary injunction of the Technical Assistance Document as moot. This Court should not, however, vacate that portion of the district court's order because Defendants bear the blame for voluntarily relinquishing their right to appeal *Texas*.

"Vacatur is an 'extraordinary remedy,' and it is 'Appellants' burden, as the party seeking relief from the status quo of the lower court judgment, to demonstrate not merely equivalent responsibility for the mootness, but equitable entitlement' to vacatur." *Blankenship v. Blackwell*, 429 F.3d 254, 258 (6th Cir. 2005) (cleaned up) (quoting *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 26 (1994)). This Court also considers public interest, but the "question of fault is central to" the Court's "determination regarding vacatur." *Ford*, 469 F.3d at 505.

Here, Defendants-Appellants are aware that this portion of their appeal is moot but have entirely failed to carry their burden of justifying vacatur. Nor could they if they tried. When "the losing party has voluntarily forfeited his legal remedy by the ordinary processes of appeal or certiorari," such as by settling, he "surrender[s] his claim to the equitable remedy of vacatur." *U.S. Bancorp Mortg.*, 513 U.S. at 25. And because the "voluntary action of the defendants occurred soon after the district court granted . . . relief against those very parties," that raises "the

inference that 'mootness was [their] purpose or that [they] knew or should have known that [their] conduct was substantially likely to moot the appeal." *Id.* at 506 n.10 (alterations in original) (quoting *Russman v. Bd. of Educ.*, 260 F.3d 114, 122 (2d Cir.2001)).

This portion of the appeal did not become moot by "happenstance," that is "due to circumstances unattributable to any of the parties." *Id.* at 23 (quoting *Karcher v. May*, 484 U.S. 72, 82, 83 (1987)). EEOC, represented by DOJ,[11] could have appealed *Texas* to the Fifth Circuit but, for whatever reason, chose not to. And the mootness did not "result[] from the unilateral action of the party who prevailed in the lower court." *Id.* The Defendants lost in this case as well. Defendants have nobody to blame but themselves for this portion of their appeal becoming moot.

Even if the Court decides to vacate the relevant portion of the preliminary injunction order, there is no reason for the Court to decide in the first instance that "the States' claims against EEOC" should be entirely dismissed as moot, Defendants' Brief at 8 n.2, or for this Court to "reverse on the merits," Defendants' Brief at 63. To protect themselves from the EEOC Chair unilaterally inflicting harm on them again, Plaintiffs requested relief in their complaint that goes beyond vacating the Technical Assistance Document. Compl., R. 1, PageID#34. This Court

---

[11] The defendants in *Texas* also included Charlotte Burrows and Merrick Garland in their official capacities. 2022 WL 4835346, at *1 n.1.

54

should allow litigation in the district court to continue.

**B.    Plaintiffs had standing to challenge the EEOC's guidance.**

This Court need not, and should not, opine on whether Plaintiffs had standing to challenge the Technical Assistance Document, especially because the court in the *Texas* litigation, whose vacatur of the document is now final, ruled a State does have standing to challenge the document.  *See* Not. of Supplemental Auth. Attachment A, R. 82-1, PageID#1187-1215 (providing *Texas v. EEOC*, No. 2:21-CV-194-Z (N.D. Tex. May 26, 2022), ECF No. 53).

But if this Court opines on standing, Plaintiffs had standing to challenge the Technical Assistance Document for reasons mostly similar to those for the Department's guidance.  PI Order, R. 86, PageID#1950-58.  The document exposed Plaintiffs to damages liability by expanding Title VII.   Under the Technical Assistance Document, employers "could contribute to an unlawful hostile work environment" if they "intentionally and repeatedly" decline to use biologically inaccurate preferred pronouns.  Compl. Ex. D, R. 1-5, PageID#82.  Employers had to allow men who identify as women to use women's "bathrooms, locker rooms, and showers."  *Id.*   And employers could not have sex-specific dress codes.  *Id.* at PageID#81.

True, *Bostock* was a Title VII case.  But it dealt only with "[f]iring employees" "simply for being homosexual or transgender."  140 S. Ct. at 1753.  The Supreme

Court expressly did "not purport to address bathrooms, locker rooms, or anything else of the kind" under Title VII. *Id.* While "[a]n individual's homosexuality or transgender status *is not relevant* to employment decisions" about hiring and firing, *id.* at 1741 (emphasis added), *sex is relevant* to decisions about locker rooms, showers, and the like, where biological differences between the two sexes matter.

Accordingly, Plaintiffs have numerous laws and policies that at least arguably conflicted with the Technical Assistance Document. *See* Compl. ¶¶ 98-99, R. 1, PageID#18-20 (copies in Addendum); PI Ex. E ¶ 6, R. 11-5, PageID#179. The guidance invited employees to "fil[e] a charge of discrimination against . . . a state or local government employer." *Id.* at PageID#83. EEOC has previously enforced such a broad understanding against federal employees. *E.g.*, *Lusardi v. McHugh*, 2015 WL 1607756, at *6 (EEOC Apr. 1, 2015). The vacatur of the Technical Assistance Document redressed many of Plaintiffs' harms.

Because Defendants voluntarily mooted this portion of their appeal, this Court lacks jurisdiction to consider the merits of the APA challenge to the now-vacated document. In any case, the district court correctly ruled that the Technical Assistance Document, at a minimum, was an invalid legislative rule issued without the required notice and comment. PI Order, R. 86, PageID#1984.

## CONCLUSION

Plaintiff States respectfully request that this Court affirm the district court's preliminary injunction order as to the Department's Interpretation, Dear Educator Letter, and Fact Sheet and dismiss as moot Defendants' appeal of the preliminary injunction of the now-vacated EEOC Technical Assistance Document.

Respectfully submitted,

JONATHAN SKRMETTI
 Attorney General and Reporter
 of the State of Tennessee

ANDRÉE S. BLUMSTEIN
 Solicitor General

/s/ *Clark Lassiter Hildabrand*
CLARK LASSITER HILDABRAND
 Assistant Solicitor General

STEVEN J. GRIFFIN
 Assistant Attorney General

P.O. Box 20207
Nashville, TN 37202
(615) 253-5642
Clark.Hildabrand@ag.tn.gov

*Counsel for all Plaintiffs-Appellees other than the State of Arizona*

January 24, 2023

STEVE MARSHALL
  *Attorney General of Alabama*
KATHERINE G. ROBERTSON
  *Chief Counsel*
A. BARRETT BOWDRE
  *Deputy Solicitor General*
State of Alabama
Office of the Attorney General
501 Washington Ave.
Montgomery, AL 36130
(334) 242-7300
Barrett.Bowdre@AlabamaAG.gov
**Counsel for State of Alabama**


TREG R. TAYLOR
*Attorney General of Alaska*
CORI M. MILLS
  *Deputy Attorney General*
State of Alaska
P.O. Box 110300
Juneau, AK 99811
(907) 465-3600
cori.mills@alaska.gov
**Counsel for State of Alaska**


LESLIE RUTLEDGE
  *Attorney General of Arkansas*
NICHOLAS J. BRONNI
  *Solicitor General*
Office of the Arkansas Attorney General
323 Center St., Suite 200
Little Rock, AR 72201
(501) 682-6307
nicholas.bronni@arkansasag.gov
**Counsel for State of Arkansas**

CHRISTOPHER M. CARR
  *Attorney General of Georgia*
STEPHEN J. PETRANY
  *Solicitor General*
Office of the Georgia Attorney General
40 Capitol Square, S.W.
Atlanta, GA 30334
(404) 458-3408
spetrany@law.ga.gov
**Counsel for State of Georgia**


RAÚL R. LABRADOR
  *Attorney General of Idaho*
ALAN W. FOUTZ
  *Deputy Attorney General*
Office of the Idaho Attorney General
P.O. Box 83720
Boise, ID 83720
(208) 334-2400
alan.foutz@ag.idaho.gov
**Counsel for State of Idaho**


THEODORE E. ROKITA
  *Attorney General of Indiana*
THOMAS M. FISHER
  *Solicitor General*
Office of the Indiana Attorney General
IGC-South, Fifth Floor
302 West Washington St.
Indianapolis, IN 46204
(317) 232-6255
Tom.Fisher@atg.in.gov
**Counsel for State of Indiana**

KRIS KOBACH
  *Attorney General of Kansas*
KURTIS K. WIARD
  *Assistant Solicitor General*
Office of the Kansas Attorney General
120 S.W. 10th Ave.
Topeka, KS 66612
(785) 296-2215
kurtis.wiard@ag.ks.gov
**Counsel for State of Kansas**

DANIEL CAMERON
  *Attorney General of Kentucky*
MARC MANLEY
  *Assistant Attorney General*
COURTNEY E. ALBINI
  *Assistant Solicitor General*
Office of the Kentucky Attorney General
700 Capital Ave., Suite 118
Frankfort, KY 40601
(502) 696-5300
Marc.Manley@ky.gov
**Counsel for Commonwealth of Kentucky**

JEFF LANDRY
  *Attorney General of Louisiana*
ELIZABETH B. MURRILL
  *Solicitor General*
J. SCOTT ST. JOHN
  *Deputy Solicitor General*
Louisiana Department of Justice
1885 N. Third St.
Baton Rouge, LA 70804
(225) 326-6766
emurrill@ag.louisiana.gov
stjohnj@ag.louisiana.gov
**Counsel for State of Louisiana**

LYNN FITCH
  *Attorney General of Mississippi*
JUSTIN L. MATHENY
  *Deputy Solicitor General*
State of Mississippi
Office of the Attorney General
P.O. Box 220
Jackson, MS 39205
(601) 359-3680
justin.matheny@ago.ms.gov
**Counsel for State of Mississippi**

ANDREW BAILEY
  *Attorney General of Missouri*
JOSHUA DIVINE
  *Solicitor General*
Office of the Missouri Attorney General
P.O. Box 899
Jefferson City, MO 65102
(573) 751-8870
Josh.Divine@ago.mo.gov
**Counsel for the State of Missouri**

AUSTIN KNUDSEN
  *Attorney General of Montana*
CHRISTIAN B. CORRIGAN
  *Solicitor General*
Office of the Montana Attorney General
215 North Sanders
P.O. Box 201401
Helena, MT 59620
(406) 444-2707
Christian.Corrigan@mt.gov
**Counsel for State of Montana**

MIKE HILGERS
  *Attorney General of Nebraska*
JAMES A. CAMPBELL
  *Solicitor General*
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, NE 68509
(402) 471-2682
jim.campbell@nebraska.gov
**Counsel for State of Nebraska**

DAVE YOST
  *Attorney General of Ohio*
BENJAMIN M. FLOWERS
  *Solicitor General*
Office of the Ohio Attorney General
30 E. Broad St., 17th Floor
Columbus, OH 43215
(614) 446-8980
bflowers@OhioAGO.gov
**Counsel for State of Ohio**

GENTER F. DRUMMOND
  *Attorney General of Oklahoma*
ZACH WEST
  *Director of Special Litigation*
Office of the Attorney General
State of Oklahoma
313 N.E. 21st St.
Oklahoma City, OK 73105
(405) 522-4798
Zach.West@oag.ok.gov
**Counsel for State of Oklahoma**

ALAN WILSON
  *Attorney General of South Carolina*
J. EMORY SMITH, JR.
  *Deputy Solicitor General*
Office of the South Carolina Attorney
General
P.O. Box 11549
Columbia, SC 29211
(803) 734-3680
esmith@scag.gov
**Counsel for State of South Carolina**

MARTY J. JACKLEY
  *Attorney General of South Dakota*
Office of the South Dakota Attorney
General
PAUL SWEDLUND
  *Assistant Attorney General*
1302 East Highway 14, Suite 1
Pierre, SD 57501
(605) 773-3215
paul.swedlund@state.sd.us
**Counsel for State of South Dakota**

PATRICK MORRISEY
  *Attorney General of West Virginia*
LINDSAY S. SEE
  *Solicitor General*
Office of the West Virginia Attorney
General
State Capitol Bldg. 1, Room E-26
Charleston, WV 25305
(681) 313-4550
lindsay.s.see@wvago.gov
**Counsel for State of West Virginia**

60

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,000 words, excluding the parts exempted by Fed. R. App. P. 32(f).

