No. 22-5807

# In the

# United States Court of Appeals for the Sixth Circuit

STATE OF TENNESSEE, et al.,
Plaintiffs – Appellees,

And

ASSOCIATION OF CHRISTIAN SCHOOLS INTERNATIONAL, et al.,
Intervenors-Appellees,

v.

DEPARTMENT OF EDUCATION, et al.,
Defendants – Appellants

_____

On Appeal from the United States District Court for the
Eastern District of Tennessee at Knoxville
Case No. 3:21-cv-00308
Honorable Charles Edward Atchley, Junior, U.S. District Court Judge

_____

**Brief of *Amicus Curiae* Institute for Faith and Family
in Support of Plaintiffs-Appellees and Affirmance**

_____

Deborah J. Dewart, Attorney at Law
111 Magnolia Lane
Hubert, NC   28539
lawyerdeborah@outlook.com
(910) 326-4554 (phone)
*Attorney for Amicus Curiae*
Institute for Faith and Family

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

IDENTITY AND INTEREST OF *AMICUS CURIAE* ............................................ 1

INTRODUCTION AND SUMMARY ................................................................. 1

ARGUMENT .................................................................................. 4

I.   THE GUIDANCE IS "ARBITRARY AND CAPRICIOUS" BECAUSE IT FAILED TO CONSIDER THE FIRST AMENDMENT RIGHTS OF SCHOOL STAFF AND STUDENTS ............................................. 4

II.  COMPELLED SPEECH AND VIEWPOINT DISCRIMINATION ARE UNIQUELY PERNICIOUS ............................................................. 5

     A.   The Guidance is a paradigmatic example of compelled speech. ......... 6

     B.   The Guidance transgresses liberties of religion, conscience, and thought. ......................................................... 7

     C.   The Guidance plants the seeds of tyranny. ......................... 10

     D.   Viewpoint-based compelled speech stifles debate and attacks the dignity of those who disagree with the prevailing state orthodoxy…12

     E.   The prohibition of viewpoint discrimination is a necessary component of the Free Speech Clause. ............................... 15

III. THE DOE'S GUIDANCE IS A VIEWPOINT-BASED SPEECH MANDATE ............................................................... 19

     A.   Government employees are citizens................................. 19

     B.   The DOE may not suppress a student's viewpoint about "gender identity" or compel expression of a view the student does not hold ... 22

i

C.    The DOE may not lawfully suppress any student's viewpoint about "gender identity" or compel expression of a view the student does not hold ................................................................................... 24

CONCLUSION .................................................................................... 27

CERTIFICATE OF COMPLIANCE ...................................................... 28

CERTIFICATE OF SERVICE ............................................................... 29

# TABLE OF AUTHORITIES

## Cases

*Abrams v. United States*,
  250 U.S. 616 (1919)........................................................................... 15

*Ashcroft v. Free Speech Coal.*,
  535 U.S. 234 (2002)........................................................................... 10

*Axson-Flynn v. Johnson*,
  356 F.3d 1277 (10th Cir. 2004) ........................................................ 25

*Benton v. Maryland*,
  395 U.S. 784 (1969)............................................................................. 8

*Bethel Sch. Dist. No. 403 v. Fraser*,
  478 U.S. 675 (1986)........................................................................... 24

*Bd. of Educ., Island Trees Union Free Sch. Dist. v. Pico*,
  457 U.S. 853 (1982)........................................................................... 23

*Bostock v. Clayton County*,
  140 S. Ct. 1731 (2020)..................................................................... 1, 4

*Boy Scouts of Am. v. Dale*,
  530 U.S. 640 (2000)....................................................................... 5, 25

*Branti v. Finkel*,
  445 U.S. 507 (1980)........................................................................... 21

*Brown v. Li*,
  308 F.3d 939 (9th Cir. 2002) ............................................................ 25

*Burwell v. Hobby Lobby Stores, Inc.*,
  573 U.S. 682 (2014)........................................................................... 19

*Capitol Square Review & Advisory Bd. v. Pinette*,
  515 U.S. 753 (1995)............................................................................. 7

*Carey v. Brown*,
  447 U.S. 455 (1980) ........................................................... 17

*Cohen v. California*,
  403 U.S. 15 (1971) .......................................................... 15, 16

*Coles ex rel. Coles v. Cleveland Bd. of Educ.*,
  171 F.3d 369 (6th Cir. 1999) ............................................. 23

*Connick v. Myers*,
  461 U.S. 138 (1983) .......................................................... 21

*Curry v. Sch. Dist. of Saginaw*,
  452 F.Supp.2d 723 (E.D. Mich. 2006) ............................... 25

*Doe v. University of Michigan*,
  721 F.Supp.852 (E.D. Mich. 1989) ................................... 25

*Garcetti v. Ceballos*,
  547 U.S. 410 (2006) ...................................................... 21, 22

*Girouard v. United States*,
  328 U.S. 61 (1946) ............................................................. 9

*Good News Club v. Milford Central School*,
  533 U.S. 98 (2001) ........................................................... 17

*Hazelwood Sch. Dist. v. Kuhlmeier*,
  484 U.S. 260 (1988) .......................................................... 24

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*,
  515 U.S. 557 (1995) ............................................. 11, 14, 18, 27

*Iancu v. Brunetti.*
  139 S. Ct. 2294 (2019) ................................................... 13, 18

*Janus v. Am. Fed'n of State, Cnty. & Mun. Emps., Council 31*,
  138 S. Ct. 2448 (2018) ............................................. 3, 6, 13, 20

*Keyishian v. Bd. of Regents*,
    385 U.S. 589 (1967)................................................................ 21, 23

*Lamb's Chapel v. Center Moriches Union Free School District*,
    508 U.S. 384 (1993)...................................................................... 17

*Lane v. Franks*,
    573 U.S. 228 (2014)...................................................................... 21

*Lee v. Weisman*,
    505 U.S. 577 (1992)................................................................... 9, 22

*Little Sisters of the Poor v. Pennsylvania*,
    140 S. Ct. 2367 (2020)..................................................................... 4

*Matal v. Tam*,
    137 S. Ct. 1744 (2017)......................................................... 5, 15, 18

*Meriwether v. Hartop*,
    992 F.3d 492 (6th Cir. 2021) ............................................ 1, 3, 20, 23

*Morse v. Frederick*,
    551 U.S. 393 (2007)...................................................................... 24

*Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut.*
    *Automobile Ins. Co.*,
    463 U.S. 29 (1983)......................................................................... 4

