No. 22-5807

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT
_____

STATE OF TENNESSEE, *ET AL.*,
*Plaintiff-Appellees*,

AND

ASSOCIATION OF CHRISTIAN SCHOOLS, ET AL.,
*INTERVENOR-APPELLEES,*

*v.*

UNITED STATES DEPARTMENT OF EDUCATION, ET AL.,
*Defendant-Appellants,*
_____

On Appeal from the United States District Court
For the Eastern District of Tennessee, No. 3:21-cv-00308 (Atchley, J.)
_____

# BRIEF OF DEFENSE OF FREEDOM INSTITUTE FOR POLICY STUDIES, INC. AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFF-APPELLEES AND INTERVENOR-APPELLEES
_____

GARY M. LAWKOWSKI
Dhillon Law Group, Inc.
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314
Telephone: 703-574-1654
GLawkowski@DhillonLaw.com

*Counsel for amicus curiae Defense of Freedom Institute for Policy Studies, Inc.*

# TABLE OF CONTENTS

STATEMENT OF INTEREST ................................................................1

INTRODUCTION ..............................................................................2

ARGUMENT ....................................................................................3

I.  The Text of Title IX Shows that "Sex" Refers to a Binary Distinction Between Biological Men and Women ................................................3

A.  The Text of a Statute is Paramount in Assessing its Meaning ....................3

B.  The Word "Sex" in Title IX Unambiguously Refers to a Binary Distinction Between Biological Males and Females ............................................5

II. The Original Meaning of "Sex" Refers to Biological Sex, Not Gender Identity ....................................................................................7

A.  The Court's Understanding of "Sex" at the Time Title IX was Adopted Reflects a Binary Distinction Based on Immutable Characteristics Determined at Birth ....................................................................................7

B.  Contemporary Dictionaries Reflect a Binary Understanding of "Sex" ........8

C.  Interpreting "Sex" to Include Gender Identity Fails Justice Scalia's "Cocktail Party" Test ....................................................................9

III. The History of the Adoption of Title IX Shows that "Sex" Meant Biological Sex ....................................................................................11

IV. Expanding Title IX is a Question Properly Left to Congress, Not the Department of Education or the Courts ................................................16

A.  Expanding Title IX to Encompass Gender Identity is a Major Question that Has Not Been Delegated to the Executive Branch ................................16

i.  How to Address Gender Identity in the Context of Education is a Matter of Great Political Significance and Earnest Debate Across the County ........17

i

ii.  The Department's Reinterpretation of the 50-Year-Old Title IX Provisions is Contrary to the Department's Longstanding Past Interpretations 20

B.  Congress is Better Suited to Address the Trade-Offs and Compromises Necessary to Expand Title IX than the Department of Education or the Courts 23

V. *Bostock* Does Not Compel an Alternative Conclusion ................................... 27

CONCLUSION ........................................................................................................ 28

# TABLE OF AUTHORITIES

## Cases

*Adams v. Sch. Bd. of St. Johns Cnty.*, No. 18-13592, 2022 U.S. App. LEXIS 35962 (11th Cir. Dec. 30, 2022) (en banc) ...................................................................8, 10

*Asgrow Seed Co. v. Winterboer*, 513 U.S. 179 (1995) ...............................................7

*Bostock v. Clayton Cnty.,* 140 S. Ct. 1731 (2020) ........................................... passim

*Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999) .....................................28

*Democratic Nat'l Comm. v. Wisconsin State Legislature*, 141 S. Ct. 28 (2020) ....23

*Frontiero v. Richardson*, 411 U.S. 677 (1973)..........................................................8

*Johnson v. United States*, 529 U.S. 694 (2000) ........................................................9

*K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281 (1988) ...................................................4

*Meriweather v. Hartop*, 992 F.3d 492 (6th Cir. 2021) .............................................27

*New State Ice Co. v. Liebmann*, 285 U.S. 262 (1932) .............................................19

*NFIB v. OSHA*, 142 S. Ct. 661 (2022)......................................................................24

*Pecha v. MW Bancorp, Inc.*, 988 F.3d 318 (6th Cir. 2021)....................................27

*Rotkiske v. Klemm*, 140 S. Ct. 355 (2019) ................................................................4

*Tanzin v. Tanvir*, 141 S. Ct. 486 (2020) ..................................................................3

*United States v. Jackson*, 995 F.3d 522 (6th Cir. 2021) ......................................2, 3

*United States v. Virginia*, 518 U.S. 515 (1996) ...................................................8, 25

*West Virginia v. EPA*, 142 S. Ct. 2587 (2022)................................................. passim

*Whitman v. American Trucking Ass'ns*, 531 U.S. 457 (2001)................................16

**Statutes**

20 U.S.C. § 1681 ................................................................... 2, 5, 6

20 U.S.C. §§ 1681-1688 ................................................. passim

2022 Fla. Laws 22 ...............................................................19

Title VII...............................................................................28


**Other Authorities**

116 Cong. Rec. 22,681–82 (1970) ......................................14

116 Cong. Rec. 6,398–400 (1970) ......................................12

117 Cong. Rec. 22,735–43 (1971) ......................................15

117 Cong. Rec. 32,476 (1971) ............................................14

117 Cong. Rec. 39,259 (1971) ............................................15

118 Cong. Rec. 5,808 (1972) ..............................................15

Akeem Glaspie, *"Father of Title IX" Birch Bayh Leaves Lasting Legacy for Women's Sports*, IndyStar (Mar. 14, 2019), https://www.indystar.com/story/sports/2019/03/14/father-title-ix-birch-bayh-leaves-lasting-legacy-womens-sports/3160476002/............................................14

