No. 22-5807

# United States Court of Appeals for the Sixth Circuit

————————————

THE STATE OF TENNESSEE, ET AL.,
PLAINTIFFS-APPELLEES,

ASSOCIATION OF CHRISTIAN SCHOOLS INTERNATIONAL, ET AL.,
INTERVENORS-APPELLEES,

*v.*

DEPARTMENT OF EDUCATION, ET AL.,
DEFENDANTS-APPELLANTS.

————————————

*APPEAL FROM THE U.S. DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE,
NO. 21-CV-308, HON. JAMES DAVID CAIN, JR., PRESIDING*

————————————

## BRIEF OF AMERICA FIRST LEGAL FOUNDATION AS *AMICUS CURIAE* SUPPORTING PLAINTIFFS-APPELLEES AND AFFIRMANCE

————————————

GENE P. HAMILTON
REED D. RUBINSTEIN
NICHOLAS R. BARRY
*America First Legal Foundation*
*300 Independence Ave. SE*
*Washington, D.C. 20003*
*(202) 964-3721*
*gene.hamilton@aflegal.org*

CHRISTOPHER MILLS
*Spero Law LLC*
*557 East Bay Street #22251*
*Charleston, SC 29413*
*(843) 606-0640*
*cmills@spero.law*

Counsel for *Amicus Curiae*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations
# and Financial Interest

Sixth Circuit
Case Number: 22-5807          Case Name: Tennessee, et al. v. Dep't of Educ., et al.

Name of counsel:  Christopher Mills

Pursuant to 6th Cir. R. 26.1, America First Legal Foundation

*Name of Party*

makes the following disclosure:

1. Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> No

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

> No

---

CERTIFICATE OF SERVICE

I certify that on _____ January 31, 2023 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Christopher Mills
557 East Bay St. #22251
Charleston, SC 29413

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

**Page**

Table of Authorities ..................................................................................... ii

Interest of *Amicus Curiae* ...........................................................................1

Introduction ..................................................................................................3

Argument.......................................................................................................6

    I.    The guidance unlawfully conflates biological sex with gender identity.............................................................................................6

    II.    The guidance would nullify Title IX and render its administration absurd. ........................................................................14

Conclusion ..................................................................................................22

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 2022 WL 18003879 (11th Cir. Dec. 30, 2022)................................................................ 7, 10, 14, 17, 22

*B.P.J. v. W. Virginia State Bd. of Educ.*, 2023 WL 111875 (S.D. W. Va. Jan. 5, 2023) ................................................................................................. 11, 15, 21

*Bostock v. Clayton County*, 140 S. Ct. 1731 (2020) ...................... 1, 3, 7, 11, 12, 20

*Cape v. Tennessee Secondary Sch. Athletic Ass'n*, 563 F.2d 793 (6th Cir. 1977) ..15

*Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996) ................2

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993) ..17

*City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432 (1985)......................9

*Clark By & Through Clark v. Arizona Interscholastic Ass'n*, 886 F.2d 1191 (9th Cir. 1989)........................................................................................................17

*Coleman v. Ct. of Appeals of Maryland*, 566 U.S. 30 (2012)...................................8

*Daunt v. Benson*, 999 F.3d 299 (6th Cir. 2021)......................................................13

*Dodds v. U.S. Dep't of Educ.*, 845 F.3d 217 (6th Cir. 2016) ..................................13

*Frontiero v. Richardson*, 411 U.S. 677 (1973)......................................................3, 8

*Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020).......................10

*Kuhn v. Washtenaw Cnty.*, 709 F.3d 612 (6th Cir. 2013)..........................................9

*McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275 (2d Cir. 2004) ................................................................................................16

*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021) ............................................14

*Neese v. Becerra*, 2022 WL 16902425 (N.D. Tex. Nov. 11, 2022) .......................21

*Nordlinger v. Hahn*, 505 U.S. 1 (1992) ..................................................................10

*Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)..............................................11

*Tandon v. Newsom*, 141 S. Ct. 1294 (2021) ..........................................................10

*Texas v. EEOC*, 2022 WL 4835346 (N.D. Tex. Oct. 1, 2022) ...............................11

ii

*Tuan Anh Nguyen v. INS*, 533 U.S. 53 (2001) ................................................... 8, 13

*United States v. Virginia*, 518 U.S. 515 (1996) ........................................... 8, 9, 15

*Univ. of Texas v. Camenisch*, 451 U.S. 390 (1981) ................................................13

*Ward v. Polite*, 667 F.3d 727 (6th Cir. 2012) ........................................................17

## STATUTES

20 U.S.C. § 1681 ..................................................................................................3, 7

20 U.S.C. § 1686 ......................................................................................................3

42 U.S.C. § 2000e-2 ...............................................................................................11

Pub. L. No. 93-380, § 844, 88 Stat. 484, 612 (Aug. 21, 1974)................................15

