ARCHIVED AND NOT FOR RELIANCE
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).



UNITED STATES DEPARTMENT OF EDUCATION
OFFICE OF THE GENERAL COUNSEL

Date: January 8, 2021

**MEMORANDUM FOR KIMBERLY M. RICHEY
ACTING ASSISTANT SECRETARY
OF THE OFFICE FOR CIVIL RIGHTS**

*Re: Bostock v. Clayton Cty., 140 S. Ct. 1731 (2020)*

The U.S. Department of Education's (Department) Office for Civil Rights (OCR) enforces Title IX of the Education Amendments of 1972 (Title IX), as amended, 20 U.S.C. § 1681, *et seq*., and its implementing regulations at 34 C.F.R. Part 106, prohibiting discrimination on the basis of sex in any education program or activity receiving Federal financial assistance. You have asked the Office of the General Counsel a series of questions regarding the effect of the Supreme Court's decision in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), with respect to Title IX. Our answers are presented below.

**Question 1:** Does the *Bostock* decision construe Title IX?

**Answer:** No. *Bostock v. Clayton Cty.,* 140 S. Ct. 1731 (2020) construes the prohibition on sex discrimination in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* (Title VII). The Court decided the case narrowly, specifically refusing to extend its holding to Title IX and other differently drafted statutes. *Id.* at 1753. The Department does not have authority to enforce Title VII. Our understanding is OCR occasionally receives cases alleging discrimination filed by employees. OCR's [Case Processing Manual](#) describes OCR's views on its jurisdiction over employment-related complaints.

Title IX, which the Department does have authority to enforce, prohibits sex discrimination in education programs or activities receiving Federal financial assistance. But Title IX text is very different from Title VII text in many important respects. Title IX, for example, contains numerous exceptions authorizing or allowing sex-separate activities and intimate facilities to be provided separately on the basis of biological sex or for members of each biological sex. *Compare* 42 U.S.C. §§ 2000e-1, 2000e-2 *with* 20 U.S.C. §§ 1681(a), 1686. However, Title VII and Title IX both use the term "sex", and it is here *Bostock* may have salience. *Bostock* compels us to interpret a statute in accord with the ordinary public meaning of its terms at the time of its enactment. *Bostock*, 140 S. Ct. at 1738 (citations omitted). And as explained below, specifically in the answer to Question 2, the Department's longstanding construction of the term "sex" in Title IX to mean biological sex, male or female, is the only construction consistent with the ordinary public meaning of "sex" at the time of Title IX's enactment.

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

ARCHIVED AND NOT FOR RELIANCE
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

**Question 2:** Does *Bostock* affect the meaning of "sex" as that term is used in Title IX?

**Answer:** No. *Bostock* does not affect the meaning of "sex" as that term is used in Title IX for at least two reasons. First, as we pointed out in response to Question 1, *Bostock* does not construe Title IX. However, it is worth noting the Court's assumption that the ordinary public meaning of the term "sex" in Title VII means biological distinctions between male and female. *See Bostock*, 140 S. Ct. at 1738–39; *see also* 1784–91 (Appendix A) (Alito, J. dissenting).[1] This is consistent with and further supports the Department's long-standing construction of the term "sex" in Title IX to mean biological sex, male or female.

Second, statutory and regulatory text and structure, contemporaneous Supreme Court authorities, and the Department's historic practice demonstrate that the ordinary public meaning of the term "sex" at the time of Title IX's enactment could *only* have been, as Justice Gorsuch put it, "biological distinctions between male and female." *See* 20 U.S.C. §§ 1681(a), 1686; *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality opinion) ("[S]ex, like race and national origin, is an immutable characteristic determined solely by the accident of birth"); 34 CFR §§ 106.32(b)(1), 106.33, 106.34, 106.40, 106.41, 106.43. 106.52, 106.59, 106.61; *see also Bostock*, 140 S. Ct. at 1739, 1784–91 (Appendix A) (Alito, J. dissenting); *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 684 (1983) ("discrimination based on a woman's pregnancy is, on its face, discrimination because of her sex."); *General Elec. Co v. Gilbert*, 429 U.S. 125, 146, 149 (1976) (Brennan, J. and Marshall, J. dissenting) ("*Geduldig* itself obliges the Court to determine whether the exclusion of a sex-linked disability from the universe of compensable disabilities was actually the product of neutral, persuasive actuarial considerations, or rather stemmed from a policy that purposefully downgraded women's role in the labor force. . . . [T]he Court simply disregards a history of General Electric practices that have served *to undercut the*

---

[1] The Court's assumption that "sex" as used in Title VII means the biological distinctions between male and female drove the reasoning.

