Case No. 22-5807

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

STATE OF TENNESSEE, ET AL.,

*Plaintiffs – Appellees,*

AND

ASSOCIATION OF CHRISTIAN SCHOOLS INTERNATIONAL, ET AL.,

*Intervenors – Appellees*

v.

DEPARTMENT OF EDUCATION, ET AL.,

*Defendants – Appellants.*

On Appeal from the United States District Court
for the Eastern District of Tennessee, No. 3:21-cv-00308 (Atchley, J.)

## BRIEF OF AMICUS CURIAE SOUTHEASTERN LEGAL FOUNDATION IN SUPPORT OF PLAINTIFFS-APPELLEES AND INTERVENORS-APPELLEES AND AFFIRMANCE

Kimberly S. Hermann
Braden H. Boucek
Celia Howard O'Leary
  *Counsel of Record*
SOUTHEASTERN LEGAL FOUNDATION
560 W. Crossville Rd., Ste. 104
Roswell, GA 30075
(770) 977-2131
khermann@southeasternlegal.org
bboucek@southeasternlegal.org
coleary@southeasternlegal.org

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, Amicus Southeastern Legal Foundation (SLF) is a Georgia nonprofit corporation. Amicus does not have any parent companies, subsidiaries, or affiliates. Amicus does not issue shares to the public; no publicly traded corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ....................................................... ii

TABLE OF AUTHORITIES ................................................................. iv

IDENTITY AND INTEREST OF AMICUS CURIAE............................................1

SUMMARY OF ARGUMENT ...............................................................1

ARGUMENT ..............................................................................2

I.    Without a preliminary injunction, the Department's guidance documents violate students' and teachers' freedom of speech...........................................2

    A. The guidance documents are unconstitutionally vague and overbroad. .......4

    B. Through the guidance documents, the Department discriminates against certain views while compelling students and teachers to adopt its own views. ..................................................................................7

    C. The guidance documents impose a chilling effect on teachers and students. ..................................................................................8

II.   Denying pre-enforcement standing to Appellees would gut an important procedural safeguard that protects constitutional rights, especially freedom of speech. ..............................................................................12

CONCLUSION ...........................................................................15

CERTIFICATE OF COMPLIANCE....................................................16

CERTIFICATE OF SERVICE .............................................................17

# TABLE OF AUTHORITIES

**Cases**

*Babbitt v. UFW Nat'l Union*, 442 U.S. 289 (1979) ....................................13

*Boos v. Barry*, 485 U.S. 312 (1988)...........................................................7

*Bostock v. Clayton County*, 140 S. Ct. 1731 (2020) ...............................2, 3

*Connally v. General Constr. Co.*, 269 U.S. 385 (1926) ............................4

*Doe v. Bolton*, 410 U.S. 179 (1973)..........................................................12

*Healy v. James*, 408 U.S. 169 (1972) .....................................................2, 4

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) .......................13

*Hurley v. Irish-Am. Gay, Lesbian, and Bisexual Grp. of Boston, Inc.*, 515 U.S. 557 (1995) .......................................................................................................7

*Keyishian v. Bd. of Regents*, 385 U.S. 589 (1967)....................................1

*Matal v. Tam*, 137 S. Ct. 1744 (2017) ......................................................6

*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021) ...............................8

*Papish v. Board of Curators of Univ. of Mo.*, 410 U.S. 667 (1973)...................7, 12

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37 (1983)...................7

*Rosenberger v. Rector & Visitors of U. of Va.*, 515 U.S. 819 (1995) ..................7, 9

*Speech First, Inc. v. Schlissel*, 939 F.3d 756 (6th Cir. 2019) ...................9

*Steffel v. Thompson*, 415 U.S. 452 (1974) ...............................................12

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014)........................13

*Texas* v. *Johnson*, 491 U.S. 397 (1989) ...................................................6

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) .......................2

*Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392–93 (1988) .........................12

*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) ....................................7

**Other Authorities**

College Pulse, et al., *2021 College Free Speech Rankings: What's the Climate for Free Speech on America's College Campuses?* ....................................................9

Knight Foundation, *College Students Support the First Amendment, but Some Favor Diversity and Inclusion Over Protecting the Extremes of Free Speech* (May 13, 2019) ..........................................................................................................9

Press Release, Alliance Defending Freedom, *Virginia Teacher Placed on Leave for Engaging in Free Speech at Public Meeting* (May 28, 2021)............................11

