Case No. 22-5807

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

STATE OF TENNESSEE, *et al.*,
                                    *Plaintiffs-Appellees,*

and

ASSOCIATION OF CHRISTIAN SCHOOLS INTERNATIONAL, *et al.*,
                                    *Intervenors-Appellees*,
v.

UNITED STATES DEPARTMENT OF EDUCATION, *et al.*,
                                    *Defendants-Appellants*.

On Appeal from the United States District Court
for the Eastern District of Tennessee, No. 3:21-cv-00308 (Atchley, J.)

BRIEF OF *AMICUS CURIAE* MOUNTAIN STATES LEGAL
FOUNDATION IN SUPPORT OF APPELLEES AND AFFIRMANCE

William E. Trachman
Kaitlyn D. Schiraldi
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, CO 80227
Phone: (303) 292-2021
Fax: (877) 349-7074
wtrachman@mslegal.org
kschiraldi@mslegal.org

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Sixth Circuit Rule 26.1, *Amicus Curiae* certify that no party to this appeal is a subsidiary or affiliate of a publicly owned corporation. *Amicus Curiae* further certify that no publicly owned corporation that is not a party to this appeal has a financial interest in the outcome.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ..................................... i

TABLE OF CONTENTS.......................................................... ii

TABLE OF AUTHORITIES ................................................... iii

IDENTITY AND INTEREST OF *AMICUS CURIAE* .......................... 1

SUMMARY ...................................................................... 2

ARGUMENT .................................................................... 4

I.    Title IX Has Never Contemplated Gender Identity
      Discrimination ............................................... 4

II.   The Notice of Interpretation Exceeds the Scope of Title
      IX, and Indeed Prohibits What Title IX Requires ...................... 7

III.  In Addition to Exceeding the Scope of Title IX, the
      Department's Notice of Interpretation Violates the
      Constitution................................................. 17

      A.    The Department's interpretation violates the First
            Amendment by compelling speech ................................. 17

      B.    The Department's interpretation also violates the
            Spending Clause................................................ 22

      C.    The Department's interpretation violates the Major
            Questions Doctrine ............................................ 24

CONCLUSION.................................................................. 28

CERTIFICATE OF COMPLIANCE...................................................... 29

CERTIFICATE OF SERVICE ................................................... 30

# TABLE OF AUTHORITIES

<u>CASE</u>                                                                      <u>PAGE(S)</u>

*303 Creative LLC v. Elenis*,
    142 S. Ct. 1106 (2022) (mem.) ............................................................. 1

*Adams v. Sch. Bd. of St. Johns Cty.*,
    No. 18-13592, 2022 WL 18003879
    (11th Cir. Dec. 30, 2022) ...................................................... *passim*

*Adarand Constructors, Inc. v. Pena*,
    515 U.S. 200 (1995).............................................................................. 1

*B.P.J. v. W. Va. State Bd. of Educ.*,
    No. 2:21-cv-00316, 2023 WL 111875 (S.D. W.Va., Jan. 5, 2023) ..... 8, 10

*Ballard v. United States*,
    329 U.S. 187 (1946).............................................................................. 2

*Barnes v. Gorman*,
    536 U.S. 181 (2002)......................................................................... 23, 24

*Bostock v. Clayton Cty.*,
    140 S. Ct. 1731 (2020)........................................................... *passim*

*Cummings v. Premier Rehab Keller, PLLC*,
    142 S. Ct. 1562 (2022)..................................................................... 22, 23

*Dobbs v. Jackson Women's Health Org.*,
    142 S. Ct. 2228 (2022)........................................................................ 2

*Emilee Carpenter, LLC v. James*,
    575 F. Supp. 3d 353 (W.D.N.Y. 2021)................................................ 1

*Frontiero v. Richardson*,
    411 U.S. 677 (1973).............................................................................. 2

*Gonzales v. Oregon*,
    546 U.S. 243 (2006).......................................................................... 26

*Grimm v. Gloucester Cty. Sch. Bd.*,
    972 F.3d 586 (4th Cir. 2020)......................................................... *passim*

*Grimm v. Gloucester Cty. Sch. Bd.*,
   976 F.3d 399 (4th Cir. 2020) (mem.)................................................... 16

*Loudoun Cty. Sch. Bd. v. Cross*,
   No. 21-0584, 2021 WL 9276274 (Va. Aug. 30, 2021)....................... 22

*Meriwether v. Hartop*,
   992 F.3d 492 (6th Cir. 2021).............................................................. 18

*Neese v. Becerra*,
   No. 2:21-cv-163-z, 2022 WL 1265925 (N.D. Tex. Apr. 26, 2022)..... 5

*Neese v. Becerra*,
   No. 2:21-cv-163-z, 2022 WL 16902425
   (N.D. Tex., Nov. 11, 2022) ................................................................. 7, 10

*Newport News Shipbuilding and Dry Dock Co. v. EEOC*,
   462 U.S. 669 (1983) ............................................................................ 2

*NFIB v. OSHA*,
   142 S. Ct. 661 (2022) .......................................................................... 26

*Pennhurst State Sch. and Hosp. v. Halderman*,
   451 U.S. 1 (1981) ................................................................................ 22

*Ricard v. USD 475 Geary Cty. Sch. Bd.*,
   No. 5:22-cv-04015, 2022 WL 1471372 (D. Kan., May 9, 2022) ........ 22

*Tennessee v. U.S. Dep't of Educ.*,
   No. 3:21-cv-308, 2022 WL 2791450 (E.D. Tenn. July 15, 2022)....... 27

*Tuan Anh Nguyen v. I.N.S.*,
   533 U.S. 53 (2001) .............................................................................. 2

*United States v. Varner*,
   948 F.3d 250 (5th Cir. 2020)............................................................... 19

*United States v. Virginia*,
   518 U.S. 515 (1996) ............................................................................ 2

*Vlaming v. West Point Sch. Bd.*,
   10 F.4th 300 (4th Cir. 2021) ............................................................... 21

*W. Va. State Bd. of Educ. v. Barnette*,
   319 U.S. 624 (1943) ............................................................................ 17

*West 49th Street, LLC v. O'Neill*,
   178 N.Y.S.3d 874 ............................................................................ 8, 9

*West Virginia v. EPA*,
   142 S. Ct. 2587 (2022) ....................................................... 25, 26, 27

*Whitman v. Am. Trucking Ass'ns*,
   531 U.S. 457 (2001) ............................................................................ 26

