No. 22-5807

# In the United States Court of Appeals
# for the Sixth Circuit

———————

State of Tennessee, et al.,

*Plaintiffs-Appellees*,

v.

Department of Education, et al.,

*Defendants-Appellants*.

———————

On Appeal from the United States District Court
for the Eastern District of Tennessee
Case No. 3:21-cv-00308 (Atchley, J.)

———————

**BRIEF OF THE AMERICAN CIVIL RIGHTS PROJECT
AS AMICUS CURIAE
IN SUPPORT OF THE APPELLEE AND AFFIRMANCE**

———————

Peter N. Kirsanow
  *Counsel of Record*
Benesch, Friedlander,
  Coplan & Aronoff, LLP
200 Public Square; Suite 2300
Cleveland, Ohio 44114
(216) 363-4500
pkirsanow@beneschlaw.com

Gail Heriot
4830 Hart Drive
San Diego, California 92116

Daniel I. Morenoff
The American Civil Rights Project
P.O. Box 12207
Dallas, Texas 75225
(214) 504-1835
dan@americancivilrightsproject.org

i

## Rule 29(a)(4)(A) Corporate Disclosure Statement

The ACR Project is a nonprofit corporation organized under the laws of Texas. It issues no stock and is neither owned by, nor the owner of any corporate entity in whole or in part.

ii

## Statement of Compliance with Rule 29

All parties have consented to the filing of this brief. No counsel for a party authored any part of this brief. And no one other than the amicus curiae and its counsel financed the preparation or submission of this brief.

iii

# Table of Contents

Rule 29(a)(4)(A) Corporate Disclosure Statement ..................................... i

Statement of Compliance with Rule 29 ..................................................... ii

Table of Contents ................................................................................... iii

Table of Authorities.............................................................................. iv

Interest of *Amicus Curiae* ......................................................... vii

Summary of the Argument ........................................................ 1

Argument................................................................................. 3

    I.    Title IX and Its Regulations Cannot Mean
        What the Federal Defendants Contend ................................ 3

    II.   Title VII Cannot Mean What the Federal
        Defendants Contend, Either ................................ 9

Conclusion............................................................................. 13

Certificate of Compliance....................................................... 15

Certificate of Service ............................................................. 16

iv

# TABLE OF AUTHORITIES

## CASES

*Adams v. Sch. Bd. of St. John's C'ty.*,
  2022 WL 18003879 (11th Cir. 2022) .............................................. 6

*Bostock v. Clayton Co.*,
  140 S. Ct. 1731 (2020) ........................................................ passim

*B.P.J. v. W.Va. State Bd. of Ed.*,
  2023 WL 111875 (S.D. W.Va. 2023)............................................. 7

*Frank v. United Airlines, Inc.*,
  216 F.3d 84 (9th Cir. 2000) ................................................... 11

*Garlitz v. Alpena Reg'l Med. Ctr.*,
  834 F.Supp.2d 668 (Mich. E.D. 2011) ......................................... 11

*Grimm v. Gloucester Co. Sch. Bd.*,
  972 F.3d 586 (4th Cir. 2020) .................................................. 6

*Harrington v. Vandalia-Butler Bd. of Ed.*,
  585 F.2d 192 (6th Cir. 1978) ................................................. 10

*Hulbert v. Memphis Fire Dep't*,
  2000 U.S. App. LEXIS 15804 (6th Cir. 2000)............................... 11

*Texas v. E.E.O.C.*,
  2022 WL 4835346 (N.D. Tex. 2022) .......................................... 13

*Wedow v. City of K.C.*,
  442 F.3d 661 (8th Cir. 2005) ................................................. 12

## STATUTES

20 U.S.C. § 1681(a).............................................................. 4

v

20 U.S.C. § 1682 ................................................................. 5

20 U.S.C. § 1686 ......................................................... passim

42 U.S.C. § 2000e-2(a) ........................................................ 9

42 U.S.C. § 2000e-2(e)(1) ............................................... 2, 10

Title VI of the Civil Rights Act of 1964 ............................... 8

Title VII of the Civil Rights Act of 1964 ...................... passim

Title IX of the Education Amendments of 1972 ............. passim

## **OTHER AUTHORITIES**

Gail L. Heriot, Title VII Disparate Impact Liability Makes Almost Everything Presumptively Illegal,
14 NYU J.L.& Liberty 1 (Jan 1, 2020) ............................... 8

