No. 22-5807

═══════════════════════════

**In the**
**United States Court of Appeals for the Sixth Circuit**

_____

STATE OF TENNESSEE, *ET AL.*,
*Plaintiffs-Appellees*,
v.
DEPARTMENT OF EDUCATION, *ET AL.*,
*Defendants-Appellants*.

_____

**On Appeal from the**
**United States District Court for**
**the Eastern District of Tennessee**

_____

**Brief *Amicus Curiae* of LONANG Institute**
**in Support of Plaintiffs-Appellees and Affirmance**

_____

*Kerry Lee Morgan (P32645)
PENTIUK, COUVREUR & KOBILJAK, P.C
Attorneys for Amicus Curiae
LONANG Institute
2915 Biddle Avenue, Suite 200
Wyandotte, MI 48192
Main: (734) 281-7100
Fax: (734) 281-2524
KMorgan@pck-law.com

Gerald R. Thompson (P-29003)
37637 Five Mile Rd., #397
Livonia, MI 48154
Main: (734) 469-6494
thompson@t-tlaw.com

*Attorney of Record
January 31, 2023

═══════════════════════════

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 22-5807 _____    Case Name: State of Tennessee v Dept of Education

Name of counsel: Kerry Lee Morgan _____

Pursuant to 6th Cir. R. 26.1, Amicus LONANG Institute _____
Name of Party
makes the following disclosure:

1.  Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the
    identity of the parent corporation or affiliate and the relationship between it and the named
    party:

> No.

2.  Is there a publicly owned corporation, not a party to the appeal, that has a financial interest
    in the outcome? If yes, list the identity of such corporation and the nature of the financial
    interest:

> No.

---

CERTIFICATE OF SERVICE

I certify that on _____ January 31, 2023 _____ the foregoing document was served on all
parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not,
by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Kerry Lee Morgan _____
Pentiuk, Couvreur & Kobiliak, P.C. _____
Attorneys for Amicus LONANG Institute

---

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs,
immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

Page

DISCLOSURE STATEMENT ..................................................i

TABLE OF AUTHORITIES ...............................................iv

STATEMENT OF IDENTIFICATION OF *AMICUS CURIAE* ..............................1

STATEMENT OF THE CASE..................................................3

ARGUMENT ...............................................................4

    I.  The District Court's injunction is Easily Sustained ...................................4
        a. *Bostock* only Reached Title VII Terminations .................................4
        b. *Bostock* declined to Reach Title IX ...................................4

    II.  Agency Adopted New Rules are Legislative requiring
        Prior Notice and Comment ..........................................5

    III.  Judicially Adopted New Rules are Legislative Violating
        Separation of Powers ...............................................6

    IV.  To Follow Precedent or Follow Law?.....................................8

    V.  An Honest Observance of Separation of Powers,
        Illuminates *Bostock* as Wrongly Decided..................................9

    VI.  Justice Gorsuch's "Ordinary Public Meaning" Test in *Bostock*
        Is without Legal Pedigree, Fact-less, and Non-precedential .................10
        a.  Justice Gorsuch's "Ordinary Public Meaning" Test
           is Self-invented................................................12
        b.  Justice Gorsuch's "Ordinary Public Meaning" Test
           is not Factually based. .........................................14
        c.  Justice Gorsuch's "Ordinary Public Meaning" Test
           is not Precedential. .............................................15

    VII.  The Text of Title VII and Title IX in Light of the Law of Nature is
        the Starting Place, Not *Bostock*. ........................................16

CONCLUSION ..................................................................................................20

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) .....................................21

CERTIFICATE OF SERVICE ............................................................................21

# TABLE OF AUTHORITIES

**CASES**                                                                 **Page(s)**

**U.S. Supreme Court Cases**

Bostock v. Clayton Cnty., Georgia,
  207 L. Ed. 2d 218, 140 S. Ct. 1731 (2020)....................................ii,1,3-9,11-16,19

Food Mktg. Inst. v. Argus Leader Media,
  204 L. Ed. 2d 742, 139 S. Ct. 2356, 2362 (2019)................................................13

