No. 22-5807

### In the
### United States Court of Appeals for the Sixth Circuit

———————————

STATE OF TENNESSEE, *ET AL.*,
*Plaintiffs-Appellees*,
v.
DEPARTMENT OF EDUCATION, *ET AL.*,
*Defendants-Appellants*.

———————————

**On Appeal from the
United States District Court for
the Eastern District of Tennessee**

———————————

**Brief *Amicus Curiae* of Public Advocate of the United States,
America's Future, U.S. Constitutional Rights Legal Defense Fund,
Clare Boothe Luce Center for Conservative Women,
Eagle Forum Foundation, Fitzgerald Griffin Foundation, and
Conservative Legal Defense and Education Fund
in Support of Plaintiffs-Appellees and Affirmance**

———————————

JOHN I. HARRIS III
  Nashville, TN

J. MARK BREWER
  Houston, TX

JAMES N. CLYMER
  Lancaster, PA

PATRICK MCSWEENEY
  Powhatan, VA

WILLIAM J. OLSON*
JEREMIAH L. MORGAN
  WILLIAM J. OLSON, P.C.
  370 Maple Avenue W., Suite 4
  Vienna, VA  22180-5615
  (703) 356-5070
*Attorney of Record
January 31, 2023

*Attorneys for Amici Curiae*

## DISCLOSURE STATEMENT

The *amici curiae* herein, Public Advocate of the United States, America's Future, U.S. Constitutional Rights Legal Defense Fund, Clare Boothe Luce Center for Conservative Women, Eagle Forum Foundation, Fitzgerald Griffin Foundation, and Conservative Legal Defense and Education Fund, through their undersigned counsel, submit this Disclosure Statement pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A).  These *amici curiae* are non-stock, nonprofit corporations, none of which has any parent company, and no person or entity owns them or any part of them.

*s/William J. Olson*
William J. Olson

# TABLE OF CONTENTS

Page

DISCLOSURE STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

INTEREST OF *AMICI CURIAE* . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT

I.    THE BIDEN DOE GUIDANCE DOCUMENTS ARE NOT SUPPORTED BY *BOSTOC*K, BUT RATHER ARE YET ANOTHER EFFORT TO UNDERMINE THE MORALITY OF THE NATION . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.    The DOE Guidance Documents Are Designed to Achieve a Radical Political Objective, Not to Follow the *Bostock* Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    B.    Homosexual Rights Are Often Based on Fabrications . . . . . . . . 8

        1.  *Romer v. Evans* (1996) . . . . . . . . . . . . . . . . . . . . . . . 8

        2.  *Lawrence v. Texas* (2003) . . . . . . . . . . . . . . . . . . . . . 9

        3.  California Proposition 8 (2008) . . . . . . . . . . . . . . . . . . . 10

        4.  Matthew Shepard Hate Crimes Prevention Act (2009). . . . . . 12

        5.  *Obergefell v. Hodges* (2015) . . . . . . . . . . . . . . . . . . . . 13

        6.  *Bostock v. Clayton County* (2019) . . . . . . . . . . . . . . . . . 14

        7.  Respect for Marriage Act (2022) . . . . . . . . . . . . . . . . . . 15

8.  Special Rules for Special Rights . . . . . . . . . . . . . . . . . . . 16

II.   DOE'S GUIDANCE DOCUMENTS WOULD HARM CHILDREN AND
JEOPARDIZE THE SPECIAL PROTECTION AGAINST DISCRIMINATION
TARGETING FEMALES IN TITLE IX. . . . . . . . . . . . . . . . . . . . . . . . 16

A.   Title IX Was Premised on the Understanding that "Sex" Is a
Binary Term Encompassing Only Biological Males and
Females . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

B.   The Sponsor of Title IX Was Clear that Its Purpose Was to
Remedy Disparities in Educational Opportunities which
Favored Males over Females . . . . . . . . . . . . . . . . . . . . . . . 18

C.   Basing Educational Policy on Politics Rather than Science
Ensures the Continuation of Sex Discrimination . . . . . . . . . . . 20

III.  DOE'S GUIDANCE DOCUMENTS WOULD ENDANGER ALL STUDENTS . . . 23

A.   Public Health Dangers of Homosexual Activity . . . . . . . . . . . 23

B.   Persons Suffering from Gender Dysphoria . . . . . . . . . . . . . . 25

C.   Grooming of Students . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

IV.   THE BIDEN GUIDANCE DOCUMENTS ELEVATE THE RELIGION OF
SECULAR HUMANISM OVER BIBLICAL CHRISTIANITY . . . . . . . . . . . . 30

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

# TABLE OF AUTHORITIES

Page

**HOLY BIBLE**

*Genesis* 1:27 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
*Exodus* 20:12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
*Deuteronomy* 11:19 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
*Proverbs* 19:18 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
*Proverbs* 21:2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
*Matthew* 19:4-6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
*Ephesians* 6:1-3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
*Colossians* 3:20 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
*Hebrews* 13:17 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**CASES**

*Bostock v. Clayton County*, 140 S. Ct. 1731 (2020) . . . . . . . . . . . 2, *passim*
*Bowers v. Hardwick*, 478 U.S. 186 (1986) . . . . . . . . . . . . . . . . . . 9
*Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022) . . . 15
*Frontiero v. Richardson*, 411 U.S. 677 (1973) . . . . . . . . . . . . . . . 18
*Hollingsworth v. Perry*, 570 U.S. 693 (2013) . . . . . . . . . . . . . . . . 11
*Lawrence v. Texas*, 539 U.S. 558 (2003) . . . . . . . . . . . . . . . . 9, 10
*Loving v. Virginia*. 386 U.S. 1 (1967) . . . . . . . . . . . . . . . . . . . 15
*In re Marriage Cases*, 43 Cal.4th 757, 183 P.3d 384 (2008) . . . . . . . . . . 10
*Obergefell v. Hodges*, 576 U.S. 644 (2015) . . . . . . . . . . . . . . . 13, 14
*Pickup v. Brown*, 740 F.3d 1208 (9th Cir. 2014) . . . . . . . . . . . . . . . 23
*Roe v. Wade*, 410 U.S. 113 (1973) . . . . . . . . . . . . . . . . . . . . . 9, 10
*Romer v. Evans*, 517 U.S. 620 (1996) . . . . . . . . . . . . . . . . . . . . 8
*Stenberg v. Carhart*, 530 U.S. 914 (2000) . . . . . . . . . . . . . . . . . . 10
*Strauss v. Horton*, 46 Cal. 4th 364, 207 P.3d 48 (2009). . . . . . . . . . . . 11
*Texas v. United States*, 201 F. Supp. 3d 810 (N.D. Tex. 2016) . . . . . . . . . 5
*Whole Woman's Health v. Hellerstedt*, 579 U.S. 582 (2016) . . . . . . . . . . . 16

