No. 22-5807

# In the United States Court of Appeals for the Sixth Circuit

———

STATE OF TENNESSEE, *ET AL.*,
*Plaintiffs-Appellees*,

and

ASSOCIATION OF CHRISTIAN SCHOOLS, *ET AL.*,
*Intervenors-Appellees*,

*v.*

DEPARTMENT OF EDUCATION, *ET AL.*,
*Defendants-Appellants.*

———

On Appeal from the United States District Court
for the Eastern District of Tennessee, Knoxville Division

———

## BRIEF FOR THE STATE OF TEXAS AS AMICUS CURIAE SUPPORTING APPELLEES AND AFFIRMANCE

———

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

JUDD E. STONE II
Solicitor General

LANORA C. PETTIT
Principal Deputy Solicitor General

RYAN D. WALTERS
Special Counsel
Special Litigation Division
ryan.walters@oag.texas.gov

Counsel for Amicus Curiae
State of Texas

i

# Table of Contents

Table of Contents ...................................................................................ii

Table of Authorities.............................................................................iii

Corporate Disclosure Statement ........................................................ 1

Interest of Amicus Curiae ...................................................................2

Introduction...........................................................................................2

Argument................................................................................................4

    I.    The Technical Assistance Document was inconsistent with Title VII and *Bostock*.................................................................................4

        A.   The Technical Assistance Document applied *Bostock's* prohibition of gender-identity discrimination to workplace policies disregarding that concept. ...................................... 16

        B.   The Technical Assistance Document wrongly protected practices correlated with protected traits..........................................20

        C.   *Bostock* does not forbid all sex-based distinctions...............................23

        D.   The Technical Assistance Document wrongly attempted to impose accommodation requirements. .............................................26

Conclusion............................................................................................ 31

Certificate of Service.......................................................................... 32

Certificate of Compliance ................................................................. 32

# Table of Authorities

## Cases

*Adams v. Sch. Bd. of St. Johns Cnty.*,
— F.4th -—, No. 18-13592, 2022 WL 18003879,
(11th Cir. Dec. 30, 2022) (en banc) .................................................................. 3

*Adams v. Sch. Bd. of St. Johns Cty.*,
3 F.4th 1299  (11th Cir. 2021) (Pryor, C.J., dissenting),
*rev'd by Adams v. Sch. Bd. of St. Johns Cnty.*, — F.4th -—,
No. 18-13592, 2022 WL 18003879
(11th Cir. Dec. 30, 2022) (en banc) ......................................................... 17, 18

*Bear Creek Bible Church v. EEOC*,
571 F. Supp. 3d 571 (N.D. Tex. 2021)............................................................. 13

*Bostock v. Clayton County*,
140 S. Ct. 1731 (2020) ..........................................................................passim

*Cicero v. Borg-Warner Auto., Inc.*,
280 F.3d 579, 582–83 (6th Cir. 2002).............................................................. 15

*City of Cleburne v. Cleburne Living Ctr., Inc.*,
473 U.S. 432 (1985)......................................................................................... 26

*Dobbs v. Jackson Women's Health Org.*,
142 S. Ct. 2228 (2022) .................................................................................... 22

*Doe 2 v Shanahan*,
755 F. App'x 19 (D.C. Cir. 2019) (per curiam) ............................................... 16

*Doe 2 v. Shanahan*,
917 F.3d 694 (D.C. Cir. 2019) (Williams, J., concurring in the result) ......passim

*EEOC v. Abercrombie & Fitch Stores, Inc.*,
575 U.S. 768 (2015) ........................................................................................ 29

*EEOC v. Catastrophe Mgmt. Sols.*,
852 F.3d 1018 (11th Cir. 2016)........................................................................ 21

*Espinoza v. Farah Mfg. Co.*,
414 U.S. 86, 88 (1973) .................................................................................... 21

*Everson v. Michigan Dep't of Corr.*,
391 F.3d 737 (6th Cir. 2004)............................................................................ 15

*Garcia v. Gloor,*
618 F.2d 264 (5th Cir. 1980) ........................................................................... 21

*Garcia v. Spun Steak Co.*,
  998 F.2d 1480 (9th Cir. 1993)....................................................21, 31

*Gen. Elec. Co. v. Gilbert*,
  429 U.S. 125 (1976) .................................................................. 22

*Griffin v. Oceanic Contractors, Inc.*,
  458 U.S. 564 (1982). ................................................................ 15

*Harris v. Forklift Sys., Inc.*,
  510 U.S. 17 1993)......................................................................26

*Hazen Paper Co., v. Biggins*,
  507 U.S. 614 (1993) .................................................................. 22

*In re Union Pac. R.R. Emp. Pracs. Litig.*,
  479 F.3d 936 (8th Cir. 2007)...................................................... 22

*K Mart Corp. v. Cartier, Inc.*,
  486 U.S. 281, (1988) .................................................................14

*Lawrence v. Texas*,
  539 U.S. 558 (2003) .................................................................. 11

*Maner v. Dignity Health*,
  9 F.4th 1114 (9th Cir. 2021) (Bea, J.) ........................................ 6

*Oncale v. Sundowner Offshore Servs., Inc.*,
  523 U.S. 75 (1998)........................................................... 5, 13, 30

*Raytheon Co. v. Hernandez*,
  540 U.S. 44 (2003) ............................................................ 18, 27

*Roberts v. Sea-Land Servs., Inc.*,
  566 U.S. 93 (2012) ...................................................................14

*Texas Dept. of Cmty. Affairs v. Burdine*,
  450 U.S. 248 (1981) ..................................................................26

*Texas v. EEOC*,
  No. 2:21-cv-194-Z, 2022 WL 4835346 (N.D. Tex. Oct. 1, 2022) .................... 2

