No. 22-5087

⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

## IN THE UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

—————————————

THE STATE OF TENNESSEE, *et al.*,

*Plaintiffs-Appellees,*

v.

UNITED STATES DEPARTMENT OF EDUCATION, *et al.*,

*Defendants-Appellants.*

—————————————

**On Appeal from the United States District Court for the Eastern District of Tennessee, No. 3:21-cv-00308 (Atchley, J.)**

—————————————

**BRIEF OF *AMICUS CURIAE* WOMEN'S LIBERATION FRONT IN SUPPORT OF Plaintiffs-Appellees**

—————————————

Lauren Adams Bone
JACKSON BONE LLP
5215 N Ironwood Rd. STE 202
Washington, WI 53217
Phone: (415) 599-8410
Email: lbone@jacksonbonelaw.com

Counsel for *Amicus Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES                                            iv

INTERESTS OF *AMICUS CURIAE*                                     1

SUMMARY                                                          2

STATEMENT OF THE CASE                                            4

ASSIGNMENTS OF ERROR AND STANDARD OF REVIEW                      4

ARGUMENT                                                         4

I.   WOMEN AND GIRLS REQUIRE SEX SEPARATION IN
     INTIMATE SPACES TO FULLY ACCESS PUBLIC LIFE.               18

     A.  Sex Is Material And Immutable, And Sex Differences Matter In
         Some Circumstances.                                     5

     B.  Violence Perpetration Risk Tracks Sex, Not "Gender Identity."   8

     C.  Men who …                                              13

II.  THE DEFENDANTS RELY ON AN OUTDATED
     INTERPRETATION OF *BOSTOCK*.                               18

A.  Schools Lack A Legitimate Interest In Favoring Gender Identity Beliefs Over Competing Facts, Ideas, And Beliefs.    19

B.  If The Ruling Below Stands It Will Be Used To Punish Students Who Decline To Use "Gender Identity"-Based Speech.    21

III. HARMFUL AND ABSURD RESULTS FOLLOW WHEN COURTS DENY MATERIAL SEX DIFFERENCES.    23

A.  Vulnerable Populations Are At Risk When Courts Give Undue Deference To Medical Fads.    24

B.  Women And Girls Lose Legal Protections When Courts Deny Material Sex Differences.    25

CONCLUSION    30

CERTIFICATE OF COMPLIANCE    32

CERTIFICATE OF SERVICE    33

# TABLE OF AUTHORITIES

**Cases**

*Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 968 F.3d
1286, 1305 (11th Cir. 2020), petition for reh'g en banc pending, No.
18-13592 (Aug. 28, 2020).

*Bostock v. Clayton Cnty.*, 140 S.Ct. 1731 (2020)                                      17

*Chandler, et al. v. Calif. Dept. of Corrections and Rehab.*,
Case No. 1:21-cv-01657 (E.D. Cal., Nov. 17, 2021)                            13, 27

*Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020)   16, 17,
18, 22

*Michael M. v. Superior Court*, 450 U.S. 464 (1981)                              23

*United States v. Virginia*, 518 U.S. 515 (1996)                                    23

**Statutes**

California SB 132, "The Transgender Respect, Agency, and Dignity Act,"


**Other Authorities**

American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders (DSM-5), Fifth ed.* (2013)                    11, 18

American Psychiatric Association, *Gender Dysphoria* (2013), http://bit.ly/2Re1MA5                    11

Burt, C. H. (2020). Scrutinizing the US Equality Act 2019: A feminist examination of definitional changes and sociolegal ramifications. Feminist Criminology, 15(4), 363-409.

Dictionary.com, based on RANDOM HOUSE UNABRIDGED DICTIONARY (2021) 12

Dhejne, C., Lichtenstein, P., Boman, M., Johansson, A. L., Långström, N., & Landén, M. (2011). Long-term follow-up of transsexual persons undergoing sex reassignment surgery: cohort study in Sweden. PloS one, 6(2), e16885.