This brief also complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5)-(6) because it has been prepared in proportionally spaced typeface using Times New Roman 14-point font.

/s/ *Clark Lassiter Hildabrand*
CLARK LASSITER HILDABRAND
Assistant Solicitor General

January 24, 2023

## CERTIFICATE OF SERVICE

I, Clark Hildabrand, counsel for Plaintiffs-Appellees other than the State of Arizona and a member of the Bar of this Court, certify that, on January 24, 2023, a copy of the Brief of All Plaintiffs-Appellees Other Than State of Arizona was filed electronically through the appellate CM/ECF system.  I further certify that all parties required to be served have been served.

/s/ *Clark Lassiter Hildabrand*
CLARK LASSITER HILDABRAND
 Assistant Solicitor General

# ADDENDUM

Page

Designation of Court Documents............................................................ A-2

Statutory and Regulatory Provisions ..................................................... A-4

Order in *Texas v. EEOC*, 2:21-cv-194-Z (N.D. Tex. May 26, 2022)................. A-29

# DESIGNATION OF COURT DOCUMENTS

*State of Tennessee, et al. v. Department of Education, et al.*,
No. 3:21-cv-00308 (E.D. Tenn.)

| Docket Entry No. | Description | Page ID # |
|---|---|---|
| 1 | Complaint | 1-38 |
| 1-2 | Complaint Exhibit A ("Interpretation") | 41-45 |
| 1-3 | Complaint Exhibit B ("DOJ Memorandum") | 46-68 |
| 1-4 | Complaint Exhibit C ("Fact Sheet") | 69-74 |
| 1-5 | Complaint Exhibit D ("Technical Assistance Document") | 75-86 |
| 10 | Plaintiffs' Motion for Preliminary Injunction | 120-126 |
| 11 | Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction | 127-164 |
| 11-1 | Preliminary Injunction Exhibit A, Declaration of Howard H. Eley | 165-167 |
| 11-2 | Preliminary Injunction Exhibit B, Declaration of Emily House | 168-170 |
| 11-3 | Preliminary Injunction Exhibit C, Declaration of Eve Carney | 171-173 |
| 11-4 | Preliminary Injunction Exhibit D, Declaration of Josh Mason | 174-176 |
| 11-5 | Preliminary Injunction Exhibit E, Declaration of Stephen C. Raymer | 177-179 |
| 48 | Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction | 288-339 |
| 57 | Reply in Support of Plaintiffs' Motion for Preliminary Injunction | 566-604 |
| 79 | Plaintiffs' Response to Notice of Supplemental Authority | 1162-1168 |
| 82-1 | Notice of Supplemental Authority Attachment A, Order in *Texas v. EEOC*, 2:21-cv-194-Z (N.D. Tex. May 26, 2022) | 1187-1215 |
| 83 | Plaintiffs' Notice of Supplemental Authority | 1226-1233 |
| 86 | Memorandum Opinion and Order | 1942-1988 |

| 93 | Defendants' Answer to Plaintiffs' Complaint | 2019-2051 |
| 100 | Notice of Appeal | 2407-2408 |
| 111 | Order Denying Defendants' Motion to Strike Intervenor Complaint and Granting Unopposed Motion to Stay Further District Court Proceedings | 2546-2551 |

## STATUTORY AND REGULATORY PROVISIONS

## Title VII

### 42 U.S.C. § 2000e-2

(a) Employer practices

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

\*\*\*

## Title IX

### 20 U.S.C. § 1681

(a) Prohibition against discrimination; exceptions

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance, except that:

(1) Classes of educational institutions subject to prohibition in regard to admissions to educational institutions

This section shall apply only to institutions of vocational education, professional education, and graduate higher education, and to public institutions of undergraduate higher education;

(2) Educational institutions commencing planned change in admissions in regard to admissions to educational institutions

This section shall not apply (A) for one year from June 23, 1972, nor for six years after June 23, 1972, in the case of an educational institution which has begun the process of changing from being an institution which admits only students of one sex to being an institution which admits students of both sexes, but only if it is carrying out a plan for such a change which is approved by the Secretary of Education or (B) for seven years from the date an educational institution begins the process of changing from being an institution which admits only students of only one sex to being an institution which admits students of both sexes, but only if it is carrying out a plan for such a change which is approved by the Secretary of Education, whichever is the later;

(3) Educational institutions of religious organizations with contrary religious tenets

This section shall not apply to an educational institution which is controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization;

(4) Educational institutions training individuals for military services or merchant marine

This section shall not apply to an educational institution whose primary purpose is the training of individuals for the military services of the United States, or the merchant marine;

(5) Public educational institutions with traditional and continuing admissions policy in regard to admissions

This section shall not apply to any public institution of undergraduate higher education which is an institution that traditionally and continually from its establishment has had a policy of admitting only students of one sex;

(6) Social fraternities or sororities; voluntary youth service organizations

This section shall not apply to membership practices—

A-5

(A) of a social fraternity or social sorority which is exempt from taxation under section 501(a) of Title 26, the active membership of which consists primarily of students in attendance at an institution of higher education, or

(B) of the Young Men's Christian Association, Young Women's Christian Association, Girl Scouts, Boy Scouts, Camp Fire Girls, and voluntary youth service organizations which are so exempt, the membership of which has traditionally been limited to persons of one sex and principally to persons of less than nineteen years of age;

(7) Boy or Girl conferences this section shall not apply to—

(A) any program or activity of the American Legion undertaken in connection with the organization or operation of any Boys State conference, Boys Nation conference, Girls State conference, or Girls Nation conference; or

(B) any program or activity of any secondary school or educational institution specifically for—

(i) the promotion of any Boys State conference, Boys Nation conference, Girls State conference, or Girls Nation conference; or

(ii) the selection of students to attend any such conference;

(8) Father-son or mother-daughter activities at educational institutions

This section shall not preclude father-son or mother-daughter activities at an educational institution, but if such activities are provided for students of one sex, opportunities for reasonably comparable activities shall be provided for students of the other sex; and

(9) Institution of higher education scholarship awards in "beauty" pageants

This section shall not apply with respect to any scholarship or other financial assistance awarded by an institution of higher education to any individual because such individual has received such award in any pageant in which the attainment of such award is based upon a combination of factors related to the personal appearance, poise, and talent of such individual and in which participation is limited to individuals of one sex only, so long as such pageant is in compliance with other nondiscrimination provisions of Federal law.

A-6

\*\*\*

## 20 U.S.C. § 1682

Each Federal department and agency which is empowered to extend Federal financial assistance to any education program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, is authorized and directed to effectuate the provisions of section 1681 of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken. No such rule, regulation, or order shall become effective unless and until approved by the President. Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement, but such termination or refusal shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made, and shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found, or (2) by any other means authorized by law: Provided, however, That no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means. In the case of any action terminating, or refusing to grant or continue, assistance because of failure to comply with a requirement imposed pursuant to this section, the head of the Federal department or agency shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action. No such action shall become effective until thirty days have elapsed after the filing of such report.

## 20 U.S.C. § 1683

Any department or agency action taken pursuant to section 1682 of this title shall be subject to such judicial review as may otherwise be provided by law for similar action taken by such department or agency on other grounds. In the case of action, not otherwise subject to judicial review, terminating or refusing to grant or to continue financial assistance upon a finding of failure to comply with any requirement imposed pursuant to section 1682 of this title, any person aggrieved

(including any State or political subdivision thereof and any agency of either) may obtain judicial review of such action in accordance with chapter 7 of Title 5, and such action shall not be deemed committed to unreviewable agency discretion within the meaning of section 701 of that title.

**20 U.S.C. § 1686**

Notwithstanding anything to the contrary contained in this chapter, nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes.

## Education Regulations

**34 C.F.R. § 106.33**

A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex.

**34 C.F.R. § 106.37**

(c) Athletic scholarships.

(1) To the extent that a recipient awards athletic scholarships or grants-in-aid, it must provide reasonable opportunities for such awards for members of each sex in proportion to the number of students of each sex participating in interscholastic or intercollegiate athletics.

(2) Separate athletic scholarships or grants-in-aid for members of each sex may be provided as part of separate athletic teams for members of each sex to the extent consistent with this paragraph and § 106.41.

**34 C.F.R. § 106.41**

(a) General. No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis.

(b) Separate teams. Notwithstanding the requirements of paragraph (a) of this section, a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport. However, where a recipient operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try-out for the team offered unless the sport involved is a contact sport. For the purposes of this part, contact sports include boxing, wrestling, rugby, ice hockey, football, basketball and other sports the purpose or major activity of which involves bodily contact.

(c) Equal opportunity. A recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes. …

\*\*\*

## Administrative Procedure Act

### 5 U.S.C. § 553

(b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include—

(1) a statement of the time, place, and nature of public rule making proceedings;

(2) reference to the legal authority under which the rule is proposed; and

(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

Except when notice or hearing is required by statute, this subsection does not apply—

(A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or

(B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

(c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose.

\*\*\*

## 5 U.S.C. § 704

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

## 5 U.S.C. § 706

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

## State Statutes and Constitutional Provisions

**Tenn. Code Ann. § 49-2-802 (cited in Complaint ¶ 98, R. 1, PageID#18-19, as "2021, Tenn. Pub. Acts, c. 452")**

As used in this part:

***

(4) "Sex" means a person's immutable biological sex as determined by anatomy and genetics existing at the time of birth. Evidence of a person's biological sex includes, but is not limited to, a government-issued identification document that accurately reflects a person's sex listed on the person's original birth certificate.

***

**Tenn. Code Ann. § 49-2-805 (cited in Complaint ¶ 98, R. 1, PageID#18-19, as "2021, Tenn. Pub. Acts, c. 452")**

(a) A student, teacher, or employee of the public school, or the student's parent or legal guardian if the student is under eighteen (18) years of age, has a private right of action against the LEA or public school, if:

A-11

(1)

     (A) The student, teacher, or employee encounters a member of the opposite sex in a multi-occupancy restroom or changing facility located in a public school building;

     (B) The student, teacher, or employee is in a multi-occupancy restroom or changing facility designated for the student's, teacher's, or employee's sex at the time of the encounter; and

     (C) The LEA or public school intentionally allowed a member of the opposite sex to enter the multi-occupancy restroom or changing facility while other persons were present; or

(2) The student, teacher, or employee is required by the public school to share sleeping quarters with a member of the opposite sex, unless the member of the opposite sex is a family member of the student, teacher, or employee.

(b) A student, teacher, or employee, or a student's parent or legal guardian, as applicable, claiming a right of action pursuant to this section may bring suit in the chancery court in the county where the claim arose.

(c) A student, teacher, or employee, or a student's parent or legal guardian, as applicable, aggrieved under this section who prevails in court may recover monetary damages, including, but not limited to, monetary damages for all psychological, emotional, and physical harm suffered. An individual who prevails on a claim brought pursuant to this section is entitled to recover reasonable attorney fees and costs.

\*\*\*

**Tenn. Code Ann. § 49-6-310 (cited in Complaint ¶ 98, R. 1, PageID#18, as "2021 Tenn. Pub. Acts, c. 40 § 1")**

(a) A student's gender for purposes of participation in a public middle school or high school interscholastic athletic activity or event must be determined by the student's sex at the time of the student's birth, as indicated on the student's original birth certificate. …

\*\*\*

**Tenn. Code Ann. § 49-6-2904**

(b) Subject to subsection (a), a student shall be permitted to voluntarily:

\*\*\*

(2) Express religious viewpoints in a public school to the same extent and under the same circumstances as a student is permitted to express viewpoints on nonreligious topics or subjects in the school;

(3) Speak to and attempt to share religious viewpoints with other students in a public school to the same extent and under the same circumstances as a student is permitted to speak to and attempt to share nonreligious viewpoints with other students;

\*\*\*

**Tenn. Code Ann. § 49-7-180**

(a)

(1) Intercollegiate or intramural athletic teams or sports that are designated for "females," "women," or "girls" and that are sponsored, sanctioned, or operated by a public institution of higher education or by a private institution of higher education whose students or teams compete against public institutions of higher education shall not be open to students of the male sex.