*National Institute of Family & Life Advocates v. Becerra* (*NIFLA*),
    138 S. Ct. 2361 (2018)............................................. 3, 9, 10, 13, 17

*Pacific Gas & Electric Co. v. Public Utilities Comm'n of Cal.*,
    475 U.S. 1 (1986)............................................................. 11, 16, 27

*Palko v. Connecticut*,
    302 U.S. 319 (1937)........................................................................ 8

*Parents Defending Education v. Linn-Marr Sch. Dist.*,
    8th Cir. Case No. 22-2927 ............................................................... 2

*Pelcha v. MW Bancorp, Inc.*,
  988 F.3d 318 (6th Cir. 2021) .............................................................................. 1

*Perry v. Sindermann,*
  408 U.S. 593 (1972)........................................................................................... 21

*Perry Education Ass'n v. Perry Local Educators' Ass'n*,
  460 U.S. 37 (1983)............................................................................................. 16

*Pickering v. Bd. of Educ. of Township High School District 205*,
  391 U.S. 563 (1968)...................................................................................... 20, 21

*Police Department of Chicago v. Mosley*,
  408 U.S. 92 (1972)............................................................................................. 16

*R.A.V. v. City of St. Paul*,
  505 U.S. 377 (1992)...................................................................................... 16, 17

*Reed v. Town of Gilbert*,
  135 S. Ct. 2215 (2015)....................................................................................... 18

*Regents of University of California v. Bakke,*
  438 U.S. 265 (1978)........................................................................................... 25

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
  487 U.S. 781 (1988).......................................................................................... 5, 9

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
  515 U.S. 819 (1995)...................................................................................... 12, 17

*Schneiderman v. United States*,
  320 U.S. 118 (1943).......................................................................................... 8, 9

*Shelton v. Tucker,*
  364 U.S. 479 (1960)......................................................................................... 7, 24

*Sweezy v. New Hampshire*,
  354 U.S. 234 (1957)........................................................................................... 26

*Texas v. Johnson*,
491 U.S. 397 (1989)............................................................................. 16, 24, 25

*Thomas v. Collins,*
323 U.S. 516 (1945)............................................................................. 13

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
393 U.S. 503 (1969)............................................................. 21, 23, 24, 26

*Turner Broadcasting Systems, Inc. v. FCC,*
512 U.S. 622 (1994)............................................................................. 13

*United States v. Schwimmer*,
279 U.S. 644 (1929)............................................................................. 5

*Van Orden v. Perry,*
545 U.S. 677 (2005)............................................................................. 22

*Vlaming v. West Point Sch. Bd.*,
Supreme Court of Virginia Record No. 211061 ................................... 1

*West Virginia State Board of Education v. Barnette*,
319 U.S. 624 (1943).................................... 3, 6, 9, 10, 12, 13, 14, 15, 18, 23, 26

*Wieman v. Updegraff*,
344 U.S. 183 (1952)............................................................................. 23

*Wooley v. Maynard*,
430 U.S. 705 (1977)............................................................. 3, 7, 9, 12, 17, 27

**State Constitutions**

Alabama Const. Art. I, Sec. 4 ..................................................................... 8

A.R.S. Const. Art. II, § 12 ......................................................................... 8

Alaska Const. Art. I, § 4 ............................................................................ 8

Ark. Const. Art. 2, § 24.............................................................................. 8

Cal. Const. art. I, § 4 ............................................................................ 8

Colo. Const. Art. II, Section 4 ............................................................. 8

Conn. Const. Art. I., Sec. 3 .................................................................. 8

Del. Const. art I, § 1 ............................................................................. 8

Fla. Const. Art. I, § 3 ........................................................................... 8

Ga. Const. Art. I, § I, Para. III ............................................................. 8

HRS Const. Art. I, § 4 .......................................................................... 8

Idaho Const. Art. I, § 4 ........................................................................ 8

Illinois Const., Art. I, § 3 ..................................................................... 8

Ind. Const. Art. 1, §§ 2, 3 .................................................................... 8

Iowa Const. Art. I, § 3 .......................................................................... 8

Kan. Const. B. of R. § 7 ........................................................................ 8

Ky. Const. § 1 ........................................................................................ 8

La. Const. Art. I, § 8 ............................................................................. 8

ALM Constitution Appx. Pt. 1, Art. II ............................................... 8

Me. Const. Art. I, § 3 ............................................................................ 8

Md. Dec. of R. art. 36 ........................................................................... 8

MCLS Const. Art. I, § 47 ..................................................................... 8

Minn. Const. art. 1, § 16 ...................................................................... 8

Miss. Const. Ann. Art. 3, § 18 ............................................................. 8

Mo. Const. Art. I, § 5 ................................................................................. 8

Mont. Const., Art. II § 5 ............................................................................. 8

Ne. Const. Art. I, § 4 .................................................................................. 8

Nev. Const. Art. 1, § 4 ............................................................................... 8

N.H. Const. Pt. FIRST, Art. 4 and Art. 5 ................................................... 8

N.J. Const., Art. I, Para. 3 ......................................................................... 8

N.M. Const. Art. II, § 11 ............................................................................ 8

NY CLS Const Art I, § 3 ............................................................................ 8

N.C. Const. art. I, § 13 ............................................................................... 8

N.D. Const. Art. I, § 3 ................................................................................ 8

Oh. Const. art. I, § 7 .................................................................................. 8

Okl. Const. Art. I, § 2 ................................................................................ 8

Ore. Const. Art. I, §§ 2, 3 .......................................................................... 8

Pa. Const. Art. I, § 3 .................................................................................. 8

R.I. Const. Art. I, § 3 ................................................................................. 8

S.C. Const. Ann. Art. I, § 2 ....................................................................... 8

S.D. Const. Article VI, § 3 ......................................................................... 8

Tenn. Const. Art. I, § 3 .............................................................................. 8

Tex. Const. Art. I, § 6 ................................................................................ 8

Utah Const. Art. I, § 4 ............................................................................... 8

Vt. Const. Ch. I, Art. 3 ................................................................................ 8

Va. Const. Art. I, § 16 ............................................................................... 8

Wash. Const. art. 1, § 11 ............................................................................ 8

W. Va. Const. Art. III, § 15 ...................................................................... 8

Wis. Const. Art. I, § 18 .............................................................................. 8

Wyo. Const. Art. 1, § 18 ............................................................................ 8