Anne Branigin and N. Kirkpatrick, *Anti-trans Laws are on the Rise. Here's a Look at Where—and What Kind*, Wash. Post (Oct. 14, 2022), https://www.washingtonpost.com/lifestyle/2022/10/14/anti-trans-bills/ ............18

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ................................................. 3, 4, 5

Brief of the National Education Association, et al., as Amici Curiae in Support of Defendants-Appellants, *Tennessee v. United States Dep't of Educ.*, Case No. 22-5807 (6th Cir. Dec. 20, 2022) ...............................................19

Dep't of Educ., *Dear Colleagues Letter* (Oct. 26, 2010),
   https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.pdf ...........22

Dep't of Educ., *Enforcement of Title IX of the Education Amendments of 1972 with Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of Bostock v. Clayton County*, 86 Fed. Reg. 32,637 (June 22, 2021) .........26

Dep't of Educ., *Notice of Proposed Rulemaking: Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*,
   87 Fed. Reg. 41,390, 41,391 (Jul. 12, 2022) ....................................................1, 21

Dep't of Justice and Dep't of Educ., *Dear Colleague Letter* (Feb. 22, 2017),
   https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201702-title-ix.pdf
   ....................................................................................................................22

Dep't of Justice and Dep't of Educ., *Dear Colleague Letter* (May 13, 2016),
   https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201605-title-ix-transgender.pdf......................................................................................22

*Discrimination Against Women*: Hearings Before the Special Subcomm. on Education of the H. Comm. on Education and Labor, 91st Cong. (1970),
   https://babel.hathitrust.org/cgi/pt?id=uiug.30112011649 503&view=1up&seq=7
   ....................................................................................................................14

Exec. Order No. 13,988, 86 Fed. Reg. 7,023 (Jan. 20, 2021)................................26

H.R.J. Res. 208, 92nd Cong. (1972) ......................................................................13

Orion Rummler, *Health Care for Transgender Adults Becomes New Target for 2023 Legislative Session*, The 19th News (Jan. 5, 2023),
   https://19thnews.org/2023/01/trans-health-care-bills-2023-legislative-session-lgbtq/ ...........................................................................................................18

Peg Pennepacker, *The Beginning of Title IX—The Bernice Sandler Story*, National Federation of High School Associations (May 12, 2022),
   https://www.nfhs.org/articles/the-beginning-of-title-ix-the-bernice-sandler-story/
   ....................................................................................................................12

President's Task Force on Women's Rts. & Resps., A Matter of Simple Justice III
   (1970)............................................................................................................13

v

Rhonda R. Rivera, *Our Straight-Laced Judges: The Legal Position of Homosexual Persons in the United States*, 30 Hastings L. J. 799 (1979) .................................11

Robert C. Bird, *More than a Congressional Joke: A Fresh Look at the Legislative History of Sex Discrimination of the 1964 Civil Rights Act*, 3 Wm. & Mary J. Women & L. 137 (1997)......................................................................................12

Russell Goldman, *Here's a List of 58 Gender Options for Facebook Users*, ABC News (Feb. 13, 2014), https://abcnews.go.com/blogs/headlines/2014/02/heres-a-list-of-58-gender-options-for-facebook-users ...................................................6, 26

Tara D. Sonenshine, *Women and Sports: 50 Years after Title IX, Is the Playing Field Level?*, The Hill (June 20, 2022), https://thehill.com/opinion/civil-rights/3529746-women-and-sports-50-years-after-title-ix-is-the-playing-field-level/.................................................................................................................................25

## Regulations

34 C.F.R. § 106.33 (1980) .........................................................................................21

34 C.F.R. § 106.41 (1980) .........................................................................................26

## STATEMENT OF INTEREST[1]

The Defense of Freedom Institute for Policy Studies, Inc. ("DFI") is a nonprofit, nonpartisan 501(c)(3) institute dedicated to defending and advancing freedom and opportunity for every American family, student, entrepreneur, and worker and to protecting the civil and constitutional rights of Americans at school and in the workplace. Former senior leaders of the U.S. Department of Education ("the Department") who are experts in education law and policy founded DFI in 2021. DFI possesses significant legal expertise and policy experience in interpreting and administering Title IX of the Education Amendments of 1972 and the Department's implementing regulations. On September 11, 2022, DFI submitted substantive, comprehensive public comments concerning the Department's *Notice of Proposed Rulemaking: Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 87 Fed. Reg. 41,390, 41391 (Jul. 12, 2022).

---

[1] No counsel for any party authored this brief in whole or in part, and no person or entity, other than amicus curiae or its counsel, contributed money to fund the brief's preparation or submission. The parties have consented to the filing of this brief. DFI has no parent corporation and there is no publicly held corporation that owns 10% or more of its stock.

## INTRODUCTION

"[J]udges . . . assume that Congress says what it means and means what it says." *United States v. Jackson*, 995 F.3d 522, 523 (6th Cir. 2021), *cert. denied*, *Jackson v. United States*, 142 S. Ct. 1234 (2022).

When it adopted Title IX, Congress said what it meant and meant what it said: "No person in the United States shall, *on the basis of sex*, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681 (emphasis added). The text of Title IX further made clear that the word "sex" meant a binary differentiation between biological males and females. *See, e.g.*, 20 U.S.C. § 1681(a)(7) (referring to "Boy or Girl Conferences"); 20 U.S.C. § 1681(a)(8) (referring to "Father-Son or Mother-Daughter Activities at Educational Institutions"). Contemporary sources, including contemporary dictionaries and judicial opinions, indicate that this was also the commonly understood original meaning of the term "sex" at the time Title IX was adopted. Finally, the context and history surrounding the adoption of Title IX show that it was intended and understood to be directed at rectifying discriminatory treatment of biological females relative to biological men.