## RULES

34 C.F.R. § 106.32 ................................................................................................3, 4

34 C.F.R. § 106.33 ................................................................................................3, 4

34 C.F.R. § 106.34 ...................................................................................................3

34 C.F.R. § 106.40 ................................................................................................3, 8

34 C.F.R. § 106.41 ................................................................................... 3, 15, 16, 17

34 C.F.R. § 106.43 ...................................................................................................3

34 C.F.R. § 106.52 ...................................................................................................3

34 C.F.R. § 106.59 ...................................................................................................3

34 C.F.R. § 106.61 ...................................................................................................3

Enforcement of Title IX of the Education Amendments of 1972 With Respect to
  Discrimination Based on Sexual Orientation and Gender Identity in Light of
  *Bostock v. Clayton County*, 86 Fed. Reg. 32637 (2021) ........................... 4, 20, 21

Nondiscrimination on the Basis of Sex in Education Programs or Activities
  Receiving Federal Financial Assistance, 87 Fed. Reg. 41390 (2022) ...................2

Nondiscrimination on the Basis of Sex Under Federally Assisted Education
  Programs and Activities, 40 Fed. Reg. 24128 (1975) .........................................16

Preventing and Combating Discrimination on the Basis of Gender Identity or
  Sexual Orientation, 86 Fed. Reg. 7023 (2021).....................................................2

## OTHER AUTHORITIES

18B Wright & Miller, *Federal Practice & Procedure* § 4478.5 (3d ed.) ..............13

Gender Identity: Key Terminology, Department of Labor,
https://www.dol.gov/agencies/oasam/centers-offices/civil-rights-
center/internal/policies/gender-identity...............................................................20

Guidelines for Psychological Practice with Transgender and Gender
Nonconforming People, 70 Am. Psychologist 836 (Dec. 2015),
https://www.apa.org/practice/guidelines/transgender.pdf....................................18

Jason Rafferty, Policy Statement, Ensuring Comprehensive Care & Support for
Transgender & Gender-Diverse Children & Adolescents, 142 Pediatrics no. 4
(Oct. 2018), https://tinyurl.com/38ans522 .........................................................19

Kylin Camburn, 9 young people explain what being non-binary means to them
(July 14, 2019), https://www.glaad.org/amp/9-young-people-explain-what-
being-non-binary-means-them ..............................................................................18

Nigel Barber, *The evolutionary psychology of physical attractiveness: Sexual
selection and human morphology*, 16 Ethnology and Sociobiology 395 (1995)...2

Ruth Bader Ginsburg, The Fear of the Equal Rights Amendment, Wash. Post, Apr.
7, 1975, at A21 .....................................................................................................15

Standards of Care for the Health of Transsexual, Transgender, and Gender-
Conforming People (7th version 2012), https://tinyurl.com/2ptzcupz ......... 18, 20

Terminology, CDC, https://www.cdc.gov/healthyyouth/terminology/sexual-and-
gender-identity-terms.htm ....................................................................................20

*The Gender Book*, https://tinyurl.com/bc4pdzcs......................................................19

# INTEREST OF *AMICUS CURIAE*

America First Legal Foundation is a nonprofit organization dedicated to promoting the rule of law in the United States by preventing executive overreach, ensuring due process and equal protection for every American citizen, and encouraging understanding of the law and individual rights guaranteed under the Constitution and laws of the United States.[1]

America First Legal has a substantial interest in this case. First, it represents parents nationwide who are fighting, *inter alia*, to protect their daughters' physical safety, personal privacy, and access to sports and other educational opportunities. Second, as a participant in notice-and-comment rulemaking and an organization often engaged in litigation to protect the rule of law, it has an interest in ensuring that the Executive Branch does not abuse the Constitution, the Administrative Procedure Act, and controlling Supreme Court authorities, as it has done here. Third, America First Legal's undersigned attorneys include the former Trump Administration official who authored the Department of Education's Office of General Counsel memorandum on *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), referenced in the Biden Administration's Title IX Notice of Proposed Rulemaking. *See*

---

[1] All parties consented to the filing of this brief. Pursuant to Fed. R. App. P. 29(a)(4)(E), no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and, no person—other than the *amicus curiae*, its members, or its counsel—contributed money that was intended to fund preparing or submitting the brief.

Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 87 Fed. Reg. 41390, 41530 (2022). The referenced memorandum is attached as Exhibit 1.[2]

---

[2] The Biden Administration's criticisms of the memorandum include inconsistency with Executive Order 13988, Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation, 86 Fed. Reg. 7023 (2021), and failure to "explain how a school should determine a student's 'biological' sex." 87 Fed. Reg. at 41530-31. First, executive orders do not rewrite statutes. *See Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1332 (D.C. Cir. 1996). Second, the settled science is that there are self-evident biological differences in morphology between males and females and that these differences are critical to human reproduction. *See, e.g.*, Nigel Barber, *The evolutionary psychology of physical attractiveness: Sexual selection and human morphology*, 16 Ethnology and Sociobiology 395 (1995). Thus, the Biden Administration's assertion that the federal government must "explain" to a school (or anyone else) how to determine biological sex is a chilling Orwellian erasure of objective reality. The infinitely more difficult question is how to determine "gender identity," and the Biden Administration's guidance makes no attempt to explain *that*. *See infra* pp. 18–21.

## INTRODUCTION

Title IX, codified at 20 U.S.C. § 1681 and titled "Sex," provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination" under any education program or activity receiving federal financial assistance. Statutory and regulatory text and structure, relevant Supreme Court authorities, and the Department's historical practice demonstrate that the ordinary public meaning of the term "sex" at the time of Title IX's enactment could only mean biological male and female, not "gender identity." *See, e.g.*, 20 U.S.C. §§ 1681(a)(3)-(9), 1686; 34 C.F.R. §§ 106.32(b)(1), 106.33, 106.34, 106.40, 106.41, 106.43. 106.52, 106.59, 106.61; *see also Bostock*, 140 S. Ct. at 1739; *id.* at 1784–91 (Alito, J. dissenting) (Appendix A). Under Title IX, sex, like race and national origin, is an immutable characteristic acquired at birth. *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality opinion).

Congress did not blind itself to reality when enacting the statute. Thus, Title IX recognized that ensuring equality between men and women sometimes requires accounting for and accommodating biological differences through, for instance, "separate living facilities for the different sexes," "separate toilet, locker room, and shower facilities," and "separate [sports] teams." 20 U.S.C. § 1686; 34 C.F.R. §§ 106.33, 106.41(b). In accord with the broader statutory prohibition on sex discrimination, male and female facilities must be "comparable," and schools must

3

provide "equal athletic opportunity for members of both sexes." 34 C.F.R. §§ 106.32(b), 106.33, 106.41(c). In short, Title IX forbids treating one sex worse than the other; it does not forbid (and sometimes mandates) recognizing that boys and girls have inherent, immutable, biological differences.

The Biden Administration's Department of Education guidance, by contrast, upends the plain text, the relevant statutory context, and Congress's uniquely clear legislative intent by forcing schools nationwide to disregard biological differences between boys and girls, nullifying all the ways that Congress sensibly recognized that boys and girls are not the same. The guidance here "interprets Title IX's prohibition on sex discrimination to encompass discrimination based on . . . gender identity." 86 Fed. Reg. 32637, 32637 (2021). According to the guidance, if a school's decision "is associated with an individual's . . . gender identity," the Department "will fully enforce Title IX" against the school. *Id.* at 32638–39. The Department thus pledges to "investigate," for example, a principal who enforces policies prohibiting a male high school student from entering "the girls' restroom" or from trying out for girls' sports teams. Compl. Ex. C, R. 1-4, Page ID # 72.

At root, the Department's guidance elides the critical, enduring distinctions between males and females. In practically all relevant Title IX cases, the issue presented has been whether a person who identifies as another gender can engage in some sex-selective activity. Again, such activities and places—sports, living

4

facilities, bathrooms—are statutorily permitted to discriminate based on biological sex, because it is relevant to all those situations. When biological sex is a relevant and permissible basis for differential treatment, "gender identity" does not suddenly flip the table. This is because biological sex is not the same thing as the newly discovered notion of "gender identity." A rule that no man may enter and use the girls' bathroom is permitted under Title IX. That a man calling himself a woman (or anything else) also cannot use the girls' bathroom does not result in unlawful sex discrimination, for this person has been treated the same as any other man. To reach a contrary result, the Department of Education rewrites Title IX, ignores its own regulations and historical practices, and overrides the Supreme Court's precedents.

The guidance's unlawful conflation of biological sex and "gender identity" turns Title IX on its head. Rather than protect women's sports, for instance, the guidance opens women's sports to male domination. Rather than protect privacy, the guidance opens bathrooms and locker rooms to anyone at any time based on self-proclaimed identities. The ill-effects will snowball: if a biological male is entitled to play women's soccer, it would presumably be impermissible sex discrimination to forbid *another* biological male (regardless of gender identity) from also playing on the women's soccer team, for the school could hardly maintain any sex-based interest in a level playing field. Ultimately, the Department's reading destroys the statute, for once one untethers "gender identity" from sex and defines "gender identity" as

all varieties of fluid expression (as medical elites have now done), every activity or facility must be open to a person based on their own self-described, outwardly-invisible, and ever-changing "identity."