> [T]ake an employer who fires a transgender person who was identified as a male at birth but who now identifies as a female. If the employer retains an otherwise identical employee who was identified as female at birth, the employer intentionally penalizes a person identified *as male at birth* for traits or actions that it tolerates in an employee identified *as female at birth*."

140 S. Ct. at 1741 (emphasis added). In other words, a male employee who identifies as female nonetheless remains a biological male. Therefore, when an employer discriminates against such a person for certain "traits or actions" otherwise tolerated in a biological female, *Bostock* holds the employer violated Title VII.

*Bostock* uses a "but for" analysis to determine whether an employee's homosexuality or transgender status is covered by Title VII's bar on sex discrimination. *See Bostock* at 1742. We believe the same "but for" analysis would logically extend to individuals who allege discrimination on the basis that they are heterosexual or non-transgender. Nevertheless, we note no reason to believe the Court's logic necessarily leads to the conclusion that all forms of sexual orientation are covered by Title VII.

ARCHIVED AND NOT FOR RELIANCE
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

*employment opportunities of women who become pregnant while employed.*") (citations and footnote omitted).[2]

As stated in the Preamble to the Title IX Final Rule published on May 19, 2020:

> Title IX and its implementing regulations include provisions that presuppose sex as a binary classification, and provisions in the Department's current regulations . . . reflect this presupposition. For example, 20 U.S.C. 1681(a)(2), which concerns educational institutions commencing planned changes in admissions, refers to ''an institution which admits only students of one sex to being an institution which admits students of both sexes.'' Similarly, 20 U.S.C. 1681(a)(6)(B) refers to ''men's'' and ''women's'' associations as well as organizations for ''boys'' and ''girls'' in the context of organizations ''the membership of which has traditionally been limited to persons of one sex.'' Likewise, 20 U.S.C. 1681(a)(7)(A) refers to ''boys''' and ''girls''' conferences. Title IX does not prohibit an educational institution ''from maintaining separate living facilities for the different sexes'' pursuant to 20 U.S.C. 1686.
>
> . . . .
>
> In promulgating regulations to implement Title IX, the Department expressly acknowledged physiological differences between the male and female sexes. For example, the Department's justification for not allowing schools to use "a single standard of measuring skill or progress in physical education classes . . . [if doing so] has an adverse effect on members of one sex" was that "if progress is measured by determining whether an individual can perform twenty-five push-ups, the standard may be virtually out-of-reach for many more women than men because of the difference in strength between average persons of each sex."

U.S. Dep't of Educ., Office for Civil Rights, Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, Final Rule, 85 Fed. Reg. 30,178 (May 19, 2020).

Additional evidence that the term "sex" and human biology are inextricably linked under Title IX may be found in the Department's regulations expressly prohibiting discrimination related to a student or employee's pregnancy. 34 C.F.R. § 106.40(b)(1). These regulations are valid only because they effectuate Title IX's prohibition against sex discrimination. *See* 20 U.S.C. § 1682. Courts have recognized, quite correctly in our view, that discrimination on the basis of pregnancy constitutes discrimination on the basis of female physiology and is therefore prohibited under Title

---

[2] *Gilbert* and *Newport News* are Title VII cases. *Frontiero* is a due process case. However, all are roughly contemporaneous with the enactment of Title IX and the promulgation of the Department's regulations, and all suggest the ordinary public meaning of "sex" at the time of Title IX's enactment was biological sex, male or female, not transgender status or homosexuality.

ARCHIVED AND NOT FOR RELIANCE
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

IX. *Conley v. Nw. Fla. State College*, 145 F. Supp. 3d 1073, 1077 (N.D. Fl. 2015). Biological males, regardless of transgender status or surgical interventions, are incapable of bearing children.