Press Release, Foundation for Individual Rights and Expression, *Punished for Not Using a Student's Preferred Pronouns, Theater Professor Sues* (Sept. 8, 2022) ....................................................................................................................11

Press Release, Wisconsin Institute for Law and Liberty, *WILL to Kiel Schools: Drop Title IX Complaint, Investigation of Eighth Graders for Using "Incorrect Pronouns"* ......................................................................................................11

**Regulations**

34 C.F.R. § 106.30(a)...............................................................................................10

34 C.F.R. § 106.44(a)...............................................................................................10

86 Fed. Reg. 32,637 (June 22, 2021) .......................................................................4

## IDENTITY AND INTEREST OF AMICUS CURIAE[1]

Southeastern Legal Foundation (SLF), founded in 1976, is a national, nonprofit legal organization dedicated to defending liberty and Rebuilding the American Republic®. This case concerns Amicus because SLF has an abiding interest in the protection of our constitutional freedoms and civil liberties. This is especially true when the federal government alters longstanding legal precedent and suppresses free speech on public issues in colleges and K-12 schools.

## SUMMARY OF ARGUMENT

Civil rights laws like Title IX of the Education Amendments Act of 1972 ensure equal opportunity for all students regardless of sex, race, or other protected classifications. These laws represent years of hard-fought battles to ensure that every American is treated equally, as enshrined in our Constitution and Declaration of Independence. And just as equal treatment furthers the ideals of our nation's founding, so does open discourse. A college campus is the "marketplace of ideas" where students are exposed "to that robust exchange of ideas which discovers truth." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967). Likewise, K-12 students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506

---

[1] Pursuant to Fed. R. App. P. 29, all parties consented to the filing of this brief and no one other than amicus and their counsel wrote any part of this brief or paid for its preparation or submission.

(1969). Freedom of speech and academic inquiry are "vital," because only through thoughtful debate and discourse can real education occur. *Healy v. James*, 408 U.S. 169, 180 (1972).

Yet the Department of Education's ("Department") Title IX guidance documents do away with freedom of expression while reversing years of progress toward true equality. In one fell swoop, the Department imposes a nationwide orthodoxy on all students, teachers, and schools receiving federal funding. Worse, the Department asserts that the Plaintiff States and Intervenors (collectively, "Appellees") must wait to assert their constitutional rights until the government has punished them. Such a holding would leave individuals powerless to stop an unconstitutional government action as it imminently approaches, and it would particularly undermine the procedural safeguards in place to protect students' and teachers' freedom of speech.

## ARGUMENT

### I.    Without a preliminary injunction, the Department's guidance documents violate students' and teachers' freedom of speech.

On the day he took office, President Biden issued an executive order unilaterally extending the Supreme Court's reasoning in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), to Title IX. Br. of Pls.-Appellees at 8. In *Bostock*, the Supreme Court held that employers could not take adverse action against their employees just because they were transgender or homosexual. 140 S. Ct. at 1737.

But the Court made it plain that its decision did *not* reach other antidiscrimination laws, like Title IX. *See id*. at 1753 ("The employers worry that our decision will sweep beyond Title VII to other federal or state laws that prohibit sex discrimination. . . . But none of these other laws are before us[.] . . . The only question before us is whether an employer who fires someone simply for being homosexual or transgender has discharged or otherwise discriminated against that individual "because of such individual's sex."). Undeterred, President Biden ignored the Court's ruling and instructed the Department of Education to produce guidance documents implementing *Bostock* in schools and extracurricular programs.

Soon after, the Department of Education issued a Notice of Interpretation ("Interpretation") and a letter to educators with a fact sheet explaining the Interpretation (collectively, "Fact Sheet"). Br. of Pls.-Appellees at 8-9. The guidance documents make it clear that the Biden administration will not tolerate certain views on gender identity and sexual orientation, and that it will even compel individuals to affirm its policy mandates. At the same time, much of the language the Department uses is vague and overbroad. Without an injunction, the Department will move forward with implementing these guidance documents—chilling speech and forcing conformity along the way.