## CONSTITUTIONAL PROVISION

U.S. CONST. amend. I ............................................................................ 17

## STATUTES

20 U.S.C. § 1681(a) ............................................................................ 4, 14

20 U.S.C. § 1681(a)(2) ............................................................................ 5

20 U.S.C. § 1682 ............................................................................ 4, 12

## RULES

FED. R. APP. P. 26.1 ............................................................................ i

FED. R. APP. P. 29(a)(2) ............................................................................ 1

FED. R. APP. P. 29(a)(5) ............................................................................ 29

FED. R. APP. P. 29(a)(4)(E) ............................................................................ 1

FED. R. APP. P. 32(a)(5) ............................................................................ 29

FED. R. APP. P. 32(a)(6) ............................................................................ 29

FED. R. APP. P. 32(a)(7)(B) ............................................................................ 29

FED. R. APP. P. 32(g)(1) ............................................................................ 29

FED. R. APP. P. 32(f) ............................................................................ 29

Sixth Circuit Rule 26.1 ............................................................................ i

<u>**REGULATIONS**</u>

34 CFR § 106.32(b) .................................................................    14

34 C.F.R. § 106.33 ..................................................................    5, 14

34 C.F.R. § 106.34 ..................................................................    14

34 C.F.R. § 106.34(a)(3) .........................................................    5

34 C.F.R. § 106.37(c)(1) .........................................................    6

34 C.F.R. § 106.40 ..................................................................    14

34 C.F.R. § 106.40(b)(1) .........................................................    12

34 C.F.R. § 106.41 ..................................................................    14

34 C.F.R. § 106.43 ..................................................................    14

Enforcement of Title IX of the Education Amendments of 1972
    With Respect to Discrimination Based on Sexual Orientation
    and Gender Identity in Light of *Bostock v. Clayton County*, 86
    Fed. Reg. 32,637 (June 22, 2021) (codified at 34 C.F.R. ch. 1) ..........    3, 14

Nondiscrimination on the Basis of Sex in Education Programs or Activities
    Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026 (May 19, 2020)
    (codified at 34 C.F.R. pt. 106) ............................................................    6, 18

<u>**OTHER AUTHORITIES**</u>

Berit Brogaard, *"I am in Love with Trains"*, PSYCHOLOGY TODAY
    (Sept. 1, 2020) .....................................................................    9

Cortney Weil, *School reportedly allows teen girl to identify as a
    cat in class: 'No one seems to have a protocol for students
    identifying as animals'*, BLAZE MEDIA (Aug. 29, 2022)......................    21

*Creature Comforts: School accused of installing litter boxes for
    students who identify as cats hits back after parents' outrage*,
    THE U.S. SUN (Jan. 22, 2022)................................................................    21

Emma Colton, FOX NEWS, *Transgender women must sign up for military draft under Biden admin, trans men get a pass* (Oct. 11, 2022) ................................................................... 23

Equality Act, H.R. 5, 117th Cong. (as passed by House, Feb. 25, 2021) ....................................................................... 27

*Gender Discrimination*, STANFORD UNIVERSITY .................................... 19

*Gender Pronoun Guide*, MISSOURI STATE ............................................. 20

*Gender Pronouns*, UNIVERSITY OF WISCONSIN—MILWAUKEE .............. 20

Kate Jerkovich, '*Nobody's Perfect': Disney Star Demi Lovato Explains Why She's Going Back to 'She/Her' Pronouns*, DAILY WIRE (Aug. 2, 2022) ..................................................... 24

Madeleine Kearns and Jennifer C. Braceras, *Weaponizing Title IX to Punish Speech*, NATIONAL REVIEW, (Aug. 6, 2022) ...................... 19

Michael C. Seto, *Is Pedophilia a Sexual Orientation?*, SPRINGERLINK (Jan. 5, 2012) .................................................. 9

U.S. DEP'T OF EDUC., OFFICE FOR CIVIL RIGHTS, ANNUAL REPORT TO THE SECRETARY, THE PRESIDENT, AND THE CONGRESS (2021)........ 8

U.S. DEP'T OF EDUC., OFFICE FOR CIVIL RIGHTS, FIRST AMENDMENT: DEAR COLLEAGUE LETTER (2003)................................ 18

U.S. DEP'T OF EDUC., OFFICE FOR CIVIL RIGHTS, LETTER TO CONGRESSMAN MARK E. GREEN (2020)................................................. 14

U.S. DEP'T OF EDUC., OFFICE FOR CIVIL RIGHTS, REVISED SEXUAL HARASSMENT GUIDANCE: HARASSMENT OF STUDENTS BY SCHOOL EMPLOYEES, OTHER STUDENTS, OR THIRD PARTIES (2001) ............................................................................... 17, 18

U.S. DEP'T OF EDUC., OFFICE OF THE GENERAL COUNSEL, MEMORANDUM FOR KIMBERLY M. RICHEY, ACTING ASSISTANT SECRETARY OF THE OFFICE FOR CIVIL RIGHTS RE: *BOSTOCK V. CLAYTON CTY.*, 140 S. CT. 1731 (2020) ................................................. *passim*

U.S. Dep't of Justice & Dep't of Educ., Dear Colleague Letter: Civil Rights in Juvenile Justice Residential Facilities (2014) ................................................................. 11

*What Are the 72 Other Genders?*, MedicineNet (Feb. 2, 2022) ........... 20

*What are the different types of sexualities?*, Medical News Today ................................................................................. 9

## IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]

Mountain States Legal Foundation ("MSLF") is a nonprofit public-interest law firm organized under the laws of the State of Colorado. MSLF is dedicated to bringing before the courts issues that are vital to the defense and preservation of individual liberties: the right to speak freely, the right to own and use property, and the need for limited and ethical government. Since its creation in 1977, MSLF attorneys have been active in litigation regarding the proper interpretation and application of statutory, regulatory, and constitutional provisions. *See*, *e.g.*, *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995) (MSLF serving as lead counsel); *303 Creative LLC v. Elenis*, 142 S. Ct. 1106 (2022) (mem.) (*amici curiae* in support of petitioners); *Emilee Carpenter, LLC v. James*, 575 F. Supp. 3d 353 (W.D.N.Y. 2021), *appeal docketed*, No. 22-75 (2d Cir. Jan. 13, 2022) (*amicus curiae* in support of appellants).

To secure these interests, MSLF files this *amicus curiae* brief urging this Court to affirm the Eastern District of Tennessee's ruling.