Richard Elkins & Dave King,
The Transgender Phenomenon 82 (2006) ....................... 1

Verhoven, Paul, director. *Starship Troopers*.
Sony Pictures, 1997 ........................................................ 6

Virginia Prince, *Change of Sex or Gender*,
10 Transvestia 53, 60 (1969) .......................................... 1

Eugene Volokh, The Cal. Civil Rights Initiative: an Interpretive Guide,
44 UCLA L.Rev. 1335 (June 1997) ............................... 10

## **RULES**

34 C.F.R. § 106.33 (1975) ..................................... 2, 5, 6, 7

34 C.F.R. § 106.61 (1996)................................................................. 10

45 C.F.R. § 86.61 (1996)................................................................... 10

82 C.F.R. § 46666 (2017)................................................................. 10

82 C.F.R. § 46655 (2017)................................................................. 10

## <u>TREATISES</u>

1 Larson on Employment Discrimination § 11.02 (2022)................................ 10

vii

### Interest of *Amicus Curiae*

The American Civil Rights Project (the "ACR Project") is a public-interest law firm, dedicated to protecting and where necessary restoring the equality of all Americans before the law.  The ACR Project believes its expertise will benefit the Court in its consideration of this case.

This case interests the ACR Project because it focuses on the proper interpretation of some of America's most important civil rights enactments.

## Summary of the Argument

Defendants' interpretation of Title VII of the Civil Rights Act of 1964 ("Title VII") and Title IX of the Education Amendments of 1972 ("Title IX") is remarkably misguided. In particular, their reliance on *Bostock v. Clayton Co.*, 140 S. Ct. 1731 (2020), to justify their astonishing regulatory overreach is an ideologically driven, logical error.

*Bostock* does not hold that Title VII bans discrimination based on gender identity. Rather, it correctly notes that Title VII bans *sex* discrimination. Its analysis proceeds this way: If a woman in feminine attire can keep her job, then a man in feminine attire must also be able to do so. This is a perfectly coherent approach.

The same approach can be applied to Title IX. On its face, it bans *sex* discrimination, not discrimination based on gender identity.[1] Thus, if a girl in feminine attire can attend a school as a student, then a boy in feminine attire must also be able to do so as well.

---

[1]   The distinction between sex and gender identity was recognized by the original interpretive community for at least Title IX. Indeed, precisely this distinction drove the coining of the term "transgender" to contrast with the older "transsexual" – "transgender" was intended to describe individuals who had adopted the traits of the opposite sex *without* having actually attempted to cross over into "becoming" a member of the opposite sex (through the body's surgical alteration). In 1969, Virginia Prince, an anatomical man who lived as a female, wrote in the underground magazine Transvestia: "I, at least, know the difference between sex and gender and have simply elected to change the latter and not the former. If a word is necessary, I should be termed a 'transgenderal.'" Virginia Prince, *Change of Sex or Gender*, 10 Transvestia 53, 60 (1969), quoted in Richard Elkins & Dave King, The Transgender Phenomenon 82 (2006).

But here's the crucial distinction between *Bostock* and the cases that concern bathrooms, locker rooms, and showers: both Title VII and Title IX expressly **allow** separation by sex for these purposes. Put differently, they both provide **exceptions** to the basic rule that discrimination (including separation) by sex is illegal. For Title IX, the authority for this kind of separation comes from 20 U.S.C. § 1686 and 34 C.F.R. § 106.33 (1975) (the "1975 Regulation"). For Title VII, the authority comes from the 42 U.S.C. § 2000e-2(e)(1), which allows for disparate treatment when sex is a bona fide occupational qualification.

For the sake of argument, though, suppose that's wrong. Suppose that Title VII and Title IX do not expressly allow for separation by sex for the purpose of bathrooms, locker rooms, or showers. If so, that would mean **all** men, not just those who psychologically identify as female, should be able to use the women's facilities. And vice versa. Put differently, it would mean that **unisex** facilities are required.

The same would go for athletic teams. Either Title VII and Title IX authorize separation by sex, or they require unisex teams. There is no basis for any other reading.