Holmes v. Jennison,
  39 U.S. 540, 570-71 (1840) ........................................................................11

Marbury v. Madison,
  5 U.S. 137, 180 (1803).................................................................................9

New Prime Inc. v. Oliveira,
  586 U.S. –, 139 S. Ct. 532, 538-539, 202 L. Ed.2d 536 (2019) ..........................7

Ogden v. Saunders,
  25 U.S. 213, 232 (1827)..............................................................................13

Richfield Co. v. Christian,
  206 L. Ed. 2d 516, 140 S. Ct. 1335, 1363 (2020)................................................13

Wisconsin Central Ltd. v. United States,
  585 U. S. ——, 138 S. Ct. 2067, 2074, 201 L. Ed.2d 490 (2018)......................13

**Lower Court Cases**

Holloway v. Arthur Andersen & Co.,
  566 F.2d 659, 661 (CA9 1977) (addressing claim from 1974) ..........................14

Mann Constr., Inc. v. United States,
  27 F.4th 1138, 1142-43 (6th Cir. 2022)............................................................6,7

Pelcha v. MW Bancorp, Inc.,
    988 F.3d 318, 324 (6th Cir. 2021) (quoting *Bostock*, 140 S. Ct. at 1753)............4

Smith v. Liberty Mut. Ins. Co.,
    395 F. Supp. 1098, 1099 (ND Ga. 1975) (addressing claim from 1969)..........14

**Statutes**

Title VII, 42 U.S. Code § 2000e–2 .....................................................3-6,11-12,14-19
Title IX, 20 U.S. Code § 1681 ......................................................3-5,11,15-16,18-19

**Court Rules**

Fed. R. App. P. 29(a)(2)...........................................................................................2
Fed. R. App. P. 32(a)(5)..........................................................................................21
Fed. R. App. P. 32(a)(6)..........................................................................................21
Fed. R. App. P. 32(a)(7)(B) .....................................................................................21
Fed. R. App. P. 32(a)(7)(B)(iii) ...............................................................................21

**Miscellaneous**

Herbert W. Titus, The Constitution and the High Court: The Case
for Textual Fidelity (2006). https://lonang.com/commentaries/conlaw/judicial-
power/the-constitution-and-the-high-court/#fn15d   ...............................................11

Kerry Lee Morgan, The Laws of Nature and of Nature's God:
The True Foundation of American Law. (2006).
https://lonang.com/commentaries/conlaw/declaration/laws-of-nature-and-natures-
god/ ........................................................................................................................17

May 27, 1830: Andrew Jackson, Veto Message Regarding Funding of
Infrastructure Development.
https://www.loc.gov/resource/maj.08174_0001_0018/?sp=8&st=image   ............10

Young India, 1924-1926 by Mahatma Gandhi, p. 1285.
https://dspace.gipe.ac.in/xmlui/handle/10973/33432?show=full  ..........................10

## STATEMENT OF IDENTIFICATION OF AMICUS CURIAE

LONANG Institute is a Michigan-based, nonprofit and nonpartisan research, and educational institute. Application of the "Laws Of Nature And Nature's God" to contemporary legal disputes is its specialty. Referenced in the Declaration of Independence of 1776, the law and its principles including the creation of mankind, male and female, and separation of powers became then permanently enshrined into our forms of civil government. This same law also presupposed that any civil government, branch, agency, or commission thereafter created are obliged to honestly observe, not suppress, its principles.

As friend of the Court, LONANG Institute offers the Court reasoned insight into the legal implications of that Law pertinent to <u>Bostock v. Clayton Cnty., Georgia</u>, 207 L. Ed. 2d 218, 140 S. Ct. 1731 (2020). The Institute reasons that Justice Gorsuch's "ordinary public meaning" test propping up that decision, lacks legal authority among the Supreme Court's case law and is therefore neither binding nor precedential upon this Circuit.

The undersigned counsel authored the brief in whole. No party's counsel authored the brief in whole or in part. No party or a party's counsel contributed money intended to fund the preparation or submission of the brief. No person other than the amicus curiae, its members, or its counsel contributed money intended to fund the preparation or submission of the brief.