**STATUTES**

18 U.S.C. § 249 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
28 U.S.C. § 455 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
Education Amendments of 1972, Pub. L. No. 92-318, Title IX . . . . . 2, *passim*
"Respect for Marriage Act," Pub. L. No. 117-228 (Dec. 13, 2022) . . . . . . . 15

iv

## MISCELLANEOUS

118 *Cong. Rec.* 5804 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

118 *Cong. Rec.* 5808 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

The American College Dictionary (1970) . . . . . . . . . . . . . . . . . . . . 17

The American Heritage Dictionary of the English Language (1st ed. 1969) . . 17

M. Artigues and M. Cretella, "Sex is a Biological Trait of Medical
Significance," American College of Pediatricians (Mar. 2021) . . . . . . 21

A. Barnes, "American sprinter becomes most decorated woman in
Olympic track history," *The Hill* (Aug. 6, 2021) . . . . . . . . . . . . . . 22

D. Carpenter, "The Unknown Past of Lawrence v. Texas," 102 MICH
L. REV. No. 7 (June 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

L. Casiano, "Chicago schools watchdog investigated complaints of
alleged employee sexual misconduct with students," *Fox 32 Chicago*
(Jan. 7, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Dep't of Education, Interpretation, 86 *Fed. Reg.* 32637
(June 22, 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 5, 7

Dep't of Education, Notice of Proposed Rulemaking, "Nondiscrimination on
the Basis of Sex in Education Programs or Activities Receiving
Federal Financial Assistance" 87 *Fed. Reg.* 41390 (July 12, 2022) . . . . 3

R. DeSoto, "VA Lawmaker Introduces Bill to Ban Including
'Misgendering' as Child Abuse After Officials Kept Girl from
Parents," *Western Journal* (Jan. 26, 2023) . . . . . . . . . . . . . . . . . . 27

R. Destro, "Abortion and the Constitution: The Need for a Life-Protective
Amendment," 63 CALIF. L. REV. 1250 (1975) . . . . . . . . . . . . . . . . 10

Executive Order No. 13988, "Preventing and Combating Discrimination on
the Basis of Gender Identity or Sexual Orientation" (Jan. 20, 2021) . . 2, 4

Executive Order No. 14021, "Guaranteeing an Educational Environment
Free from Discrimination on the Basis of Sex, Including Sexual
Orientation or Gender Identity" (Mar. 8, 2021) . . . . . . . . . . . . . . . . 2

N. Flanders, "Exposing the six lies of Roe v. Wade that led to legal
abortion," *LiveAction* (Sept. 30, 2018) . . . . . . . . . . . . . . . . . . . . 10

C. Geidner, "Prop 8 Judge Walker, Now Retired, Tells Reporters He's
Gay," *MetroWeekly* (April 6, 2011) . . . . . . . . . . . . . . . . . . . . . . 11

"Ginsburg to Officiate Same-Sex Wedding," *The Washington Post*
(Aug. 30, 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

L. Hanford, "Virginia Teen Sex-Trafficked Twice After School Hides
  Gender Identity From Her Parents," *The Federalist* (Jan. 19, 2023) . . . 27

C. Holcomb, "Biden preaches science while ignoring it on high school
  sports," *N.Y. Daily News* (Feb. 5, 2021) . . . . . . . . . . . . . . . . . . . 22

K. Jay and A. Young, The Gay Report: Lesbians and Gay Men Speak
  Out About Sexual Experiences & Lifestyles (Summit Books: 1979) . . . 30

Stephen Jimenez, The Book of Matt: Hidden Truths About the Murder
  of Matthew Shepard (Steerforth Press: 2020) . . . . . . . . . . . . . . . . 13

E. Kao and A. Jones, "We Must Fight the Sexualization of Children by
  Adults," Heritage Foundation (Oct. 5, 2019). . . . . . . . . . . . . . . . . 28

J. Lohn, "A Look At the Numbers and Times: No Denying the
  Advantages of Lia Thomas," *Swimming World* (Apr. 5, 2022) . . . . . . 21

S. Lovett, "Tavistock gender clinic facing action over 'failure of care'
  claims," *Independent* (Aug. 11, 2022) . . . . . . . . . . . . . . . . . . . . . 28

N. McCorvey, Won by Love (Jan Dennis Books: 1997). . . . . . . . . . . . . . 10

A. Miller, "Licensed Pennsylvania sex therapist defends 'minor-attracted
  persons' in viral video" *Fox News* (Aug. 11, 2022). . . . . . . . . . . . . 30

B. Palmer, "How many kids are sexually abused by their Teachers:
  Probably millions" *Slate* (Feb. 8, 2012) . . . . . . . . . . . . . . . . . . . . 29

The Random House College Dictionary (1973) . . . . . . . . . . . . . . . . . . 17

C. Rice, "Beyond Anal Sex: Sexual Practices among MSM and
  Associations with HIV and Other Sexually Transmitted Infections,"
  J. SEX MED. 2016 (Mar. 13, 2016) . . . . . . . . . . . . . . . . . . . . . . . 24

L. Rosiak, Race to the Bottom: Uncovering the Secret Forces Destroying
  American Public Education (Broadside Books: 2022) . . . . . . . . . . 8, 18

A. Shrier, Irreversible Damage: The Transgender Craze Seducing
  Our Daughters (Regnery Publishing: 2020). . . . . . . . . . . . . . . . . . 25

"Supreme Court Justice Performs Her First Same-Sex Wedding," *CBS
  News* (Sept. 22, 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

M. Talbot, "A Gay Judge's Case," *The New Yorker* (Apr. 26, 2011) . . . . . . 11

Webster's New International Dictionary (3d ed. 1968). . . . . . . . . . . . . . 17

Webster's Third Dictionary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## INTEREST OF *AMICI CURIAE*[1]

Public Advocate of the United States, America's Future, U.S. Constitutional Rights Legal Defense Fund, Clare Boothe Luce Center for Conservative Women, Eagle Forum Foundation, Fitzgerald Griffin Foundation, and Conservative Legal Defense and Education Fund, are nonprofit organizations, exempt from federal taxation under sections 501(c)(3) or 501(c)(4) of the Internal Revenue Code. Each is dedicated, *inter alia*, to the correct construction, interpretation, and application of law.