*United States v. Virginia*,
  518 U.S. 515 (1996) ..................................................................26

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
  570 U.S. 338 (2013)...................................................................29

*West v. Radtke*,
  48 F.4th 836 (7th Cir. 2022) .......................................................5

*Zarda v. Altitude Express*,
  *Inc.,* 883 F.3d 100 (2d Cir. 2018) (en banc) ............................... 5, 17

**Statutes**

42 U.S.C. § 12111(9). ................................................................27

42 U.S.C. § 12211(a) ................................................................29

42 U.S.C. § 12211(b)(1) ............................................................29

42 U.S.C. § 2000e(j) ...........................................................26, 28

42 U.S.C. § 2000e-(k) ............................................................. 21

**Other Authorities**

1 Barbara T. Lindemann & Paul Grossman, *Employment Discrimination
    Law* 265 (4th ed. 2007) ...................................................34

Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental
    Disorders* 451 (5th ed. 2013) ...........................................17

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal
    Texts* § 30, at 192–93 (2012) ..........................................23

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of
    Legal Texts* 107 (2012) ....................................................27

Br. of Amici Curiae ALCLU, et al., ...............................................3

John M. Finnis, *Law, Morality, and "Sexual Orientation,"*
    69 Notre Dame L. Rev. 1049, 1053–54 (1994) ..................10

Reply Br. for Pet'r at 23, *Bostock v. Clayton Cnty.*,
    140 S. Ct. 1731 (2020), 2019 WL 4464221, at *23 ..........30

Reply Br. for Resp'ts at 19-21, *Altitude Express, Inc. v. Zarda*,
    140 S. Ct. 1731 (2020), 2019 WL 4464222, at *19-21.......30

William Baude, *The Judgment Power*, 96 Geo. L.J. 1807, 1844 (2008) .....................3

William N. Eskridge, Jr., *A Social Constructionist Critique of Posner's Sex
    and Reason: Steps Toward a Gaylegal Agenda*,
    102 Yale L.J. 333, 360, 367 (1992) ..................................11

**Regulations**

29 C.F.R. § 1604.2(b)(5) ...........................................................22

# Corporate Disclosure Statement

Under Sixth Circuit Rule 26.1(a), Amicus the State of Texas, as a governmental party, need not furnish a corporate disclosure statement.

/s/ *Ryan D. Walters*
RYAN D. WALTERS
*Counsel of Record for State of Texas*

## Interest of Amicus Curiae

Amicus Curiae the State of Texas submits this brief to assist this Court in interpreting the proper scope of anti-discrimination provisions in the wake of the Supreme Court's decision in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020) Texas has an interest in this question because it is subject to several federal laws that prohibit discrimination based on sex, including (1) as an employer covered by Title VII of the Civil Right Act of 1964, 42 U.S.C. § 2000e, (2) as a recipient of federal education funding subject to Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681, and (3) as a recipient of federal healthcare funding subject to Section 1557 of the Affordable Care Act, 42 U.S.C. §18116.

## Introduction

Texas filed suit in the Northern District of Texas against the same Technical Assistance Document issued by the Equal Employment Opportunity Commission (EEOC) that was challenged in this case. After Defendants appealed to this Court, the Northern District declared unlawful, vacated, and set aside the Technical Assistance Document. *Texas v. EEOC*, No. 2:21-cv-194-Z, 2022 WL 4835346 (N.D. Tex. Oct. 1, 2022). EEOC declined to appeal.

Though Defendants' appeal of the preliminary injunction against implementation of the Technical Assistance Document is now moot, the challenges to the Department of Education's Interpretation and Fact Sheet remain. Most importantly is the proper application of *Bostock v*, 140 S. Ct. 1731. Texas submits this

brief to explain the proper scope of that ruling, if *Bostock* is deemed to also apply to Title IX.[1]

The Technical Assistance Document listed what it deemed unlawful employer conduct post-*Bostock*: "[p]rohibiting a transgender person from dressing or presenting consistent with that person's gender identity"; prohibiting a transgender person from using the "bathrooms, locker rooms, or showers" that correspond to the person's gender identity; and using "pronouns or names that are inconsistent with an individual's gender identity." Technical Assistance Document, R. 1-5, PageID#81-82

The ACLU *amici* argue that the district court "inexplicably overlooked this Circuit's controlling precedents," including *EEOC v. G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560 (6th Cir. 2018). Br. of Amici Curiae ACLU, *et al.*, 2. They contend that "[b]ecause the Supreme Court affirmed this Court's judgment [in *Harris Funeral Homes*] instead of vacating it, the opinion continues to bind courts in this Circuit." *Id.* at 10.

This conflates a court's judgment with its opinion. Only the judgment in *Harris Funeral Homes* was affirmed in *Bostock*, not the opinion announcing that judgment. *See* William Baude, *The Judgment Power*, 96 Geo. L.J. 1807, 1844

---

[1] Texas agrees with Plaintiffs that *Bostock*'s logic does not apply to Title IX. Br. of All Plaintiffs-Appellees Other Than State of Arizona 39–46; *see also Adams v. Sch. Bd. of St. Johns Cnty.*, — F.4th -—, No. 18-13592, 2022 WL 18003879, *13–18 (11th Cir. Dec. 30, 2022) (en banc). However, if this Court were to determine that it does apply, this brief analyzes the scope of that ruling.

(2008) ("*Judgments* become binding law, not *opinions*. Opinions merely explain the grounds for judgments, helping other people to plan and order their affairs."). Any *opinions* of this Circuit are superseded to the extent they are inconsistent with the reasoning of *Bostock*. To the extent it contradicts the scope of the Supreme Court's opinion, *Harris Funeral Homes* should be given a proper burial.