Drescher, et al., *Expert Q & A: Gender Dysphoria*, https://www.psychiatry.org/patients-families/gender-dysphoria/ expert-q-and-a                    11

Fair Play for Women. (2017, November 9). Half of all transgender prisoners are sex offenders or dangerous category A inmates [Weblog post]. https://fairplayforwomen.com/transgender-prisoners/

Hamm, *Women's Liberation Front Holds Sold-Out Event At Seattle Public*

*Library Despite Bomb Threat, Interruptions, Arrests,*

FEMINISTCURRENT.COM (Feb. 3, 2020)                              28

Jenness, *Transgender Inmates in California's Prisons: An Empirical Study of a Vulnerable Population,* UC Irvine Center for

Evidence-Based Corrections, (2009).

https://cpb-us-e2.wpmucdn.com/sites.uci.edu/dist/0/1149/files/2013/06/

Transgender-Inmates-in-CAs-Prisons-An-Empirical-Study-of-a-Vulner

able-Population.pdf                                              7

Kaltiala-Heino, et al., *Gender dysphoria in adolescence: current perspectives*, ADOLESCENT HEALTH, MEDICINE AND THERAPEUTICS

9, 31–41. (March 2, 2018)                                       12

Katz-Wise, *Gender fluidity: What it means and why support matters*,

Harvard Health Publishing, (2020).

https://www.health.harvard.edu/blog/gender-fluidity-what-it-means-an

d-why-support-matters-2020120321544                             16

Keep Prisons Single Sex, *Data From California Shows That 1/3 Of The Men Seeking To Transfer To Women's Prison Are Registered Sex*

*Offenders, [Weblog post].*

*https://usa.kpssinfo.org/data-from-california-shows-that-1-3-of-the-m*

*en-seeking-to-transfer-to-womens-prison-are-registered-sex-offenders/*

(retrieved Jan 31, 2023)                                                                 8

Keep Prisons Single Sex, *Males in Women's Prisons: Convictions &*

*Sentences, [Weblog post].*

*https://kpssinfo.org/males-in-womens-prisons-convictions-sentences/*

(retrieved Jan 31, 2023)                                                                 7

MILLER-KEANE ENCYCLOPEDIA AND DICTIONARY OF MEDICINE, NURSING, AND

ALLIED HEALTH (7th ed. 2003)                                                       3

Nuttbrock, et al., *A Further Assessment of Blanchard's Typology of*

*Homosexual Versus Non-Homosexual or Autogynephilic Gender*

*Dysphoria*, ARCHIVES OF SEXUAL BEHAVIOR 40(2) (April 2011)            11

Sawyer, *et al.*, *Mass Incarceration: The Whole Pie 2022,* Prison Policy

Iniative, (2022). https://www.prisonpolicy.org/reports/pie2022.html    7

Slatz, *USA: Almost 50% of Trans Inmates in Federal Custody for Sex*

*Offences,* 4W, (2022).

https://4w.pub/50-of-trans-inmates-in-federal-custody-for-sex-offences/

Uniform crime reporting handbook: UCR. (2004-2019) [Washington,

D.C.: U.S. Dept. of Justice, Federal Bureau of Investigation] [Web.]

Retrieved from the Library of Congress,

https://ucr.fbi.gov/crime-in-theu.s/2019/crime-in-the-u.s.-2019.

Women's Liberation Front, *National Poll Reveals Majority Of Voters*

*Support Protecting Single-Sex Spaces,* (2020).

*https://womensliberationfront.org/news/national-poll-support-for-wo*

*mens-spaces* (retrieved Jan 31, 2023)

## INTRODUCTION AND INTERESTS OF *AMICUS CURIAE*[1]

*Amicus curiae* is the Women's Liberation Front ("WoLF"), a nonprofit organization of radical feminists dedicated to protecting, advancing, and restoring the rights of women and girls. Members of WoLF live, work, and attend or teach in schools across the United States, in Plaintiff states and in the Sixth Circuit. WoLF's interest in this case stems from its goals of empowering and protecting the safety and privacy of women and girls and preserving women's sex-based civil rights; goals which are thwarted when women and girls must shrink away from public life, including school and outside employment, due to lack of access to single-sex spaces.[2]

Women's hard-earned rights are threatened by the agency policies currently being enjoined; policies that embrace the vague concept of

---

[1] No counsel for a party authored this brief in whole or in part, and no party, party's counsel, or any person other than *amicus curiae* or their counsel contributed money intended to fund preparation or submission of this brief.