(2) Subdivision (a)(1) does not restrict the eligibility of a student to participate in an intercollegiate or intramural athletic team or sport designated for "males," "men," or "boys" or designated as "coed" or "mixed."

(b) For purposes of this section, an institution of higher education shall rely upon the sex listed on the student's original birth certificate, if the birth certificate was issued at or near the time of birth. If a birth certificate provided by a student is not the student's original birth certificate issued at or near the time of birth or does not indicate the student's sex, then the student must provide other evidence indicating the student's sex.

A-13

\*\*\*

**Tenn. Code Ann. § 49-7-2405**

(a) The governing body of every institution shall adopt a policy that affirms the following principles of free speech, which are the public policy of this state:

\*\*\*

(2) An institution shall be committed to giving students the broadest possible latitude to speak, write, listen, challenge, learn, and discuss any issue, subject to § 49-7-2408;

\*\*\*

(10) Although faculty are free in the classroom to discuss subjects within areas of their competence, faculty shall be cautious in expressing personal views in the classroom and shall be careful not to introduce controversial matters that have no relationship to the subject taught, and especially matters in which they have no special competence or training and in which, therefore, faculty's views cannot claim the authority accorded statements they make about subjects within areas of their competence; provided, that no faculty will face adverse employment action for classroom speech, unless it is not reasonably germane to the subject matter of the class as broadly construed, and comprises a substantial portion of classroom instruction;

\*\*\*

**Ala. Code § 16-1-52**

(a) The Legislature finds and declares the following:

(1) Physical differences between biological males and biological females have long made separate and sex-specific sports teams important so that female athletes can have equal opportunities to compete in sports.

(2) Physical advantages for biological males relevant to sports include, on average, a larger body size with more skeletal muscle mass, a lower percentage of body fat, and greater maximal delivery of anaerobic and aerobic energy than biological females.

A-14

(3) Even at young ages, biological males typically score higher than biological females on cardiovascular endurance, muscular strength, muscular endurance, and speed and agility. These differences become more pronounced during and after puberty as biological males produce higher levels of testosterone. On average, biological male athletes are bigger, faster, stronger, and more physically powerful than their biological female counterparts. This results in a significant sports performance gap between the sexes.

(4) Studies have shown that the benefits that natural testosterone provides to biological male athletes is not significantly diminished through the use of testosterone suppression. Testosterone suppression in biological males does not result in a level playing field between biological male and biological female athletes.

(5) Because of the physical differences between biological males and biological females, having separate athletic teams based on the athletes' biological sex reduces the chance of injury to biological female athletes and promotes sex equality. It provides opportunities for biological female athletes to compete against their peers rather than against biological male athletes, and allows biological female athletes to compete on a fair playing field for scholarships and other athletic accomplishments.

(b)

(1) Except as provided in subsection (c), a public K-12 school may not participate in, sponsor, or provide coaching staff for interscholastic athletic events within this state that are either scheduled by or conducted under the authority of any athletic association of the state that permits or allows participation in athletic events within the state conducted exclusively for males by any individual who is not a biological male or participation in athletic events within the state conducted exclusively for females by any individual who is not a biological female.

(2) A public K-12 school may not allow a biological female to participate on a male team if there is a female team in a sport. A public K-12 school may not allow a biological male to participate on a female team.

(c) This section does not apply to athletic events at which both biological males and biological females are permitted or allowed to participate.

**Alaska Stat. § 14.18.040**

(a) Equal opportunity for both sexes in athletics and in recreation shall be provided in a manner that is commensurate with the general interests of the members of each sex. Separate school-sponsored teams may be provided for each sex. A school that sponsors separate teams in a particular sport shall provide equipment and supplies, services, and opportunities, including use of courts, gymnasiums, and pools, to both teams with no disparities based on sex. A school that provides showers, toilets, or training-room facilities for athletic or recreational purposes shall provide comparable facilities for both sexes, either through the use of separate facilities or by scheduling separate use by each sex.

\*\*\*

**Ark. Code Ann. § 6-1-107**

(c) Interscholastic, intercollegiate, intramural, or club athletic teams or sports that are sponsored by a school shall be expressly designated as one (1) of the following based on biological sex:

    (1) "Male", "men's", or "boys";

    (2)

        (A) "Female", "women's", or "girls".

        (B) An interscholastic, intercollegiate, intramural, or club athletic team or sport that is expressly designated for females, women, or girls shall not be open to students of the male sex; or

    (3) "Coed" or "mixed".

\*\*\*

A-16

**Ark. Code Ann. § 16-130-103 (cited in Complaint ¶ 99, R. 1, PageID#19, as "Gender Integrity Reinforcement Legislation for Sports (GIRLS) Act, 2021 Ark. Act 953 (Apr. 29, 2021)")**

As used in this chapter:

\*\*\*

(2) "Sex" means a person's immutable biological sex as objectively determined by anatomy and genetics existing at the time of birth.

**Ark. Code Ann. § 16-130-104 (cited in Complaint ¶ 99, R. 1, PageID#19, as "Gender Integrity Reinforcement Legislation for Sports (GIRLS) Act, 2021 Ark. Act 953 (Apr. 29, 2021)")**

(a) Any interscholastic, intercollegiate, intramural, or club athletic teams or sports that are sponsored by a covered entity shall be expressly designated for one (1) of the following groups based on sex:

　　(1) Males, men, or boys;

　　(2) Females, women, or girls; or

　　(3) Coed or mixed.

(b) Members of the male sex are prohibited from an interscholastic, intercollegiate, intramural, or club athletic team or sport that is expressly designated for females, women, or girls.

**Ariz. Rev. Stat. Ann. § 15-120.02**

A. Each interscholastic or intramural athletic team or sport that is sponsored by a public school or a private school whose students or teams compete against a public school shall be expressly designated as one of the following based on the biological sex of the students who participate on the team or in the sport:

　　1. "Males", "men" or "boys".

　　2. "Females", "women" or "girls".

3. "Coed" or "mixed".

B. Athletic teams or sports designated for "females", "women" or "girls" may not be open to students of the male sex.

\*\*\*

## Ga. Code Ann. § 20-2-316

(c)

(1) No high school which receives funding under this article shall participate in, sponsor, or provide coaching staff for interscholastic sports events which are conducted under the authority of, conducted under the rules of, or scheduled by any athletic association unless the athletic association complies with the provisions of this subsection by having a charter, bylaws, and other governing documents which provide for governance and operational oversight by an executive oversight committee as follows:

\*\*\*

(E) The authority and duties of the executive oversight committee shall include:

\*\*\*

(v) If the athletic association determines that it is necessary and appropriate to prohibit students whose gender is male from participating in athletic events that are designated for students whose gender is female, then the athletic association may adopt a policy to that effect; provided, however, that such policy shall be applied to all of the athletic association's participating public high schools;

\*\*\*

## Idaho Code Ann. § 33-6203

(1) Interscholastic, intercollegiate, intramural, or club athletic teams or sports that are sponsored by a public primary or secondary school, a public institution of higher education, or any school or institution whose students or teams compete against a

public school or institution of higher education shall be expressly designated as one (1) of the following based on biological sex:

(a) Males, men, or boys;

(b) Females, women, or girls; or

(c) Coed or mixed.

(2) Athletic teams or sports designated for females, women, or girls shall not be open to students of the male sex.

\*\*\*

### Ind. Code Ann. § 20-33-13-4

(a) A school corporation, public school, nonpublic school, or association that organizes, sanctions, or sponsors an athletic team or sport described in section 1 of this chapter shall expressly designate the athletic team or sport as one (1) of the following:

(1) A male, men's, or boys' team or sport.

(2) A female, women's, or girls' team or sport.

(3) A coeducational or mixed team or sport.

(b) A male, based on a student's biological sex at birth in accordance with the student's genetics and reproductive biology, may not participate on an athletic team or sport designated under this section as being a female, women's, or girls' athletic team or sport.

### Ky. Rev. Stat. Ann. § 164.2813

(1)

(a) A public postsecondary education institution or private postsecondary education institution that is a member of a national intercollegiate athletic association shall designate all intercollegiate and intramural athletic teams,

activities, sports, and events that are sponsored or authorized by the institution as one (1) of the following categories:

> 1. "Men's";
>
> 2. "Coed"; or
>
> 3. "Women's."

(b)

> 1. A public postsecondary education institution or private postsecondary education institution that is a member of a national intercollegiate athletic association shall prohibit a member of the male sex from competing in any intercollegiate or intramural athletic team, activity, sport, or event designated as "women's."
>
> 2. Nothing in this section shall be construed to restrict the eligibility of any student to participate in an athletic activity or sport designated as "men's" or "coed."

(2) The sex of a student for the purpose of determining eligibility to participate in an athletic activity or sport or to use an athletic facility designated for the exclusive use of a single sex shall be determined by:

(a) A student's biological sex as indicated on the student's original, unedited birth certificate issued at the time of birth; or

(b) An affidavit signed and sworn to by a physician, physician assistant, advanced practice registered nurse, or chiropractor under penalty of perjury establishing the student's biological sex at the time of birth.

\*\*\*

## La. Stat. Ann. § 4:444

A. Each intercollegiate or interscholastic athletic team or sporting event that is sponsored by a school and that receives state funding shall be expressly designated, based upon biological sex, as only one of the following:

A-20

(1) Except as provided in Subsection C of this Section, a male, boys, or mens team or event shall be for those students who are biological males.

(2) A female, girls, or womens team or event shall be for those students who are biological females.

(3) A coeducational or mixed team or event shall be open for participation by biological females and biological males.

B. Athletic teams or sporting events designated for females, girls, or women shall not be open to students who are not biologically female.

***

**Miss. Code. Ann. § 37-97-1**

(1) Interscholastic or intramural athletic teams or sports that are sponsored by a public primary or secondary school or any school that is a member of the Mississippi High School Activities Association or public institution of higher education or any higher education institution that is a member of the NCAA, NAIA or NJCCA shall be expressly designated as one of the following based on biological sex:

(a) "Males," "men" or "boys";

(b) "Females," "women" or "girls"; or

(c) "Coed" or "mixed."

(2) Athletic teams or sports designated for "females," "women" or "girls" shall not be open to students of the male sex.

**Mont. Code Ann. § 20-7-1306 (cited in Complaint ¶ 99, R. 1, PageID#19, as "Save Women's Sports Act, 2021 Mont. Laws, ch. 405")**

(1) Interscholastic, intercollegiate, intramural, or club athletic teams or sports that are sponsored by a public elementary or high school, a public institution of higher education, or any school or institution whose students or teams compete against a public school or institution of higher education must be expressly designated as one of the following based on biological sex:

A-21

(a) males, men, or boys;

(b) females, women, or girls; or

(c) coed or mixed.

(2) Athletic teams or sports designated for females, women, or girls may not be open to students of the male sex.

**Neb. Rev. Stat. § 79-2,124**

The Nebraska Equal Opportunity in Education Act does not prohibit any educational institution from maintaining separate toilet facilities, locker rooms, or living facilities for the different sexes.