**Statutes**

5 U.S.C. § 553 ............................................................................................. 4

**Other Authorities**

Lackland H. Bloom, Jr., *The Rise of the Viewpoint-Discrimination Principle*,
   72 SMU L. Rev. F. 20 (2019) ............................................... 15, 17, 18

Robert Bolt, *A Man For All Seasons*: *A Play in Two Acts*
   (1st ed., Vintage Int'l 1990) (1962) ...................................................... 2

Richard F. Duncan, *Seeing the No-Compelled-Speech Doctrine Clearly
   Through the Lens of Telescope Media*,
   99 Neb. L. Rev. 58 (2020) ................................. 6, 9, 10, 11, 12, 13, 14

Richard F. Duncan, *Article: Defense Against the Dark Arts:
   Justice Jackson, Justice Kennedy, and the No-Compelled Speech Doctrine*,
   32 Regent U. L. Rev. 265 (2019-2020) .................................... 2, 3, 6, 10, 13, 18

Robert P. George, Facebook (Aug. 2, 2017),
   https://www.facebook.com/ RobertPGeorge/posts/10155417655377906 .......... 6

Erica Goldberg, *"Good Orthodoxy" and the Legacy of Barnette*,
   13 FIU L. Rev. 639 (2019) ...................................................... 10, 19, 22

Paul Horwitz, *A Close Reading of Barnette, in Honor of Vincent Blasi*,
     13 FIU L. Rev. 689 (2019) .......................................................... 11, 13

George Orwell, *1984*. (Penguin Group 1977) (1949)............................................. 10

## IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]

As *amicus curiae*, the Institute for Faith and Family ("IFFNC") urges this Court to affirm the District Court's ruling granting a preliminary injunction.

IFFNC is a North Carolina nonprofit organization that exists to preserve and promote faith, family, and freedom through public policies that protect constitutional liberties, including speech and religion. See https://iffnc.com. IFFNC is engaged in fighting policies like the one represented by the recent "guidance documents" (the "Guidance"), issued by the Department of Education ("DOE") purporting to extend the rationale of *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020) to Title IX.

## INTRODUCTION AND SUMMARY

The Guidance dramatically expands the reach of *Bostock*, contrary to the Supreme Court's explicit limitation of its scope. *See Bostock*, 140 S. Ct. at 1753; *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021) ("*Bostock* extends no further than Title VII"); *Meriwether v. Hartop*, 922 F.3d 492, 510 n.4 (6th Cir. 2021) (*Bostock* does not "automatically apply in the Title IX context"). *Amicus curiae* writes to highlight the First Amendment dangers spawned by the Guidance. Similar threats have emerged in litigation over public school policies that facilitate

---

[1] *Amicus curiae* certifies that no counsel for a party authored this brief in whole or in part and no person or entity, other than *amicus*, its members, or its counsel, has made a monetary contribution to its preparation or submission. All parties have consented to the filing of this brief.

1

sex transitions and compel speech contrary to reality, e.g., *Parents Defending Education v. Linn-Marr Sch. Dist.*, 8th Cir. Case No. 22-2927 (pending); *Vlaming v. West Point Sch. Bd*., Supreme Court of Virginia Record No. 211061 (pending). The expansive "Guidance," like these policies, jeopardizes First Amendment liberties in schools across the nation.

The Guidance is "arbitrary and capricious" because the DOE not only skipped past the "notice and comment" requirement, but also evaded the massive constitutional issues that should have been considered.

There is hardly a more "dramatic example of authoritarian government and compelled speech" than King Henry's command that Sir Thomas More sign a statement blessing the King's divorce and remarriage. Richard F. Duncan, *Article: Defense Against the Dark Arts: Justice Jackson, Justice Kennedy, and the No-Compelled Speech Doctrine*, 32 Regent U. L. Rev. 265, 292 (2019-2020), citing Robert Bolt, *A Man For All Seasons*: *A Play in Two Acts* (1st ed., Vintage Int'l 1990) (1962). Thomas More, a faithful Catholic, could not sign.

Five centuries later, the Guidance creates a conundrum no less momentous than Thomas More's predicament, triggering mandates riddled with viewpoint-based speech compulsion. There is "probably no deeper division" than a conflict provoked by the choice of "what doctrine . . . public educational officials shall compel youth to unite in embracing." Duncan, *Defense Against the Dark Arts*, 32

2

Regent U. L. Rev. at 292, citing *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 641 (1943). The divisions surrounding transgender ideology have a profound impact in public education.

Compelled speech is anathema to the First Amendment, especially where the government mandates conformity to its preferred viewpoint. *Barnette, Wooley, NIFLA* and other "eloquent and powerful opinions" stand as "landmarks of liberty and strong shields against an authoritarian government's tyrannical attempts to coerce ideological orthodoxy." Duncan, *Defense Against the Dark Arts*, 32 Regent U. L. Rev. at 266; *Barnette*, 319 U.S. 624; *Wooley v. Maynard*, 430 U.S. 705 (1977); *NationaI Institute of Family & Life Advocates v. Becerra,* 138 S. Ct. 2361 (2018) ("*NIFLA*").

There is hardly a more contentious matter of current public debate than transgender ideology, a "controversial [and] sensitive political topic[]." *Janus v. AFSCME, Council 31*, 138 S. Ct. 2448, 2476 (2018) (cleaned up). Speech about this issue merits heightened protection. The Guidance will demand the use of pronouns to "communicate a message" many believe is false—that "[p]eople can have a gender identity inconsistent with their sex at birth." *Meriwether*, 992 F.3d at 507. "Pronouns can and do convey a powerful message implicating a sensitive topic of public concern." *Id*. at 508. It is not the business of *any* government official in *any* position to coerce *any* person's chosen perspective on this topic.

3

The DOE creates a formula for tyranny, combining speech and viewpoint compulsion and sacrificing the First Amendment on the altar of transgenderism.

## ARGUMENT

### I.   THE GUIDANCE IS "ARBITRARY AND CAPRICIOUS" BECAUSE IT FAILED TO CONSIDER THE FIRST AMENDMENT RIGHTS OF SCHOOL STAFF AND STUDENTS.

As Intervenor-Plaintiffs explain in their Complaint (¶¶ 290-335), the DOE not only failed to conduct the required notice and comment (5 U.S.C. § 553) but "entirely failed to consider an important aspect of the problem." *Little Sisters of the Poor v. Pennsylvania*, 140 S. Ct. 2367, 2383-2384 (2020), quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983). The DOE neglected the impact on core constitutional liberties, including speech and religion. The Guidance is particularly offensive to the *religious* speech of teachers and students whose faith does not conform to the Administration's transgender ideology.