Over time, societal approaches and mores may have changed or at least been in dispute. But whether Title IX *should* prohibit discrimination based on gender

identity is distinct from whether it *does* prohibit such discrimination as written. This is a policy question properly addressed only by Congress, which is solely vested with the constitutional power to enact federal legislation and to fully consider the nuances and consequences involved in policymaking. Only Congress, not the Department of Education or the courts, is ultimately accountable to the American people through the electoral process.

Accordingly, the interpretation set forth in the Department's guidance documents is both contrary to the unambiguous intent of Congress and arbitrary. This Court should confirm the original, unambiguous meaning of "sex" for purposes of Title IX—a differentiation between biologically determined males and females—and affirm the district court's grant of a preliminary injunction.

## ARGUMENT

### I.   The Text of Title IX Shows that "Sex" Refers to a Binary Distinction Between Biological Men and Women

#### A. The Text of a Statute is Paramount in Assessing its Meaning

"[S]tatutory interpretation begins with the text." *United States v. Jackson*, 995 F.3d 522, 523 (6th Cir. 2021), *cert. denied, Jackson v. United States*, 142 S. Ct. 1234 (2022) (mem.); *see also Tanzin v. Tanvir*, 141 S. Ct. 486, 489 (2020) ("As usual, we start with the statutory text."); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 56 (2012) [hereinafter *Reading Law*] ("As

3

Justinian's Digest put it: *A verbis legis non est recedendum* ('Do not depart from the words of the law')" (quoting Digest 32.69 pr. (Marcellus))); "If the words of a statute are unambiguous, this first step of the interpretive inquiry is our last." *Rotkiske v. Klemm*, 140 S. Ct. 355, 360 (2019).

"It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *West Virginia v. EPA*, 142 S. Ct. 2587, 2607 (2022) (quoting *Davis v. Michigan Dept. of Treasury*, 489 U.S. 803, 809 (1989)); *see also Reading Law* at 56 ("The words of a governing text are of paramount concern, and what they convey, in their context, is what the text means."). "In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988); *see also Reading Law* at 167–169 (describing the "whole-text canon" of statutory construction).

As Sir Edward Coke explained, "it is the most natural and genuine exposition of a statute to construe one part of the statute by another part of the same statute, for that best expresseth the meaning of the makers." *Reading Law* at 167 (quoting 1 Edward Coke, *The First Part of the Institutes of the Laws of England, or a Commentary upon Littleton* § 728, at 381a (1628; 14th ed. 1791). Accordingly, "[i]f any section [of a law] be intricate, obscure, or doubtful, the proper mode of

discovering its true meaning is by comparing it with the other sections, and finding out the sense of one clause by the words or obvious intent of the other." *Id.*

### B. The Word "Sex" in Title IX Unambiguously Refers to a Binary Distinction Between Biological Males and Females

The word "sex" in Title IX is unambiguous, particularly in the textual context of the rest of Title IX. Title IX repeatedly draws binary distinctions between "boys" and "girls" and does not reference current conceptions of gender identity. For example:

- Section 1681(a)(5) refers to public universities with "a policy of admitting on students of *one sex*," 20 U.S.C. § 1681(a)(5) (emphasis added);

- Subsection (6)(B) refers to youth service organizations that have "traditionally been limited to persons of *one sex* . . .," 20 U.S.C. § 1681(a)(6)(B) (emphasis added);

- Subsection (7) applies to "boy or girl conferences," 20 U.S.C. § 1681(a)(7);

- Subsection (8) concerns "father-son or mother-daughter activities at educational institutions" and provides "if such activities are provided for students of *one sex*, opportunities for reasonably comparable activities shall be provided for students of *the other sex*," 20 U.S.C. § 1681(a)(8) (emphasis added);

5

- Subsection (9) addresses "'beauty' pageants" in which "participation is limited to individuals of *one sex* only," 20 U.S.C. § 1681(a)(9) (emphasis added); and

- Section 1681(b) likewise refers to "disparate treatment to the members of *one sex*," 20 U.S.C. § 1681(b) (emphasis added).

These intertextual references show that "sex" can only be understood as a reference to a binary understanding that categorizes persons as either male or female for the purposes of Title IX.

Interpreting "sex" to include gender identity is irreconcilable with Title IX's references. For example, subsection (8) refers to "the other sex," positing a binary classification. 20 U.S.C. § 1681(a)(8). Yet gender identity, by its own terms, refers to a much broader variety of classifications. Facebook alone has provided at least 58 different options for gender identity. *See* Russell Goldman, *Here's a List of 58 Gender Options for Facebook Users*, ABC News (Feb. 13, 2014), https://abcnews.go.com/blogs/headlines/2014/02/heres-a-list-of-58-gender-options-for-facebook-users. Similarly, multiple sections above address situations where activities and events involve "one sex." These references do not make sense in the context of gender identity.

Thus, the text of Title IX shows that "sex" unambiguously refers to a binary distinction between biological males and females.

**II. The Original Meaning of "Sex" Refers to Biological Sex, Not Gender Identity**

The Supreme Court has explained that it "normally interprets a statute in accord with the ordinary public meaning of its terms at the time of its enactment." *Bostock v. Clayton Cnty.,* 140 S. Ct. 1731, 1738 (2020); *see also Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995) ("When terms used in a statute are undefined, we give them their ordinary meaning."). Since "the law's ordinary meaning at the time of enactment usually governs, we must be sensitive to the possibility a statutory term that means one thing today or in one context might have meant something else at the time of its adoption or might mean something different in another context." *Bostock*, 140 S. Ct. at 1750.