Title IX does not sanction or require ending women's sports, throwing intimate facilities open to all, and otherwise disregarding the biological reality that boys and girls are different. Yet the Department of Education threatens imminent legal action against schools that try to follow the law as written. The guidance is *ultra vires*, substantively unlawful, and invalid, and the Court should affirm the preliminary injunction.

## ARGUMENT

### I.  The guidance unlawfully conflates biological sex with gender identity.

When Title IX contemplates sex-based treatment, it cannot violate Title IX for schools to act accordingly. In other words, if Title IX allows schools to separate sports, living facilities, and bathrooms based on biological sex, then Title IX could not simultaneously make it unlawful to exclude opposite-sex individuals, no matter how they identify. Concluding otherwise, as the Department of Education did, unlawfully conflates sex and gender identity.

Only recently has anyone struggled with the meaning of sex. Sex has always, including at the time of Title IX, meant biological sex. *See Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 2022 WL 18003879, at *14 (11th Cir. Dec. 30,

2022) (en banc); *see* 20 U.S.C. § 1681(a)(2) (referring to "both sexes"); *id.* § 1681(a)(6)(B) (referring to "men's" and "women's" associations as well as organizations for "boys" and "girls" in the context of organizations "the membership of which has traditionally been limited to persons of one sex"); *id.* § 1681(a)(8) (referring to "students of one sex" and "students of the other sex"); *see also Bostock*, 140 S. Ct. at 1738–39 (Gorsuch, J.); *id.* at 1784–91 (Alito, J., dissenting) (Appendix A).

Sex is real. It "is not a stereotype." *Adams*, 2022 WL 18003879, at *15. Though the Department (and its *amici*) incessantly invoke *Bostock*, they ignore that *Bostock* itself "proceed[ed] on the assumption" that the term "sex," as used in Title VII, "refer[ed] only to biological distinctions between male and female." 140 S. Ct. at 1739. Not only did *Bostock* proceed on that assumption, it *depends* on the understanding that gender identity is a "distinct concept[] from sex." *Id.* at 1746–47. *Bostock* provided the hypothetical of "an employer who fires a transgender person" who is biologically male, explaining that "[i]f the employer retains an otherwise identical employee who" is biologically female, "the employer intentionally penalizes a [male] person . . . for traits or actions that it tolerates in a[ female] employee" and thus engages in sex discrimination. *Id.* at 1741. If that is true,[3] it is only because the employee is, in reality, male.

---

[3] *Bostock* appears to assume that being "transgender" simply means identifying as the opposite of one's biological sex. That assumption is not obvious. *See infra* pp. 18–21.

The Supreme Court's precedents confirm the point and emphasize the relevance of sex to Title IX issues. As these precedents explain, sex is an immutable characteristic that implicates enduring, often relevant differences between males and females. *See Frontiero*, 411 U.S. at 686 (plurality opinion) ("[S]ex, like race and national origin, is an immutable characteristic determined solely by the accident of birth."); *United States v. Virginia*, 518 U.S. 515, 533 (1996) (Ginsburg, J.) ("Physical differences between men and women, however, are enduring: The two sexes are not fungible; a community made up exclusively of one [sex] is different from a community composed of both." (cleaned up)); *Tuan Anh Nguyen v. INS*, 533 U.S. 53, 73 (2001) ("The difference between men and women in relation to the birth process is a real one.").[4]

The Supreme Court has likewise recognized that governmental policies can and often should recognize the inherent differences between the sexes. As it explained in one case, "[t]o fail to acknowledge even our most basic biological differences—such as the fact that a mother must be present at birth but the father need not

---

[4] Additional evidence that the Department historically considered the term "sex" and human biology inextricably linked may be found in the Department's regulations expressly prohibiting discrimination related to pregnancy. 34 C.F.R. § 106.40(b)(1); *see id.* § 106.40(b)(5) (referring to the protected student as a "she"). Biological males, regardless of their "gender identity" or surgical procedures, forever have one X and one Y chromosome and cannot ovulate or carry and bear children. *See Coleman v. Ct. of Appeals of Maryland*, 566 U.S. 30, 55 (2012) (Ginsburg, J., dissenting) ("[I]t is the capacity to become pregnant which primarily differentiates the female from the male." (cleaned up)).

be—risks making the guarantee of equal protection superficial, and so disserving it." *Id.*; *see also, e.g.*, *Virginia*, 518 U.S. at 550 n.19 (explaining that admitting women to VMI "would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements, and to adjust aspects of the physical training programs"); *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 468–69 (1985) (Marshall, J., concurring in the judgment in part and dissenting in part) ("A sign that says 'men only' looks very different on a bathroom door than a courthouse door.").