The Title IX regulations became effective only after direct and extensive Congressional review, including six days of House hearings to determine whether the regulations were "consistent with the law and with the intent of the Congress in enacting the law." *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 531–33 (internal quotation marks omitted). Accordingly, they carry extra weight and interpretative authority. *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001); *Chevron U.S.A., Inc. v. Natural Res. Defense Council, Inc.*, 468 U.S. 837, 842–45 (1984). Additionally, the Title IX statute has been amended repeatedly since the Title IX regulations were adopted, *see, e.g.*, *McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 286–87 (2d Cir. 2004) (discussing amendments made by the Civil Rights Restoration Act of 1987, Pub. L. No. 100-259, § 3(a), 102 Stat. 28, 28–29 (1988)), and although the matter has been the subject of some debate within Congress, Congress has not disturbed these regulations. *See North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 531–35 (1982) ("Where an agency's statutory construction has been 'fully brought to the attention of the public and the Congress, and the latter has not sought to alter that interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned.") (citations and internal quotation marks omitted).

Consequently, based on controlling authorities, we must give effect to the ordinary public meaning at the time of enactment and construe the term "sex" in Title IX to mean biological sex, male or female. Congress has the authority to rewrite Title IX and redefine its terms at any time. To date, however, Congress has chosen not to do so.

**Question 3: How should OCR view allegations that a recipient targets individuals for discriminatory treatment on the basis of a person's transgender status or homosexuality?**

**Answer:** Although *Bostock* expressly does not decide issues arising under Title IX or other differently drafted laws, the logic of *Bostock* may, in some cases, be useful in guiding OCR's understanding as to whether the alleged discrimination on the basis of a person's transgender status or homosexuality necessarily takes into account the person's biological sex and, thus, constitutes discrimination on the basis of sex. Depending on the facts, complaints involving discrimination on the basis of transgender status or homosexuality might fall within the scope of Title IX's non-discrimination mandate because they allege sex discrimination. *See Bostock*, 140 S. Ct. at 1741, 1737 ("Sex plays a necessary and undisguisable role in the decision" to fire an employee because of the employee's homosexual or transgender status).

However, we emphasize that Title IX and its implementing regulations, unlike Title VII, may *require* consideration of a person's biological sex, male or female. 20 U.S.C. §§ 1681(a), 1686; 34 CFR §§ 106.32(b), 106.33, 106.34, 106.40, 106.41, 106.43. 106.52, 106.59, 106.61. Consequently, we believe a recipient generally would not violate Title IX by, for example, recording a student's biological sex in school records, or referring to a student using sex-based pronouns that correspond to the student's biological sex, or refusing to permit a student to participate in a program or activity lawfully provided for members of the opposite sex, regardless of transgender status or homosexuality.

ARCHIVED AND NOT FOR RELIANCE
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

**Question 4: After *Bostock*, how should OCR view allegations of employment discrimination or sexual harassment based on an individual's transgender status or homosexuality?**

**Answer:** We address the employment and harassment aspects of this question separately below.

A.   <u>Employment</u>

In *Bostock*, the Supreme Court considered "whether an employer who fires someone simply for being homosexual or transgender has discharged or otherwise discriminated against that individual 'because of such individual's sex'" under Title VII. *Bostock*, 140 S. Ct. at 1753. Assuming the term "sex" in Title VII means biological sex, male or female, the Supreme Court held: "An employer who fires an individual for being homosexual or transgender fires that person for traits or actions it would not have questioned in members of a different sex. Sex plays a necessary and undisguisable role in the decision, exactly what Title VII forbids." *Id*. at 1737. Title IX also prohibits termination of an employee on the basis of sex, meaning a person's biological sex, male or female. By analogy to *Bostock*, terminating an employee on the basis of the employee's homosexuality or transgender status implicates that employee's sex and, thus, is at least in part discrimination on the basis of the employee's biological sex. An individual employee's sex is "not relevant to the selection, evaluation, or compensation of employees." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 239 (1989) (plurality opinion). Even Title VII, however, recognizes that there are circumstances where an individual's sex is relevant to employment and expressly provides that an employer may consider sex "in those certain instances where . . . sex . . . is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise." 42 U.S.C. § 2000e-2(e)(1). If a person's sex is a bona fide occupational qualification, "such that consideration of sex with regard to such action is essential to successful operation of the employment function concerned," then Title IX and its implementing regulations, like Title VII, would not prohibit discrimination on the basis of sex. 34 C.F.R. § 106.61; *see also* 34 C.F.R. §§ 106.55(c), 106.59.