**A. The guidance documents are unconstitutionally vague and overbroad.**

The Department's guidance documents are unconstitutionally vague and overbroad. A law or policy is unconstitutionally vague when "men of common intelligence must necessarily guess at its meaning[.]" *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926). Vague and overbroad policies are especially dangerous when individuals must hazard guesses about whether their speech is punishable. Students, teachers, and even government entities like schools and states cannot be expected to comply with a vague federal policy when they have no way of knowing exactly what is required or prohibited. *See Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

First, the Department's Interpretation states that Title IX "encompass[es] discrimination based on sexual orientation and gender identity" and that the Department's Office of Civil Rights ("OCR") will investigate "allegations of individuals being harassed, disciplined in a discriminatory manner, excluded, denied equal access to, or subjected to sex stereotyping[.]" 86 Fed. Reg. 32,637 (June 22, 2021). It adds in the Fact Sheet, "Many students face bullying, harassment, and discrimination based on sex stereotypes and assumptions about what it means to be a boy or a girl," and it states that schools have a duty to redress claims of harassment. R.1-4, Page ID # 73.

4

Not once does the Department define "harassment," "bullying," "stereotypes," or "assumptions" in its guiding documents. Instead, it peppers its Fact Sheet with examples of what counts as harassment: students refusing to use a transgender student's preferred pronouns; a professor failing to promptly notify a college about potential harassment; a teacher refusing to recognize that there are more than two genders; and school officials preventing a biological male from using the girls' restroom or participating on the girls' cheerleading squad. *Id*. The Department's lack of adequate definitions will leave schools wondering how to implement the guidance, and it forces students and teachers to hazard guesses about what would subject them to potential investigations and even punishment.

The Department's guidance is also overbroad because it sweeps protected speech under its purview. In a related Title VII guidance document, the Biden administration explains that the "use of pronouns or names that are inconsistent with an individual's gender identity" could be harassment. R. 1-5, Page ID # 82.[2] The Title IX Fact Sheet underscores this position by warning against refusing to use

---

[2] As Plaintiffs-Appellees note, the U.S. District Court for the Northern District of Texas enjoined this guidance document, and the Department did not appeal that decision. *See* Br. of Pls.-Appellees at 2, 6. But the document is still useful because it evinces the Biden administration's determination to push *Bostock* beyond its practical limits. Although the Supreme Court expressly declared that its holding in *Bostock* did *not* extend beyond hiring and firing under Title VII, the Biden administration unilaterally extended it to Title IX.

they/them pronouns or otherwise failing to recognize dozens of genders. R. 1-4, Page ID # 73.

Together with the Department's broad ban on bullying, stereotyping, and making assumptions about gender under Title IX, offensive speech—or speech that individuals *perceive* to be offensive—will no longer be tolerated in colleges or K-12 schools. That could include expressing one's belief that there are only two genders, stating that marriage should be between one man and one woman, misgendering another student, or even expressing concerns about sharing facilities with students of a different biological sex. Broad bans on offensive speech are plainly unconstitutional. *See, e.g.*, *Texas* v. *Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."); *Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017) ("Giving offense is a viewpoint.").

Without clear guidelines and definitions, the Department's documents will leave individuals and entities wondering whether constitutionally protected speech will trigger a Title IX investigation and discipline. Such vagueness and overbreadth violate the First Amendment.

**B. Through the guidance documents, the Department discriminates against certain views while compelling students and teachers to adopt its own views.**

"If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). The government can never promote or discourage speech based on a speaker's message or motivating ideology, nor can it command individuals to affirm beliefs they do not hold. *See id.*; *Hurley v. Irish-Am. Gay, Lesbian, and Bisexual Grp. of Boston, Inc.*, 515 U.S. 557, 579 (1995) ("While the law is free to promote all sorts of conduct in place of harmful behavior, it is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government."); *Rosenberger v. Rector & Visitors of U. of Va.*, 515 U.S. 819, 828 (1995) ("It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys."); *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37 (1983); *Boos v. Barry*, 485 U.S. 312, 319 (1988); *Papish v. Board of Curators of Univ. of Mo.*, 410 U.S. 667, 670 (1973).

Yet the Department's Title IX guidance documents do exactly that. Although the Department fails to use clear language to define terms like "bullying" and

"stereotypes," its Fact Sheet makes it abundantly clear that the federal government will not tolerate the beliefs that there are only two genders, that marriage should be between one man and one woman, or that there are fundamental differences between biological males and females. *See* R. 1-4, Page ID # 73. By conflating these beliefs with so-called harassment, the Department casts a pall of orthodoxy on every teacher, every student, and every school across America. Now, teachers, students, and schools will have a choice to make: either accept and affirm the Biden administration's views on gender, or risk being labeled a bully, facing discipline, and losing federal funding. *See Meriwether v. Hartop*, 992 F.3d 492, 517 (6th Cir. 2021) (finding unconstitutional coercion where a university presented a professor with a "Hobson's Choice" of affirming a student's preferred pronouns contrary to his sincerely held beliefs or facing punishment).