---

[1]    Pursuant to Federal Rule of Appellate Procedure 29(a)(2), all parties have consented to the filing of this brief. Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), no party or parties counsel authored this brief in whole or in part or contributed money that was intended to fund its preparation or submission and no other person other than the *amicus curiae*, its members, or its counsel contributed money that was intended to fund the preparation or submission of this brief.

## SUMMARY

This Circuit is bound by precedent that there are two sexes, and that the differences between the two sexes are based on biology. *See United States v. Virginia*, 518 U.S. 515, 533 (1996) ("Physical differences between men and women, however, are enduring: '*[T]he two sexes* are not fungible[.]'") (quoting *Ballard v. United States*, 329 U.S. 187, 193 (1946)) (emphasis added); *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) ("[S]ex, like race and national origin, is an *immutable* characteristic determined solely by the accident of birth[.]") (emphasis added); *Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53, 68 (2001) ("[T]he mother's knowledge of the child and the fact of parenthood have been established in a way not guaranteed in the case of the unwed father."); *Newport News Shipbuilding and Dry Dock Co. v. EEOC*, 462 U.S. 669, 684 (1983) ("[O]nly women can become pregnant[.]"); *accord Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2346 (2022) (dissenting opinion of JJ. Breyer, Sotomayor, and Kagan) ("[A] majority of today's Court has wrenched this choice from *women* and given it to the States.") (emphasis added).

These foundational premises are important because Title IX bars recipients of federal funds from engaging in certain forms of "sex" discrimination. It is silent, however, with respect to the word "gender," much less "gender identity." Even *Bostock*, upon which the Appellant's June 2021 Notice of Interpretation ("NOI")

heavily relies, speaks only to the limited proposition that in the employment context, a man who now identifies as a woman may generally not be treated worse than a woman who still identifies as a woman. *See* Enforcement of Title IX of the Education Amendments of 1972 With Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of *Bostock v. Clayton County*, 86 Fed. Reg. 32,637 (June 22, 2021) (codified at 34 C.F.R. ch. 1); *see Bostock v. Clayton Cty.,* 140 S. Ct. 1731, 1746 (2020) ("By discriminating against transgender persons, the employer unavoidably discriminates against persons with one sex identified at birth and another today."); *id.* at 1739 ("The only statutorily protected characteristic at issue in today's cases is 'sex'—and that is also the primary term in Title VII whose meaning the parties dispute.").

Nevertheless, Appellant's NOI mandates that under Title IX, schools must adhere to any number of fluid, newly-minted gender identities and sexual orientations, and are subject to losing federal funds for not doing so. *See* 86 Fed. Reg. at 32,637 ("[T]he Department interprets Title IX's prohibition on discrimination 'on the basis of sex' to encompass discrimination on the basis of sexual orientation and gender identity.").

The existing injunction thus should be preserved for four reasons.

First, Title IX has never been understood to encompass anything other than two binary sexes. Thus, the NOI is far outside the scope of Appellant's regulatory

or administrative authority. Second, this Circuit has held that mandating the sorts of policies embraced by the NOI—such as speaking and affirming a variety of potential pronouns—violates the First Amendment. Third, the NOI violates the Spending Clause, which requires that the federal government not surprise recipients of federal funds with new conditions on grant funds. And fourth, the NOI violates the Major Questions Doctrine, because it radically alters the meaning of a statutory term, thereby affecting innumerable stakeholders in the wake of failed federal legislation.

## ARGUMENT

### I.    Title IX Has Never Contemplated Gender Identity Discrimination.

They key directive of Title IX of the Education Amendments of 1972 is contained in 37 simple words: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a). The statute also provides that the Department of Education ("Department") may promulgate regulations enforcing its key non-discrimination mandate, against sex discrimination. 20 U.S.C. § 1682.

Title IX disallows recipients of federal funds—like schools—from discriminating on the basis of sex, and treats sex as limited to the binary categories of male and female, both objective and fixed. *See Adams v. Sch. Bd. of St. Johns Cty.*, No. 18-13592, 2022 WL 18003879, at *15 (11th Cir. Dec. 30, 2022) (*en banc*)

("[R]eading in ambiguity to the term 'sex' ignores the overall statutory scheme and purpose of Title IX, along with the vast majority of dictionaries defining 'sex' based on biology and reproductive function."); *see also Neese v. Becerra*, No. 2:21-cv-163-z, 2022 WL 1265925, at *12 (N.D. Tex. Apr. 26, 2022) ("Title IX presumes sexual dimorphism in section after section, requiring equal treatment for each 'sex.'"); *see also* 20 U.S.C. § 1681(a)(2) ("[T]his section shall not apply . . . in the case of an educational institution which has begun the process of changing from being an institution which admits only students of *one sex* to being an institution which admits students of *both sexes*[.]") (emphasis added); *see also* 20 U.S.C. § 1681(a)(8) ("[T]his section shall not preclude father-son or mother-daughter activities at an educational institution, but if such activities are provided for students of *one sex*, opportunities for reasonably comparable activities shall be provided for students of *the other sex*[.]") (emphasis added).

Moreover, apart from the explicit terms of the statute, from the beginning, the Department's earliest regulations confirmed this textual reading. *See*, *e.g.*, 34 C.F.R. § 106.33 ("A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of *one sex* shall be comparable to such facilities provided for students of the *other sex*.") (emphasis added); 34 C.F.R. § 106.34(a)(3) ("Classes . . . in elementary and secondary schools that deal primarily with human sexuality may be conducted in separate sessions for

*boys and girls*.") (emphasis added); *cf.* 34 C.F.R. § 106.37(c)(1) ("To the extent that a recipient awards athletic scholarships or grants-in-aid, it must provide reasonable opportunities for such awards for members of *each sex* in proportion to the number of students of *each sex* participating in interscholastic or intercollegiate athletics.") (emphasis added).

The idea of nonbiological gender identity—which encompasses not just females and males, but also students who identify as neither or both—is *not* found in the text of Title IX, nor is it consistent with decades of interpretation of that statute. Indeed, the last time that the Department promulgated regulations under Title IX, the Department once again properly emphasized this point in the preamble to those regulations: "Title IX and its implementing regulations include provisions that *presuppose sex as a binary classification*, and provisions in the Department's current regulations, which the Department did not propose to revise in this rulemaking, reflect this presupposition." Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance (hereinafter, "Current Rule"), 85 Fed. Reg. 30,026, 30,178 (May 19, 2020) (codified at 34 C.F.R. pt. 106) (emphasis added). Interpreting sex to mean anything other than biological sex, therefore would forever undermine the text of Title IX.