Counsel has diligently searched for evidence that anybody thought that Title VII would mandate unisex bathrooms, locker rooms, showers, and athletic teams when it passed in 1964. Similarly, counsel has looked for evidence that anyone thought Title IX would do so. We found no such evidence.

Arguing that a "transgender woman" (i.e., a chromosomal and anatomical man who psychologically identifies as female) really is a woman doesn't help the defendants' case. Indeed, it spoils it. Neither Title VII nor Title IX prohibits discrimination against ***different kinds of women***.

It is important to note that while neither Title VII, nor Title IX ***require*** employers or federally funded schools or employers to assign transgender individuals to the bathrooms, locker rooms, showers, or athletic teams of the sex they psychologically identify with, our analysis doesn't indicate that the statutory texts ***prohibit*** them from doing so if they wish to. Since there is no federal law forbidding gender identity discrimination, there is no need for a law that expressly authorizes such separation. Just as they may separate by left- and right-handedness, they may separate by gender identity.

This is as it should be. Deciding how to handle a situation with an employee or student who is transgender requires some flexibility on the part of the employer or school. Sometimes one solution is best, sometimes another is. The defendants' one-size-fits-all approach is not just a misinterpretation of the law, it is also bad policy.

## Argument

## I.    Title IX and Its Regulations Cannot Mean What the Federal Defendants Contend

Title IX forbids federally funded education programs or activities from engaging in sex discrimination. Its key provision states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be

denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance….”  20 U.S.C. § 1681(a).  There is no other section of Title IX that forbids other kinds of discrimination.  By its express terms, Title IX addresses sex discrimination and only sex discrimination.  A federal funding recipient's policies discriminating based on anything other than sex does not violate Title IX.

Title IX contains an exception to its sweeping rule against sex discrimination.  “[N]othing contained herein shall be construed to prohibit any educational institution … from maintaining separate living facilities for the different sexes.” 20 U.S.C. § 1686.  Congress expressly directs that, even if a recipient's policies of maintaining separate living facilities for the different sexes would otherwise qualify as sex discrimination, Title IX “shall [not] be construed to prohibit” that policy.

§ 1686 is not surplusage.  Had Congress failed to enact it, any boarding-school boy in 1973 or at any point thereafter (regardless of whether he identified as a boy or a girl) could have pointed to a girls' dorm and said “if I were a girl, I would be allowed to sleep there.  Since I am a boy, my partially-federally-funded school bars me from doing so.  That's sex discrimination, prohibited by Title IX!”  And he would have been right that it *would* have been sex discrimination.  But his conclusion that Title IX prohibited his

exclusion from the girls' dorm would be wrong, because Congress included and passed § 1686 in Title IX, so *authorizing* that sex discrimination.[2]

Soon after, President Ford approved the 1975 Regulation, clarifying § 1686.[3] The 1975 Regulation reads: "A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex."

The 1975 Regulation's interpretation of "living facilities" as including "toilet, locker room, and shower facilities" was not controversial in 1975 and has never been controversial since. We have searched the internet and have found no examples of anyone: (a) interpreting § 1686 between Congress's passage of Title IX and President Ford's approval of the 1975 Regulation as requiring the abolition of single-sex bathrooms, locker rooms, and showers;[4] or (b) contending in the years since that the 1975 Regulation overstepped its regulatory authority or misinterpreted § 1686.[5] Indeed, the Eleventh Circuit

---

[2]  Exactly the same could be said for any boarding-school girl, demanding access to a boys' dorm.

[3]  § 1682 of Title IX required Presidential approval for it to take effect.

[4]  Indeed, we have been unable to identify: (a) any court case referencing § 1686 prior to 1995; and (b) any article or treatise referencing § 1686: (i) at all, published prior to 1985; and (ii) as well as bathrooms, locker rooms, or showers prior to 1995.