1

Amicus LONANG Institute obtained the consent of the parties to file its Amicus brief pursuant to Fed. R. App. P. 29(a)(2). The Appellant Department of Justice replied that it "consents to a timely-filed amicus brief pursuant to FRAP 29." The Appellee States indicated they had no objection to Amicus LONANG Institute filing an Amicus brief. The Intervenor-Appellees also indicated they had no objection to Amicus LONANG Institute filing an Amicus brief.

## STATEMENT OF THE CASE

Appellants United States Department of Education (DOE), the Equal Employment Opportunity Commission (EEOC) and the Department of Justice (DOJ) appealed the District Court's order granting in part and denying in part the Appellee States' motion for a preliminary injunction. Op. 46, R. 86, Page ID # 1987. The District Court enjoined implementation of interpretive documents issued by the EEOC and the DOE purporting to apply the Supreme Court's decision in Bostock v. Clayton Cnty., Georgia, 207 L. Ed. 2d 218, 140 S. Ct. 1731 (2020).

The government Appellants' enjoined documents prohibited sex discrimination broadly under Title VII and Title IX respectively, by expanding *Bostock's* actual holding regarding discrimination based on sexual orientation and gender identity. The core of the government's appeal is that the district court abused its discretion in granting the preliminary injunction because the States failed to show a likelihood of success on the merits and that the balance of equities weighed against preliminary relief.

The appellee States maintain, *inter alia*, that the DOE and EEOC's documents are an unauthorized and unconstitutional new rule expansion of *Bostock* and the District Court's decision was correct and should be affirmed. Their fourteen count complaint alleges several theories including a violation of separation of powers. Comp. Doc. 1, Page ID #23.

3

## ARGUMENT

### I.  The District Court's injunction is Easily Sustained

a. *Bostock* only Reached Title VII Terminations.

The District Court found Plaintiffs (Appellees) demonstrated a likelihood of success on the merits.  The Defendants' (Appellants) challenged guidance documents expanded the *Bostock* decision to both Title IX and all of Title VII's prohibitions.  The *Bostock* decision, however, held that it was narrow in scope only applying to Title VII and only in regard to employment terminations subject to Title VII.  Title VII prohibits an employer from "fir[ing] someone simply for being homosexual or transgender." *Bostock*, 140 S. Ct. at 1753. The Sixth Circuit has adopted this position. See Pelcha v. MW Bancorp, Inc., 988 F.3d 318, 324 (6th Cir. 2021) (quoting *Bostock*, 140 S. Ct. at 1753) "Bostock extends no further than Title VII."

b. *Bostock* declined to Reach Title IX

Since the government's rules went beyond applying *Bostock* to Title VII terminations and also applied it whole cloth to Title IX, the District Court reasoned the government's challenged documents constituted new legislative rules.  The new rules created new and additional rights and obligation in the Title VII and Title IX context, not found in *Bostock*.

The APA sets different procedural requirements for "legislative rules" and "interpretive rules": the former must be promulgated pursuant to notice-and-comment rulemaking; the latter need not.  Since the Defendants failed to comply with the APA's requirements in promulgating its new legislative rules under Title VII and Title IX, the Plaintiffs easily enjoyed a strong likelihood of success on the merits.  The Sixth Circuit should have no problem in affirming the lower court's injunctive relief considering the government's inexcusable APA legal failures.

## II.   Agency Adopted New Rules are Legislative, Requiring Prior Notice and Comment.

Yet, Amicus write to explain that *Bostock* itself presents a new legislative rule, and is not simply a judicial decision. It created a rule of general applicability governing employer terminations, a power reserved to Congress, not the weaker judicial branch.  Who decides?  Who in our Constitutional System decides the legal scope of the term "sex" in Title VII?  The Congress, the executive branch through its orders, commissions and agency documents, or the courts? Relying on binding precedent, the Sixth Circuit has already explained the applicable legal standard for who decides:

> [L]egislative rules have the force and effect of law and interpretive rules do not. Thus, a rule that intends to create new law, rights, or duties, is legislative, while a rule that simply states what the administrative agency thinks the statute means, and only reminds affected parties of existing duties is interpretive. Because interpretive rules cannot effect a substantive change in the regulations, a rule that adopts a new position inconsistent with any of the [agency's] existing regulations is necessarily legislative.