Some of these *amici* have filed 29 *amicus* briefs in similar cases, including the following Supreme Court merits briefs:

- Lawrence v. Texas, U.S. Supreme Court, No. 02-102 (Feb. 18, 2003);
- Obergefell v. Hodges, U.S. Supreme Court, Nos. 14-556, 14-562, 14-571, and 14-574 (Apr. 3, 2015); and
- Bostock v. Clayton County/Altitude Express v. Zarda, U.S. Supreme Court, Nos. 17-1618 & 17-1623 (Aug. 23, 2019).

---

[1] All parties have consented to the filing of this brief *amicus curiae*. No party's counsel authored the brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than these *amici curiae*, their members or their counsel contributed money that was intended to fund preparing or submitting this brief.

## STATEMENT OF THE CASE

On the day of his inauguration, President Biden's issued Executive Order No. 13988:  "Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation" (Jan. 20, 2021).  That directive cited as authority the U.S. Supreme Court's decision in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020) that "Title VII's prohibition on discrimination 'because of … sex' covers discrimination on the basis of gender identity and sexual orientation."

Although recognizing that the Supreme Court's decision in *Bostock* applied only to an employer who fires an individual for being gay or transgender, under Title VII, President Biden asserted that Title IX of the Education Amendments of 1972 and other federal laws also should be interpreted to prohibit discrimination based on sexual orientation or gender identity ("SOGI") "so long as the laws do not contain sufficient **indications to the contrary**."  EO 13988, section 1 (emphasis added).  That Executive Order required the head of each agency to assess all regulations and find ways to implement President Biden's understanding of *Bostock*.[2]

---

[2]  In March, President Biden issued a similar directive, Executive Order No. 14021, entitled "Guaranteeing an Educational Environment Free from Discrimination on the Basis of Sex, Including Sexual Orientation or Gender Identity" (Mar. 8, 2021).

In response, the Department of Education ("DOE") issued a new "Interpretation" published in the *Federal Register* explaining that "'Title IX's prohibition on sex discrimination … encompass[es] discrimination based on sexual orientation and gender identity' in light of the [Supreme Court's] *Bostock* decision." 86 *Fed. Reg.* 32637 (June 22, 2021). DOE added "to the extent other interpretations may exist, this is the best interpretation of the statute." DOE also stated that it would "**fully enforce Title IX**" against discrimination by educational organizations that receive federal financial assistance. DOE then issued a "Dear Educator" letter to those entities that receive federal assistance and DOE believed would be subject to DOE's new interpretation.

On July 13, 2022, DOE issued a Notice of Proposed Rulemaking entitled "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance" 87 *Fed. Reg.* 41390 (July 12, 2022). Comments were due by September 12, 2022, and 240,186 comments were submitted.[3]

Led by the State of Tennessee, 20 states filed suit in the Eastern District of Tennessee challenging the legality of the DOE and EEOC guidance documents.

---

[3] One of these *amici,* America's Future, filed comments on September 12, 2022, in response to this rulemaking.

3

*See id*.  On July 15, 2022, the district court issued a preliminary injunction of the two agencies' guidance documents, preventing implementation of this document as to plaintiffs.  The court concluded that the guidance documents created rights well beyond what the Supreme Court recognized in *Bostock*, as well as Title IX, or implementing regulations, and that the agencies failed to comply with the APA's notice and comment requirements for rulemakings.  *See Tenn. v. U.S. Dep't of Education*, 2022 U.S. Dist. LEXIS 125684 (E. Dist. Tenn. 2022).

## ARGUMENT

### I.     THE BIDEN DOE GUIDANCE DOCUMENTS ARE NOT SUPPORTED BY *BOSTOCK*, BUT RATHER ARE YET ANOTHER EFFORT TO UNDERMINE THE MORALITY OF THE NATION.

#### A.     The DOE Guidance Documents Are Designed to Achieve a Radical Political Objective, Not to Follow the *Bostock* Decision.

Within months after President Biden issued Executive Order No. 13988, DOE acted to issue forceful directives to those entities that receive federal funds. The DOE Guidance Document indicates that its new interpretation of Title IX was based on *Bostock v. Clayton County*.  *See* "Enforcement of Title IX of the Education Amendments of 1972 with Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of Bostock v. Clayton County," 86 *Fed. Reg*. 32637 (June 22, 2021).  DOE asserts that it reviewed the Supreme Court's

4

*Bostock* decision involving a Title VII employment law issue, and concluded the Court's analysis "properly guides the Department's interpretation of discrimination 'on the basis of sex' under Title IX and leads to the conclusion that Title IX prohibits discrimination based on sexual orientation and gender identity." *Id*. at 32638.[4]

It would be a mistake to assume that DOE issued this guidance because it felt compelled to do so by *Bostock*.  Rather, *Bostock* merely provided a convenient excuse.  Indeed, when President Biden was Vice President, DOE made a similar effort to redefine (through a "Dear Colleague Letter" sent to schools across the country) Title IX to provide special protection to sexual orientation and gender identity during the waning months of the Obama Administration.  On May 13, 2016, DOE advised schools that they must "immediately allow students to use the bathrooms, locker rooms and showers of the student's choosing, or risk losing Title IX-linked funding." *See Texas v. United States*, 201 F. Supp. 3d 810, 816 (N.D. Tex. 2016).  This effort was

---

[4]  The guidance document aggressively assert that the Department "will fully enforce Title IX to prohibit discrimination based on sexual orientation and gender identity in education programs and activities that receive Federal financial assistance…." *Id*. at 32639.

enjoined by the Northern District of Texas on August 21, 2016, shortly before the 2016 Presidential election, and the United States did not appeal that decision.

During the Trump Administration, the Department's Office of Civil Rights ("OCR") itself took the polar opposite position on one of the issues addressed in the DOE Guidance Documents — whether Title IX or *Bostock* requires allowing males to compete on female sports teams.  On August 31, 2020, Kimberly M. Richey, the Acting Assistant Secretary for Civil Rights, sent a letter to Connecticut schools providing a comprehensive reasoning for its position that allowing biological males to compete on women's and girls' teams unlawfully discriminates against biological females on the basis of sex.