**ARGUMENT**

## I.    THE  TECHNICAL  ASSISTANCE  DOCUMENT  WAS INCONSISTENT WITH TITLE VII AND *BOSTOCK*.

*Bostock* stands for a far more limited interpretation of Title VII that that articulated in the Technical Assistance Document.

First, it did not adopt a broader definition of "sex," but "proceed[ed] on the assumption that 'sex' . . . refer[s] only to biological distinctions between male and female," and did not include "norms concerning gender identity." *Bostock v. Clayton County*, 140 S. Ct. 1731, 1739 (2020).

Second, *Bostock* disclaimed that it was deciding whether "sex-segregated bathrooms, locker rooms, and dress codes" would violate Title VII. *Id*. Nor did it address the issue of pronouns.

Third, *Bostock* did not prohibit all sex-based distinctions in employment. *Bostock* repeatedly cited the Court's earlier decision in *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998), as authority. *Oncale* explained that Title VII "does not reach genuine but innocuous differences in the ways men and women routinely

4

interact with members of the same sex and of the opposite sex," and "requires neither asexuality nor androgyny in the workplace." *Id.* at 81.

The Court noted the central concern of Title VII was not every aspect of interaction in the workplace but "whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Id.* at 80 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 25 (1993) (Ginsburg, J., concurring)). The Second Circuit—in one of the cases consolidated with and affirmed in *Bostock*—also favorably cites *Oncale* as "arguably" supporting the view that "sex-specific bathroom and grooming policies [do not] impose disadvantageous terms or conditions" because not all distinctions of "'sexual content or connotations' rise to the level of discrimination." *Zarda v. Altitude Express, Inc.,* 883 F.3d 100, 119 & n.16 (2d Cir. 2018) (en banc) (quoting *Oncale*, 523 U.S. at 79–80)); *see also West v. Radtke*, 48 F.4th 836, 849 (7th Cir. 2022) (finding Title VII would not be violated by preventing transgender prison guard from performing strip searches of opposite-sex inmates because it did not constitute an adverse employment action).

Relatedly, *Bostock* also cautioned that "Title VII does not concern itself with everything that happens 'because of' sex," 140 S. Ct. at 1740, but only discrimination that is "inextricably" related to sex is forbidden; distinctions "related to sex in some

vague sense" or having only "some disparate impact on one sex or the other" are not reached by the statute. *Id*. at 1741–42.

Fourth, *Bostock* did not overturn any Supreme Court precedents, instead resting on those dating to the 1970s. It also did not disturb lower-court precedent that has long applied those same precedents. "[T]the Court relied in *Bostock* on the same well established Title VII principles that animated the outcome in those prior decisions [of lower courts that applied the same key precedents, so those courts] effectively anticipated *Bostock*'s rationale." *Maner v. Dignity Health*, 9 F.4th 1114, 1124 (9th Cir. 2021) (Bea, J.) (explaining *Bostock* did not overturn decades of lower-court precedents rejecting "paramour preference" theory of liability).

This is consistent with *Willingham v. Macon Tel. Publ'g Co.*, 507 F.2d 1084 (5th Cir. 1975) (en banc), which upheld sex-specific grooming codes under Title VII. *Willingham* applied *Phillips v. Martin Marietta Corp.*, 400 U.S. 542 (1971), one of the key cases the Supreme Court relied on in *Bostock*. The Second Circuit in *Zarda*— which relied on the same key precedents that the Supreme Court would later adopt in *Bostock* (*Martin Marietta* and *L.A. Dep't of Water & Power v. Manhart*, 435 U.S. 702 (1978))—favorably cited *Willingham* as consistent with its analysis, 883 F.3d at 118–19.

6

In short, *Bostock* did not nullify the Supreme Court's longstanding acceptance of differences between the sexes. It did not question any longstanding precedent beyond the narrow question before it: whether "[a]n employer who fires an individual *merely for being* gay or transgender defies the law." *Bostock*, 140 S. Ct. at 1754 (emphasis added).

Finally, *Bostock* never defined the terms "sexual orientation," "transgender status," or "gender identity." Indeed, the issues in *Bostock* were exclusively related to discrimination based on status; no discrimination based on conduct was at issue: "Each of the three cases before us started the same way: An employer fired a long-time employee shortly after the employee revealed that he or she is homosexual or transgender—and allegedly for no reason other than the employee's homosexuality or transgender status." *Id*. at 1737; *see also id.* at 1753 ("The only question before us is whether an employer who fires someone *simply for being* homosexual or transgender" violates Title VII) (emphasis added).

Any articulation of what constitutes discrimination based on sexual orientation or gender identity must come from other principles of anti-discrimination law that *Bostock* did not address, much less overrule. This includes the crucial distinction between (1) acting with an intent to discriminate based on those characteristics, and (2) acting with the knowledge that it will foreseeably

affect a person with those characteristics. So, using pronouns based on biological sex for all persons, regardless of gender identity, would fall into category (2), as would assigning bathroom usage based on biological sex, or dress code requirements based on biological sex, when those requirements disregard the concept of gender identity.

This is consistent with how the terms "sexual orientation" and "gender identity" are defined by proponents of those concepts. The Nation's largest "LGBTQ+" advocacy organization defines "sexual orientation" based not on conduct but on "emotional, romantic, or sexual attraction to other people."[2] This is consistent with a status-based interpretation of *Bostock* and with the reality that not all persons with "an emotional, romantic, or sexual attraction" to people of the same sex act on those urges.[3]

---

[2] Human Rights Campaign, *Glossary of Terms*, available at https://www.hrc.org/resources/glossary-of-terms.