[2] *Amicus* uses "sex" throughout to mean "the fundamental distinction, found in most species of animals and plants, based on the type of gametes produced by the individual," and the resulting classification of human beings into those two reproductive classes: female (women and girls) or male (men and boys). *See* "Sex," MILLER-KEANE ENCYCLOPEDIA AND DICTIONARY OF MEDICINE, NURSING, AND ALLIED HEALTH (7th ed. 2003); *id.*, "Male," *id.*, "Female," https://medical-dictionary.thefreedictionary.com/sex.

"gender identity" in a manner that overrides statutory and Constitutional protections that are based explicitly on "sex." In doing so, each Defendant not only ignores its obligation, but also cedes its own ability to protect women and girls from sex-based discrimination by proclaiming that women are not permitted to exclude males from any space or activity, thus threatening their physical safety and undercutting their access to public life.

As a radical feminist organization, WoLF locates the root source of sexual oppression in the biological differences between males and females, and it seeks to address the ways in which female sexual and reproductive capacity and the unique physical characteristics of the female body are leveraged for the purpose of exploiting and abusing women and girls. Proponents of the concept of "gender identity" (especially those who seek to conflate that amorphous idea with the distinct concept of sex in law and policy) ignore this reality, instead basing their view of sex on stereotypes while ignoring and outright denying biological reality. To do so, they spend untold amounts of money, time, and effort to manufacture messaging and lobbying guides which all teach how to convince people that, actually, it is men and boys

who are exploited and abused by biological reality, with women and girls standing between them and the female-only spaces and resources to which they are entitled. People intuitively reject this notion; few people believe there is no need whatever for clear distinctions between males and females in law and policy.

## ARGUMENT

## I.    WOMEN AND GIRLS REQUIRE SEX SEPARATION IN INTIMATE FACILITIES TO FULLY ACCESS PUBLIC LIFE.

Courts have long recognized that the sexes are "not similarly situated in certain circumstances," due to innate and enduring physical differences between male and female physiology. *Michael M. v. Superior Court*, 450 U.S. 464, 469 (1981); *United States v. Virginia*, 518 U.S. 515, 533 (1996). Government decision makers that ignore necessary and appropriate distinctions between men and women (when relevant) build unworkable public policy which tends to disproportionately harm women and girls.

Governmental prohibitions on the exclusion of males from female-only intimate facilities do not aim to foster greater access or equal opportunity to any woman or girl covered under the mandates of

Title IX or Title VII. Instead, these agency actions impose self-identification of sex onto sex-separated intimate facilities solely to suit the subjective and idiosyncratic sensibilities of male individuals desiring access to such facilities. If separation of the sexes in intimate facilities serves no legitimate purpose, then there is no reason for members of either sex to insist on entering and using facilities designated for members of the opposite sex.

Men and boys need and deserve privacy on equal grounds to women and girls, but it is the latter group who *require* single-sex facilities to remain safe from violence perpetrated by the opposite sex. "*[W]hen a female is beaten, raped, or murdered, it is nearly always perpetrated by a male.*" Dec. of Callie Burt in Supp. of Pl. Opp. to Mot. to Dismiss at 1, ¶5, *Janine Chandler, et al. v. California Dept. of Corr. and Rehab., et al.*, E.D. Cal. Case No. 1:21-cv-01657-JLT-HBK (May 31, 2022) (citing FBI data)   The admission of any particular male into a female-only space does significantly reduce his own personal risk of victimization because, "*[w]hen a male is beaten, raped, or murdered, it is also nearly always perpetrated by a male.*" *Id.*

To the extent such policies do offer any benefit to those male

4

individuals (such as a reduction in their risk of violent victimization), it is at the expense of every woman and girl using that facility. As such, these actions lack any legitimate governmental or educational purpose.

### A. Men are more likely to violently offend; Women are more vulnerable and suffer unique consequences

The meaning of sex is both objective and longstanding. Sex is observed and recorded – not "assigned" – at or before birth by qualified medical professionals, and it is an exceedingly accurate and reliable categorization.