**51 Okla. Stat. § 253**

B. No governmental entity shall substantially burden a person's free exercise of religion unless it demonstrates that application of the burden to the person is:

1. Essential to further a compelling governmental interest; and

2. The least restrictive means of furthering that compelling governmental interest.

\*\*\*

**70 Okla. Stat. § 1-125**

A. As used in this section:

1. "Sex" means the physical condition of being male or female based on genetics and physiology, as identified on the individual's original birth certificate;

\*\*\*

B. To ensure privacy and safety, each public school and public charter school that serves students in prekindergarten through twelfth grades in this state shall require every multiple occupancy restroom or changing area designated as follows:

A-22

　　1. For the exclusive use of the male sex; or

　　2. For the exclusive use of the female sex.

\*\*\*

## 70 Okla. Stat. § 27-106

C. Athletic teams that are sponsored by a school or sponsored by a private school whose students or teams compete against a school shall be expressly designated as one of the following based on biological sex:

　　1. "Males", "men" or "boys";

　　2. "Females", "women" or "girls"; or

　　3. "Coed" or "mixed".

\*\*\*

## 70 Okla. Stat. § 2119.2

B. A public institution of higher education may substantially burden a student's exercise of religion only if that institution demonstrates that application of the burden to the student:

　　1. Is in furtherance of a compelling interest of the public institution of higher education;

　　2. Actually furthers that interest; and

　　3. Is the least restrictive means of furthering that interest.

\*\*\*

## 70 Okla. Stat. § 2120

B. Expressive activities protected under the provisions of this section include but are not limited to any lawful verbal, written, audio-visual or electronic means by which individuals may communicate ideas to one another, including all forms of peaceful

assembly, protests, speeches and guest speakers, distribution of literature, carrying signs and circulating petitions.

C.

1. The outdoor areas of campuses of public institutions of higher education in this state shall be deemed public forums for the campus community, and public institutions of higher education shall not create "free speech zones" or other designated areas of campus outside of which expressive activities are prohibited. Public institutions of higher education may maintain and enforce reasonable time, place and manner restrictions narrowly tailored in service of a significant institutional interest only when such restrictions employ clear, published, content- and viewpoint-neutral criteria and provide for ample alternative means of expression. Any such restrictions shall allow for members of the campus community to spontaneously and contemporaneously assemble and distribute literature.

2. Nothing in this subsection shall be interpreted as limiting the right of student expression elsewhere on campus.

D.

1. Any person who wishes to engage in noncommercial expressive activity on campus shall be permitted to do so freely, as long as the person's conduct is not unlawful and does not materially and substantially disrupt the functioning of the public institutions of higher education, subject only to the requirements of subsection C of this section.

2. Nothing in this subsection shall prohibit public institutions of higher education from maintaining and enforcing reasonable time, place and manner restrictions that are narrowly tailored to serve a significant institutional interest only when such restrictions employ clear, published, content- and viewpoint-neutral criteria. Any such restrictions shall allow for members of the campus community to spontaneously and contemporaneously assemble, speak and distribute literature.

3. Nothing in this subsection shall be interpreted as preventing public institutions of higher education from prohibiting, limiting or restricting expression that the First Amendment does not protect or prohibiting harassment as defined by this section.

4. Nothing in this section shall enable individuals to engage in conduct that intentionally, materially and substantially disrupts another person's expressive activity if that activity is occurring in a campus space reserved for that activity under the exclusive use or control of a particular group.

\*\*\*

**Okla. Admin. Code § 335:15-3-2(b)(5)**

(b) Effect of sex-preference employer policies and practices.

\*\*\*

(5) Oklahoma Law may require that separate restroom facilities be provided employees of each sex. An employer will be deemed to have engaged in an unlawful employment practice if it refuses to hire or otherwise adversely affects the employment opportunities of applicants or employees in order to avoid the provision of such restrooms for persons of that sex.

**S.C. Code Ann. § 59-1-500**

(B)

(1) Interscholastic, intercollegiate, intramural, or club athletic teams or sports that are sponsored by a public elementary or secondary school or public postsecondary institution must be expressly designated as one of the following based on the biological sex at birth of team members:

> (a) males, men, or boys;

> (b) females, women, or girls; or

> (c) coed or mixed, including both males and females.

(2) Athletic teams or sports designated for males, men, or boys shall not be open to students of the female sex, unless no team designated for females in that sport is offered at the school in which the student is enrolled.

(3) Athletic teams or sports designated for females, women, or girls shall not be open to students of the male sex.

A-25

(4) A private school or a private institution sponsoring an athletic team or sport in which its students or teams compete against a public school or institution must also comply with this section for the applicable team or sport.

\*\*\*

## S.D. Codified Laws § 13-67-1

Any interscholastic, intercollegiate, intramural, or club athletic team, sport, or athletic event that is sponsored or sanctioned by an accredited school, school district, an activities association or organization, or an institution of higher education under the control of either the Board of Regents or the Board of Technical Education must be designated as one of the following, based on the biological sex at birth of the participating students:

(1) Females, women, or girls;

(2) Males, men, or boys; or

(3) Coeducational or mixed.

Only female students, based on their biological sex, may participate in any team, sport, or athletic event designated as being for females, women, or girls.

For purposes of this section, biological sex is either female or male and the sex listed on the student's official birth certificate may be relied upon if the certificate was issued at or near the time of the student's birth. The failure to comply with this section is a limited waiver of sovereign immunity for relief authorized under this chapter.

## W. Va. Code Ann. § 18-2-25d

(b) Definitions. -- As used in this section, the following words have the meanings ascribed to them unless the context clearly implies a different meaning:

(1) "Biological sex" means an individual's physical form as a male or female based solely on the individual's reproductive biology and genetics at birth.

(2) "Female" means an individual whose biological sex determined at birth is female. As used in this section, "women" or "girls" refers to biological females.

A-26

(3) "Male" means an individual whose biological sex determined at birth is male. As used in this section, "men" or "boys" refers to biological males.

(c) Designation of Athletic Teams. --

(1) Interscholastic, intercollegiate, intramural, or club athletic teams or sports that are sponsored by any public secondary school or a state institution of higher education, including a state institution that is a member of the National Collegiate Athletic Association (NCAA), National Association of Intercollegiate Athletics (NAIA), or National Junior College Athletic Association (NJCAA), shall be expressly designated as one of the following based on biological sex:

(A) Males, men, or boys;

(B) Females, women, or girls; or

(C) Coed or mixed.

(2) Athletic teams or sports designated for females, women, or girls shall not be open to students of the male sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport.

***

## W. Va. Code Ann. § 18B-20-2

Expressive activities protected under the provisions of § 18-1-1 et seq. of this code include, but are not limited to, any lawful verbal and nonverbal speech. This may include lawful and protected forms of peaceful assembly, protests, speeches and guest speakers, distribution of literature, carrying signs, and circulating petitions.

## W. Va. Code Ann. § 21-3-12

Every factory, mercantile establishment, mill or workshop shall be provided with a sufficient number of water closets, and whenever both male and female persons are employed, separate water closets shall be provided for the use of each sex, and plainly marked by which sex they are to be used. No person or persons shall be allowed to use the closets assigned to the opposite sex.

A-27

\*\*\*

## W. Va. Code Ann. § 21-3-13

In all factories, mercantile establishments, mills or workshops, adequate washing facilities shall be provided for the employees, where necessary. When the labor performed by the employees is of such a character as to make customary or necessary a change of clothing by the employees, there shall be provided a sanitary and suitable dressing room or rooms. Separate dressing rooms and washing facilities shall be maintained for each sex.

## W. Va. Const. art. 3, § 15

No man shall be compelled to frequent or support any religious worship, place or ministry whatsoever; nor shall any man be enforced, restrained, molested or burthened, in his body or goods, or otherwise suffer, on account of his religious opinions or belief, but all men shall be free to profess and, by argument, to maintain their opinions in matters of religion; and the same shall, in nowise, affect, diminish or enlarge their civil capacities; and the Legislature shall not prescribe any religious test whatever, or confer any peculiar privileges or advantages on any sect or denomination, or pass any law requiring or authorizing any religious society, or the people of any district within this State, to levy on themselves, or others, any tax for the erection or repair of any house for public worship, or for the support of any church or ministry, but it shall be left free for every person to select his religious instructor, and to make for his support such private contracts as he shall please.

ORDER IN *TEXAS V. EEOC*, 2:21-CV-194-Z (N.D. TEX. MAY 26, 2022)

A copy of this decision is filed pursuant to Fed. R. App. P. 32.1(b); 6 Cir. R. 32.1(a). Plaintiffs provided the decision to the district court at Not. of Supplemental Auth. Attachment A, R. 82-1, PageID#1187-1215.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 2:21-CV-194-Z |
| | § | |
| EQUAL EMPLOYMENT OPPORTUNITY | § | |
| COMMISSION, *et al.,* | § | |
| | § | |
| Defendants. | § | |

**ORDER**

Before the Court is Defendants'[1] Motion to Dismiss for Lack of Jurisdiction (ECF No. 12) and Supplemental Motion to Dismiss the First Amended Complaint (collectively "Motions") (ECF No. 37). Having considered the Motions and relevant law, the Court **GRANTS IN PART** and **DENIES IN PART** the Motions. The Court **DISMISSES** Count XI of the Amended Complaint.

**BACKGROUND**

**A. *Bostock* and Federal Guidance**

On June 15, 2020, the Supreme Court held Title VII's "because of . . . sex" terminology should be read to prohibit "sexual orientation" and "gender identity" discrimination. *See generally Bostock v. Clayton County*, 140 S. Ct. 1731 (2020). Exactly one year later, Charlotte Burrows, Chairman of the EEOC issued a "technical assistance document" ("June 15 Guidance") purportedly explaining "what the *Bostock* decision means for LGBTQ+ workers (and all covered

---

[1] Defendants are the Equal Employment Opportunity Commission ("EEOC"), Charlotte A. Burrows, in her official capacity as Chairman of the EEOC, Merrick B. Garland, in his official capacity as Attorney General of the United States, the United States Department of Health and Human Services ("HHS"), Xavier Becerra, in his official capacity as Secretary of HHS, and Lisa J. Pino, in her official capacity as Director of HHS's Office for Civil Rights. The Court will refer to all these parties collectively as "Defendants."

workers) and for employers across the country" and "explain[ed] the [EEOC's] established legal positions on LGTBQ+ related matters, as voted by the Commission." ECF No. 31-1 at 4.

On March 2, 2022, HHS's Office of Civil Rights issued a similar "Notice and Guidance" ("March 2 Guidance"). *Id.* at 14. The March 2 Guidance interprets Section 1557 of the Affordable Care Act, Section 504 of the Rehabilitation Act, and Title II of the Americans with Disabilities Act to prohibit federally funded entities from "restricting an individual's ability to receive medically necessary care, including gender-affirming care, from their health care provider solely on the basis of their sex assigned at birth or gender identity" and from "prevent[ing] otherwise qualified individuals from receiving medically necessary care on the basis of their gender dysphoria, gender dysphoria diagnosis, or perception of gender dysphoria." *Id.* at 15. HHS issued the March 2 Guidance in direct response to a Texas gubernatorial order. *See id.* at 18 ("[O]n the heels of a discriminatory gubernatorial order in Texas, Health and Human Services (HHS) Secretary Xavier Becerra released the following statement . . . [and] announced several immediate actions HHS is taking [sic] to support LGBTQI+ youth and further remind Texas and others of the federal protections that exist.").

**B. Procedural History**

On September 20, 2021, Plaintiff State of Texas sued EEOC, Charlotte Burrows, in her official capacity as Chairman of the EEOC, and Merrick Garland, in his official capacity as Attorney General of the United States. On March 9, 2022, Plaintiff filed an Amended Complaint (ECF No. 31), adding HHS, Xavier Becerra, in his official capacity as Secretary of the HHS, and Lisa Pino, in her official capacity as Director of HHS's Office for Civil Rights. Plaintiff asks the Court to declare the June 15 Guidance and the March 2 Guidance (collectively "Guidances") unlawful, vacate the Guidances, issue preliminary and permanent injunctive relief enjoining

Defendants from enforcing or implementing the June 15 Guidance, issue a temporary restraining order, preliminary injunction, and permanent injunction prohibiting HHS Defendants from enforcing or implementing the March 2 Guidance, and award attorney's fees. In response, Defendants filed the instant Motions pursuant to Federal Rule of Civil Procedure 12(b)(1) arguing this Court lacks jurisdiction.