The Guidance flouts *Bostock*'s promise to respect religious liberty. The Court was "deeply concerned with preserving the promise of the free exercise of religion enshrined in our Constitution," a "guarantee [that] lies at the heart of our pluralistic society." *Bostock*, 140 S. Ct. at 1754. Executive branch officials are now using *Bostock* as a springboard to coerce sweeping changes that attack strong religious convictions.

4

## II.    COMPELLED SPEECH AND VIEWPOINT DISCRIMINATION ARE UNIQUELY PERNICIOUS.

The "proudest boast" of America's free speech jurisprudence is that we safeguard "the freedom to express 'the thought that we hate.'" *Matal v. Tam*, 137 S. Ct. 1744, 1764 (2017) (plurality opinion) (quoting *United States v. Schwimmer*, 279 U.S. 644, 655 (1929) (Holmes, J., dissenting)). Gender identity may be "embraced and advocated by increasing numbers of people," but that is "all the more reason to protect the First Amendment rights of those who wish to voice a different view." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 660 (2000). Our law also protects the right to remain silent—to *not* express viewpoints a speaker hates. Compelled expression is even worse than censorship. It is difficult to discern the viewpoint of one who is silent, but compelled speech affirmatively associates the speaker with a viewpoint he does not hold.

The Guidance will "[m]andate speech" that many persons "would not otherwise make" and "exact a penalty" for refusal. *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988). The Guidance demands that persons who object to transgender ideology make assertions they believe are false, e.g., using *male* pronouns to refer to a biological *female*. Such a mandate is obviously based on *content*—pronouns used with reference to another. Worse yet, it is viewpoint-based because it requires the speaker to endorse transgender ideology even if it conflicts with conscience and faith.

5

"When the law strikes at free speech it hits human dignity . . . *when the law compels a person to say that which he believes to be untrue, the blade cuts deeper* because it requires the person to be untrue to himself, perhaps even untrue to God." Richard F. Duncan, *Seeing the No-Compelled-Speech Doctrine Clearly Through the Lens of Telescope Media*, 99 Neb. L. Rev. 58, 59 (2020) (emphasis added). The Guidance creates a two-edged sword—compelled speech and viewpoint discrimination.

### A.    The Guidance is a paradigmatic example of compelled speech.

Compelled speech is even more tyrannical than compelled silence because "it invades the private space of one's mind and beliefs." Richard F. Duncan, *Defense Against the Dark Arts*, 32 Regent U. L. Rev. at 275. While "ordinary authoritarians" merely demand silence, "[t]otalitarians insist on forcing people to say things they know or believe to be untrue." *Id*., quoting Professor Robert George.[2] The totalitarian Guidance demands acknowledgement of a *female* as a *male* (or vice versa). Many cannot comply with this demand in good conscience.

A government edict that commands "involuntary affirmation" demands "even more immediate and urgent grounds than a law demanding silence." *Janus*, 138 S. Ct. at 2464, citing *Barnette*, 319 U.S. at 633 (internal quotation marks omitted). Even

---

[2] Robert P. George, Facebook (Aug. 2, 2017), https://www.facebook.com/ RobertPGeorge/posts/10155417655377906.

a legitimate and substantial government purpose "cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Wooley*, 430 U.S. at 716-717, citing *Shelton v. Tucker*, 364 U.S. 479, 488 (1960). The DOE cannot jump this hurdle. The Guidance forces school employees, students, and parents to become "instrument[s] for fostering . . . an ideological point of view" they find "morally objectionable." *Wooley*, 430 U.S. at 714-715.

**B.    The Guidance transgresses liberties of religion, conscience, and thought.**

The Guidance encroaches on conscience and religious speech, which is not only "as fully protected . . . as secular private expression," but historically, "government suppression of speech has so commonly been directed *precisely* at religious speech that a free-speech clause without religion would be Hamlet without the prince." *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995) (internal citations omitted). Convictions about sexuality are integrally intertwined with religious faith and conscience. Many faith traditions have strong teachings about sexual morality, marriage, and the distinction between male and female. Compelled speech—that a boy is a girl or a girl is a boy—tramples deeply held beliefs and conscience.

Most state constitutions expressly define religious liberty in terms of conscience.[3] A few do not use the word "conscience" but protect against state compulsion. Alabama Const. Art. I, Sec. 4; Iowa Const. Art. I, § 3; Md. Dec. of R. art. 36; W. Va. Const. Art. III, § 15. Some broadly describe religious liberty, with narrow limitations (threaten to peace and/or safety). Conn. Const. Art. I., Sec. 3; Fla. Const. Art. I, § 3; Md. Dec. of R. art. 36; Miss. Const. Ann. Art. 3, § 18. Several states essentially duplicate the U. S. Constitution. Alaska Const. Art. I, § 4; HRS Const. Art. I, § 4; La. Const. Art. I, § 8; Mont. Const., Art. II § 5; S.C. Const. Ann. Art. I, § 2. Oklahoma's unique language provides for "perfect toleration of religious sentiment." Okl. Const. Art. I, § 2.

Freedom of thought is the "indispensable condition" of "nearly every other form of freedom." *Palko v. Connecticut*, 302 U.S. 319, 326-27 (1937)), *overruled on other grounds by Benton v. Maryland*, 395 U.S. 784 (1969). It undergirds the First Amendment and merits "unqualified attachment." *Schneiderman v. United*

---

[3] *See* A.R.S. Const. Art. II, § 12; Ark. Const. Art. 2, § 24; Cal. Const. art. I, § 4; Colo. Const. Art. II, Section 4; Del. Const. art I, § 1; Ga. Const. Art. I, § I, Para. III-IV; Idaho Const. Art. I, § 4; Illinois Const., Art. I, § 3; Ind. Const. Art. 1, §§ 2, 3; Kan. Const. B. of R. § 7; Ky. Const. § 1; ALM Constitution Appx. Pt. 1, Art. II; Me. Const. Art. I, § 3; MCLS Const. Art. I, § 4; Minn. Const. art. 1, § 16; Mo. Const. Art. I, § 5; Ne. Const. Art. I, § 4; Nev. Const. Art. 1, § 4; N.H. Const. Pt. FIRST, Art. 4 and Art. 5; N.J. Const., Art. I, Para. 3; N.M. Const. Art. II, § 11; NY CLS Const Art I, § 3; N.C. Const. art. I, § 13; N.D. Const. Art. I, § 3; Oh. Const. art. I, § 7; Ore. Const. Art. I, §§ 2, 3; Pa. Const. Art. I, § 3; R.I. Const. Art. I, § 3; S.D. Const. Article VI, § 3; Tenn. Const. Art. I, § 3; Tex. Const. Art. I, § 6; Utah Const. Art. I, § 4; Vt. Const. Ch. I, Art. 3; Va. Const. Art. I, § 16; Wash. Const. art. 1, § 11; Wis. Const. Art. I, § 18; Wyo. Const. Art. 1, § 18.