"[T]he authority of this Court is limited to saying what the law *is*," not what one might like it to be. *Bostock*, 140 S. Ct. at 1784 (Alito, J., dissenting). "Today, many Americans know individuals who are . . . transgender and want them to be treated with the dignity, consideration, and fairness that everyone deserves." *Id*. But pursuit of that goal does not mean the Department or the courts can reinterpret a 50-year-old statute to mean something different today than what it meant when enacted.

    **A. The Court's Understanding of "Sex" at the Time Title IX was Adopted Reflects a Binary Distinction Based on Immutable Characteristics Determined at Birth**

At the time Title IX was adopted, the ordinary public meaning of "sex" was a binary distinction between males and females. Less than a year after Title IX was

adopted, the Supreme Court stated that "sex, like race and national origin, is an immutable characteristic determined solely by the accident of birth." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973). Similarly, the Court has repeatedly referenced "inherent differences" between men and women as a factor in its discussion of "sex" in the context of education. *See United States v. Virginia*, 518 U.S. 515, 533 (1996) ("'Inherent differences' between men and women, we have come to appreciate, remain cause for celebration, but not for denigration of members of either sex or for artificial constraints on an individual's opportunities.").

### B. Contemporary Dictionaries Reflect a Binary Understanding of "Sex"

The Court's definition accords with contemporary dictionaries. "Dictionary definitions are valuable because they are evidence of what people at the time of a statute's enactment would have understood its words to mean." *Bostock*, 140 S. Ct. at 1766 (Alito, J., dissenting). "Reputable dictionary definitions of 'sex' from the time of Title IX's enactment show that when Congress prohibited discrimination on the basis of 'sex' in education, it meant biological sex." *Adams v. Sch. Bd. of St. Johns Cnty.*, No. 18-13592, 2022 U.S. App. LEXIS 35962 at *45 (11th Cir. Dec. 30, 2022) (en banc). The Eleventh Circuit in *Adams* identified at least six such dictionary definitions. In his *Bostock* dissent, Justice Alito also identified at least six contemporary dictionary definitions of sex predating Title IX. *See Bostock*, 140 S. Ct. at 1784–1789 (Alito, J. dissenting) (Appendix A). "In all of those dictionaries,

8

the primary definition of 'sex' was essentially the same as that in the then-most recent edition of Webster's New International Dictionary . . . '[o]ne of the two divisions of organisms formed on the distinction of male and female.'" *Bostock*, 140 S. Ct. at 1756 (Alito, J., dissenting) (quoting *Sex*, *Webster's New International Dictionary* (2d ed. 1953); *see also Bostock*, 140 S. Ct. at 1756 (Alito, J., dissenting) ("Anyone who examines those dictionaries can see the primary definition in every one of them refers to the division of living things into two groups, male and female, based on biology, and most of the definitions further down the list are the same or very similar.").

### C. Interpreting "Sex" to Include Gender Identity Fails Justice Scalia's "Cocktail Party" Test

Finally, a binary, biologically based definition of sex is consistent with how the word was used at the time Title IX was adopted.

In assessing the ordinary meaning of a statute, the late Justice Scalia counseled "the acid test of whether a word can reasonably bear a particular meaning is whether you could use the word in that sense at a cocktail party without having people look at you funny." *Johnson v. United States*, 529 U.S. 694, 718 (2000) (Scalia, J., dissenting). Interpreting "sex" to include "gender identity" plainly fails this test as "[a]ny such notion would have clashed in spectacular fashion with the societal norms of the day." *Bostock*, 140 S. Ct. at 1769 (Alito, J., dissenting).

First, the purpose of Title IX was to address shocking and pervasive discrimination against women in favor of men in the educational context. *Adams v. Sch. Bd. of St. Johns Cnty.*, No. 18-13592, 2022 U.S. App. LEXIS 35962 at *42 (11th Cir. Dec. 30, 2022) (en banc) (The "purposes' of Title IX, "as derived from its text, is to prohibit sex discrimination in education."). "[T]he concept of discrimination 'because of,' 'on the basis of,' 'on account of,' or 'on the basis of' sex was well understood" because it "was part of the campaign for equality that had been waged by women's rights advocates for more than a century" and "meant . . . equal treatment for men and women." *Bostock*, 140 S. Ct. at 1769 (Alito, J., dissenting).

There is a paucity of contemporaneous records referencing "gender identity" that likely reflects the novelty of current approaches to the issue. "While it is true that there have always been individuals who experienced what is now termed 'gender dysphoria' . . . [i]t was not until 1980 that the APA, in DSM-III, recognized two main psychiatric diagnosis related to this conduction." *Bostock*, 140 S. Ct. at 1773 (Alito, J., dissenting) (citations omitted). By contrast, "[t]he term 'transgender' is said to have been coined 'in the early 1970s,' and the term 'gender identity' . . . apparently first appeared in an academic article in 1964." *Bostock*, 140 S. Ct. at 1772 (Alito, J., dissenting) (cleaned up). At the same time, even in the late 1970s, "[t]here [was] a popular, but incorrect, belief that transsexualism and homosexuality are the

10

same thing," with "transsexualism" defined as a "person whose psychological identity differs from his physiological sex." Rhonda R. Rivera, *Our Straight-Laced Judges: The Legal Position of Homosexual Persons in the United States*, 30 Hastings L. J. 799, 803 (1979).