Where sex provides an appropriate basis for drawing distinctions—as in sports, facilities, and single-sex groups expressly protected by Title IX—a person is not excluded "because of" or "based on" gender identity. Instead, a person is excluded based on sex. A man excluded from the women's bathroom is excluded for one reason: because he is a man. His gender identity matters no more than the color of his shoes.

Under both general equal protection and Title IX principles, a plaintiff alleging discrimination must show that he "was treated differently than a similarly situated" person. *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013); *see Cleburne*, 473 U.S. at 439 ("The Equal Protection Clause" is "essentially a direction that all persons similarly situated should be treated alike."). Anti-discrimination laws "keep[] governmental decisionmakers from treating differently persons who are in

9

all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). And "[w]hen it comes to the bathroom policy" and similar sex-based policies permitted by Title IX, "biological sex is the 'relevant respect' with respect to which persons must be 'similarly situated,' because biological sex is the sole characteristic on which" those policies are based. *Adams*, 2022 WL 18003879, at \*7 n.6; *cf. Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) ("[W]hether two activities are comparable . . . must be judged against the asserted government interest that justifies the regulation at issue."). Thus, biological males are similarly situated to each other for purposes of these policies, and prohibiting a male who identifies as something else from using the girls' bathroom does not treat similarly situated people differently.

Once again, any argument otherwise wrongly conflates gender identity with biological sex. For instance, the Fourth Circuit has asserted that a transgender boy "was treated worse than students with whom he was similarly situated because he alone could not use the restroom corresponding with his *gender*," even though the student concededly could use the restroom corresponding with her *sex*. *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 618 (4th Cir. 2020) (emphasis added). The court acknowledged that "the act of creating sex-separated restrooms in and of itself is not discriminatory" under Title IX but held that the school may not "rely on its own discriminatory notions of what 'sex' means." *Id.* The meaning of "sex" under Title IX, however, is not left up to individual schools, the Biden Administration, or

the ACLU. Instead, what matters is the word's "ordinary public meaning" at the time of Title IX's enactment. *Bostock*, 140 S. Ct. at 1738. And no one here, including the Department of Education, disputes that Title IX's reference to sex means biological sex, just as *Bostock* did not dispute—indeed, based its decision on—the premise that Title VII's reference to sex means biological sex. *See B.P.J. v. W. Virginia State Bd. of Educ.*, 2023 WL 111875, at *9 (S.D. W. Va. Jan. 5, 2023) ("There is no serious debate that Title IX's endorsement of sex separation . . . refers to biological sex.").

In short, what matters when a boy is excluded from the girls' bathroom or soccer team is not gender identity or his "being transgender," it is his immutable, biological sex. *See generally Texas v. EEOC*, 2022 WL 4835346, at *2–8 (N.D. Tex. Oct. 1, 2022).[5]

Neither the Department of Education nor its *amici* analyze the above issues. California and other states simply assert that *Bostock* "encompasses" "bathroom-access rules that discriminate on the basis of sex by denying equal rights to LGBT individuals" and thus makes "bathroom use requirements inconsistent with an [individual's] gender identity" "unlawful." Doc. 32, at 24. Bathroom access rules

---

[5]An individual employee's sex is "not relevant to the selection, evaluation, or compensation of employees." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 239 (1989) (plurality opinion). Congress recognized, however, that there are circumstances where biological sex *is* relevant to employment and expressly provides that an employer may consider sex where it is a bona fide occupational qualification. 42 U.S.C. § 2000e-2(e)(1). Notably, there is no such carve out for racial discrimination.

separate the sexes; just as obviously, they have nothing to do with whether one is "LGBT." No boy can use the girls' bathroom. And California makes no argument that bathroom access rules are illegal writ large. So it makes no more sense to say that bathroom access rules exclude individuals because of their "gender identity" than it would to say that they exclude individuals because of their shirt color. Both are irrelevant to the access rule.

The ACLU, meanwhile, suggests[6] that required bathroom access stems from the principle that "[s]ex stereotyping based on a person's gender non-conforming behavior is impermissible discrimination." Doc. 31, at 19 (cleaned up). But like California, the ACLU does not try to explain how this answers any relevant question about bathroom access (or other sex-based spaces): a male is denied access to the female bathroom regardless of his hair style, clothing, or nail polish. He is denied because he is male. And if that denial is permissible as a general matter—and ACLU does not dispute that it is—adding "non-conforming behavior" to the mix changes nothing in terms of the bathroom sex policy or Title IX's meaning. As the Supreme Court has explained, "Mechanistic classification of all our differences as stereotypes

---

[6] It is telling that none of the Department's *amici* engages with any statutory interpretation argument. Instead, they distort *Bostock,* rendering its carefully cabined analysis into irrelevant syllogisms and invoking wrongly decided lower court decisions that redefine the word "sex" without explaining how those attempts square with the original public meaning of Title IX. *E.g.*, Doc. 31, at 17–23 (ACLU et al.); Doc. 29, at 17–24 (National Education Association et al.).