B.   <u>Sexual Harassment</u>

In the Title IX Final Rule, issued on May 19, 2020, the Department for the first time recognized and defined sexual harassment as a form of sex discrimination with regulations that had the force and effect of law. 85 Fed. Reg. 30,026. Under our regulations, "sexual harassment" means conduct on the basis of sex that satisfies one or more of the following:

(1) An employee of the recipient conditioning the provision of an aid, benefit, or service of the recipient on an individual's participation in unwelcome sexual conduct (hereinafter referred to as "*quid pro quo* sexual harassment");

(2) Unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity; or

ARCHIVED AND NOT FOR RELIANCE
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

(3) "Sexual assault" as defined in 20 U.S.C. § 1092(f)(6)(A)(v), "dating violence" as defined in 34 U.S.C. § 12291(a)(10), "domestic violence" as defined in 34 U.S.C. § 12291(a)(8), or "stalking" as defined in 34 U.S.C. 12291(a)(30).

34 C.F.R. § 106.30(a).

The preamble acknowledged "[a]nyone may experience sexual harassment, irrespective of gender identity or sexual orientation," 85 Fed. Reg. 30,178, and stated the "final regulations focus on prohibited conduct, irrespective of the identity of the complainant and respondent," 85 Fed. Reg. 30,179. Under 34 C.F.R. § 106.30(a), the Department continues to interpret "conduct on the basis of sex" as conduct on the basis of a person's biological sex. Consistent with *Bostock*, harassment on the basis of a person's transgender status or homosexuality may implicate that person's biological sex and, thus, may at least in part constitute "conduct on the basis of sex." Accordingly, unwelcome conduct on the basis of transgender status or homosexuality may, if so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity on the basis of their transgender status or homosexuality, constitute sexual harassment prohibited by Title IX. 34 C.F.R. § 106.30(a).

**Question 5:  How does the Department interpret Title IX and its implementing regulations in light of *Bostock* with respect to athletics, intimate facilities, religious exemptions, and other sex-segregated programs or activities addressed under Title IX and its regulations?**

**Answer:** Our answer to this question is based on three propositions. First, *Bostock* applies only to Title VII. *Compare* 42 U.S.C. § 2000e, *et seq. with* 20 U.S.C. §§ 1681, *et seq.* It does not purport to construe, much less abrogate, Title IX's statutory and regulatory text permitting or requiring biological sex to be taken into account in an educational setting.[3] Second, the ordinary public meaning of "sex" at the time of Title IX's enactment was biological sex, male or female, not transgender status or sexual orientation. Third, the Department's regulations recognizing the male/female biological binary carry extra weight and interpretative authority because they were the product of uniquely robust and direct Congressional review. *Bell*, 456 U.S. at 531–32 (describing Congressional review of regulations implementing Title IX); *see also Mead Corp.*, 533 U.S. at 226–27; *Chevron*, 468 U.S. at 842–45. Consequently, our view is that *Bostock's* holding and reasoning, to the extent relevant, support the Department's position that Title IX's statutory and regulatory provisions permit, and in some cases require, biological sex, male or female, to be taken into account in an education program or activity.[4] *See* 20 U.S.C. §§ 1681(a), 1686; 34 CFR

---

[3] *Bostock* emphasized that general non-discrimination statutes often contain exceptions that override a general duty in some circumstances. *See, e.g.*, 140 S. Ct. at 1754 ("As a result of its deliberations in adopting the law, Congress included an express statutory exception for religious organizations [in Title VII]."). Even under Title VII (concerning workplace discrimination), the *Bostock* Court expressly left open the issue of sex-segregated facilities and policies.

[4] This Memorandum does not presume to exhaust the ways recipients may lawfully consider sex under Title IX in their programs and activities, and there may be circumstances not addressed by this document under which a recipient's consideration of sex does not constitute unlawful discrimination under Title IX.

ARCHIVED AND NOT FOR RELIANCE
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

§§ 106.32(b)(1), 106.33, 106.34, 106.40, 106.41, 106.43. 106.52, 106.59, 106.61; *see also Brown & Williamson Tobacco Corp.*, 529 U.S. at 133; *Yates*, 574 U.S. at 537-38; *Davis*, 489 U.S. at 809.

A.   Athletics

We believe the ordinary public meaning of controlling statutory and regulatory text requires a recipient providing separate athletic teams to separate participants solely based on their biological sex, male or female, and not based on transgender status or homosexuality, to comply with Title IX.