## C. The guidance documents impose a chilling effect on teachers and students.

These days, cancel culture is all too prevalent. One only need say something that could be perceived in a remotely offensive way, and she is shouted down, unfollowed on social media, threatened, and even fired from work or expelled from school. Unfortunately, nowhere is cancel culture more visible than on school grounds. Studies show that censorship on college campuses is at an all-time high. *See* College Pulse, et al., *2021 College Free Speech Rankings: What's the Climate*

*for Free Speech on America's College Campuses?*[3]; Knight Foundation, *College Students Support the First Amendment, but Some Favor Diversity and Inclusion Over Protecting the Extremes of Free Speech* (May 13, 2019).[4] The Biden Administration's Title IX guidance documents only exacerbate this problem.

A chilling effect exists when a speaker objectively fears that speaking will result in discipline and thus censors his speech altogether. The Supreme Court repeatedly writes that the danger of chilling speech "is especially real in the University setting, where the State acts against a background and tradition of thought and experiment that is at the center of our intellectual and philosophic tradition." *Rosenberger*, 515 U.S. at 835. Any action taken by government authorities that has a chilling effect on speech is unconstitutional. *Id.* And even when a government official lacks the authority to impose discipline, the mere appearance of authority is enough to objectively chill and censor speech. *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 764-65 (6th Cir. 2019). This is especially true when schools rely on reporting systems, through which students can report their peers for any perceived instances of harassment. *Id.* at 765.

---

[3] https://reports.collegepulse.com/college-freespeech-rankings-2021.

[4] https://knightfoundation.org/press/releases/college-students-support-first-amendment-some-favor-diversity-and-inclusion-new-knight-report/.

The Department's Title IX Fact Sheet urges students to file complaints any time they feel offended. R. 1-4, Page ID # 73. It also suggests that teachers *must* report speech or conduct that appears to be offensive. *Id*. at Page ID # 74 (listing a professor's failure to report potential harassment as an example of an incident OCR can investigate). Whereas the current rule only obligates *schools* to remedy discrimination when they have *actual* knowledge of harm, the Department's Fact Sheet suggests that *teachers* must report anything that *could* be considered discriminatory. *Compare id*. *with* 34 C.F.R. §§ 106.30(a), 106.44(a) (2020). Together with the vague language in the guidance documents, that means teachers must report anything that could be considered offensive.

Thus, if students approach a coach with concerns about competing against members of another sex, the coach must notify the school. The school then must either investigate and discipline the students or risk losing federal funding. Likewise, a teacher who overhears a joke between friends must report it, even if neither friend took offense. Not only will this impose significant costs on schools as they develop more resources, training sessions, and reporting forms to meet this requirement, but it will also impose a chilling effect on teachers and students.

Moreover, the consequences of being reported for harassment can be devastating. The proposed rule will force students to hazard guesses about what could offend their peers. In today's climate, that could mean anything. Rather than

10

risk being reported to school authorities for their expression and facing discipline, students will choose to self-censor. Teachers, too, will have the difficult choice of either falling in line with the Biden administration's policy preferences or risking their jobs. And these consequences have already begun, with professors and students having nowhere to turn but the courts for redress. *See* Press Release, Alliance Defending Freedom, *Virginia Teacher Placed on Leave for Engaging in Free Speech at Public Meeting* (May 28, 2021)[5]; Press Release, Wisconsin Institute for Law and Liberty, *WILL to Kiel Schools: Drop Title IX Complaint, Investigation of Eighth Graders for Using "Incorrect Pronouns"*[6]; Press Release, Foundation for Individual Rights and Expression, *Punished for Not Using a Student's Preferred Pronouns, Theater Professor Sues* (Sept. 8, 2022).[7] This forced censorship is unconstitutional and cannot continue.

---

[5] https://adflegal.org/press-release/virginia-teacher-placed-leave-engaging-free-speech-public-meeting.

[6] https://will-law.org/will-urges-kiel-schools-to-drop-title-ix-complaint-investigation-of-eighth-graders-for-using-incorrect-pronouns/.

[7] https://www.thefire.org/news/punished-not-using-students-preferred-pronouns-theater-professor-sues.

II.     **Denying pre-enforcement standing to Appellees would gut an important procedural safeguard that protects constitutional rights, especially freedom of speech.**

The Department expects Appellees to stand aside and wait until it takes their powers and violates their rights before they can avail themselves of the courts. If the Department's reasoning were allowed to stand, it would have major implications for pre-enforcement challenges in other areas, especially when it comes to constitutional rights and the First Amendment.