6

II.     **The Notice of Interpretation Exceeds the Scope of Title IX, and Indeed Prohibits What Title IX Requires.**

The NOI embraces the idea that Title IX covers gender identity discrimination without defining the term "gender identity" or acknowledging the proliferation of genders, identities, and pronouns associated with that mandate. In the same vein, the NOI insists that Title IX covers discrimination against all forms sexual orientations; far beyond mere heterosexuality or homosexuality.

The Department does so primarily on the basis of the Supreme Court's decision in *Bostock*. However, the Department's reading of *Bostock* is far too broad. *See Neese v. Becerra*, No. 2:21-cv-163-z, 2022 WL 16902425, at *1 (N.D. Tex., Nov. 11, 2022) ("In his *Bostock* dissent, Justice Alito foresaw how litigants would *stretch* the majority opinion like an elastic blanket to cover categories, cases, and controversies expressly not decided.").

Notably, *Bostock*'s holding relied on the assumption that sex was binary, and biologically determined. It was not based on a broad conception of "gender identity" or "sexual orientation." *See id.* at *11 ("Title IX says nothing about 'sexual orientation' and 'gender identity.' And why would it? Title IX's protections center on differences between the two biological sexes—not SOGI status."). *Bostock*'s key passage is the following:

> [T]ake an employer who fires a transgender person who was identified as a male at birth but who now identifies as a female. If the employer retains an otherwise identical employee who was identified as female

at birth, the employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth. Again, the individual employee's sex plays an unmistakable and impermissible role in the discharge decision.

140 S. Ct. at 1741–42; *see also* U.S. DEP'T OF EDUC., OFFICE FOR CIVIL RIGHTS, ANNUAL REPORT TO THE SECRETARY, THE PRESIDENT, AND THE CONGRESS, at 27 (2021)[2] ("The Court's holding stated that it was assuming that sex referred to an employee's biological sex, but in fact the Court's holding in *Bostock* relies on that assumption, by noting that the employee who identifies as female is biologically male[.]"); *B.P.J. v. W. Va. State Bd. of Educ.*, No. 2:21-cv-00316, 2023 WL 111875, at *7 (S.D. W.Va., Jan. 5, 2023) ("It is beyond dispute that, barring rare genetic mutations not at issue here, a person either has male sex chromosomes or female sex chromosomes."); *id.* at *9 ("[T]ransgender girls are biologically male. Short of any medical intervention that will differ for each individual person, biological males are not similarly situated to biological females for purposes of athletics.").

With respect to sexual orientation, *Bostock*'s analysis is limited solely to heterosexuality and homosexuality. The opinion does not address employees who are bisexual even, much less employees who assert other sexual orientations that are unrelated to their specific sex, such as polyamorous individuals, asexual individuals, or individuals who have other non-traditional sexual orientations. *See West 49th*

---

[2]  https://www2.ed.gov/about/reports/annual/ocr/report-to-president-and-secretary-of-education-2020.pdf

8

*Street, LLC v. O'Neill*, No. 178 N.Y.S.3d 874, 882, n.11, n.12, 883, 883 n.13, n.14
(N.Y. Civ. Ct. 2022) (expanding *Obergefell*'s rationale to cover polygamy); *see also*
Berit Brogaard, *"I am in Love with Trains"*, PSYCHOLOGY TODAY (Sept. 1, 2020)[3]
("Objectophilia, or Object-Sexuality, is a sexual orientation involving an enduring
emotional, romantic or sexual attraction toward specific objects. . . . [A] self-
identified objectophile[] describes it as 'an orientation just as hetero- and homo-
sexuality are orientations of one's innate sexuality.'"); *What are the different types
of sexualities?*, MEDICAL NEWS TODAY[4] (last visited Jan. 30, 2023) (listing over 25
sexual orientations, including Demiromantic, Skoliosexual, and Spectrasexual).

What about teachers or school personnel who identify as minor-attracted
persons, as one part of their sexual orientation? *See*, *e.g.*, Michael C. Seto, *Is
Pedophilia a Sexual Orientation?*, SPRINGERLINK (Jan. 5, 2012)[5]. Surely schools are
permitted to leave in place policies that bar such employees from being employed in
schools.

Including all gender identities and all sexual orientations under Title IX's
umbrella is not only atextual; it contradicts the longstanding meaning and purpose
of Title IX, which was to prevent sex discrimination and protect educational

---

[3]    https://www.psychologytoday.com/us/blog/the-mysteries-love/202009/i-am-in-
love-trains
[4] https://www.medicalnewstoday.com/articles/types-of-sexuality
[5] https://link.springer.com/article/10.1007/s10508-011-9882-6

opportunities. But the NOI would keep schools and school districts guessing, and force them to go through acrobatics to comply with federal civil rights laws or face federal investigation and a loss of federal funds. That hinders Title IX's very purpose, and turns its provisions and regulations into mush. *See Neese*, 2022 WL 16902425, at \*8 ("If 'on the basis of sex' included 'sexual orientation' and 'gender identity,' as Defendants envision, Title IX and its regulations would be nonsensical."); *B.P.J.*, 2023 WL 111875, at \*9 ("As other courts that have considered Title IX have recognized, although the regulation applies equally to boys as well as girls, it would require blinders to ignore that the motivation for the promulgation of the regulation was to increase opportunities for women and girls in athletics.") (internal quotation and citation omitted).

It is unclear if even the Department understands the full scope of its NOI. Truly requiring equal access and opportunities across every gender identity and sexual orientation would cause chaos. For instance, if the Department compelled schools across the country to equally maintain separate athletic teams for students who do not identify as either male or female, there is no limit to the number of separate athletic teams that schools may be compelled to sponsor. By the same token, would students who identify as gender-fluid compete as both male and female, and be counted as athletes on both athletic teams for Title IX purposes? *See Adams*, 2022 WL 18003879, at \*15 ("If sex were ambiguous, it is difficult to fathom why the

10

drafters of Title IX went through the trouble of providing an express carve-out for sex-separated living facilities, as part of the overall statutory scheme.").

At the postsecondary level, in addition to athletics and school-sponsored single-sex activities such as sororities or fraternities, wrapping gender identity into Title IX would force colleges to create new separate and equal facilities, such as dormitories, each for men, women, intersex individuals, pansexual individuals, bi-gender individuals, and members of each of the many other currently published genders. *See Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 621 (4th Cir. 2020) (Wynn, J., concurring) ("[T]ransgender individuals often *defy binary categorization* on the basis of physical characteristics alone.") (emphasis added). Every school in the United States would be torn between trying to fully integrate all facilities— bathrooms, dormitories, and more—without regard to sex, or having numerous equal facilities as new genders emerged.