[5]  Even when the Fourth Circuit Court of Appeals applied what it wrongly described as *Bostock*'s reasoning to find a policy barring a biological female from using a men's restroom to violate Title IX, it did so by sidestepping the 1975 Regulation, rather than contending that the 1975

recently held that § 1686 and the 1975 Regulation permit schools to maintain separate intimate living facilities (specifically, separate bathrooms, locker rooms, and showers) for the two sexes.[6]  Simply put, no one has ever contended that Title IX requires every school in America to host the shower scenes from *Starship Troopers*.[7]

That includes the Supreme Court's *Bostock* majority.  *Bostock* was a Title VII case, concerning employers who fired employees because they were, respectively, gay and transgendered.  *Bostock* does not hold that when Title VII says "sex" it means "sex or sexual orientation or gender identity."  It held that Congress's prohibition on sex discrimination prohibited discrimination based on sex – "an employer who fires a transgender person who was identified as a male at birth but who now identifies as female" while "retain[ing] an otherwise identical employee who was identified as female at birth … penalizes" the fired employee "for traits or actions that it tolerates in an employee identified as female at birth.  [That] employee's sex plays an unmistakable and impermissible role in the discharge decision."  *Bostock*, 140 S.Ct. at 1742.

The transgendered plaintiff prevailed in *Bostock* precisely because, however the plaintiff "identified," the plaintiff's sex had not changed.[8]  Title VII

---

Regulation was arbitrary or capricious.  *Grimm v. Gloucester Co. Sch. Bd.*, 972 F.3d 586, 618 (4th Cir. 2020).

[6]  *Adams v. Sch. Bd. of St. John's C'ty.*, 2022 WL 18003879, at *13–*16 (11th Cir. 2022).

[7]  Verhoven, Paul, director. *Starship Troopers*.  Sony Pictures, 1997.

[8]  The Southern District of West Virginia recently recognized the same truth in the Title IX context.  The court in that case held that a state statute

only applied because an employer who fires an employee identifying as female *who is a man*, that would not have fired an employee identifying as female *who is a woman*, definitionally makes the fired employee's sex a but-for cause of the termination. The plaintiff's gender "identification" was relevant only as a behavior the employer accepted from a woman, but not from a man, not as an additional form of discrimination whose prohibition had been newly discovered in Title VII's 56-year-old text.

That logic is entirely consistent with the analysis, above, concerning § 1686. Like the hypothetical boarding-school student, a hypothetical transgender girl[9] would be entirely right to say: "I am an anatomical and chromosomal boy who identifies as female, but am not allowed to use the showers, locker rooms, and bathrooms my school provides for girls. If I were a girl who identified as female, I would be able to use them. That is sex discrimination!" Yes, it would be. But it would be precisely the kind of sex discrimination expressly authorized by Congress in § 1686 and by the 1975 Regulation, so it does not violate Title IX.

---

requiring students to participate on the athletic teams designated for their biological sex did not violate Title IX because Title IX applies to biological sex, not gender. *B.P.J. v. W.Va. State Bd. of Ed.*, 2023 WL 111875, at *9 (S.D. W.Va. 2023) ("There is no serious debate that Title IX's endorsement of sex separation in sports refers to biological sex. . . . transgender girls are biologically male.").

[9] Again, this example would work precisely the same for a transgender boy, with all the sexes reversed.

It would be no answer for the hypothetical transgender girl to insist that she really *is* a girl, who should have access to her school's single-sex girls' showers, locker rooms, and bathrooms.  On the one hand, if she were a girl for the purposes of Title IX, her exclusion from the facilities the school provides for biological girls would be discrimination based on something other than "sex," which Title IX did not prohibit.  On the other, if she were right that Title IX prohibited her exclusion from the girls' facilities, despite her biological sex, the result would be the same for *all* biological boys, whatever their gender identity.  Title IX would then prohibit the maintenance of single-sex facilities *entirely*; it would not allow schools to maintain them, while compelling an exception to their access rules based on students' gender identities.

It is worth noting that while Title IX does not *require* federal funding recipients to make such exceptions, it most likely does not *constrain* the ability of any federal funding recipient to: (a) do so; (b) establish solely unisex bathrooms; or (c) separate bathrooms, locker rooms, and showers on any other basis.  Should a school choose to establish separate bathrooms for the left- and right-handed or for students whose surnames all begin with particular letters, those decisions might be odd, but they wouldn't entail sex discrimination, so Title IX should have nothing to say about the matter.[10]

---

[10]  Given established racial and national-origin disparities in handedness and in the distribution of surnames across their first letters, such policies could be indicative of the kind of intentional discrimination forbidden by Title VI.  Gail L. Heriot, *Title VII Disparate Impact Liability Makes Almost Everything Presumptively Illegal*, 14 NYU J.L.& Liberty 1 (Jan 1, 2020).  But

The defendants' position simply misstates governing statutory law and the relevance of Justice Gorsuch's holding from *Bostock*.  The Court should not vacate the district court's preliminary injunction and so re-authorize the Department of Education's provision of faulty guidance to its regulated community.