5

<u>Mann Constr., Inc. v. United States</u>, 27 F.4th 1138, 1142-43 (6th Cir. 2022) The District court quoted this rule verbatim, 2022 U.S. Dist. LEXIS 125684, *58.

So far, so good.  But as this is the rule—that the executive branch cannot lawfully create a new rule through its bureaucracy, the same rule must also hold true when applied to the judicial branch through its courts.

### III.    Judicially Adopted New Rules are Legislative, Violating Separation of Powers.

The key question, therefore, the Sixth Circuit ought to consider beyond simply affirming the lower court's injunctive relief, is whether the decision of the Supreme Court in *Bostock* really applies existing Title VII law, or instead the decision invented a substantive change in existing Title VII law.  Did *Bostock* create a new legislative rule under the guise of determining the meaning of the word "sex" in Title VII?

The point is made more sharply by applying the *Mann Construction* Court's own agency-based statutory construction approach to the Supreme Court's *Bostock* decision. It is easy for a court to apply the test to the executive branch. But the true law of nature principle that legislative power is for the legislature (in this case Congress), applies equally in examining decisions of the judicial branch. If one knows when an *agency* makes new rules versus stating what the statute means, then one can also know by the same yardstick if the Court's decision in *Bostock*, makes a new rule versus stating what the statute already means.

6

What follows is the *Mann Construction* court's own rule concerning how you know legislation when you see it, as rephrased by Amicus, and then applied to the judicial branch.

> Because judicial decisions cannot effect a substantive change in the statute, a decision that adopts a new position inconsistent with the existing Congressional statute is necessarily legislative, and as such violates the Constitution's horizontal separation of powers. And if that decision affects a State, then it also violates the Constitution's vertical separation of power.[1]

This re-paraphrase states the rule when applied to the "other branch," meaning the Judicial branch. It is not a rule just for the executive branch. If horizontal and vertical separation of powers still mean anything substantively, it must be candidly admitted that the judicial branch has no more Constitutional authority than the executive branch with all its bloated departments, agencies, and commissions, to adopt a new legal position inconsistent with any of the existing laws passed by Congress. Just because a new legal position is dressed up and titled

---

[1]  The *Bostock* majority pays lip service to this, approach assuring the naïve reader that it is faithfully staying in its judicial lane. But its holding discards the principle in practice.

"After all, only the words on the page constitute the law adopted by Congress and approved by the President. If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process reserved for the people's representatives. And we would deny the people the right to continue relying on the original meaning of the law they have counted on to settle their rights and obligations." See New Prime Inc. v. Oliveira, 586 U.S. ——, 139 S. Ct. 532, 538–539, 202 L. Ed.2d 536 (2019)."

a Rule, a Guidance, a Regulation, an Executive order, or even a Supreme Court decision, it cannot legitimize its embrace of a new legislative power.

As lawyers and judges, however, our professional experience and atextual constitutional training about who should decide, makes the *Bostock* Court's sleight of hand harder to see. If only Judicial opinions were labeled an "agency guidance" our task would be easier.

## IV.    To Follow Precedent or Follow Law?

Amicus recognize the easy path here is to affirm the injunctive relief ordered by the District Court and be done with it. To go beyond that, requires this Court to struggle with its duty as a lower court to follow the decisions of the Supreme Court as precedent, or reflect more attentively upon its constitutional oath individually taken by each judge to support the Constitution.  Who can serve two masters?  The duty regarding adherence to precedent does not require slavish obedience to precedent, but distinguishing precedent is not to be undertaken lightly.  Amicus' view is that this ought not be a hard decision since an oath invokes the judgment of the Almighty as the supreme judge of the oath taker's conscience, whereas the duty to follow the decisions of a superior tribunal only invokes the displeasure of human beings.