When the Biden Administration came to power, it had the opportunity to reverse the Trump DOE policy and revert back to the Obama-Biden DOE position on SOGI, under the guise of applying *Bostock*.  First, President Biden's Executive Order asserted "[u]nder *Bostock's* reasoning, laws that prohibit sex discrimination — including Title IX of the Education Amendments … prohibit discrimination on the basis of gender identity or sexual orientation.…"  The DOE similarly concluded that "the interpretation of sex discrimination set out by the Supreme Court in *Bostock* … leads to the conclusion that Title IX prohibits

6

discrimination based on sexual orientation and gender identity." 86 *Fed. Reg.* at 32638.  However, no such conclusions can be drawn from the Court's opinion.

Justice Gorsuch's majority opinion in *Bostock* explained that the Court's holding was limited to the firing of an employee solely based on sexual orientation or gender identity.  The Court specifically stated that it did not purport to address any other kinds of discriminatory actions other than firing — such as "sex-segregated bathrooms, locker rooms, and dress codes" — which were not before the Court, "and we do not prejudge any such question today." *Bostock* at 1753.  "Whether other policies and practices might or might not qualify as unlawful discrimination or find justifications under other provisions of Title VII are questions for future cases, not these." *Id*.

There are fundamental differences between firing an adult based on Title VII and educating minor children in government schools based on Title IX. There is no constitutional equivalence between the two.  However there is nothing new here.  Just as the DOE Guidance Documents are not based on *Bostock*, the development of special rights for homosexuals and for those suffering from conditions including Gender Dysphoria, have been based on lies, frauds, and fabrications.

7

**B.    Homosexual Rights Are Often Based on Fabrications.**

    **1.  *Romer v. Evans* (1996).**

Unable to find precedent for a decision based on "equal protection," the Tenth Circuit and the Supreme Court relied on *ad hominem* attacks on Colorado voters who were seeking to prevent special rights being granted to homosexuals by localities, imputing both "animus" and "a bare … desire to harm a politically unpopular group" to the supporters of Colorado Amendment 2.  *Romer v. Evans*, 517 U.S. 620, 632, 634 (1996).  Justice Scalia refuted that charge, explaining that: "is not the manifestation of a 'bare … desire to harm' homosexuals … but is rather a modest attempt by seemingly tolerant Coloradans to preserve traditional sexual mores against the efforts of a politically powerful minority to revise those mores through use of the laws."  *Id.* at 636.

This watershed homosexual rights case illustrates the most popular tactic employed against those opposed to special rights for homosexuals and same-sex marriage — alleging opponents are homophobes, filled animus for homosexuals. It is similar to the approach of accusing opponents of "Critical Race Theory," of being racist.  *See* L. Rosiak, <u>Race to the Bottom: Uncovering the Secret Forces</u>

Destroying American Public Education (Broadside Books: 2022) at x (Forward by Peter Schweizer).

### 2. *Lawrence v. Texas* **(2003).**

In *Bowers v. Hardwick*, 478 U.S. 186 (1986), the Supreme Court upheld the constitutionality of a Georgia sodomy law, but it took only 17 years for that decision to be overturned, revealing that *stare decisis* does not have full application with respect to homosexual rights cases.  Justice White's opinion for the Court could find no constitutional provision protecting homosexual sodomy (*id*. at 191-92), and Chief Justice Burger's concurrence demonstrated that, based on a "millennia of moral teaching," homosexual sex was viewed as an "infamous crime against nature," and "a crime not fit to be named," in the words of William Blackstone (*id*. at 197).  However, in dissent, Justice Blackmun had no problem inferring a right to engage in acts of homosexual sex from the atextual notions of the "right to privacy" and "substantive due process" (*id*. at 199, 216, (Blackmun, J., dissenting)).  (Justice Blackmun had earlier posited such "fundamental rights" (yet another term not found in the Constitution) to infer a constitutional right to abort a baby in *Roe v. Wade*, 410 U.S. 113 (1973).)

9

The Blackmun view became the majority view in *Lawrence v. Texas*, 539 U.S. 558 (2003), overturning *Bowers*. *Lawrence* itself was contrived.[5]  It was based on a fabrication — an arrest of two homosexuals that was staged to set up the constitutional challenge.  *See* D. Carpenter, "The Unknown Past of Lawrence v. Texas," 102 MICH L. REV. No. 7 (June 2004) pp. 1454-1527.

### 3.  California Proposition 8 (2008).

In May 2009, the California Supreme Court ruled that state's ban on same-sex marriage to be unconstitutional.  *See In re Marriage Cases*, 43 Cal.4th 757, 183 P.3d 384 (2008).  In an effort to overturn the state court's repudiation of traditional marriage, on November 4, 2008, the people of California approved the ballot initiative Proposition 8 to amend the state constitution to specify that marriage was only between a man and a woman.  Governor Schwarzenegger and

---

[5]  As *Lawrence* was contrived, so was *Roe v. Wade*.  *Roe* was grounded in deception that Norma McCorvey, the lead litigant identified as Jane Roe, had been raped — which she later confessed was a lie.  *See* N. McCorvey, Won by Love (Jan Dennis Books: 1997); N. Flanders, "Exposing the six lies of Roe v. Wade that led to legal abortion," *LiveAction* (Sept. 30, 2018).  Additionally, Justice Blackmun's opinion in *Roe* relied heavily on the historical analysis of professor Cyril H. Means which was later demonstrated to have been fabricated. *See* R. Destro, "Abortion and the Constitution: The Need for a Life-Protective Amendment," 63 CALIF. L. REV. 1250, 1268 (1975).  From that ignominious beginning, the nation lost respect for the judiciary as it witnessed "the Court's troubling tendency to bend the rules when any effort to limit abortion … is at issue." *Stenberg v. Carhart*, 530 U.S. 914 (2000) (Scalia, J., dissenting).

other state officials refused to defend the action of the people of California,

leaving the defense of the Amendment to private parties.  The California

Supreme Court upheld the Amendment,[6] but a separate challenge filed in district

court in San Francisco resulted in the Amendment being struck down, a decision

which the Ninth Circuit affirmed.  In *Hollingsworth v. Perry*, 570 U.S. 693

(2013), the U.S. Supreme Court declined to rule on the constitutional issue,

determining that both it and the Ninth Circuit lacked jurisdiction to hear the case

since the private parties defending Prop 8 did not have authority to do so,

allowing the district court's decision to stand.