[3] *See, e.g., A Gay Catholic Voice Against Same-Sex-Marriage*, The New York Times, June 4, 2010, available at https://www.nytimes.com/2010/06/05/us/05beliefs.html.

The Human Rights Campaign also defines "gender identity" as "[o]ne's innermost concept of self as male, female, a blend of both or neither—how individuals perceive themselves and what they call themselves."[4]

It contrasts this with "[g]ender expression" which is the "[e]xternal appearance of one's gender identity, usually expressed through behavior, clothing, body characteristics or voice, and which may or may not conform to socially defined behaviors and characteristics typically associated with being either masculine or feminine."[5]

The same organization notes the highly contingent nature of "[t]ransitioning," noting that "*some* transgender and non-binary people" undergo such a "unique and personal process that can include changing clothes, names, pronouns and behaviors to fit their gender identity" and can include medical interventions such as hormones, voice training, hair removal, and surgical amputations.[6]

---

[4] Human Rights Campaign, *Transgender and Non-Binary People FAQ*, available at https://www.hrc.org/resources/transgender-and-non-binary-faq.

[5] *Id.*

[6] Human Rights Campaign, *Glossary of Terms*, available at https://www.hrc.org/resources/glossary-of-terms (emphasis added).

However, it asserts that "[t]ransgender people may choose to undergo some, all or none of these processes."[7] There is no objective way of determining another's gender identity—it relies exclusively on the subjective, internal sense of that person: "You may know if someone is transgender or non-binary if they are open about their identity or otherwise choose to tell you. There is no one way to determine if someone is transgender or non-binary unless they share their personal gender identity."[8]

The Technical Assistance Document was part of a long political strategy of conflating "orientation" or "identity" with any conduct that may be associated with it. The dissertation advisor to the author of *Bostock* pointed this out long ago. *See* John M. Finnis, *Law, Morality, and "Sexual Orientation,"* 69 Notre Dame L. Rev. 1049, 1053–54 (1994); *see also* William N. Eskridge, Jr., *A Social Constructionist Critique of Posner's Sex and Reason: Steps Toward a Gaylegal Agenda*, 102 Yale L.J. 333, 360, 367 (1992). There is widespread acceptance that people should not be discriminated against because of their deep-seated subjective identities shaped by the cultural forces of their times. This strategy seeks to leverage that instinct to protect

---

[7] *Id.*

[8] Human Rights Campaign, *Transgender and Non-Binary People FAQ*, available at https://www.hrc.org/resources/transgender-and-non-binary-faq.

conduct that may be associated with those identities or the sub-cultures that have sprung up around them.

This conflation arose once "the concept of the homosexual as a distinct category of person emerged in the late 19th century." *Lawrence v. Texas*, 539 U.S. 558, 568 (2003) (cleaned up).[9] What had once been an evaluation of a person's conduct became a classification of a person's inner identity. This classification scheme was originally set up by the emerging medical establishment to condemn "homosexual" acts and to contrast them with supposedly justified non-procreative "heterosexual" acts. After the breakdown of "heterosexual" morality throughout the 20th century undermined the justifications for criticizing "homosexual" conduct, however, the concept was taken up by its original targets to remove the stigma from their behavior.[10]

---

[9] See J. Katz, *The Invention of Heterosexuality* 10 (1995); J. D'Emilio & E. Freedman, *Intimate Matters: A History of Sexuality in America* 121 (2d ed. 1997); Michel Foucault, *The History of Sexuality: Volume I: An Introduction* 43 (1978) (discussing the historical emergence of "the homosexual" in a "famous article of 1870," and suggesting that "[h]omosexuality appeared as one of the forms of sexuality when it was transposed from the practice of sodomy onto a kind of interior androgyny, a hermaphrodism of the soul," and concluding that "[t]he sodomite had been a temporary aberration; the homosexual was now a species").

[10] *See* Michael Hannon, *Against Heterosexuality*, First Things, March 2014, available at https://www.firstthings.com/article/2014/03/against-heterosexuality.

The same sleight-of-hand is seen in treatment of the later concept of "gender identity," including in the Technical Assistance Document. This was "a concept that was essentially unknown" 50 years ago. *Bostock*, 140 S. Ct. at 1755 (Alito, J., dissenting); *see also id.* at 1772 ("The term 'transgender' is said to have been coined 'in the early 1970s.'" (cleaned up)) This took off after World War II, building on the subjective identity basis in sexual orientation. *See Bostock*, 140 S. Ct. at 1772–73 (Alito, J. dissenting). "Transgender individuals have a gender identity—an internalized, felt sense of who they are as male or female—that does not align with their sex assigned at birth." *Doe 2 v. Shanahan*, 917 F.3d 694, 708 (D.C. Cir. 2019) (Williams, J., concurring in the result) (cleaned up).

But the Technical Assistance Document did not address discrimination against employees based on their "internalized, felt sense of who they are as male or female"—it instead sought to require exceptions for transgender employees from concededly lawful sex-based rules for dress codes, bathroom usage, and pronoun usage. But such special treatment violates the admonition that "[a]n individual's homosexuality or transgender status is not relevant to employment decisions." *Bostock*, 140 S. Ct. at 1741.