Although people's lives and personalities are not determined by their sex, their sex is always determined by their biology. Nowhere is the immutability of sex more apparent than in the medical context. Regardless of whether any particular woman *identifies with* her reproductive capacity, it remains true that only female humans are capable of carrying eggs and gestating infants, while only males are capable of producing sperm needed to fertilize eggs. *See* "Gamete," MERRIAM-WEBSTER.COM DICTIONARY,

https://www.merriam-webster.com/dictionary/gamete; Lehtonen, et al., Gamete competition, gamete limitation, and the evolution of the two

sexes, MOLECULAR HUMAN REPRODUCTION, Vol.20, No.12 pp.

1161–1168, (2014), https://pubmed.ncbi.nlm.nih.gov/25323972/

Although people of both sexes are vulnerable to sexual assault, only

women can be forcibly impregnated through rape. *Id.* While men may be

indirectly affected, only women's bodies are directly, physically

regulated by laws concerning abortion, *in vitro* fertilization, and

miscarriage.

### B. Rates of perpetration of violent crime correspond closely with sex as determined at birth, not subjective "gender identity."

"Available evidence reveals that crime, and especially violence

perpetration, tracks sex not gender identity. The best evidence, which

comes from a robust longitudinal study in Sweden, finds that

transwomen (trans-identified males) offend at a rate statistically

indistinguishable from non-trans males and significantly higher than

that of females." Dec. of Callie Burt in Supp. of Pl. Opp. to Mot. to

Dismiss at 1, ¶5, *Janine Chandler, et al. v. California Dept. of Corr. and*

*Rehab., et al.*, E.D. Cal. Case No. 1:21-cv-01657-JLT-HBK (May 31,

2022) (citing Dhejne, C., Lichtenstein, P., Boman, M., Johansson, A. L.,

Långström, N., & Landén, M. (2011). Long-term follow-up of

6

transsexual persons undergoing sex reassignment surgery: cohort study in Sweden. PloS one, 6(2), e16885. "This study found that males who identify as transwomen and transition with hormone treatment and/or genital surgeries offend at a rate that is no different from other (non-trans) males and is significantly higher than that of females." *Id.* "That is, females are no less vulnerable to crime, including violent crime and sexual assaults, perpetrated by trans-identified males (transwomen and non-binary males) than by non-trans males." *Id.* Furthermore, this claim that trans-identified males pose no greater threat to females than the threat that females pose to other females is belied by the criminal records of incarcerated trans-identified males in California and other jurisdictions including the U.K. Public records reveal that incarcerated trans-identified males are equally, if not more likely, to be convicted of sexual offenses.*Id.* at 3, ¶ 7. "To not think that predatory, voyeuristic males will use gender identity access to prey upon females in prisons and jails ignores the fact that they already have." *Id.*

Violent crime – especially serious assault, rape, and homicide – is committed by a fairly small proportion of the male population. Ingraham, *10 percent of the population commits 63 percent of the*

*homicide,* The Washington Post, (2015),

https://www.washingtonpost.com/news/wonk/wp/2015/06/18/10-percent-of-the-population-commits-63-percent-of-the-homicide/; Sawyer, *et al.,*

*Mass Incarceration: The Whole Pie 2022,* Prison Policy Initiative, (2022).

https://www.prisonpolicy.org/reports/pie2022.html. It is not an insult to

say that a man who identifies himself as female or as trangender is,

nonetheless, a man.

We do not have female-only spaces because *all* men do these things - but

rather because *some* men do, and such men do not typically announce or

otherwise make apparent their intentions.

### C.    Incarcerated men who self-identify as women commit more sex crimes in prison (against both men and women) compared to male inmates generally.

The studies cited in the foregoing section provide strong evidence

that cosmetic genital surgeries and long-term cosmetic use of feminizing

drugs and hormones do not statistically reduce a man's risk of criminal

perpetration, including violent crime. *Amici* are aware of no study

which  suggests that his risk is *higher* than the general male

population; merely that these medical interventions do not have a statistically significant impact at all.  *See* Dhejne, *et al.*, 2011.