### LEGAL STANDARD

A Rule 12(b)(1) motion "allows a party to challenge the subject-matter jurisdiction of the district court to hear a case." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). The plaintiff bears the burden to establish a court's jurisdiction. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). A federal court must "presume [it] lack[s] jurisdiction unless the contrary appears affirmatively from the record." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006) (internal marks omitted). "Ultimately, a motion to dismiss for lack of subject matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of [its] claim that would entitle plaintiff to relief." *Ramming*, 281 F.3d at 161.

### ANALYSIS

Defendants argue five grounds preclude the Court's subject-matter jurisdiction: (1) the Guidances do not constitute final agency actions and are thus not subject to judicial review under the Administrative Procedure Act ("APA"); (2) Plaintiff has an adequate, alternative remedy; (3) Plaintiff lacks Article III standing to sue Defendants;  (4) Plaintiff's claims are not ripe; and (5) the narrow *ultra vires* exception to the APA's final agency action requirement does not apply. The Court will evaluate each of these in turn.

### A. The Guidances Constitute Final Agency Actions

The Court addresses the question of final agency action first because the analysis "contextualizes the standing inquiry." *Texas v. E.E.O.C.* 933 F.3d 433, 441 (5th Cir. 2019). The APA only permits judicial review of *final* agency action. 5 U.S.C. § 704. Final agency action is action that: (1) "mark[s] the consummation of the agency's decision-making process" and (2) "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal marks omitted). "The Supreme Court has long taken a pragmatic approach to finality, viewing the APA's finality requirement as flexible." *E.E.O.C.*, 933 F.3d at 441 (internal marks omitted).

#### 1. The Guidances mark the consummation of EEOC's and HHS's decision-making processes.

The consummation prong requires the Court to determine "whether an action is properly attributable to the agency itself and represents the culmination of that agency's consideration of the issue," or "only the ruling of a subordinate official, or tentative." *Soundboard Ass'n v. Fed. Trade Comm'n*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (internal marks omitted). Guidance letters can mark the "consummation" of an agency's decision-making process. *See Her Majesty the Queen in Right of Ontario v. E.P.A.*, 912 F.2d 1525, 1532 (D.C. Cir. 1990) (holding EPA's guidance letters constituted final agency actions because they "serve[d] to confirm a definitive position that has a direct and immediate impact on the parties").

Defendants argue the June 15 Guidance is not the consummation of EEOC's decision-making process because it "merely summarizes prior EEOC decision-making and the *Bostock* decision — it does not reflect any new decision by the agency." ECF No. 12 at 25. This argument ignores the limited reach of *Bostock*, the limited weight of EEOC's prior decisions, and the June 15 Guidance itself.

*Bostock* "did not establish a new or otherwise separate protected class, but instead clarified the scope of sex classification." *Stolling v. Tex. Tech Univ.*, No. 5:20-CV-250-H, 2021 WL 3748964, at *10 (N.D. Tex. Aug. 25, 2021); *see also Bostock*, 140 S. Ct. at 1739 (interpreting definition of "sex" rather than creating new, independent protected class); *Bear Creek Bible Church v. E.E.O.C.*, No. 4:18-CV-00824-O, 2021 WL 5449038, at *35 (N.D. Tex. Nov. 22, 2021) ("Transgender individuals are not a protected class, and the 'discrimination' must still link to biological sex."). Nor did *Bostock* broaden the definition of "sex", and the Supreme Court explicitly refused to decide whether "sex-segregated bathrooms, locker rooms, and dress codes" violate Title VII. *Bostock*, 140 S. Ct. at 1739, 1753. Yet, the June 15 Guidance does not cabin itself to *Bostock*'s holding — addressing only discrimination against employees based on their gender identity — but seeks to mandate accommodations for transgender employees from lawful, sex-based workplace rules.

*Bostock* forbids "gender identity" discrimination under the Title VII protected class "sex." But this prohibition does not necessarily include *conduct* associated with "transgenderism."[2] Specifically, *Bostock* expressly did not hold that Title VII discrimination "because of . . . sex" necessarily includes all *conduct* correlated to the protected class "sex" — or by *Bostock*'s reading, "gender identity." *See Bostock*, 140 S. Ct. 1731, 1753 ("But none of these other laws are before us; we have not had the benefit of adversarial testing about the meaning of their terms, and we do not prejudge any such question today. Under Title VII, too, we do not purport to address bathrooms, locker rooms, or anything else of the kind."); *see also Garcia v. Gloor*, 618 F.2d 264,

---

[2] The Guidances and briefs intermittently use the terms "homosexual," "bisexual," and "transgender" to refer to the categories "sexual orientation" and "gender identity" referenced in *Bostock*. Though the terminology is potentially underinclusive, overinclusive, and inaccurate, this Court will refer to "sexual orientation" and "gender identity" as collective of *all* aforementioned categories — unless particularity is necessary for the Court's analysis.

268 (5th Cir. 1980) (rejecting attempts to find discrimination based on "language" because it correlated with "national origin"); *Garcia v. Spun Steak Co.*, 998 F.2d 1480, 1489–90 (9th Cir. 1993) (holding rule mandating only English be spoken in workplace was not "national origin" discrimination); *E.E.O.C. v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018, 1032 (11th Cir. 2016) ("[E]very court to have considered the issue has rejected the argument that Title VII protects hairstyles culturally associated with race"). By forcing employers to more favorably accommodate *conduct* associated with "gender identity," the June 15 Guidance exceeds the scope of Title VII and *Bostock.*

Defendants argue the June 15 Guidance merely recites "established legal positions," citing prior EEOC decisions as examples. ECF No. 12 at 11–13 (citing ECF No. 1-1 at 3–4). But these decisions are irrelevant because they interpret Title VII provisions applicable to *federal* employers — not private-sector and state employers. *Compare* 42 U.S.C. § 2000e-(2)(a)(1) (declaring it unlawful for private-sector and state employers to "fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual . . . *because of* such individual's . . . sex" (emphasis added)), *with* 42 U.S.C. § 2000e-(16)(a) ("All personnel actions affecting employees or applicants for employment . . . shall be made *free from any discrimination based on* . . . sex . . . ." (emphasis added)). These differences "hold the Federal Government to a stricter standard than private employers or state or local government." *Babb v. Wilkie*, 140 S. Ct. 1168, 1173–74 (2020) (analyzing ADEA standard with identical wording to Title VII). Given the difference in language, the Court cannot assume these provisions should be interpreted synonymously. *See Neese v. Becerra*, No. 2:21-CV-163-Z, 2022 WL 1265925, at *13 (N.D. Tex. Apr. 26, 2022).

Defendants also rely on a 2016 document titled "Preventing Employment Discrimination Against Lesbian, Gay, Bisexual, or Transgender Works," highlighting consent decrees negotiated with private employers. For Defendants, this 2016 document evinces that the June 15 Guidance is nothing new. ECF No. 12 at 27. However, "adoption of a consent decree is not an agency act under the APA." *Home Builders Ass'ns of N. Cal. v. Norton*, 293 F. Supp. 2d 1, 5 (D.D.C. 2002). Contrast the 2016 document, which relies only on federal-sector decisions and cites no judicial authority, to the June 15 Guidance which asserts "established legal positions" and imposes "existing requirements under the law," particularly *Bostock*. ECF No. 1-1 at 3–4.

Finally, Defendants' argument that the June 15 Guidance is "merely a summary" ignores the operation and text of the Guidance itself. Like the assistant administrator's letter at issue in *Her Majesty the Queen in Right of Ontario* — issued under the authority of the EPA and explaining a legal position — the June 15 Guidance was issued under EEOC's authority and explicitly claims its requirements are "established legal positions" and "existing requirements under the law." ECF No. 1-1 at 3–4. Evaluating all this under the Supreme Court's instruction to approach finality flexibly and pragmatically, the June 15 Guidance "marks the consummation" of EEOC's decision-making process.

Likewise, the March 2 Guidance "marks the consummation" of HHS's decision-making process. Defendants argue the March 2 Guidance is an interpretive rule or a general policy statement, "merely provid[ing] potential applications of the law in the abstract." ECF No. 37 at 28. Thus, the March 2 Guidance does not constitute HHS's final determination of any issues. *Id.* But this argument suffers the same fate as Defendants' argument defending the June 15 Guidance as mere summarization of prior EEOC decisions and the requirements of *Bostock*. Like the June 15

Guidance — which exceeds the requirements of *Bostock*, Title VII, and prior EEOC decisions — the March 2 Guidance extends beyond the provisions of Title IX and the limits of *Bostock*.

The March 2 Guidance "does not simply repeat the relevant provisions" of the statutes and regulations it relies on. *Texas v. E.E.O.C.*, 827 F.3d 372, 385 (5th Cir. 2016). Instead, the March 2 Guidance "purports to interpret authoritatively" those statutory and regulatory requirements *Id.* The March 2 Guidance states: "Section 1557 protects the right of individuals to access the health programs and activities of recipients of federal financial assistance without facing discrimination on the basis of sex, which *includes* discrimination on the basis of *gender identity*." ECF No. 31-1 at 15 (emphasis added). Therefore — according to HHS — "[c]ategorically refusing to provide treatment to an individual based on their gender identity *is* prohibited discrimination," and "federally-funded covered entities restricting an individual's ability to receive medically necessary care, including gender-affirming care, from their health care provider solely on the basis of their sex assigned at birth or gender identity *likely violates* Section 1557." *Id.* (emphasis added).

But Section 1557 does not include the terms "sex" or "gender identity." 42 U.S.C. § 18116(a). Instead, Section 1557 expressly incorporates Title IX, which prohibits discrimination "on the basis of sex." *See id.*; 20 U.S.C. § 1681(a). Based on the ordinary public meaning conveyed when Congress enacted Title IX and "judicially accepted principles of linguistics in reading the whole — including compositionality . . . . Title IX appears to operate in binary terms — male and female — when it references 'sex.'" *Neese*, 2022 WL 1265925, at *12.

And not even the outer limits of *Bostock* justify the March 2 Guidance's interpretation of Section 1557. Though Courts *generally* apply the legal standards used in Title VII cases to adjudicate similar Title IX cases — *see, e.g.*, *Canutillo Indep. Sch. Dist. v. Leija*, 101 F.3d 393, 404 (5th Cir. 1996) (collecting cases) — Title IX and Section 1557 do not completely mirror Title VII.

In *Bostock*, the plaintiff sued for a violation of Title VII. 140 S. Ct. at 1738; 42 U.S.C. § 2000e-2(a)(1). Title VII prohibits certain employer decisions "*because of*" certain factors, including "sex." *Id.* (emphasis added). By contrast, Title IX forbids "discrimination *on the basis of* sex." 20 U.S.C. § 1681(a) (emphasis added). The Court cannot read these phrases synonymously.

The Court must give full effect to Congress's decision to use different phrases. HENRY J. FRIENDLY, MR. JUSTICE FRANKFURTER AND THE READING OF STATUTES, *in* BENCHMARKS 224 (1967) ("[W]hen Congress employs the same word, it normally means the same thing, when it employs different words, it usually means different things"). "After all, only the words on the page constitute the law adopted by Congress and approved by the President." *Bostock*, 140 S. Ct. at 1738. The Court "would risk amending [the] statutes outside the legislative process reserved for the people's representatives" should it ignore the different phrasing in Title VII and Title IX. *Id.* Based on Title VII's "because of" sex language, the Supreme Court used a "but-for" causation analysis to decide *Bostock* and hold Title VII prohibits employment discrimination because of one's gender identity. *See id.* at 1739. Because Title IX prohibits discrimination "on the basis of sex," no certainty exists that Title IX and Section 1557 similarly prohibit discrimination on the basis of gender identity. As "neither Title VII, [Title IX], . . . nor *Bostock* 'compels or logically justifies' the [March 2 Guidance], it is a legislative rule." ECF No. 42 at 9–10. Legislative rules are "by definition, final agency action." *E.E.O.C.*, 933 at 441.