*States*, 320 U.S. 118, 144 (1943). The distinction between compelled speech and compelled silence in this context is "without constitutional significance." *Riley*, 487 U.S. at 796. These two rights are "complementary components" of the "individual freedom of mind." *Wooley*, 430 U.S. at 714; *Barnette*, 319 U.S. at 637. Together they guard "both the right to speak freely and the right to refrain from speaking at all." *Wooley*, 430 U.S. at 714; *Barnette*, 319 U.S. at 633-634; *id*., at 645 (Murphy, J., concurring). A system that protects the right to promote all sorts of ideological causes "must also guarantee the concomitant right to decline to foster such concepts." *Wooley*, 430 U.S. at 714; Duncan, *Seeing the No-Compelled-Speech Doctrine Clearly*, 99 Neb. L. Rev. at 63.

The victory for freedom of thought recorded in the Bill of Rights recognizes that in the domain of conscience there is a moral power higher than the State. *Girouard v. United States,* 328 U.S. 61, 68 (1946). Courts have an affirmative "duty to guard and respect that sphere of inviolable conscience and belief which is the mark of a free people." *Lee v. Weisman*, 505 U.S. 577, 592 (1992). The Guidance assaults liberty of thought and conscience, compelling school faculty and students "to contradict [their] most deeply held beliefs, beliefs grounded in basic philosophical, ethical, or religious precepts"—by affirming the lie that a biological female is a male (or vice versa). *NIFLA*, 138 S. Ct. at 2379 (Kennedy, J., concurring);

9

*see* Duncan, *Seeing the No-Compelled-Speech Doctrine Clearly*, 99 Neb. L. Rev. at 65-66.

###### C.    The Guidance plants the seeds of tyranny.

"The possibility of enforcing not only complete obedience to the will of the State, but *complete uniformity of opinion* on all subjects, now existed for the first time." George Orwell, *1984*. 206 (Penguin Group 1977) (1949) (emphasis added).

Viewpoint discrimination ushers in an orwellian system that destroys liberty of thought. As Justice Kennedy cautioned, "The right to think is the beginning of freedom, and speech must be protected from the government because speech is the beginning of thought." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253 (2002); *see* Duncan, *Defense Against the Dark Arts*, 32 Regent U. L. Rev. at 265. The Guidance imperils these liberties.

"[T]he history of authoritarian government . . . shows how relentless authoritarian regimes are in their attempts to stifle free speech." *NIFLA*, 138 S. Ct. at 2379 (Kennedy, J., concurring). There is "no such thing as good orthodoxy" under a Constitution that safeguards thought, speech, conscience, and religion, even when the government pursues seemingly benign purposes like national allegiance (*Barnette*), equality, or tolerance. Erica Goldberg, *"Good Orthodoxy" and the Legacy of Barnette*, 13 FIU L. Rev. 639, 643 (2019). "Even commendable public values can furnish the spark for the dynamic that Jackson insists leads to the

'unanimity of the graveyard.'" Paul Horwitz, *A Close Reading of Barnette, in Honor of Vincent Blasi*, 13 FIU L. Rev. 689, 723 (2019).

Every speaker must decide "what to say and what to leave unsaid." *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 575 (1995), quoting *Pacific Gas & Electric Co. v. Public Utilities Comm'n of Cal.*, 475 U.S. 1, 11 (1986) (plurality opinion) (emphasis in original). "Intellectual autonomy" is the freedom to say what a speaker believes is true and to refrain from saying what is false. Duncan, *Seeing the No-Compelled-Speech Doctrine Clearly*, 99 Neb. L. Rev. at 85. A speaker's choice "not to propound a particular point of view" is simply "beyond the government's power to control," regardless of the speaker's reasons for remaining silent. *Hurley*, 515 U.S. at 575. There is "no more certain antithesis" to free speech than a government mandate imposed to produce "orthodox expression." *Id*. at 579. Such a restriction "grates on the First Amendment." *Id*. "Only a tyrannical government . . . requires one to say that which he believes is not true." *Id*. Here, the Guidance demands false affirmations about the sex of students who reject biological reality.

The Supreme Court has *never* upheld a viewpoint-based mandate compelling "an unwilling speaker to express a message that takes a particular ideological position on a particular subject." Duncan, *Seeing the No-Compelled-Speech Doctrine Clearly*, 99 Neb. L. Rev. at 78. But that is precisely where the Guidance

11

leads. The Guidance darkens the "fixed star in our constitutional constellation" that forbids any government official, "high or petty," from prescribing "what shall be orthodox in politics, nationalism, religion, . . . or force citizens to confess by word or act their faith therein." *Barnette*, 319 U.S. at 642. Regardless of transgender ideology's acceptance in current culture, the DOE's interest in disseminating that ideology "cannot outweigh [anyone's] First Amendment right to avoid becoming the courier for such message." *Wooley*, 430 U.S. at 717. *Barnette* and *Wooley* solidify the principle that government lacks the "power to compel a person to speak, compose, create, or disseminate a message on any matter of political, ideological, religious, or public concern." Duncan, *Seeing the No-Compelled-Speech Doctrine Clearly*, 99 Neb. L. Rev. at 63-64. The Guidance is far more intrusive than in *Wooley*, where the state did not "require an individual to speak any words, affirm any beliefs, or create or compose any expressive message," but rather to serve as a "mobile billboard" for an ideological message obviously attributable to the state. *Id*. at 63. But even that passive display violated the First Amendment by "usurps[ing] speaker autonomy." *Id*. at 76.

### D. Viewpoint-based compelled speech stifles debate and attacks the dignity of those who disagree with the prevailing state orthodoxy.

Viewpoint discrimination is "an egregious form of content discrimination." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). It creates a "substantial risk of excising certain ideas or viewpoints from the public dialogue."

*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994). This is "poison to a free society." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2302 (2019) (Alito, J., concurring).