In short, anything like the current prevailing understanding of "gender identity" would plainly fail the "cocktail party" test in 1972. Interpreting Title IX as written to encompass gender identity is contrary to the ordinary public meaning of the statute when it was adopted.

### III. The History of the Adoption of Title IX Shows that "Sex" Meant Biological Sex

Title IX did not arise in a vacuum. It was the product of a long struggle to seek and obtain equality for biological women vis-à-vis biological men and should be interpreted consistent with that context.

"There can be no doubt that our Nation has had a long and unfortunate history of sex discrimination." *Frontiero v. Richardson*, 411 U.S. 677, 684 (1973). Traditionally, discrimination against women "was rationalized by an attitude of 'romantic paternalism.'" *Id.* "As a result of notions such as these, our statute books gradually became laden with gross, stereotyped distinctions between the sexes," including prohibiting women from holding public office, serving on juries, bringing suits in their own names, and even voting until the early 20th century. *Id.* at 685. Leading up to the 1970s, "the position of women in America . . . improved

markedly," even while "it can hardly be doubted that, in part because of the high visibility of the sex characteristic, women still face[d] pervasive, although at times more subtle, discrimination." *Id.* at 685–86 (citations omitted).

Prior to the introduction of Title IX, high level government reports, congressional statements, and congressional hearings make clear that Congress was interested in addressing discrimination against women, particularly in the context of education, and place the phrase "on the basis of sex" squarely within that context.

In 1970, Representative Martha Griffith—one of the most forceful advocates for the addition of "sex" to Title VII of the Civil Rights Act—"gave the first speech ever in the U.S. Congress on the discrimination against women in education," stating in part "[i]t is shocking and outrageous that universities and colleges, using Federal moneys, are allowed to continue treating women as second-class citizens, while the Government hypocritically closes its eyes." Peg Pennepacker, *The Beginning of Title IX—The Bernice Sandler Story*, National Federation of High School Associations (May 12, 2022), https://www.nfhs.org/articles/the-beginning-of-title-ix-the-bernice-sandler-story/; *see also* 116 Cong. Rec. 6,398–400 (1970); *See generally* Robert C. Bird, *More than a Congressional Joke: A Fresh Look at the Legislative History of Sex Discrimination of the 1964 Civil Rights Act*, 3 Wm. & Mary J. Women & L. 137 (1997).

In April 1970, the President's Task Force on Women's Rights and Responsibilities issued a report which warned "[s]o widespread and pervasive are discriminatory practices against women that they have come to be regarded, more often than not, as normal." President's Task Force on Women's Rts. & Resps.*, A Matter of Simple Justice* III (1970). Presaging what would become Title IX, the Task Force also recommended that Congress amend the Civil Rights Act to "authorize the Attorney General to aid women and parents of minor girls in suits seeking equal access to public education, and to require the Office of Education to make a survey concerning the lack of equal educational opportunities for individuals by reason of sex." *Id*. at IV.

In May 1970, the House and Senate held multiple hearings on and eventually proposed the Equal Rights Amendment to the Constitution ("ERA"), including debating legislation to prevent discrimination against women at American universities. *See* H.R.J. Res. 208, 92nd Cong. (1972).

In June and July 1970, Congress held hearings on discrimination against women, which sought to prohibit discrimination "on the basis of sex," including in the educational context, placing the phrase "on the basis of sex" squarely within the context of the treatment of women. *See Discrimination Against Women*: Hearings Before the Special Subcomm. on Education of the H. Comm. on Education and

Labor, 91st Cong. (1970), https://babel.hathitrust.org/cgi/pt?id=uiug. 30112011649503&view=1up&seq=7.

In July 1970, Rep. Abner Mikva (D-IL) introduced the Women's Equality Act of 1970, a bill to prohibit discrimination against women in federally assisted programs, government employment, and employment in educational institutions, noting "[i]t is surprising and inexcusable that the quality of life Americans have sought for nearly 200 years is in many ways denied female Americans by law." 116 Cong. Rec. 22,681–82 (1970).

This focus continued in the lead up to Title IX. In September 1971, the "father of Title IX," Senator Birch Bayh, introduced a bill that was eventually largely included in Title IX, the Women's Educational Equality Act. *See* Akeem Glaspie, *"Father of Title IX" Birch Bayh Leaves Lasting Legacy for Women's Sports*, IndyStar (Mar. 14, 2019), https://www.indystar.com/story/sports/2019/03/14/father-title-ix-birch-bayh-leaves-lasting-legacy-womens-sports/3160476002/. In doing so, Senator Bayh stated, "[t]he bill I am submitting today will guarantee that women, too, enjoy the educational opportunity every American *woman* deserves." 117 Cong. Rec. 32,476 (1971) (emphasis added).

This focus on women was consistent with Senator Bayh's statements while attempting to introduce similar legislation earlier in 1971. At that time, Senator Bayh stated "[t]o my mind our greatest legislative failure relates to our continued refusal

to recognize and take steps to eradicate the pervasive, divisive, and unwarranted discrimination against a majority of our citizens, the *women* of this country." 117 Cong. Rec. 22,735–43 (1971) (emphasis added). Senator Bayh further urged that the legislation would "narrow the gap between our obligations and our performance by giving to women the benefit of the major civil rights legislation of the last decade" and noted that it would "implement[] the recommendations of the President's Task Force on Women's Rights and Responsibilities." *Id*.

Likewise, when Title IX was introduced in the House, it was defended in terms of promoting equality for women. Representative Edith Green stated at the time that "[a]ll that this title does is to ask that a woman be considered as a human being, that her qualifications, her high-school work and other qualifications be considered in the same fashion of those of a male applicant." 117 Cong. Rec. 39,259 (1971) (emphasis added).