would operate to obscure those misconceptions and prejudices that are real." *Nguyen*, 533 U.S. at 73.[7]

In sum, the Biden Administration's guidance is substantively wrong, *ultra vires*, and unlawful in nearly all cases in which it purports to "guide" schools. "Sex" under Title IX means biological sex. A student excluded based on sex is not excluded based on gender identity. A student may thus be excluded from a bathroom, sport, or single-sex group for being the opposite sex, regardless of the student's appearance, identification, or orientation. And schools do not face liability under Title IX

---

[7] Rather than grapple with the substantive question, the ACLU contends that "the district court inexplicably overlooked this Circuit's controlling precedent[] in *Dodds v. United States Department of Education*, 845 F.3d 217 (6th Cir. 2016)." Doc. 31, at 15; *see id.* at 18–24. Presumably the district court did not focus on *Dodds* because the government below cited the case on this point a single time in the Background section of its brief at the end of a string-cite. Opp. to Mot. for Preliminary Injunction, R. 48, Page ID # 303; *contra* Doc. 27, at 73 (government now suggesting that *Dodds* is controlling). And presumably the government gave this supposed "controlling precedent" such treatment because the Court's order there merely said that a school district seeking a stay of a preliminary injunction requiring it to let a boy use the girls' restroom had shown only "a possibility of relief" and not "a likelihood of success." 845 F.3d at 221. The order's "analysis" of the merits consisted of a single sentence ("We are not convinced that Highland has made its required showing of a likelihood of success on appeal.") followed by a definition of "gender nonconformity" and a string-cite. *Id.* This analysis does not even mention Title IX, much less address the arguments raised here. Because the order was not "a fully considered appellate ruling on an issue of law"—and indeed acknowledged that the school district had shown "a possibility" of success—it does not control here. *Daunt v. Benson*, 999 F.3d 299, 308 (6th Cir. 2021) (cleaned up); *see, e.g.*, 18B Wright & Miller, *Federal Practice & Procedure* § 4478.5 (3d ed.) ("Rulings—predictions—as to the likely outcome on the merits made for" "an appellate injunction pending appeal" "do not ordinarily establish the law of the case."); *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (similar).

for recognizing reality-based differences between boys and girls. The Department of Education's guidance is unlawful.

## II.    The guidance would nullify Title IX and render its administration absurd.

The Department's lawless effort to conflate sex and gender identity eviscerates Title IX, denying women and girls the legal protection that Congress intended to provide. As the Eleventh Circuit recently explained, if "sex" includes gender identity, then "the various carveouts" for sex-separated activities like living facilities and sports teams "would be rendered meaningless." *Adams*, 2022 WL 18003879, at *15. "[R]eading 'sex' to include 'gender identity'" "would result in situations where an entity would be prohibited from installing or enforcing the otherwise permissible sex-based carve-outs when the carve-outs come into conflict with a transgender person's gender identity"—even though the text of the statute permits *sex*-based carve-outs, not "gender identity"-based ones. *Id.* at *16. Living facilities, locker rooms, bathrooms, and sports teams could no longer be separated based on sex; instead, men could enter women's locker rooms, compete against them in sports, and take their scholarships. *See Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021) ("under Title IX, universities must consider sex in allocating athletic scholarships, 34 C.F.R. § 106.37(c)").

Title IX sensibly recognizes biological realities and protects student privacy. *Cf.* Ruth Bader Ginsburg, The Fear of the Equal Rights Amendment, Wash. Post,

Apr. 7, 1975, at A21 ("Separate places to disrobe, sleep, [and] perform personal bodily functions are permitted, in some situations required, by regard for individual privacy."). The guidance forces schools to allow an invasion of that privacy, to deny women and girls equal educational opportunities, and to ignore biological reality.

Congress also enacted Title IX to provide and protect athletic opportunities for women and girls by allowing sex-segregated athletics. *See* 34 C.F.R. § 106.41(b); *accord Virginia*, 518 U.S. at 551 n.19 (emphasizing "physiological differences between male and female individuals"); *B.P.J.*, 2023 WL 111875, at *9 ("[B]iological males are not similarly situated to biological females for purposes of athletics."). "It takes little imagination to realize that were play and competition not separated by sex, the great bulk of the females would quickly be eliminated from participation and denied any meaningful opportunity for athletic involvement." *Cape v. Tennessee Secondary Sch. Athletic Ass'n*, 563 F.2d 793, 795 (6th Cir. 1977).