Under Title IX and its regulations, a person's biological sex *is* relevant for the considerations involving athletics, and distinctions based thereon are permissible and may be required because the sexes are not similarly situated. 34 CFR § 106.41. Biological females and biological males are different in ways that are relevant to athletics because of physiological differences between males and females. *See United States v. Virginia*, 518 U.S. 515, 533 (1996) ("Physical differences between men and women, however, are enduring."); *Frontiero*, 411 U.S. at 686 (plurality opinion) ("[S]ex, like race and national origin, is an immutable characteristic determined solely by the accident of birth"). Accordingly, schools must consider students' biological sex when determining whether male and female student athletes have equal opportunities to participate. *See McCormick*, 370 F.3d at 287 ("[I]dentical scheduling for boys and girls is not required. Rather, compliance is assessed by first determining whether a difference in scheduling has a negative impact on one sex, and then determining whether that disparity is substantial enough to deny members of that sex equality of athletic opportunity."); *Clark v. Ariz. Interscholastic Ass'n*, 886 F.2d 1191, 1192 (9th Cir. 1989) (quoting *Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126, 1131 (9th Cir. 1982) ("The record makes clear that due to average physiological differences, males would displace females to a substantial extent if they were allowed to compete for positions on the volleyball team. Thus, athletic opportunities for women would be diminished")).

*Bostock* does not diminish the relevance of biological sex in athletics, and does not address the validity of the Department's historic measures to ensure biological females (girls and women) have equal opportunities to participate in athletics because males and females are not similarly situated with respect to athletic competition.[5] Unlike Title VII, one of Title IX's crucial purposes is protecting women's and girls' athletic opportunities. Indeed, Title IX was enacted, and its regulations promulgated, to prohibit discrimination on the basis of sex in education programs and activities and to protect equal athletic opportunities for students who are biological females, including by providing for sex-segregated athletics.

The fact is, Congress specifically mandated that the Department consider promulgating regulations to address sports. After first enacting Title IX, Congress subsequently passed another

---

[5] Although the Department does not address Equal Protection Clause claims regarding separate athletic teams for biological females and biological males, the Department's position on such claims is stated in its Brief for the United States as Amicus Curiae Supporting Appellants and Urging Reversal in *Hecox v. Little*, Nos. 20-35813, 20-35815, U.S. Court of Appeals for the Ninth Circuit (filed Nov. 19, 2020).

ARCHIVED AND NOT FOR RELIANCE
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

statute, entitled the Javits Amendment, instructing the Secretary of Health, Education, and Welfare to publish regulations "implementing the provisions of Title IX . . . which shall include with respect to intercollegiate activities reasonable provisions considering the nature of the particular sports." Public Law 93–380 (HR 69), § 844, 88 Stat 484, 612 (August 21, 1974). Congress reserved the right to review the regulations following publication to determine whether they were "inconsistent with the Act from which [they] derive[] [their] authority." *Id*.

The Secretary of Health, Education, and Welfare subsequently published Title IX regulations, including regulatory text identical to the current text of the Department's athletics regulations. *Compare* Nondiscrimination on the Basis of Sex Under Federally Assisted Education Programs and Activities, 40 Fed. Reg. 24,128, 21,142–43 (June 4, 1975) (promulgating § 86.41 Athletics) *with* 34 C.F.R. § 106.41. After Congressional review, including over six days of hearings, Congress allowed the regulations to go into effect. *See McCormick*, 370 F.3d at 287 (laying out the history of the Javits Amendment, and the response from Congress to the regulations promulgated thereunder). Consequently, the regulations validly and authoritatively clarify the scope of a recipient's non-discrimination duties under Title IX in the case of sex-specific athletic teams. *See Cohen v. Brown Univ.*, 991 F.2d 888, 895 (1st Cir. 1993) ("The degree of deference [to the Department of Education] is particularly high in Title IX cases because Congress explicitly delegated to the agency the task of prescribing standards for athletic programs under Title IX.").

34 C.F.R. § 106.41 prohibits a recipient from discriminating on the basis of sex with respect to providing athletic programs or activities, permits a recipient to provide sex-segregated teams for competitive activities or contact sports, and obligates a recipient to provide equal athletic opportunity for members of both sexes.[6] As it has for over forty years, the Department must interpret 34 C.F.R. § 106.41(b), regarding operation of athletic teams "for members of *each sex*," and 34 C.F.R. § 106.41(c), regarding equal athletic opportunity for "members of *both sexes*" (emphasis added), to mean operation of teams and equal opportunity for biological males, and for biological females. Based on statutory text and regulatory history, it seems clear that if a recipient chooses to provide "separate teams for members of each sex" under 34 C.F.R. § 106.41(b), then it must separate those teams solely on the basis of biological sex, male or female, and not on the basis of transgender status or sexual orientation, to comply with Title IX.[7]