Courts do not require plaintiffs to expose themselves to prosecution before challenging an unconstitutional or illegal government action. *See Doe v. Bolton*, 410 U.S. 179, 188 (1973) (holding that a plaintiff "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief"); *see also Steffel v. Thompson*, 415 U.S. 452, 459 (1974) (holding that although the plaintiff had not been arrested for violating the contested law, he had standing to challenge the law because he claimed that it deterred his constitutional rights). Instead, a person may challenge a law or policy immediately when a constitutional harm can be realized even without an actual prosecution. *See Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392–93 (1988) (holding that the plaintiffs had standing to challenge the constitutionality of a criminal statute prohibiting the display of sexually explicit materials even though the plaintiffs were neither charged nor convicted of the crime).

12

All that is needed is a "credible threat of enforcement." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158–61 (2014) (holding that plaintiffs had standing because the threat of future enforcement was not "imaginary or speculative"). The Supreme Court recognizes a credible threat of enforcement when a plaintiff alleges "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute." *Id*. at 159; *Babbitt v. UFW Nat'l Union*, 442 U.S. 289, 298 (1979) (holding that plaintiffs could challenge a statute imposing sanctions upon consumers who planned to boycott products through deceptive publicity because the statute was vague and plaintiffs reasonably feared prosecution); *accord Holder v. Humanitarian Law Project*, 561 U.S. 1, 15 (2010) (allowing plaintiffs to challenge a law that criminalized providing material support to terrorist organizations because plaintiffs had provided support in the past and planned to provide support again in the future).

The Plaintiff States simply want to continue to create and enforce their own legal codes, and the Intervenors want to continue to provide and participate in athletic activities on an equal playing field. *See* Br. of Pls-Appellees at 19-20; Br. of Intervenors-Appellees at 11-14. But the Department has explicitly stated that it will "fully enforce" its Title IX guidance documents contrary to those measures. 86 Fed. Reg. at 32,639. Indeed, it has already done so. *See* Br. of Pls.-Appellees at 23 (describing past and current enforcement that comports with the guidance

documents). Appellees cannot stand by and wait for the federal government to enforce a bad law any more than it already has.

As Appellees explain, pre-enforcement challenges are an important procedural safeguard to prevent government overreach. Br. of Pls.-Appellees at 21-25; Br. of Intervenors-Appellees at 19-22. They are particularly necessary in the First Amendment context. Many college students are unwilling to risk their education and future careers by violating a campus policy and being punished before they can challenge it. Rather than risk intense scrutiny from peers and administrators that could result in suspension or expulsion, students do not exercise their First Amendment rights at all. *See supra* Part I.C. The same is true for teachers who face adverse employment action any time they speak. *Id*. Under the Department's new Title IX guidance documents, the threats of prosecution, compulsion, and viewpoint discrimination only worsen for students and teachers.

Litigants must be able to rely on procedural safeguards to challenge First Amendment violations before they speak, lest they face the untenable choice of holding their tongues or facing discipline. A decision to the contrary would chip away at settled law regarding pre-enforcement challenges, and with it, chip away at freedom of speech.

## CONCLUSION

This Court should affirm the district court's order granting a preliminary injunction to Plaintiffs-Appellees and dismiss as moot Defendants-Appellants' appeal of the EEOC Technical Assistance Document.

/s/ Celia Howard O'Leary

Kimberly S. Hermann
Braden H. Boucek
Celia Howard O'Leary
    *Counsel of Record*
SOUTHEASTERN LEGAL FOUNDATION
560 W. Crossville Rd., Ste. 104
Roswell, GA 30075
(770) 977-2131
khermann@southeasternlegal.org
bboucek@southeasternlegal.org
coleary@southeasternlegal.org

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. Proc. 29(a)(4) and 32(g)(1), this is to certify the foregoing complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 3112 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). The foregoing complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it was prepared on a computer using Times New Roman font (14 point).

January 31, 2023.                          /s/ Celia Howard O'Leary
                                           Celia Howard O'Leary

16

## CERTIFICATE OF SERVICE

I hereby certify that on January 31, 2023, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. Mail and/or facsimile. Parties may access the filing through the Court's electronic filing system.

January 31, 2023.                                    /s/ Celia Howard O'Leary
                                                     Celia Howard O'Leary

17