Separately, not all "recipients" of federal funds are traditional schools. Some are juvenile justice facilities. *See* U.S. DEP'T OF JUSTICE & DEP'T OF EDUC., DEAR COLLEAGUE LETTER: CIVIL RIGHTS IN JUVENILE JUSTICE RESIDENTIAL FACILITIES (2014).[6] The NOI essentially forces these facilities around the country to either fully

---

[6] https://www2.ed.gov/about/offices/list/ocr/letters/colleague-residential-facilities-201412.pdf

integrate their facilities without regard to sex, or establish new and separate wings of their facilities for each new gender identity, as they emerge.

Moreover, existing pregnancy discrimination protections under Title IX are within the scope of the statute *only* if they relate to sex discrimination. *See* 34 C.F.R. § 106.40(b)(1) ("A recipient shall not discriminate against any student, or exclude any student from its education program or activity, including any class or extracurricular activity, on the basis of such student's pregnancy[.]"). If men and members of other gender identities may become pregnant, those regulations likely exceed the Department's permissible regulatory power. *See*, *e.g.*, U.S. DEP'T OF EDUC., OFFICE OF THE GENERAL COUNSEL, MEMORANDUM FOR KIMBERLY M. RICHEY, ACTING ASSISTANT SECRETARY OF THE OFFICE FOR CIVIL RIGHTS RE: *BOSTOCK V. CLAYTON CTY.*, 140 S. CT. 1731 (2020), at 3–4 (2021)[7] ("These regulations are valid only because they effectuate Title IX's prohibition against sex discrimination. *See* 20 U.S.C. § 1682. Courts have recognized, quite correctly in our view, that discrimination on the basis of pregnancy constitutes discrimination on the basis of female physiology and is therefore prohibited under Title IX"). Interpreting

---

[7]    https://www2.ed.gov/about/offices/list/ocr/correspondence/other/ogc-memorandum-01082021.pdf. The memorandum was later withdrawn but remains available online in OCR's Correspondence portal. Its analysis is persuasive on the issue of Title IX after *Bostock*.

Title IX to extend to gender identity would, at a minimum, weaken the legal rationale underlying such regulations implemented to prevent sex discrimination.

Even after *Bostock*, the Department announced important distinctions that limited *Bostock*'s application to Title IX. Specifically, the Department's Office for Civil Rights ("OCR") queried its Office of the General Counsel, asking for answers regarding the impact of the Supreme Court's analysis. The Office of the General Counsel responded with a memorandum dated January 8, 2021. *See* MEMORANDUM FOR KIMBERLY M. RICHEY. The document noted that Title IX, unlike Title VII, often requires consideration of a student's biological sex—for instance, with respect to equal athletic opportunities.

### Question 3: How should OCR view allegations that a recipient targets individuals for discriminatory treatment on the basis of a person's transgender status or homosexuality?

**Answer:** Although *Bostock* expressly does not decide issues arising under Title IX or other differently drafted laws, the logic of *Bostock* may, in some cases, be useful in guiding OCR's understanding as to whether the alleged discrimination on the basis of a person's transgender status or homosexuality necessarily takes into account the person's biological sex and, thus, constitutes discrimination on the basis of sex. Depending on the facts, complaints involving discrimination on the basis of transgender status or homosexuality might fall within the scope of Title IX's non-discrimination mandate because they allege sex discrimination. *See Bostock*, 140 S. Ct. at 1741, 1737 ("Sex plays a necessary and undisguisable role in the decision" to fire an employee because of the employee's homosexual or transgender status).

However, we emphasize that Title IX and its implementing regulations, unlike Title VII, may *require* consideration of a person's biological sex,

male or female. 20 U.S.C. §§ 1681(a), 1686; 34 CFR §§ 106.32(b), 106.33, 106.34, 106.40, 106.41, 106.43. 106.52, 106.59, 106.61. Consequently, we believe a recipient generally would not violate Title IX by, for example, recording a student's biological sex in school records, or referring to a student using sex-based pronouns that correspond to the student's biological sex, or refusing to permit a student to participate in a program or activity lawfully provided for members of the opposite sex, regardless of transgender status or homosexuality.

*Id.* at 4; *see also* U.S. DEP'T OF EDUC., OFFICE FOR CIVIL RIGHTS, LETTER TO CONGRESSMAN MARK E. GREEN, at 1 (2020)[8] ("By itself, refusing to use transgender students' preferred pronouns is not a violation of Title IX[.]").

Notably, the Department of Education's Office of the General Counsel also pointed out that contrary opinions in the Fourth and Eleventh Circuits—including in *Grimm* and the then-operative panel opinion in *Adams*—the courts "failed to rigorously analyze Title IX's plain text[.]" MEMORANDUM FOR KIMBERLY M. RICHEY, at 11.

Now, though, the Department's *Bostock* interpretation relies in part on *Grimm*. 86 Fed. Reg. at 32,639. But even a cursory review of *Grimm* confirms the Office of the General Counsel letter's analysis. For instance, the *Grimm* court seemed to understand that gender identity and sex were distinct concepts. *See Grimm*, 972 F.3d at 593 ("Grimm's birth-assigned sex, or so-called 'biological sex,'

---

[8]    https://www2.ed.gov/about/offices/list/ocr/correspondence/congress/20200309-title-ix-and-use-of-preferred-pronouns.pdf

is female, but his gender identity is male."); *id.* at 594 ("But there have always been people who consistently, persistently, and insistently express a gender that, on a binary, we would think of as opposite to their assigned sex.") (internal quotation and citation omitted). Yet, by *ipse dixit*, the court concluded that Grimm's Title IX claim succeeded because he was denied access to a bathroom that was consistent with his gender identity, even though the school district in that case had afforded him access to a bathroom consistent with his sex. *Id.* at 618 ("Grimm was treated worse than students with whom he was similarly situated because he alone could not use the restroom corresponding with his gender.").