## II.   Title VII Cannot Mean What the Defendants Contend, Either

A parallel analysis of Title VII dictates the same result.

The relevant language of Title VII forbids employers from engaging in sex discrimination:

> It shall be an unlawful employment practice for an employer—
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's…sex…or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's … sex[.]

42 U.S.C. § 2000e-2(a).

---

we are unaware of any documented sex-differences in the allocation of handedness or surnames that would make such policies implicate Title IX.

Title VII does not include a "living facility" exception like § 1686's for Title IX.  Instead, it contains an exception for "bona fide occupational qualifications" based on sex.  See 42 U.S.C. § 2000e-2(e)(1) ("it shall not be an unlawful employment practice for an employer to hire and employ employees … on the basis of [their] … sex … in those certain instances where … sex … is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business").

It is black letter law that, given the undisputed need for sexual privacy (a consideration not at issue in *Bostock*), this exception allows employers to hire only women to be attendants in women's bathrooms, locker rooms, and showers (and men to be attendants in men's facilities).[11]

If so, *a fortiori*, being a woman is a bona fide occupational qualification for entrance into the women's bathroom, locker room, or shower, and being a man is a bona fide occupational qualification for entrance into the men's facilities.[12]   Put another way, Title VII governs not just hiring, but the

---

[11]  1 Larson on Employment Discrimination § 11.02 (2022).  See also: 82 C.F.R. 46655, 46666 (2017); 34 C.F.R. 106.61 (1996); and 45 C.F.R. 86.61 (1996).  See further also, Eugene Volokh, *The Cal. Civil Rights Initiative: an Interpretive Guide*, 44 UCLA L.Rev. 1335, 1371 (June 1997) ("Courts do not insist that we change our reluctance to be seen unclothed by the opposite sex.").

[12]  This court has long acknowledged that employers at least *may* separate locker rooms and showers by sex.  *Harrington v. Vandalia-Butler Bd. of Ed.*, 585 F.2d 192, 193 & 197 (6th Cir. 1978) (upholding district court's finding of intentional discrimination in conditions, where employer provided private lockers and shower facilities for male physical education teachers, but not for female physical education teachers, but denying

employment that follows hiring.  It expressly exempts from its ban on sex discrimination not only *hiring* based on sex where sex is a bona fide occupational qualification reasonably necessary to the normal operation of a business, but also *employment*.  In context, the inclusion of *employment* in the exception must exempt from the otherwise applicable ban on sex-discrimination differences in the "terms, conditions, or privileges of employment" of men and women, where "reasonably necessary to the normal operation" of an employer's business.[13]  Given the legitimacy courts have long recognized of employees' privacy concerns in bathrooms, locker rooms, and showers, conditioning access to single-sex facilities on the sex of employees must qualify as among the kind of sex-specific terms, conditions, or privileges of employment that are necessary to the normal operation of businesses and so authorized by Title VII.

---

damages based on since amended remedial provision of Title VII); Cf., *Hulbert v. Memphis Fire Dep't*, 2000 U.S. App. LEXIS 15804, *2 (6th Cir. 2000) (holding that Title VII violation was supported by showing that employer failed to afford a woman additional work opportunities at a location, because it lacked women's shower facilities).

[13]  *Frank v. United Airlines, Inc.*, 216 F.3d 84, 853-55 (9th Cir. 2000) (assessing whether a policy imposing different terms and conditions of employment on employees of differing sexes qualifies as a successful bona fide occupational qualification); *Garlitz v. Alpena Reg'l Med. Ctr.*, 834 F.Supp.2d 668, 677-78 (Mich. E.D. 2011) (holding that under Title VII discrimination "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's … sex" "can only be countenanced if sex is a bona fide occupational qualification…").