If this approach lacks persuasion, then Chief Justice John Marshall may resonate.  The very legitimacy of judicial review rests on the proposition that the

"framers … contemplated that instrument as a rule of government of the courts."

Referring to the Constitution's oath he asks the following, which Amicus believe is also directed to this Circuit's instant panel:

> Why otherwise does it direct the judges to take an oath to support it? …
> Why does a judge swear to discharge his duties agreeably to the constitution
> of the United States, if that constitution forms no rule for his government? If
> it is closed to him, and … not … inspected by him? If such be the real state
> of things, this is worse than solemn mockery. To prescribe, or take this oath
> becomes equally a crime.[2]

Can the Sixth Circuit be so reckless of its constitutional obligations to prefer an unbending commitment to strict appellate review, accepting the *Bostock* decision of the Supreme Court, when the foundational principles of the Union are torn away thereby? Is there so little hope to find a friend of federalism these days? Will the Court follow *Bostock* as if it is real precedent or will it follow the law, which in this case is the Constitution's separation of powers doctrine?

## V.  An Honest Observance of Separation of Powers, Illuminates *Bostock* as Wrongly Decided.

Perhaps Amicus can help make the choice clearer?   President Andrew Jackson framed such constitutional choices by stating:

> When an honest observance of constitutional compacts cannot be obtained
> from communities like ours, it need not be anticipated elsewhere, and the
> cause in which there has been so much martyrdom, and from which so much
> was expected by the friends of liberty, may be abandoned, and the degrading
> truth that man is unfit for self-government admitted. And this will be the

---

[2]  <u>Marbury v. Madison,</u> 5 U.S. 137, 180 (1803).

case if expediency be made a rule of construction in interpreting the Constitution. Power in no government could desire a better shield for the insidious advances which it is ever ready to make upon the checks that are designed to restrain its action.[3]

It is critical to acknowledge that President Jackson portrayed the struggle as one over honesty first and foremost: "When an honest observance of Constitutional compacts cannot be obtained from communities like ours . . . ." Why honesty? Why not an observance based on the "case law" or Supreme Court "decisions"? Jackson chose honesty because that is the human issue undergirding fidelity to the law of the land.

As the law of nature observes, without honesty, Justice is turned back, and righteousness stands far away. When truth has stumbled in the public square, uprightness cannot enter. Isaiah 59:14. Without honesty, we turn away from listening to the truth and wander off into myths. Timothy 4:4. Indeed, "An error does not become truth by reason of multiplied propagation, nor does truth become error because nobody sees it" or so said Mahatma Gandhi in 1925.[4]

Nor should this Court lose to antiquity what Chief Justice Taney wrote:

---

[3] May 27, 1830: Andrew Jackson, Veto Message Regarding Funding of Infrastructure Development.
https://www.loc.gov/resource/maj.08174_0001_0018/?sp=8&st=image

[4] Young India, 1924-1926 by Mahatma Gandhi, p. 1285.
https://dspace.gipe.ac.in/xmlui/handle/10973/33432?show=full

In expounding the Constitution of the United States, every word must have its due force and appropriate meaning; for it is evident from the whole instrument that no word was unnecessarily used or needlessly added…. Every word appears to have been weighed with the utmost deliberation, and its force and effect to have been fully understood. No word in the instrument, therefore, can be rejected as superfluous or unmeaning.[5]

This same respect for the written word should likewise apply to the Court's textual approach to statutes like Title VII and Title IX. "Given this high view of the constitutional text, the Court adopted a rule of construction, designed to maintain the prevalence of that written text over the courts."[6]

## VI. Justice Gorsuch's "Ordinary Public Meaning" Test in *Bostock* Is without Legal Pedigree, Fact-less, and Non-precedential.

Amicus have so far discussed how the test for legislation and new rules applies equally to the judicial as well as executive branches. We have recalled the high standard of honesty observed by Chief Justice Marshall and President Andrew Jackson when adjudicating Constitutional and statutory questions. Amicus now turn to those additional forceful reasons to assist this Court to go beyond mere affirmance of the lower court, but rather to also cast a critical judicial eye upon *Bostock* itself. Amicus present legal arguments that discredit *Bostock's* "ordinary

---

[5]    <u>Holmes v. Jennison</u>, 39 U.S. 540, 570-71 (1840) (The construction given to the word "suit" in the act of 1789 is well calculated to promote the great ends of justice, and undoubtedly conforms to the intention of the legislature.) Id. at 568.