The district court's decision became highly controversial when it was

learned that the judge had a clear, but hidden, conflict of interest.  District Judge

Vaughn Walker was a closeted homosexual in a long term relationship with

another man, who may well have wanted to "marry," as his decision permitted,

evidencing both conflict of interest and likely bias.  After his retirement, Judge

Walker revealed his homosexuality and 10-year relationship with a male

physician.[7]  In the Ninth Circuit, a defender of Prop 8 made an unsuccessful

---

[6] *See Strauss v. Horton*, 46 Cal. 4th 364, 207 P.3d 48 (2009).

[7] *See* C. Geidner, "Prop 8 Judge Walker, Now Retired, Tells Reporters
He's Gay," *MetroWeekly* (April 6, 2011); M. Talbot, "A Gay Judge's Case,"

motion to disqualify Judge Stephen Reinhardt because of his wife's legal work for the ACLU on the original Prop 8 challenge. Had Judge Walker done his duty and recused, or had the Ninth Circuit or the Supreme Court vacated his opinion, or if Judge Reinhardt had done his duty and recused, or had California elected officials done their duty to defend the Amendment, California would not have become the second state in the country to sanction same-sex marriage.

### 4. Matthew Shepard Hate Crimes Prevention Act (2009).

Five days before the November 2008 presidential election, candidate Barack Obama stated the goal of the Obama-Biden Administration would be to "fundamentally transform the United States of America."[8] With respect to matters of homosexual rights, that promise was not an empty one. President Obama signed into law the Matthew Shepard Hate Crimes Prevention Act of 2009 to add sexual orientation and gender identity to the list of motivations singled out for special attention in the federal hate-crime law. *See* Public Law

---

*The New Yorker* (Apr. 26, 2011); Brief Amicus Curiae of Citizens United's National Committee for Family, Faith and Prayer, *et al.* in *Hollingsworth v. Perry* (Jan. 29, 2013) at 27-33

[8] B. Obama, "Obama Rallies Columbia, Missouri," *RealClearPolitics* (Oct. 30, 2008).

111-84; 18 U.S.C. § 249.[9]  The law was touted as honoring Matthew Shepard, a 21-year old homosexual college student who was supposedly murdered on October 6, 1998, for being "gay."  It was later learned that the Shepard story of anti-gay bigotry was a complete lie, and he was no martyr who died at the hands of hateful bigoted heterosexuals, as the truth was uncovered by a courageous homosexual journalist, Stephen Jimenez in The Book of Matt: Hidden Truths About the Murder of Matthew Shepard (Steerforth Press: 2020).  A pub note for that book described that lie as "a politically expedient myth that took the place of important facts."  That myth not only led to the enactment of the Matthew Shepard law, but that fabrication is perpetuated every time that law is referenced by that name.

### 5. *Obergefell v. Hodges* (2015).

The Supreme Court decision in *Obergefell* was based in part on the absence of any record evidence of the negative effects of homosexual marriage: "The respondents have not shown a foundation for the conclusion that allowing same-sex marriage will cause the harmful outcomes they describe."  *Obergefell*

---

[9]  The Obama Department of Justice explained this law, designed to protect homosexuals from crime, was enacted "pursuant to Congress's Thirteenth Amendment authority to eradicate badges and incidents of slavery."  *See* DOJ Press Release on Matthew Shepard Act (undated) (emphasis added).

*v. Hodges*, 576 U.S. 644, 679 (2015).  Indeed, Justice Kennedy explained that the "asserted basis" of *Obergefell* was "two consenting adults whose marriages would pose no risk of harm to themselves or third parties" (*id.* at 679) but neglected to explain that the reason why the states challenging *Obergefell* did not build a better record was that the district court judge had barred one of Michigan's witnesses and rejected out-of-hand the testimony of all other witnesses for Michigan, while embracing as truth every word testified to by expert witnesses testifying for the plaintiffs.  *See*, *e.g.*, *DeBoer v. Snyder*, Brief for Michigan Defendants-Appellants at 6-12, 34-37.

Additionally, two of the justices who joined the five-member majority in *Obergefell* had previously officiated at same-sex weddings.  An excellent case could be made for the recusal of these justices pursuant to 28 U.S.C. § 455.[10]

### 6. *Bostock v. Clayton County* (2019).

The *Zarda* case, which was consolidated with *Harris Funeral* and decided with *Bostock v. Clayton County*, involved a homosexual skydiver, who claimed to have been fired for being homosexual.  In truth, no one cared about his being

---

[10]  *See* "Ginsburg to Officiate Same-Sex Wedding," *The Washington Post* (Aug. 30, 2013); "Supreme Court Justice Performs Her First Same-Sex Wedding," *CBS News* (Sept. 22, 2014).

homosexual, until he repeatedly "over-shared" about his sexual behavior with customers, which led to his being fired. Thus, the entire predicate of the *Zarda* case was factually unsupported. *See* Brief of Petitioner at 2, *Altitude Express v. Zarda*, Supreme Court No. 17-1623.

### 7. Respect for Marriage Act (2022).

On December 13, 2022, President Biden signed the "Respect for Marriage Act," Pub. L. No. 117-228 (Dec. 13, 2022). The proponents of this law and President Biden explained that it was needed to protect not just same-sex marriage, but primarily inter-racial marriage. The claim was that the Supreme Court's recent decision in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), somehow threatened the Supreme Court's ruling on interracial marriage in *Loving v. Virginia*. 386 U.S. 1 (1967), a decision for which it would be difficult to find any credible modern criticism. Nevertheless, this new law asserted it guaranteed "marriage equality" for both "***interracial*** and same-sex couples." *Id*. at § 2 (emphasis added). During his signing ceremony, President Biden again gave primacy to "**interracial**" marriage stating:

> For most of our nation's history, we denied **interracial** couples and same-sex couples from these protections. We failed. We failed to treat them with an equal dignity and respect. And now, the law requires that **interracial** marriages and same-sex marriage must be

recognized as legal in every state in the nation.  [Remarks by President Biden and Vice President Harris at Signing of H.R. 8404, the Respect for Marriage Act (Dec. 13, 2022) (emphasis added).]

### 8. Special Rules for Special Rights

Writing in an abortion case, but commenting more generally about recent Supreme Court jurisprudence, Justice Thomas explained the problem we face: "[o]ur law is now so riddled with special exceptions for special rights that our decisions deliver neither predictability nor the promise of a judiciary bound by the rule of law….  As the Court applies whatever standard it likes to any given case, nothing but empty words separates our constitutional decisions from judicial fiat…."[11]

## II. DOE'S GUIDANCE DOCUMENTS WOULD HARM CHILDREN AND JEOPARDIZE THE SPECIAL PROTECTION AGAINST DISCRIMINATION TARGETING FEMALES IN TITLE IX.