The analysis of *Bostock* (and its several hypotheticals) in *Bear Creek Bible Church v. EEOC*, 571 F. Supp. 3d 571 (N.D. Tex. 2021), is the one that makes the

12

most sense of the opinion. *Bear Creek Bible Church* points to "[t]wo diverging tests [that] have emerged in Title VII sex discrimination litigation: favoritism and blindness." *Bear Creek Bible Church v. EEOC*, 571 F. Supp. 3d 571, 618 (N.D. Tex. 2021) (citing *Wittmer v. Phillips 66 Co.*, 915 F.3d 328, 333–34 (5th Cir. 2019) (Ho, J., concurring)). "Under the [favoritism test], 'Title VII prohibits employers from favoring men over women, or vice versa. By contrast, under [the blindness test], Title VII does more than prohibit favoritism toward men or women—it requires employers to be entirely blind to a person's sex.'" *Id.* (quoting *Wittmer*, 915 F.3d at 333–34). Thoroughly examining the language of *Bostock* and its hypotheticals, *Bear Creek Bible Church* concludes that "*Bostock* did not explicitly endorse one or the other," *id.*, but a hybrid of the two: "the proper test must be favoritism, plus blindness to sex if the secondary trait is homosexuality or transgenderism." *Id.* at 619.

The favoritism aspect relating to sex makes sense of *Bostock*'s repeated reliance on *Oncale*, which explained that Title VII "does not reach genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex," and "requires neither asexuality nor androgyny in the workplace." *Oncale*, 523 U.S. at 81. Thus, Title VII does not require a disregard of sex differences where neither sex is disadvantaged.

And the blindness aspect relating to the subcategories of sexual orientation and gender identity prevents other aspects of Title VII from being undermined by the subjectivity of these social constructs. Since context determines meaning, it makes sense to consider the entire context of the language under construction. With statutory construction, that means looking not only to the provision in question, but also to "the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988). Courts construe statutes so one provision does not contradict another. The "task is to fit, if possible, all parts into an harmonious whole." *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 100 (2012) (quoting *FTC v. Mandel Bros., Inc.*, 359 U.S. 385, 389 (1959)).

By requiring total disregard of the concept of gender identity in employment decisions, the blindness approach prevents several provisions of Title VII from becoming incoherent. For example, under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), "a plaintiff must show that (1) he is a member of a protected class, (2) he was qualified for his job and did it satisfactorily, (3) despite his qualifications and performance, he suffered an adverse employment action, and (4) that he was *replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside his protected class*." *Cicero v. Borg-Warner Auto., Inc.*,280 F.3d 579 (6th Cir. 2002) (emphasis

added) (citations omitted). If the replacement employee were able to be classified as a member of the same sex of the plaintiff based solely on an unchallengeable assertion, Congress's intention to protect employees against sex discrimination would be undermined. *See* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 451 (5th ed. 2013) (defining "transgender" to include "individuals who transiently" identify one way).

Consider the allowance in Title VII for positions where sex is a bona fide employment qualification, 42 U.S.C. § 2000e-2(e)(1), including for accommodating patients' privacy interests in the healthcare setting, *Everson v. Michigan Dep't of Corr.*, 391 F.3d 737, 756–60 (6th Cir. 2004). It could not serve its purpose if a man could claim qualification for such a position by his subjective identification as a woman. "[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982).

What the Technical Assistance Document really seemed to be addressing was discrimination based on the concept of gender expression or gender dysphoria and any treatment for it, neither of which were addressed in *Bostock*. These subjects are commonly confused, but courts have sometimes been careful recognizing these distinctions. For example, in *Shanahan*, the D.C. Circuit considered a challenge to

15

the Department of Defense's policy requiring members of the military to serve consistent with their biological sex. *Doe 2 v. Shanahan*, 755 F. App'x 19 (D.C. Cir. 2019) (per curiam). This policy was challenged as a "transgender ban," but the Court found that it instead discriminated based on gender dysphoria rather than gender identity and was permissible. *Id.* at 24; *see also Shanahan*, 917 F.3d at 696 (Wilkins, J., concurring); *id.* at 721–23 (Williams, J., concurring in the result). Transgender members were permitted to serve so long as they did not attempt any "transitioning"—including dressing and complying with physical fitness standards—of the opposite sex.

"[T]he transgender community is not a monolith in which every person wants to take steps necessary to live in accord with his or her preferred gender (rather than his or her biological sex)." *Shanahan*, 917 F.3d at 722 (Williams, J., concurring); *see also id.* at 701 (Wilkins, J., concurring) (same). Being "transgender" is defined "in terms of how one *identifies*, not how one *lives*." *Id.* at 722 (emphasis in original; cleaned up).

### A. The Technical Assistance Document applied *Bostock's* prohibition of gender-identity discrimination to workplace policies disregarding that concept.

The types of workplace policies targeted by the Technical Assistance Document do not discriminate based on gender identity. While *Bostock* held that

16

"discrimination based on homosexuality or transgender status necessarily entails discrimination based on sex," 140 S. Ct. at 1747, the Technical Assistance Document instead addressed "the converse question: whether discrimination on the basis of sex necessarily entails discrimination based on transgender status." *Adams v. Sch. Bd. of St. Johns Cty.*, 3 F.4th 1299, 1332 (11th Cir. 2021) (Pryor, C.J., dissenting), *rev'd by Adams v. Sch. Bd. of St. Johns Cnty.*, — F.4th - —, No. 18-13592, 2022 WL 18003879 (11th Cir. Dec. 30, 2022) (en banc).

The Technical Assistance Document never addressed the question of whether the policies "impose[d] disadvantageous terms or conditions" based on sex. The Second Circuit ruling affirmed in *Bostock* left this question open but indicated the serious possibility that such policies were not covered by Title VII even if discrimination based on sexual orientation and gender identity were forbidden. *Zarda*, 883 F.3d at 118-19 (favorably citing on this ground *Oncale,* 523 U.S. 75, and *Willingham*, 507 F.2d 1084). This distinction is alluded to in *Bostock* itself. *See Bostock*, 140 S. Ct. at 1753 (after noting that its reasoning does not settle the issue of "bathrooms, locker rooms, or anything else of the kind," referring to Title VII's limitation to "distinctions or differences in treatment that injure protected individuals"; while "firing employees surely counts, other policies and practices might or might not qualify as unlawful discrimination") (cleaned up). But if such

17

policies *are* covered by Title VII, then the Technical Assistance Document violated the prohibition on treating employees differently based on gender identity.