This is not true in the correctional setting, for reasons that are not well-understood. In the UK, Freedom of Information requests revealed that 50% of trans-identifying male prisoners had at least one conviction for a sexual offense. This is more than twice the rate of the general male prison population of England and Wales, where only about about 18% of inmates are convicted sex offenders, according the UK Ministry of Justice. Notably, the sexual offense rate for female prisoners was only two percent. Fair Play for Women, *Transgender women exhibit a male-type pattern of criminality: Implications for legislators and policy makers, (*Dec. 12, 2020),

https://fairplayforwomen.com/transgender-male-criminality-sex-offences/ .

A similar pattern has also been revealed in the United States. FOIA requests revealed in 2021 that 48% of trans-identified male federal inmates are in custody for sex offenses, compared to 11% of the general male population. In comparison, only five percent of trans-identified female inmates are sex offenders (*see* Slatz, 2022). In

California, documents from the California Department of Corrections and Rehabilitation disclose that over one-third of the men then 287 male inmates seeking transfer to women's facilities last year were registered sex offenders (*see* Keep Prisons Single Sex 2022).

It is obvious why male access to women's spaces, especially in places like prisons, is a poor and dangerous idea. The concept of "transgender" is rarely defined in a coherent way, but increasingly in culture, and increasingly in law, it is defined explicitly by self-definition - that the sole criterion permitting you to legally self-identify as whichever sex you like is "I am because I say I am." This practice may make it incredibly easy for predatory men to access women by pretending to "be trangender," but the concept of "pretending" does not exist under this statutory scheme.

For reasons unknown, the transgender-by-self-ID category tends to have among its ranks an enormous number of dangerous, serious offenders, including in several different jurisdictions - around half are sex offenders. The Federal Bureau of Prisons' 2021 report on the Prison Rape Elimination Act found that among federal prisoners, transgender identity was - for the first time ever - formally correlated to higher risk

factor for perpetration of sexual offenses. The report, also noting that the year-over-year increase is growing, specifically links it "to the continued increase in self-identification by this population" (*see* BOP, 2021).

## II.    THE DEFENDANTS RELY ON OUTDATED INTERPRETATIONS OF BOSTOCK

WoLF submits that the federal government's collective interpretation of *Bostock* is wholly unreasonable and undermines the purpose of laws and policies aimed at combatting sex discrimination.

It has been well-described and documented how the actions of these federal agencies, under the auspices of executive action, are based on this flawed understanding of *Bostock*.

To the extent this document was offered to support the school's interpretation of its policy it fell far short of the mark, as the agency's opinion letter had already been withdrawn, rendering the document obsolete. In any event, neither document carried any legal or persuasive weight.

A. **Agency Action That Relied On a Now-Reversed Federal Decision (And Explicitly Rejected That Now-Adopted Dissent) Renders It Moot**

Despite recent incursions (*see*, generally, *Grimm, supra*), students still have a material interest in accessing safe and dignified accommodations for performing intimate bodily functions on school premises, such as using the toilet, undressing, and showering. These policies disrespect and harm students by forcing them to share communal bathrooms and shower rooms with members of the opposite sex.

If the ruling below is reversed, the women and girls impacted by this action who feel uncomfortable being partially clothed, toileting, and/or showering with members of the opposite sex, will not only be required to suffer the experience, but suffer it in silence because there is no longer a safe way to speak up - no longer  any right to single-sex spaces. This creates an illusion of consent, and the illusion of a harmless and beneficial policy.  The preliminary injunction is necessary because it creates a safe status quo in which litigants can challenge these policies with the full benefit of participation by women in the

those states, and by the intervenors.

## III.  GENDER IDENTITY IDEOLOGY IS SPURIOUS AND INCONSISTENT

### A.  Pro-gender messaging is elite and artificial

In contrast to the significant partisan polarization this issue inspires, public opinion is more diverse and more in favor of single-sex spaces. For example, 2020 polling found cross-partisan support for single-sex spaces, including 67% support for preventing men or boys who identify as transgender from competing in women's athletics. Support for single-sex spaces was higher among Black and Hispanic voters, and middle and lower class workers (*see* Women's Liberation Front 2020).

The Transgender Law Center ("TLC") has done its own polling. The organization developed messaging to convince people that men should be allowed to play women's sports if they call themselves women. The findings were devastating: No matter the angle, no matter how staunch the ally, the more a person learned about the subject, the more they rejected male athletes playing on female-only teams. ASO

13

Communications, *Messaging Guide - Transgender Youth and the Freedom to Be Ourselves: Building Our Choir with a Race Class Gender Narrative,* (2022).