### 2. *Legal consequences flow from the Guidances.*

*Bennett*'s second prong is satisfied when an agency's guidance document binds it and its staff to a legal position "produc[ing] legal consequences or determin[ing] rights and obligations." *Id.* Action binding an agency to a legal view "gives rise to direct and appreciable legal consequences." *U.S. Army Corps of Eng'rs v. Hawkes*, 578 U.S. 590, 598 (2016) (internal marks

omitted). Courts look for mandatory language to determine "whether an agency's action binds it and accordingly gives rise to legal consequences." *E.E.O.C.*, 933 F.3d at 441.

As illustrated above, the June 15 Guidance imposes new duties and "chang[ed] the text" of the statute it "profess[ed] to interpret." *POET Biorefining, LLC v. E.P.A.*, 970 F.3d 392, 407 (D.C. Cir. 2020). Although the dress-code, bathroom, and pronoun accommodations it imposes are not required by *Bostock* or EEOC's cited federal-sector employment decisions, the Guidance argues those impositions are "existing requirements under the law." ECF No. 1-1 at 3. As Plaintiff argues, these requirements are "legislative rules that impose new duties on employers." ECF No. 18 at 32. All legislative rules are, "by definition, final agency action." *E.E.O.C.*, 933 F.3d at 441.

Defendants argue the June 15 Guidance "exhibits none of the attributes that the Fifth Circuit found dispositive of final agency action in *Texas v. EEOC*," claiming the June 15 Guidance "does not indicate in *any* manner how EEOC staff must assess potential sex discrimination on the basis of sexual orientation or gender identity." ECF No. 12 at 26. But Defendants "can't have their cake and eat it too": if the June 15 Guidance states existing requirements of law and "established legal positions," how could EEOC investigators and staff not consider them *binding*?

The June 15 Guidance also uses mandatory language. *See* ECF 19-1 at 7–8 ("May a covered employer require a transgender employee to dress in accordance with the employer's sex assigned at birth? No . . . ."); *id.* ("[E]mployers may not deny an employee equal access to a bathroom . . . that corresponds to the employee's gender identity."); *id.* ("Could use of pronouns or names that are inconsistent with an individual's gender identity be considered harassment? Yes, in certain circumstances."). Such language commands, requires, orders, and dictates. *See Appalachian Power Co. v. E.P.A.*, 208 F.3d 1015, 1022–23 (D.C. Cir. 2000) (holding an EPA document constituted final agency action when "the entire Guidance, from beginning to

10

end . . . read like a[n] ukase."). Defendant cannot fall back on the Guidance's boilerplate provisions "stating [t]he contents of this document do not have force and effect of law and are not meant to bind the public in any way." ECF No. 19-1 at 3. Such a disclaimer does not render a guidance non-final where legal consequences still flow from it, as they do here. *See Appalachian Power*, 208 F.3d at 1023. Further, where the language of an EEOC guidance "broadly condemn[s]" an employment practice, "it leaves no room for EEOC staff *not* to issue referrals to the Attorney General when an employer" implements the condemned practice. *E.E.O.C.*, 933 F.3d at 443. Here, the challenged Guidance broadly condemns the employment practices that Plaintiff and its agencies implement, leaving no wriggle room for EEOC to issue referrals to the Attorney General. Therefore, legal consequences stem from the Guidance.

Finally, the June 15 Guidance creates safe harbors by which public employers can avoid EEOC referrals to the Department of Justice. When "the language of the agency document is such that private parties can rely on it as a norm or safe harbor by which to shape their actions, it can be binding as a practical matter." *Id.* at 442 (internal marks omitted). Here, the Guidance creates at least three safe harbors in its requirement of dress code, bathroom, and pronoun usage accommodations. And it "open[s] the field of potential plaintiffs," *id.* at 444 (internal marks omitted), inviting employees to "fil[e] a charge of discrimination against . . . a state . . . employer." ECF No. 19-1 at 8. Such an invitation imposes legal consequences.

Legal consequences also flow from the March 2 Guidance. Defendants argue the March 2 Guidance "does not purport to determine the outcome of any particular enforcement action or any rights or obligations," but "only 'remind[s] parties of existing statutory duties, [and] merely track[s] the statutory requirements and thus simply explain[s] something the statute already require[s]." ECF No. 37 at 27 (citing *Pros. & Patients for Customized Care v. Shalala*, 56 F.3d

592, 602 (5th Cir. 1995)) (internal marks omitted). First, this argument ignores the fact the March 2 Guidance does more than merely "track" and "explain" existing statutory requirements as explained above. *Supra* at 7–9.

Second, the March 2 Guidance — like the June 15 Guidance — binds agency staff. Secretary Becerra issued a statement alongside the March 2 Guidance. *See generally* ECF No.31-1 at 17–20. In that statement, Secretary Becerra decried Texas's interpretation of its own child-abuse laws as "discriminatory and unconscionable." *Id.* at 18. Secretary Becerra also stated he "directed [his] team to evaluate the tools at [its] disposal" in response to the "discriminatory gubernatorial order in Texas" and encouraging "[a]ny individual or family in Texas who is being targeted by a child welfare investigation . . . to contract our Office for Civil Rights." *Id.* Secretary Becerra's statement broadly condemns Plaintiff's interpretation of its own laws and announces HHS's determination that Plaintiff's actions violate federal law. How could HHS staff act contrary to this statement? *See Shalala*, 56 F.3d at 599 ("We would expect agency employees to consider all sources of pertinent information in performing [their] task[s], whether the information be contained in a substantive rule, an interpretive rule, or a statement of policy. Indeed, what purpose would an agency's statement of policy serve if agency employees could not refer to it for guidance?"). Thus, the March 2 Guidance — as described by Secretary Becerra — binds HHS staff.

Finally, the March 2 Guidance widens the field of potential plaintiffs. Secretary Becerra's statement encourages "[a]ny individual or family in Teas who is being targeted by a child welfare investigation because of this discriminatory gubernatorial order." ECF No. 31-1at 18. Such an invitation imposes legal consequences. And like the June 15 Guidance, the March 2 Guidance is "binding as a practical matter because private parties can rely on it as a norm or safe harbor by

which to shape their actions." *E.E.O.C.*, 933 F.3d at 444 (internal marks omitted). The March 2 Guidance declares: "'gender affirming care for minors' must not be considered 'abuse,'" threatening Plaintiff to change its child abuse laws or risk the loss of federal healthcare funding. ECF No. 42 at 11 (citing ECF No. 31-1 at 14–15). Considering the above, the Guidances mark consummations of agency action and legal consequences flow from them. As Plaintiff surpasses both prongs of the *Bennett* test, the Court finds the Guidances constitute final agency actions.

### B.  No Adequate, Alternative Remedy Precludes Judicial Review

A court may only review final agency action "for which there is no other adequate remedy in a court." 5 U.S.C. § 704. The "alternative remedy need only be adequate," and "does not need to be as effective as an APA lawsuit, merely that it provides the same genre of relief." *De La Garza Gutierrez v. Pompeo*, 741 F. App'x 994, 998 (5th Cir. 2018) (internal marks omitted). When an adequate alternative remedy exists, the district court lacks subject matter jurisdiction to adjudicate an APA claim. *Id.* at 997. Defendants argue the APA's alternative remedy provision precludes Plaintiff's claims because the State "would have an opportunity to defend itself in any future Title VII enforcement action," designating that occurrence as the proper context for the assertion of Plaintiff's defenses. ECF No. 12 at 24 (citing *NAACP v. Meese*, 615 F. Supp. 200, 203 (D.D.C. 1985)).

Defendants' arguments are belied by the very language cited in their briefs to this Court. Defendants correctly assert the alternative remedy must merely "provide the *same* genre of relief." ECF No. 12 at 23 (emphasis added). Here, Plaintiff seeks *pre-enforcement* equitable relief. Requiring Plaintiff to wait until EEOC moves to enforce the June 15 Guidance is an inadequate alternative — it precludes Texas from obtaining the pre-enforcement equitable relief it seeks and is not the "same genre of relief." Furthermore, "a plaintiff need not . . . run the risk of enforcement

proceedings or pursue an arduous, expensive, and long . . . process to seek review of an already-final agency action," like the June 15 Guidance. *De La Garza Gutierrez*, 741 F. App'x at 998 (internal marks omitted).

Nor does *Meese* support Defendants' argument. *Meese* did not concern reviewable agency action; it involved an attempt to prevent the Attorney General from reopening any consent decree pending in another court. 615 F. Supp. at 201–03. Additionally, courts in this district have rejected agency attempts to rely on *Meese* when a final rule is challenged. *See, e.g.*, *Texas v. United States*, 201 F. Supp. 3d 810, 826 n.14 (N.D. Tex. 2016).

Courts also allow pre-enforcement challenges to agency action even if the parties could raise the same arguments as defenses in a future enforcement action. *See Sackett v. E.P.A.*, 566 U.S. 120 (2012). In *Sackett*, the Supreme Court permitted a pre-enforcement challenge to an EPA compliance order even though "judicial review ordinarily comes by way of a civil action" brought by the agency. *Id.* at 127. The Court reasoned that no adequate remedy — apart from APA review — existed where plaintiffs could not "initiate that process [of judicial review]" and were forced to "wait for the Agency to drop the hammer" while accruing daily penalties. *Id.* Defendants believe *Sackett* is inapposite, arguing Plaintiff "cannot point to any injury it is currently suffering or will imminently suffer as a result of EEOC document." ECF No. 29 at 25. But like the agency action challenged in *Sackett*, EEOC forces Plaintiff to choose: (1) comply with the June 15 Guidance's accommodation mandates — against its own interests, or (2) violate the June 15 Guidance at risk of financial penalties — while waiting for EEOC and the Department of Justice to "drop the hammer." ECF No. 18 at 39–40. Similarly situated to the plaintiffs in *Sackett*, Plaintiff's only adequate remedy is judicial review under the APA.

14

Defendants raise the same argument regarding the March 2 Guidance: Plaintiff "may defend against any future enforcement of Section 1557 under the express administrative and judicial review provisions provided by Congress." ECF No. 37 at 23 (citing 42 U.S.C. § 18116(a)). Just as with the June 15 Guidance, Defendants expect Plaintiff to choose between compliance with the March 2 Guidance or violate the Guidance and wait for HHS to "drop the hammer" — a situation that is only abated by a pre-enforcement challenge under the APA. Though Defendants cite several cases to support their argument that review under the enforcement mechanisms of Section 1557 provides the same genre of relief — *see* ECF No. 37 at 23–25 — as Plaintiff explains, those cases "involve plaintiffs who file[d] lawsuits to attempt to evade already-underway administrative proceedings." ECF No. 42 at 13. Those cases are inapt; there is no ongoing administrative proceedings regarding the issuance of the March 2 Guidance.

Finally, Defendants aver that Section 1557's "procedure for adjudicative proceedings, followed by judicial review, plainly reflects Congress's desire to preclude pre-enforcement judicial review of [Texas's] claims." ECF No. 37 at 25. Defendants argue the Supreme Court "held that a statute providing for administrative proceedings followed by judicial review foreclose[s] a parallel challenge to an agency's statutory interpretation." *Id.* at 25–26 (citing *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207–08 (1994). Defendants assert this case is analogous to *Thunder Basin*, and Congress's intent to preclude pre-enforcement judicial review is "fairly discernible in the statutory scheme" provided by Section 1557 through Title IX. *Id.* Specifically — like *Thunder Basin* — Defendants aver no action has been taken against Plaintiff, Plaintiff's claims turn on statutory interpretation, the statute does not evince Congress's intent to allow pre-enforcement review, and the statute provides "opportunity for judicial review if the agency files an action in federal court or seeks to withhold federal funds." *Id.*

15

But Title IX does not preclude Plaintiff's pre-enforcement action here. Regarding judicial review, Title IX states:

> Any department or agency action taken pursuant to section 1682 shall be subject to such judicial review as may otherwise be provided by law for similar action taken by such department or agency on other grounds. In the case of action, not otherwise subject to judicial review, terminating or refusing to grant or to continue financial assistance upon a finding of failure to comply with any requirement imposed pursuant to section 1682 of this title, any person aggrieved (including any State or political subdivision thereof and any agency of either) may obtain judicial review of such action in accordance with chapter 7 of Title 5, and such action shall not be deemed committed to unreviewable agency discretion within the meaning of section 701 of that title.