Citizens who hold competing views may use the political process, but under *Barnette*, the government may not "insist that the victory of one side, of one creed or value, be memorialized by compelling the defeated side to literally give voice to its submission." Duncan, *Defense Against the Dark Arts*, 32 Regent U. L. Rev. at 278, quoting Horwitz, *A Close Reading of* Barnette, 13 FIU L. REV. at 723. "Forcing free and independent individuals to endorse ideas they find objectionable is always demeaning." *Janus*, 138 S. Ct. at 2464.

The Guidance is "a paradigmatic example of the serious threat presented when government seeks to impose its own message in the place of individual speech, thought, and expression." *NIFLA*, 138 S. Ct. at 2379 (Kennedy, J., concurring). It creates a viewpoint-based compulsion to speak that not only controls content (pronouns) but also imposes an ideology. Such coerced compliance attacks the dignity of persons who object. "Freedom of thought, belief, and speech are fundamental to the dignity of the human person." Duncan, *Seeing the No-Compelled-Speech Doctrine Clearly*, 99 Neb. L. Rev. at 59.

The Guidance contravenes "[t]he very purpose of the First Amendment . . . to foreclose public authority from assuming a guardianship of the public mind through regulating the press, speech, and religion." *Thomas v. Collins,* 323 U.S. 516, 545

13

(1945) (Jackson, J., concurring). This is dangerous to a free society because the government must respect a wide range of diverse viewpoints. "Struggles to coerce uniformity" of thought are ultimately futile, "achiev[ing] only the unanimity of the graveyard." *Barnette*, 319 U.S. at 640, 641.

The government itself may adopt a viewpoint but may never "interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government." *Hurley*, 515 U.S. at 579. Even when it is appropriate to regulate harmful discriminatory conduct, the state may not require that some citizens "communicate a message of tolerance that affirms the dignity of others." *Id*. Dignity is an interest "so amorphous as to invite viewpoint-based discrimination, antithetical to our viewpoint-neutral free speech regime, by courts and legislatures." *Id*. at 665. The state may not enhance the dignity of some by censoring the protected expression of others.

As *Hurley* warns, the state must guard against "conflation of message with messenger" because a speaker's objection to an ideological message is "at the core of the no-compelled-speech doctrine." Duncan, *Seeing the No-Compelled-Speech Doctrine Clearly*, 99 Neb. L. Rev. at 64. The trial judge in *Hurley* erroneously reasoned that the parade organizer's rejection of a group's *message* was tantamount to "discrimination" based on "the innate *personhood*" of its members." *Id.* (emphasis

14

added). The First Amendment guards a speaker's autonomy to "discriminate" by favoring viewpoints he wishes to express and rejecting other views. *Id*. Rejecting a *message* is not equivalent to rejecting a *person* who prefers that message.

### E. The prohibition of viewpoint discrimination is a necessary component of the Free Speech Clause.

A century ago, the Supreme Court affirmed a conviction under the Espionage Act, which criminalized publication of "disloyal, scurrilous and abusive language" about the United States when the country was at war. *Abrams v. United States*, 250 U.S. 616, 624 (1919). If that case were heard today, no doubt "the statute itself would be invalidated as patent viewpoint discrimination." Lackland H. Bloom, Jr., *The Rise of the Viewpoint-Discrimination Principle*, 72 SMU L. Rev. F. 20, 21 (2019). A few years after *Abrams*, the Court decided *Barnette*, "a forerunner of the more recent viewpoint-discrimination principle." *Id*. *Barnette*'s often-quoted "fixed star" passage was informed by "the fear of government manipulation of the marketplace of ideas." *Id*. Justice Kennedy connected the dots: "The danger of viewpoint discrimination is that the government is attempting to remove certain ideas or perspectives from a broader debate." *Matal*, 137 S. Ct. at 1767-1768 (Kennedy, J., concurring).

Since *Barnette*, courts have further developed and refined the concept of viewpoint discrimination. In *Cohen v. California*, Justice Harlan voiced concern that "governments might soon seize upon the censorship of particular words as a

15

convenient guise for banning the expression of unpopular views." 403 U.S. 15, 26 (1971). The Court subsequently affirmed that "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content" and "must afford all points of view an equal opportunity to be heard." *Police Department of Chicago v. Mosley*, 408 U.S. 92, 95-96 (1972).

Further development occurred in the 1980's. In *Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983), all Justices agreed that viewpoint discrimination is impermissible; such discrimination "is censorship in its purest form and government regulation that discriminates among viewpoints threatens the continued vitality of 'free speech.'" *Id*. at 62 (Brennan, J., dissenting). Three years later, the Court invalidated a regulation that coerced association with the views of other speakers. *Pacific Gas & Electric Co.*, 475 U.S. at 20-21 (plurality opinion). Several years later, the Court affirmed the "bedrock principle underlying the First Amendment . . . that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

In the early 1990's the Court struck down an ordinance that criminalized placing a symbol on private property that "arouses anger, alarm or resentment in others" based on "race, color, creed, religion or gender." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 380 (1992) (burning cross). The Court considered "the anti-viewpoint-

16

discrimination principle . . . so important . . . that it applied even to speech that was otherwise excluded from First Amendment protection." Bloom, *Viewpoint-Discrimination Principle*, 72 SMU L. Rev. F. at 25, citing *R.A.V.*, 505 U.S. at 384-385. The ruling defined viewpoint discrimination as "hostility—or favoritism—towards the underlying message expressed" (*R.A.V.*, 505 U.S. at 385 (citing *Carey v. Brown*, 447 U.S. 455 (1980)), effectively placing the principle "at the very heart of serious free speech protection." Bloom, *Viewpoint-Discrimination Principle*, 72 SMU L. Rev. F. at 25. The government may not "license one side of a debate to fight free style, while requiring the other to follow Marquis of Queensberry rules." *R.A.V.*, 505 U.S. at 392.

During the same time frame, the Supreme Court held that the government may not discriminate against speech solely because of its religious perspective. *See, e.g., Lamb's Chapel v. Center Moriches Union Free School District*, 508 U.S. 384, 394 (1993) (school premises open for social, civic, and recreational meetings could not exclude religious film series); *Rosenberger*, 515 U.S. at 829 (invalidating university regulation that prohibited expense reimbursement to a religious student newspaper); *Good News Club v. Milford Central School*, 533 U.S. 98, 112 (2001) (striking down school community use regulation that discriminated against religious speech).