In February 1972, Sen. Bayh introduced an amendment to S. 659 and noted that "[w]hile the impact of this amendment would be far-reaching, it is not a panacea. It is, however, an important first step in the effort to provide for the women of America something that is rightfully theirs—an equal chance to attend the schools of their choice, to develop the skills they want, and to apply those skills with the knowledge that they will have a fair chance to secure the jobs of their choice with equal pay for equal work." 118 Cong. Rec. 5,808 (1972).

Title IX was directed specifically at rectifying traditional discriminatory treatment of women, particularly as contrasted with the treatment of men. The word "sex" for purposes of Title IX should be understood consistent with this context.

## IV. Expanding Title IX is a Question Properly Left to Congress, Not the Department of Education or the Courts

Even if the word "sex" were somehow ambiguous (it is not), it would still not support the Department's interpretation. As a legal and practical matter, Congress, not an administrative agency and not the courts, is the proper forum to address the application of Title IX to gender identity.

### A. Expanding Title IX to Encompass Gender Identity is a Major Question that Has Not Been Delegated to the Executive Branch

As the Supreme Court has noted, "[w]e presume that 'Congress intends to make major policy decisions itself, not leave those decisions to agencies.'" *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022) (quoting *United States Telecom Ass. v. FCC*, 855 F.3d 381, 419 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from denial of rehearing en banc)).

The late Justice Scalia wrote, "Congress . . . does not, one might say, hide elephants in mouseholes." *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Congress does not "typically use oblique or elliptical language to empower an agency to make a 'radical or fundamental change' to a statutory scheme" and "[e]xtraordinary grants of regulatory authority are rarely accomplished through

16

'modest words,' 'vague terms,' or 'subtle device[s].'" *West Virginia*, 142 S. Ct. at 2609 (quoting *MCI Telecomms. Corp. v. American Tel. & Tel. Co.*, 512 U.S. 218, 229 (1994); *Whitman*, 531 U.S. at 468). Yet that is all the Department of Education has set against a robust public debate.

Even if an interpretation is "textually plausibl[e]" or "ha[s] a colorable textual basis," the Court will reject it if "given the various circumstances, 'common sense as to the manner in which Congress [would have been] likely to delegate' such power to the agency at issue . . . made it very unlikely that Congress had actually done so." *West Virginia*, 142 S. Ct. at 2608, 2609 (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)).

In this case, the Department is claiming the power to resolve a matter of great political significance by reinterpreting a 50-year-old statute in a manner that is inconsistent with the Department's past interpretations of Title IX. Accordingly, whether Title IX should be expanded to include gender identity constitutes a major question that Congress has not delegated to the Executive Branch.

### i. How to Address Gender Identity in the Context of Education is a Matter of Great Political Significance and Earnest Debate Across the County

One indicator that "common sense" makes it very unlikely that Congress has delegated certain authority to an administrative agency is if "an agency claims the power to resolve a matter of great 'political significance' . . . or end an 'earnest and

17

profound debate across the country.'" *West Virginia*, 142 S. Ct. at 2620 (Gorsuch, J., concurring) (quoting *NFIB v. OSHA*, 142 S. Ct. 661, 665 (2022); *Gonzales v. Oregon*, 546 U.S. 243, 267 (2006)).

How to address gender identity, particularly in the educational context, is plainly a matter of "great political significance" and "earnest and profound debate across the country." The Washington Post reports that over 390 bills concerning issues related to gender identity have been introduced in the past four years, with 155 bills introduced in 2022 alone. Anne Branigin and N. Kirkpatrick, *Anti-trans Laws are on the Rise. Here's a Look at Where—and What Kind*, Wash. Post (Oct. 14, 2022), https://www.washingtonpost.com/lifestyle/2022/10/14/anti-trans-bills/. Additional legislation is anticipated in 2023. *See generally* Orion Rummler, *Health Care for Transgender Adults Becomes New Target for 2023 Legislative Session*, The 19th News (Jan. 5, 2023), https://19thnews.org/2023/01/trans-health-care-bills-2023-legislative-session-lgbtq/.

The interplay of sex, gender identity, and education is a key focus of many of these laws. At least 18 states have adopted laws concerning gender identity and youth sports. *See* Anne Branigin and N. Kirkpatrick, *Anti-trans Laws are on the Rise. Here's a Look at Where—and What Kind*, Wash. Post (Oct. 14, 2022), https://www.washingtonpost.com/lifestyle/2022/10/14/anti-trans-bills/. Others have adopted specific laws and policies concerning instruction on gender identify in

public education and the rights of parents to know information about their children if they seek to change their gender identity. *See*, *e.g.*, 2022 Fla. Laws 22.

Moreover, States and localities are not necessarily taking the same approach to issues of gender identity in the educational context. *See* Brief of the National Education Association, et al., as Amici Curiae in Support of Defendants-Appellants at 10–11, *Tennessee v. United States Dep't of Educ.*, Case No. 22-5807 (6th Cir. Dec. 20, 2022) (identifying school districts that adopted policies explicitly prohibit discrimination and harassment on the basis gender identity). Instead, States and localities are performing their traditional and constitutional function as "laboratories" for "novel social and economic experiments," *New State Ice Co. v. Liebmann*, 285 U.S. 262, 387 (1932) (Brandeis, J., dissenting), with different States taking different approaches to these thorny practical and moral questions.