Shortly after enacting Title IX, Congress passed the Javits Amendment, instructing the Secretary of Health, Education, and Welfare to publish regulations implementing the provisions of Title IX "which shall include with respect to intercollegiate athletic activities reasonable provisions considering the nature of particular sports." Pub. L. No. 93-380, § 844, 88 Stat. 484, 612 (Aug. 21, 1974). Congress reserved the right to review any regulation following publication to determine whether it was "inconsistent with the Act from which it derives its authority." *Id.*,

§ 509, 88 Stat. at 567 (cleaned up).  The Secretary of Health, Education, and Welfare subsequently published Title IX regulations, including regulatory text identical to the current text of the Department's athletics regulations. *Compare* Nondiscrimination on the Basis of Sex Under Federally Assisted Education Programs and Activities, 40 Fed. Reg. 24128, 24142–43 (1975)*, with* 34 C.F.R. § 106.41. After congressional review, including over six days of hearings, Congress allowed the regulations to go into effect. *See McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 287 (2d Cir. 2004) (laying out the history of the Javits Amendment, and the response from Congress to the regulations promulgated thereunder).

Consequently, the Department's current regulations validly and authoritatively clarify Congress's view of a recipient's non-discrimination duties under Title IX in the case of sex-specific athletic teams. 34 C.F.R. § 106.41 prohibits a recipient from discriminating on the basis of sex with respect to providing athletic programs or activities, permits a recipient to provide sex-segregated teams for competitive activities or contact sports, and obligates a recipient to provide equal athletic opportunity for members of both biological sexes, male and female. Statutory text and regulatory history make it clear that if a recipient chooses to provide "separate teams for members of each sex" under 34 C.F.R. § 106.41(b), then it must separate those teams based only on biological sex, not gender identity.

The new guidance memory holes Title IX's text and history, while denying physical reality for the purpose of opening women's sports to male domination, or simply ending them entirely. *See Clark By & Through Clark v. Arizona Interscholastic Ass'n*, 886 F.2d 1191, 1192 (9th Cir. 1989) (explaining that "males would displace females to a substantial extent if they were allowed to compete for positions on [a sports] team" and "athletic opportunities for women would be diminished"); *Adams*, 2022 WL 18003879, at *20 (Lagoa, J., concurring) ("[A] commingling of the biological sexes in the female athletics arena would significantly undermine the benefits afforded to female student athletes under Title IX[].").

The guidance forecloses equality. For instance, take a biological male who identifies as female, and is entitled under the guidance to play women's soccer (or obtain one of the team's scholarships). His participation necessarily deprives a woman of her opportunity to compete. And it would presumably be impermissible sex discrimination to forbid *another* biological male (regardless of gender identity) from also playing on the women's soccer team, for the school would not have a sex-based interest in maintaining a level playing field. *See* 34 C.F.R. § 106.41(b); *cf. Ward v. Polite*, 667 F.3d 727, 740 (6th Cir. 2012) ("tolerat[ing]" exceptions "severely undermine[s] the university's interest"); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993) ("[A] law cannot be regarded as

protecting an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited." (cleaned up)).

Worse, if Title IX forbids "gender identity" discrimination against "transgender" individuals, those terms' meaning (or lack thereof) will completely erase the statute's protections. The World Professional Association for Transgender Health uses "transgender" to "describe a diverse group of individuals who cross or transcend culturally defined categories of gender." Standards of Care for the Health of Transsexual, Transgender, and Gender-Conforming People 97 (7th version 2012), https://tinyurl.com/2ptzcupz ("WPATH Standards"). It refers to "gender identity" as a "person's intrinsic sense of being" a "boy," "man," "girl," "woman," "boygirl, girlboy, transgender, genderqueer, [or] eunuch." *Id.* at 96. Further confusing the matter is that, according to the American Psychological Association, "some people" "experience their gender identity as fluid." Guidelines for Psychological Practice with Transgender and Gender Nonconforming People, 70 Am. Psychologist 836 (Dec. 2015), https://www.apa.org/practice/guidelines/transgender.pdf.[8]

Likewise, the American Academy of Pediatrics says that being transgender is

---

[8] *See also, e.g.*, Kylin Camburn, 9 young people explain what being non-binary means to them (July 14, 2019), https://www.glaad.org/amp/9-young-people-explain-what-being-non-binary-means-them ("I choose to see my gender as a creature that exists not *because* of me or *for* me, rather, it exists *through* me. I am merely a conduit of expression for the multitude of ways gender takes form. Each day is different.").

not limited to those "whose gender identity does not match their assigned sex," but "also encompasses many other labels individuals may use to refer to themselves" (and "can be fluid, shifting in different contexts"). Jason Rafferty, Policy Statement, Ensuring Comprehensive Care & Support for Transgender & Gender-Diverse Children & Adolescents, 142 Pediatrics no. 4, at 2 (Oct. 2018), https://tinyurl.com/38ans522; *see id.* at 3 ("transgender" is "not [a] diagnos[i]s," but a "personal" and "dynamic way[] of describing one's own gender experience"). The American Academy of Pediatrics suggests the following "explanation" of "gender identity," *id.*—note especially the "Rules":



*The Gender Book*, https://tinyurl.com/bc4pdzcs.