---

[6] Specifically, 34 C.F.R. § 106.41(a) provides a general rule that recipients shall not provide athletics separately based on sex. However, 34 C.F.R. § 106.41(b) permits a recipient to operate or sponsor separate teams for members of each sex where selection for the teams is based on competitive skill, or the activity is a contact sport, and also provides that where a recipient operates or sponsors a team in a particular sport for members of one sex with no such team for members of the opposite sex, then members of the excluded sex must be allowed to try out for the team unless it is for a contact sport. Finally, 34 C.F.R. § 106.41(c) obligates a recipient to provide "equal athletic opportunity for members of both sexes" by taking into account specified factors in deciding what athletic programs to offer.

[7] Different treatment based on transgender status or homosexuality would generally constitute unlawful sex discrimination because students who do not identify as transgender or homosexual cannot generally be treated worse than students who identify as transgender or homosexual. *See*

ARCHIVED AND NOT FOR RELIANCE
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

B.   Intimate Facilities

As discussed above, the ordinary public meaning of the term "sex" at the time of Title IX's enactment was biological sex, male or female. That too was the meaning given to the term when it was used in the Department's implementing regulations approved by Congress. *See, e.g.*, *Bell*, 456 U.S. at 531–32; 34 CFR §§ 106.32(b)(1), 106.33, 106.34, 106.40, 106.41, 106.43. 106.52, 106.59, 106.61. 34 C.F.R. § 106.33 permits schools to provide separate bathrooms, locker rooms, and showers "on the basis of sex," as long as the school provides comparable facilities for "each sex." Therefore, we believe the plain ordinary public meaning of the controlling statutory and regulatory text requires a recipient providing "separate toilet, locker room, and shower facilities on the basis of sex" to regulate access based on biological sex.

Our opinion is contrary to the holding of a divided panel of the Fourth Circuit Court of Appeals in *Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir. 2020). There, the court held denying a biological female who identified as a male access to intimate facilities reserved for males violated Title IX and acknowledged that "*Bostock* expressly does not answer this 'sex-separated restroom' question." *Id*. at 618 (citing *Bostock* 140 S. Ct. at 1753). The court's analysis of 34 C.F.R. § 106.33, in its entirety, was:

> [T]he Board emphasizes a Department of Education implementing regulation, 34 C.F.R. § 106.33, which interprets Title IX to allow for "separate toilet, locker room, and shower facilities on the basis of sex," so long as they are "comparable" to each other. But Grimm does not challenge sex-separated restrooms; he challenges the Board's discriminatory exclusion of himself from the sex-separated restroom matching his gender identity. And the implementing regulation cannot override the statutory prohibition against *discrimination* on the basis of sex. All it suggests is that the act of creating sex-separated restrooms in and of itself is not discriminatory—not that, in applying bathroom policies to students like Grimm, the Board may rely on its own discriminatory notions of what "sex" means.
>
> As explained above, Grimm consistently and persistently identified as male. He had been clinically diagnosed with gender dysphoria, and his treatment provider identified using the boys restrooms as part of the appropriate treatment. Rather than contend with Grimm's serious medical need, the Board relied on its own invented classification, "biological gender," for which it turned to the sex on his birth certificate. And even when Grimm provided the school with his amended birth certificate, the Board *still* denied him access to the boys restrooms. For these reasons, we hold that the Board's application of its restroom policy against Grimm violated Title IX.

*Id.* at 618–19 (citations omitted) (emphasis in original).

---

*Bostock*, 140 S. Ct. at 1747. ("But, as we've seen, discrimination based on homosexuality or transgender status necessarily entails discrimination based on sex; the first cannot happen without the second.")

ARCHIVED AND NOT FOR RELIANCE
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

Our opinion is also contrary to a divided Eleventh Circuit panel decision, *Adams by and through Kasper v. School Board of St. Johns County*, 968 F. 3d 1286 (11th Cir. 2020). There, the court also held that denying a biological female who identified as a male access to intimate facilities reserved for males violated Title IX. Specifically:

> The School Board believes 34 C.F.R. § 106.33 of the Title IX implementing regulations forecloses Mr. Adams's discrimination claim. Section 106.33 reads:
>
>> A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex.
>
> The School Board argues that the use of the term "sex" in this regulation clearly means "biological sex," or sex assigned at birth. Thus, it asserts that dividing restrooms by sex assigned at birth—requiring transgender boys to use the girls' restroom and transgender girls to use the boys' restroom—cannot be discriminatory under Title IX. The Board considers Mr. Adams a "biological female," and it seeks to exclude him from the boys' restroom on this basis. But Mr. Adams's discrimination claim does not contradict the implementing regulations for two reasons. First, Mr. Adams is not challenging § 106.33's provision of separate restrooms for girls and boys. He is simply seeking access to the boys' restroom as a transgender boy. And second, the regulation does not mandate how to determine a transgender student's "sex." Thus, we perceive no conflict between the text of § 106.33 and Mr. Adams's successful claim of discrimination.