The dissent in *Grimm* properly criticized the majority for missing this basic fact. Grimm had not challenged the constitutionality of Title IX, or the appropriateness of its regulations separating students based on sex. The dissent stated the obvious: "As several sources make clear, the term 'sex' in this context must be understood as referring to the traditional biological indicators that distinguish a male from a female, not the person's internal sense of being male or female, or their outward presentation of that internally felt sense." *Id.* at 632 (Niemeyer, J., dissenting); *see id.* at 634 ("Grimm's argument, however, is facially untenable. While he accepts the fact that Title IX authorizes the separation of restrooms—indeed, he seeks to use the male restrooms so separated from female

restrooms—the implementation of his position would allow him to use restrooms contrary to the basis for separation.").

The Department of Education's Office of General Counsel, like the dissent in *Grimm*, found fault with *Grimm* and similar cases. *See* MEMORANDUM FOR KIMBERLY M. RICHEY, at 11 ("[The panel decision in] *Adams* and *Grimm* were decided more than two months after publication of the Title IX rule and its interpretative preamble. Yet neither discussed the Department's interpretation."); *id.* at 4 ("[W]e must give effect to the ordinary public meaning at the time of enactment and construe the term 'sex' in Title IX to mean biological sex, male or female. Congress has the authority to rewrite Title IX and redefine its terms at any time."); *see also Grimm v. Gloucester Cty. Sch. Bd.*, 976 F.3d 399, 401 (4th Cir. 2020) (mem.) (Niemeyer, J., concurring in the denial of rehearing *en banc*) (opining that the panel decision in *Grimm* "failed to apply Title IX and its regulations").

Thus, thoughtful analysis of Title IX from OCR's Office of the General Counsel and elsewhere, consistent with the text and history of Title IX, explains why broad gender identity protections are not encompassed within the statute. Put simply, the text and purpose of Title IX do not counsel in favor of an overexpansive adoption of *Bostock*, and the interpretation hinders Title IX's statutory purpose.

**III.    In Addition to Exceeding the Scope of Title IX, the Department's Notice of Interpretation Violates the Constitution.**

The NOI, read literally, would require schools throughout this country to enact speech codes compelling teachers and other school personnel to adopt specific forms of pronouns and other references to students. This Court should thus hold that the NOI is unconstitutional in that respect, and that such a constitutional violation constitutes irreparable harm, necessitating an injunction.

**A.    The Department's interpretation violates the First Amendment by compelling speech.**

By re-defining "sex" to encompass gender identity, the Department would require schools to violate Title IX by compelling the use of a student's preferred pronouns. The First Amendment commands that "Congress shall make no law . . . abridging the freedom of speech[.]" U.S. CONST. amend. I. The prohibition extends to the Executive Branch and covers instances where the Executive Branch either chills or compels speech. *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 640 (1943) ("Struggles to coerce uniformity of sentiment in support of some end thought essential to their time and country have been waged by many good as well as by evil men.").

Notably, the Department has historically emphasized the harmonization of Title IX with the free speech rights of students and teachers. *See*, *e.g.*, U.S. DEP'T OF EDUC., OFFICE FOR CIVIL RIGHTS, REVISED SEXUAL HARASSMENT GUIDANCE:

HARASSMENT OF STUDENTS BY SCHOOL EMPLOYEES, OTHER STUDENTS, OR THIRD PARTIES, at 22 (2001)[9] ("Title IX is intended to protect students from sex discrimination, not to regulate the content of speech.."); *see also* U.S. DEP'T OF EDUC., OFFICE FOR CIVIL RIGHTS, FIRST AMENDMENT: DEAR COLLEAGUE LETTER (2003)[10] ("OCR's regulations and policies do not require or prescribe speech, conduct or harassment codes that impair the exercise of rights protected under the First Amendment."); Current Rule, 85 Fed. Reg. at 30,142 ("The Department agrees with commenters noting that the Department has a responsibility to enforce Title IX while not interfering with principles of free speech and academic freedom[.]").

But interpreting Title IX to force teachers and personnel to use and affirm a student's preferred pronouns violates the First Amendment. In fact, this Court recently deemed the firing of a university professor for refusing to use preferred pronouns to be a First Amendment violation. *See Meriwether v. Hartop*, 992 F.3d 492, 511–12 (6th Cir. 2021) ("[W]e hold that the university violated Meriwether's free-speech rights.").

As the Court is aware, pronoun categories have far eclipsed traditional male, female, and even plural pronouns, and often become a distraction unto themselves.

---

[9] https://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf. Note that this guidance was issued after notice and comment in January 2001. *Id.* at ii. It was withdrawn after formal regulations addressing sexual harassment were promulgated in August 2020, but remains available for historical purposes.

[10] https://www2.ed.gov/about/offices/list/ocr/firstamend.html

*See, e.g., United States v. Varner*, 948 F.3d 250, 257 (5th Cir. 2020) ("If a court orders one litigant referred to as 'her' (instead of 'him'), then the court can hardly refuse when the next litigant moves to be referred to as 'xemself' (instead of 'himself')."); *see id.* (referring to University of Wisconsin-Milwaukee chart that includes "perself," "eirself," and "xyrs" as usable pronoun options).

An internet search for "college pronoun policies" uncovers too many policies to list. For instance, Stanford's Title IX page provides numerous examples of gender identity discrimination, one of which being "[m]isgendering or mispronouning (purposefully using the wrong gender identity or pronouns to address someone)[.]"[11] Similarly, at another university in California,

> the Title IX coordinator released a statement explaining that while "unintentional misgendering is usually resolved with a simple apology," "intentional misgendering is inconsistent with the type of community we hold ourselves to be." The coordinator warned that "intentional deadnaming," i.e., using a trans-identifying person's given name, "could be a form of bullying, outing, or otherwise harassing an individual."[12]

Another institution implies that short of apologizing and correcting the "mistake" of calling someone by the wrong pronoun, and then immediately using

---

[11] *Gender Discrimination*, STANFORD UNIVERSITY, https://share.stanford.edu/get-informed/learn-topics/gender-discrimination (last visited Jan 30, 2023).
[12] Madeleine Kearns and Jennifer C. Braceras, *Weaponizing Title IX to Punish Speech*, NATIONAL REVIEW, (Aug. 6, 2022), https://www.nationalreview.com/2022/08/weaponizing-title-ix-to-punish-speech/.

the proper preferred pronoun, misgendering has occurred.[13] One university displays charts on its LGBTQ+ resource center of unintelligible words that are meant to be examples of potential pronouns:

| 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|
| (f)ae | (f)aer | (f)aer | (f)aers | (f)aerself |
| e/ey | em | eir | eirs | eirself |
| he | him | his | his | himself |
| per | per | pers | pers | perself |
| she | her | her | hers | herself |
| they | them | their | theirs | themself |
| ve | ver | vis | vis | verself |
| xe | xem | xyr | xyrs | xemself |
| ze/zie | hir | hir | hirs | hirself |

[14]

Similarly, a growing list of genders exists. One medical website states, "[b]esides male and female, there are 72 other genders," meaning that school personnel will be compelled to memorize any number of applicable pronouns.[15] Because the NOI does not provide a definition of gender identity, or identify what personality identifications fall outside of the term "gender," there is no limit to what a school might have to indulge.