But suppose defendants argue that Title VII's bona fide occupational qualification exception does not apply and that separation by sex in bathrooms, locker rooms, and showers is not permitted. Given that Title VII specifically prohibits employers from "segregating" employees by sex (unless a BFOQ justifies doing so), that would not mean that employers were required to assign transgender employees to employer-maintained, single-sex bathrooms, locker rooms, and showers for the gender they psychologically identify with. Instead, it would mean that no chromosomal/anatomical man could legally be refused entry into employer-provided women's facilities whether that man is cisgender or transgender. Similarly, it would mean that no chromosomal/anatomical woman, cisgender or transgender, could legally be refused entry into employer-provided men's facilities. That isn't the result that defendants are calling for, but a consistent application of the statutory interpretation they advocate could yield no other result.

*Bostock*, as discussed in the previous section, is entirely consistent with this reading of Title VII. It is a case about sex discrimination, not a case about gender identity. Indeed, it specifically states that "under Title VII … we do not purport to address bathrooms, locker rooms, or anything else of the kind." *Bostock*, 140 S.Ct. at 1753.

Note that – under this reading – Title VII need not *require* employers to provide separate, single-sex bathrooms, locker rooms, and showers.[14] The

---

[14]   But see *Wedow v. City of K.C.*, 442 F.3d 661, 671-672 (8th Cir. 2005) (holding that: (a) providing unisex locker and shower facilities or inadequate

bona fide occupational qualification clause simply *permits* them to do so.  Presumably, an employer could provide unisex facilities or facilities separated by gender identity, instead, if that is its choice.

Again, the defendants' position simply misstates governing statutory law and the relevance of Justice Gorsuch's holding from *Bostock*.  The Northern District of Texas has also recognized that the defendants' interpretation of Title VII is erroneous and has vacated the guidance Chairman Burrow issued on behalf of the EEOC.[15]  The Court should not vacate the district court's preliminary injunction and so re-authorize Chairman Burrow's provision of faulty guidance to the EEOC's regulated community.

## Conclusion

Substantively, the defendants rely on a misreading of *Bostock* to instruct their regulated communities to accept logically untenable versions of Title IX and Title VII.  They were wrong to do so.  The Court should leave the district court's preliminary injunction standing in order to avoid restoring the efficacy of the defendants' substantive errors of law.

---

women's shower facilities was insufficient to comply with Title VII, because "sanitary and private facilities are essential to the job of a firefighter" and "the terms and conditions of a female firefighter's employment are affected by a lack of … private, sanitary shower and restroom facilities[;]" so that (b) "each time a firefighter is required … to serve a 24-hour shift without adequate restroom and shower facilities due to discrimination on account of sex, a separate Title VII violation occurs.").  This case doesn't help defendants any more than the analysis in this brief does.

[15]  *Texas v. E.E.O.C.*, 2022 WL 4835346 (N.D. Tex. 2022).

Respectfully submitted.

 /s/ Peter S. Kirsanow

Peter N. Kirsanow
   Counsel of Record
Benesch, Friedlander,
   Coplan & Aronoff, LLP
200 Public Square; Suite 2300
Cleveland, Ohio 44114
(216) 363-4500
pkirsanow@beneschlaw.com

Gail Heriot
4830 Hart Drive
San Diego, California 92116

Daniel I. Morenoff
The American Civil Rights Project
P.O. Box 12207
Dallas, Texas 75225
(214) 504-1835
dan@americancivilrightsproject.org

*Counsel for* Amici Curiae

Dated: January 31, 2023

# Certificate of Compliance

With Type-Volume Limitation, Typeface Requirements,
and Type Style Requirements

1.    This brief complies with the type-volume limitation of Fed. R. App. P.
32(a)(7)(B) because:

[X]    this brief contains 3,423 words, excluding the parts of the brief
exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

[ ]    this brief uses a monospaced typeface and contains [state the
number of] lines of text, excluding the parts of the brief exempted by Fed. R.
App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P.
32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

[X]    this brief has been prepared in a proportionally spaced typeface
using Microsoft Word for Mac, version 15.39 in Times New Roman 14-point
type face, or

[ ]    this brief has been prepared in a monospaced typeface using
[state name and version of word processing program] with [state number of
characters per inch and name of type style].


 /s/ Peter S. Kirsanow
Peter S. Kirsanow
*Counsel for* Amici Curiae


Dated: January 31, 2023

### Certificate of Service

I certify that this document has been filed with the clerk of the court and served by ECF upon all counsel of record.

/s/ Peter S. Kirsanow
Peter S. Kirsanow
*Counsel for* Amici Curiae