[6]    Herbert W. Titus, <u>The Constitution and the High Court: The Case for Textual Fidelity (2006)</u>. <u>https://lonang.com/commentaries/conlaw/judicial-power/the-constitution-and-the-high-court/#fn15d</u>

11

public meaning" test as one with no real pedigree, illustrate *Bostock's* lack of any factual foundation, and conclude that *Bostock* is non-precedential, or at least distinguishable and does not govern this appeal.

In so doing, Amicus focus on the lynchpin of Justice Gorsuch's majority opinion—his invention and contrivance of the phrase "ordinary public meaning." Whether Justice Gorsuch is mistaken, confused or simply not honest with the invocation of his "ordinary public meaning" test is for others to decide.

But let facts be submitted to a candid world, or in this case the panel. Consider these key foundational claims in *Bostock*.  "This Court normally interprets a statute in accord with the *ordinary public meaning* of its terms at the time of its enactment."  140 S. Ct. at 1738. "With this in mind, our task is clear. We must determine the *ordinary public meaning* of Title VII's command." 140 S. Ct. at 1738. Justice Gorsuch passes this phrase along as if it really is what the "Court normally" interprets and what it typically "determine[s]."  But is this really an honest construction?

a.  Justice Gorsuch's "Ordinary Public Meaning" Test is Self-invented.

Contrast his "ordinary public meaning" test with the right of the people "to continue relying on the ***original meaning*** of the law they have counted on to settle

their rights and obligations." 140 S. Ct. at 1738. The "original meaning" - that is the "normal" test that is "typically" applied.  That is the Marshall test.[7]

Where then did "ordinary public meaning" come from? What is its pedigree? A Westlaw search reveals it is merely referenced in two prior Supreme Court cases.  It was alluded to once in a FOIA case, <u>Food Mktg. Inst. v. Argus Leader Media</u>, 204 L. Ed. 2d 742, 139 S. Ct. 2356, 2362 (2019).   Justice Gorsuch delivered the opinion of the Court in that case.  The term also appears once in <u>Richfield Co. v. Christian</u>, 206 L. Ed. 2d 516, 140 S. Ct. 1335, 1363 (2020) "(When interpreting a statute, this Court applies the law's ordinary public meaning at the time of the statute's adoption, here 1980.  <u>See</u> <u>Wisconsin Central Ltd. v. United States</u>, 585 U. S. ——, 138 S. Ct. 2067, 2074, 201 L. Ed.2d 490 (2018)." Justice Gorsuch wrote a concurring in part and dissenting in part opinion in that case too.  A further review of the *Wisconsin Central* case cited reveals again that Justice Gorsuch was its author, and in that case, he used "ordinary meaning;" "common meaning," and "ordinary, contemporary, common meaning" all interchangeably. What a mishmash.

---

[7] "To say that the intention of the instrument must prevail; that this intention must be collected from its words; that its words are to be understood in that sense in which they are generally used by those for whom the instrument was intended; that its provisions are neither to be restricted into insignificance nor extended to objects not comprehended in them, nor contemplated by its framers is to repeat what has been already said more at large and is all that can be necessary." <u>Ogden v. Saunders</u>, 25 U.S. 213, 232 (1827), Marshall, C.J. dissenting.

Thus, as to the pedigree of "ordinary public meaning," a candid world can see it has none of any account. It is an evolving term conceived of by average lawyers and then adopted and championed by Justice Gorsuch as the true historical test of a statute's meaning. Its zenith so far is reflected in the *Bostock* decision. Yet, it is a palpable departure from and rejection of originalism and "original meaning."