In granting injunctive relief, the district court was required to consider the "harm-to-others factor."  The court's analysis focused on the government's claim that "an injunction will harm Defendants, as they will be prevented from 'fully enforc[ing]' the challenged guidance like they vowed to do" and claims that the guidance would undermine state laws.  *See Tennessee* at *65.  The court

---

[11]  *Whole Woman's Health v. Hellerstedt*, 579 U.S. 582, 629, 638 (2016) (Thomas, J. dissenting).

correctly concluded that the harm to the plaintiff states outweighed any harm to the defendants (*id.* at *66) but these *amici* believe that great harm will be suffered by "others" who need protection — children in government-funded schools including girls who do not want to have boys in the girls' showers, or boys unfairly competing in girls' sports. The DOE Guidance Documents also would harm boys who do not want to be forced to wrestle girls or have girls in the boys' restroom. Perversely, the harms caused by DOE's misinterpretation would violate the actual protections girls/women provided by Congress in Title IX.

A.    **Title IX Was Premised on the Understanding that "Sex" Is a Binary Term Encompassing Only Biological Males and Females.**

When Congress enacted Title IX in 1972, the only commonly understood meaning of "sex" was biological sex.[12] In that same year, the United States filed

---

[12] When Title IX was enacted, all popular dictionaries defined "sex" as referring to the physiological distinctions between males and females, with reference to the reproductive functions. Webster's Third Dictionary defined "sex" as "one of the two divisions of organic esp. human beings respectively designated male or female," or "the sum of the morphological, physiological, and behavioral peculiarities of living beings that subserves biparental reproduction." Webster's New International Dictionary at 2081 (3d ed. 1968). *See also* The Random House College Dictionary at 1206 (1973); The American College Dictionary at 1109-10 (1970); The American Heritage Dictionary of the English Language at 1187 (1st ed. 1969).

a brief with the U.S. Supreme Court stating that "sex, like race and national origin, is a visible and immutable biological characteristic." U.S. Brief at *15, *Frontiero v. Laird*, No. 71-1694, 1972 WL 137566 (U.S. Dec. 27, 1972). In that case, the Supreme Court agreed that "sex" is "an immutable characteristic determined solely by the accident of birth." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973). These concepts have been unchallenged, until a collective delusion has swept the nation, largely spread through government schools. *See generally*, L. Rosiak, Race to the Bottom.

### B.    The Sponsor of Title IX Was Clear that Its Purpose Was to Remedy Disparities in Educational Opportunities which Favored Males over Females.

With certain limited exceptions, primarily for military and religious schools, Title IX of the Education Amendments of 1972[13] provided:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

Senator Birch Bayh (D-IN), the bill's sponsor, offered extensive remarks introducing the legislation making clear his objective:  to ensure that at federally funded educational institutions, that females have the same opportunities

---

[13]  Pub. L. No. 92-318.

18

available to males.  Senator Bayh condemned "corrosive and unjustified discrimination against women."  He specifically contrasted discrimination against women with discrimination against other minorities and made clear it was discrimination against women that the bill was designed to address.  *Id*.  He denounced stereotypes of females as "pretty things who go to college to find a husband … and finally marry, have children and never work again."  It is clear that Senator Bayh and his legislation were referring to biological females, not to 2022 concepts of "gender identity."

Senator Bayh denounced "discrimination against females on faculties and in administration.…"  *Id*.  He repeatedly compared opportunities in education and employment between "males" and "females."  *Id*.  Further, Senator Bayh expressly stated that "differential treatment by sex" would be permitted under his bill such as "in sports facilities or other instances where personal privacy must be preserved."  It is clear that the furthest thing from the mind of the bill's sponsors was any suggestion of allowing biological males to invade the locker rooms and bathrooms of biological female students.

### C.     Basing Educational Policy on Politics Rather than Science Ensures the Continuation of Sex Discrimination.

Senator Bayh was crystal clear that the purpose of his Title IX Education Amendments in 1972 was to reduce the disparities that existed in favor of men and against women in educational opportunities.  He decried "the desire of many schools not to waste a 'man's place' on a woman."  118 *Cong. Rec.* 5804.  He addressed the out-of-balance opportunities in favor of men as "persistent, pernicious discrimination which is 'serving to perpetuate second-class citizenship for American women.'"  *Id.*  The purpose of the amendments, he stated, was to provide women "an equal chance to attend the schools of their choice, to develop the skills they want, and to apply those skills with the knowledge that they will have a fair chance to secure the jobs of their choice...."  118 *Cong. Rec.* 5808.

Yet the Department's Guidance Documents would effectively enshrine sex discrimination in federal education funding with the force of federal law.  In the name of "nondiscrimination," the guidance constructs an unbreakable barrier to women's achievement in scholastic sports.  This has been amply demonstrated, both scientifically and historically:

> The predominant influence affecting male versus female athletic performance is hormonal, particularly during puberty.  The sex hormone testosterone plays an important role in regulating bone

20

mass, fat distribution, muscle mass and strength, and the production of red blood cells leading to higher circulating hemoglobin. After puberty, male circulating testosterone concentrations are 15 times greater than those of females at any age. The result is a clear male advantage in regard to muscle mass, strength and circulating hemoglobin levels even after adjusting for sex differences in height and weight.

On average, females have 50-60% of male's upper arm muscle cross-sectional area and 65-70% of male's thigh muscle cross-sectional area with a comparable reduction in strength. Young males have on average a skeletal muscle mass over 12kg greater than age-matched females at any given body weight. While numerous genes and environmental factors such as physical activity and diet contribute to muscle mass, the major cause of the sex difference in muscle mass and strength is the difference in circulating testosterone. Taken together, these discrepancies render females, on average, unable to compete effectively against males in power-based or endurance-based sports. [M. Artigues and M. Cretella, "Sex is a Biological Trait of Medical Significance," American College of Pediatricians (Mar. 2021).]

The sports media spotlight has recently shone on the swimmer currently known as "Lia Thomas," a biological male allowed to compete in women's swimming teams. And a cursory review of Thomas' swimming record is illustrative:

During the last season Thomas competed as a member of the Penn men's team, which was 2018-19, [Thomas] ranked 554th in the 200 freestyle, 65th in the 500 freestyle and 32nd in the 1650 freestyle. As [Thomas'] career at Penn wrapped, [Thomas] moved to fifth, first and eighth in those respective events on the women's deck. [J. Lohn, "A Look At the Numbers and Times: No Denying the Advantages of Lia Thomas," *Swimming World* (Apr. 5, 2022).]