Consider standard bathroom norms. All biological males, regardless of their gender identity, may use the men's bathroom; all biological females, regardless of their gender identity, may use the women's bathroom. "Separating bathrooms based on sex dates back as far as written history will take us," long before the concept of gender identity even existed. *Adams*, 3 F.4th at 1328 (Pryor, C.J., dissenting) (cleaned up). These policies do not even consider "gender identity," and therefore cannot be described as discriminating based on that category. *Cf. Raytheon Co. v. Hernandez*, 540 U.S. 44, 54 n.7 (2003) ("[I]f no part of the hiring decision turned on [the applicant's] status as disabled, he cannot, *ipso facto,* have been subject to disparate treatment"). "Separating bathrooms by sex treats people differently on the basis of sex . . . [but] the mere act of determining an individual's sex, using the same rubric for both sexes, does not treat anyone differently on the basis of sex." *Adams*, 3 F.4th at 1325–26 (Pryor, C.J., dissenting).

The Technical Assistance Document purported to allow sex-specific bathrooms (explicitly)[11] and sex-specific dress codes and pronoun usage policies (implicitly) as a general matter. But it then "tr[ied] to work around [those concessions] with a linguistic device." *Shanahan*, 917 F.3d at 723 (Williams, J., concurring in the result) (noting plaintiffs' concession that military may have sex-specific standards but maintaining that "sex" should be determined by subjective gender identity). It is no consolation to tell employers they can still have sex-specific bathrooms (or dress codes or pronoun usage) so long as they allow exceptions for employees who subjectively identify as the opposite sex.

If employers may have separate bathrooms for men and women, as the Technical Assistance Document conceded, then they may also require their employees to comply with that policy. *Cf.* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 30, at 192–93 (2012) ("[W]henever a power is given by a statute, everything necessary to making it effectual or requisite to

---

[11] Indeed, EEOC's existing regulations approve of States requiring employers to have separate bathrooms based on sex. *See* 29 C.F.R. § 1604.2(b)(5) ("Some States require that separate restrooms be provided for employees of each sex. An employer will be deemed to have engaged in an unlawful employment practice if it refuses to hire or otherwise adversely affects the employment opportunities of applicants or employees in order to avoid the provision of such restrooms for persons of that sex.").

attaining the end is implied.") (citation omitted). The same is true for sex-specific dress codes or allowing the use of gendered pronouns as part of standard English in the workplace; such policies do not classify based on the gender identity of employees but disregard that concept altogether, exactly as *Bostock* requires. Indeed, to allow employers to have sex-specific workplace policies, but then require them to allow exemptions only for transgender employees, violates *Bostock*.

## B. THE TECHNICAL ASSISTANCE DOCUMENT WRONGLY PROTECTED PRACTICES CORRELATED WITH PROTECTED TRAITS.

Discrimination based on gender dysphoria or its treatment—which would include conduct such as opposite-sex dress, bathroom usage, or pronoun usage—is not the same as discrimination based on transgender status. *Shanahan*, 917 F.3d at 699–700.

By finding Title VII to prohibit discrimination based on gender identity because it is sex discrimination, *Bostock* forbids employers from discriminating against an employee based on that individual's internal sense of being male or female. *Bostock* does not allow any expansion of this concept to conduct that may be "associated with" transgender status—or any expansion as to sexual orientation beyond the internal orientation of one's sexual attraction. Any such conduct would only be "related [to transgender status] in 'some vague sense,'" or merely have

"some disparate impact" on transgender employees. *Bostock*, 140 S. Ct. at 1742.
Given that many transgender persons make no attempt to socially transition, such
behavior is not "inextricably" related to transgender status, and thus not sufficiently
related to sex to be reached by Title VII. *Id.*

*Bostock*'s treatment of sex discrimination is consistent with longstanding
judicial precedent relating to other protected categories in Title VII and other anti-
discrimination laws. As a result, even if "social transitioning" is *correlated* with
transgender status, it is not protected.

For example, Title VII permits employers to limit the languages spoken in the
workplace, even though an employee's native language is closely bound up with his
national origin and he may have a strong cultural connection with his native
language. *See, e.g., Garcia v. Gloor,* 618 F.2d 264, 268 (5th Cir. 1980); *Garcia v. Spun
Steak Co.*, 998 F.2d 1480, 1489–90 (9th Cir. 1993).

For all categories in Title VII (other than religion), courts have repeatedly
rejected attempts to conflate volitional behavior or attributes that are associated with
protected classes. *See Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 88, 95 (1973) (rejecting
conflation of citizenship or alienage status with Title VII category of national origin);
*EEOC v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018, 1032 (11th Cir. 2016) (noting
"every court to have considered the issue has rejected the argument that Title VII

protects hairstyles culturally associated with race") (collecting cases); *In re Union Pac. R.R. Emp. Pracs. Litig.*, 479 F.3d 936, 942– 45 (8th Cir. 2007) (rejecting conflation of contraception use with Title VII category of sex); *cf. Hazen Paper Co., v. Biggins*, 507 U.S. 614, 608– 14 (1993) (rejecting conflation of age discrimination under ADEA with seniority or pension status).