The TLC Messaging Guide suggests that people hesitant to end 50 years of Title IX might be convinced by comparisons to the historic struggle of Black women, which they call a "Race Class Gender Narrative." For example, suggested messaging includes: "Call out how the villains exploit divisions across races. ex. 'We see this in how schools tell Black kids how to keep their hair.' Ironically, messaging "that named how elite competitions question and disqualify Black women athletes" as a comparison to trans-identified males being excluded from female sports resulted in a loss of support among Black adults, who apparently do not find that narrative compelling. *Id.*.

It was not long ago that proponents of gender-identity policies sought to hide their tactics, or at least keep them quiet, due to how widely-unpopular the impacts of these policies are among the general population In 2019, a document by Dentons Law Firm advised transgender organizations on best practices for winning legal support. The techniques suggested include "the limitation of press coverage and

exposure" because public exposure on these topics has resulted in "opposition." The report claims this is because "much of the general public is not well informed about trans issues, and therefore misinterpretation can arise," Dentons, *Only Adults? Good Practices In Legal Gender Recognition For Youth,* (2019). To the contrary, the TLC Messaging Guide provides evidence that the opposition to "gender identity" policies becomes more pronounced the more one learns of its true nature and implications.

**B.    Gender Identity Ideology Is Rooted In Idiosyncratic And Quasi-Spiritual Beliefs.**

A core tenet of the gender identity belief system is that the sole criterion for determining whether someone is transgender is that they say they are. The only defining characteristic of a person claiming legal transgender status (which includes neologisms like "gender-fluid" and "genderqueer") is the demand to be legally recognized as one's subjective gender identity instead of one's sex. Any person, at any time, and for any reason may claim to possess a gender identity, so there is no inherent limit to the potential size of the transgender category, nor can

gender identity or transgender status be described as stable or discrete characteristics.

Nor is a person's self-described "gender identity" alleged to always be the same across a lifespan (*see* Katz-Wise, 2020). This leads to a perplexing ritual: first a person "comes out" as "transgender" which suggests a disembodiment, a separation of the free mind from the trappings of the sexed body.[3]

Because they lack grounding in material reality, claims based on gender identity must always ride on the coattails of other distinct classes of people whose status is determined by a material state of being. Sex, homosexuality or bisexuality, are each defined by a material and verifiable state of being that is objectively defined. Protecting people from discrimination on the basis of any of these characteristics requires a recognition that sex is real and verifiable, not subjective.

---

[3] It also expressly appropriates a term many gay and bisexual people use to describe their experience of telling friends and family about their sexual orientation–a characteristic that has objective implications: who one dates, who one marries, the way in which one may have children, etc.

In contrast, protecting transgender status requires people to *deny* the basic fact that sex in humans is dictated by biology at the moment of conception, and remains immutable throughout life. It therefore becomes necessary for proponents to claim that sex is "assigned at birth".

"Gender dysphoria" is itself a controversial diagnosis, encompassing a disparate collection of psychiatric conditions previously described in the medical literature as transsexualism, transvestic disorder, fetishistic transvestitism, and gender identity disorder. *See* Nuttbrock, et al., *A Further Assessment of Blanchard's Typology of Homosexual Versus Non-Homosexual or Autogynephilic Gender Dysphoria*, Archives of Sexual Behavior 40(2), 247-57 (April 2011), https://www.researchgate.net/publication/40806058; *see also* Drescher, et al., *Expert Q & A: Gender Dysphoria*, https://www.psychiatry.org/patients-families/gender-dysphoria/expert-q-and-a; and American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders (DSM-5), Fifth ed.* (2013), available at https://www.academia.edu/32447322/DIAGNOSTIC_AND_STATISTICAL_MANUAL_OF_MENTAL_DISORDERS. The diagnosis applies to

*anyone* who experiences significant distress at the thought of one's sex, including people who do not identify as transgender. American Psychiatric Association, *Gender Dysphoria* (2013), http://bit.ly/2Re1MA5 (discussing the diagnostic criteria contained in the DSM-5). For example, "crossdressers, drag queens/kings or female/male impersonators, and gay and lesbian individuals" commonly experience gender dysphoria. WPATH Standards at 7. In short, while doctors diagnose "gender dysphoria" using psychiatric clinical criteria, a person's "gender identity" is a subjective experience that is self-identified and unverifiable. The diagnosis is invoked when present, but dismissed as irrelevant when absent.