20 U.S.C. § 1683.

Section 1682 describes two types of agency action: (1) "issuing rules, regulations, or orders of general applicability" and (2) "termination of or refusal to grant or to continue assistance . . . as to whom there has been an express finding on the record . . . of a failure to comply with such requirement." *Id.* § 1682. Here, Plaintiff challenges the issuance of "rules, regulations, or orders of general applicability," which is "subject to judicial review as . . . provided by law for similar action." *Id.* §§ 1682, 1683. The law providing access to judicial review is the APA, and Title IX does not preclude review. 5 U.S.C. § 702. Other courts in this District have found the same. *See Texas v. United States*, 201 F. Supp. 3d 810, 826–27 (N.D. Tex. 2016) ("Title IX [does not] present[] [a] statutory scheme[] that would preclude Plaintiffs from bringing these claims in federal district court. Indeed, the Supreme Court has held that Title IX's enforcement provisions, codified at Title 20 U.S.C. §§ 1681–1683, do[] not provide the exclusive statutory remedy for violations."). Unlike the statute at issue in *Thunder Basin*, whose "comprehensive enforcement structure demonstrate[d] that Congress intended to preclude challenges," "[n]o similar elaborate statutory framework exists covering Plaintiff's claims." *Thunder Basin*, 510 U.S. at 200; *Texas*, 201 F. Supp. 3d at 826. Therefore, no adequate, alternative remedy exists to deprive the Court of jurisdiction.

### C.  Plaintiff has Article III Standing to Challenge the Guidances

Article III standing requires: (1) an injury in fact which is concrete and particularized, actual or imminent, not conjectural or hypothetical; (2) the injury must be fairly traceable to the challenged action; and (3) the injury must be redressable by a favorable ruling. *Lujan v. Defs. of Wildlife*, 504 U.S. at 560–61. Before examining whether Plaintiff established standing under the three above elements, the Court must analyze whether Plaintiff is owed special solicitude as a State. *See Texas v. Biden*, 20 F.4th 928, 969 (5th Cir. 2021).

"Special solicitude has two requirements: (1) the State must have a procedural right to challenge the action in question, and (2) the challenged action must affect one of the State's quasi-sovereign interests." *Id*. When a State is entitled to special solicitude, "that means imminence and redressability are easier to establish here than usual." *Id*. at 970. Special solicitude also applies to the traceability element of standing. "The Fifth Circuit has explicitly interpreted special solicitude to lower the level of certainty required in the traditional causation . . . analysis." *Texas v. United States*, 549 F. Supp. 3d 572, 585 (S.D. Tex. July 16, 2021) (citing *Texas v. United States*, 809 F.3d 134, 159 (5th Cir. 2015)).

Plaintiff satisfies both prongs. Assertion of a procedural right under the APA to challenge an agency action satisfies the first prong. *Texas*, 20 F.4th at. at 970; *see also Texas*, 809 F.3d at 152 ("In enacting the APA, Congress intended for those suffering legal wrong because of agency action to have judicial recourse, and states fall well within that definition." (internal marks omitted)). Defendants aver Plaintiff holds no procedural right here, as the APA "extends a procedural right to challenge final agency action for which there is no other adequate remedy in court." ECF No. 29 at 8 (internal marks omitted). Defendants also argue because "the EEOC Document is merely explanatory . . . Plaintiff has no procedural right that it can properly assert

here." *Id.* Even so, these arguments ignore the fact that the Guidances constitute final agency action, as described above.

Plaintiff also satisfies the second prong. A State's quasi-sovereign interests include those implicated by: "(1) federal assertions of authority to regulate matters they believe they control, (2) federal preemption of state law, and (3) federal interference with the enforcement of state law, at least where the state statute at issue regulates behavior or provides for the administration of a state program and does not simply purport to immunize state citizens from federal law." *Texas*, 809 F.3d at 153 (internal marks omitted). Plaintiff's interest in determining "how its agencies perform their duties under State law, and how its employees conduct themselves" qualifies as the type of quasi-sovereign interest supporting special solicitude. ECF No. 18 at 41. The June 15 Guidance would preempt Texas law empowering the Commissioner of the Texas Department of Agriculture ("TDA") to "employ personnel as the duties of the department require" and to determine "[employee] qualifications for employment and their responsibilities under the applicable laws relating to standards of conduct for state employees." TEX. AGRIC. CODE §§ 11.001, 12.013(a) (empowering the commissioner of agriculture with responsibility for "exercising the powers and performing the duties assigned to the department by [the Texas Agriculture Code]"). Defendants argue Plaintiff "does not point to any actual employment policies or practices of the [TDA] regarding transgender persons." ECF No. 29 at 9. But the TDA does have such policies, even if Defendants consider them "unwritten and contingent." *See generally* ECF No. 1 at 8, ¶¶ 30–32 And the March 2 Guidance would interfere with the State's enforcement of its own child abuse laws. *See generally* ECF No. 26-1 at 14, ¶ 62. Meeting both prongs, Plaintiff is entitled to special solicitude in the standing inquiry.

### 1. *Plaintiff suffers from an alleged, imminent injury.*

"An increased regulatory burden typically satisfies the injury in fact requirement." *E.E.O.C.*, 933 F.3d at 446 (internal marks omitted). And "being pressured to change state law constitutes an injury," because "states have a sovereign interest in the power to create and enforce a legal code." *Id.* at 446–47 (citing *Texas v. United States*, 787 F.3d 733, 749 (5th Cir. 2015)). The Fifth Circuit has stated the injury-in-fact requirement is satisfied when an EEOC "[g]uidance does, at the very least, force Plaintiff to undergo an analysis, agency by agency, regarding whether the certainty of EEOC investigations stemming from the [Guidance's] standards overrides the State's interest." *E.E.O.C.*, 827 F.3d at 379. Past enforcement and "threatened enforcement of a law create[s] an Article III injury." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–59 (2014). Therefore, a plaintiff can articulate pre-enforcement standing when it can show "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Id.* (internal marks omitted) Under these principles, Plaintiff has articulated an injury in fact.

Plaintiff meets the requirement of showing "an intention to engage in a course of conduct arguably affected with a constitutional interest." *Id.* As discussed above, Plaintiff holds a quasi-sovereign interest in determining "how its agencies perform their duties under State law, and how its employees conduct themselves." ECF No. 18 at 41. And its agencies, such as the TDA, enforce policies that govern how the agency will perform its duty and how its employees will conduct themselves in the workplace. The State also has "a significant role to play in regulating the medical profession" — *Gonzales v. Carhart*, 550 U.S. 124, 157 (2007) — and has fulfilled that role in utilizing state agencies to investigate the subjection of children to elective gender-transition procedures and administration of puberty-blocking drugs.

19

Plaintiff also meets the second requirement, showing that its present and intended future conduct is proscribed by the June 15 Guidance's accommodations mandates as well as the March 2 Guidance. The June 15 Guidance states that Title VII, which Defendants enforce and interpret through that Guidance, "applies . . . to state and local government employers with 15 or more employees." ECF No.19-1 at 5. There is no indication from Defendants or in the record that the Guidance does not apply to Plaintiff. As for the March 2 Guidance — the plain language of the Guidance applies to Plaintiff, as the OCR document and Secretary Becerra's statement call out the application of Plaintiff's child abuse laws. ECF 31-1, Exs. B & C.

Finally, a credible threat of prosecution exists under the Guidances. Again, the Guidances' plain language suggests they apply to Plaintiff, and Defendants have not suggested they will not apply to Plaintiff. Nothing "suggest[s] that [Defendants] will refrain from enforcing the [Guidances] against [Texas]." *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 543 (5th Cir. 2008). In *Roark & Hardee*, injury in fact was found even when the defendant-city had not provided notice or charged any plaintiffs for violating the challenged city ordinance. *Id.* Here, however, Defendants admit in their Motion that EEOC has performed investigations, prosecuted lawsuits, and entered consent decrees based on the interpretation of Title VII outlined in the June 15 Guidance. ECF No. 12 at 9 n.3. It thus stands to reason that Defendants would enforce the June 15 Guidance against Plaintiff. The March 2 Guidance goes even further — Secretary Becerra directly referenced the "discriminatory gubernatorial order in Texas" and described the State's action as "discriminatory and unconscionable." ECF No. 31-1 at 18. "When an individual is subject to such a threat, an actual . . . enforcement action is not a prerequisite to challenging the law." *Susan B. Anthony List*, 573 U.S. at 158.

20

Defendants deploy myriad arguments against Article III injury. All fail to persuade. First, Defendants argue Plaintiff lacks standing because the State is not "currently engaged in any litigation alleging that it has violated Title VII's antidiscrimination provisions" as they relate to gender identity or sexual orientation "or that it is currently being investigated in connection with a complaint of such discrimination . . . [n]or has it alleged that it is aware of any imminent or threatened investigation." ECF No. 12 at 16.

Relying on *Trump v. New York*, Defendants argue the lack of litigation or specter of investigation confirms that Plaintiff's injuries are too "speculative" to constitute an injury in fact as there are too many "contingencies and speculations that impede judicial review." 141 S. Ct. 530, 535 (2020). Defendants contend this is especially so because the June 15 Guidance is "merely explanatory," and a "long chain of procedural contingencies" must occur before Plaintiff "might suffer any liability." ECF No. 12 at 17.

But *Trump* is distinguishable. *Trump* involved a challenge to a presidential memorandum instructing the Secretary of Commerce to take certain actions with regards to the 2020 Census results. 141 S. Ct. at 534. As the Supreme Court explained, the case against the President was "riddled with contingencies" because he had qualified his directive to the Secretary that he should act "to the extent practicable," making the alleged injury speculative. *Id*. at 535. Furthermore, the Court recognized the tentative nature of the President's action as "the Secretary [could] make (and the President [could] direct) changes to the census up until the President transmits his statement to the House." *Id*. Unlike the memorandum and directive in *Trump*, "there is nothing tentative or interlocutory" about the June 15 Guidance. ECF No. 18 at 40 n.11. Furthermore, the June 15 Guidance is not "merely explanatory." As described above, the June 15 Guidance exceeds what is required by Title VII as interpreted in *Bostock*. *Supra*, 4–7.

Second, Defendants aver that "[w]ithout any certainly impending harm, costs incurred in anticipating and proactively responding to legal uncertainties are not Article III injuries." ECF No. 12 at 17. Relying on *Clapper v. Amnesty International USA*, Defendants assert "any decision by Texas to change its behavior due to a fear of future enforcement that is not certainly impending does not confer standing." *Id.* at 18. This argument ignores the recent jurisprudence, cited above, recognizing the validation of a plaintiff's Article III standing in a pre-enforcement action. And Defendants argue the June 15 Guidance does not "regulate, constrain, or compel any action" on Plaintiff's part, and Plaintiff "has not shown any credible threat of an enforcement action by the federal government against it, much less any threat that is certainly impending." *Id.* (internal marks omitted). But this argument once again ignores the fact that the Guidance applies an interpretation of Title VII beyond that required in *Bostock* and ignores Supreme Court precedent such as *Susan B. Anthony List*.