Government mandates may implicate viewpoint discrimination by either compelling a speaker to express the government's viewpoint (*Wooley*, *NIFLA*) or a

third party's viewpoint (*Hurley*). Duncan, *Defense Against the Dark Arts*, 32 Regent U. L. Rev. at 283. After *Hurley*, "the constitutional ideal of intellectual autonomy for speakers, artists, and parade organizers, which originated in *Barnette*, now had the support of a unanimous Supreme Court." *Id.* at 282. Even when the government's motives are innocent, there is a residual danger because "future government officials may one day wield such statutes to suppress disfavored speech." *Reed v. Town of Gilbert*, 576 U.S. 155, 167 (2015).

More recently, *Matal* "is the Court's most important decision in the anti-viewpoint-discrimination line of cases." Bloom, *Viewpoint-Discrimination Principle*, 72 SMU L. Rev. F. at 29. "Giving offense [to a transgender student] is a viewpoint." *Matal*, 137 S. Ct. at 1763. The DOE may not escape the charge of viewpoint discrimination "by tying censorship to the reaction of [the] audience." *Id.* at 1766. Shortly after *Matal*, the Court struck down a provision forbidding "immoral or scandalous" trademarks because the ban "disfavors certain ideas." *Iancu v. Brunetti*, 139 S. Ct. at 2297. The Court's approach "indicated that governmental viewpoint discrimination is a per se violation of the First Amendment." Bloom, *Viewpoint-Discrimination Principle*, 72 SMU L. Rev. F. at 33. The viewpoint-based Guidance is also a "per se violation of the First Amendment."

18

## III. THE DOE'S GUIDANCE IS A VIEWPOINT-BASED SPEECH MANDATE.

Pronouns are an integral part of everyday speech. Many use pronouns based on objective biological reality, coupled with a personal belief that each person is created immutably male or female. Not everyone accepts the DOE's concept of "gender identity" or believes that a person can transition from one sex to the other. The Constitution safeguards the right to speak about this issue according to individual conscience and faith.

Neither students nor teachers abandon their constitutional rights at the school door. Students not only need to learn how the Constitution guards their own rights, but also to respect the rights of others. It is a "critical part of a professor's job" to "affirm[] the equal dignity of every student," and create the best environment for learning. Goldberg, *"Good Orthodoxy"*, 13 FIU L. Rev. at 666. But teachers and students alike can respect the dignity of others without sacrificing their own rights to thought, conscience, and speech.

### A. Government employees are citizens.

The First Amendment embraces not only the freedom to believe but also "the right to express those beliefs and to establish one's religious (or nonreligious) self-definition in the political, civic, and economic life of our larger community." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 736-737 (2014) (Kennedy, J., concurring). The "larger community" includes a person's place of employment.

Government employees may speak on matters of public concern. There is hardly a more contentious matter of current public debate than gender identity, "a controversial [and] sensitive political topic[] . . . of profound value and concern." *Janus*, 138 S. Ct. at 2476 (cleaned up). The Guidance will compel public school employees to "use pronouns to communicate a message" many believe is false, namely that "[p]eople can have a gender identity inconsistent with their sex at birth." *Meriwether*, 992 F.3d at 507. "Pronouns can and do convey a powerful message implicating a sensitive topic of public concern." *Id.* at 508.

The Supreme Court has crafted a test that balances "between the [free speech] interests of [a] teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ. of Township High School District 205*, 391 U.S. 563, 568 (1968). *Pickering*'s balancing test does not warrant the DOE's compulsion that a teacher express *personal* agreement on a controversial public issue where citizens are deeply divided. *Janus*, 138 S. Ct. at 2471 ("prominent members of the founding generation condemned laws requiring public employees to affirm or support beliefs with which they disagreed").

Even as an employer, *the government is still the government*, subject to constitutional constraints. Even as a government employee, *a citizen is still a citizen*. Government employees "do not surrender all their First Amendment rights by reason

20

of their employment." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). The Constitution does not permit the DOE to "leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens." *Id.* at 419; see *Perry v. Sindermann,* 408 U.S. 593, 597 (1972); *Connick v. Myers*, 461 U.S. 138, 147 (1983) ("Our responsibility is to ensure that citizens are not deprived of fundamental rights by virtue of working for the government"). Neither students nor *teachers* "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969).

The doctrine of unconstitutional conditions further condemns the Guidance. "[A] State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Garcetti,* 547 U.S. at 413; *see Connick*, 461 U.S. at 142; *Keyishian v. Bd. of Regents*, 385 U.S. 589, 605-606 (1967); *Pickering*, 391 U.S. 563; *Perry v. Sindermann*, 408 U.S. at 597; *Branti v. Finkel*, 445 U.S. 507, 515-516 (1980). There was a time when "a public employee had no right to object to conditions placed upon the terms of employment—including those which restricted the exercise of constitutional rights." *Garcetti*, 547 U.S. at 417, quoting *Connick,* 461 U.S. at 143. That theory has been "uniformly rejected." *Pickering*, 391 U.S. at 568); *Keyishian*, 385 U.S. at 605-606; *Lane v. Franks*, 573 U.S. 228, 236 (2014) ("public employees do not renounce their

21

citizenship when they accept employment, and . . . public employers may not condition employment on the relinquishment of constitutional rights").

A teacher's use of pronouns also does not constitute government speech that would fall outside the First Amendment. *Government speech* occurs when a public employee speaks in that capacity and "there is no relevant analogue to speech by citizens who are not government employees." *Garcetti*, 547 U.S. at 424. There is an obvious analogue here because pronouns are a common feature of everyday language. Even "when public officials deliver public speeches . . . their words are not exclusively a transmission from *the* government because those oratories have embedded within them the inherently personal views of the speaker as an individual." *Van Orden v. Perry,* 545 U.S. 677, 723 (2005) (Stevens, J., dissenting). A teacher's view of biological sex is "embedded within" the pronouns he or she uses.

### B. The DOE may not suppress a student's viewpoint about "gender identity" or compel expression of a view the student does not hold.

An important part of every student's education is learning "to tolerate views that upset them, or even disturb them to their core." Goldberg, *"Good Orthodoxy"*, 13 FIU L. Rev. at 666. Students must learn to endure speech that is offensive or even false as "part of learning how to live in a pluralistic society." *Lee v. Weisman*, 505 U.S. at 590. Indeed, students attending required classes are exposed to "ideas they find distasteful or immoral or absurd or all of these." *Id*. at 591. Transgender students are not exempt but must learn to tolerate the views of those who disagree with them.

22

Our Nation's deep commitment to "safeguarding academic freedom" is "a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom." *Meriwether*, 992 F.3d at 504-505, 509, quoting *Keyishian*, 385 U.S. at 603. Teachers are asked "to foster those habits of open-mindedness and critical inquiry which alone make for responsible citizens" but "[t]hey cannot carry out their noble task if the conditions for the practice of a responsible and critical mind are denied to them." *Wieman v. Updegraff*, 344 U.S. 183, 196 (1952) (Frankfurter, J., concurring). Public schools have a role in "educat[ing] youth in the values of a democratic, pluralistic society." *Coles ex rel. Coles v. Cleveland Bd. of Educ.*, 171 F.3d 369, 378 (6th Cir. 1999); *id*. at 377 ("public schools are particularly important to the maintenance of a democratic, pluralistic society"). Rigorous protection of constitutional liberties is essential to preparation for citizenship, so that we do not "strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." *Barnette*, 319 U.S. at 637.

Public schools are not "enclaves of totalitarianism" and students are not "closed-circuit recipients of only that which the State chooses to communicate." *Bd. of Educ., Island Trees Union Free Sch. Dist. v. Pico*, 457 U.S. 853, 877 (1982) (Blackmun, J., concurring), quoting *Tinker*, 393 U.S. at 511. Students "cannot be punished merely for expressing their personal views on the school premises."

*Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988). They do not "shed their constitutional rights . . . at the schoolhouse gate." *Tinker*, 393 U.S. at 506. The Guidance does not fall within the narrowly crafted exceptions for sexually explicit speech (*Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 685 (1986)), speech that promotes illegal drug use (*Morse v. Frederick*, 551 U.S. 393, 408 (2007)), or any other exception.

"The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Shelton v. Tucker*, 364 U.S. at 487. "The Nation's future depends upon leaders trained through wide exposure" to a "robust exchange of ideas" that "discovers truth out of a multitude of tongues" rather than "authoritative selection*." Keyishian*, 385 U.S. at 603.

## C.    The DOE may not lawfully suppress any student's viewpoint about "gender identity" or compel expression of a view the student does not hold.

There is nothing legitimate about the DOE's attempt to forcibly alter the speech of either teachers or students. A student's speech and beliefs about sexuality merit constitutional protection no matter how profoundly school officials (or society generally) might disagree. "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea offensive or disagreeable." *Texas v. Johnson*, 491 U.S. at 414.

24

The Guidance is not about "academic assignments" that educators may require students to complete. *Brown v. Li*, 308 F.3d 939, 949 (9th Cir. 2002). Faculty can "exercis[e] editorial control over the style and content of student speech in school sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Hazelwood*, 484 U.S. at 273. But courts must discern whether "educational discretion" is used as a pretext to punish a student. *Regents of University of California v. Bakke,* 438 U.S. 265 (1978) (racial factors); *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1293 (10th Cir. 2004) (Mormon acting student). Elementary school officials violated a student's free speech rights by rejecting his candy cane project merely because it incorporated a religious message. *Curry v. Sch. Dist. of Saginaw*, 452 F.Supp.2d 723, 736 (E.D. Mich. 2006).

The Guidance adopts one side of the contentious transgender debate and shuts down further inquiry. But the Constitution protects unpopular minority viewpoints. *Dale,* 530 U.S. at 660; *Texas v. Johnson*, 491 U.S. 397 (burning American flag); *Doe v. University of Michigan*, 721 F.Supp.852, 863 (E.D. Mich. 1989) (University could not "proscribe speech simply because it was found to be offensive, even gravely so, by large numbers of people"). This is particularly true in a changing social environment—"the fact that an idea may be embraced and advocated by increasing numbers of people is all the more reason to protect the First Amendment rights of those who wish to voice a different view." *Dale,* 530 U.S. at 660. Even elementary

schools may not squelch speech based on "a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Tinker*, 393 U.S. at 509. "Mere unorthodoxy or dissent from the prevailing mores is not to be condemned. The absence of such voices would be a symptom of grave illness in our society." *Sweezy v. New Hampshire*, 354 U.S. 234, 251 (1957).

Schools are not a haven where educators can ignore the First Amendment with impunity. Public schools cannot invade the protected liberties of either faculty or students. It is well settled that censorship is only tolerated "when the expression presents a clear and present danger of action of a kind the State is empowered to prevent and punish." *Barnette*, 319 U.S. at 633 (no "clear and present danger" in exempting students from the compulsory flag salute). Reversal of the District Court's preliminary injunction would send the message "that a Bill of Rights which guards the individual's right to speak his own mind, left it open to public authorities to compel him to utter what is not in his mind." *Id*. at 634. Such compulsion "invades the sphere of intellect and spirit" which the First Amendment "reserve[s] from all official control." *Id.* at 642.

The Guidance would compel students to either dishonestly affirm a belief they do not hold or alter their beliefs under state compulsion. Both alternatives gut the First Amendment. Students face compulsion to *declare a belief*, not merely to respect other persons. Decades of precedent drives the conclusion that the DOE

cannot compel students to affirm the morality of conduct that collides with their own convictions. *Wooley*, 430 U.S. at 715 ("The First Amendment protects the right of individuals . . . to refuse to foster . . . an idea they find morally objectionable."); *Pacific Gas & Electric*, 475 U.S. at 16 ([I]f "the government [were] freely able to compel . . . speakers to propound political messages with which they disagree, . . . protection [of a speaker's freedom] would be empty, for the government could require speakers to affirm in one breath that which they deny in the next."); *Hurley*, 515 U.S. at 575 ("[T]he choice of a speaker not to propound a particular point of view . . . is presumed to lie beyond the government's power to control.")

## CONCLUSION

This Court should affirm the District Court ruling granting a preliminary injunction.

DATED: January 30, 2023

/s/Deborah J. Dewart
Deborah J. Dewart, Attorney at Law
111 Magnolia Lane
Hubert, NC 28539
lawyerdeborah@outlook.com
(910) 326-4554 (phone)
*Attorney for Amicus Curiae*
Institute for Faith and Family

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,493 words, excluding the parts of this brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Times New Roman font.

DATED:  January 30, 2023

/s/Deborah J. Dewart
Deborah J. Dewart
*Attorney for Amicus Curiae*
Institute for Faith and Family

28

# CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system on January 30, 2023. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

DATED:  January 30, 2023          /s/Deborah J. Dewart
                                  Deborah J. Dewart
                                  *Attorney for Amicus Curiae*
                                  Institute for Faith and Family