Whether and how to expand Title IX protections to encompass gender identity is "the sort of question normally reserved for Congress. As a result, we look for clear evidence that the people's representatives in Congress have actually afford the agency the power it claims." *West Virginia*, 142 S. Ct. at 2622 (Gorsuch, J., concurring). History shows that they have not.

ii.    **The Department's Reinterpretation of the 50-Year-Old Title IX Provisions is Contrary to the Department's Longstanding Past Interpretations**

Two factors that the Court looks to in assessing whether Congress has clearly authorized an administrative agency's actions are "the age and focus of the statute the agency invokes in relation to the problem the agency seeks to address" and "the agency's past interpretations of the relevant statute." *West Virginia*, 142 S. Ct. at 2623 (Gorsuch, J., concurring).

Title IX is over 50 years old. As described above, *see* section III *supra*, Congress' primary focus in adopting Title IX was to rectify discrimination against biological women relative to biological men in the educational context. In *NFIB v. OSHA*, the Supreme Court "found a clear statement lacking when OSHA sought to impose a nationwide COVID-19 vaccine mandate based on a statutory provision that was adopted 40 years before the pandemic and that focused on conditions specific to the workplace rather than a problem faced by society at large." *West Virginia*, 142 S. Ct. at 2623 (Gorsuch, J., concurring). The age and focus of Title IX reflect that Congress has not clearly delegated the Department authority to reinterpret Title IX to include gender identity.

The lack of a clear statement is confirmed by the Department's prior interpretations. In *West Virginia*, Justice Gorsuch counseled "[a] 'contemporaneous' and long-held Executive Branch interpretation of a statute is entitled to some weight

as evidence of the statute's original charge to an agency," while in *NFIB* "the Court found it 'telling that OSHA, in its half a century of existence, ha[d] never before adopted a broad public health regulation' under the statute the agency sought to invoke as authority." *West Virginia*, 142 S. Ct. at 2623 (Gorsuch, J., concurring) (citations omitted).

As even the Department has acknowledged, expanding Title IX to include issues of gender identity "deviate from some past agency statements on Title IX's coverage of discrimination based on . . . gender identity." Dep't of Educ., *Notice of Proposed Rulemaking: Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 87 Fed. Reg. 41,390, 41,391 (Jul. 12, 2022).

Indeed, agency actions contemporaneous with the adoption of the statute indicate that the Executive Branch did not interpret Title IX to encompass gender identity. Title IX's early implementing regulations provided for schools to have "separate toilet, locker rooms, and shower facilities on the basis of sex." 34 C.F.R. § 106.33 (1980). There was no regulatory provision for access to such facilities based on "gender identity," nor was any historical equivalent to "gender identity" included in the implementing regulations.

It was not until 2010—nearly 40 years after the adoption of Title IX—that the Department began to suggest that harassment on the basis of gender identity may

constitute "sex discrimination" under Title IX, *see* Dep't of Educ., *Dear Colleagues Letter* (Oct. 26, 2010), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.pdf. Likewise, it was not until 2016—in a guidance document issued without the benefit of notice and comment—that the Department first unequivocally asserted that Title IX's prohibition on sex discrimination "encompasses discrimination based on a student's gender identity." Dep't of Justice and Dep't of Educ., *Dear Colleague Letter* (May 13, 2016), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201605-title-ix-transgender.pdf. This "guidance" was promptly withdrawn less than a year later. Dep't of Justice and Dep't of Educ., *Dear Colleague Letter* (Feb. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201702-title-ix.pdf.

It is "telling" that for 40 years, the Department did not interpret sex for purposes of Title IX to clearly encompass gender identity, and that the "contemporaneous" and "long-held" view of the agency is that "sex" means a binary distinction between biological males and biological females.

Whether and how to expand Title IX to include gender identity is a major question that must be addressed by Congress, not the Executive Branch or the courts.

**B. Congress is Better Suited to Address the Trade-Offs and Compromises Necessary to Expand Title IX than the Department of Education or the Courts**

The proper place to address the trade-offs, line drawing, and policy judgments inherent in expanding Title IX is Congress. Not the Department of Education. And not the courts.

As Justice Gorsuch observed, "[l]egislators can be held accountable by the people for the rules they write or fail to write; typically judges cannot." *Democratic Nat'l Comm. v. Wisconsin State Legislature*, 141 S. Ct. 28, 29 (2020) (Gorsuch, J., concurring in denial of application to vacate stay). Similarly, "[l]egislatures make policy and bring to bear the collective wisdom of the whole people when they do" and "enjoy far greater resources for research and fact finding on questions of science and safety than usually can be mustered in litigation between discrete parties before a single judge." *Id*.

Perhaps most importantly "[i]n reaching their decisions, legislators must compromise to achieve the broad social consensus necessary to enact new laws, something not easily replicated in courtrooms where typically one side must win and the other lose." *Id*.; *see also West Virginia*, 142 S. Ct. at 2618 (Gorsuch, J., concurring) ("By effectively requiring a broad consensus to pass legislature, the Constitution sought to ensure that any new laws would enjoy wide social acceptance, profit from input by an array of different perspectives during their consideration, and

thanks to all this prove stable over time.") The result is that "[t]he need for compromise inherent in this design also sought to protect minorities by ensuring that their votes would often decide the fate of proposed legislation—allowing them to wield real power alongside the majority." *West Virginia*, 142 S. Ct. at 2618 (Gorsuch, J., concurring).

Questions about controversial issues such as access to sex-segregated bathrooms and locker rooms and the impact of women's sports are the classic sort of policy questions that would benefit from the legislative process and should be resolved by Congress. They are also issues that necessarily involve trade-offs between the preferences of persons with gender identities that differ from their biological sex and biological women, the class of people Title IX was enacted to protect. *See generally NFIB v. OSHA*, 142 S. Ct. 661, 666 (2022) ("It is not [the Court's] role to weigh such tradeoffs. In our system of government, that is the responsibility of the people chosen through democratic processes.").

For example, interpreting Title IX to include gender identity could easily mean that "transgendered persons will be able to argue that they are entitled to use a bathroom or locker room that is reserved for persons of the sex with which they identify." *Bostock*, 140 S. Ct. 1779 (Alito, J., dissenting). But there "are many people who are reticent about disrobing or using toilet facilities in the presence of individuals whom they regard as members of the opposite sex," including "women

24

who have been victimized by sexual assault or abuse" for whom "the experience of seeing an unclothed person with the anatomy of a male in a confined and sensitive location such as a bathroom or locker room can cause serious psychological harm." *Bostock*, 140 S. Ct. at 1778–79 (Alito, J., dissenting).

Similarly, the growth of participation in women's sports is viewed as one of Title IX's "major achievements." *Bostock*, 140 S. Ct. at 1779 (Alito, J., dissenting). Since its enactment, female participation at the high school level has grown 1,057 percent and at the college level by 614 percent. Tara D. Sonenshine, *Women and Sports: 50 Years after Title IX, Is the Playing Field Level?*, The Hill (June 20, 2022), https://thehill.com/opinion/civil-rights/3529746-women-and-sports-50-years-after-title-ix-is-the-playing-field-level/. Importing gender identity into Title IX "may . . . force young women to compete against students who have a very significant biological advantage, including students who have the size and strength of a male but identify as female and students who are taking male hormones in order to transition from female to male." *Bostock*, 140 S. Ct. at 1779–80 (Alito, J., dissenting); *see also United States v. Virginia*, 518 U.S. 515, 533 (1996) ("Physical differences between men and women, however, are enduring."). This may have direct consequences on women's participation in youth sports, as well as second-order consequences, such as impacting women's ability to obtain athletic

scholarships, recognition, and awards as they progress. *See generally* 34 C.F.R. § 106.41 (1980) (concerning the requirements of Title IX for athletics).

Finally, even the term "gender identity" is fluid and necessitate line-drawing and tradeoffs. For example, how would Title IX apply to persons who are "'gender fluid,' that is, individuals whose gender identity is mixed or changes over time?" *See Bostock*, 140 S. Ct. at 1779 (Alito, J., dissenting).

Tellingly, neither President Biden's Executive Order nor the Department's guidance document defines "gender identity." *See* Exec. Order No. 13,988, 86 Fed. Reg. 7,023 (Jan. 20, 2021); Dep't of Educ., *Enforcement of Title IX of the Education Amendments of 1972 with Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of Bostock v. Clayton County*, 86 Fed. Reg. 32,637 (June 22, 2021). As noted above, private companies like Facebook have given users the option of selecting between at least 58 different gender identities. Russell Goldman, *Here's a List of 58 Gender Options for Facebook Users*, ABC News (Feb. 13, 2014), https://abcnews.go.com/blogs/headlines/2014/02/heres-a-list-of-58-gender-options-for-facebook-users. Which ones constitute protected classifications, and on what terms? As gender identity is perceived as more fluid and less defined, what classifications are legally protected and what are simply matters of personal taste or preference? The Administration's guidance offers little for States to go by

26

and fails to reconcile a constantly changing paradigm conceded even by advocates for the government's position.

These are not easy questions. Answering them requires making complex policy and value judgments best made by Congress, which has access to a wide variety of views (not just that of the parties before it), a greater ability to assess scientific and safety claims, and the ability to adopt stable, nuanced compromises that defy black and white determinations. Accordingly, Congress—not the Department of Education and not the courts—is the best and proper place to resolve questions about whether and how Title IX should apply to gender identity.

### V. *Bostock* Does Not Compel an Alternative Conclusion

"Title VII differs from Title IX in important respects," therefore "it does not follow that principles announced in the Title VII context automatically apply in the Title IX context." *Meriweather v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021).

The Court in *Bostock* took pains to emphasize that it was only resolving the issue directly before it. *Pecha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021) ("[T]he Court in Bostock was clear on the narrow reach of its decision and how it was limited only to Title VII itself."). The Court in *Bostock* explicitly disclaimed the implications of extending its interpretation of section VII of the Civil Rights Act to Title IX, noting concerns about access to bathrooms, locker rooms, and dress codes before disclaiming "none of these other laws are before us." *Bostock*,

140 S. Ct. at 1753; *see also Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 651 (1999) ("Courts . . . must bear in mind that schools are unlike the adult workplace.").

Moreover, the Court in *Bostock* acknowledged that a different statutory scheme could lead to a different result, stating "we have not had the benefit of adversarial testing about the meaning of their terms, and we do no prejudge any such question today." *Bostock*, 140 S. Ct. at 1753.

Title IX is a statutory scheme distinct from Title VII. As described in section I, *supra*, this distinct statutory scheme makes clear that "sex" can only be understood as a binary, biologically determined characteristic. Moreover, as described in sections I–III, *supra*, applying a broader definition or import of the term "sex" to Title IX is in direct conflict with the text and purpose of Title IX, which sought to level the playing field for biological women compared to biological men.

## CONCLUSION

For the foregoing reasons, the judgment of the district court granting Plaintiffs' preliminary injunction should be affirmed.

Respectfully submitted,

/s/Gary M. Lawkowski
GARY M. LAWKOWSKI
Dhillon Law Group, Inc.
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314
Telephone: 703-574-1654
GLawkowski@DhillonLaw.com

*Counsel for amicus curiae Defense of*
*Freedom Institute for Policy Studies, Inc.*

Dated January 30, 2023