19

If these definitions are imported into Title IX, as the Department of Education seems to demand,[9] the statute loses *all* meaning. Take a male student who "transcends" categories and internally identifies as a transgender eunuch (though fluidly). Rejecting "a male/female binary understanding of gender," he does not "consider [himself] either male or female." WPATH Standards 9. He wishes to use the girls' locker room. Under the Department of Education's guidance, how would a school avoid federal government investigation and a Title IX charge? Parroting *Bostock*, the guidance says that when one "discriminates against a person for being . . . transgender," one "necessarily discriminates against that person for traits or actions it would not have questioned in members of a different sex." 86 Fed. Reg. at 32638 (quoting *Bostock*, 140 S. Ct. at 1737). So has the school discriminated against the transgender eunuch for not letting him use the girls' locker room? It has not treated him differently from other males, but the Department insists that is not good enough. The school has no other transgender eunuchs to compare him to, at least

---

[9] Though the Department's guidance did not bother to define the critical terms "gender identity" or "transgender," other parts of the federal government use broad (and circular) definitions. *See, e.g.*, Terminology, CDC, https://www.cdc.gov/healthyyouth/terminology/sexual-and-gender-identity-terms.htm ("gender identity": "[a]n individual's sense of their self as man, woman, transgender, or something else"); Gender Identity: Key Terminology, Department of Labor, https://www.dol.gov/agencies/oasam/centers-offices/civil-rights-center/internal/policies/gender-identity ("gender identity": "[a] person's internal sense of being male, female, or something else such as agender, binary, gender fluid, gender nonconforming, genderqueer, or nonbinary").

that day, much less a female transgender eunuch ("there are no rules," say the experts!) to play a "change the sex and see what happens" game.

And yet, if the school did not give a student access to the bathroom that he desired that day, but gave it to students with other gender identities, that seems to be enough for a Title IX investigation and violation. If so, Title IX has no meaning. Every program or activity is apparently open on demand to any person "at the moment they verbalize" any gender identity, whatever that identity might mean, regardless of its relation to biological sex, and no matter if it changed from the moment before. *B.P.J.*, 2023 WL 111875, at *8. According to the Department, Title IX demands the same funding for eunuch and genderqueer sports teams as male and female sports teams. All those teams, of course, would be open to anyone who demanded access at any time. Likewise, bathrooms, locker rooms, and living facilities could not be subject to any meaningful rules at all. *See generally Neese v. Becerra*, 2022 WL 16902425, at *8 (N.D. Tex. Nov. 11, 2022) ("If 'on the basis of sex' included 'sexual orientation' and 'gender identity,'" "Title IX and its regulations would be nonsensical.").

\*     \*     \*

The Department's guidance proclaims that its interpretation "is most consistent with the purpose of Title IX, which is to ensure equal opportunity." 86 Fed. Reg. at 32,639. But "[c]hanging how we define 'female' so that it includes

21

individuals of both sexes, and then disallowing any distinctions among them on the basis of sex, is by definition and in effect a rejection of Title IX's equality goals." *Adams*, 2022 WL 18003879, at *21 (Lagoa, J., concurring). The Department's interpretation would make the equality sought by Title IX impossible, leaving women to compete against men, depriving women of scholarships, and invading the privacy of all students. And it would fail to provide comprehensible guidance to the schools and families that need to know how to understand the law when angry activists deny the biological reality that men are not women. The Department's guidance is unlawful.

## CONCLUSION

The Court should affirm the preliminary injunction.

Respectfully submitted,

s/ Christopher Mills

GENE P. HAMILTON
REED D. RUBINSTEIN
NICHOLAS R. BARRY
*America First Legal Foundation*
*300 Independence Ave. SE*
*Washington, D.C. 20003*
*(202) 964-3721*
*gene.hamilton@aflegal.org*
*reed.rubinstein@aflegal.org*
*nicholas.barry@aflegal.org*

CHRISTOPHER MILLS
*Spero Law LLC*
*557 East Bay Street #22251*
*Charleston, SC 29413*
*(843) 606-0640*
*cmills@spero.law*

Counsel for *Amicus Curiae*

JANUARY 31, 2023

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this brief contains 5,300 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

3. This document has been scanned for viruses and is virus-free.

Dated:  January 31, 2023

/s Christopher Mills
Christopher Mills

## CERTIFICATE OF SERVICE

I, Christopher Mills, an attorney, certify that on this day the foregoing Brief was served electronically on all parties via CM/ECF.

Dated:  January 31, 2023

                                        s/ Christopher Mills
                                         Christopher Mills