*Id*. at 1308. The court reasoned that Title IX and its accompanying regulations contain no definition of the term "sex" and "the plain language of the regulation sheds no light on whether Mr. Adams's 'sex' is female as assigned at his birth or whether his 'sex' is male as it reads on his driver's license and his birth certificate." *Id.* at 1310. It explicitly rejected the argument which *Bostock* relied upon, reading the term "sex" to mean "biological sex" and not transgender status. And it concluded the traditional understanding of biological sex to be "narrow" and "unworkable." *Id.*

We are unpersuaded by the Title IX analysis in both *Adams* and *Grimm* for at least three reasons. First, as described above in response to Question 3, we believe, based on our review of the statutory text, regulatory history, and cited authorities, that the ordinary public meaning of the term "sex" at the time of Title IX's enactment was biological sex, male or female. The notion that "because neither Title IX nor the regulation define 'sex' or 'on the basis of sex,' the statute and regulation cannot be presumed to mean 'biological sex'" is at odds with controlling interpretative canons. *Compare Bostock*, 140 S. Ct. at 1738 *with Adams*, 968 F. 3d at 1310. And if the terms "sex" and "on the basis of sex" are truly ambiguous, then the Department's longstanding construction, reflected in the implementing regulations and reaffirmed in the Title IX Final Rule is entitled to deference and is for now controlling.

ARCHIVED AND NOT FOR RELIANCE
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

Second, *Adams* and *Grimm* failed to rigorously analyze Title IX's plain text, *compare Bostock,* 140 S. Ct. at 1738–1743, or to fairly address the legal consequence of the Department's unique implementing regulations, *see Bell*, 456 U.S. at 531–32. In *Adams*, for example, the majority variously argued *Bostock* does not endorse reading the term "sex" to mean "biological sex"; Title IX and its regulations do not define "sex"; and the traditional understanding of biological sex is "narrow and unworkable." *Adams,* 968 F. 3d at 1310. In *Grimm*, the court asserted "the implementing regulation cannot override the statutory prohibition against *discrimination* on the basis of sex," arguing the act of creating sex-separated restrooms in and of itself is not discriminatory but relying on "discriminatory notions of what 'sex' means" is unlawful. *Grimm*, 972 F.3d at 618 (footnote omitted). Both panels assuredly should have engaged in the textual analysis mandated by controlling Supreme Court authorities, *see New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 538–39 (2019), determined the term's ordinary public meaning at the time of enactment, and addressed the interplay of the entire statutory and regulatory text.[8]

Third, the Department issued its Title IX regulation on May 19, 2020 stating, "Title IX and its implementing regulations include provisions that presuppose sex as a binary classification, and provisions in the Department's current regulations . . . reflect this presupposition." 85 Fed. Reg. 30,178. "In promulgating regulations to implement Title IX, the Department expressly acknowledged physiological differences between the male and female sexes." *Id*. *Adams* and *Grimm* were decided more than two months after publication of the Title IX rule and its interpretative preamble. Yet neither discussed the Department's interpretation. As *Adams* suggests, the Department's views on the meaning of "sex" in Title IX should have been given deference, or, at a minimum, addressed in the panel decisions, particularly because the statutory and regulatory definition of "sex," or supposed lack thereof, was purportedly critical to the outcome in both cases. *See Adams*, 968 F.3d at 1310 (citing *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019)); *Chevron,* 467 U.S. at 842–44.

---

[8]For example, *Grimm's* panel reasoned:

> In the Title IX context, discrimination "mean[s] treating that individual worse than others who are similarly situated." In light of our equal protection discussion above, this should sound familiar: Grimm was treated worse than students with whom he was similarly situated because he alone could not use the restroom corresponding with his gender. Unlike the other boys, he had to use either the girls restroom or a single-stall option. In that sense, he was treated worse than similarly situated students.

*Grimm*, 972 F.3d at 618. However, Grimm was not treated "worse than similarly situated students" because under the Department's regulations the proper comparator should have been biological females not biological males.

ARCHIVED AND NOT FOR RELIANCE
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

C. <u>Religious Exemptions</u>

The holding in *Bostock* does not affect the statutory exemption from Title IX, 20 U.S.C. § 1681(a)(3), and its implementing regulations, 34 C.F.R. § 106.12, for an educational institution controlled by a religious organization. *Maxon, et al. v. Fuller Theological Seminary*, No. 2:19-cv-09969 (C.D. Cal. Oct. 7, 2020), *appeal docketed*, No. 20-56156 (9th Cir. Nov. 4, 2020). For example, *Bostock* acknowledged the express statutory exception in Title VII for religious organizations and expressed "deep[] concern[] with preserving the promise of the free exercise of religion enshrined in our Constitution[.]" *Bostock*, 140 S. Ct. at 1753–54. Thus, the Court "recognized that the First Amendment can bar the application of employment discrimination laws[.]" *Id*. at 1754 (citing *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171, 188 (2012)). Accordingly, the Department's regulations implementing Title IX do not and lawfully could not require a recipient to restrict "any rights that would otherwise be protected from government action by the First Amendment of the U.S. Constitution," including the free exercise of religion. 34 C.F.R. § 106.6(d)(1).

Additionally, the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. § 2000bb, *et seq*., "operates as a kind of super statute, displacing the normal operation of other federal laws [] [such that] it might supersede Title VII's commands in appropriate cases." *Bostock*, 140 S. Ct. at 1753–54. The Department also acknowledges that RFRA operates as a super statute that might supersede Title IX's commands in appropriate cases. Office of the General Counsel, U.S. Dep't of Educ., Guidance Regarding Department of Education Grants and Executive Order 13798, 85 Fed. Reg. 61,736, 61,738–39 (Sept. 30, 2020) ("Congress expressly applied RFRA to all Federal law, statutory or otherwise, whether adopted before or after its enactment. RFRA therefore applies to all laws governing ED programs, including but not limited to nondiscrimination laws such as Title IX") (footnotes omitted). Although OCR does not have jurisdiction over complaints lodged under RFRA, schools and individuals may inform the Department of a burden or potential burden under RFRA, using the process provided in the Department's Guidance Regarding Department of Education Grants and Executive Order 13798, [here](#).

D. <u>Other Sex-Segregated Programs or Activities Addressed Under Title IX and its Regulations</u>

Title IX and its implementing regulations address other circumstances under which it is permissible to provide education programs or activities based on distinctions between the two biological sexes. Examples include, but are not limited to, the following:

- The admissions policies of any public institution of undergraduate higher education that traditionally and continually from its establishment has had a policy of admitting only students of one sex. 20 U.S.C. § 1681(a)(5).
- The membership practices of certain organizations such as a social fraternity or social sorority whose members are primarily students at an institution of higher education. 20 U.S.C. § 1681(a)(6)(A).

ARCHIVED AND NOT FOR RELIANCE
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

- Organizations such as the Girl Scouts whose membership "has traditionally been limited to persons of one sex and principally to persons of less than nineteen years of age." 20 U.S.C. § 1681(a)(6)(B).
- Separate mother-daughter and father-son activities. 20 U.S.C. § 1681(a)(8).
- A school's decision to provide separate housing for members of each sex. 20 U.S.C. § 1686.
- A recipient's decision to provide single-sex classes, extracurricular activities, or schools subject to specific regulatory requirements on the basis of sex. 34 C.F.R. § 106.34(b)-(c).
- A recipient's decision to separate students in physical education classes involving contact sports based on each student's sex, or to conduct separate sessions in human sexuality classes for students of each sex. 34 C.F.R. § 106.34(a)(1), (a)(3).

For the reasons discussed in response to Questions 2, 3, 5(A), and 5(B), the term "sex" with respect to these and other similar programs or activities should be construed to mean biological sex, male or female.

Please contact us if we may be of further assistance.
.
U.S. DEPARTMENT OF EDUCATION
THE OFFICE OF THE GENERAL COUNSEL

Reed Rubinstein
Digitally signed by Reed Rubinstein
Date: 2021.01.08 14:28:38 -05'00'

Reed D. Rubinstein,
Principal Deputy General Counsel delegated
 the authority and duties of the General Counsel