---

[13] *Gender Pronoun Guide*, MISSOURI STATE, https://www.missouristate.edu/TitleIX/gender-pronoun-guide.htm (last visited Jan. 30, 2023) ("The best thing to do if you use the wrong pronoun for someone is to say something right away, like: 'Sorry, I meant (insert pronoun).' If you realize that you made a mistake after the fact, apologize in private and move on.").

[14] *Gender Pronouns*, UNIVERSITY OF WISCONSIN—MILWAUKEE, https://uwm.edu/lgbtrc/support/gender-pronouns/ (last visited Jan. 30, 2023).

[15] *What Are the 72 Other Genders?*, MEDICINENET (Feb. 2, 2022), https://www.medicinenet.com/what_are_the_72_other_genders/article.htm.

Allegedly, a school in Michigan had students "who identif[ied] themselves as 'furries[.]'"[16] Because the NOI does not define what the outer bounds of gender identity are, under the NOI, to the extent that a student self-identifies their "gender" as "feline," it would then be a Title IX violation for refusing to use the student's feline pronouns.[17] However silly that may sound today, the same may be said of compelling the use of pronouns like "ze" or "xyrs" only a few years ago.

The Court should not dismiss these as chicken-little concerns. Numerous teachers have been fired for refusing to use preferred pronouns, or for pushing back on concepts of gender fluidity. *See Vlaming v. West Point Sch. Bd.*, 10 F.4th 300, 304 (4th Cir. 2021) ("[The teacher] told [the principal] that using male pronouns to refer to someone who was born a female violated his religious beliefs because it was untruthful. [The principal] reiterated that he should use male pronouns to refer to [the student] and that failure to do so could result in his termination."); *see also*

---

[16] *Creature Comforts: School accused of installing litter boxes for students who identify as cats hits back after parents' outrage*, THE U.S. SUN (Jan. 22, 2022), https://www.the-sun.com/news/4520035/school-litter-boxes-furries-students-cats-outrage-parents/.

[17] Although this news came from Australia, this is not too far-fetched for American schools. A student was permitted to act like a cat—"[t]he school will also allow the unnamed girl to avoid at least one behavior which is distinctly human: talking." Cortney Weil, *School reportedly allows teen girl to identify as a cat in class: 'No one seems to have a protocol for students identifying as animals'*, BLAZE MEDIA (Aug. 29, 2022), https://www.theblaze.com/news/school-reportedly-allows-teen-girl-to-identify-as-a-cat-in-class-no-one-seems-to-have-a-protocol-for-students-identifying-as-animals.

*Loudoun Cty. Sch. Bd. v. Cross*, No. 21-0584, 2021 WL 9276274, at \*1–2 (Va. Aug. 30, 2021) (educator placed on administrative leave for speaking out at a school board meeting about a transgender policy stating, "I will not affirm that a biological boy can be a girl and vice versa because it is against my religion. It's lying to a child. It's abuse to a child."); *Ricard v. USD 475 Geary Cty. Sch. Bd.*, No. 5:22-cv-04015, 2022 WL 1471372, at \*10 (D. Kan., May 9, 2022) (teacher obtained preliminary injunction preventing school from forcing her to hide gender-identity based pronouns from parents).

The NOI ought to be enjoined because it necessarily compels speech in violation of the First Amendment.

## B.    The Department's interpretation also violates the Spending Clause.

All schools that receive federal education funds must adhere to Title IX or risk losing funding. Accordingly, "Congress has broad power under the Spending Clause of the Constitution to set the terms on which it disburses federal funds. '[L]egislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, [the recipients] agree to comply with federally imposed conditions.'" *Cummings v. Premier Rehab Keller, PLLC*, 142 S. Ct. 1562, 1568 (2022) (quoting *Pennhurst State Sch. and Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)).

"Just as a valid contract requires offer and acceptance of its terms, the legitimacy of Congress' power to legislate under the spending power rests on whether the recipient voluntarily and knowingly accepts the terms of the contract." *Barnes v. Gorman*, 536 U.S. 181, 186 (2002) (cleaned up). "A safeguard of our federalist system is the demand that Congress provide the States with a clear statement when imposing a condition on federal funding[.]" *Adams*, 2022 WL 18003879, at *17.

The Department's NOI would breach this contractual arrangement. In the same way that forcing schools to pay out emotional damages is an unpredictable result of a contractual bargain, so too is incurring liability under Title IX for not enacting strict gender identity and sexual orientation policies. *See Cummings*, 142 S. Ct. at 1570–71 ("[T]o decide whether emotional distress damages are available under the Spending Clause statutes . . . we [] ask . . . [w]ould a prospective funding recipient, at the time it engaged in the process of deciding whether [to] accept federal dollars, have been aware that it would face such liability?") (internal quotation and citation omitted).[18]

---

[18] Indeed, even the Biden Administration has acknowledged that biological males who identify as female still are "male" for the purpose of the Selective Service. Emma Colton, FOX NEWS, *Transgender women must sign up for military draft under Biden admin, trans men get a pass* (Oct. 11, 2022), https://www.foxnews.com/us/transgender-women-must-sign-up-military-draft-biden-admin-trans-men-pass.

Most importantly, when terms of great magnitude such as "gender identity" remain undefined, no school or school district could predict the terms of its contract. *See Barnes*, 536 U.S. at 188 ("Not only is it doubtful that funding recipients would have agreed to exposure to such unorthodox and indeterminate liability; it is doubtful whether they would even have *accepted the funding* if punitive damages liability was a required condition."). Indeed, schools could never reasonably predict that they would have to violate the First Amendment in order to obtain federal funds.

And of course, a rule relying on "gender identity" for preferred pronouns poses a hopelessly in-administrable rule: students can change their identities numerous times, with little or no warning, and with no limit to the types of gender identities available. Some students vacillate multiple times between preferences.[19] Against this backdrop, schools could never have predicted the terms of the Title IX "contract" to change so dramatically.

**C.    The Department's interpretation violates the Major Questions Doctrine.**

The Department's NOI also runs afoul of the Major Questions Doctrine. If Congress wanted the Department to interpret the word "sex" to include all forms of gender identity and sexual orientation, it would have said as much. The Major

---

[19] Kate Jerkovich, '*Nobody's Perfect': Disney Star Demi Lovato Explains Why She's Going Back to 'She/Her' Pronouns*, DAILY WIRE (Aug. 2, 2022), https://www.dailywire.com/news/nobodys-perfect-disney-star-demi-lovato-explains-why-shes-going-back-to-she-her-pronouns.

Questions Doctrine establishes that "administrative agencies must be able to point to clear congressional authorization when they claim the power to make decisions of vast economic and political significance." *West Virginia v. EPA*, 142 S. Ct. 2587, 2616 (2022) (Gorsuch, J., concurring) (internal citation and quotations omitted); *see also id.* at 2628 (Kagan, J., dissenting) (the Court rejected Justice Kagan's alternative view, that "[a] key reason Congress makes broad delegations . . . is so an agency can respond, appropriately and commensurately, to new and big problems").

A judicial rule that Congress must speak clearly on "major questions" ensures a strict separation of powers between the Executive and Legislative branches. *Id.* at 2617 (Gorsuch, J., concurring) ("The major questions doctrine works in much the same way to protect the Constitution's separation of powers."). Most recently, in *West Virginia v. EPA*, the Supreme Court emphasized, "[a]gencies have only those powers given to them by Congress, and enabling legislation is generally not an open book to which the agency [may] add pages and change the plot line." *Id.* at 2609 (majority opinion) (internal quotation and citation omitted). The same principles utilized in *West Virginia v. EPA* serve to invalidate the Department's NOI.

Our democracy depends on vesting power with the people, in the form of elected representatives, rather than with bureaucracies. *See id.* at 2617 (Gorsuch, J., concurring) ("It is vital because the framers believed that a republic—a thing of the

people—would be more likely to enact just laws than a regime administered by a ruling class of largely unaccountable 'ministers.'").

Congress authorized the Department to carry out provisions of Title IX of the Education Amendments of 1972. But the Department is not authorized to create sweeping new interpretations, particularly when such interpretations have vast economic and political impact. If Congress intended for sex to be non-binary, it wouldn't have "hid[den] elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

In his concurrence in *West Virginia v. EPA*, Justice Gorsuch elucidated several ways that the Supreme Court has historically flagged Major Questions Doctrine issues. Importantly, "th[e] Court has indicated that the doctrine applies when an agency claims the power to resolve a matter of great 'political significance,' . . . or end an 'earnest and profound debate across the country[.]'" *Id.* at 2620 (quoting *NFIB v. OSHA*, 142 S. Ct. 661, 665 (2022); *Gonzales v. Oregon*, 546 U.S. 243, 267–68 (2006)). Also, if the content of bills rejected by Congress are now the content of the agency's regulation, that can be a telling sign. *Id.* at 2620–21.

To address the "history and the breadth of the authority that [the agency] has asserted," the idea of nonbiological, non-binary gender identity is not found in the text of Title IX, nor is it consistent with decades of interpretation of that statute. *Id.* at 2608 (internal quotation and citation omitted). From the beginning, Title IX

regulations have confirmed the textual reading, establishing a binary, objective, and immutable meaning of sex within the statute's terms. *See supra* sections I, II.

Furthermore, the Department's interpretation would end an earnest and profound policy debate across the country about the meaning of "sex" discrimination. *Bostock* merely addressed whether a biological man who identifies as a woman can be fired for such identification consistent with Title VII; it is too much, however, to suggest that *Bostock* held that sex discrimination includes all forms of gender identify and sexual orientation discrimination when the Court expressly disclaimed any such holding. *See Tennessee v. U.S. Dep't of Educ.*, No. 3:21-cv-308, 2022 WL 2791450, *1 (E.D. Tenn. July 15, 2022) ("The Court was careful to narrow the scope of its holding.").

The Department's NOI also follows in the wake of failed legislation; as recently as 2022, Congress unsuccessfully attempted to pass the "Equality Act," which would have "prohibit[ed] discrimination based on sex, sexual orientation, and gender identity in areas including . . . education[.]" Equality Act, H.R. 5, 117th Cong. (as passed by House, Feb. 25, 2021)[20]; *see also West Virginia*, 142 S. Ct. at 2620–21 (Gorsuch, J., concurring) ("[T]his Court has found it telling when Congress has considered and rejected bills authorizing something akin to the agency's proposed course of action. . . . That [] may be a sign that an agency is attempting to

---

[20] https://www.congress.gov/bill/117th-congress/house-bill/5

work [a]round the legislative process to resolve for itself a question of great political significance.") (internal quotations and citations omitted); *Adams*, 2022 WL 18003879, at *18 ("Absent a clear statement from Congress, such a reading of Title IX would offend first principles of statutory interpretation and judicial restraint."). Thus, the Department's guidance document violates the Major Questions Doctrine.

## CONCLUSION

Broad notions of sexual orientation and gender identity are distinct from, and not encompassed within, "sex," as that term is used in Title IX. This Court should thus affirm the District Court because the Department of Education's NOI does violence to the text of Title IX, would lead to violations of the First Amendment, and contravenes both the Spending Clause and the Major Questions Doctrine. The injunction should thus be affirmed.

Respectfully submitted,

*/s/ William E. Trachman*
William E. Trachman
Kaitlyn D. Schiraldi
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, CO 80227
Phone: (303) 292-2021
Fax: (877) 349-7074
wtrachman@mslegal.org
kschiraldi@mslegal.org

## CERTIFICATE OF COMPLIANCE

In compliance with FRAP 32(g)(1), this brief complies with the type-volume limitation of FRAP 29(a)(5) and FRAP 32(a)(7)(B) because it contains not more than 6,500 words, excluding the parts exempted by FRAP 32(f).

This brief complies with the typeface requirements of FRAP 32(a)(5) and the type style requirements of FRAP 32(a)(6) because it has been prepared in Microsoft Word using 14-point Times New Roman proportionally spaced typed font.

/s/ William E. Trachman
William E. Trachman
*Attorney for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of January, 2023, I filed the foregoing

Brief of *Amicus Curiae* with the Clerk of the court using the CM/ECF system, which

will automatically serve electronic copies upon all counsel of record.

On this the 31st day of January, 2023.

*/s/ William E. Trachman*
William E. Trachman
*Attorney for Amicus Curiae*