<u>b.  Justice Gorsuch's "Ordinary Public Meaning" Test is not Factually based.</u>

And what part of the record below does the *Bostock* Court point to establishing any understanding of even the "ordinary public meaning" of Title VII in 1964?  The best it can muster is that gay advocates filed judicial claims which were all denied.[8]  As such, some employees believed the 1964 statute was broad enough to include sexual orientation and gender identity.  Historically, however, Justice Gorsuch could have done better than that.  A reference to the ancient beliefs of the gay and transgender citizens of Sodom and Gomorrah about the meaning of

---

[8]  "The employers assert that "no one" in 1964 or for some time after would have anticipated today's result. But is that really true? Not long after the law's passage, gay and transgender employees began filing Title VII complaints, so at least some people foresaw this potential application. See, e.g., <u>Smith v. Liberty Mut. Ins. Co.</u>, 395 F.Supp. 1098, 1099 (ND Ga. 1975) (addressing claim from 1969); <u>Holloway v. Arthur Andersen & Co.</u>, 566 F.2d 659, 661 (CA9 1977) (addressing claim from 1974)." *Bostock*, 140 S. Ct. at 1750–51.

14

sex would have easily predated the statute making his position more persuasive. Genesis 19:5. But this would assume history actually mattered to the decision.

Even so, what new rule of statutory construction is this? That a plaintiff's pleadings reflect the binding "ordinary public meaning" of a statute?[9] Apart from its absurdity, the Court misses the obvious—that the EEOC and courts denial of these early claims is the ordinary public meaning of the term "sex," not the pleadings of attorneys.

### c.  Justice Gorsuch's "Ordinary Public Meaning" Test is not Precedential.

Now this Court is expected to uncritically accept Justice Gorsuch's pedigree-less test in the instant case as precedential, as if it possessed all the historicity and legal heft of the *Magna Carta*. This Court is expected and asked to merely accept Justice Gorsuch's contrivance against the text of Title VII in the *Bostock* case on no actual evidence whatsoever of *any* meaning in 1964. The Sixth Circuit is asked and expected to merely apply the *Bostock* decision to decide if it should reach further than termination of employment under Title VII or even to Title IX. It is asked to accept uncritically as a foundational principle, and as a precedential proposition a dishonest observance of our constitutional compact built

---

[9]   President Donald Trump who filed complaints across the country challenging multiple election law procedures contesting the 2020 Presidential election should welcome this new rule as good news. Amicus looks forward to Justice Gorsuch affirming that the President's pleadings define the meaning of those challenged state and federal election procedures.

on nothing more than a Justice's atextual invention of "ordinary public meaning"-- an empty vessel ready to be filled by judicial majorities.  It is to this house of judicial cards we are trained to close our eyes.

The Bostock majority concludes from this facade of a test, by drawing conclusions in lieu of analysis.  "From the *ordinary public meaning* of the statute's language at the time of the law's adoption, a straightforward rule emerges: An employer violates Title VII when it intentionally fires an individual employee based in part on sex." 140 S. Ct. at 1741.

> At bottom, these cases involve no more than the straightforward application of legal terms with plain and settled meanings. For an employer to discriminate against employees for being homosexual or transgender, the employer must intentionally discriminate against individual men and women in part because of sex. That has always been prohibited by Title VII's plain terms—and that 'should be the end of the analysis.' 140 S. Ct. at 1743.

## VII.   The Text of Title VII and Title IX in Light of the Law of Nature is The Starting Place, Not *Bostock*.

Rather than start with *Bostock*, the Sixth Circuit should start with the statute itself. Its original intent reached only male and female biological distinctions, not what a person identifies as, believes or wants to be or become.  These distinctions were based on the law God laid down at creation when He created mankind.  "In the likeness of God made he him; male and female created he them." Genesis 5:12. In short, God has ordained only two sexual orientations, one male for one female, and one female for one male; and only two acceptable preferences, one male for

one female in a life-long marriage, and one female for one male in a like union. All other sexual orientations and preferences are contrary to the law of nature.

The Declaration of Independence says the consenting States could legitimately become a nation among those of the earth, based on the "Laws of Nature and of Nature's God." This law was not some religious propaganda to be laughed at by lawyers and judges who know more law and judging than the "Supreme Judge of the world." It is a rule binding on our nation that carries with it certain fixed legal principles unambiguously stated therein throughout all generations. Among those principles fixed in our constitutional orbit is that mankind is either male or female as a matter of creation and biology. Departure from that principle is a departure from the organic law of the union. A power to discard, reinvent or make a new legislative rule, is not Constitutionally provided for in any branch, and certainly not by judicial review.[10]

Identity and belief concepts do not influence, let alone control the statutory meaning of "sex." As such an individual's homosexuality or transgender status whatever it may be, be chosen, or believed to be at any particular day or time, when considered by an employer, does not constitute a violation of Title VII. Title

---

[10] Kerry Lee Morgan, The Laws of Nature and of Nature's God: The True Foundation of American Law. (2006). https://lonang.com/commentaries/conlaw/declaration/laws-of-nature-and-natures-god/

VII does not make lawful discrimination against a person for being homosexual or transgender unlawful discrimination against that individual based on sex. The same reasoning applies to "sex" in Title IX.

The Sixth Circuit must "continue relying on the original meaning of the law the[] [people] have counted on to settle their rights and obligations." 140 S. Ct. at 1738. From the original intent of the statute's language at the time of the law's adoption, a straightforward rule emerges: An employer does not violate Title VII when it intentionally fires an individual employee based on homosexuality or transgender status.

At bottom, the instant cases involve no more than the straightforward application of legal terms of Title VII and Title IX with its plain and settled meaning since 1964 and 1972 respectively, based on the original intent of those who adopted it -- that discrimination based on homosexuality or transgender status does not entail discrimination based on sex. Thus, not only were the government appellants' guidance documents properly enjoined as contrary to *Bostock*, but more importantly, they are contrary to the text of Title IX and Title VII themselves.

The Court should distinguish the *Bostock* ruling. The underlying "ordinary public meaning" is not an established test.  Its use creates confusion.  This Court should affirm that Title VII and Title IX impose no non-discrimination criteria with regard to homosexuality or transgender status because of sex under either law.

It should also hold that *Bostock's* claim to the contrary in the context of Title VII terminations is unpersuasive, contrived, lacking a factual foundation, and therefore nonprecedential.

Taken to its logical conclusion, the *Bostock* ruling, if taken seriously, renders all legal dictionaries obsolete and useless. Not only does *Bostock* remove the distinction between words having a specific legal meaning and words not having any particular legal meaning, but it downgrades all legal terms to be equivalent to words as they are used in contemporary popular culture. There are no legal words anymore – only contemporary, common, or popular words.

With the way in which popular culture is constantly changing, the *Bostock* ruling is in reality a rejection of the fixed meaning of words – not merely legal terms, but all words. How long will it be until a clever employer claims it has not violated Title VII or Title IX because the word "sex" is no longer capable of definition according to popular culture, or that firing a woman is not in violation of law because the term "woman" can no longer be defined? Yet, inescapably, this is the direction in which the *Bostock* ruling points us.

# CONCLUSION

For the foregoing reasons, the decision of the court below should be affirmed.

Respectfully submitted,

*/s/ Kerry Lee Morgan*
\*Kerry Lee Morgan (P32645)
PENTIUK, COUVREUR & KOBILJAK, P.C
Attorneys for Amicus Curiae
LONANG Institute
2915 Biddle Avenue, Suite 200
Wyandotte, MI 48192
Main: (734) 281-7100
Fax: (734) 281-2524
KMorgan@pck-law.com

Gerald R. Thompson (P-29003)
37637 Five Mile Rd., #397
Livonia, MI 48154
Main: (734) 855-6494
thompson@t-tlaw.com

\*Attorney of Record
January 31, 2023

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 4,614 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Kerry Lee Morgan*

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the foregoing Brief *Amicus Curiae* of LONANG Institute in Support of Plaintiffs-Appellees and Affirmance, was made, this 31st day of January 2023, by the Court's Case Management Electronic Case Files system upon the attorneys for the parties.

*/s/ Kerry Lee Morgan*
Kerry Lee Morgan
Attorney for *Amicus Curiae*

21