21

"Olympic sprinter Allyson Felix … is a six-time Olympic gold medalist and holds numerous World Championship titles.  Yet in 2018, 275 high school boys ran faster times than Felix's lifetime best."  C. Holcomb, "Biden preaches science while ignoring it on high school sports," *N.Y. Daily News* (Feb. 5, 2021).  Felix is "the most decorated woman in Olympic track history."  A. Barnes, "American sprinter becomes most decorated woman in Olympic track history," *The Hill* (Aug. 6, 2021).  But she would be only 276th best among U.S. male high school athletes.

If the guidance documents are allowed to stand, sport will cease to be a "great and respected vehicle for women's gains."  In its determination to pursue a political agenda over science, the DOE's Guidance Documents hurt the very women Title IX was created to help.  As Henkel stated in her letter to the International Olympic Committee, "We currently look on as sporting entities blind themselves to human biology, in an attempt to hoodwink science in the name of politico-ideological agendas.  We currently look on a moral perversion against women and the complicity of sport authorities around the world in a supreme form of misogyny.…"  *Id*.

## III.   DOE'S GUIDANCE DOCUMENTS WOULD ENDANGER ALL STUDENTS.

While those supporting the Biden DOE position may believe they are protecting the interests of homosexual and transgender students, in truth they are harming them, and all other students as well.

### A.  Public Health Dangers of Homosexual Activity.

Just 44 years ago, "homosexuality was removed from the Diagnostic and Statistical Manual of Mental Disorders." *Pickup v. Brown*, 740 F.3d 1208, 1222 (9th Cir. 2014).  Soon thereafter, "the American Psychological Association declared that homosexuality is not an illness." *Id*.  Then, like dominoes, "[o]ther major mental health associations" fell in line.  *Id*.  Yet, despite their "expert" pronouncements, these actions did not make homosexuals healthy in body, mind, or spirit, or homosexuality normal, proper, or moral.

Same-sex attraction is increasingly viewed as just another way of life. Persons who are encouraged to act on that attraction routinely are led into a life that involves dangerous and unhealthy behaviors generally unknown to

heterosexuals.  A recent publication of the Centers for Disease Control[14] studied

homosexual men with an average age of 26, set about to explain:

> Unprotected anal intercourse is often used as a single indicator of
> risky behavior among men who have sex with men (MSM), yet
> MSM engage in a variety of behaviors which have unknown
> associations with sexually transmitted infection (STI) and HIV.  [*Id*.]

Far from the image of homosexual sex being limited to affectionate

behaviors within loving, committed relationships, the CDC study reveals that:

58 percent of homosexuals engaged in Anonymous Sex (with a partner whose

name they did not know); 68 percent engaged in Group Sex; 27 percent engaged

in Erotic Asphyxiation; 26 percent engaged in Watersports (use of urine during

sexual acts); 29 percent engaged in Snowballing (oral exchange of semen

between partners); 10 percent engaged in Felching (using mouth to suck semen

from partner's rectum); and 62 percent engaged in Rimming (using tongue to

provide stimulation to anus).

It is not difficult to see that these behaviors cause sexually transmitted

diseases to be disproportionately suffered by homosexuals:

---

[14]  C. Rice, "Beyond Anal Sex: Sexual Practices among MSM and
Associations with HIV and Other Sexually Transmitted Infections," J. SEX MED.
2016 (Mar. 13, 2016).

Three-quarters of primary and secondary syphilis cases, along with 22% of gonorrhea cases and two-thirds of HIV diagnoses, in the US are among MSM….

The DOE Guidance has the effect of mandating that government-funded schools encourage impressionable school-age children, many of whom are pre-pubescent, to enter into the type of behaviors that the CDC has revealed leads to disease and degradation. This court should not permit it.

### B. Persons Suffering from Gender Dysphoria.

Even before the encouragement provided by Department of Education's challenged guidance, government schools have been misleading children who are going through what is usually a transitory stage of gender confusion to do irreversible damage to themselves.[15] This is often done without parental involvement, usurping parental authority over children,[16] having terrible consequences for children, as illustrated by a story in Virginia.

Sage was an adopted teenage girl who began dressing like a boy and identifying as a male while in school, assuming a new name. A school counselor

---

[15] *See generally* A. Shrier, Irreversible Damage: The Transgender Craze Seducing Our Daughters (Regnery Publishing: 2020).

[16] *See Exodus* 20:12; *Deuteronomy* 11:19; *Proverbs* 19:18; *Ephesians* 6:1-3; *Colossians* 3:20; and *Hebrews* 13:17.

told Sage she could use the boys' bathroom, and she faced some bullying. School officials not only failed to inform Sage's mother Blair of her adoption of a male persona, they failed to disclose the bullying, because that would have required the school to reveal the reason for the bullying was her identification as a boy. The school counselor directed Sage to transgender websites where she connected with a person who represented himself as a 16-year old boy, but was an older man who was a sex trafficker. That trafficker took Sage out of state where she was raped multiple times by different men. Blair reported Sage missing, and ultimately she was rescued from the sex trafficking ring in Maryland. Shockingly, Maryland officials would not release Sage to Blair and her husband but rather held a hearing where a Public Defender accused her adoptive mother of being abusive for not using her male name and pronouns. Although cleared of those charges, the consequences of government usurpation of parental authority continued to inflict devastating harm on Sage.

Maryland placed Sage in an all-boys home, where she was assaulted again, only to be transferred to a "gender-friendly" facility in Virginia. There, Sage ran away to meet her 16-year old friend only to discover he was an older man who raped and brutalized her. Blair located her and brought her back to Virginia

where she was ordered to return to the same facility. Ultimately a legal defense fund secured her released, almost a year after she had first left home. After this ordeal, she is home, and now identifies as her biological sex — female. As Sage explained "I never was a boy. Everybody was doing it, I just wanted to have friends."

It is parents who provide the best protection for children — certainly not school counselors, teachers, and administrators. And, what happened to Sage demonstrates that government encouragement of an irrational, political, transgender ideology underlying the DOE Guidance Documents. *See*, R. DeSoto, "[VA Lawmaker Introduces Bill to Ban Including 'Misgendering' as Child Abuse After Officials Kept Girl from Parents](#)," *Western Journal* (Jan. 26, 2023); L. Hanford, "[Virginia Teen Sex-Trafficked Twice After School Hides Gender Identity From Her Parents](#)," *The Federalist* (Jan. 19, 2023).

Other countries are realizing the danger in pushing transgenderism. In the United Kingdom, the National Health Service has shut down the Tavistock gender identity clinic, the primary clinic of its kind in the nation, following reports that children "were put on the pathway to transitioning too early and before they had been properly assessed," causing the clinic to now face claims

for harm to children by as many as 1,000 plaintiffs.  S. Lovett, "[Tavistock gender clinic facing action over 'failure of care' claims](#)," *Independent* (Aug. 11, 2022).

### C.  Grooming of Students.

Each young person has a sense of modesty, which mothers particularly understand.[17]  The responsibility of parents and school officials is to respect and protect that modesty.  However, our elitist influencers, and many in public education seek to make children immodest, sexualizing children rather than protecting them, making them more likely to be exploited by adults — even by teachers.  "Childhood used to be a time of  innocence.  But as our culture has become more and more sexualized, children have become the casualties of adult exploitation."  E. Kao and A. Jones, "[We Must Fight the Sexualization of Children by Adults](#)," Heritage Foundation (Oct. 5, 2019) (emphasis added).

---

[17]  "[When Do Children Feel Modesty?](#)" You Are Mom (Mar. 15, 2019) ("Children feel modesty by age four. They start to experience shame, and this mixes with their desire for autonomy.  In addition, they don't want strangers to look at them. Also, they don't like physical exams or questions about their bodies.").

Even without the DOE Guidance, scores of stories about "grooming" of children in government schools have been published.[18]  As just one illustration, the Chicago Public Schools Office of the Inspector General recently reported that it was able to substantiate 70 sexual misconduct allegations out of more than 600 complaints and that it found policy violations in 302 investigations just since October 2018.[19]  The sad truth is that DOE's Guidance Documents actually provide cover for groomers and other individuals who target young people for exposure to sexual activity before they are sexually mature and fully understand the nature of their behavior.  Rather than providing a safe haven for children and young people from abusers, the DOE Guidance Documents allow some predators hired as counselors and teachers to discuss sexual behaviors with young children, fraudulently enticing them to make life-altering decisions.

---

[18]  *See* B. Palmer, "How many kids are sexually abused by their Teachers: Probably millions" *Slate* (Feb. 8, 2012).

[19]  L. Casiano, "Chicago schools watchdog investigated complaints of alleged employee sexual misconduct with students," *Fox 32 Chicago* (Jan. 7, 2023).

## IV.   THE BIDEN GUIDANCE DOCUMENTS ELEVATE THE RELIGION OF SECULAR HUMANISM OVER BIBLICAL CHRISTIANITY.

The Holy Scriptures reveal that God created mankind, male and female, in the image of God.  *Genesis* 1:27; *Matthew* 19:4-6.  Homosexual sex and homosexual marriage are a repudiation of God's created order.[20]  Nature itself reveals that God fashioned the male penis and the female vulva/vagina as complementary sex organs.  One homosexual testified to this obvious truth when he reported that homosexual sex is "a poor substitute for intercourse with a woman.…"[21]

Now that the nation has cynically abandoned Biblical morality, it is on a slippery slope as every man does what is right in his own eyes.  *See Proverbs* 21:2.  Indeed, some consider pedophiles to be embracing a legitimate sexual orientation, recently rebranded as "minor-attracted persons,"[22] returning us to the

---

[20]  In Robert Bolt's play "A Man for All Seasons," Sir Thomas More asked "if [the world] is round, will the King's command flatten it?"  Likewise here, if God created us male and female, can an order of a President or this Court undo it?

[21]  K. Jay and A. Young, The Gay Report: Lesbians and Gay Men Speak Out About Sexual Experiences & Lifestyles (Summit Books: 1979), p. 477.

[22]  *See* A. Miller, "Licensed Pennsylvania sex therapist defends 'minor-attracted persons' in viral video," *Fox News* (Aug. 11, 2022).

30

pagan pederasty of ancient Greece, and repudiating statutory prohibitions against sex with minors.

Requiring schools to educate and care for children according to the Biden DOE Guidance Documents will contribute mightily to the destruction of American society by sexual confusion of the nation, sexualizing children and young adults, encouraging them to learn about, experiment with, and perhaps adopt dangerous, self-destructive, and sinful behaviors.

## CONCLUSION

For the foregoing reasons, the decision of the court below should be affirmed.

Respectfully submitted,

_   /s/ William J. Olson_

| | |
|---|---|
| JOHN I. HARRIS III | WILLIAM J. OLSON* |
|   SCHULMAN, LEROY & BENNETT, P.C. | JEREMIAH L. MORGAN |
|   3310 West End Avenue |   WILLIAM J. OLSON, P.C. |
|   Suite 460 |   370 Maple Avenue W., Suite 4 |
|   Nashville, TN  37203 |   Vienna, VA  22180-5615 |
| |   (703) 356-5070 |
| J. MARK BREWER |   wjo@mindspring.com |
|   BREWER & PRITCHARD, P.C. | *Attorney of Record |
|   800 Bering Drive, Suite 201A | January 31, 2023 |
|   Houston, TX  77057 | _Attorneys for Amici Curiae_ |

31

JAMES N. CLYMER
  CLYMER MUSSER & SARNO, P.C.
  408 West Chestnut Street
  Lancaster, PA  17603

PATRICK MCSWEENEY
  3358 John Tree Hill Road
  Powhatan, VA  23139

## <u>CERTIFICATE OF COMPLIANCE</u>

IT IS HEREBY CERTIFIED:

1.     That the foregoing Brief *Amicus Curiae* of Public Advocate of the United States, *et al.*, in Support of Plaintiffs-Appellees and Affirmance complies with the type-volume limitation of Rule 29(a)(5), Federal Rules of Appellate Procedure, because this brief contains 6,409 words, excluding the parts of the brief exempted by Rule 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using WordPerfect version 21.0.0.194 in 14-point CG Times.

_____/s/ William J. Olson_____
William J. Olson
Counsel for *Amici*

Dated:  January 31, 2023

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the foregoing Brief *Amicus Curiae* of Public Advocate of the United States, *et al.*, in Support of Plaintiffs-Appellees and Affirmance, was made, this 31st day of January, 2023, by the Court's Case Management/Electronic Case Files system upon the attorneys for the parties.

                                           */s/William J. Olson*
                                         William J. Olson
                                         Attorney for *Amici Curiae*