Consider the Pregnancy Discrimination Act that explicitly added to the definition of "because of sex" discrimination to include "because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e-(k). This was adopted after the Supreme Court had held that such discrimination was not covered by the general prohibition on discrimination "because of sex" in Title VII. *See Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 136–38 (1976). There is no such statute relating to traits or attributes "associated with" transgenderism, so their interpretation is doomed by the "Negative–Implication Canon[:] The expression of one thing implies the exclusion of others (*expressio unius est exclusio alterius*)"). *Reading Law: The Interpretation of Legal Texts* 107.

Even if there were a high correlation between particular "gender expression" and transgender status, even perfect correlation is not enough to constitute discrimination. *See Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2245–46 (2022) (citations omitted).

Simply put, gender identity is not more protected than race or national origin, and EEOC was wrong to do so in the Technical Assistance Document. Practices or conduct associated with transgender status—as opposed to the status of feeling one is "really" the opposite sex—are not protected at all.

## C. *BOSTOCK* DOES NOT FORBID ALL SEX-BASED DISTINCTIONS.

Defendants concede that nothing in the challenged documents indicate that sex-separated bathrooms, dress codes, or sports teams are per se unlawful under Title VII or Title IX." Br. for Appellants at 26. But if such policies are permitted under Title VII post-*Bostock*, then the but-for standard causation it articulates does not forbid all sex distinctions in the workplace.

*Bostock* itself cautioned that

> As sweeping as even the but-for causation standard can be, Title VII does not concern itself with everything that happens "because of" sex. The statute imposes liability on employers only when they "fail or refuse to hire," "discharge," "or otherwise. . . discriminate against" someone because of a statutorily protected characteristic like sex.

*Bostock*, 140 S. Ct. at 1740. To "discriminate against" a person "mean[s] mean treating that individual worse than others who are similarly situated," and "the difference in treatment based on sex must be intentional." *Id.*

Justice Gorsuch's concurring opinion in *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1735–36 (2018), illuminates what he means by

this in *Bostock*. There, he reasoned that Jack Phillips had no intent to discriminate based on sexual orientation when he refused to bake a cake for a same-sex wedding. *Id*. at 1735–36 (Gorsuch, J., concurring). Justice Gorsuch noted a distinction between the foreseeable effects of Mr. Phillips' conduct on the same-sex couple and "actual proof of intent to discriminate on the basis of membership in a protected class." *Id*. at 1737. *Bostock*, of course, notes that Title VII requires actual intent to discriminate. Justice Gorsuch also previews his use of "inextricably tied" to a protected trait to describe conduct towards a protected class,[12] *id*. at 1736, a test which he finds Mr. Phillips's actions did not meet and thus did not constitute discrimination based on a protected characteristic. *Id*. at 1735 ("But there's no indication the bakers actually *intended* to refuse service *because of* a customer's protected characteristic") (emphases in original). This illustrates the status-conduct distinction that would come later in *Bostock*.

*Bostock*'s analysis with respect to employment termination does not extend to decisions concerning bathrooms. Discrimination requires treating certain individuals "worse than others who are similarly situated." *Bostock*, 140 S. Ct. at

---

[12] Compare Justice Gorsuch's use of this phrase with "inextricably bound up with sex" to describe the traits protected from intentional discrimination in *Bostock*, 140 S. Ct. at 1742.

1740. Providing separate but "comparable," 34 C.F.R. § 106.33, restrooms for the different sexes does not treat members of one sex worse than members of the other sex. Counsel for the plaintiffs in *Bostock* agreed, stating at oral argument that sex-separated bathrooms are "not discriminatory because" no one is "subjected to a disadvantage." Tr. of Oral Arg. at 12-13, *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731 (2020) (Nos. 17-1618, 17-1623); *see also* Reply Br. for Resp'ts at 19-21, *Altitude Express, Inc. v. Zarda*, 140 S. Ct. 1731 (2020), 2019 WL 4464222, at *19-21; Reply Br. for Pet'r at 23, *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731 (2020), 2019 WL 4464221, at *23 ("Sex-specific dress, bathroom, fitness, or other policies may be justified as bona fide occupational qualifications … and they may not even be discriminatory at all because they do not constitute '*disadvantageous* terms or conditions of employment.'" (emphasis in original) (quoting *Zarda*, 883 F.3d at 118).

Nor are members of one sex "similarly situated" to members of the other sex when it comes to bathrooms, locker rooms, and the like where privacy interests are at stake. While "[a]n individual's homosexuality or transgender status *is not relevant* to employment decisions" about hiring and firing, *Bostock*, 140 S. Ct. at 1741 (emphasis added), *sex is relevant* in contexts such as bathrooms where physiological differences between the sexes matter. "A sign that says 'men only' looks very different on a bathroom door than a courthouse door." *City of Cleburne v. Cleburne*

25

*Living Ctr., Inc.*, 473 U.S. 432, 468-69 (1985) (Marshall, J., concurring in the judgment in part and dissenting in part); *see also United States v. Virginia*, 518 U.S. 515, 550 n.19 (1996) (admitting women to the Virginia Military Institute "would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements").

As to pronoun usage, the Technical Assistance Document did not mandate that employers use a gender-neutral (but awkward and confusing) "they" at all times in the workplace. As Defendants don't think biologically based pronoun usage is inherently discriminatory, it cannot constitute harassing behavior. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 25 (1993) ("When the workplace is permeated with "discriminatory intimidation, ridicule, and insult" Title VII is violated) (citation omitted).

**D.    THE TECHNICAL ASSISTANCE DOCUMENT WRONGLY ATTEMPTED TO IMPOSE ACCOMMODATION REQUIREMENTS.**

While *Bostock* prohibits an employer from discriminating against employees based on sexual orientation or gender identity, the employer is not required to treat homosexual or transgender employees more favorably than other employees. *See Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 259 (1981) (employers not required to give preferential treatment to minorities or women). By requiring

employers to make exceptions to concededly lawful policies for practices "associated with" a particular gender identity, the Technical Assistance Document turned Title VII's prohibition on sex discrimination into an accommodation mandate. There is no textual warrant for requiring accommodations for any aspect of sex discrimination—unlike, for example, religious accommodation. *See* 42 U.S.C. § 2000e(j). The Technical Assistance Document did not address discrimination based on sexual orientation or gender identity as aspects of sex discrimination, as did *Bostock*. Instead, it attempted to require employers to accommodate practices that are purportedly "associated with" transgender status, even though it is well established that "apply[ing] a neutral, generally applicable" policy "can, in no way, be said to have been motivated by" a protected classification and constitute illegal disparate treatment. *Raytheon*, 540 U.S. at 55.

It is helpful to see how the Americans with Disabilities Act defines the term:

The term "reasonable accommodation" may include--

(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

(B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9).

27

That is exactly what the Technical Assistance Document was attempting to do: to require the alteration of the ordinary work rules, facilities, terms, and conditions that apply to all other employees. *Cf. Shanahan*, 917 F.3d at 708 (Williams, J., concurring in the result) (describing the requirement that all servicemembers serve in their biological sex as "declining to make … accommodations for gender transition," rather than "a transgender ban"). But "[f]ailure to provide a reasonable accommodation is a type of unlawful discrimination . . . not generally applicable to all the protected status groups under Title VII, and has been reserved to issues of discrimination on the basis of religion and disability." 1 Barbara T. Lindemann & Paul Grossman, *Employment Discrimination Law* 265 (4th ed. 2007).

Compare the Technical Assistance Document's accommodation mandates with Title VII's well-known accommodation requirement for religion. Title VII defines "religion" broadly to include "all aspects of religious *observance and practice*, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's or prospective employee's religious observance or practice." 42 U.S.C. § 2000e(j) (emphasis added). And Title VII's accommodation requirement, unlike the norm of neutrality for most anti-discrimination provisions, requires preferential treatment for employees based on religious practices:

> Title VII does not demand mere neutrality with regard to religious practices—that they be treated no worse than other practices. Rather, it gives them favored treatment, affirmatively obligating employers not "to fail or refuse to hire or discharge any individual. . . because of such individual's" "religious observance and practice." An employer is surely entitled to have, for example, a no-headwear policy as an ordinary matter. But when an applicant requires an accommodation as an "aspec[t] of religious. . . practice," it is no response that the subsequent "fail[ure] . . . to hire" was due to an otherwise-neutral policy. Title VII requires otherwise-neutral policies to give way to the need for an accommodation.

*EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 775 (2015).

*Bostock*, on the other hand, forbids "favored treatment" based on sexual orientation and gender identity, and thus precludes any requirement of accommodation. None of the other Title VII protected characteristics require accommodation of employees' voluntary "observance[s] or practice[s]," including dress, bathroom usage, or customized language demands. The religious accommodation requirement "reinforce[es] the conclusion that Congress acted deliberately when it omitted" any accommodation requirement from the sex discrimination provision in the same section of the statute. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 354 (2013). Indeed, Congress has explicitly precluded gender dysphoria or transgender status (or homosexuality) as a basis for an accommodation under the Americans with Disabilities Act. *See* 42 U.S.C. § 12211(a), (b)(1). Through the Technical Assistance Document, EEOC seeks to overcome

Congress's deliberate choice to not require accommodations based on these concepts.

Consider pronouns. Standard English usage is that individual pronouns are based on sex, not gender identity—a usage that existed long before the latter concept existed. EEOC does not assert that standard English is forbidden in workplaces in general, but the Technical Assistance Document requires that an exception be made when referring to transgender employees. But it is difficult to think of anything more of a "genuine but innocuous difference[] in the ways men and women routinely interact with members of the same sex and of the opposite sex," *Oncale*, 523 U.S. at 81, than the standard use of the English language.

The Technical Assistance Document would have also produced a host of practical difficulties. Under its approach, employers, judges, and juries would be required to engage in unbounded theorizing about what "real" homosexual or transgender individuals do, speculating about what practices are "associated with" different sexual orientations or gender identities; whether a given employee is of this or that sexual orientation or gender identity; and whether the employee is, by some behavior or practice, engaging in a cultural display associated with that identity, as to which he—but not his co-workers of a different identity—is uniquely entitled. The

result would be the very sort of stereotyping and discrimination that *Bostock* said Title VII forbids.

Unlike with religion, Title VII does not protect "observance[s] or practice[s]" related to sexual orientation or gender identity nor require employers to accommodate such volitional practices—transgender *status* or homosexual *status* alone are protected. "[T]there is nothing in Title VII which requires an employer to allow employees to express their cultural identity." *Spun Steak Co.*, 998 F.2d at 1487.

## Conclusion

The Court should affirm the district court's preliminary injunction order.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

Judd E. Stone II
Solicitor General

Brent Webster
First Assistant Attorney General

Lanora C. Pettit
Principal Deputy Solicitor General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

*/s/ Ryan D. Walters*
Ryan D. Walters
Special Counsel
Special Litigation Division
ryan.walters@oag.texas.gov

Counsel for Amicus Curiae
State of Texas

31

## Certificate of Service

I hereby certify that on January 31, 2023, I electronically filed the foregoing brief with the Clerk of Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system.

*/s/ Ryan D. Walters*
RYAN D. WALTERS

## Certificate of Compliance

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,495 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

*/s/ Ryan D. Walters*
RYAN D. WALTERS