Importantly, a diagnosis does not mean the individual possesses an immutable characteristic of "being transgender." Quite to the contrary, "[e]vidence from the 10 available prospective follow-up studies from childhood to adolescence . . . indicates that for ~80% of children who meet the criteria for [gender dysphoria in childhood], the [gender dysphoria] recedes with puberty." Kaltiala-Heino, et al., *Gender dysphoria in adolescence: current perspectives*, ADOLESCENT HEALTH, MEDICINE AND THERAPEUTICS 9, 31–41. (March 2, 2018), available at

https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5841333/. In other words, a diagnosis of gender dysphoria only describes an individual's subjective state of mind at the time of diagnosis; it has no bearing on that individual's vital and immutable sex characteristics.

It is no exaggeration to say that the current wave of "gender identity" advocacy involves an explicit rejection of objective scientific fact. That was on full display last year when a coalition of lawyers led by the Transgender Law Center filed a motion to intervene in WoLF's lawsuit challenging California's SB 132, a law that allows male inmates, including convicted rapists and murderers, to be housed in women's facilities. In their motion, Proposed Intervenors, Transgender Gender-Variant & Intersex Justice Project et al., "deny the allegation that 'it is precisely a combination of anatomy, genitalia, and physical characteristics that differentiate men from women,'" and further "deny the allegation that 'human beings' are 'sexually dimorphic, divided into males and females each with reproductive systems, hormones, and chromosomes that result in significant differences between men[] and women[.]'" Proposed Answer to Plaintiffs' Complaint for Declaratory and Injunctive Relief, *Chandler, et al. v. California Dept. of Corrections*

*and Rehabilitation, et al.*, No. 1:21-cv-01657-JLT-HBK, Dkt. 19-8 (E.D. Cal., May 9, 2022), available at

https://www.womensliberationfront.org/chandler-v-cdcr-press. While people are free to engage in this type of science denialism in the privacy of their homes, it has no place in federal law.

Spiritual beliefs provide many people with a sense of purpose and a way to understand the world. But these beliefs can neither be imposed on the public nor used to justify profound changes in evidence-based, longstanding, common sense practices like single-sex correctional facilities.

Schools and universities, public institutions, and even federal agencies abandon fact and reason in favor of a fashionable but completely irrational and harmful ideology. In doing so, they elevate the subjective beliefs and interest of a very few over the competing interests and privacy and safety rights of all others, particularly the rights of vulnerable women and girls. We urge this Court to affirm the preliminary motion.

**CONCLUSION**

20

For the reasons stated above, the Women's Liberation Front respectfully requests the Court to affirm the preliminary injunction.

Respectfully submitted this 31st day of January, 2023.

 */s/ Lauren Adams Bone*
Lauren Adams Bone
JACKSON BONE LLP
5215 N Ironwood Rd. STE 202
Glendale, Wisconsin 53217
Phone: 415-599-8410
Email: lbone@jacksonbonelaw.com

*Counsel for Amicus Curiae*
*Women's Liberation Front*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B). Exclusive of the sections exempted by Fed. R. App. P. 32(f), the brief contains XXX words, according to the word count feature of Word for Microsoft 365. This brief also complies with Fed. R. App. P. 32(a)(5)-(6) because it was prepared using Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/ Lauren Adams Bone*
Lauren Adams Bone
*Counsel for Amicus Curiae*
*Women's Liberation Front*

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of January, 2023, I electronically filed the foregoing Brief of *Amicus Curiae* Women's Liberation Front In Support of Plaintiffs-Appellees with the Sixth Circuit using the CM/ECF system, which will accomplish service on all participants in the case through the Court's electronic filing system.

 /s/ Lauren Adams Bone
Lauren Adams Bone
*Counsel for Amicus Curiae*
*Women's Liberation Front*