Defendants' arguments notwithstanding, Plaintiff also seeks relief under the Declaratory Judgment Act ("DJA") — 28 U.S.C. §§ 2201–02 — which creates a mechanism for pre-enforcement review of government action. "[W]here threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007). A plaintiff suing under the DJA has Article III standing whenever governmental coercion "put[s] the challenger to the choice between abandoning his rights or risking prosecution." *Id*. at 129. Plaintiff faces the dilemma of coercion here and "cannot simply abandon its rights and forswear the authority granted by State law to its agencies as employers," to avoid the risk of prosecution. ECF No. 18 at 45. Thus, for this reason and the reasons discussed above, Plaintiff has articulated an imminent injury.

####    2.   *Plaintiff's injuries are traceable to the Guidances.*

Defendants make two primary arguments against traceability of Plaintiff's injuries to the June 15 Guidance: (1) "[a]ny legal consequences flow from Title VII itself, not the [Guidance]"; and (2) the "[Guidance] merely summarizes existing law and longstanding EEOC policy." ECF No. 12 at 19. As the Court has explained in detail, the Guidance diverges from *Bostock* and EEOC's relied-upon federal-sector decisions do not support the Guidance.

Plaintiff's injuries are traceable because the June 15 Guidance, "not Title VII, condemns [Plaintiff's] policies," and the Guidance, "not Title VII, pressures [Plaintiff] to change its laws and policies or risk referral to the Attorney General by EEOC." *E.E.O.C.*, 933 F.3d at 448. As further explained by the Fifth Circuit in that case, Plaintiff meets the traceability requirement because "[t]he pressure on Texas to change its laws exists, in part, because the Attorney General has prosecutorial power to bring enforcement actions against Texas based on EEOC referrals or a pattern-or-practice claim . . . . That the Attorney General has not attempted to enforce the Guidance against Texas does not deprive it of standing." *Id.* at 449. Because Plaintiff's injury and any legal consequences it might face flow from the June 15 Guidance, the injury is traceable.

Defendants argue the same vis-à-vis the March 2 Guidance. ECF No. 37 at 15. As with the June 15 Guidance, it is the March 2 Guidance — not Title IX — that *directly* condemns Plaintiff's policies and pressures the State to change it laws and policies to avoid adverse action taken by HHS and its Office of Civil Rights. Plaintiff again meets the traceability requirement as the State is pressured to change its laws and policies because HHS has the power and ability to withhold billions of dollars in federal healthcare funding. "That the [HHS] has not attempted to enforce the Guidance against Texas does not deprive it of standing." *E.E.O.C.*, 933 F.3d at 449. Here, Plaintiff's injury and potential consequences flow from and are traceable to the March 2 Guidance.

### 3. Plaintiff's injuries are redressable by a favorable decision from this Court.

A judicial remedy redresses an injury where the "risk [of the alleged harm] would be reduced to some extent if [the plaintiffs] received the relief they seek." *Massachusetts v. E.P.A.*, 549 U.S. 497, 526 (2007). The "court's remedy need not forestall *every* injury a plaintiff will suffer." *Planned Parenthood of Greater Tex. Surgical Health Servs. v. City of Lubbock*, No. 5:21-CV-114-H, 2021 WL 4775135, at *7 (N.D. Tex. Oct. 13, 2021) (citing *Massachusetts*, 549 U.S. at 526 (emphasis in original)).

Defendants argue the redressability requirement is not met because private litigants could still pursue Title VII claims and "HHS could investigate and adjudicate a complaint of sex discrimination (including sexual orientation or gender identity discrimination) under [S]ection 1557" despite an order vacating the Guidances and enjoining Defendants. ECF No. 12 at 20; ECF No. 37 at 16. Plaintiff agrees that such an order would not prevent suits from private litigants based on the understanding of Title VII set forth in the June 15 Guidance. Yet such an order would reduce the alleged harm to some extent. As for the March 2 Guidance, Plaintiff argues — and the Court agrees — the judicial relief it seeks "against an agency action *operates against the action* — here, the adoption of the interpretation — and *not just the explanatory documents*." ECF No. 42 at 19 (emphasis added). Were the Court to grant Plaintiff the relief it seeks against the March 2 Guidance — that is vacating the adoption of an interpretation of Title IX — the relief would reduce the risk of the alleged harm in some way. Therefore, a favorable decision of the Court would redress Plaintiff's alleged injuries should the Court grant the relief sought.

Because Plaintiff has shown injury in fact, fairly traceable to the challenged agency action and redressable by a favorable decision, Plaintiff has Article III standing to challenge the Guidances.

24

### D. Plaintiff's Claims Are Ripe for Review

The Court now turns to the ripeness of Plaintiff's claims. Agency rules, unlike statutes, are "typically reviewable without waiting for enforcement." *U.S. Telecom Ass'n v. F.C.C.*, 825 F.3d 674, 739 (D.C. Cir. 2016). When deciding whether a plaintiff's claims are ripe for judicial review, a court "must consider whether: (1) delayed review would cause hardship to the plaintiff[]; (2) judicial intervention would inappropriately interfere with further administrative action; and (3) the courts would benefit from further factual development of the issues presented." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998). Considering this test, Plaintiff's claims are ripe for review.

Here, delayed review would cause hardship to Plaintiff. In *Ohio Forestry Ass'n*, the Court determined delay in judicial review would not cause hardship to the plaintiffs. This was because the Land Resource Management Plan causing the alleged harm did "not command anyone to do anything or refrain from doing anything; [did] not grant, withhold, or modify any formal legal license, power, or authority; [did] not subject anyone to any civil or criminal liability; [and did] not create . . . legal rights or obligations. *Id*. Unlike the Land Resource Management Plan at issue in *Ohio Forestry Association*, the June 15 Guidance modifies formal legal authority and power, and it creates legal obligations by forcing Plaintiff to change its employment policies to reflect Defendants' interpretation of Title VII that extends beyond what is required by *Bostock*. And it subjects Plaintiff to civil liability should it violate the Guidance. The March 2 Guidance operates similarly, creating legal obligations by forcing Plaintiff to modify its child abuse laws in accordance with Defendant's interpretation of Section 1557 and Title IX.

As discussed above, the Guidances harm Plaintiff now — coercing it to change its employment policies and practices and enforcement of its child abuse laws or suffer legal consequences. "Where a regulation requires an immediate and significant change in plaintiffs' conduct of their affairs with serious penalties attached to noncompliance, hardship has been demonstrated." *Roark & Hardee*, 522 F.3d at 545. The *Roark & Hardee* court held that a challenge to an Austin city ordinance was ripe for review because the ordinance forced the plaintiffs to choose between compliance with the allegedly valid ordinance or risk a fine. *Id.* Plaintiff is similarly situated: the Guidances coerce Plaintiff to abandon its workplace policies and enforcement of its child abuse laws with threats of enforcement actions, civil penalties, and withholding of federal funds.

Judicial intervention would not interfere with further administrative action. In *Ohio Forestry Association*, the Court determined immediate judicial review would interfere with further administrative action, as the possibility existed that further consideration would occur before the Land Resource Management Plan's implementation. 523 U.S. at 735. But nothing here suggests the Guidances will undergo further consideration. Defendants argue the June 15 Guidance is based on already established principles of law. EEOC has already launched investigations, prosecuted misconduct, and entered consent decrees based on those legal principles. ECF No. 12 at 9, n.3. And the March 2 Guidance — according to Defendants — "reflects the [HHS's] prior determination . . . that HHS will interpret Section 1557 to prohibit discrimination based on gender identity." ECF No. 37 at 13. No action by this court would interfere with any further administrative action.

Finally, neither this Court nor any court on appellate review would benefit from further factual development. Plaintiff's claims are "purely legal, facial challenges" to the Guidance. ECF No. 18 at 47; ECF No. 42 at 18. Facial challenges to a regulation are generally ripe the moment the challenged regulation is passed. *Suitum v. Tahoe Reg'l Plan. Agency*, 520 U.S. 725, 736 n.10 (1997). A facial attack on a regulation raises a purely legal question and is therefore ripe. *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 287–88 (5th Cir. 2012). And in another case involving Texas, EEOC, and EEOC's felon-hiring guidance, the Fifth Circuit stated:

> Having determined that the Guidance is final agency action under the APA, it follows naturally that Texas' APA claim is ripe for review. Texas's challenge to the EEOC Guidance is purely a legal one, and as such it is unnecessary to wait for further factual development before rendering a decision. Furthermore, Texas faces significant hardships should the court decline to consider its claims. Taking Texas's allegations as true, it must change its hiring practices to ensure compliance with the Guidance, or face the numerous adverse effects already set forth.

*E.E.O.C.*, 827 F.3d at 388 n.9 (internal marks omitted). The same is true of Plaintiff's claims here, the workplace policies it implements, and the enforcement of its own laws.

Defendants argue — regarding the June 15 Guidance — that this Court "is not in a position to evaluate what, if any, actions by the Federal Government should be enjoined and what specific conduct by Texas should be allowed" without "a concrete set of facts." ECF No. 12 at 22. As Plaintiff correctly responds, "only two facts matter." ECF No.18 at 48. First, that Plaintiff argues it is authorized by law to create (and has created) workplace policies that enforce sex-specific dress codes, sex-segregated bathrooms, and pronoun usage based on biological sex. *Id*. Second, the June 15 Guidance, based on Defendants' own interpretation of *Bostock* and Title VII, makes Plaintiff's policies unlawful. *Id.* Plaintiff and Defendants set forth competing understandings of Title VII. No further factual development is necessary to adjudicate this dispute. Regarding the March 2 Guidance, Defendants argue "critical facts remain to be developed which would define the scope

of the controversy and aid the court in reaching a decision." ECF No. 37 at 20. Plaintiff's challenge

to the March 2 Guidance — however — is a facial attack raising a purely legal question on HHS's

interpretation and enforcement of Section 1557. Plaintiff's claims against HHS "need no factual

development because they do not involve a particular enforcement action . . . but challenge the

legality of a generally applicable rule." ECF No. 42 at 19 (internal marks omitted).

Plaintiff satisfies all three prongs of the *Ohio Forestry Association* standard, and there is a

credible threat of enforcement against the State. Accordingly, Plaintiff's claims are ripe for review.

### E.   The Court Lacks Jurisdiction Over Plaintiff's *Ultra Vires* Claim

Plaintiff asserts the Guidances constitute *ultra vires* agency actions over which the Court

may exercise its jurisdiction. ECF No. 31 at 24–25. The Court may exercise its jurisdiction over

"agency action exceed[ing] the scope of its delegated authority or violat[ing] a clear statutory

mandate." *Kirby Corp. v. Pena*, 109 F.3d 258, 268 (5th Cir. 1997); *see also Leedom v. Kyne*, 358

U.S. 184 (1958). Courts have "rarely exercised their jurisdiction under *Kyne*, and have limited

*Kyne*'s application to situations in which an agency has exceeded it delegated powers or on its face

violated a statute. *Kirby Corp.*, 109 F.3d at 268–69 (internal marks omitted). And an "agency

action allegedly in excess of authority must not simply involve a dispute over statutory

interpretation or challenged findings of fact." *Am. Airlines, Inc. v. Herman*, 176 F.3d 283, 293 (5th

Cir. 1999) (internal marks omitted).

Here, Plaintiff's challenge to the Guidances raises — at its core — a dispute as to EEOC's

and HHS's interpretation and application of the word "sex" in Title VII and Title IX. Therefore,

the Court will not exercise jurisdiction over Plaintiff's *ultra vires* claim in Count XI of the

Amended Complaint. The Court **DISMISSES** Count XI of the Amended Complaint.

**CONCLUSION**

For the reasons set forth above, Plaintiff meets its burden to establish this Court's jurisdiction over all its claims except for the *ultra vires* claim raised in Count XI of the Amended Complaint. The Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motions. The Court **DISMISSES** Count XI of the Amended Complaint.

**SO ORDERED**.

May 26, 2022.

_____
MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE